# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|   |   |   |
|---|---|---|
| **THE UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Cr. No. 05-100-1 (RWR)** |
| | : | |
| **ANTWUAN BALL,** | : | |
| also known as "Twuan," | : | |
| also known as "Big Ant," | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID
## OF SENTENCING FOR ANTWUAN BALL

The United States of America, by and through its attorney, the United States Attorney for the

District of Columbia, herewith files this memorandum in aid of sentencing for defendant Antwuan

Ball.  In support of this memorandum, the government relies on the following points and authorities

and any other points and authorities that may be cited at the sentencing hearing.

### Procedural and Factual Background

Since March of 2005, a total of eighteen individuals have been indicted in connection with the

instant case.  Fifteen of these defendants were indicted on March 22, 2005, and charged with, among

other things, participation in a narcotics conspiracy, as well as individual acts of drug-dealing and

weapons possession, in violation of 21 U.S.C. §§ 841, 846, and 18 U.S.C. §§ 922(g)(1), 924(c)(1), and

other statutes.  Subsequently, on November 29, 2005, the grand jury returned a superseding indictment

against fifteen defendants – twelve who remained from the initial March 2005 group, plus an

additional three defendants.  This superseding indictment charged these fifteen defendants with the

same counts contained in the March 2005 indictment as well as participation in a RICO conspiracy, as

1

well as individual acts of violence, including four murders, in violation of, among other things, 18 U.S.C. §§ 1962, 1963 and 1959.

Prior to the instant trial in this case, twelve of the eighteen defendants either pled guilty or were found guilty after trial.  Notably, the following seven defendants each pled guilty to RICO Conspiracy (count two of the superseding indictment), admitted participation in the charged narcotics conspiracy (count one as well as racketeering act one), and further represented to this Court that after reviewing the superseding indictment in this case, the allegations set forth in that document were either true or they had no information to dispute or disprove the allegations: Raymond Bell, aka Santuce; Marcus Smith, aka Mick; Gerald Bailey, aka Chow-Wow; Luscious Fowler; Philip Wallace; Jasmine Bell, aka Jazz; Daniel Collins, aka DC.  In addition, each of these defendants admitted that he was accountable for distributing or possessing with intent to distribute more than 1.5 kilograms of crack cocaine.

In addition, co-defendant Newett Ford went to trial before this Court in June of 2006.  After a four-day trial, Mr. Ford was convicted (after just 3 hours of jury deliberation) of the narcotics conspiracy which was charged in count one of the superseding indictment.[1]  Mr. Ford was subsequently sentenced by this Court to 263 months of incarceration.

As the Court is aware, Mr. Ball, along with five other defendants, went to trial in this case.[2] The jury acquitted the six defendants of counts one and two, and returned guilty verdicts on a number

---

[1]     Prior to Mr. Ford's trial, the government had dismissed the RICO Conspiracy charge (count two) against him.

[2]     The six defendants who went to trial before this Court from February though November of 2007 – Antwuan Ball, aka Twuan, Big Ant; David Wilson, aka Cool Wop; Desmond Thurston, aka Dazz; Joseph Jones, aka JoJo; Gregory Bell, aka Boy-Boy; and Dominic Samuels, aka Don, Dom  –  represent the final six of the total of eighteen defendants indicted in this case.

of other charges, including a guilty verdict for the first-degree double-homicide of Ronnie Middleton and Sabrina Bradley.  There was evidence presented at trial that this double-homicide was committed as part of an ongoing turf war between the Congress Park Crew charged in the superseding indictment and one of its rivals, the 1-5 Mob.  The jury deadlocked on only two counts – each relating to co-defendant Dominic Samuels's August 27, 2002 murder of Jamel Sills, aka Black (counts 37 and 50).  On January 24, 2008, Mr. Samuels pled guilty before this Court to manslaughter while armed, admitting that he had, in fact, shot and killed Jamel Sills in Congress Park on August 27, 2002, just as was alleged in the indictment in this case, and just as several trial witnesses had attested to and/or testified at the trial.

Defendant Ball was convicted by the jury of one count of Distribution of 5 Grams or More of Crack Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii) (Count 22).  Accordingly, Mr. Ball faces a sentence of not less than 5 years nor more than 40 years incarceration.  *See* 21 U.S.C. § 841(b)(1)(B).

The United States Probation Office prepared a Pre-Sentence Investigation Report ("PSI") for Mr. Ball and computed that pursuant to the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), Mr. Ball has a total offense level of 43, a criminal history category of III, and a recommended Guidelines range for imprisonment of 480 months.  *See* PSI Paragraphs 98, 104, and 142.[3]

## Legal Standards

The Supreme Court opinion in *United States v. Booker,* 543 U.S. 220 (2005), held, *inter alia,* that the Guidelines are no longer mandatory and therefore "effectively advisory."  *Id.* at 245, 259.  *See*

---

[3]     The Guidelines range for someone who has an offense level of 43 and a criminal history category of III is life imprisonment.  However, since Mr. Ball faces a maximum of 40 years incarceration by statute, the statutorily authorized maximum sentence is the recommended Guidelines sentence.  *See* U.S.S.G. § 5G1.1.

*also Gall v. United States*, No. 06-7949, 552 U.S. at ----, 128 S. Ct. 586, 594-96 (2007); *Kimbrough v. United States,* No. 06-6330, 552 U.S. at ----, 128 S.Ct. 558, 570-71 (2007).  Accordingly, the Sixth Amendment's bar against judicial fact-finding does not apply to Guidelines sentencing.  Although judges are still required "to take account of the Guidelines together with other sentencing goals," without the provision that makes "the relevant sentencing rules . . . mandatory . . . ," the statute falls outside [the constitutional] requirement."  *Booker,* 543 U.S. at 259; *id.* at 252. (citations omitted).

In *United States v. Dorcely*, 454 F.3d 366 (D.C. Cir.), *cert. denied*, 127 S. Ct.691 (2006), the District of Columbia Court of Appeals, interpreting *Booker*, held that a sentencing court may base a sentence on unconvicted conduct without offending a defendant's Sixth Amendment right to trial by jury.  *Id.* at 371.  Indeed, as the Court of Appeals pointed out, every circuit that has reviewed the issue, post-*Booker*, has held that a district court may still consider acquitted conduct while applying the guidelines in an advisory manner.  *Id*. (citing cases). The Court of Appeals found two aspects of the *Booker* holding to be instructive.  First, the Court in *Dorcely* pointed out that the Supreme Court noted in *Booker* that "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant," and that a sentencing court has "broad discretion in imposing a sentence within a statutory range." *Id.* at 372 (citing *Booker*, 543 U.S. at 233).  Second, the Court noted that the *Booker* remedial opinion concluded that 18 U.S.C. § 3661, which provides that no limitation shall be placed on the information concerning the background, character, and conduct of the convicted person that a sentencing court may receive and consider, posed no Sixth Amendment problem and permits a sentencing court to consider acquitted conduct.  *Id.* (citing *Booker*, 543 U.S. at 251); *see also United States v. Watts*, 519 U.S. 148, 151 (1997).

Thus, the *Dorcely* court concluded, "[u]nder *Booker,* consideration of acquitted conduct

violates the Sixth Amendment only if the judge imposes a sentence that exceeds what the jury verdict authorizes." *Id.* at 371.  Here, defendant Ball's conviction on the count of distribution of 5 grams or more of crack cocaine authorizes a sentence of "not less than 5 years nor more than 40 years" incarceration.  Hence, any sentence which is within the 5-to-40 year range "plainly falls within the authorized sentence." *Dorcely*, 454 F.3d at 372; *see also Booker*, 543 U.S. at 244 ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."); *see also* U.S.S.G. § 5G1.2.

In *Dorcely*, the Court of Appeals also held that a sentencing court may base a sentence on acquitted conduct without offending a defendant's due process rights under the Fifth Amendment. 454 F.3d at 372.  The Court noted that the Supreme Court has ruled that "possession of the fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant - if not essential - to [the judge's] selection of an appropriate sentence." *Id.* (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). Thus, the Supreme Court has ruled that a sentencing judge may consider past criminal behavior of a defendant that did not result in a conviction without violating due process. *Dorcely*, 454 F.3d at 372 (citing cases).  In this regard, in making its sentencing determination, a court may consider acquitted and untried conduct, as well as conduct for which a jury deadlocked.  *See United States v. Lawson*, 494 F.3d 1046, 1056-58 (D.C. Cir. 2007); *United States v. Bras*, 483 F.3d 103, 107-08 (D.C. Cir. 2007).

When determining relevant conduct, the sentencing court is to make its findings by a preponderance of the evidence.  *See Dorcely*, 454 F.3d at 372-73 ("[W]e reject Dorcely's claim that a sentencing court's use of acquitted conduct must be based not on a preponderance of the evidence but instead beyond a reasonable doubt."); *see also Watts*, 519 U.S. at 157; *Bras,* 483 F.3d at 107; *see*

*generally* U.S.S.G. § 6A1.3.[4]

The District of Columbia Court of Appeals has held that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness." *Dorcely*, 454 F.3d at 376 (citations omitted); *see also Gall*, 128 S. Ct. at 597 ("If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness.")[5]. As the Supreme Court recently clarified in *Gall,* "the Guidelines should be the starting point and the initial benchmark" in determining a sentence. *Gall,* 128 S. Ct. at 596 ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"). District courts must therefore "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough,* 128 S. Ct. at 570 (quoting *Booker*, 543 U.S. at 245-46).

Indeed, sentencing does not end with consideration of the Guidelines. A sentencing court must also consider the non-guideline sentencing factors enumerated under 18 U.S.C. § 3553(a), *Lawson*, 494 F.3d 1057-58. *See also United States v. Price*, 409 F.3d 436, 442 (D.C.Cir. 2005); *Booker* 543 U.S. at 261 ("Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.").[6]

---

[4]     The sentencing judge need not consider only evidence which has been subject to cross-examination. In addition, the rules of hearsay as well as other provisions of the Federal Rules of Evidence are not applicable. *Bras*, 483 F.3d at 108 (citing cases).

[5]     This principle was just recently re-articulated by the District of Columbia Court of Appeals in *United States v. Melvin B. Brown*, ---- F.3d. ----, slip op. at 4 (No. 03-3102, Feb. 29, 2008).

[6]     Section 3553(a) requires the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a)(2). Although that provision is "often cited by defendants as if it were an admonition to be lenient," *United States v.*

Section 3553(a) lists, *inter alia*, the following factors relevant to a defendant's sentence: "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed to reflect the seriousness of the offense, and to promote respect for the law, and to provide just punishment"; "to afford adequate deterrence"; "to protect the public from further crimes of the defendant"; "to provide the defendant with needed training and medical care . . . [and] to avoid unwarranted sentence disparities" among similarly situated defendants. *Id.* A district court is not required to refer specifically to *each* factor listed in Section 3553(a), "nor is it required 'to explain *sua sponte* why it did not find [a particular] factor relevant to its discretionary decision [if] a defendant has not asserted the import of [that] factor.'" *Bras*, 483 F.3d at 113 (*quoting Simpson* 430 F.3d at 1186-87 (emphasis in original). As the Supreme Court noted in *Gall*, "[t]he sentencing judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Gall*, 128 S. Ct. at 597.

## Argument

Mr. Ball stands before this Court as someone who spent the better part of the past 15 years possessing and dealing large quantities of crack cocaine, threatening and intimidating witnesses, carrying guns, lying under oath, and committing murder and attempted murder, not to mention also leading a violent crew of fellow criminals who committed these same criminal acts. For these reasons, the government respectfully submits that the recommended Guidelines sentence of 480 months

---

*Navedo-Concepcin*, 450 F.3d 54, 58 (1st Cir. 2006), it merely directs the district court to impose a sentence that is consistent with the factors in Section 3553(a)(2), most of which "hardly connote less punishment." *Id.* Moreover, the "not greater than necessary" language does not require that the sentencing court, "having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate." *Id.*; *see also United States v. Maciel-Vasquez*, 458 F.3d 994, 995 (9th Cir. 2006) ("neither *Booker* nor our circuit precedent impose any requirement that the court state why it chose a particular sentence rather than other potential sentences").

incarceration is the appropriate sentence to impose on Mr. Ball.[7]

One additional important point is worthy of mention at this time.  Despite the frequent use of the term "acquitted conduct" in case law and elsewhere, much of the conduct considered by the PSI writer and/or contained in the instant government memorandum is not acquitted conduct.  Rather, it is either uncharged conduct or conduct upon which the jury never voted.  Indeed, the jury acquitted on the conspiracy counts because they did not unanimously agree, beyond a reasonable doubt, with the government's theory of the partnership among the charged defendants.  The jury never voted, one way or another, if Antwuan Ball dealt or possessed with intent to distribute over 1.5 kilograms of crack cocaine in Congress Park.  They were simply never asked to consider this question.  Similarly, the jury never voted, one way or another, on whether Mr. Ball attempted to kill Bradley Carter, threatened and intimidated witnesses, or lied under oath during a Superior Court grand jury murder investigation.

What remains, therefore, is an ample record before this Court to apply its discretion – with guidance from the U.S.S.G. and Section 3553(a) – in imposing the appropriate sentence to a person who spent most of his adult life harming the Congress Park community (as well as neighboring communities).

---

[7]        The count that Mr. Ball was convicted of carries a statutory maximum sentence of 40 years incarceration.  That means that when it passed the Uniform Controlled Substances Act, Congress determined that there would exist at least some defendants who warranted a 40-year sentence for committing the crime for which Mr. Ball has been convicted.  As set forth and detailed more fully below, the government respectfully submits that Mr. Ball represents just such a defendant.  As set forth below, Mr. Ball's drug dealing, violence, and leadership of a violent crew for well over a decade make him a candidate for receiving the maximum sentence on his conviction.

I.      **The United States Probation Office correctly calculated that
under the U.S.S.G., Mr. Ball faces a sentence of 480 months
of incarceration.  This benchmark sentence is reasonable.**

Mr. Ball's PSI recommends a sentence of 480 months.  This calculation is largely based on Mr.

Ball's drug-dealing, possession of weapons, witness intimidation, and criminal history.[8]  Indeed, a vast

majority of this Guidelines calculation is driven by Mr. Ball's own personal conduct, having nothing to

do with his participation in the charged conspiracy in this case.[9]  Indeed, it is important to note what

this Guidelines calculation does *not* take into consideration: Mr. Ball's attempted murder of Bradley

Carter; Mr. Ball's murders of Troy Lewis and Trevon Shaw; Mr. Ball's perjury in the Jamel Sills grand

jury investigation; and it does not even take into consideration Mr. Ball's participation in the charged

conspiracies in this case.  (These additional factors also support the imposition of the 480-month

sentence recommended by the Guidelines and will be discussed in the next section.)  However, it is

worth underscoring that most of the criminal conduct generating the recommended Guidelines

sentence of 480 months incarceration is virtually entirely based on Mr. Ball's own personal conduct

*vis-a-vis* drugs, guns, threats and criminal history.

---

[8]      Although the PSI writer did not add this to his computations under the Guidelines, he could have also factored in the felony murders of Trevon Shaw and Troy Lewis pursuant to U.S.S.G. Section 2D1.1(d)(1) (cross-referencing Section 2A1.2).  Such computation would have resulted in a base offense level of 38 for this murder.  Mr. Ball's participation in these murders is discussed in the next section of this memorandum.

[9]      As set forth below, Mr. Ball is personally responsible for the distribution of at least 1.5 kilograms of cocaine base, for possessing weapons, and for his criminal history.  These factors alone would lead to an offense level of 40 and a criminal history category of III, leading to a recommended Guidelines range of incarceration of 365 months to life.  Mr. Ball's offense level grows from a 40 to a 44 due to his leadership of the charged conspiracy.  As set forth below, there is ample evidence on this record for the Court to make a finding that Mr. Ball lead this conspiracy and is therefore subject to an additional 4-point enhancement.

**A.    Mr. Ball is directly accountable for the distribution or possession
with the intent to distribute more than 1.5 kilograms of crack cocaine.**

The record in this case is replete with sworn testimony establishing that Mr. Ball distributed

and/or possessed with the intent to distribute well more than 1.5 kilograms of crack cocaine during the

many years that he spent in the Congress Park neighborhood.  This 1.5 kilogram figure is reached

based on the direct, personal acts of Mr. Ball himself – not based on any agency and/or co-conspirator

theories.[10]

As set forth below, the Court has heard sworn testimony regarding Mr. Ball's crack cocaine

dealing from a variety of sources: customers, fellow drug dealers, and suppliers.  All of this testimony

demonstrates that Mr. Ball personally dealt in excess of 1.5 kilograms of crack cocaine in Congress

Park during the better part of the 1990s through and until his arrest in April of 2004.

**1.    Season Wood**

Season Wood testified at trial in this case that in July of 2001, Antwuan Ball had told Wood

that he had some "good" crack cocaine to sell.  Based on Ball's comments, on July 20, 2001, Wood

called Mr. Ball on his cellular telephone in order to set up the drug deal.  Based on this phone

conversation, Ball and Wood met in an alley in Congress Park and discussed Ball selling Wood one-

half of an ounce of crack cocaine for $600.  2/28/07 Tr. at 935-36.  The audiotape of this initial

recorded conversation was marked and introduced into evidence as **Government's Exhibits 319** and

**319.1**.  Not only can Mr. Ball be clearly heard discussing selling crack cocaine to Wood, he also makes

_____

[10]      As set forth later in this memorandum, there is ample evidence before this Court
to make a finding that Mr. Ball not only was a member of the charged conspiracy (and is
therefore also responsible for all of the reasonably foreseeable acts committed by his co-
conspirators, _see generally_ U.S.S.G. Section 1B1.3(a)), but also its leader.

a clear reference to waiting for his security check on this same tape.  2/28/07 Tr. at 939.[11]

Mr. Wood later testified that on July 26, 2001, he again had a discussion with Antwuan Ball regarding Ball selling him one-half of an ounce of crack cocaine for $600.  This conversation was also by cell phone.  As a result of this conversation, Wood and Ball met in the same alley in Congress Park where they had previously met.  At this meeting, Ball gave Wood over 11 grams of crack cocaine in exchange for $600.  2/28/07 Tr. at 944-49.  The following exhibits relating to this controlled purchase were marked and admitted into evidence in this case: **Government Exhibits 320** (unabridged audio of controlled purchase); **320.1** (abridged audio of controlled purchase); **320.2** (11.6 grams of crack cocaine); **320.2A** (DEA-7); and **320.4** (photo of crack cocaine).  On this tape, Mr. Ball can be heard saying that he is giving Mr. Wood four "short" eight-balls.  *Id.* at 944. Also during this taped conversation, Mr. Ball can be heard admonishing Mr. Wood to be careful talking too much while they are in Ball's car, because Ball's car was recently "in the shop." *Id.* at 950.

Mr. Ball was convicted of count 22 in the superseding indictment, which was this July 26, 2001 controlled purchase to Season Wood.

Mr. Wood testified that a few months later, on October 23, 2001, he spoke to Antwuan Ball inside of Ball's gray Ford Expedition truck regarding the sale of more crack cocaine.  This conversation also happened inside of the Congress Park neighborhood.  During this conversation, Mr. Ball discussed selling Mr. Wood "an O" – or ounce – of crack cocaine.  Also during this conversation, Mr. Ball is heard to ask Mr. Wood if Wood wanted the ounce of crack "half and half" – meaning in two separate half-ounce quantities.  2/28/07 Tr. at 953-57.  The audiotape of this conversation was admitted into evidence as **Government Exhibits 321 and 321.1**.

---

[11]     Mr. Ball went to great lengths at trial to establish that he worked in some capacity as a security officer in Congress Park from approximately 2001 through April of 2004.

During cross-examination, Mr. Wood was not significantly impeached by defense counsel regarding his accounts of the drug sales and conversations with Mr. Ball regarding crack cocaine. 3/1/07 Tr. at 1160-64; 1176-80; 1185-89.  Copies of the relevant transcript pages of Mr. Wood's trial testimony are attached hereto at **Exhibit A.**

###    2.    Robert Crawford

Witness Rob Crawford testified regarding several subjects, including his crack cocaine dealings with Antwuan Ball in the 1999-2001 time period.  Mr. Crawford's testimony provides additional evidence regarding large amounts of additional crack cocaine that Ball was selling around the same time he was dealing with Season Wood.  Copies of the relevant transcript pages of Mr. Crawford's trial testimony regarding crack cocaine are attached hereto at **Exhibit B.**

Mr. Crawford testified that during the 1999-2001 time period, he would sell "anywhere from 62 [grams] to an eighth of a key" of crack cocaine to a customer of his named Andre Scott, aka Cheese.  4/16/07 Tr. at 7136-37.  Scott was a regular customer of Crawfords and would purchase these amounts from him "[m]aybe two, three times a week." *Id.* at 7137.  Crawford went on to explain that in approximately 2000 he learned that some of the crack cocaine he was selling to Scott, Scott was then reselling to Mr. Ball.  *Id.* at 7137-38.  Shortly after learning this, Mr. Scott arranged a meeting between Ball and Crawford at Mr. Ball's urging.  *Id.* at 7137-38.  Mr. Crawford's initial meeting with Antwaun Ball happened in Congress Park.  Crawford testified: "He [Mr. Ball] just letting me know that he had been buying crack cocaine from me through Cheese for some time, and he feel as though Cheese was charging him too much. . . . Well, he [Mr. Ball] was giving Cheese [$]1,750 or sometimes [$]1,800, to come to me and purchase a 62. . . . He [Mr. Ball] was letting me know it had been going on for quite some time.  He never gave me how long, but he said it was for some time.  He said he had been trying to meet me but Cheese wouldn't let him." *Id.*

12

After this initial face-to-face meeting between Crawford and Ball, Ball and Crawford arranged, and completed, a sale of 62 grams of crack cocaine to Ball later that day.  Ball paid $1,600 for the crack.  4/16/07 Tr. at 7140-42.  After this initial encounter, Crawford and Ball "met almost every day" because Crawford "wanted to get to know him [Ball] on a business level."  *Id.* at 7142.

Mr. Crawford explained that he and Ball "got pretty close" in part because: "I [Crawford] was trying to get to know him for business-wise.  I seen the potential that he [Ball] could make some money.  And if he make some money, I make money."  Crawford explained that he reached this conclusion because, "[a] few times I met him [Ball] around Congress Park, I seen the respect that he carried around there."  *Id.* at 7143.  At another point, Mr. Crawford explained, "he [Ball] had a lot of respect in the alley from a lot of the young guys around there [Congress Park]. . . . The younger guys, just some of the ways wanted to be like him, always wanted to be around him."  *Id*. at 7145.  At one point, Crawford brought up the possibility of partnering with Ball to sell crack cocaine together in Congress Park.  Ball declined working with Crawford in such a partnership by explaining: "He [Ball] was *telling me he got the alley, that's his spot, that's his strip.*"  *Id*. at 7145-46 (emphasis added).

Crawford testified that after he learned that Ball had been purchasing crack cocaine from Crawford indirectly (*i.e.,* with Scott as the middleman) he and Ball then had "anywhere from four to five" additional sales of crack cocaine where they dealt with each other face-to-face.  4/16/07 Tr. at 7144.  Each of these additional sales were for between 62 grams of crack up to an eighth of a kilogram of crack.  *Id*. at 7144-51.  Mr. Crawford provided some detailed testimony regarding the particulars of some of these additional sales.  *Id.*

A conservative estimate of Mr. Crawford's trial testimony attributes at least 700 grams of crack cocaine to Mr. Ball.  Assuming that Mr. Crawford only had four face-to-face dealings with Antwuan Ball, and assuming two of these dealings were for a "62" (*i.e*., 62 grams) and the other two dealings

were for an eighth of a kilogram of crack, leads to a finding of 360 grams of crack cocaine (2 x 60 (grams) = 120 (grams) plus 2 x 120 (grams) = 240 grams; 120 (grams) + 240 (grams) = 360 grams). And further assuming that Crawford and Ball had at least this many dealings indirectly – *i.e.,* when they were dealing with Scott as the intermediary – before they were introduced, leads to an additional 360 grams.  Thus, a conservative estimate of Mr. Ball's crack cocaine dealings with Mr. Crawford, alone is over 700 grams of crack.

### 3.    Steve Marsh

Witness Steve Marsh testified reluctantly at trial.  The Court will recall that while Marsh had previously been a cooperating witness for the government in other cases, he had been sentenced in those cases, and was serving his period of supervised release when subpoenaed to testify in this case. Mr. Marsh's testimony also provides additional evidence regarding large amounts of additional crack cocaine that Ball was selling around the same time he was dealing with Season Wood and Rob Crawford.  Copies of the relevant transcript pages of Mr. Marsh's trial testimony regarding Mr. Ball's cocaine dealings are attached hereto at **Exhibit C.**.

Mr. Marsh testified regarding his dealings with Antwuan Ball during the 1999-2001 time period while Marsh was on the run because of an indictment that had been returned against him in Virginia.  Marsh initially did not know much about the Congress Park neighborhood, and was staying with his friend "Cody" who cut hair in Congress Park.  4/30/07 Tr. at 9176-79.  At the time, Marsh had already established himself as a significant drug dealer in other neighborhoods.

As Marsh began to familiarize himself with the Congress Park neighborhood, he quickly identified Antwuan Ball as "a person of interest . . . [b]ecause of his influence."  4/30/07 Tr. at 9177-78.  As Marsh explained: "Well, when you're in a position like I was in at the time, you got to – it's always good to align yourself with somebody who has influence when you're dealing drugs, especially

in the neighborhood that I'm in." *Id.* at 9178.  Marsh went on to explain that during this time period –

1999, 2000, and until Marsh's arrest in May of 2001 – he developed a relationship with Ball because "I

could help him [and] he could help me. . . .  I can get drugs and he can help me get rid of them or make

it to where I can get rid of them." *Id.* at 9180.

Steve Marsh testified that on several occasions, Antwuan Ball purchased large quantities of

powder cocaine from Marsh.  4/30/07 Tr. at 9182-85.  Marsh stated that the amount Ball bought from

him was "[u]sually eighths of keys, which is like four ounces . . . [f]our ounces and some change." *Id.*

at 9183.  Marsh estimated that he sold this quantity of cocaine to Ball "a handful of times." *Id.*  Marsh

also testified that in addition to one-eighth kilograms of cocaine, he also sold quantities of 62 grams of

cocaine to Ball.  *Id.* at 9184-9185.[12]

In addition to the powder cocaine that Marsh sold to Ball, Marsh testified that Ball also sold

crack cocaine to Marsh "a couple of times," which Marsh explained meant "no more than four times."

*Id.* at 9188.  Marsh also testified that "two [or] three times[]" Ball sold powder cocaine to Marsh

during this same time period.  *Id.* at 9188-89.[13]

Marsh also testified that on one or two occasions, he saw Antwuan Ball cook powder cocaine

into crack cocaine inside of Ball's apartment.  4/30/07 Tr. at 9191-93.  When asked about how much

cocaine Ball cooked up, Marsh stated: "Oh, I don't remember no exact number.  But I'm sure, you

know, 50, 60 grams, try to make it something more than it was." *Id.* at 9192.  Marsh and Ball then

---

[12]     Marsh testified that in addition to powder cocaine, he sold Ecstacy pills to Ball "[a] couple" of times.  Each of these times he sold Ball approximately 100 pills at a price of "[b]etween seven and 10 dollars a pill." 4/30/07 Tr. at 9185-86.  Marsh explained that the resale value of these pills he sold to Ball was between 20 and 25 dollars per pill.  *Id.*

[13]     The record is not clear as to the amounts of crack cocaine and powder cocaine Mr. Ball sold to Mr. Marsh in these instances.  However, in light of Mr. Marsh's testimony regarding other weights he and Mr. Ball dealt with, it is reasonable to assume that the amounts involved in each of these transactions were at least 62 grams.

shared and split up the cocaine that Ball had cooked up.  *Id.* at 9192-9193.

A conservative estimate of Mr. Marsh's trial testimony attributes at least 600 grams of powder cocaine and at least 300 grams of crack cocaine to Ball.  Assuming Marsh sold Ball an eighth of a kilogram of powder cocaine five times, this leads to a finding of 600 grams (5 x 120 (grams) = 600 grams).[14]  In addition, assuming Ball sold "62s" of crack to Marsh four times, this leads to an additional 240 grams of crack cocaine (4 x 60 (grams) = 240 (grams)).  Furthermore, Marsh testified about the one or two times he and Ball cooked up 50 to 60 grams of powder cocaine to "try and make it something more than it was" 4/30/07 Tr. at 9192.  This, at a minimum, should increase the 240-gram crack cocaine figure up to 300 grams.

### 4.  **Bobby Capies**

Witness Bobby Capies also testified regarding Mr. Ball's crack cocaine dealing.  His testimony put in context Ball's dealings with Crawford, Marsh and Wood by describing Ball's drug dealing activities immediately beforehand and in the 1990s.  Copies of the relevant transcript pages of Mr. Capies' trial testimony regarding Ball's crack cocaine dealings are attached hereto at **Exhibit D.**

Bobby Capies testifed that in the mid 1990s several people would congregate inside of "Mom's" house on 13th Place, S.E.  Capies further testified that "[e]veryone around there would sell coke" in Congress Park.  3/29/07 Tr. at 4899-00.  When pressed as to who "everyone" included, Capies identified the following individuals: "Wop, Twan [one of Ball's aliases], Jo-Jo, Don, Dazz, Jazz, Santu, Boy-Boy."  *Id.* at 4900.

Mr. Capies testified that in approximately 1995, he and co-defendant Dominic Samuels purchased cocaine from Antwuan Ball.  Capies testified that while Samuels usually would purchase

---

[14]     This does not even factor in the "two or three times" that Ball sold powder cocaine to Marsh.  4/30/07 Tr. at 9188-89.

the crack cocaine from Ball on behalf of both Capies and Samuels, "a few times" Capies went with Samuels to purchase the cocaine from Ball.  3/29/07 Tr. at 4895-98.  Capies estimated that when he and Samules purchased the crack cocaine from Ball it was a "half once, it's $500."  *Id.* at 4896.

Bobby Capies testified that around the same 1995 time period, he spent time in Mom's apartment on 13th Place.  When he was inside of the apartment, he saw people selling crack and he also saw weapons inside of the apartment.  4/2/07 Tr. at 5173-74.  Capies explained that during some of the times that he was fronted crack cocaine from Antwuan Ball, he would meet with Ball inside of Mom's place because that is where Ball stored his crack cocaine.  *Id.* at 5174.

Bobby Capies testified regarding an incident in 1995 when he and Samuels prepared to make a purchase of crack cocaine from Ball.  Capies got into Ball's van in Congress Park.  "Froggy" was also inside the van with Ball.  Ball then showed Capies and Samuels a block of powder cocaine that Ball said was a half-kilogram worth of cocaine.  3/29/07 Tr. at 4901-03.  Ball then said to Capies and Samuels that, "I'm going to be nice in a minute," which suggested to Capies that Ball intended to cook up the powder and then sell the remaining crack to Capies and Samuels, as well as others.  *Id.* at 4903-04.  Approximately two days after this meeting inside of Ball's van, Capies and Samuels met with Ball and purchased a half of an ounce of crack cocaine from Ball, which was their "normal" amount at the time to purchase from him.  *Id.* at 4908-10.

At another point in his testimony, Bobby Capies was asked who the main people were whom he bought his wholesales from during 1992-1996, and he replied: "Boy-Boy, Kairi, and Antwuan."  3/29/07 Tr. at 4969-71.  At another point of his testimony, Bobby Capies testified that during 1992-1996, he saw the following individuals "hustling" crack cocaine in the circle of Congress Park: "Doo-Doo . . . Jo[J]o, Antwuan, Kairi, Boy-Boy, Fat Tony.  3/29/07 Tr. at 4973-74; 4978-80.

Bobby Capies testified that in approximately 1997/1998, he was with Antwuan Ball in Ball's

car on several occasions when Ball sold "weight" of crack to various individuals.  4/2/07 Tr. at 5274-76.  Capies did not see money exchanged, but did see crack exchanged from Ball to these other individuals, suggesting that the crack was being fronted to them.  The individuals that Capies saw Ball front in this manner were: "Doo-Doo, Lucious, S-Curl, and a dude named Rob."  *Id.* at 5275-76.

Mr. Capies' trial testimony conservatively attributes approximately another 800 grams of crack cocaine to Mr. Ball.  As an initial matter, Capies testified regarding seeing a half of a kilogram of crack in Ball's possession when he was with "Froggy" in 1995.  In addition to this half kilogram, Capies testified that he would often get fronted crack cocaine from Antwuan Ball during 1992 through 1996 (including at least five times in 1995 alone when Ball fronted him a half-ounce of crack); conservatively estimating fifteen half-ounce sales during this time period leads to an additional 180 grams of crack (15 x 12 (grams) = 180 (grams)).  In addition, Capies testified regarding several other instances in 1997/1998 when he saw Ball selling "weight" to at least four different people.  Assuming Ball sold an ounce of crack only one time to each of these four people an additional 100 grams (4 x 25 (grams) = 100 (grams)) should be attributed to him.  Moreover, none of these calculations takes into account any of Capies' additional testimony regarding him seeing Ball regularly hustling on his own at the Circle and at Mom's house during 1992-1996.[15]

###### 5.    Kairi Kelliebrew

Antwuan Ball's younger cousin, Kairi Kelliebrew, also testified regarding Ball's crack cocaine dealings throughout the 1990s and thereafter.  Copies of the relevant transcript pages of Mr. Kelliebrew's trial testimony regarding Ball's crack cocaine activities are attached hereto at **Exhibit E.**

---

[15]    These estimates also do not take into consideration the two ounces of crack cocaine that Ball took from David Wilson's apartment in January of 2001 on the day that he pistol-whipped Bobby Capies.  This incident is discussed at greater length later in this memorandum.

Kairi Kelliebrew testified that he began selling crack cocaine in Congress Park when he was around 13 or 14 years old.  5/7/07 Tr. at 10112.  Among the first people that he bought his crack cocaine from were Antwuan Ball, Gregory Bell and Joseph Jones.  *Id.* at 10113.  Mr. Kelliebrew testified that around 1994, he saw Antwuan Ball selling and cutting up crack cocaine in the family's house on 14th Place, S.E.  In addition, he testified that "they always had guns" in the house. 5/7/07 Tr. at 10117-19.  Kelliebrew further clarified that also around this same time period – 1994/1995 – he would get quarter ounces of crack cocaine from Antwuan Ball.  *Id.* at 10119.  Sometimes, Ball would sell the crack to Kelliebrew; other times, Ball would "front" the crack to Kelliebrew.  *Id.* at 10120-22.

Kairi Kelliebrew testified that he was released from jail around 2001, and shortly thereafter he "started dealing with Antwuan" Ball again.  5/7/07 Tr. at 10215-17.  Specifically, Kelliebrew testified that shortly after getting released, Ball called Kelliebrew over to his house at Benning Road, SE.  When he did, Ball gave two ounces of crack cocaine as well as a .357 pistol to Kelliebrew.  The next day, Kelliebrew saw Ball, and offered to return the crack to him, but Ball said Kelliebrew should keep it.  Kelliebrew explained that he then sold the crack cocaine.  After Kelliebrew sold these two ounces, Ball fronted him another two ounces of crack cocaine.  Kelliebrew again sold these two ounces of crack, and Ball then fronted Kelliebrew two more ounces of crack.  *Id.* at 10217-19; 10227-28.

Mr. Kelliebrew's testimony conservatively leads to at least an additional 150 grams of crack cocaine being attributed to Ball.  Assuming that from 1992 through 1995, Ball fronted Kelliebrew quarter-ounces of crack cocaine only ten times, leads to an additional 70 grams (10 x 7 (grams) = 70 (grams)).  Added to this would be the two separate times that Ball fronted Kelliebrew two ounces of crack cocaine in around 2001 (4 x 25 (grams) = 100 (grams)).

In short, conservative estimates from the testimony of Wood, Crawford, Marsh, and Capies account for over 1950 grams of crack cocaine and 600 grams of powder cocaine being attributable to

Ball.  Accordingly, Ball is, as the PSI writer found, accountable for the distribution of over 1.5

kilograms of crack cocaine.

**B.      Pursuant to U.S.S.G. Section 2D1.1(b)(1), Mr. Ball should receive
a two-point enhancement for possession of a dangerous weapon.**

Several witnesses testified about how Mr. Ball possessed guns while he was in Congress Park,

including but not limited to 2001, when he made his July 26, 2001 controlled purchase to Season

Wood.

**1.      Larry Browne**

Witness Larry Browne testified that a few days after he assisted David Wilson in the February

2001, murder of Sam Phillips in front of the Hope Village halfway house, he went back to the

Congress Park neighborhood.  At that time, he saw Antwuan Ball in a vehicle with his mother.  3/5/07

Tr. at 1418-21.  Ball told Browne that he "had something that he might be interested in," and asked

Browne to wait while he dropped off his mother.  Ball returned shortly thereafter, and then sold

Browne a loaded semi-automatic "Uzi" submachine gun for $500 plus approximately $100 worth of

marijuana.  *Id.* at 1421-24.

Mr. Browne testified that he also purchased a P-89, 9 millimeter Rueger semi-automatic pistol

from Antwuan Ball during the summer of 2000, for $350.  Browne further testified that this 9

millimeter Rueger was the same weapon that he provided to David Wilson on the day Mr. Wilson shot

and killed Sam Phillips.  3/5/07 Tr. at 1443-46.[16]  On cross-examination, Mr. Browne agreed that in his

written proffer before Judge Lamberth, he stated that this second weapon was a .9 millimeter Baretta,

rather than a .9 millimeter Rueger.  Browne testified that he caught this error before the plea was

finally executed before Judge Lamberth, and told his attorney about it; however, he testified that he

---

[16]      There is no evidence tying Ball to the Sam Phillips murder.

signed the plea documents with the wrong brand (*i.e.,* Beretta instead of Ruger) any way because no one had changed the language.  *Id.* at 1535-37.

Copies of the relevant transcript pages of Mr. Browne's trial testimony relating to Ball's weapons possession are attached hereto at **Exhibit F.**

### 2.     Bobby Capies

Bobby Capies testified that from 1995-1996, he personally observed Antwuan Ball carrying weapons – specifically, .9 millimeter Sig-Sauers.  3/29/07 Tr. at 5066-68.  In fact, this testimony is corroborated by the fact that Ball was arrested around this time (once in 1995 and once in 1996) for carrying a pistol without a license.  *See* PSI at Paragraphs 73, 100, and 116.

Bobby Capies testified at length regarding the incident when Antwuan Ball pistol-whipped him inside of David Wilson's apartment at 1313 Congress Street, S.E., in January of 2001, with Phil Wallace and David Wilson also present.  *See, e.g.,* 4/3/07 Tr. at 5451-54; 5456-62; 5467-70.  During this violent encounter, Ball not only smacked Capies across his mouth with the weapon, knocking out a front tooth, but also led Capies to the back bedroom of the apartment, and had him put a pillow to his head, as Ball prepared to kill him, before ultimately changing his mind.  Ball stole approximately two ounces of crack cocaine, $3800, as well as two pistols from the apartment during this incident.  4/3/07 Tr. at 5523.

The day after Antwuan Ball pistol-whipped Capies, the two men saw each other outside in Congress Park.  Ball attempted to speak to Capies, but Capies avoided a face-to-face encounter at this time.  When Capies saw Ball across the street on this day, he saw Ball holding the same two guns that he had stolen from the apartment the day before.  4/3/07 Tr. 5479-82.

Mr. Capies also testified about how he agreed to hold onto an SK-style rifle and a .45 machine gun for Antwuan Ball in the June/July 2001 time period.  4/4/07 Tr. at 5698-5770.

Copies of the relevant transcript pages of Mr. Capies' trial testimony regarding Ball's weapon possession are attached hereto at **Exhibit G.**

>        3.        **Robert Crawford**

Rob Crawford also corroborated the testimony of Bobby Capies regarding the time that Ball pistol-whipped Capies in January of 2001. Crawford saw Ball later during the day of the pistol-whipping, and could clearly see that Ball had "[a] disturbed look, and angry look, like something was wrong." 4/16/07 Tr. at 7158. Ball then told Crawford: "'I just had to fuck these young-uns up around here . . . they think they going to take over the strip.'" *Id.* Ball further explained to Crawford: "'I just had to knock . . . Munya's [*i.e.* Capies'] teeth out of his mouth. . . . Wop and Munya, they supposed to be planning on killing me.'" *Id.* at 7158-59.

On cross-examination, Crawford was again asked questions regarding his encounter with Ball on the day that he pistol-whipped Capies' tooth out. In addition to confirming that Ball appeared "disturbed" with "an angry look," Crawford also testified that he saw Ball "had a gun hanging out." 4/17/07 Tr. at 7472-73.

Copies of the relevant transcript pages of Mr. Crawford's trial testimony regarding Ball's weapon possession are attached hereto at **Exhibit H.**

>        4.        **Steve Marsh**

Steve Marsh also testified that during the time that he knew Antwuan Ball  – 1999 through 2001 – he personally saw Mr. Ball with various weapons, specifically, "[h]andguns, semiautomatic weapons." 4/30/07 Tr. at 9194-95. Marsh, himself, supplied Ball with "a gun or two." *Id.* at 9195; 9204.

Steve Marsh also testified that Ball had admitted to him that he (Ball) had pistol-whipped Bobby Capies. During his testimony, Marsh provided the account of the incident that Ball had told

him.  The details of this account were consistent with the account provided by Bobby Capies.  4/30/07

Tr. at 9210-12.

Copies of the relevant transcript pages of Mr. Marsh's trial testimony regarding Ball's weapon

possession are attached hereto at **Exhibit I.**

In sum, the evidence of Ball's possessing of dangerous weapons is legion.  Four separate

witnesses testified to Ball's possession of an array of different guns, including a .45 caliber machine

gun, an SK-style assault rifle, and various makes of semi-automatic handguns.  As such, the PSI writer

correctly gave Ball a two-point enhancement pursuant to U.S.S.G. Section 2D1.1(b)(1).

### C.   Pursuant to U.S.S.G. Section 3B1.1(a), Mr. Ball should receive a two-point enhancement for obstruction of justice.

Antwuan Ball has obstructed justice through a variety of methods: intimidation, threats,

planning to harm suspected cooperating witnesses, and committing perjury.  The two examples that

follow occurred after the trial in the instant case began.  Other examples abound and will be discussed

later in this memorandum.

### 1.   Antwuan Ball threatened witness Bobby Capies at trial while Capies was testifying in the instant case.

At the conclusion of the morning court session on March 29, 2007 (which was the first day of

Bobby Capies' trial testimony), Capies received a threat from Antwuan Ball.  Capies immediately

reported to the government that after the jury and the Court left the courtroom for the lunch-break, but

before Capies was taken from the courtroom by the Marshals, Ball made eye contact with Capies and

then mouthed a threat to him.  3/29/07 Tr. at 4950-57.  This incident was immediately reported to the

Court, who then instructed the lead courtroom Marshals to investigate.  An investigation was

conducted and a report was provided to the Court and all counsel.  The Court ultimately decided, in an

abundance of caution, to preclude the government from inquiring of Mr. Capies regarding this threat

during its continued direct examination of him because of the potential prejudicial affect that it might

have on the trial.  Copies of some of the relevant transcript pages relating to Ball's threat of Capies  are

attached hereto at **Exhibit J.**

> **2.      Antwuan Ball threatened witness**
> **Antonio Pleasant during the trial in the instant case.**

In June of 2007, as the government was winding down its case-in-chief, it considered calling as

a witness a young man named Antonio Pleasant.  Mr. Pleasant would have testified regarding, among

other things, certain conversations that he had with Antwuan Ball while both men were housed

together in the Southwest #3 housing unit of D.C. Jail in 2004.  Specifically, Mr. Pleasant was

prepared to testify regarding several conversations he had with Mr. Ball regarding the murder of

someone named "Trevon."  Mr. Pleasant would have testified that Ball told him: (i) Trevon had

disrespected him; (ii) Antwuan and someone named "C-Wopp" met up with Trevon in Congress Park

to talk; (iii) Antwuan and C-Wopp killed Trevon; (iv) Antwuan used to be close to Trevon, and was

still close with Trevon's mother; (v) there was "a little girl" who had incriminated Antwuan, but

Antwuan thought the statements would get suppressed; (vi) Antwuan was making up an alibi that he

was in an office talking to someone on the phone when the shooting happened; and (vii) C-Wopp's

alibi was going to be that he was in a limousine at the time of the murder.[17]

Mr. Pleasant's anticipated testimony was discussed, on the record, on several occasions in June

of 2007, out of the presence of the jury, because of issues relating to the scope of appropriate *Giglio*

disclosures for Mr. Pleasant.  In addition to being a cooperating witness, Mr. Pleasant had a history of

emotional and psychological issues, and was a juvenile when he received some of his treatment.  Mr.

Pleasant's attorney, Santha Sonenberg, also addressed the Court concerning these issues.  During the

---

[17]      During another conversation, Mr. Pleasant also overheard Dominic Samuels
apologize to Mr. Ball for killing Jamel Sills in Congress Park.

time that this *Giglio* issue was being litigated in court, the government was preparing Mr. Pleasant to testify at trial in the coming few days.  These "prep sessions" took place in the federal district courthouse.[18]

During the days that the government was preparing Mr. Pleasant for his anticipated trial testimony, the government put in a request with the U.S. Marshals Service to have Mr. Pleasant brought from the Correctional Treatment Facility ("CTF") to the federal district courthouse.  At all times, Mr. Pleasant was housed at the 4th floor "cooperator's wing" of CTF, and separation orders were in place for Mr. Pleasant and each of the six defendants on trial in the instant case, including Mr. Ball. These separation orders related not only to housing in jail, but also in the courthouse, as well as during transport to the courthouse.

Despite these separation requirements, due to inadvertent human error, Mr. Ball encountered Mr. Pleasant during prisoner transport to and from the courthouse during the morning of Wednesday, June 13, 2007.  In this encounter, Ball threatened Mr. Pleasant by stating to him that his "blood was already spilled."  Mr. Pleasant immediately notified his attorney, Ms. Sonenberg, as well as the undersigned AUSAs regarding this incident.  Upon learning of this incident, the government made prompt additional efforts to secure Mr. Pleasant's continued safety.

In short, two individuals made prompt reports that Ball threatened them as a result of their status as witnesses in this case.  Therefore, the PSI writer was entirely correct in finding that Mr. Ball should receive a two-point enhancement pursuant to U.S.S.G. Section 3B1.1(a).

---

[18]     Despite preparing Mr. Pleasant to testify, the government ultimately decided – for tactical reasons having nothing to do with Mr. Pleasant's credibility – not to call Mr. Pleasant as a witness at trial.  These tactical decisions had to do with the anticipated length of his cross-examination, the nature of some of the *Giglio* material, and likely obligations to sanitize certain portions of his testimony due to *Bruton* concerns.

**D.      Under the Sentencing Guidelines, Mr. Ball should receive a four-point
         enhancement for organizing and leading the Congress Park Crew.**

There is ample evidence before this Court which demonstrates that Mr. Ball, along with his
fellow co-defendants, knowingly and actively chose to participate in the conspiracies charged in the
superseding indictment in this case.[19]   Moreover, there is strong additional evidence that Mr. Ball was
the leader of this conspiracy.   The existence of the conspiracy, and Mr. Ball's leadership of the
conspiracy, can be demonstrated in several ways: (i) numerous instances from the trial record in this
case; (ii) sworn statements of Mr. Ball himself; and (iii) additional evidence excluded from the jury's
consideration during the trial.

**1.      There is abundant evidence in the trial record proving
         (i) the partnership among the charged Congress Park Crew
         members; and (ii) Antwuan Ball's leadership of that Crew.**

At various times, members of the conspiracy, including Mr. Ball, (i) used the unique code word
"doors" in order to share sales and customers; (ii) chased away drug dealers who were not from
Congress Park; (iii) acted violently towards individuals from rival gangs in other neighborhoods; (iv)
warned each other of the presence of law enforcement; (v) shared stashes; (vi) had common suppliers;
(vii) fronted each other crack cocaine and (viii) shared proceeds from robberies.   What follows are
merely some of the many examples of the partnership in crime that Ball shared with his fellow crew

---

[19]      Numerous defendants have already admitted to factual proffers which formed the
basis for this Court to accept their pleas to RICO Conspiracy.   Similarly, another jury has already
convicted a charged co-defendant, Newett Ford, of being a member of the same conspiracy
brought against Mr. Ball.   Moreover, the jury in the instant case convicted co-defendant David
Wilson of having participated in the August 1998 double-homicide of Ronnie "Squid" Middleton
and Sabrina Bradley.   The motive for this murder was retaliation against the rival 1-5 Mob for the
1993 murder of Congress Park member Maurice Doleman, aka Reecey.   In addition, co-
defendant Dominic Samuels recently pled guilty before this Court and admitted that he, in fact,
killed Jamel Sills, aka Black, as was alleged in the superseding indictment in this case (and just
as witnesses such as Jacques "JT" Powell, Kairi Kelliebrew, and Robert Pough had attested).
These admissions and convictions certainly corroborate the evidence presented at trial that Mr.
Ball, in fact, was a member of a conspiracy in Congress Park.

members, as well as Ball's leadership in this crew.

### *"Doors"*:

• Bobby Capies explained that several members of Congress Park participated in the *"uno dos tres* system" of sharing drug sales for safety reasons as a result of increased violence with 10th Place.  *See, e.g.,* 4/2/07 Tr. at 5337.

• Robert Crawford also testified about seeing the game *doors* being played in Congress Park.  4/18/07 Tr. at 7553-7554.

• Jacques "JT" Powell testified about selling crack cocaine in the 2000 to 2001 time period near "the Lincoln" and "the Circle," and he identified the following people as sharing crack cocaine sales by playing the *uno, dos* "game": "me [Powell], Kairi, Don, Wop, Dazz, Phil, Terrance, Jazz, Santu, Kay-Bay, everybody."  *Id.* at 12215

Copies of the relevant pages relating to "*doors*" are attached hereto at **Exhibit K.**

### *Violence Towards Rivals:*

• Mr. Capies testified regarding an instance in early 1997, where Desmond Thurston told him about how Thurston, Ball, Antonio Roberson, aka LT, and David Wilson, aka Wop, "got in a shootout with some guys with 10th Place."  4/2/07 Tr. at 5308.  Capies further explained: "[Dazz] told me that him, Antwuan, LT, and Wop went down 10th Place to try to creep on them guys, and somebody opened fire on them, which they believe was Steve and Patrick, and they stopped the car and jumped out and opened fire back."  *Id.* at 5309-10; 5308-09.

• Kairi Kelliebrew also testified about the period of time in the late 1990's when Congress Park was beefing with members of rival 10th Place.  Kelliebrew testified that because of the increased violence, many of the drug dealers in Congress Park congregated near "the Lincoln" and the Circle. 5/7/07 Tr. at 10168-69.

Copies of the relevant pages relating to violence towards rivals are attached hereto at **Exhibit L.**

### *Warnings About Law Enforcement:*

• Bobby Capies testified regarding how he and some of his fellow co-conspirators would alert each other of when one of them saw "jumpout" police officers in the area. 4/4/07 Tr. at 5692.

Copies of the pages relating to warnings about law enforcement are attached hereto at **Exhibit M.**

### *Unity Within The Crew:*

- Bobby Capies testified that after Ball pistol-whipped him in January 2001, he gave serious thought to retaliating against Ball by killing him.  In doing so, he tried to enlist David Wilson, however, Wilson balked at the idea.  When asked why he did not retaliate against Ball by himself, Capies explained that he could not do that because: "it would have been me against the Park.  I would have got killed." 4/3/07 at 5526.

Copies of the relevant pages relating to unity within the crew are attached hereto at **Exhibit N.**

### *Chasing Away Threats:*

- Cedric Conner testified regarding an incident in 1999/2000 when he went near the Circle in Congress Park and began selling "hand-to-hand, . . . small quantities[]" so that he could make a little extra money for a trip he was about to take.  4/24/07 Tr. at 8243-44.  After, "making a lot of sales" for about 30 minutes, Desmond Thurston and Daniel Collins, aka DC, approached Conner and, "*told me that I couldn't come around there and take all the money because I don't be out there with them, you know, when they beefing and stuff like that. . . . [DC] told me they built that strip*." *Id*. at 8246-48 (emphasis added).  Conner ignored this request and continued to sell crack in the Circle.  Approximately 25 minutes later, Antwuan Ball drove up to the area. *Id.* at 8249-52.

- Shortly after he ignored Thurston and Collins, Conner then saw them speak to Antwuan Ball, and then right after that, Ball walked across the street to talk to Conner. *Id.* at 8249-52.  When asked what Ball said to him, Conner replied: "We had a conversation and the basis of the conversation was that I didn't really have to be out there and *that was the way that they made their livelihood*." *Id.* at 8283 (emphasis added).  Conner then explained that "I then kind of saw that they went back to where he was and I took that as a warning and I left . . . [because] it could have got ugly." *Id.* at 8254.

- Jacques "JT" Powell testified regarding an incident, in Congress Park, where he and Kairi Kelliebrew pulled a gun and knife, respectively, with the intention of scaring away two people they did not know, who they suspected were about to try selling crack cocaine in Congress Park. 5/22/07 Tr. at 12437-38.

- Donna Brown testified on July 16, 2007, regarding the difficulties she faced as a private security officer working in Congress Park during the 2000 to 2002 time period.  In addition to general resistance she and her Eagle Security colleagues faced working in the neighborhood, she testified that she was threatened by several members of the charged conspiracy, including Desmond Thurston, Gregory Bell and Joseph Jones.  Brown testified that on more than one occasion, Thurston told her that he would kill her.  Gregory Bell made hand gestures in her direction, representing a pistol.

Copies of the relevant pages relating to chasing away threats are attached hereto at **Exhibit O.**

***Harm To Potential Witnesses:***

- Robert Pough further testified that he was present for a conversation with Antwuan Ball, Antonio Roberson, aka LT, and himself where Ball said to Roberson: "[H]urry up, he [Roberson] needed to hurry up and get out of the halfway house so he could start getting rid of some of the guys that he thought was going to flip." 5/17/07 Tr. at 11786-89. Ball further explained that he was aware that the government was working on a 'conspiracy case[.]'" *Id.* at 11787.

Copies of the relevant pages relating to harm to potential witnesses are attached hereto at **Exhibit P.**

***Sharing, Fronting and Partnership:***

- Jacques "JT" Powell testified that between 1995 and 1997, he partnered with Jasmine Bell and Dominic Samuels in buying and selling crack cocaine in Congress Park. During this time period, he also began to purchase crack cocaine from Gregory Bell. Powell estimated that he "was getting like wholesales, eight-balls . . . from him [Bell]." 5/21/07 Tr. at 12195-96. Powell explained that Bell "had wholesale whenever you need it." *Id.* at 12196-97.

- Powell further testified that around 1997/1998, he and Kairi Kelliebrew became close friends. Shortly thereafter, the two of them began pooling their money purchasing crack cocaine, then selling it, and splitting the proceeds. 5/21/07 Tr. at 12207-09. Burke Johnson was one of their suppliers. So was Antwuan Ball. Powell estimated that "probably like four or five times[]" he and Kelliebrew got fronted crack cocaine from Ball. The most they were ever fronted by Ball was "about a half ounce" of crack. *Id.* at 12210-11. Powell explained that getting fronted by Ball was different than getting fronted by Burke Johnson because Ball put a lot of pressure on them to pay back quickly. As Powell explained: "[Y]ou ain't have long to pay Twan back. . . .It was just you knew to give Twuan his money ASAP." *Id.* Powell recalled one time, in approximately 2002, when Kelliebrew appeared "real nervous" because he owed Ball drug money. *Id.* at 12212.

- Powell testified regarding an incident when fellow co-conspirator, Phil Wallace, robbed Powell of $300 in Congress Park. At that time, Antwuan Ball came up on the scene and Powell complained to him that Wallace had stolen money from him. 5/22/07 Tr. at 12255-58. Ball then went up to Wallace and said: "'Phil, *you got to give him that shit back because that's my shit he got*.'" *Id.* at 12258 (emphasis added). Powell explained that Ball had just recently fronted Powell approximately one-quarter of an ounce of crack cocaine to sell, and so Ball had a proprietary interest in Powell getting reimbursed for what was stolen from him. Wallace reimbursed Powell as he was instructed by Ball. *Id.* at 12258-59.

- Powell also testified about how, during the 1995 to 1997 time period, he, Jasmine Bell, aka Jazz, and Dominic Samuels, aka Don, would pool their money together for the

purpose of buying crack cocaine from a common supplier so that they could then sell the crack cocaine in Congress Park.  5/21/07 Tr. at 12190-92.

•     Powell further testified that in addition to being fronted crack cocaine by Antwaun Ball, Powell was also fronted crack cocaine by Gregory Bell.  5/21/07 Tr. at 12213-14.

Copies of relevant pages relating to sharing, fronting and partnership are attached hereto at **Exhibit Q.**

### *Leadership:*

•     Bobby Capies testified that during the middle of the 1990s, when he saw Antwuan Ball and other associates inside of Mom's apartment on 13th Place, S.E., Antwuan Ball carried himself as a leader.  As Capies put it, "[w]hat he say goes."  Capies explained that this was true especially of "the younger group" in Congress Park.  4/2/07 Tr. at 5175-76.

•     Cedric Conner also testified regarding the fact that Antwaun Ball was a leader who "demanded respect" in Congress Park.  4/23/07 Tr. at 8146-47.

•     Robert Crawford testified how he "was trying to get to know him [Ball] for business-wise.  I seen the potential that he [Ball] could make some money.  And if he make some money, I make money."  Crawford explained that he reached this conclusion because, "[a] few times I met him [Ball] around Congress Park, I seen the respect that he carried around there."  4/16/07 at 7143.  At another point, Crawford explained, "he [Ball] had a lot of respect in the alley from a lot of the young guys around there [Congress Park]. . . . The younger guys, just some of the ways wanted to be like him, always wanted to be around him."  *Id.* at 7145.  At one point, Crawford brought up the possibility of partnering up with Ball to sell crack cocaine together in Congress Park.  Ball declined working with Crawford in such a partnership by explaining: "He [Ball] was telling me *he got the alley, that's his spot, that's his strip*."  *Id.* at 7145-46 (emphasis added).

•     Steve Marsh quickly identified Antwaun Ball as "a person of interest . . . [b]ecause of his influence."  4/30/07 Tr. at 9177-78.  As Marsh explained: "Well, when you're in a position like I was in at the time, you got to – it's always good to align yourself with somebody who has influence when you're dealing drugs, especially in the neighborhood that I'm in. . . . . I can get drugs and he can help me get rid of them or make it to where I can get rid of them."  *Id.* at 9178-80.

•     Robert Pough testified that he also dealt drugs near Congress Park, but he was not closely associated with the regular drug-dealers in the Circle.  Rather, Pough and some of his associates sold their crack cocaine closer to 12th Street and Congress Place, S.E.  Pough and his associates had a somewhat chilly relationship with the regulars from the Circle; however, they were not rivals in the way the 10th Place Crew was with the Congress Park Crew.  In fact, although Pough sold his crack cocaine a block or so away from the Circle, he was not run off from the Circle as other outsiders were.  During the time that Pough spent at the Circle, he could tell that Antwuan Ball was a leader.  As Pough put it: "He

[Ball] was running house, you know.  He ran Congress Park. . . . If something was going down, they'd go to Antwuan. . . .  He was in charge." 5//17/07 Tr. at 11662-63.

- Jacques "JT" Powell testified that Antwuan Ball was the main leader in Congress Park. As he explained: "He [Ball] had respect. . . . He had the most respect throughout the hood. . . . He was the man."  5/21/07 Tr. at 12217.

Copies of the relevant pages relating to leadership are attached hereto at **Exhibit R.**

## 2.        Additional Sworn Statements of Antwuan Ball.

The trial record in this case contains two separate instances of Mr. Ball testifying under oath: (i) his June 18, 2003 grand jury testimony in connection with the Superior Court investigation of Dominic "Don" Samuels' murder of Jamel Sills; and (ii) his February 18-19, 2004 trial testimony in *United States v. Kenneth Simmons* ("Kevin Gray II").  While Mr. Ball perjured himself during his testimony in both proceedings, he still reveals much about the existence of a Congress Park conspiracy, as well as his leadership role.  Copies of the relevant pages of Mr. Ball's grand jury testimony are attached hereto as **Exhibit S.**

### a.        June 18, 2003 Grand Jury Testimony

The following are some highlights of Mr. Ball's June 18, 2003 grand jury testimony in the Superior Court investigation of Dominic Samuels' murder of Jamel Sills:

- Ball explained that Congress Park is a "heavy" or "tight" neighborhood.  GJ Tr. at 7-8.  Ball further explained that he knew that Black had previously shot Samuels[] because, "in the beginning I knew . . . because the block told me . . . [Samuels] didn't have to, I already knew." *Id.* at 8.

- "Don [Samuels] knows that I'm not going to go in front of no – go and tell no police what he did, you know."  *Id.* at 31.

- "I've spent 28 years in the streets and during that time we develop this code of silence thing. . . . I would have been disappointed at my little cousin for saying that he killed him."  *Id.* at 35.

- "I'm a lot uncomfortable with my little cousin. . . . I'm extremely disturbed and I would be – to be honest with you, I would be disturbed still if Don did kill Black

31

and he told the police.  That's just – you know, and I'm not proud of it . . . " *Id.* at 37.

- When asked: "In other words, you don't deal with the police, you don't deal with the prosecutors?" Ball replied: "Exactly."  *Id.* at 38.

- "Snitch and hot is the same thing. . . .  And when you lie, we haven't put a word together for that yet.  We just call him hot.  I'm not – I'm not trying to be funny or anything but . . . " *Id.* at 43.

- When asked if Jamel Sills made a lot of enemies before he was killed, Ball replied: "Definitely.  But now, to be honest with the [j]ury, not too many people going to come in our neighborhood and, you know, and do nothing like that, you know, so just to be honest with the Jury."  *Id.* at 48.

As discussed above, the most material portion of Mr. Ball's grand jury testimony  – that Kairi Kelliebrew told him that a "short, stocky dude" killed Jamel Sills – was false.  However, even while trying to exculpate a fellow co-conspirator – Dominic Samuels, who has since admitted that he committed this murder – Mr. Ball's ego gets the better of him as he expounds to his captive audience about how Congress Park is tight-knit and how he and others from the community ("we") developed a code of silence and did not cooperate with the police.

At the time that Mr. Ball provided this grand jury testimony he was collecting a paycheck for providing security to the Congress Park neighborhood.

### b.      February 18-19, 2004 Trial Testimony in Kevin Gray II

The following are some highlights of Mr. Ball's February 18-19, 2004 trial testimony in Kevin Gray II:

- When asked if Keith McGill sold cocaine in Congress Park, Ball responded: "Well, no.  He had to hang in Congress Park in order to sell in Congress Park, and he didn't hang in Congress Park."  2/19/04 (a.m.) at 63.

- Along these same lines, Ball reiterated that McGill did not sell cocaine in Congress Park: "No.  That's not – that's our – that's where we from, Congress Park."  2/18/04 (a.m.) at 95.

Mr. Ball made these statements while at the same time trying to provide a professional courtesy to a co-conspirator (McGill) from another neighborhood.  In doing so, Mr. Ball lied during certain portions of his trial testimony.  For example, while Ball conceded that he had dealt cocaine in the past, he minimized this criminal conduct by saying that he dealt only "shake" (*i.e.,* powder), rather than crack cocaine.  2/18/04 (p.m.) Tr. at 16 and 2/19/04 (a.m.) Tr. at 72 and 89-90.  In addition, Ball swore that he stopped dealing drugs in approximately 1998-1999.  2/19/04 (a.m.) Tr. at 89-90.  This was clearly false testimony, as Mr. Ball's July 26, 2001 controlled purchase of 11.6 grams of crack cocaine to Season Wood demonstrates.  Copies of the relevant transcript pages of Mr. Ball's Kevin Gray II trial testimony are attached hereto at **Exhibit T.**

In any event, Ball's testimony is still revealing to the extent that he clearly acknowledges Congress Park was a distinct neighborhood and marketplace for crack cocaine, where only "accepted" people could sell crack cocaine.  The context and timing of Mr. Ball's trial testimony is also instructive.  Mr. Ball testified – openly wearing an "Omerta" sweatshirt for two days – less than two months before Trevon Shaw was murdered; and after Kairi Kelliebrew, Bobby Capies and Keith Barnett were already known to be cooperating with the government.

### 3.  Additional evidence shows the existence of the charged conspiracy.

There was also additional evidence introduced to this Court –  but not shown to the jury during trial  – which further established the charged conspiracy in this case.  For example, a one-page handwritten roster of names underneath the title "Congress Park Crew" was found in the bedroom of admitted co-conspirator, Raymond Bell, aka Santuce, and which included the names of each of the six defendants in this case.  The Court ruled that, for evidentiary purposes, the jury should not consider this roster.  The "Congress Park Crew" list was contained within **Government Exhibit 711.6** (Item 9. A copy of the "Congress Park Crew" list is attached hereto as **Exhibit U.**

In addition, based on evidentiary rulings, the jury was not allowed to receive each of the four complete grand jury transcripts of Antwuan Ball, Joseph Jones, Steve Sutton, aka Geeka, and Aman Ball, aka Bird, relating to the Superior Court investigation of the murder of Jamel Sills, aka Black. The testimony in each of these four grand jury transcripts: (a) falsely exculpated fellow co-conspirator Dominic Samuels (Samuels has since admitted committing the murder); (b) used exactly the same language in describing the fabricated perpetrator ("short, stocky dude") in doing so; and (c) falsely discredited the government's sole eyewitness to the murder, Kairi Kelliebrew, who at the time was known to be cooperating with the government. The four Superior Court grand jury transcripts were marked (but not admitted) as Exhibits 1200 (Ball GJ), 1201 (Sutton GJ), 1202 (Aman Ball GJ) and 1203 (Jones GJ). Only redacted portions of Mr. Ball's and Mr. Jones's grand jury transcripts were admitted into evidence at this trial (**Government Exhibit 1300**). The carbon-copy nature of the falsehoods contained in these grand jury transcripts is further evidence of the existence of the conspiracy, as is the fact that each of these false sworn accounts discredited their former co-conspirator, Kairi Kelliebrew. Copies of the relevant excerpts of the grand jury testimony of Antwuan Ball, Jones, Sutton and Aman Ball are attached hereto as **Exhibit V.**

\*   \*   \*   \*

These examples are more than sufficient to support a finding that Antwuan Ball led a conspiracy. Indeed, the D.C. Circuit has long recognized a chain conspiracy analysis that focuses on, instead of the conspiracy's format, each conspirator's intent "'to further the common unlawful objective.'" *United States v. Haire*, 371 F.3d 833, 837 (D.C. Cir. 2004), *vacated on other grounds*, 125 S.Ct. 1014 (2005), *judgment reinstated* 2005 WL 3279991 (D.C. Cir. July 22, 2005) (quoting *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988)). That common unlawful objective can be as broad as merely "the distribution of narcotics." *Haire,* 371 F.3d at 838 (finding sufficient for a conspiracy conviction

evidence showing that "part of the objective of the conspiracy was to distribute drugs in Washington, D.C. and that this objective was accomplished").  "The existence of such a vertically integrated, loose-knit combination, may raise the inference that each conspirator has agreed with the others (some whose specific identity may be unknown) to further a common unlawful objective, e.g. the distribution of narcotics." *Id*. *See also United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) (recognizing that contemporary drug conspiracies frequently "result[] in only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market"); *United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005) (same) (citing *Banks* 432 F.3d at 1054); *United States v. Wilson*, 116 F.3d 1066, 1075 (5th Cir. 1997) *vacated by* 123 F.3d 213 (5th Cir. 1997) ("[t]he goal of selling cocaine for profit satisfies the common-goal requirement") a*nd reh'g on different grounds by* 161 F.3d 256 (5th Cir. 1998); *cf. United Sttates v. Roach*, 164 F.3d 404, 412 (8th Cir. 1998) ("[d]ealers who compete with one another may be members of the same conspiracy").

**II.      Application of the factors enumerated pursuant to
         Section 3553(a) also compels a 480-month sentence.**

     As already mentioned, the computation of the recommended sentencing range pursuant to the U.S.S.G. is merely a starting point, and does not even take into consideration any of the many additional acts of violence, witness intimidation and other obstructive acts which Mr. Ball participated in during the many years in which he led the Congress Park Crew.  These additional considerations are not only relevant as a matter of law, but also show what a true danger Ball is.  Indeed, when evaluating Mr. Ball's sentence through the additional lens of Section 3553(a), the government respectfully submits that the maximum sentence is wholly appropriate.  In addition to his rampant drug-dealing, Mr. Ball threatened witnesses, lied in a grand jury murder investigation, attempted to kill Bradley Carter, and murdered

Trevon Shaw and Troy Lewis.  All of these repeated and dangerous criminal acts, coupled with Mr.

Ball's drug dealing, weapons possession, leadership of a criminal enterprise, and criminal history,

demonstrate the need to impose a significant sentence in order to punish such reckless and repeated

criminal conduct, deter future similar activities, and protect the public.

### A.   The Murder Of Trevon Shaw

Witness Season Wood testified that in early September 2003 (a few days before his birthday,

which is September 8), Mr. Wood was outside of his mother's home in an alley in Congress Park when

he witnessed Trevon Shaw, along with two associates, fire shots at Antwuan Ball and other compatriots

of Ball's (which included, among other people, co-defendant Joseph Jones).  3/1/07 Tr. at 1038-46.  This

shooting happened seven months prior to the murder of Trevon Shaw.  Copies of the relevant pages

relating to Wood's testimony relating to the Trevon Shaw murder are attached hereto at **Exhibit W.**

Robert Pough testified that during September through November of 2003, he hung out with

Antonio Roberson, aka LT (whom he had recently befriended while they were both incarcerated) and

Antwuan Ball.  Pough told of one time when Ball was driving Pough and Roberson downtown because

they each needed to give a urine sample for mandatory drug-testing, which was part of their court-

ordered release conditions.  Ball was driving his Silver Expedition at the time.  5/17/07 Tr. at 11774-78.

While Ball was driving, Pough noticed bullet holes in the truck and began "messing with Antwuan about

the bullet holes[.]" *Id.* at 11775.  Pough then testified that "Basically LT asked him [Ball] who did it,

and he was like 'Man, Trevon.'  As soon as he get a chance, man, he was going to smash him." *Id.* at

11776.  Pough further testified that: "He [Ball] just said that the guy had come up – they had fought or

smacked him, one or the other.  I don't remember quite what he said, but I know they was beefing." *Id.*

at 11777 and 11784-86.  Copies of the relevant pages relating to Wood's testimony relating to the

Trevon Shaw murder are attached hereto at **Exhibit X.**

36

Witness Brittany O'Brien testified that she was outside in "the Alley" in Congress Park on April 3, 2004, which was night that Trevon Shaw was shot and killed.  Moments before the murder, Miss O'Brien saw David Wilson driving Gregory Bell's car, and circling the Alley three times.  While Wilson circled the block, he made eye contact with Trevon Shaw, and was "mugging" at him.  This caused Miss O'Brien to ask Trevon Shaw if he did anything to Wilson to upset him.  6/18/07 Tr at. 15882-91.

Miss O'Brien testified that Wilson eventually parked Gregory Bell's car near where she and Trevon were standing in the alley, and that Wilson and Trevon had a brief conversation.  After that, Antwuan Ball, who was sitting in his Grey Expedition just down the alley, called over to Trevon, and Trevon walked towards the Expedition.  Just as Trevon got near the Expedition, a hand, holding a gun, came out of the driver's side of the truck.  One shot was fired, and Trevon fell to the ground.  Antwuan Ball then got out of the driver's side of the truck, stood over Trevon and fired a second shot into Trevon's head.  Brittany screamed as Antwuan Ball walked away towards a fence.  Wilson then walked towards Trevon's body, stood over Trevon, and kneeled over the body.  Brittany then ran away, just as she heard a third shot fired.  She turned around and saw Wilson, with a gun in his hand, walk away from the body just after this third shot was fired.  Brittany ran into her house, where she was comforted by her cousin.  6/18/07 Tr. at 15893-907.  Copies of the relevant transcript pages of Brittany O'Brien's trial testimony are attached hereto at **Exhibit Y.**

Brittany's mother, Charlotte O'Brien, testified regarding some of the events of the evening of April 3, 2004.  While she did not witness the murder itself, she was inside of her apartment when she heard the three shots fired.  She ran outside shortly after hearing the third shot fired and saw David Wilson carrying a pistol in his hand, walking away from Trevon Shaw's body.  She then saw Wilson walk towards Gregory Bell's car, get in the car, and drive away quickly.  6/20/07 Tr. at 16285-99.  This testimony provides important corroboration of portions of Brittany O'Brien's testimony.  Copies of the

relevant transcript pages of Charlotte O'Brien's trial testimony are attached hereto at **Exhibit Z.**

### B.       Additional Acts of Obstruction of Justice

As discussed above, Mr. Ball threatened two different witnesses (Capies and Pleasant) in an effort to deter them from providing inculpatory trial testimony against him and his co-defendants.  These two instances are only part of a much larger pattern of Ball repeatedly obstructing justice.

Mr. Ball engaged in all of the obstructive acts listed below while he was collecting a paycheck as a security officer in Congress Park.

### 1.       Antwuan Ball intimidated teenage girls in connection with the investigation of the murder of Jamel Sills, in which Ball's friend and co-defendant, Dominic Samuels, was a suspect.

Witness Toya Ryals testified at trial regarding, among other things, the murder of Jamel Sills, aka Black.  Sills was shot and killed by Dominic Samuels in August of 2002.  In August of 2002, Ms. Ryals was approximately 15 years old and Antwuan Ball was approximately 30 years old.  Ms. Ryals testified that although she did not witness Samuels's  murder of Sills, she was in the Congress Park neighborhood on the day of the murder, and further testified that shortly after the murder, her two good friends – Tanay Gross and Shanay Glenn – both came running to her home just shortly after the murder.  Both Ms. Gross and Ms. Glenn were outside when the murder took place.  Ms. Ryals testified that during the days that followed the murder, Antwuan Ball – whom she knew as "Big Ant" – initiated a conversation with her, Miss Gross and Miss Glenn.  Ball asked the young women if any of them has witnessed the shooting, and further instructed them "not to talk to nobody."  5/3/07 Tr. 10014-17.  Ms. Ryals further testified that shortly thereafter, Mr. Ball initiated a second conversation with these same three young women along the same lines.  During this second conversation, Ms. Ryals left with the impression that both Miss Gross and Miss Glenn were "scared" after Ball spoke to them.  *Id.* at 10020-22.  Copies of the relevant transcript pages of Miss Ryals's trial testimony are attached hereto at **Exhibit AA.**

Mr. Ball's conduct towards these young women is especially egregious and deserves harsh punishment, because it was so effective. Indeed, the Court will recall that each of these three young women were called by the government in its case-in-chief relating to its presentation of evidence for the Jamel Sills murder. Each of these witnesses was hostile to the government, evasive in her responses, and had to be impeached with prior grand jury testimony. In short, Mr. Ball's obstructive conduct towards these women successfully harmed a homicide investigation.

2.      **Antwuan Ball intentionally and repeatedly perjured himself to a grand jury investigating the murder of Jamel Sills.**

Earlier in this memorandum, the government discussed how Antwuan Ball, Jones, Sutton and Aman Ball falsely testified how Kairi Kelliebrew stated that a "short, stocky" person committed the murder of Sills, rather than the tall and slim Samuels. *See* **Exhibit V**, attached hereto. Kairi Kelliebrew has always consistently swore under oath – more than once in the grand jury and multiple times at trial in this case – that the tall and slim Dominic Samuels had committed this murder. Further, Kelliebrew denied ever having told anyone that a "short, stocky dude" committed the murder.

On the morning of January 24, 2008, Dominic Samuels took an oath to tell the truth before this Court and swore that he committed the murder of Jamel Sills. This unequivocal sworn statement by Samuels establishes that Kairi Kelliebrew was telling the truth about the tall and slim Dominic Samuels having murdered Jamel Sills and further corroborates Kelliebrew's repeated denials that he ever told anyone that a "short, stocky" person committed the murder. The convenient nearly-exact language that each of the four men used in their sworn grand jury testimony further strongly supports the conclusion that this grand jury testimony was part of an agreed-to effort to obstruct the government's investigation of Samuels's murder of Sills.

Perhaps more importantly, Mr. Ball's perjury merits significant punishment because it worked. By falsely exculpating a murderer and falsely discrediting the sole eyewitness to the murder, it is an understatement to say that Mr. Ball harmed the Sills murder investigation.

**3.    Antwuan Ball discussed killing witnesses whom he suspected were cooperating with the government.**

**a.    Testimony of Kairi Kelliebrew**

Kairi Kelliebrew testified at trial how he had some conversations with Antwuan Ball shortly after Kelliebrew was cooperating with the government.  Kelliebrew testified that Ball said to him he knew Kellibrew was cooperating with law enforcement, and told him he would kill him when he got the opportunity.  5/8/07 Tr. at 10408.

During the last period of time Kellibrew was at large in the community, he also heard Antwuan Ball in a discussion with others, including Joseph Jones, discussing prospective cooperating witnesses in the anticipated "conspiracy" case the government was planning to bring.  Ball stated at this meeting: "'We going to have to kill anybody we think that's going to tell when they come, before they come. . . . We need to kill them before they bring this conspiracy.'" 5/8/07 Tr. at 10557-58.  Copies of the relevant transcript pages of Mr. Kelliebrew's trial testimony relating to these death threats by Ball are attached hereto at **Exhibit BB.**

**b.    Testimony of Robert Pough**

Robert Pough testified that he was present for a conversation around October of 2003 with Antwuan Ball, Antonio Roberson, aka LT, and himself where Ball said to Roberson: " . . . hurry up, he [Roberson] needed to hurry up and get out of the halfway house so he could start getting rid of some of the guys that he thought was going to flip." 5/17/07 Tr. at 11786-89.  Ball further explained that he was aware that the government was working on a 'conspiracy case' because Bobby Capies had been calling

"home" telling people about it.  *Id.* at 11787.  Copies of the relevant transcript pages of Mr. Pough's trial testimony relating to this conversation are attached hereto at **Exhibit CC.**

### 4. Omerta

Antwuan Ball has made his affection for the code of "Omerta" well known.  Ball has taken the concept of Omerta beyond any lawful purpose and corrupted it to serve his criminal goals.  In the end, Omerta for Mr. Ball stands for obstructing justice, intimidating witnesses, and hampering any legitimate efforts by law enforcement to do its job and protect the community.  As Mr. Ball himself stated in the Superior Court grand jury as he lied in connection with the Jamel Sills murder investigation: "I've spent 28 years in the streets and during that time we develop this code of silence thing. . . I would be disturbed still if [Kairi Kelliebrew] told the police."[20]

Ball's affection for Omerta clothing has also crossed bounds to the extent it advocates doing harm to "snitches."  Many of these clothing examples were introduced at trial in this case.  *See, e.g.,* **Government Exhibit 703.13.**  As the Court is aware, certain of these shirts, sweatshirts and posters depicted a rat sitting in the middle of a bull's-eye – which is consistent with the scope of a rifle.

Indeed, and as discussed above, Mr. Ball testified in open court in the case of *United States v. Kenneth Simmons* (Kevin Gray II) before Judge Lamberth in February of 2004.  Mr. Ball openly wore an Omerta sweatshirt during both days of his trial testimony.  This sweatshirt was later seized in connection with the Congress Park investigation and introduced into evidence in this case.  *See* **Government**

---

[20]     As Mr. Ball himself asserted in his defense case, he was a leader among the Congress Park members who became security officers beginning in 2001.  Security officer Donna Brown testified on July 16, 2007 in this case regarding the difficulties she faced as a private security officer working in Congress Park.  In addition to general resistance she and her Eagle Security colleagues faced working in the neighborhood, she testified that she was threatened by several members of the charged conspiracy, including Desmond Thurston, Gregory Bell and Joseph Jones.  Brown testified that on more than one occasion, Thurston told her that he would kill her.  Gregory Bell made hand gestures in her direction representing a pistol.

**Exhibit 705.13.**

> **C.**     **The Attempted Murder of Bradley Carter**

Detective Oliver Garvey testified that he was assigned as the lead detective to investigate the

February 20, 1994 attempted murder of Bradley Carter and three other 1-5 Mob associates by Antwuan

Ball, Joseph Jones, and Kairi Ball, which was a shooting that was done in retaliation for the 1993 murder

of Marucie Dolemen, aka Reecy.  Detective Garvey testified that at the scene, Bradley Carter was

initially uncooperative, but then cooperative later when he later came to Detective Garvey's office on

March 8, 1994.  At this second meeting, Mr. Carter identified Antwuan Ball and Joseph Jones as two of

the men who had shot at him.  Detective Garvey testified regarding the two separate photo-identification

procedures that he conducted with Mr. Carter.  The first of these identification procedures happened on

March 8, 1994, and during this procedure, Mr. Carter clearly and unequivocally identified Mr. Ball as

one of the people who had shot at him on February 20, 1994.  The exhibits relating to this first

identification were marked and admitted as **Government's Exhibit 400.9 and 400.3J, 400.3L, 400.3M**

**400.3N, 400.3O, 400.3P, 400.3Q,  400.3R** and **400.3S.**  5/31/07 Tr. at 13708-13.

Detective Garvey conducted the second identification procedure with Mr. Carter two days later,

on March 10, 1994.  During this second procedure, Mr. Carter was cooperative and clearly and

unequivocally identified Joseph Jones as the second gunman who shot at him and his associates in the

car. 5/31/07 Tr. at 13714-18.  Detective Garvey memorialized Mr. Carter stopping when he saw the

photograph of Joseph Jones and stating:  "There he is.  That's Jojo.  He was shooting from the back." *Id.*

at 13717.  The exhibits relating to this second identification procedure were marked and admitted as

**Government's Exhibits 400.3A, 400.3B, 400.3C, 400.3D, 400.3E, 400.3F, 400.3G, 400.3H** and

**400.3I.**

The Court might recall that the government went to great lengths to secure Mr. Carter as a

witness at trial in this case.  Mr. Carter was generally uncooperative and made it clear that he did not

want to be called as a witness at trial.  And when he was called to the stand, Mr. Carter purported to have

altogether forgotten the entire February 20, 1994 shooting.  In fact, he claimed, incredibly, not to have

any memory at all of ever having been shot.  As a result of Mr. Carter's contrived memory lapse, the

government was allowed to mark and admit two separate sworn grand jury transcripts in which Mr.

Carter on two separate occasions gave a detailed and sworn account of Mr. Ball and Mr. Jones having

shot at him in the car on February 20, 1994.  These two separate grand jury exhibits were marked and

admitted into evidence at this trial as **Government's Exhibit 1231** and **1232.**  These exhibits were

shown to Mr. Carter, and published to the jury during Mr. Carter's trial testimony on the afternoon of

May 30, 2007.

Witness Damion Greene testified that he was a member of the 1-5 Mob back in 1994 and that he

was with Bradley Carter on the night that he was shot by Antwuan Ball and Joseph Jones on February

20, 1994.  Bradley ran up to Greene and others very shortly after the shooting.  Greene remembered that

Carter, "was real hyped  . . . [and] he was tired, he was just – you could tell he'd been running."  5/31/07

Tr. at 13804-06.  Greene recalled Carter saying that Carter "had seen Antwuan and Jo-Jo in the car[]"

and also that "Antwuan started shooting out the window of his car."  Greene did not recall Carter saying

anything about Jones shooting as well.  *Id.* at 13806-07.

Copies of the relevant transcript pages of Mr. Carter's and Mr. Greene's trial testimony relating

to this attempted murder are attached hereto at **Exhibits DD** and **EE**, respectively.

### D.    The Murder of Troy Lewis

Bobby Capies testified at trial that while he did not witness the murder of Troy Lewis in January

of 1996, he heard the shots fired and then went outside shortly afterwards to see a dead Lewis slumped

on the ground near his truck, which was parked on Congress Street, S.E.  Capies testified that during the

weeks after this murder, Ball admitted to Capies that he had killed Lewis.  3/29/07 Tr. at 5043-59.

Capies testified that Ball explained why and how he killed Lewis – by creeping up on Lewis who was

sitting in his parked truck, shooting multiple shots through the window of the truck, and then running

away near an alley in the Lincoln.  *Id.*

Kairi Kelliebrew also testified about how Antwuan Ball admitted to killing Troy Lewis.  Mr. Ball

discussed this murder during two separate instances in front of Kelliebrew.  During these conversations,

Ball provided certain details of the murder to Mr. Kelliebrew which were accurate, including the fact

that Ball shot Lewis towards his head through the glass window of his truck.  5/8/07 Tr. At 10477-78.

Copies of the relevant transcript pages of Mr. Capies's and Mr. Kelliebrew's trial testimony

relating to the murder of Troy Lewis are attached hereto at **Exhibits FF** and **GG**, respectively.

### E.     <u>Additional Shooting at 10th Place</u>

Bobby Capies testified that Desmond Thurston was often present during discussions with him

and David Wilson regarding retaliating against members of 10th Place, and that Dazz never disagreed

with the notion of retaliating.  In addition, Capies testified that Dazz talked positively about retaliating

and told him of at least one occasion in early 1997 where he – Thurston  –  "got in a shootout with some

guys with 10th Place."  4/2/07 Tr. at 5308.  Thurston further explained: "[Dazz] told me that him,

Antwuan, LT, and Wop went down [to] 10th Place to try to creep on them guys, and somebody opened

fire on them, which they believe was Steve and Patrick, and they stopped the car and jumped out and

opened fire back."  *Id.* at 5308-10.

Copies of the relevant transcript pages of Mr. Capies' trial testimony relating to this attempted

murder are attached hereto at **Exhibit HH.**

In sum, the 3553(a) factors also require that the defendant's repeatedly violent and obstructive

criminal conduct result in a lengthy term of imprisonment.

## **Conclusion**

The government is aware that the sentence it is recommending is a significant one, and does not make this recommendation lightly.  However, Mr. Ball stands before this Court as a man who chose to spend the better part of his adult life causing enormous harm to the community.  His distribution of multiple kilograms of poison, his weapons possession and his criminal history are, amazingly, only part of the great harm he has caused.  Mr. Ball's additional acts of witness intimidation, perjury and threats have successfully impeded at least one homicide investigation (the Jamel Sills murder) and have had a chilling effect on witnesses involved in this trial.  Ball has repeatedly abused his leadership position in Congress Park for criminal purposes.  And all of this comes before even mentioning Ball's violent conduct:  the murders of Trevon Shaw and Troy Lewis, and the attempted murder of Bradley Carter.  Simply put, Ball has been, and remains, a tremendous danger to our citizenry.  The government respectfully submits that a significant sentence is not only well within this Court's discretion to impose, but is essential to provide just punishment, to reflect the nature and seriousness of Ball's reckless and violent criminal behavior, to promote respect for the law, to provide adequate deterrence, and to protect the public.

WHEREFORE, the United States respectfully requests that the Court sentence defendant

Antwuan Ball to, *inter alia,* 480 months of incarceration.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498-610

_____

GLENN S. LEON
Assistant United States Attorney
New York Bar
555 4th Street, N.W., Room 4112
Washington, DC  20530
(202) 305-0174

_____

ANN PETALAS
Assistant United States Attorney
TX Bar No. 24012852
555 4th Street, N.W., Room 4211
Washington, DC  20530
(202) 307-0476

_____

GILBERTO GUERRERO, JR.
Assistant United States Attorney
Bar No.  KS-19271
555 4th Street, N.W., Room 4811
Washington, DC  20530
(202) 514-7298