# Exhibit 2

**MOTION FOR A MISTRIAL (Docket 986)**

**Exhibit 1**

**Exhibit 2**

**SUPPLEMENT TO MOTION FOR A MISTRIAL**

**Exhibit 3**

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : **Criminal No. 05-CR-100-2 (rwr)** |
| **v.** | : |
| | : |
| **DAVID WILSON** | : |
| | : |

## MOTION FOR A MISTRIAL

David Wilson, by and through undersigned counsel, respectfully moves this Honorable Court for a mistrial for the presentation of perjured testimony in the presentation of re-direct testimony of Damien Green. In support of this motion, counsel states the following:

1.    On Thursday May 31 and June 4, 2007, the government presented the testimony of Damien Green aka "Old Face" to the jury, to support the conspiracy and RICO charge (counts one and two) as well as substantive counts of assault with intent to kill James Faison.

2.    During cross, counsel asked about all of the incidents[1] that Mr. Green discussed on direct, two of which he testified about at the Edelin trial, only differently there.[2] *See* Exhibit 1 – excerpts[3] of Damien Green's testimony in Edelin case. During cross he volunteered that there was another incident with Tweety, Joonie and Cool Wop. Tr at 14142. (See Exhibit 2 – Transcript of

---

[1] These incidents were (1) a 1993 incident where Mr. Green claims Mr. Wilson stole his polo sweatshirt, (2) a 1995 incident where he claims he saw the print of a gun in Mr. Wilson's pocket as he walked in the Brooks family's house on 15th Place, (3) three shootings in 1996 (A) Tweety and Wop shooting at JJ's car at Congress Place and Stanton Road SE (B) hearing gunshots and then seeing Tweety and Wop with guns (and Squid shot at Tweety) and (C) in the back of the rec center seeing Tweety, Wop, Fat Tony, Draino and Joe Joe in a car and then observing Wop and Tweety shooting 75 shots.

[2] Notably, he testified there that (1) they went around Congress Park in a stolen cab looking for Tweety, whereas in the case at bar he testified that they were looking for Cool Wop and (2) that Tweety, Spook and Cool Wop came through the cut and that he saw them shooting; whereas here he claimed on direct that it was merely Tweety and Cool Wop; and admitted that he did not see any shooting except Squid shooting at Tweety.

[3] Counsel has excerpted the portions of his testimony where he mentioned "KoolWhop" as well

Damien Green's testimony in *US v Ball et al*.)  This was nonresponsive to counsel's question.  Over objection, the Court allowed the government to question the witness about the incident involving Tweety, Joonie and Cool Wop.  The Court then did not allow counsel re-cross on this area, so the jury is now left thinking that Mr. Green testified consistently at the Edelin trial; while the truth is that he did not.  Not only did he claim it was Tweety, Junie and Pete in the Edelin case; he said he did not see them but rather was told by Anthony and his cousin Muncee.  *See Exhibit 1* at 13975 lines 21-23.

3.     Counsel would note that there was NO incident that Mr. Green testified about at the Edelin trial that involved Tweety, Joonie and Cool Wop; rather he testified about an incident involving Tweety, Joonie and Pete, which appears to be the same incident, albeit "Pete" is not Cool Wop.  See Exhibit 1 at 13973  line 12 through 13980 line 18.  As stated previously, the only mention by this witness of Cool Wop at the Edelin trial pertained to other incidents.  Counsel submits that at the government's asking, which is charged with the knowledge of the witness's previous statements, the witness committed perjury.  The government sponsored this testimony and did nothing to correct it, even though the government has the affirmative constitutional "responsibility and duty to correct what he knows to be false."  *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959).  And the government sponsored the testimony with the mention of Pete rather than Cool Wop in the previous proceeding.

4.     This evidence raises constitutional considerations that afford Mr. Wilson relief.  This evidence inculpates the government in knowingly using perjured testimony, in violation of the Due Process Clause of the United States Constitution, in this matter.   The Supreme Court has made clear that "a lie is a lie no matter what its subject, and, if it is in any way relevant to the case, the [prosecutor] has the responsibility and duty to correct what he knows to be false and elicit the truth,"

---

as his testimony of the incident where Cooler got shot at by Tweety, Junie and Pete.

by apprising the jury of the "true facts." *Napue*, 360 U.S. at 269-70 (1959). Accordingly, once a prosecutor determines that false testimony has been presented, he or she has an affirmative responsibility under the Due Process Clause to "correct" it in open court – not merely disclose it to the court and/or the defense. *Id.* at 269; *see also Keys v. United States*, 767 A.2d 255, 261 (D.C. 2001); *United States v. Iverson*, 637 F.2d 799, 803 n. 10 (D.C. Cir. 1980). Throughout the country, courts have found that the presentation of false testimony creates an affirmative obligation on the part of the prosecutor to actively cleanse the trial record, holding, for example, that "despite defense counsel's efforts on cross-examination, the government ha[s] an independent obligation immediately to take steps to correct known misstatements of its witnesses." *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003).[4] This is because "the government's duty to correct perjury by its witnesses" requires unequivocal clarification of the record and is therefore "not discharged merely because counsel knows, and the jury may figure out, that the testimony is false." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).

Already, the defense *did* affirmatively request correction, by way of recross. This request for affirmative correction distinguishes this case from those federal cases in which the defense never made a contemporaneous request for affirmative correction of the record. *See, e.g., United States v. O'Keefe*, 128 F.3d 885, 896 (5th Cir. 1997); *United States v. Grosz*, 76 F.3d 1318, 1328 (5th Cir. 1996).

WHEREFORE for these grounds, grounds raised at any hearing on the defendant's motion,

---

[4] *See also Jenkins v. Artuz*, 294 F.3d 284, 294-96 (2nd Cir. 2002) (reversing conviction where prosecutor "did nothing to correct" false evidence and holding that "even prosecutorial silence harms defendants who are unable to respond effectively"); *United States v. Mason*, 293 F.3d 826, 829 (5th Cir. 2002) (reversing conviction where government failed to correct false testimony and holding that defense conduct "does not relieve the government of its affirmative obligation to correct false testimony"); *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988) (reversing conviction where prosecutor "breached…duty to correct falsehoods").

and any other grounds deemed meritorious by the Court, counsel and Mr. Wilson request a mistrial in this matter.

Respectfully Submitted

_____/s/_____
JENIFER WICKS
The Law Offices of Jenifer Wicks
The Webster Building
503 D Street, N.W., Suite 250A
Washington, DC 20001
(202) 326-7100


_____/s/_____
GARY PROCTOR
8 E. Mulberry Street
Baltimore, MD 21202
(410) 444-1500

Counsel for David Wilson

Page 13726

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          :  CR Number 98-264
                                   :
             Government,           :
                                   :
       v.                          :  Washington, D.C.
                                   :  Monday, July 16, 2001
TOMMY EDELIN,                      :  9:44 a.m.
EARL EDELIN,                       :
SHELTON MARBURY,                   :
HENRY JOHNSON,                     :
MARWIN MOSLEY,                     :
BRYAN BOSTICK,                     :
                                   :
             Defendants.   :
                                   :
- - - - - - - - - - - - - - - -x


DAY 64
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the Government:     STEPHEN J. PFLEGER, ESQUIRE
                        WILLIAM M. SULLIVAN, ESQUIRE
                        PAUL A. QUANDER, ESQUIRE
                        ASSISTANT UNITED STATES ATTORNEYS
                        U.S. ATTORNEY'S OFFICE
                        555-4th Street, N.W.
                        Washington, D.C.  20001
                        (202) 353-8835, 353-8833, 514-9519

For Defendant           JAMES W. RUDASILL, JR., ESQUIRE
   Tommy Edelin         601 Indiana Avenue, N.W.
                        Suite 500
                        Washington, D.C.  20004
                        (202)  783-7908
                 Pages 13,726 through 13,986


                                     THERESA M. SORENSEN,
   OFFICIAL COURT REPORTER

Page 13907

1  Q.    What does that mean?
2  A.    It mean that he smoke PCP and the PCP had him in
3  another world far as hallucinating, spaced out.  He was just
4  real high.
5  Q.    When he told you that he was lunching off of the PCP
6  and that he was planning on killing you and others, did you
7  know who Tony was talking about when he said he was planning
8  to kill you and the others?
9  A.    Yeah.
10 Q.    Who?
11 A.    Talking about me, Blue, Wah-Luck, J.J., La-La,
12 whoever out there, he was beefing with everybody.
13 Q.    When Tony gave you that information about keep your
14 gun with you, don't put your gun down, and you said
15 something else about the police rather -- what was that?
16 A.    He was saying that you would rather for the police to
17 catch you with the gun than your enemy.
18 Q.    Why is that?
19 A.    Because if your enemy catch you without your gun, you
20 can't protect yourself.  But if the police catch you,
21 there's always a way that you can get out.
22 Q.    Did you take his advice seriously?
23 A.    Yeah.
24 Q.    When Tony Edelin passed on that information to you,
25 what impact did Tony telling you that information have on

Page 13908

1  you?
2  A.    Say that again.
3  Q.    What impact did Tony Edelin himself sharing that
4  information with you have on you?
5  A.    It was a lot -- it was a lot of impact.  I'm going to
6  listen to him.
7  Q.    Why?  Why are you going to listen to Tony Edelin?
8  A.    Because he a old-timer and I mean far as -- I mean
9  far as me growing up, he always used to be, you know,
10 schooling us to a lot of things, you know, even if it was
11 either good or bad.  You know, he going to give us some
12 knowledge, regardless.
13 Q.    You said either good or bad?
14 A.    Yeah.  He going to give us some knowledge,
15 regardless.
16 Q.    Have you ever known Mr. Edelin, Tony Edelin, to carry
17 a gun?
18 A.    Yeah.
19 Q.    Tell us about that.  How do you know Tony Edelin
20 carried a gun?
21 A.    He showed me.
22 Q.    Where was he when he showed you?
23 A.    In the center.
24 Q.    The recreation center?
25 A.    Yeah.

Page 13909

1  Q.    And how was it that he happened to show you this gun?
2  A.    He had like a strap on his stomach, he strap it, put
3  the gun like in the middle of it, and you put your sweater
4  over top of it, and you couldn't tell that you have a gun on
5  you.
6  Q.    Was there any particular reason why he showed you the
7  way that he carried the gun?
8  A.    Because he was trying to show me how to carry mine
9  steady.  Carry it in my pocket, and you see the print and
10 everybody can see it.  Said just either have on some
11 sweatpants and get you a -- like one of them holsters with a
12 cushion and you can put it in front of you, and then you can
13 have on sweatpants and nobody won't think that you will have
14 a gun on you while you got on sweatpants.  So -- or either
15 get one of them straps that he got.  And so nobody can't see
16 the print of the gun.
17 Q.    Did you consider that good advice?
18 A.    Yeah.
19 Q.    Again showing you Government's Exhibit Number 17B1,
20 did there come a time when your cousin Munsey was involved
21 in a shooting with Tweety while he was on a bicycle?
22 A.    Yeah.
23 Q.    Can you tell the ladies and gentlemen of the jury
24 what happened in that incident?
25 A.    It was one night, I don't remember what date, we had

Page 13910

1  got a call saying that Tweety supposed to came -- supposed
2  to come around there.  So me, Squid, and Wah-Luck and J.J.,
3  we was all in the court, and my cousin had came around, so
4  he was riding the Baja, a bike.  So I told my cousin to get
5  off the bike, and --
6  Q.    Why?  Why did you tell him to get off the bike?
7  A.    Because Tweety and them supposed to be coming around.
8  Q.    And just so it will be clear, the cousin that you're
9  speaking of is who?
10 A.    Munsey.
11 Q.    Okay.
12 A.    So Munsey rode up, we was in this court right here.
13 Munsey --
14 Q.    Who lives in this court?
15 A.    Who live in this court right here?
16 Q.    Yes.
17 A.    Mush baby mother.
18 Q.    Okay, what is her name?
19 A.    Bernie.
20 Q.    Bernie?
21 A.    Yeah.  Treesy.  Squid baby mother cousin.  Junebug,
22 police officer mother Ms. Carrie.
23 Q.    So Junebug's mother lives in this court here?
24 A.    Yeah.
25 Q.    All right.  So just for consistency and sake of

Page 13911

1  arguing -- or sake of ease, why don't we refer to this court
2  where you just put the arrow as Junebug's court.
3   A.   Okay.
4   Q.   When we refer to that.  Okay?
5   A.   Okay.
6   Q.   Why don't we refer to this court here as Blue's
7  court.
8   A.   Okay.
9   Q.   Okay.  And why don't we refer to this court as Ms.
10 Carrie's cut, or the boathouse?
11  A.   Okay.
12  Q.   All right.  So we're talking about Junebug's mother's
13 court right here.
14  A.   Right.
15  Q.   Okay.  Tell us what happened.
16  A.   So Squid was standing like right here.  Munsey rode
17 the bike all the way up here.  Tweety came through this cut.
18 Spook came through this cut, and Koolwhop came through this
19 cut.
20  Q.   Now who is Koolwhop?
21  A.   He live around Congress Park.
22  Q.   Was he associated with Tweety and Spook?
23  A.   Yeah.
24  Q.   All right.  Please continue.
25  A.   So we was all in this court where there's a lot of

Page 13912

1  young dudes was in this court right here.
2   Q.   In Blue's court?
3   A.   In Blue's court.
4   Q.   Okay.
5   A.   And they didn't know we was in this court.  So they
6  got the -- all three of them got to shooting from over here
7  to over here.  They got to shoot in this court.
8   Q.   Okay.  So all three individuals were shooting in
9  Blue's court on Congress Place?
10  A.   Right.
11  Q.   Okay.  And after they finish shooting, Tweety ran
12 from this cut and ran to this cut.  When he got like where
13 the street at, Squid shot from over here, try to hit him,
14 but he didn't.  So when he got -- Tweety got like up here,
15 that's when my cousin Munsey caught him through this cut,
16 start shooting at him right here, then he ran down this way.
17  Q.   Now how do you know all of this?  Where were you
18 located?
19  A.   I'm still -- I'm still in the court, but after Munsey
20 shot at him, Munsey came and told us that he caught him in
21 the cut right here.  I seen Tweety ran from this cut to this
22 cut.  He had a blue-and-white striped sheet.
23  Q.   Could you hear the gunshots or the gunplay between
24 Tweety and your cousin Munsey?
25  A.   Yeah.  Basically I hear mostly all my cousin guns,

Page 13913

1  his gunshots.
2   Q.   How could you tell your cousin's gun?
3   A.   Because the gun that he had, I heard it go off
4  before, and the way his was going off, Tweety gun -- I knew
5  what type of gun he had.  His gun was more louder than my
6  cousin gun, and my cousin had emptied the clip on him, and
7  so after he did that, he came around there and told me that
8  he just finish shooting at Tweety.
9   Q.   Was anyone hit at all in all of this shooting, that
10 you know of?
11  A.   No.
12  Q.   Was anybody hit in Junebug's mother's court that you
13 know?
14  A.   No.
15  Q.   Was anybody hit in Blue's court?
16  A.   No.
17  Q.   You mentioned earlier an individual that you were
18 close with early on by the name of Funky.  Do you remember
19 that?
20  A.   Yeah.
21  Q.   When this beef first kicks off and this shooting
22 starts to intensify, what's the relationship between Blue
23 and Wah-Luck and Funky?
24  A.   They don't like him.
25  Q.   Why is that?

Page 13914

1   A.   Because for one Funky was hanging with Tweety, and
2  two, Blue had a gun that Randy supposed to have, and Funky
3  kept coming down there telling Blue to give him the gun.  So
4  Blue -- Funky used to be high off the PCP, so that made Blue
5  paranoid because Funky keep coming down there asking about
6  the gun.  So Blue keep saying if he keep coming down here,
7  he going to kill him.  And but he never got to that point,
8  and Wah-Luck -- when Wah-Luck and J.J. had Tweety and Funky
9  was in the car together on 15th Place, and Wah-Luck and J.J.
10 ran down on the car and shot at the car, Tweety pulled off
11 up to 15th Place and Funky stuck the gun out the sunroof and
12 shot at Wah-Luck and J.J.
13  Q.   Was anybody hit at that -- in that incident?
14  A.   No, not that I know of.
15  Q.   Did Wah-Luck know that it was Funky that was shooting
16 at him?
17  A.   Yeah.
18  Q.   What did Wah-Luck say in reference to Funky shooting
19 at him?
20  A.   That he going to kill him.  So when they got -- when
21 Wah-Luck and J.J. and them got back down there, Mush pulled
22 up in the car --
23  Q.   Now who is Mush?
24  A.   Funky brother.  And Funky was in the passenger side
25 just sitting there.  So Mush got out and came to the back of

48 (Pages 13911 to 13914)

Page 13971

1  A.    Because we had a .9.
2  Q.    And when you say "we", are you talking about the same
3  individuals that you just mentioned?
4  A.    Yeah.
5  Q.    How common was it for you to share or trade guns with
6  the people that were with your group?
7  A.    I mean, we ain't really share. Everybody had their
8  own gun. So I ain't really had to share. But a couple of
9  times, I had to give my gun out because Squid -- he used to
10 sell his guns a lot.
11      And it was before I got locked up, I had gave him
12 a Tec 9 and told him to hold it, go ahead and, you know --
13 just in case anybody come because at the time I didn't need
14 it. I was drinking, and I just got out so I didn't really
15 want to really hold a gun. Then plus, I had to ride all the
16 way back Upper Marlboro because that's where I was staying
17 at.
18      We went to the liquor store, came back, Squid had
19 took my Tec 9 over 501 with him. And when I got --
20 Q.    What's 501?
21 A.    That's over -- Capers. Capers. That's the name. I
22 think that's the name of the neighborhood. Capers. And
23 when I went over there, I blew the horn. He was already out
24 there. He seen me when I pulled up. So he popped out of
25 nowhere, and I asked where that's at. He said he left it --

Page 13972

1  Q.    I'm sorry. You've got to say -- "where that's at?"
2  A.    Where -- I asked him, where that's at but I was
3  talking about --
4  Q.    Let me stop you for a second. When you "where that's
5  at", what does that normally mean?
6  A.    That was talking about the gun.
7  Q.    So when you say "where that's at", that's -- when you
8  say that, you mean the gun?
9  A.    Yeah.
10 Q.    Okay.
11 A.    So he said he left it under the dirt bike that was in
12 Blue yard. So I was like, all right. So he was like, give
13 me something to drink. So I gave him something to drink and
14 he drunk mostly all of it. I was mad at him. And then when
15 I rode back around Congress and looked under the bike, it
16 wasn't no gun under there. So I was like, Squid playing
17 games. So --
18 Q.    Let me stop you. You went to Blue's yard to look for
19 the gun.
20 A.    Right.
21 Q.    But it wasn't there?
22 A.    Right.
23 Q.    Okay. What happened after that?
24 A.    So I was like, Squid playing games. So I told Dune
25 to get it for me. So I went over to talk to Wah-luck. I was

Page 13973

1  telling Wah-luck I'm about to go. So I was like, man, I
2  don't feel like riding all the way to Upper Marlboro. And I
3  was like, man, you think them people going to run in my
4  house. He was like, no, they shouldn't. So I went in the
5  house, went to sleep; the next day, they ran in my house
6  again and locked me up.
7  Q.    Police officers?
8  A.    Yeah.
9  Q.    Why did they run in your house this time?
10 A.    Because I shot out a hole in Keith.
11 Q.    All right. We're going to come back to that, okay.
12      Before we get to Idaho and Keith, was there an
13 occasion where Cooler gets shot in the leg -- a graze wound?
14 A.    Yeah.
15 Q.    Let me go back to that. Tell us about that. Where
16 were you, who were you with, what happened, at that point?
17 A.    We was on Congress Place. Somebody told Wah-luck
18 that Tweety and them supposed to come through. So me and
19 him was like the only ones out there that had guns on us --
20 Q.    When you say "me and him", who are you talking about?
21 A.    Wah-luck. And so me and him walked up to Mush house,
22 and --
23 Q.    Okay. Why are you going to Mush's house?
24 A.    So we can get the AK.
25 Q.    What is an AK?

Page 13974

1  A.    It's a gun that shoots over 20 times.
2  Q.    Is it a gun?
3  A.    It's a rifle.
4  Q.    Okay. And do you go up to Mush's house to get the
5  rifle?
6  A.    We go up there and knock on the door. Mush come out
7  front. We was telling Mush to let us see the rifle. He
8  wasn't trying to let us see it, so I got on the phone,
9  called my cousin Mussie, told him to come around because he
10 supposed to come through. So he came around. He parked his
11 car like down by my grandmother house and walked up. And --
12 Q.    Your grandmother's house on Alabama Avenue?
13 A.    Yeah. But he parked in the alley. He parked in one
14 of the alleys. I don't remember what alley he parked down,
15 but it was down by my grandmother house.
16 Q.    Okay. What --
17 A.    And so, at the time me and Wah-luck stood up by Mush
18 house, Mussee walking towards -- coming up towards where we
19 at. But before he get where we at, he stopped by the cut
20 where Blue live at and my cousin Egg and Cheese -- and I
21 think Brad was out there. So he was talking to Brad and Egg
22 and Cheese, so --
23 Q.    What's Egg and Cheese's real name?
24 A.    Anthony Howard.
25      (Whereupon, Government's Exhibit Number 36A18 was

Page 13975

1  marked for identification.)
2  BY MR. QUANDER:
3    Q.   Let me show you what's been marked for identification
4  as Government's Exhibit Number 36A18.  Are you familiar with
5  the person that's shown in 36A18?
6    A.   Yeah.
7    Q.   And who is that?
8    A.   That's Anthony Howard.
9    Q.   Egg and Cheese?
10   A.   Yeah.
11        MR. QUANDER:  Your Honor, at this time, the
12  government moves into evidence 36A18.
13        THE COURT:  Received.
14     (Whereupon, Government's Exhibit Number 36A18,
15  previously marked for identification, was received into
16  evidence.)
17  BY MR. QUANDER:
18   Q.   So Muncee was talking to Egg and Cheese and --
19   A.   And Brad.  And Tommy was talking to him.  Junee and I
20  think Pete and Tweety was coming through the cut.
21   Q.   Now, how do you know it was Junee, Tweety and Pete?
22   A.   Because when -- after the shooting and stuff, Muncee
23  and Anthony said it was them.
24   Q.   Now are you present at --
25   A.   Anthony -- huh?

Page 13976

1    Q.   -- I'm sorry.  Are you physically located with Muncee
2  and Egg and Cheese at this particular time?
3    A.   No.
4    Q.   Okay.  Where are you?
5    A.   Me and Wah-luck still up at Mush house.
6    Q.   And how far away is that from where Muncee and Egg
7  and Cheese and Brad are located?
8    A.   It's about -- I'd say about -- it's a lot of cuts.
9  It's a lot of houses up.
10   Q.   Is it on the same street?
11   A.   It's on -- we on the same street.  It's just -- we in
12  the alley.
13   Q.   And what street are you on?  What's the same street
14  that you're on?
15   A.   Stanton Road.
16   Q.   So what happens as far as what Muncee and Egg and
17  Cheese --
18   A.   Well, Egg and Cheese was like, who is that?  They
19  didn't say nothing.  So he was like, you better say who you
20  is.  And they still ain't say nothing.  So my cousin just
21  started opening fire.  They started opening fire back.
22        So they ran down on the one-way street --
23   Q.   Who's "they"?
24   A.   Tweety, Junee and Pete.
25   Q.   Okay.

Page 13977

1    A.   So --
2    Q.   And what's the one-way street?
3    A.   The one-way street is like off of 15th Place.  It's
4  like, you bear off -- it used to be a two-way but not it's a
5  one-way.
6    Q.   Okay.
7    A.   So when me and Wah-luck heard the shots, we ran down
8  the street where it was at, so we ran into Muncee and them,
9  and that's when they was telling us.  And then we walked
10  back up the street.
11   Q.   Now who's the "we" at this time?
12   A.   Me, Muncee and Wah-luck.
13   Q.   And where are you heading at this time after shoot
14  out with Egg and Cheese and Muncee and Tweety and Pete?
15   A.   Back to Mush house.
16   Q.   Do you get to Mush's house?
17   A.   Yeah.  So we get to Mush's house.  We stand on the
18  front porch.  So that's when, you know, we just -- we heard
19  another -- we heard a rifle go off, like an AK.  Then we
20  heard a car at the top of Stanton Road, like it was -- the
21  car came up Congress and did a drive-by.
22   Q.   Could you tell where that car was shooting at?
23   A.   It was shooting in Blue's court?
24   Q.   How do you know that?
25   A.   Because after they did it, we came down there.  The

Page 13978

1  ambulance and stuff was out there and found out that Cooler
2  got shot in the leg.
3    Q.   So after there's gunshot that you hear -- is that
4  correct? -- you're still up at Mush's, by Mush's house, is
5  that correct?
6    A.   Correct.
7    Q.   What happens after you hear that gunshot down by
8  Congress place?  What's the next thing that happens?
9    A.   We got -- well, we was ready to run down there, but
10  after the shots we heard the car stop at the stop sign, and
11  I think it was a stick.  And it made a left coming towards
12  our way.  So we just got ready for the car when it came up.
13  When it came up, all of us just shot at the car and the car
14  just kept going down Suitland Parkway.
15   Q.   When you say all of you shot at the car, do you
16  recall what type of car it was that you shot at?
17   A.   It looked like it was Honda -- a four-door Honda.
18   Q.   And could you tell who was in the four-door Honda?
19   A.   No.  I couldn't tell.
20   Q.   When you said "all of us shot at it," who are you
21  referring to that shot at this four-door Honda as it came up
22  Stanton Road?
23   A.   Me, Muncee and Wah-luck.
24   Q.   Do you know whether or not any of the shots that you
25  fired -- you or Muncee or Wah-luck -- hit the car?

64 (Pages 13975 to 13978)

Page 13979

1  A.   I don't know.
2  Q.   Do you know if anyone was injured?
3  A.   No.  I don't know.
4  Q.   After the three of you fired at that car on Stanton
5  Road, what did you do after that?
6  A.   What did we do?  I think --
7  Q.   Where did you go?
8  A.   Well, I walked back -- we all walked back down the
9  street the court.
10 Q.   And what court did you go to?
11 A.   To Blue's court.  When we walked back to the court,
12 they said Cooler just got grazed in the leg; he ain't get
13 shot bad.  So when we found out that he didn't get shot bad,
14 everything was still like -- we sat right there and talked
15 to his mother for a minute.  And then that was that.
16 Q.   Now let me show you Government's Exhibit Number 4B2-
17 1.  Do you see Blue's court?
18 A.   Yeah.
19 Q.   Could you please put an X or a mark on Blue's court.
20 A.   (Witness complies.)
21 Q.   Okay.  Where is Congress Place?  Do you see the
22 street there?
23 A.   Yeah.
24 Q.   Use your light pen and mark on your light pen the
25 direction that that car took, where it stopped at the stop

Page 13980

1  sign and then turned up Stanton Road for me, please.
2  A.   (Witness complies.)
3  Q.   And what direction did it go on Stanton Road?  Do you
4  see Mush's house in this photograph, Government's Exhibit
5  Number 4B2-1, Mush and Funky's house?
6  A.   Right here.
7  Q.   Okay.
8  A.   It like in this cut right here.
9  Q.   Where were you located when you, Muncy and Wah-luck
10 opened fire on the blue Honda four-door as it came up
11 Stanton Road?  Were you -- what was your position?  Were you
12 standing firing?  Were you kneeling?  Were you down on your
13 stomach?  How were you positioned when you fired your
14 weapon?
15 A.   I was down on my stomach.  Muncee was standing up by
16 the tree, and Wah-luck was standing up by the car.  I know
17 both of them was standing up.  I was like laying down.
18 Q.   And you said that Cooler was not seriously injured?
19     MR. QUANDER:  Your Honor, would this be a good
20 place to stop?
21     THE COURT:  All right.  You can step down.  Ladies
22 and gentlemen, we'll resume tomorrow morning at 9:30.
23 Please don't talk about the case with anyone.
24     Let me say one thing to you.  A couple of you were
25 asking in the hallway the other day about how we're

Page 13981

1  progressing.  I talked with the attorneys and I think we're
2  progressing satisfactorily.  I expect that the government
3  will be able to rest their case around August 1st or so,
4  depending on the length of some of the cross-examination,
5  which is beyond their control.
6      After the government has rested, I'll meet with
7  the defense counsel about their witnesses.  They don't
8  really have to disclose all that tomorrow until after the
9  government has rested.  Then I'll give you another estimate
10 about how long the trial is going to go and that sort thing
11 around the first part of August.
12     But we're progressing satisfactorily.  So just
13 keep your patience and keep listening to the evidence.  Have
14 a nice night, and I'll see you at 9:30 tomorrow.
15     Please don't listen to or read anything about the
16 case.  Seal your notes.  I'll see you tomorrow.
17     (Whereupon, the jury exits the courtroom.)
18     MR. QUANDER:  Your Honor, just a scheduling matter
19 I need to bring to the Court's attention, but more
20 appropriately to the defense counsel's attention.
21     The government is planning to call Dr. Arden this
22 week out of turn.  He has a scheduling problem, and he may
23 not be available when we would normally want to put him into
24 testimony.
25     It is anticipated that we may call on Wednesday of

Page 13982

1  this week.  He will offer testimony on the Anthony Payton,
2  Damin Jennifer and Sherman Johnson murders.  So I just want
3  to alert defense counsel that he would be scheduled to come
4  on Wednesday, so they can be prepared to cross-examine and
5  ask questions.  It is out of turn -- with the Court's
6  permission.
7      MR. SULLIVAN:  And just so the defense is clear,
8  only the Sherman Johnson murder will be a murder that we
9  have not offered specific evidence on prior to Dr. Arden's
10 testimony.
11     MR. QUANDER:  And possibly Damin Jennifer,
12 depending on the length f the cross-examination.  If I can
13 get the rest of Damin Jennifer on -- it's going to be very
14 brief -- I will do so.  But there may be a possibility that
15 there won't be any additional testimony other than what
16 Thomas Sims testified to concerning the Damin Jennifer
17 murder before Dr. Arden testifies.
18     MR. BRODNAX:  Your Honor, can --
19     THE COURT:  How much longer are you expecting the
20 direct of this witness to go?
21     MR. QUANDER:  I think probably an hour, hour and a
22 half at most.
23     MR. BRODNAX:  Your Honor, for scheduling purposes,
24 is there any other cooperator coming between Damien Green
25 and Dr. Arden?

United States of America v.                    CR 98-264                                    7/17/2001
Tommy Edelin, et al                                                                        Volume 65

Page 14028

1   A.    Alabama Avenue.
2   Q.    Okay.  And did you have any contact with him when you
3   saw him?
4   A.    I went over there, told him that I apologized for
5   shooting him in his legs.  He said -- he accept my apology
6   and told me he ain't worry about it, he just want his legs
7   to heal up.  I told him he know that that bullet wasn't
8   meant for him.
9   Q.    Who was it meant for?
10  A.    It was meant for Idaho.  So he accept my apology and
11  that was that.
12  Q.    Now let me ask you this.  After running into Keith,
13  did there come a time when you ran into someone else that
14  was involved in that shooting that night?
15  A.    I ran into Idaho.  He was sitting in Derek's yard,
16  rolling up a blunt.
17  Q.    What's a blunt?
18  A.    It's a cigar with weed.  You put weed in it,
19  marijuana.
20  Q.    How much time had passed from when you shot him to
21  when you saw him sitting in the yard rolling up a blunt?
22  A.    About two or three days.
23  Q.    When it -- when you saw him, did that surprise you at
24  all?
25  A.    Yeah.

Page 14029

1   Q.    Why?
2   A.    Because I thought he was dead.
3   Q.    When you saw him, what did you do?
4   A.    I looked at him, he looked at me.  He had a grin on
5   his face.  I ain't really had a grin on my face, I just was
6   so mad that I ain't kill him.  So I had a gun on me.  I
7   could have ran in the court and killed him, but there was
8   other people in the court, so I ain't want to do it, and
9   plus it was broad daylight.
10  Q.    Did you ever try to kill him again?
11  A.    No.
12  Q.    Why not?
13  A.    I got locked up down the line, it wasn't that long
14  before I got locked up.
15  Q.    Did there come a time that you are aware of where an
16  individual known to you by the nickname of Blue came into
17  possession of a cab?
18  A.    Yeah.
19  Q.    Tell us about that.
20  A.    It was on Congress Place.  We needed a car to go --
21  to do our dirt in and --
22  Q.    Wait a minute.  You've got to break it down.  When
23  you say do our dirt, what do you mean?
24  A.    Far as I mean doing our dirt, we needed a car to ride
25  to their neighborhood and shoot up their neighborhood, and

Page 14030

1   we take the car and either throw it away, like burn it,
2   something like that.  So Blue say he can get one.
3   Q.    And let me stop you.  What neighborhood do you plan
4   to do your dirt in?
5   A.    Congress Park and Stanton Terrace.
6   Q.    Why both of those neighborhoods?
7   A.    Because we was beefing with both neighborhoods.
8   Q.    And so you needed this car to --
9   A.    To get around.
10  Q.    Okay.  So how did it come about that y'all came into
11  possession of this car?
12  A.    Blue called one of his friends from up Langston Lane,
13  named Sun-Sun, and Sun-Sun came and picked him up.  They
14  went and stole a cab, came back.
15  Q.    Now do you know whether or not Sun-Sun has any
16  special skills or any unique qualifications?
17  A.    He steal cars for a living.
18  Q.    Okay.  And did -- was Blue and Sun -- were Blue and
19  Sun-Sun successful in getting a car?
20  A.    Yeah.  They came back probably I'd say about 30
21  minutes.  They weren't even that long when he came back.
22  Q.    And when they came back, what did they have?
23  A.    They had a cab.
24       (Whereupon, Government's Exhibit Number 20B7 was marked
25  for identification.)

Page 14031

1   BY MR. QUANDER:
2   Q.    Did -- let me show you what has been marked for
3   identify as Government's Exhibit Number 20B as in Boy 7.
4   Are you familiar with that photograph, sir?
5   A.    Yeah.
6   Q.    What is that?
7   A.    That's the cab.
8        MR. QUANDER:  Your Honor, at this time the
9   government moves into evidence 20B7.
10       THE COURT:  I'm sorry, could you repeat the
11  number?
12       MR. QUANDER:  Yes, I'm sorry.  It's 20B as in Boy
13  7.
14       THE COURT:  Received.
15       (Whereupon, Government's Exhibit Number 20B7, marked
16  for identification, was admitted into evidence.)
17  BY MR. QUANDER:
18  Q.    The jury now can see what we've been talking about.
19  What is that?
20  A.    That's the cab.
21  Q.    How do you know about Blue calling Sun-Sun and Sun-
22  Sun coming down and, you know, they getting the cab and --
23  how do you know about that?
24  A.    Because we was just talking about we need a car, and
25  Blue say he going to call this man Sun-Sun, Sun-Sun can get

United States District Court                                    Theresa M. Sorensen, CVR-CM
For the District of Columbia                                         Official Court Reporter

United States of America  v.
Tommy Edelin, et al

CR 98-264

7/17/2001
Volume 65

Page 14032

1  us a car.  So they got a cab.  It didn't matter what type of
2  car it really was, but they got a cab, and --
3  Q.    Now did Blue say anything about the cab, any -- what
4  did he say about the cab, if anything?
5  A.    The cab, knowing that it's a cab and the police see
6  us in a cab, they wouldn't think that we ready to do
7  something in the cab, and so when they came back with the
8  cab, I got in the driver's side.  They wanted me to drive.
9  It was me, Blue, Wah-Luck and Dune.  And I gave Dune a Tec
10  and --
11  Q.    What's a Tec?
12  A.    Tec .9.
13  Q.    Okay.
14  A.    And we all put on rubber gloves.
15  Q.    Why did you put on rubber gloves?
16  A.    For the fingerprints.
17  Q.    What do you mean for the fingerprints?
18  A.    So our fingerprints wouldn't be in the cab.
19  Q.    Okay.
20  A.    And then we rode around Congress Park.
21  Q.    Let me show you what has been admitted into evidence
22  as Government's Exhibit Number 4B3-1.  Are you familiar with
23  this photograph, sir?
24  A.    Yeah.
25  Q.    What is that a photograph of?

Page 14033

1  A.    Congress Park.
2  Q.    Did you ride around Congress Park?
3  A.    Say that again.
4  Q.    Did you go to Congress Park?
5  A.    Yeah.
6  Q.    Okay.  Now you mentioned a person that was with you,
7  did you say Dune?
8  A.    Yeah.
9  Q.    Do you know, is there a difference between Dune, D-u-
10  n-e, and Doom, D-o-o-m?
11  A.    Yeah.  Because Dune is my cousin.
12  Q.    What's your cousin's name?
13  A.    Dune.  William.
14  Q.    William?
15  A.    Yeah.
16  Q.    Okay.  And do you know the name, the real name of
17  Doom, D-o-o-m?
18  A.    No.
19  Q.    Okay.  But the person that's with you is your cousin?
20  A.    Right.
21  Q.    Dune?  Right?  D-u-n-e?
22  A.    Correct.
23  Q.    And his first name is William?
24  A.    Correct.
25  Q.    Okay.  Are you armed, sir, when you go in Congress

Page 14034

1  Park in this cab?
2  A.    No.
3  Q.    Okay.  Are other people in the cab armed as you go
4  through Congress Park?
5  A.    Yeah.
6  Q.    Who else is armed?
7  A.    Blue and Wah-Luck.
8  Q.    Are you looking for anyone in particular when you go
9  through Congress Park, or y'all just riding?
10  A.    Yeah.
11  Q.    Which is it?
12  A.    We're looking for Tweety.
13  Q.    Why would you expect Tweety to be in Congress Park?
14  A.    Because that's where he was hanging at, plus he lived
15  down that way somewhere.  He was hanging in Congress Park,
16  and he was hanging up Stanton Terrace.  But his location was
17  Congress Park.
18  Q.    So did y'all go down to Congress Park looking for
19  Tweety?
20  A.    Yeah.
21  Q.    What happened when you went down there, if anything?
22  A.    We didn't see him.  We rode through Congress Park,
23  and we seen like two or three other dudes in the car, but it
24  wasn't nobody that we was beefing with.  They was from
25  around there.  And we came back, parked the car in the alley

Page 14035

1  by Dune grandmother house.  We got out and walked back on
2  Congress, and then we left the car in the alley.  And that
3  was it.
4  Q.    Who had the keys for the car, or were there keys for
5  the car?
6  A.    No, it wasn't no keys for the car.
7  Q.    How did you get the car started?  How did it run?
8  A.    You had to take a screwdriver and start it up.
9  Q.    Did you know who the cab belonged to?
10  A.    The cab belonged to either a Jamaican or a African.
11  Q.    Why do you say that?
12  A.    He had a lot of African tapes, reggae tapes in there.
13  Q.    Y'all were playing his tapes?
14  A.    Well, I took some of the tapes out of there and I had
15  the tapes, so that's how I knew it was either a African or a
16  Jamaican.
17  Q.    So that was the type of music that was on the tape?
18  A.    Type of music that was on the tapes.
19  Q.    After that event, when the cab was stolen and y'all
20  ride around to the Congress Park, does there come a time
21  when something happens to the young man that is in front of
22  you right now?
23  A.    Yes.
24  Q.    And who is that?
25  A.    Egg and Cheese.

United States District Court
For the District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

Page 13625

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      :      Docket No. CR 05-100
                               :
            Plaintiff          :
                               :
v.                             :      Washington, DC
                               :
ANTWUAN BALL,                  :
DAVID WILSON,                  :
GREGORY BELL,                  :      May 31, 2007
DESMOND THURSTON,              :
JOSEPH JONES,                  :
DOMINIC SAMUELS,               :
                               :
            Defendants         :      9:15 a.m.
. . . . . . . . . . . . . . . . :      . . . . . . . . . . . .

VOLUME 59 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530
For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006
                          (202) 454-2811

Page 13626

A P P E A R A N C E S   C O N T I N U E D

For the Defendant    JENIFER WICKS, ESQUIRE
David Wilson:    LAW OFFICES OF JENIFER WICKS
            The Webster Building
            503 D Street, NW
            Suite 250A
            Washington, DC  20001-2728
            (202) 326-7100
            GARY E. PROCTOR, ESQUIRE
            8 East Mulberry Street
            Baltimore, MD  21202
            (410) 444-1500

For the Defendant    JAMES W. BEANE, JR., ESQUIRE
Gregory Bell:    2715 M Street, NW
            Suite 200
            Washington, DC  20007
            (202) 333-5905

For the Defendant    JONATHAN SETH ZUCKER, ESQUIRE
Desmond Thurston:    514 10th Street, NW
            9th Floor
            Washington, DC  20004
            (202) 624-0784

For the Defendant    ANTHONY DOUGLAS MARTIN, ESQUIRE
Joseph Jones:    7841 Belle Point Drive
            Greenbelt, MD  20770
            (301) 220-3700

For the Defendant    A. EDUARDO BALAREZO, ESQUIRE
Dominic Samuels:    LAW OFFICES OF A. EDUARDO BALAREZO
            400 Fifth Street, NW
            Suite 300
            Washington, DC  20001-2719
            (202) 639-0999

Page 13627

A P P E A R A N C E S   C O N T I N U E D


For Defendant Samuels:  WILLIAM B. PURPURA, ESQUIRE

            8 East Mulberry Street

            Baltimore, MD  21202

            (410) 727-8550


Court Reporter:    REBECCA STONESTREET, RPR, CRR

        Official Court Reporter

        Room 6415, U.S. Courthouse

        Washington, D.C. 20001

        (202) 354-3249



Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Page 13628

## C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRADLEY CARTER | | | | |
| By Mr. Leon | -- | -- | 13647 | -- |
| By Ms. Wicks | -- | 13629 | | |
| By Mr. Beane | -- | 13644 | -- | -- |
| | | | | |
| DETECTIVE OLIVER GARVEY | | | | |
| By Mr. Leon | 13685 | -- | 13750 | -- |
| By Mr. Martin | -- | 13719 | | |
| Mr. Tabackman | -- | 13740 | -- | -- |
| | | | | |
| DAMIEN GREEN | | | | |
| By Mr. Guerrero | 13763 | -- | -- | -- |

## E X H I B I T S

| NUMBER | ADMITTED |
|---|---|
| GOVERNMENT EXHIBIT: | |
| 400.2A | 13690 |
| 400.2C | 13690 |
| 400.2D | 13690 |
| 400.2K | 13690 |
| 400.2L | 13690 |
| 400.3A - I | 13716 |
| 400.3J | 13707 |
| 400.3L - S | 13707 |

Page 13629

```
 1              P R O C E E D I N G S
 2        THE COURT:  Good morning, ladies and gentlemen.  Good
 3  to have all of you here now.  We're ready to resume.
 4        Mr. Balarezo, any questions?
 5        MR. BALAREZO:  Good morning, Your Honor.  No, thank
 6  you.
 7        THE COURT:  Ms. Wicks?
 8        MS. WICKS:  Thank you, Your Honor.
 9           CONTINUED CROSS EXAMINATION
10  BY MS. WICKS:
11  Q.  Good morning, Mr. Carter.
12  A.  Good morning.
13  Q.  Now, Mr. Carter, I'm going to show you again
14  Government's 1231 that's in evidence.
15        MS. WICKS:  May I approach, Your Honor?
16        THE COURT:  Yes.
17  BY MS. WICKS:
18  Q.  I'm showing you 1231.  This is an exhibit that Mr. Leon
19  showed you yesterday.  And this is the grand jury of Bradley
20  Carter on June 6th of 1994.  That's what it says.  Right?
21  A.  Yes.
22  Q.  Okay.
23        MS. WICKS:  May I approach, Your Honor?
24        THE COURT:  Yes.
25  BY MS. WICKS:
```

2 (Pages 13626 to 13629)

United States District Court   kingreporter2@verizon.net   Rebecca Stonestreet, RPR, CRR
For the District of Columbia 202-354-3249   Official Court Reporter

Page 13762

1  about law enforcement, it's our understanding that the rule is
2  not limited to only law enforcement.  A prior statement of
3  identification to a third party that's not a law enforcement
4  officer, that third party could still come in and say, "I spoke
5  to X; X told me that that person did the shooting," and that's a
6  prior statement of identification.
7      THE COURT:  I'm not sure that I need to rule on
8  801(D)(1)(c), because based upon your proffer, the excited
9  utterance exception, assuming the facts come out as you say they
10  do, I think is satisfied.
11     MR. TABACKMAN:  Your Honor, I would like to be heard on
12  that.
13     THE COURT:  You have been heard on that.  We've been up
14  here 20 minutes on that.
15     MR. ZUCKER:  I have not been heard.
16     THE COURT:  Come up.
17     MR. ZUCKER:  What I just heard Mr. Guerrero to say was
18  that the witness went to the hospital, and then left the
19  hospital and went to Monkey Mark's house, and that part of the
20  reason he left was because he had a warrant out for him.
21     That implies reflection, which is exactly what would
22  undermine the excited utterance.  He stopped, he reflected that
23  he had a warrant out.  Therefore, he should not be at the
24  hospital, and it undermines his argument.
25     Additionally, and I'm not 100 percent certain on this,

Page 13763

1  I think these locations are, if I'm not mistaken, a couple miles
2  apart, which would go to the time sequence.
3      So that's all I have to say.
4      THE COURT:  You've made your record.  I have ruled.
5      (END BENCH CONFERENCE.)
6      (DAMIEN GREEN, GOVERNMENT WITNESS, having been duly sworn,
7  testified as follows:)
8          DIRECT EXAMINATION
9  BY MR. GUERRERO:
10 Q.  All right.  Good afternoon, sir:
11 A.  Good afternoon.
12 Q.  I would like you to pull that mic nice and close to you.  We
13 all want to hear you, okay?
14 A.  All right.
15 Q.  Tell us your first name and your last name, and spell each,
16 please.
17 A.  Damien Green, D-A-M-I-E-N.  Green, G-R-E-E-N.
18 Q.  I would like you to speak a little bit louder for us.  Okay?
19     How old are you, Mr. Green?
20 A.  30.
21 Q.  Where were you born?
22 A.  Southeast Community Hospital.
23 Q.  Where were you raised?
24 A.  Garfield.
25 Q.  What's Garfield?  Is that a neighborhood?

Page 13764

1  A.  Yeah.
2  Q.  Where is Garfield, what quadrant of the city?
3  A.  Stanton Road, 15th Place, Bruce Place.
4  Q.  Do you have any brothers?
5  A.  Yes.
6  Q.  How many?
7  A.  I have three brothers, one deceased.
8  Q.  Do you have any sisters?
9  A.  I have two sisters.
10 Q.  When you were growing up, who did you live with?
11 A.  Grandmother.
12 Q.  And you said you lived in Garfield.  And do you remember the
13 address where it was when you were growing up?
14 A.  1507 Bruce Place.
15 Q.  Is that close to the intersection of 15th Place and
16 Congress?
17     MR. ZUCKER:  Objection.
18     THE COURT:  Sustained.
19 BY MR. GUERRERO:
20 Q.  What are the intersections to Bruce Place?
21 A.  It's across the street from Johnson.
22 Q.  What's Johnson?
23 A.  It's a high school.
24 Q.  What ages do you think you lived over there on Bruce Place?
25 A.  I would say until I was 12, 12 or 13.

Page 13765

1  Q.  And all that time did you live with your grandmother?
2  A.  Yes.
3  Q.  Who else lived with you and your grandmother?
4  A.  My mother, brother, sister, uncles, cousin --
5  Q.  I'm sorry, go ahead.
6  A.  My cousin, that's it.
7  Q.  Was that an apartment or a house?
8  A.  It was a house.
9  Q.  Did you go to school?
10 A.  Yeah.
11 Q.  Which elementary school did you go to?
12 A.  Malcolm X.
13 Q.  Did you go to middle school?
14 A.  Yeah.
15 Q.  Which middle school did you go to?
16 A.  Johnson.
17 Q.  Did you finish middle school?
18 A.  No.
19 Q.  Did you actually -- well, what was the last grade that you
20 finished?
21 A.  Seventh.
22 Q.  Say that again.
23 A.  Seventh grade.
24 Q.  Did you finish the seventh grade at Johnson or somewhere
25 else?

Page 13766

1  A.  I was in Johnson in the seventh grade.  I was in Special Ed,
2  but I had got kicked out of Johnson so they sent me to a private
3  school --
4       MS. WICKS:  Objection.  Nonresponsive.
5       THE WITNESS:  So they sent me to --
6       THE COURT:  I'll allow it.
7  BY MR. GUERRERO:
8  Q.  If there's an objection, just pause.  Okay?
9       Can you finish your answer now, please?
10  A.  They sent me to a private school over next to CTF, over
11  there in Southeast, by D.C. Jail.
12  Q.  Okay.  CTF is part of the D.C. Jail?
13  A.  Yeah.
14  Q.  And what caused you to change schools from Johnson to that
15  other school?
16  A.  Getting in trouble, fighting, got caught with a knife.
17  Q.  How old were you then?
18  A.  I was about 13, 14, something like that.
19  Q.  And then when you went to this other school, do you happen
20  to know the name of that school that's by CTF?
21  A.  Naw, I forgot the name of it.
22  Q.  Did you finish the seventh grade?
23  A.  No.
24  Q.  Or did you move to the next grade?
25  A.  No.

Page 13767

1  Q.  And what happened that caused you not to finish seventh
2  grade?
3  A.  Well, the school that I was going to, it was for kids that
4  got in a lot of trouble, and --
5       MR. MARTIN:  Objection on relevance, Your Honor.
6       THE COURT:  I'll allow it.
7  A.  They got in a lot of trouble.  So if you get in trouble
8  there, they either give you medicine or shoot some medicine.  It
9  was for kids that was in St. Elizabeth or group homes that was
10  going to that school.  So I feel that I didn't need that.  I
11  ain't need no medicine, so I stopped going.
12  Q.  Did you ever get a GED?
13  A.  No.
14  Q.  Do you know what a GED is?
15  A.  Yes.  It's a -- well, I know it's a high grade for you.
16  Q.  How is your reading?
17  A.  Off and on.  It used to be bad, but it's still a little
18  shaky.
19  Q.  How is your writing?
20  A.  Same thing.
21  Q.  Have you taken any academic course work to improve your
22  reading or your writing?
23  A.  Yes.
24       MS. WICKS:  Objection.  Relevancy.
25       THE COURT:  I'll allow it.  Although it's 1:00 o'clock.

Page 13768

1  I wanted to break for lunch at this point.
2       Did you need to put one or two more questions?
3       MR. GUERRERO:  No, sir.
4       THE COURT:  Let's excuse the witness until 2:15, when
5  we'll resume.
6       Ladies and gentlemen, we'll break for lunch.  It's
7  1:00 o'clock.  Please come back at 2:15.  Leave your notes in
8  the jury room, and please don't talk about the case.  But enjoy
9  your lunch break.
10       (Jury out at 1:00 p.m.)
11       THE COURT:  All right.  We'll see you at 2:15.
12           (LUNCH Recess taken at 1:01 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 13769

1       CERTIFICATE OF OFFICIAL COURT REPORTER
2
3       I, Rebecca Stonestreet, certify that the foregoing is a
4  correct transcript from the record of proceedings in the
5  above-entitled matter.
6
7
8
9  _____    _____
10  SIGNATURE OF COURT REPORTER              DATE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

37 (Pages 13766 to 13769)

United States District Court   kingreporter2@verizon.net   Rebecca Stonestreet, RPR, CRR
For the District of Columbia 202-354-3249   Official Court Reporter

13770

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
          Plaintiff,               : Docket No. CR 05-100
     v.                            :
ANTWUAN BALL, DAVID WILSON,        : Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        : May 31, 2007
DOMINIC SAMUELS,                   : 2:15 p.m.
          Defendants.              :
                                   :
                                   :

VOLUME 59 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

13771

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

13772

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

13773

**AFTERNOON SESSION, MAY 31, 2007**

1
2   (2:13 p.m.)
3        MR. TABACKMAN:  Your Honor, just for the record, when the
4   court is ready, we would ask simply with respect to Mr. Green
5   that the Court do a voir dire on the issue of whether there's a
6   foundation -- whether there's a proper foundation for the issue
7   that we talked about at the bench just before lunch.
8        THE COURT:  Have you all discussed this?
9        MR. GUERRERO:  No, Your Honor, we have not, but we don't
10  join in that request.
11       THE COURT:  Come on up.
12       (Following sidebar discussion had on the record:)
13       THE COURT:  The lunch break was an hour and 15 minutes
14  ago.
15       MR. TABACKMAN:  All I would ask the Court is I think there
16  is -- I would ask that the Court conduct an out of the presence
17  of the jury voir dire to see whether there is a sufficient basis
18  for this witness to establish -- or if he can establish a
19  foundation for an excited utterance testimony.
20       THE COURT:  Okay.  That's denied.
21       MR. TABACKMAN:  Thank you.
22       THE COURT:  But I will direct the government to do that
23  prior to eliciting the utterance.
24       MR. GUERRERO:  Understood.
25       THE COURT:  All right.  Are you ready for the jury?

Scott L. Wallace, RDR, CRR
Official Court Reporter

1    MR. GUERRERO:  Yes, Your Honor, we are.

2    (Jury in at 2:19 p.m.)

3    THE COURT:  Good afternoon, ladies and gentlemen.

4    THE JURY PANEL:  Good afternoon.

5    THE COURT:  Welcome back.  We're ready to resume.

6    Mr. Guerrero.

7    MR. GUERRERO:  Thank you, Your Honor.

8    <u>CONTINUED DIRECT EXAMINATION OF DAMIEN GREEN</u>

9    BY MR. GUERRERO:

10   Q.    Okay.  Good afternoon, sir.

11   A.    Good afternoon.

12   Q.    I think we left off talking about your reading and

13   writing.  And I think I asked you last whether you've been

14   taking any courses to improve your reading or writing.

15   A.    Yes.

16   Q.    Okay.  Let me ask you, Mr. Green, to tell us that -- what

17   you were doing once you dropped out of school.  Did you work at

18   all?

19   A.    I worked a summer job, a couple of summer jobs.

20   Q.    And again, how old were you when you dropped out of the

21   seventh grade?

22   A.    About 13 or 14.

23   Q.    Were you doing anything else to get income?

24   A.    Yes.

25   Q.    What were you doing?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    A.    Selling drugs.

2    Q.    What kind of drugs?

3    A.    Cocaine, marijuana.

4    Q.    Where would you sell those drugs?

5    A.    15th Place, Stanton Road, Bruce Place.

6    MR. GUERRERO:  If we can pull up Government's Exhibit

7    103.1, marked and admitted.

8    BY MR. GUERRERO:

9    Q.    Can you see 103.1 up on the monitor?

10   A.    Yes.

11   Q.    And do you recognize what it shows?

12   A.    Yes.

13   Q.    What does it show?

14   A.    It shows my neighborhood.

15   Q.    Can you --

16   MR. GUERRERO:  May I approach, Your Honor?

17   THE COURT:  Yes.

18   BY MR. GUERRERO:

19   Q.    Okay.  Mr. Green, I've just handed you a pen.  And please

20   don't put the ink portion out, just with the pointer, can you

21   see where you -- the house your grandmother was?

22   A.    Yes.

23   Q.    Point it out for us.

24   A.    (Indicating.)

25   Q.    And you just marked on Government's Exhibit 103.1 a line

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    on top of Alabama Avenue at the intersection of Alabama Avenue

2    and 15th Place.  Did I say that right?

3    A.    Yes.

4    Q.    And where was it that you started, back at the age of 13

5    or 14, selling your drugs?  Can you see that here?

6    A.    Yes.  15th Place.

7    Q.    And is that the 15th Place that's displayed right now,

8    right in the center of 103.1?

9    A.    No, it's up some.

10   Q.    A little bit further north?

11   A.    Yes.

12   Q.    Okay.  Let me ask you, when you were selling your drugs

13   out there, what year do you think that was?

14   A.    I was selling drugs from 1990 all the way up to the day I

15   got locked up.

16   Q.    And when did you get locked up?

17   A.    '96.

18   Q.    And since 1996, where have you been?  Without telling us

19   a location, have you been free or you been locked up?

20   A.    I've been locked up.

21   Q.    So let's focus, then, between 1990 and 1996, okay?

22   A.    Right.

23   Q.    Between '90 and '93, what kind of weight were you selling

24   back then?

25   A.    Just 50s, dimes, 20s.  It wasn't really no weight.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    Q.    $50 worth?

2    A.    Yes.

3    Q.    Dimes is how much?

4    A.    $10.

5    Q.    And 20s is how much?

6    A.    $20.

7    Q.    And what wind of drugs are we are talking about?

8    A.    Cocaine.

9    Q.    Did there come a point like in 1993 when you started to

10   do a little bit more than just selling crack cocaine?

11   MS. WICKS:  Objection, leading.

12   THE COURT:  Overruled.

13   THE WITNESS:  Yes.

14   BY MR. GUERRERO:

15   Q.    And what kind of things would you get into, back starting

16   in 1993?

17   A.    Eight-balls, selling PCP, quarters.  I started moving up.

18   Q.    And did you carry guns around, starting that time?

19   A.    Yes.

20   Q.    Let's focus now between '93 to '96.  And I want you to

21   focus first on the early parts of '93.  Who would you see

22   selling crack cocaine out there in addition to you?

23   A.    That hung with me?

24   Q.    Yes.

25   A.    Jay-Jay, Squid, Mark, Honkey, Cooler, Doom, Day-Day.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   Okay.  Go a little bit slower for us.  We're trying to
2   get them all.  Day-Day?
3   **A.**   Doom, Day-Day, Troy Black, Randy, Suiterman, Raymond,
4   Tall Eric, Man, Black, Brad.  It's a lot.  I can't think no
5   more.
6   **Q.**   All right.  Let's break them down a little bit.  Who's
7   Jay-Jay?
8   **A.**   Jay-Jay?
9   **Q.**   Do you know his first name and last name?
10   **A.**   It's James Faison.
11   **Q.**   And how long did you know James Faison back then in '93?
12   **A.**   I knew him since around -- since '87, '88.
13   **Q.**   You mentioned Black?
14   **A.**   Black.
15   **Q.**   Did you know what Black's real name was?
16   **A.**   I think Maurice Willis.
17   **Q.**   And how long did you know Black or Maurice Willis back in
18   '93?
19   **A.**   I knew him since, I'd say, '89.
20   **Q.**   How about Brad?  Mentioned someone named Brad?
21   **A.**   Yeah.
22   **Q.**   Do you know Brad's last name?
23   **A.**   Carter.
24   **Q.**   And did Brad have a nickname?
25   **A.**   B-Love.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   MR. ZUCKER:  I'm sorry.  I couldn't hear the nickname.
2   THE WITNESS:  B-Love.
3   BY MR. GUERRERO:
4   **Q.**   How long did you know Brad Carter back then in '93?
5   **A.**   I knew Brad, I think, since 1990.  1990.
6   **Q.**   You also mentioned Tall Eric?
7   **A.**   Yeah.
8   **Q.**   And do you know Tall Eric's last name?
9   **A.**   I know -- I just can't remember right now.  Dang, I
10   forgot his name.  I can't remember.  I can't remember right now.
11   **Q.**   Do you know what the term "One-Five mob" means?
12   **A.**   Yeah.
13   **Q.**   What does it mean to you?
14   **A.**   It means, it mean a group.  It mean our neighborhood.
15   **Q.**   And who do you associate with One-Five mob from your
16   neighborhood?
17   **A.**   Jay-Jay, Squid, Tall Eric.
18   **Q.**   Nice and loud.
19   **A.**   Jay-Jay, Squid, Tall Eric, Black, Brad, Wal Luck.
20   **Q.**   Wal Luck, Blue?
21   **A.**   Blue.  That's it.  Monkey Mark.
22   **Q.**   Did you say Monkey Mark?
23   **A.**   Monkey Mark.
24   **Q.**   "Monkey" as in the animal, monkey?
25   **A.**   Yeah.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   And then the name Mark?
2   **A.**   Mark.
3   **Q.**   Let me run some names by you and tell me if you know who
4   these people are.  Did you ever know a person that went by the
5   nickname Tec?
6   **A.**   Yeah.
7   **Q.**   And how did you know that person?
8   **A.**   He grew up in my neighborhood, too.
9   **Q.**   Is that a person that you associated with One-Five?
10   **A.**   Yes.
11   **Q.**   How about Tommy Edelin?
12   **A.**   Yes.
13   **Q.**   How did you know Tommy?
14   **A.**   He grew up in our neighborhood, but he lived in Stanton
15   Terrace.
16   **Q.**   Is that a person you associated with One-Five?
17   **A.**   Yes.
18   **Q.**   You said Squid --
19   **A.**   Yes.
20   **Q.**   -- earlier.  And how did you know Squid?
21   **A.**   I knew him all my life.
22   **Q.**   Is that a person that you associated with One-Five?
23   **A.**   Yes.
24   **Q.**   Now, during that time period between '93 and '96, did you
25   get in some trouble yourself with the law?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **A.**   Yes.
2   **Q.**   And are you the same Damien Green who was convicted of
3   possession of cocaine and possession of PCP in case number J
4   4452-94?
5   **A.**   Yes.
6   **Q.**   Also unregistered gun in 1966, M-6967-96?
7   **A.**   Yes.
8   **Q.**   And assault with intent to kill in 1996, Felony 7803-96?
9   **A.**   Yes.
10   **Q.**   How about yourself?  Were you a member of One-Five?
11   **A.**   Yes.
12   **Q.**   And do you have a nickname?
13   **A.**   Yes.
14   **Q.**   What's your nickname?
15   **A.**   O-Face.
16   **Q.**   Why do they call you O-Face?
17   **A.**   Uh --
18   MS. WICKS:  Objection.
19   THE COURT:  Why don't you rephrase.
20   BY MR. GUERRERO:
21   **Q.**   Is there a reason why you were called O-Face?
22   **A.**   Yeah.  Jay-Jay and Mark gave me that name.
23   MS. WICKS:  Objection.
24   THE COURT:  Overruled.
25   BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   Q.   Now, around that time period, did you get to know a
2  person that went by the nickname Wop?
3   A.   Wop? Yes.
4   Q.   And how did you know that person Wop?
5   A.   We went to school together.  We hung around each other a
6  couple of times.
7   Q.   And did you see this person -- what did you know that
8  person by, their nickname?
9   A.   Cootie.
10  Q.   Say that again?
11  A.   Cootie.
12  Q.   Cootie?
13  A.   Yeah.
14  Q.   Did you know Cootie's real name?
15  A.   No.
16  Q.   And where would you see Cootie back then in '93 to '96?
17  A.   '93 to '96?  Well, '93, he was hanging around his
18  neighborhood.
19  Q.   So let's start before that, then, before 1993.  Let's go
20  '90 to '93.  Where would you see this person Cootie?
21  A.   From '90 to '93, he used to hang in the community center
22  on 15th Place.
23  Q.   Did you see him there personally?
24  A.   Yes.
25  Q.   And did you ever see him in the neighborhood of where you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  were living?
2   A.   Yes.
3   Q.   And if you saw this person again, could you identify the
4  person?
5   A.   Yes.
6   Q.   Okay.  Why don't you stand up for us and tell us if you
7  see that person that you know as Cootie in the courtroom today.
8   A.   The guy over there with the light blue tie on, on the
9  end.
10  Q.   What's the color of the shirt?
11  A.   White.
12  Q.   Is he seated next to somebody that you also recognize?
13  A.   Yes.
14  Q.   And who is he seated to that you also recognize?
15  A.   Antwuan.
16  Q.   And what's Antwuan wearing?
17  A.   He's wearing a white shirt with a blue and -- look like a
18  gray tie.
19  Q.   How about the hair on Antwuan?
20  A.   Plats.
21         MR. GUERRERO:  Your Honor, I note for the record an
22  in-court identification of Antwuan Ball and Mr. Wilson.
23         MS. WICKS:  No objection, Your Honor.
24         MR. TABACKMAN:  No objection.
25         THE COURT:  Request is granted.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  BY MR. GUERRERO:
2   Q.   Now, you said that you saw Cootie in the neighborhood
3  where you live with your grandmother.  Did you ever see where
4  Cootie was going in that neighborhood?
5   A.   Sometimes he just come up there.  Sometimes he come and
6  see people up there.  Sometime he come up there just to holler
7  at people on 15th, guys that he was cool with.  Or he might come
8  up there -- his grandmother live up there, too.
9   Q.   Cootie's grandmother lived in that neighborhood?
10  A.   Yes.
11  Q.   And can you see where Cootie's grandmother used to live?
12  A.   His grandmother used to live right here (indicating).
13  Q.   So you've pointed to 103.1, a little bit north of where
14  you indicated your grandmother lived, at the intersection of
15  Alabama and 15th Place?
16  A.   Yes.
17  Q.   And what kind of relationship did you have, if any, with
18  Cootie back then, '90 to '93?
19  A.   We was okay.  We was cool.  We was all right.
20  Q.   And how about Antwuan?  You said that that's a person
21  that you recognized --
22  A.   Yes.
23  Q.   -- here in court.  Did you know Antwuan back in '90 to
24  '93?
25  A.   Yes, I knew him.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   Q.   Did you ever come in contact with him?
2   A.   No.  Me and Antwuan wasn't on friendly -- we wasn't
3  friendly.  Back then if I see him, I speak to him or something
4  like that, but I never hung with him or deal with him or nothing
5  like that.
6   Q.   In '90 to '93, during that time period, did you ever see
7  Cootie sell any drugs?
8         MS. WICKS:  Objection to leading.
9         THE COURT:  Sustained.
10        THE WITNESS:  Uh --
11        THE COURT:  That means you can't answer.
12  BY MR. GUERRERO:
13  Q.   What kind of things did you see Cootie do back in '90,
14  '93?
15  A.   Between '90, '93, we all hung around the center.  I never
16  actually --
17        MS. WICKS:  Objection, non-responsive.
18        THE COURT:  Overruled.
19  BY MR. GUERRERO:
20  Q.   Let me -- you can finish your answer.  Go ahead.
21  A.   I never actually seen him sell drugs in front of the
22  center or nothing like that, but --
23  Q.   Okay.  Let me just pause you right there.  What's the
24  center that you're talking about?  Can you see it on the
25  exhibit?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    A.    Yes.

2    Q.    Point it out for us so we know where you're talking

3    about.

4    A.    (Indicating.)

5    Q.    All right. And you made another mark on 103.1, further

6    north on 15th Place, right before the number "1" on 15th Place,

7    right?

8          Is that right?

9    A.    Yes.

10   Q.    All right. Did there come a time when you knew Cootie

11   back between 1990 to '93 where you were playing basketball and

12   you encountered him?

13   A.    Yes.

14   Q.    And what year do you think that was?

15   A.    That was in '93.

16   Q.    And tell us about what happened then.

17   A.    Well, we was playing basketball and he came down the

18   alley on a bike.

19   Q.    Let me pause you right there. Where were you playing

20   basketball?

21   A.    On 15th Place.

22   Q.    Who were you playing basketball with?

23   A.    I don't remember who was playing with me. I can't

24   recall.

25   Q.    You said you saw Cootie come down on a bike?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    A.    Yeah.

2    Q.    And what happened?

3    A.    He came down on a bike. I had my sweatshirt on top of a

4    pole. It was a '93 Polo shirt. And everybody spoke to him and

5    then we finished playing and then I turned around and he had

6    took the sweatshirt off the pole.

7          MS. WICKS: Objection.

8    BY MR. GUERRERO:

9    Q.    Who took the sweatshirt off the pole?

10         THE COURT: Hold on. There's an objection, I think.

11         Did you object?

12         MS. WICKS: Yes. May we approach?

13         THE COURT: Yes.

14         (Following sidebar discussion had on the record:)

15         MS. WICKS: Your Honor, this is a narrative, but it also

16   sounds like he's turning around and I don't think he saw what

17   he's going to say happened. That's my concern.

18         THE COURT: Okay. I'm not going to guess what he did or

19   didn't see, but the question was: What happened? I'll let him

20   tell what happened.

21         (Sidebar discussion concluded.)

22   BY MR. GUERRERO:

23   Q.    All right. You were about to say that when you turned

24   around, what did you see?

25   A.    I seen Cool Wop.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    Q.    And what did you see Cool Wop do?

2    A.    He was taking my sweatshirt off the pole.

3          MS. WICKS: Objection.

4          THE COURT: Overruled.

5    BY MR. GUERRERO:

6    Q.    What did you do?

7    A.    I looked at him and he stopped. He took off on the bike.

8    And I started coming towards the alley, because the basketball

9    court is next to the alley, so I was going towards where he took

10   the sweatshirt off the pole at. And he turned around and

11   stopped and lifted his shirt up and showed me that he had a gun.

12   Q.    Who turned around and stopped?

13   A.    Cool Wop.

14   Q.    And when Cool Wop lifted up his shirt, what did you see?

15   A.    I seen a gun.

16   Q.    What kind of gun?

17   A.    It look like a revolver, like a .38 or something.

18   Q.    Where did you see the gun on Cool Wop's person?

19   A.    It was on his waist.

20   Q.    What did you do then?

21   A.    I just said, "Okay."

22   Q.    Did you have anything?

23   A.    Naw.

24   Q.    Did you try to get the sweatshirt back?

25   A.    Naw.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    Q.    Why not?

2    A.    Because I ain't have no gun.

3    Q.    Did you know a person named Reesey?

4    A.    Yes.

5    Q.    And did there -- just yes or no, did there come a point

6    in time when you learned that Reesey had died?

7    A.    Yes.

8    Q.    And after -- when do you think that was? What year do

9    you think that was?

10   A.    1993.

11   Q.    After that happened, do you recall being over by the rec

12   center with Squid?

13         MS. WICKS: Objection to leading, Your Honor.

14         THE COURT: Overruled.

15         THE WITNESS: Yes.

16   BY MR. GUERRERO:

17   Q.    And did an incident happen over at that rec center?

18   A.    Yes.

19   Q.    Who were you with then?

20   A.    It was me, Squid and Tony.

21   Q.    And how much after Reesey's death did this encounter

22   happen?

23   A.    Around two or three weeks.

24   Q.    And were you in a car or were you walking?

25   A.    Naw, we was standing on the front porch.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 **Q.** Is this the same rec center that you pointed at for us on
2 Government's Exhibit 103.1?
3 **A.** Yes.
4 **Q.** And what happened?  Tell us.
5 **A.** We was standing out there and Tony had just pulled up and
6 Antwuan pulled -- came down 15th.  He was driving in a brown van
7 and he had stopped for Tony.  Tony had started walking across
8 the street TOWARD his van to talk to him.
9 **Q.** Let me pause you right there.  Who's Tony?
10 **A.** Tony is Tommy's father.
11 **Q.** What's Tommy's last name?
12 **A.** Edelin.
13 **Q.** All right.  So you were about to tell us, what happened
14 then?
15 **A.** So Tony walked towards the van and Squid had hollered to
16 Antwuan.
17 **Q.** Did you hear that?
18 **A.** Yeah.
19 **Q.** And without telling us what Squid said, did you see
20 Antwuan react in any way?
21 **A.** Yeah.
22 **Q.** And what did you hear Antwuan say, if anything?
23 **A.** He said -- excuse my language -- he said, "Fuck, naw.
24 You killed my man."
25 **Q.** When Antwuan said, "Fuck, naw, you killed my man," who

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 was Antwuan talking to, that you heard?
2 MR. TABACKMAN:  Objection --
3 THE WITNESS:  Squid.
4 MR. TABACKMAN:  -- speculation.
5 THE COURT:  Overruled.
6 BY MR. GUERRERO:
7 **Q.** And did you come to an understanding, what Antwuan was
8 talking about?
9 **A.** Yeah.
10 **Q.** What did you think Antwuan was talking about?
11 MR. MARTIN:  Objection, speculation.
12 MR. TABACKMAN:  And relevance as to what he thought.
13 MR. GUERRERO:  It goes to his understanding, state of
14 mind, Judge.
15 THE COURT:  Of what?
16 MR. TABACKMAN:  And what relevance, as to what he --
17 THE COURT:  I've asked him a question.
18 MR. TABACKMAN:  I didn't understand.  I thought you were
19 talking to me.
20 MR. GUERRERO:  Nothing further, Judge.  I'll move on.
21 BY MR. GUERRERO:
22 **Q.** Did you see Squid do anything?
23 **A.** Squid said, "Well, fuck you, then."  Excuse my language.
24 MS. WICKS:  Objection.
25 BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 **Q.** Did you notice any further interaction?
2 THE COURT:  Overruled.
3 THE WITNESS:  Huh?
4 BY MR. GUERRERO:
5 **Q.** Did you notice any further interaction?
6 **A.** Squid was upset.
7 MS. WICKS:  Objection, non-responsive.
8 THE COURT:  Overruled.
9 BY MR. GUERRERO:
10 **Q.** Did you do anything?
11 **A.** No.
12 **Q.** Now, you talked about you had known Cootie or Cool Wop
13 between '90 to '93 and then you -- this incident happened with
14 Antwuan over at the rec center.  Did your relationship with
15 Cootie change or remain the same after that incident?
16 **A.** Well, our relationship changed once Reesey got killed.
17 **Q.** And when you say "our relationship," who are you talking
18 about?
19 **A.** I'd say all of us.  Squid, Antwuan, all of us.
20 MR. TABACKMAN:  Objection, 602.
21 MS. WICKS:  Objection.
22 THE COURT:  Sustained.
23 BY MR. GUERRERO:
24 **Q.** I'll be more specific.  Specifically between you and
25 Antwuan --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 MR. ZUCKER:  Objection.
2 MR. GUERRERO:  I'll withdraw that question.  Let me
3 rephrase.  I'll withdraw that question.
4 BY MR. GUERRERO:
5 **Q.** Specifically between you and Cootie or Cool Wop --
6 MS. WICKS:  Objection.
7 BY MR. GUERRERO:
8 **Q.** -- did your relationship with him and -- Cootie and you
9 change or remain the same?
10 THE COURT:  Overruled.
11 THE WITNESS:  Yes.
12 BY MR. GUERRERO:
13 **Q.** Yes, what?
14 **A.** Yes, it changed.
15 **Q.** Okay.  And how about Antwuan Ball?  You said you had
16 known him also between '90 and '93, maybe said "Hello" to him
17 and that was it.  Did your relationship, you personally with
18 Antwuan Ball, change after this incident over at the rec center?
19 MR. TABACKMAN:  Objection, leading, and objection --
20 THE COURT:  Overruled.
21 THE WITNESS:  Yes.
22 BY MR. GUERRERO:
23 **Q.** Yes, what?
24 **A.** It changed.
25 **Q.** All right.  Now, let's talk about that for a little bit.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   Before we talk about that -- we'll get to that in a
2   second -- did you also get into a bit of some trouble yourself
3   in criminal case 98072-01, where you pled guilty to conspiracy?
4   A.   Yes.
5   Q.   And do you remember what you pled guilty to?
6   A.   Attempted murder.  I think it was like three attempted
7   murders and drugs.
8   Q.   And was that in relation to your activities in One-Five?
9   A.   Yes.
10  Q.   And do you recall -- you said you'd been locked up since
11  1996.  Is that the reason you've been locked up?
12  A.   Yes.
13  Q.   What was the sentence that you received as a result of
14  that conspiracy case?
15  A.   I got five to 15 for attempted murder in Superior Court
16  and I got eight years in Federal Court.
17  Q.   All right.  So the five to 15, is that what you were
18  referring to when I asked you earlier if you had an assault with
19  intent to kill in Felony 7803-96?
20  A.   Yes.
21  Q.   Do you know who your judge was there?
22  A.   It was, I think, Judge Burgess.
23  Q.   And then in addition to, you said you got eight
24  years for the federal case.  Is that the conspiracy case?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   Q.   And again, without telling us where you are now, have you
2   been in prison as a result of both of those sentences?
3   A.   Yes.
4   Q.   And let's focus first with the federal case, the
5   conspiracy case.  Have you completed or do you still have more
6   time to serve on that sentence?
7   A.   Naw, I'm finished.
8   Q.   How much total prison time have you served so far up to
9   this date?
10  A.   Ten and a half years, almost 11.
11  Q.   And you mentioned that you had 5 to 15 on that assault
12  with intent to kill?
13  A.   Yes.
14  Q.   Are you finished or do you still have more time to serve
15  on that case?
16  A.   I have five years left.
17  Q.   Do you have any cooperation agreement with the United
18  States right now as you're testifying?
19  A.   No.
20  Q.   Do you know what a cooperation agreement is?
21  A.   It's something that you promise me.
22  Q.   Did you ever enter into a cooperation agreement before in
23  your own federal case?
24  A.   Yes.
25  Q.   And is your cooperation done?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   A.   Say that again.
2   Q.   Is your cooperation done, as far as you understand it, in
3   that cooperation agreement?
4   A.   Yes.
5   Q.   But yet you're testifying here now, right?
6   A.   Yes.
7   Q.   And are you expecting to receive anything in exchange for
8   your testimony?
9   A.   Well, it's basically taking a chance.  I'm hoping for
10  something and if -- it's up to the parole, it's up to the judge.
11  It's the only thing I can hope for.
12  Q.   Well, let's talk about that for a second.  You said,
13  "It's up to the parole."  Are you talking about the Parole
14  Board?
15  A.   Yes.
16  Q.   And have you appeared before the Parole Board already?
17  A.   Yes.
18  Q.   Have you ever received letters from the government on
19  your behalf --
20  A.   Yes.
21  Q.   -- submitted to the Parole Board?
22  A.   Yes.
23  Q.   How many have you gotten?
24  A.   Two.
25  Q.   Do you remember who the lawyers were who gave those

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   letters on your behalf?
2   A.   Steve Phleger and Ms. Ann Petalas.
3   Q.   Nice and loud.
4   A.   Ms. Ann Petalas.
5   Q.   Let's talk about the first one, Steve Phleger.
6   A.   Yes.
7   Q.   When you appeared before the Parole Board, what happened
8   that first time when you got that letter from Steve Phleger?
9       MR. TABACKMAN:  I object, Your Honor, as to the relevance
10  of the result, what happened as a result as opposed to the letter
11  being written.
12      MS. WICKS:  Exception.
13      MR. MARTIN:  Exception.
14      THE COURT:  Overruled.
15      THE WITNESS:  Say that again.
16  BY MR. GUERRERO:
17  Q.   When you got that first letter from Mr. Phleger and you
18  appeared before the Parole Board, what happened?
19  A.   I went to the Parole Board and they gave me a three-year
20  hit.
21  Q.   Even though you got the letter from the government?
22      MR. ZUCKER:  Objection to the form.
23      THE COURT:  Sustained.
24      Hold on.  When there's an objection, I need to hear it and
25  rule on it before you answer.  Okay?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    THE WITNESS:  Okay.
2    BY MR. GUERRERO:
3    Q.    Did you present the letter to the Parole Board that you
4    had gotten from Mr. Phleger?
5    A.    Yes.
6    Q.    How about when you got the letter from Ms. Ann Petalas?
7    When was that?
8    A.    That was last year.
9    Q.    And did you present that letter to the Parole Board?
10   A.    Yes.
11   Q.    And what happened when you went to the Parole Board with
12   that letter?
13   A.    I got a three-year hit.
14   Q.    Now, as you sit here today, do you still want something
15   from the government?
16   A.    Yes.
17   Q.    And what would you like from the government?
18   A.    I would like to have another letter.  I would like to
19   have a letter to go to Judge Burgess, who gave me the time, to
20   try to reduce my last five years.  That's it.
21   Q.    And have you asked me personally to submit those letters
22   on your behalf?
23   A.    Yes.
24   Q.    And what's your understanding, even if I do submit those
25   letters on your behalf?  Who has the ultimate call on what the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    ultimate outcome of your sentence is going to be?
2    A.    The judge and parole.
3    Q.    Have I promised you anything that the Parole Board would
4    do, even if I offer you a letter?
5    A.    No.
6    Q.    Have you received any promises from us as to what Judge
7    Burgess might do if we submit a letter?
8    A.    No.
9    Q.    So why are you testifying now, then?
10   A.    Well, I'm trying to help myself.  I already testified
11   once, so really, testifying on these brothers over here, it's
12   just the same thing.  I had to testify on the guys that I hung
13   with, so now I got to testify on the guys that we was beefing
14   with.
15   Q.    Now, let's talk about that beef.  I want to take you back
16   to like 1994, so when you were at Monkey Mark's house.  Do you
17   recall being there?
18   A.    Yes.
19   Q.    And who do you recall being in Monkey Mark's house then?
20   A.    I'd say Mark, Honkey, A.D., me, Jay-Jay.
21   Q.    What were you doing?
22   A.    In there drinking, smoking, playing a game.
23   Q.    Did there come a point when some of the guys left?
24   A.    Yes.
25   Q.    And who do you recall seeing leaving?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    A.    It was Black, Travis, Brad and Pooh.
2    Q.    All right.  Black.  Is that the same Maurice Willis you
3    talked about earlier?
4    A.    Yes.
5    Q.    Brad.  Is that Bradley Carter?
6    A.    Yes.
7    Q.    Pooh.  Who's that?
8    A.    Pooh, we used to call him -- I think his nickname was
9    Bread or -- I know we used to call him Bread, too.  He went to
10   school with me at Malcolm X.
11   Q.    Do you know Pooh or Bread's true name?
12   A.    No.
13   Q.    And Travis.  Who's that?
14   A.    Travis -- I forgot Travis's real name.  He from around
15   the way, too.
16   Q.    What time do you think they left?
17        MR. TABACKMAN:  Your Honor, can we get a date or some part
18   of 1994?
19   BY MR. GUERRERO:
20   Q.    Let me ask you --
21   A.    I don't know what time it was.  It was late, maybe.
22   Q.    Let me pause you right there, Mr. Green.  Let me
23   establish a little bit more.
24        When do you think this happened in '94?
25        MR. MARTIN:  Objection, form of the question, Your Honor.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    Leading.
2        THE COURT:  Overruled.
3        THE WITNESS:  This was, I'd say, during the wintertime.
4    During the wintertime.
5    BY MR. GUERRERO:
6    Q.    Okay.  And do you recall whether it was day or night when
7    these guys left?
8    A.    It was at night.
9    Q.    Did you see them leaving?
10   A.    Yes.
11   Q.    And how did you see them leave?
12   A.    They was in the alley where Brad live at and Mark live at
13   and they was going -- they was supposed to be going to the
14   liquor store.  I had gave Black some money to bring me some
15   beers back and they left, so I went back in Mark house.
16   Q.    Did you see how it was that these guys left, walking or
17   in a car?
18   A.    They was in a car.
19   Q.    Do you remember what kind of car it was?
20   A.    I think it was a Maxima.
21   Q.    Do you remember the color?
22   A.    I don't know if it was gold, champagne, it was something
23   like that.  Beige, one of them.
24        MR. GUERRERO:  If we can pull up 400.2 L, Mr. Mazzitelli.
25   BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    Q.    You can clear the screen there if you touch the lower
2  right-hand corner there where it says "Clear screen."  Just try
3  touching the lower right-hand corner.  Point to it.
4    A.    (Complied.)
5    Q.    There you go.
6          MR. GUERRERO:  Ms. Romero, can we just -- all right.
7          400.2 L, I believe marked and admitted.  Can we publish up
8  on the screen?
9  BY MR. GUERRERO:
10   Q.    Do you see 400.2 L that I just passed up to you?
11   A.    Yes.
12   Q.    And does that car look similar to the car that you saw
13  the guys leave in?
14   A.    Yes.
15   Q.    All right.  When the guys left, how long were they gone
16  for?
17   A.    I'd say about 30 -- 30 minutes.  30, 45 minutes.
18   Q.    And where did you go?
19   A.    I went back inside Mark house.
20   Q.    And after the 30 minutes, did something catch your
21  attention?
22   A.    We was inside Mark house and Brad came to the window and
23  he was like --
24   Q.    Let me pause you right there.  When Brad came to the
25  window, did you see Brad?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    A.    Yes.
2    Q.    And where were you when you saw Brad?
3    A.    I was in Mark house.
4    Q.    Were you looking out the window?
5    A.    Naw.  We was -- his room is on the ground floor, so when
6  somebody come to the window.  It's right there.
7    Q.    Okay.  Did you see Brad out the window?
8    A.    Yes.
9    Q.    And without telling us what Brad was saying at that
10  point, just describe his physical demeanor.  How was he acting?
11   A.    He was hyped, like his blood -- he was just --
12  (indicating), like he was just running.
13   Q.    What does "hyped" mean?
14   A.    It mean that your blood is flowing.
15   Q.    In that condition, did he say anything?
16   A.    He was -- when he came to the window, he was like "Black
17  just got shot in the head."
18   Q.    What did you do immediately when you heard that?
19   A.    I jumped up and ran outside.
20   Q.    And when you ran outside, how much time had gone by
21  between the time you heard Brad say Black just got shot in the
22  head until the time you're outside?
23   A.    Six seconds, five or ten seconds.
24   Q.    When you're outside, describe Brad's physical appearance
25  then.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    A.    When I got outside, he had walked -- he was walking away
2  from the window.  He was leaving to go out in the yard, so I was
3  like, "What's up?"  He was like, "Man" --
4    Q.    Before you tell me that, how was he acting then?
5    A.    He was shaking.  He was real hyped.  He was like he ain't
6  trying to go back to jail.
7    Q.    Now, in that condition, what did Brad say?
8          MR. TABACKMAN:  Objection.  Can we approach, Your Honor?
9          THE COURT:  Yes.
10         (Following sidebar discussion had on the record:)
11         MR. TABACKMAN:  We don't have any -- all we have is
12  shaking, basically, real hyped.  We don't have voices, what his
13  voice is like, that he's sweating.  The big thing is, I think, in
14  terms of the ability to reflect, the first words this witness
15  just said is, "I ain't -- I ain't going back to jail."
16         So this witness now -- so now we have Mr. Carter making an
17  excited utterance supposedly when what he's doing is he's
18  reflecting a clear indication of reflection here.  I think there
19  is just not a basis to make an excited utterance.  We don't have
20  the length of time between when Black got shot and --
21         I just think that -- I mean, the Court understands this,
22  so I don't need to go on.  I think it's clear that it's not
23  excited to the level that hearsay should come in.
24         THE COURT:  Were you going to ask anything more about his
25  condition or his appearance?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1          MR. GUERRERO:  I can, Judge, but I think the record
2  establishes that this witness saw Bradley Carter hyped, excited;
3  I think his own words were "shaking."  And I think the statement
4  that previously just came out was "Black just got shot," to
5  establish a close proximity to the excited utterance that we're
6  just about to hear.
7          THE COURT:  I'm not arguing with you.  I was just asking
8  if you were planning to ask anything more about his appearance.
9  There was some reference to blood and running.  I didn't know if
10  you were following up on that or not.
11         MR. GUERRERO:  I can follow up on that.
12         MR. TABACKMAN:  Your Honor -- I'm sorry.
13  Mr. Carter had been interviewed by the police.
14         THE COURT:  Say that again.
15         MR. TABACKMAN:  Mr. Carter had been interviewed by the
16  police by the time he's talking with this gentleman.
17         THE COURT:  That's not in the record.
18         MR. ZUCKER:  Your Honor, while he's reviewing something,
19  I'd like to respond.  I just note that I did check with some of
20  the people who are more familiar with the area and in fact to get
21  from 15th and Alabama, this approximate area, over to -- to get
22  there from greater Southeast, which is, I think, the hospital he
23  says he went to, as well as to get from the scene of the
24  shooting, which I think was 23rd -- I mean, each of those are
25  like 10, 15 minute rides, going from -- and they

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  went from the scene of the shooting to the hospital; while at the
2  hospital, he was there for a little while and was concerned about
3  being arrested because he knew there was an outstanding warrant,
4  so there's reflection on that, and then there's the additional
5  travel to the scene where the statement was made, all of which, I
6  think, undercuts the legitimacy of the excited utterance.
7      THE COURT:  I think that'll go to the weight and not the
8  admissibility.
9      (Sidebar discussion concluded.)
10 BY MR. GUERRERO:
11 **Q.**   All right.  I just want to follow up a little bit with
12 what you said was the physical appearance of Brad when you're
13 outside with him and you said "hyped" and you also said it
14 looked like he'd been running.  Describe that.  Tell us exactly
15 how he appeared?
16 **A.**   He was sweating, he was tired, he was just -- you could
17 tell he'd been running.
18 **Q.**   And in that condition, in addition to what you told us
19 earlier, what did Brad say to you?
20 **A.**   He said him, Black, Travis and Pooh, they was going to
21 the liquor store.  And he said that -- I think they stopped at a
22 stop sign or a light or something.
23     MR. CARNEY:  Objection.
24     MR. MARTIN:  Objection.
25     THE COURT:  Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

BY MR. GUERRERO:
2  **Q.**   Tell us what you recall, what you recall Brad saying.
3  **A.**   And he said a car pulled up beside them.  He said that
4  when he looked over --
5  **Q.**   Nice and loud.
6  **A.**   He said a car pulled up beside him.  He said he looked
7  over.  He said he seen Antwuan and Jo-Jo in the car.
8  **Q.**   And did -- in that condition, did Brad tell you what, if
9  anything, Antwuan and/or Jo-Jo did?
10 **A.**   He didn't say Jo-Jo did anything.  He said Antwuan
11 started shooting out the window of his car.
12 **Q.**   When you're talking to Brad, did you notice whether he
13 had any injuries?
14 **A.**   Yes.  He had -- he got shot in the hand.
15 **Q.**   What did you see in his hand?
16 **A.**   Blood.
17 **Q.**   And raise up your hand so the jury can see.  Which hand
18 are you talking about?
19 **A.**   This hand right here (indicating), the right hand.
20 **Q.**   The right hand?
21 **A.**   Yeah.
22 **Q.**   You said that Brad mentioned Jo-Jo.  Do you know who that
23 is?
24 **A.**   Yes.
25 **Q.**   And how do you know Jo-Jo?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**   I know him from hanging around Congress Park.  He used to
2  come up our way, too.
3  **Q.**   If you saw Jo-Jo again, can you recognize him?
4  **A.**   Yes.
5  **Q.**   Why don't you stand up and tell us if you see Jo-Jo.
6  **A.**   (Indicating.)  Right there with the blue -- dark blue
7  blazer on.
8  **Q.**   For the record, is that the gentleman who just stood up
9  behind me?
10 **A.**   Yeah.
11     MR. GUERRERO:  I'll note an in-court identification of
12 Mr. Jones.
13     MR. MARTIN:  No objection.
14     THE COURT:  Request is granted.
15 BY MR. GUERRERO:
16 **Q.**   Now, did you stay with Brad at that point?
17 **A.**   Naw.  He went in his house and --
18 **Q.**   Did you go inside the house?
19 **A.**   No, I didn't go with him.
20 **Q.**   What did you do when Brad went in the house?
21 **A.**   I went back towards Mark's house.
22 **Q.**   And how far away was that from Brad's house?
23 **A.**   Right next door.
24 **Q.**   And how long did you stay there?
25 **A.**   I stayed there probably about 15, 20 minutes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**   While you were there, did you notice any cars pull up to
2  Brad's house?
3  **A.**   Yes.  Fire department, police.
4  **Q.**   Did you see an ambulance?
5  **A.**   Yes.
6  **Q.**   Did you see anybody go in the ambulance?
7  **A.**   Brad.
8  **Q.**   Now, when Brad was telling you what had happened, did he
9  also tell you whether or not he had gone up to the hospital?
10 **A.**   Yes.
11 **Q.**   And was that in that same conversation that you're having
12 with him?
13 **A.**   Yes.
14 **Q.**   And this is right outside --
15 **A.**   Yes.
16 **Q.**   -- Monkey Mark's house, right?
17 **A.**   Yeah.
18 **Q.**   What did Brad say about whether or not he went to the
19 hospital before he talked to you?
20 **A.**   He said --
21     MR. TABACKMAN:  I'll object, Your Honor.
22     THE COURT:  Overruled.
23 BY MR. GUERRERO:
24 **Q.**   Go ahead, tell us.
25 **A.**   He said after Antwuan and them shot Black -- shot them,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   they had took Black to the hospital.

2   **Q.**   Who took Black to the hospital?

3   **A.**   Brad, Pooh and Travis.

4   **Q.**   And --

5   **A.**   And when they took him to the hospital, they dropped

6   Black off and Brad said he ran back.

7   **Q.**   And that's when he said he met you?

8   **A.**   Yeah.

9   **Q.**   I'd like to now focus your attention to an incident that

10   occurred over on Stanton Road and Congress Place. Do you know

11   what I'm talking about?

12       MS. WICKS: Objection as to leading, Your Honor.

13       THE COURT: Overruled.

14       THE WITNESS: With, I think, Squid.

15   BY MR. GUERRERO:

16   **Q.**   What do you remember about that incident with Squid?

17       MR. GUERRERO: First of all, let's see if we can pull up

18   103.1 again so we can get oriented.

19   BY MR. GUERRERO:

20   **Q.**   All right. Can you see 103.1 zoomed in?

21   **A.**   Yes.

22   **Q.**   And first of all, this incident that we're about to talk

23   about, when did it happen? What year, do you think?

24   **A.**   I think this was '96. '96.

25   **Q.**   Do you recall if it was the summer or the winter of '96?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **A.**   I think the summertime.

2   **Q.**   Where were you? Point to us where you were.

3   **A.**   I was right here (indicating).

4       I was inside this court right here, where the arrow is

5   at.

6   **Q.**   All right. And you first drew a line which is horizontal

7   starting at Stanton Terrace, heading left, cutting through

8   Stanton Road, and then there's an arrow that you pointed --

9   **A.**   Yeah. I put the line too long, though.

10   **Q.**   -- in between 15th Place and Stanton Road. There's like

11   a road there?

12   **A.**   Yes.

13   **Q.**   Okay. And who were you there with?

14   **A.**   It was me, Wal Luck, a female, Marcia, my girlfriend

15   Toya, a few other people.

16   **Q.**   Was it day or night?

17   **A.**   It was at night.

18   **Q.**   And what do you recall happening?

19   **A.**   Jay-Jay had went to get in his car. Squid and his baby

20   mother Sabrina and his daughter got in a car.

21   **Q.**   Did you see that?

22   **A.**   Yes.

23   **Q.**   And what kind of car was Jay-Jay driving?

24   **A.**   It was a burgundy Cadillac.

25   **Q.**   And in addition to Jay -- are we talking about Jay-Jay?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **A.**   Yes.

2   **Q.**   Is that the same James Faison that you said earlier?

3   **A.**   Yes.

4   **Q.**   Squid and Sabrina and who else did you see?

5   **A.**   Squid daughter.

6   **Q.**   And who's Sabrina? We haven't heard about her yet.

7   **A.**   That's Squid's baby mother.

8   **Q.**   And when you saw them get into the car, what else did you

9   see next?

10   **A.**   Jay-Jay was pulling off and when he pulled off, he was

11   making a left to go on Stanton Road.

12   **Q.**   All right. And is that the Stanton Road we see on

13   Government's Exhibit 103.1?

14   **A.**   Yes.

15   **Q.**   So when you say heading left, it would have been heading

16   toward the top of the exhibit?

17   **A.**   Yes.

18   **Q.**   All right. And where were you when you saw the car turn

19   left?

20   **A.**   I was standing in the front of Congress Place in the

21   court.

22   **Q.**   Is that the same location that you pointed us earlier?

23   **A.**   Yes.

24   **Q.**   What did you see?

25   **A.**   Squid and Jay-Jay and them, they pulled off and they was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   making a left. At the same time they was making a left, two

2   guys came out the cut of Turner School and started shooting at

3   the car.

4   **Q.**   Can you see the cut here on 103.1?

5   **A.**   Yes.

6   **Q.**   Okay. Why don't you clear the screen first in the lower

7   right-hand corner and point to the cut where you saw these two

8   guys come out of.

9   **A.**   Right here (indicating).

10   **Q.**   You pointed to Stanton Road, a little bit above the "S"

11   of Stanton Road?

12   **A.**   Yes.

13   **Q.**   And did you see those two guys with your own eyes?

14   **A.**   At first I didn't because the cut that they came out of,

15   it's a dark cut. But once -- so all you could see is two

16   bodies, but once the car passed and then they came out some

17   more, they was under the light.

18   **Q.**   What happened? Tell us.

19   **A.**   Well, they was making the left and as soon as they made

20   the left, we started hearing a lot of shots.

21   **Q.**   What kind of shots?

22   **A.**   Gunshots.

23   **Q.**   And were they -- which direction were the gunshots coming

24   from?

25   **A.**   Well, at first I ain't know where they was coming from,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  but when I looked up towards Stanton Road, I seen two guys.
2  They was standing like in front of the cut and they was shooting
3  at the car. Jay-Jay was making a left and they was shooting at
4  the car. And the car kept going and then you seen both of them
5  standing right there.
6  **Q.**  And did you recognize who they were?
7  **A.**  Yes.
8  **Q.**  Who did you recognize them to be?
9  **A.**  Tweety and Cool Wop.
10  **Q.**  Cool Wop, the person you identified earlier?
11  **A.**  Yes.
12  **Q.**  And Tweety. Who's that?
13  **A.**  That's Edgar Watson.
14  **Q.**  I'm sorry?
15  **A.**  Edgar Watson.
16  **Q.**  And how long had you known Tweety?
17  **A.**  I knew him all my life.
18  **Q.**  What were the -- what was the lighting conditions like
19  when you saw Cool Wop and Tweety?
20  **A.**  It was bright.
21  **Q.**  Let's focus first with Cool Wop. Did you see anything in
22  his hands?
23  **A.**  Yes. They both had guns in they hands.
24  **Q.**  What kind of gun did you see Cool Wop with?
25  **A.**  I couldn't tell what type of gun they had.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  How about Tweety?
2  **A.**  Naw, I couldn't tell.
3  **Q.**  Did you see whether or not the car that Jay-Jay was in
4  was struck?
5  **A.**  No.
6  **Q.**  What did you do?
7  **A.**  I ran. I ran and got on the phone and called my cousin
8  and told him to bring my gun because the gun that I had at
9  first, the police had took it, so I had to get another gun.
10  **Q.**  Why did you want a gun?
11  **A.**  Because I was out there and I know that somebody might
12  come through shooting or whatever, so I needed a gun.
13  **Q.**  Where did you see Cool Wop and Tweety go?
14  **A.**  They turned back around.
15  MS. WICKS: Objection, assumes facts not in evidence.
16  THE COURT: Sustained.
17  BY MR. GUERRERO:
18  **Q.**  What did you see them do?
19  **A.**  They --
20  MS. WICKS: Objection.
21  THE COURT: You can rephrase.
22  BY MR. GUERRERO:
23  **Q.**  After you saw Cool Wop and Tweety with the gun, what did
24  you see them do next?
25  **A.**  They turned around and ran towards -- back up through the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  cut.
2  **Q.**  The same cut that you pointed to earlier?
3  **A.**  Yes.
4  **Q.**  Did you see where they went after that?
5  **A.**  No.
6  **Q.**  I'd like to focus your attention to an incident that
7  occurred off two different cuts near Alabama Avenue.
8  **A.**  Yes.
9  **Q.**  What -- was there an incident that you saw in that area?
10  **A.**  Yes.
11  **Q.**  And what year do you think that was?
12  **A.**  That was '96.
13  **Q.**  Can you see that area on 103.1?
14  **A.**  Yes.
15  **Q.**  Can we -- why don't you clear the screen first.
16  **A.**  (Complied.)
17  **Q.**  All right. You cleared the screen and then, for the
18  record, you made a series of three arrows between 15th Place and
19  Stanton Road?
20  **A.**  Yes.
21  **Q.**  Which one did you mean to point to?
22  **A.**  Huh?
23  **Q.**  Which one did you want to point to? Or did you want to
24  point to all of them?
25  **A.**  I wanted to point to all of them.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  Okay. And why don't we start with -- first of all, when
2  do you think this event happened?
3  **A.**  This was in '96.
4  **Q.**  In the summer or winter?
5  **A.**  Summer.
6  **Q.**  And the areas that you've marked on 103.1, what are those
7  areas?
8  **A.**  Those are the cuts, called cuts, where you can cut
9  between the houses.
10  **Q.**  And where were you on this particular date?
11  **A.**  I was right on Congress.
12  **Q.**  You pointed to 15th Place, to the right of the "t-h" off
13  15th Place?
14  **A.**  No, it's -- yes, it's on Congress, but it's like a few
15  walks to get to 15th.
16  **Q.**  So it's like at the intersection of Congress Place and
17  15th Place?
18  **A.**  Yes.
19  **Q.**  And who were you out there with?
20  **A.**  It was me, Squid, I think Jay-Jay was with us, too. I
21  think he was. I don't know everybody, but I think Jay-Jay was
22  with us, too.
23  **Q.**  Was it day or night?
24  **A.**  It was at night.
25  **Q.**  And what were you guys doing?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   A.   We was just sitting out there, basically selling drugs.
2   Q.   And did anything happen?
3   A.   Yes.  We just started hearing a lot of gunfire.
4   Q.   And where were you when you heard the gunfire?
5   A.   Inside the court.
6   Q.   Which court?
7   A.   The first court.
8   Q.   All right.  So it's to the right of 15th Place, the first
9   court to the right of the "t-h"?
10  A.   Yes.
11  Q.   And how many gunshots did you hear?
12  A.   Maybe 20.
13  Q.   20 shots?
14  A.   Yes.
15  Q.   What did you do?
16  A.   I got down.
17  Q.   Did you see anything?
18  A.   Well, I ain't see nothing at first.  The only thing I
19  seen was a lot of people across the street from the court that
20  we was in.  They was like running, running in the house and
21  getting on the ground.
22  Q.   Which court are you talking about?  Why don't you clear
23  the screen there so we can start fresh.
24       First, point to the court again where you were.
25  A.   (Indicating.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   Q.   And now point -- you pointed again to the same area to
2   the right of the 15th, "t-h" area, the first court.  And then
3   you said you saw people running from another court?
4   A.   Right (indicating).
5   Q.   And you've pointed to almost right across the street from
6   the first area where you had mentioned you were in the first
7   court?
8   A.   Right.  This court right here (indicating).
9   Q.   All right.  And what did you see when you saw those other
10  persons running from that other court?
11  A.   They was running and then after the gunfire stopped,
12  they -- that's when I seen Tweety run from the first cut across
13  the street to the next cut.
14  Q.   All right.  Which cut are we talking about here?
15  A.   (Indicating.)
16  Q.   Okay.  You're pointing to an area to the -- on 103.1, to
17  the left of Stanton Road, looks like to be the second cut to the
18  left of Stanton Road.  And did you see anything in Tweety's
19  hands?
20  A.   Yes.
21  Q.   What did you see?
22  A.   He had a gun in his hand.
23  Q.   Could you tell what kind of gun it was?
24  A.   Uh-uh.
25  Q.   How much time had passed between the time you heard the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   20 gunshots and the time you saw Tweety with the gun in his
2   hand?
3   A.   As soon as the gunfire stopped, I seen him run across the
4   street.
5   Q.   What did you see next?
6   A.   Squid -- Squid shot at him one time.  And then after he
7   shot at him and everybody was getting up, that's when we seen
8   Cool Wop run out this cut (indicating) through the alley,
9   through the alleyway.
10  Q.   And you pointed to Government's Exhibit 103.1 to the
11  right of 15th Place, starting at the "5" and then heading north
12  on the exhibit?
13  A.   Right.
14  Q.   Did you see anything in Cool Wop's hands?
15  A.   Yes.
16  Q.   What did you see?
17  A.   He had a gun.
18  Q.   Could you tell what kind of gun it was?
19  A.   Naw.
20  Q.   What did you see next?
21  A.   Well, that was it.  After they ran through there, that
22  was it.  I ain't have no gun, I think.
23       Naw, I did have a gun.  I did have a gun on me.  I just
24  think I ain't fired.  I had a gun.
25  Q.   You had a gun?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   A.   Yeah.
2   Q.   Why didn't you fire?
3   A.   I don't know.  I ain't got no reason.
4   Q.   Did you ever see -- well, strike that.
5       I would like to now move over to an indent where you were
6   in a car with Jay-Jay and you went up to Antwuan Ball.
7   A.   Yes.
8   Q.   Do you recall where that took place?
9   A.   On Congress Place.
10  Q.   And what year do you think this was?
11  A.   I think it's '95.  I think it was '95.
12  Q.   And first of all, who were you with that day?
13  A.   Jay-Jay.
14  Q.   And was it day or night?
15  A.   It was during the daytime.
16  Q.   Was it the winter or the summer?
17  A.   The summer.
18  Q.   What were you doing with Jay-Jay?
19  A.   He had just went and picked his daughter up from school
20  and he asked me to take him around his baby mother house to drop
21  his daughter off.
22  Q.   And did you do that in a car?
23  A.   Yes.
24  Q.   Which car did you go in?
25  A.   I had a Caprice.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13822

1　Q.　Who got in the car with you?
2　A.　Well, Jay-Jay put his daughter in the car with me first.
3　He was ready to get in, but at the same time, as soon as he put
4　his daughter in the car, that's when Antwuan pulled up beside
5　us.
6　Q.　Let me pause you right there.  Can you see the area where
7　this event occurred on 103.1?
8　A.　Yes.
9　Q.　Why don't you clear the screen for us again.
10　　　All right.  And you're pointing to an area to the right
11　of 15th Place, in between 15th Place and Stanton Road?
12　A.　Yeah.  We going up towards Stanton Road.
13　Q.　So you were heading towards Stanton Road, in that
14　direction?
15　A.　Right.
16　Q.　And what happened -- well, first of all, when Antwuan
17　pulled up, is he walking or in a car?
18　A.　He was in a car.
19　Q.　Could you see who was -- was there anybody else with him?
20　A.　Yes.
21　Q.　Who was with him?
22　A.　Cool Wop.
23　Q.　And we're talking about the same Antwuan you identified
24　earlier in court?
25　A.　Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13823

1　Q.　And the same Cool Wop that we were talking about earlier
2　in court?
3　A.　Yes.
4　Q.　Was there anybody else in the car?
5　A.　Naw.
6　Q.　What kind of car was Antwuan and Cool Wop in?
7　A.　I don't know.  I can't remember.  I can't remember what
8　kind of car it was.
9　Q.　How close did the car get to you?
10　A.　It was close.  It wasn't -- it wasn't -- it was close.
11　Q.　And what did you see Squid do, if anything?
12　A.　Squid wasn't out there.
13　Q.　I'm sorry.  You said Jay-Jay?
14　A.　Yeah.
15　Q.　I meant Jay-Jay.  What did you see Jay-Jay do, if
16　anything?
17　A.　Jay-Jay was standing between the door and the car.  And
18　when Antwuan and them rolled past us, he looked and seen them,
19　they looked and seen us, so he pulled over and Cool Wop got out
20　the car and --
21　　　MS. WICKS:  Objection, non-responsive and narrative.
22　　　THE COURT:  Put your next question.
23　BY MR. GUERRERO:
24　Q.　When the car stopped, what did you see happen next -- the
25　car that you're in?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13824

1　A.　The car that I'm in?
2　Q.　Yeah.  The car that you and Jay-Jay were in, you said it
3　stopped?
4　A.　No, they car stopped.
5　Q.　Oh, okay.  I misunderstood.  When the other car stopped,
6　you're talking about the car that Antwuan and Cool Wop are in?
7　A.　Yes.
8　Q.　When that car stopped, what did you see happen?
9　A.　Cool Wop got out the car and Jay-Jay was trying to talk
10　to him.
11　Q.　Did you see Jay-Jay in the car or did you see Jay-Jay
12　approach Cool Wop?
13　A.　He was standing between the door and the car, like the
14　door was open, he's standing in the middle of the door and the
15　car.
16　Q.　And what did you see happen then?
17　A.　He stuck his hand up at Cool Wop, was like (indicating),
18　"Let me talk to you."  And Cool Wop was like, "Naw."  And then
19　Antwuan jumped out the driver's side and was like, "Naw, you
20　can't holler at him."
21　Q.　Where were you at that point?
22　A.　I was in the driver's seat.
23　Q.　Did you get out of the car at all?
24　A.　No.
25　Q.　Why not?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13825

1　A.　Because I was holding his daughter.
2　Q.　What did you see happen next?
3　A.　Cool Wop was walking towards Marcia and them house, like
4　going up the stairs, and he was still saying something.  I
5　couldn't understand what he was saying.  And he stuck his hand
6　in his pocket.
7　Q.　Who stuck his hand in his pocket?
8　A.　Cool Wop.
9　Q.　Did you see that?
10　A.　Yes.
11　Q.　And what did you see next?
12　A.　When he stuck his hand in his pocket, I was like -- I was
13　like -- I called Jay-Jay Face sometimes, too, so I was like,
14　"Face, he putting his hand in his pocket."
15　　　So Jay-Jay grabbed the gun like off the seat and was
16　like -- he wanted to go do something, but he had his daughter.
17　Q.　Who wanted to go do going?
18　A.　Jay-Jay, but he had his daughter there, so it was like he
19　let it go.  It was like he let it go.
20　Q.　When you saw Cool Wop put his hand in his pocket, could
21　you tell what he was reaching for?
22　A.　Yeah.
23　　　MS. WICKS:  Objection, assumes a fact not in evidence.
24　　　MR. MARTIN:  Objection, calls for speculation.
25　　　THE COURT:  Overruled.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13826

1 BY MR. GUERRERO:
2 **Q.** Could you see what it appeared that Cool Wop was reaching
3 for?
4 **A.** It looked like a gun.
5 **Q.** How could you tell --
6 MR. MARTIN: Objection.
7 BY MR. GUERRERO:
8 **Q.** How could you tell that?
9 Don't answer that. I'm not sure --
10 MR. MARTIN: Same objection.
11 THE COURT: Overruled.
12 BY MR. GUERRERO:
13 **Q.** How could you tell that it appeared that Cool Wop had a
14 gun?
15 **A.** Because the pants that he had on --
16 **Q.** Why don't you stand up for us and point to the pocket
17 that you saw Cool Wop go into.
18 **A.** Right pocket (indicating).
19 **Q.** And you're demonstrating that for the jury. And what did
20 it looks like to you that he was holding there?
21 **A.** It looked like a gun in there because his pants --
22 because the gun was sticking out through his pocket like this
23 (indicating).
24 **Q.** Okay. Thank you. Did you ever see him pull out a gun?
25 **A.** No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13827

1 **Q.** How did that incident end?
2 **A.** Cool Wop went inside the house and I took Jay-Jay around
3 his baby mother house.
4 **Q.** All right. I would like to focus your attention now to
5 an incident that happened over by the rec center that you told
6 us about earlier where you were with Teeny Man?
7 **A.** Yes.
8 **Q.** And what year do you think this incident happened?
9 **A.** This was in '96, I think. Yeah.
10 **Q.** And is that the rec center that you pointed out for us
11 earlier?
12 **A.** Yes.
13 **Q.** What time of year was it, winter or summer?
14 **A.** It was summertime.
15 **Q.** And was it day or night?
16 **A.** Daytime.
17 **Q.** What were you doing out at the rec center?
18 **A.** I wasn't at the rec center. We was -- I was walking
19 towards my house. And it just so happened Teeny Man was walking
20 that way too, so --
21 **Q.** Can we see that on 103.1?
22 **A.** Yes.
23 **Q.** Why don't you clear the screen again and show us where
24 this happened.
25 **A.** (Indicating.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13828

1 **Q.** All right. You pointed at 103.1 on 15th Place right
2 below the "1," a little bit to the right of the "1"?
3 **A.** Yes.
4 **Q.** And you said you were walking?
5 **A.** Yes.
6 **Q.** You were going where?
7 **A.** I was walking towards my house. Teeny Man was walking
8 towards the store, but when we walked through the cut, at the
9 end of the cut, La La and a couple of females was out there.
10 They was sitting on the wall and they was drinking and smoking.
11 We stopped right there, we was talking to them for a minute. We
12 was in the back of the rec center.
13 **Q.** And what happened when you were in the back of the rec
14 center?
15 **A.** Everybody was talking and stuff and a car had pulled in
16 the alley, so I turned around and looked at the car and --
17 **Q.** Do you remember what kind of car it was?
18 **A.** It looked like it was a Pontiac or -- I don't know. It
19 was something like that. It looked like a rental car.
20 **Q.** Could you see how many people were in the car?
21 **A.** I think it was like five people in there.
22 **Q.** How close did you get to the car?
23 **A.** Well, where we was standing at, the car was close. It
24 was -- I'd say the car, from here to the end of that table,
25 probably.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13829

1 **Q.** To the end of what table?
2 **A.** To the end of that table (indicating), the big table
3 right there.
4 **Q.** The table that I'm pointing at now?
5 **A.** Yeah.
6 **Q.** You're talking about the end of the table over where that
7 black computer is and there's a gentleman with a suit there?
8 **A.** Yes.
9 **Q.** So the distance would have been from where you are to the
10 end of the table?
11 **A.** Yes. The car was facing us.
12 MR. GUERRERO: Your Honor, is there an approximate
13 distance measurement?
14 THE COURT: 24 and a half feet.
15 THE WITNESS: I'd say --
16 BY MR. GUERRERO:
17 **Q.** And were you facing the car?
18 **A.** It was like the car was in front of us, but it was like
19 we was facing the car more than the car was facing us, so the
20 car was coming up this way and we over here. So when it pulled
21 in, we right here (indicating).
22 **Q.** What happened then?
23 **A.** So when I looked at the car, I seen Tweety driving the
24 car. And we caught eye contact. He tried to back up real fast.
25 By that time, I already seen everybody in the car.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  Who did you see in the car?

2  A.  I seen Cool Wop, I seen Jo-Jo, I seen Drano and I seen a

3 guy named Fat Tony.

4  Q.  What did you do when you saw all those guys in the car?

5  A.  Well, once Tweety backed up real fast, he backed up real

6 fast and he stopped.  So we heard -- I heard the doors open.  By

7 that time, everybody running, everybody that was sitting on the

8 wall.  Me and Teeny Man, we was backing up.  I grabbed them and

9 was like, "back up, back up."

10     So when we backed up, you got the row of houses.  It's

11 like now they can't see us, we can't see them.  But once they

12 come -- they can take maybe three, four steps right there, you

13 can -- we can see them there and they can see us.

14     So by that time, they was just shooting at everything

15 that was in their way.

16  Q.  Who did you see shooting?

17  A.  Cool Wop and Tweety.

18  Q.  And did you see a gun in Cool Wop's hands?

19  A.  Yes.

20  Q.  What kind of gun did you see?

21  A.  I don't know what type of gun it was when I seen it.  I

22 know it was like a silver gun.

23  Q.  How about Tweety?

24  A.  He had a -- he had like a -- it was a big gun he had.  It

25 was a gun -- I ain't never seen that gun before.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  How many shots did you actually see go off?

2  A.  About 75.

3  Q.  Was anyone hurt?

4  A.  No.

5  Q.  Did anyone that you were with -- you said you were with

6 Teeny Man?

7  A.  Yes.

8  Q.  Did you fire back?

9  A.  No.

10  Q.  And did Teeny Man ever fire back?

11  A.  No.

12  Q.  The gun that Teeny Man had -- strike that.  Wrong.  I'm

13 thinking wrong.  I'm incorrect.

14     The gun that you saw Tweety had, describe what it looked

15 like.

16  A.  It was a black gun and it had a thing on the top, like a

17 clip on top of it.

18  Q.  And did it looks like an automatic type gun?

19  A.  Yeah.

20     MR. TABACKMAN:  Objection.

21     MR. ZUCKER:  Objection.

22     THE COURT:  Sustained.

23 BY MR. GUERRERO:

24  Q.  Well, you tell us what it looked like.

25  A.  It was like a -- it was about this big (indicating).

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  And hold it up nice and high so we can see.

2  A.  About this big (indicating).

3  Q.  You're holding your hands up about 12 inches apart?

4  A.  Yeah.  Probably about this big (indicating).

5     MS. WICKS:  Your Honor, may we approach briefly.

6     THE COURT:  Hmm?

7     MS. WICKS:  May we approach briefly?

8     THE COURT:  On this question?

9     MS. WICKS:  Yes.

10     THE COURT:  No.

11 BY MR. GUERRERO:

12  Q.  You were saying for the jury it was about 12 inches in

13 length?

14  A.  Yes.  It was about this big (indicating).  It had a clip

15 on top of it.

16  Q.  How about the clip?  Describe that clip.  Was it a small

17 one?  A big one?

18  A.  The clip was about this long (indicating).  It sits on

19 top of the gun.

20  Q.  Have you ever seen guns like that yourself?

21  A.  No, I never seen it.

22  Q.  Did you later see a similar gun?

23  A.  Yes.

24  Q.  And did you later find out what kind of gun that was?

25  A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  What kind of gun was it?

2  A.  It's a Calico.

3  Q.  And what's a Calico?

4  A.  It's a gun that shoots a lot of bullets.

5     MR. GUERRERO:  Court's indulgence.

6 BY MR. GUERRERO:

7  Q.  When you talked about this incident here before the

8 jury -- do you recall talking to Agent Lockhart back in April of

9 2006?

10  A.  Yes.

11  Q.  And do you recall talking about this incident to him?

12     MR. TABACKMAN:  Objection.

13     MS. WICKS:  Objection.  May we approach, Your Honor?

14     THE COURT:  On this question?

15     MS. WICKS:  A concern I have.  May we approach, please?

16     THE COURT:  Not on this question, no.

17     MS. WICKS:  It's not -- it's about the proceeding.  If I

18 can please approach the bench.

19     THE COURT:  It's about what?

20     MS. WICKS:  It's the proceeding at this point.  Can I

21 please approach the Court?

22     THE COURT:  Not on this question, no.

23 BY MR. GUERRERO:

24  Q.  All right.  The question was, do you recall talking to

25 Agent Lockhart about this incident back in April of 2006?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13834

1  **A.**    Yes.

2  **Q.**    And do you recall whether or not you said anything to

3  Agent Lockhart about Jo-Jo being in the car?

4  **A.**    I don't remember.  I don't remember talking to him

5  about -- I don't remember.  I don't know.  I might have.  I

6  don't remember.

7  **Q.**    Are you -- now that you're here today, are you sure that

8  Jo-Jo was in the car or not?

9     MR. ZUCKER:  Objection.

10    THE WITNESS:  Yes.

11    THE COURT:  Hold on a second.

12    MR. MARTIN:  The question that preceded that said he

13 didn't remember.  I object to the leading form of the question.

14    THE COURT:  Come on up.

15    (Following sidebar discussion had on the record:)

16    THE COURT:  What are you trying to do?

17    MR. GUERRERO:  I'm impeaching my witness on something that

18 he didn't say before, which is I'm fronting in direct

19 examination, because we made the disclosure to the defense on the

20 302s that when he mentioned this incident to Rob Lockhart in

21 April, he didn't mention Jo-Jo.

22    And so -- and also when -- also, when he mentioned this

23 incident to Agent Lockhart in April of 2006, he didn't mention

24 that Wop had a gun.  And we released that to them.  So I'm

25 fronting something that I expect is going to be impeachable later

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13835

1  on in cross-examination.

2     THE COURT:  The last question was?

3     Do you want to put on the record your objection?

4     MR. ZUCKER:  No.  I withdraw my objection, based on that.

5     MR. MARTIN:  Mine was to leading and --

6     MS. WICKS:  Can I consult with government counsel for a

7  moment, Your Honor?

8     (Discussion had off the record.)

9  BY MR. GUERRERO:

10 **Q.**    All right.  I guess my last question to you was, you

11 don't recall mentioning Jo-Jo in the car back in April of 2006

12 to Agent Lockhart and my question is now, as you testify here

13 today, are you sure Jo-Jo was in the car?

14 **A.**    I'm sure.

15 **Q.**    Okay.  And similarly, when you talked to Agent Lockhart

16 back in 2006, do you recall whether or not you told Agent

17 Lockhart specifically that you saw a gun in Cool Wop's hand?

18 **A.**    Yes.

19 **Q.**    And do you recall saying yes, that you saw that to Agent

20 Lockhart or do you not remember?

21 **A.**    I don't remember.

22 **Q.**    Okay.  Now I'm asking you now, as you sit here today, are

23 you sure that you saw a gun in Cool Wop's hand?

24 **A.**    Yes.

25 **Q.**    Do you know a person named Boy-Boy?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13836

1  **A.**    Yes.

2  **Q.**    How do you know that person?

3  **A.**    I knew Boy-Boy -- his brother -- I went to school with

4  his youngest brothers.

5  **Q.**    And who are the brothers that you know related to

6  Boy-Boy?

7  **A.**    Santuce and Jazz.

8  **Q.**    How long did you know Boy-Boy back between '93, '96?

9  **A.**    I knew Boy-Boy basically all my life for real as far as,

10 you know, going to Malcolm X just by seeing him around other

11 guys, you know, in the neighborhood.

12 **Q.**    If you saw Boy-Boy again, would you recognize him?

13 **A.**    Yes.

14 **Q.**    Would you stand out and tell us if you see him?

15 **A.**    He's behind Cool Wop.

16 **Q.**    What's he wearing?

17 **A.**    He has on a white shirt -- I can't really see him.

18 **Q.**    And did you say he was behind someone that you recognize?

19 **A.**    He's behind Cool Wop.

20    MR. GUERRERO:  Your Honor, I note an in-court

21 identification of Mr. Bell.

22    MR. BEANE:  No objection, Your Honor.

23    THE COURT:  Request is granted.

24 BY MR. GUERRERO:

25 **Q.**    And what kind of interactions, if any, did you have with

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13837

1  Boy-Boy?

2  **A.**    Between 1993 and 1996, I bought a couple of eight-balls

3  from him.

4  **Q.**    Eight-balls of what?

5  **A.**    Cocaine.

6  **Q.**    And before '93, had you done that also with Boy-Boy?

7     MR. BEANE:  Objection, leading, Your Honor.

8     THE COURT:  Overruled.

9     THE WITNESS:  I don't remember for sure, but I know I

10 bought a few eight-balls from him, wholesales.

11    MR. GUERRERO:  Court's indulgence.

12 BY MR. GUERRERO:

13 **Q.**    Let's talk about you now.  We've talked about instances

14 where you were shot at.  How about you in particular?  Do you

15 recall, as part of your plea agreement, acknowledging some

16 participation in some violence as well?

17 **A.**    Yes.

18 **Q.**    And I'd like to focus your attention to your plea.  In

19 addition to the -- you said there was a couple of attempted

20 murders; is that what you called them?

21 **A.**    Yes.

22 **Q.**    And were you involved in an incident where a couple of

23 police officers were shot?

24 **A.**    Yes.

25 **Q.**    And tell us about that.  What happened there?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13838

1   **A.**   I was coming from the liquor store and I pulled up on
2   Congress Street -- Congress Place and I was getting out the car
3   and I had a bag of liquor in my hand and I had the gun in my
4   hand under the bag.  And a four-door car came down on Congress
5   and turned in the alley.  It was like maybe four or five people
6   in the car.
7        So a guy named Poochy told me there was supposed to have
8   been some guys from Stanton Terrace --
9        MR. ZUCKER:  Objection.  Objection to what Poochy told
10  him.
11       MR. GUERRERO:  Goes to state of mind, Your Honor.
12       MS. WICKS:  Exception.
13       MR. ZUCKER:  Exception.  I'll withdraw.
14  BY MR. GUERRERO:
15  **Q.**   Poochy told you what?
16  **A.**   That there was some guys from Stanton Terrace.  It was
17  Tweety and them.
18  **Q.**   That guys in what were from Stanton Terrace?
19  **A.**   That was in the car.
20  **Q.**   Did that car look like a police car to you?
21  **A.**   No.
22  **Q.**   And so what did you do?
23  **A.**   I put the bag down, I ran through the cut, Wal Luck ran
24  through the alley and I got down on one knee and I shot at the
25  car.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13839

1   **Q.**   Did you know who it was that was inside the car?
2   **A.**   No.
3   **Q.**   You were shooting at them because you thought they were
4   from Stanton Terrace?
5        MR. BEANE:  Objection, leading.
6        THE COURT:  Sustained.
7   BY MR. GUERRERO:
8   **Q.**   How about an incident where a person named Mark Barnes
9   was shot at?  What happened there?
10  **A.**   Well, a couple of us got together and we walked up
11  through the same cut that Cool Wop and Tweety came out of and we
12  seen a group of people at the bottom of Stanton Terrace and we
13  just started shooting at everybody.
14  **Q.**   Why did you shoot at them?
15       MR. TABACKMAN:  Your Honor, I'm going to object.  Can we
16  approach?
17       THE COURT:  To why he shot?
18       MR. TABACKMAN:  I'm going to object to the form of the
19  impeachment.  I mean, Mr. -- to have this witness at this point
20  go through all of this.  He can ask him what his conviction was.
21  We have to cross-examine him on the rest of it.
22       THE COURT:  Overruled.
23       MR. TABACKMAN:  Okay.  Thank you.
24  BY MR. GUERRERO:
25  **Q.**   Why'd you shoot?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13840

1   **A.**   Because they was -- they was part of the beef.
2   **Q.**   Part of what beef?
3   **A.**   Part of the beef that was against us.  They was with
4   Tweety.
5   **Q.**   How about an incident where a person named Ira Clanton --
6        Do you know who Ira Clanton is?
7   **A.**   Yes.
8   **Q.**   Who's that?
9   **A.**   He used to hang around us.
10  **Q.**   Did Ira have a nickname?
11  **A.**   Yes.
12  **Q.**   What's that?
13  **A.**   Idaho.
14  **Q.**   And was there an incident that happened between you and
15  him?
16  **A.**   Yes.
17  **Q.**   What happened?
18  **A.**   He supposed to have been testifying against me on
19  shooting the police officer.
20  **Q.**   And because he was testifying against you, what did you
21  do?
22  **A.**   I shot him.
23       MR. ZUCKER:  Objection to the form of the question.
24       THE COURT:  Overruled.
25  BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13841

1   **Q.**   What did you do?
2   **A.**   I shot him.
3   **Q.**   Do you know if, when you shot at Ira Clayton, there was
4   another person in there by the name of Keith Archy?
5   **A.**   Yes.
6   **Q.**   Now, as part of your plea agreement, did you take
7   accountability for those shootings?
8   **A.**   Yes.
9   **Q.**   And you mentioned earlier that you have how many years
10  left on your sentence from Superior Court?
11  **A.**   Five.
12  **Q.**   And do you know what "perjury" means?
13  **A.**   Yes.
14  **Q.**   And what does it mean to you?
15  **A.**   It means if you lie, you can get extra time.
16  **Q.**   If you lie under oath?
17  **A.**   Yes.
18  **Q.**   And if you were caught lying under oath, what would that
19  expose you to?
20       MR. TABACKMAN:  Objection, bolstering, and to the form of
21  the question.
22       THE COURT:  Overruled.
23       THE WITNESS:  Some more time.
24  BY MR. GUERRERO:
25  **Q.**   Some more time on top of what?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13842

1  **A.**   My five years.

2  **Q.**   Is that something that you're willing to risk?

3  **A.**   No.

4  **Q.**   Are you telling this jury the truth today?

5  **A.**   Yes.

6      MR. GUERRERO: I have nothing further, Your Honor.  Thank

7  you.

8      THE COURT:  Mr. Tabackman, do you want to start now or

9  after the 3:45 break?

10     MR. TABACKMAN:  After the 3:45 break, Your Honor.

11     THE COURT:  We'll go ahead and take the break now, ladies

12  and gentlemen.  We'll break for 15 minutes.  Please don't talk

13  about the case.  Take your notes with you and come back at five

14  of 4.

15     (Jury out at 3:41 p.m.)

16     (Thereupon, a break was had from 3:41 p.m. until

17  3:57 p.m.)

18     THE COURT:  Mr. Tabackman, you ready for the jury?

19     MR. TABACKMAN:  Yes, sir.

20     (Jury in at 3:59 p.m.)

21     THE COURT:  Good afternoon, ladies and gentlemen.

22     THE JURY PANEL:  Good afternoon.

23     THE COURT:  Welcome back, we're ready to resume.

24  Mr. Tabackman.

25     MR. TABACKMAN:  Thank you, Your Honor.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13843

1      CROSS-EXAMINATION OF DAMIEN GREEN

2  BY MR. TABACKMAN:

3  **Q.**   Mr. Green, you have some concerns about testifying, don't

4  you, in this case?

5  **A.**   What you mean?

6  **Q.**   Well, haven't you expressed concerns about your continued

7  cooperation?

8  **A.**   Yeah.

9  **Q.**   And you have actually expressed them to Mr. Guerrero,

10  haven't you?

11  **A.**   Say that again.

12  **Q.**   You have expressed your continuing concerns to

13  Mr. Guerrero?

14  **A.**   Yes.

15  **Q.**   And you expressed them as recently as May 27th, 2007;

16  isn't that right?

17  **A.**   Yes.

18  **Q.**   And that was on what, Monday of this week?

19  **A.**   Yes.

20  **Q.**   And those are concerns about whether or not you're going

21  to get what you want in exchange for your testimony, isn't it?

22  **A.**   Yes.

23  **Q.**   Because so far, you haven't gotten what you want; isn't

24  that right?

25  **A.**   Right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13844

1  **Q.**   They've written letters to the parole board; isn't that

2  right?

3  **A.**   Right.

4  **Q.**   But that hasn't gotten you any time knocked off?

5  **A.**   Right.

6  **Q.**   And you wanted a letter to the Judge, for a sentencing

7  modification, right?

8  **A.**   Right.

9  **Q.**   None of this parole board stuff, you're tired of that?

10  **A.**   I mean, naw, it's like this.  I want a letter for the

11  parole board, too, but incentive for modification comes from --

12  basically, I don't know the law, so I had somebody help me with

13  that and that's why he received that letter Monday.  So I tried

14  to come back at him with something, so I can try to get

15  something.

16  **Q.**   You put out your bargaining position, right?

17  **A.**   Yeah.

18  **Q.**   You want my testimony in your case, I want a letter for

19  sentence modification, right?

20  **A.**   I mean, I ain't demand that, but I want something.

21  **Q.**   Right.  Something concrete.

22  **A.**   I want something that's going to help me.

23  **Q.**   Right, because that's part of the accountability that

24  you've had for the murders that you've done, right?

25     MR. GUERRERO: Objection, argumentative.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13845

1      THE COURT: Overruled.

2      THE WITNESS:  It's not like that.

3  BY MR. TABACKMAN:

4  **Q.**   It's not like that?

5  **A.**   Naw.

6  **Q.**   Mr. Guerrero said you've taken accountability and you

7  said yes for the murders you've done?

8  **A.**   Right.

9      MR. GUERRERO:  Objection, your Honor, misstates the

10  record.

11     THE COURT:  I'll allow it.

12  BY MR. TABACKMAN:

13  **Q.**   And since you've taken accountability, you don't want to

14  take too much accountability, do you?

15  **A.**   I mean, give me what you got, I'll take all of it.  I'm

16  already in a bad position now, so, I mean, what's -- ain't

17  nothing going to hurt me now, unless you giving me more time.

18  **Q.**   You don't want to do the five years that you've still

19  got, right?

20  **A.**   Right.  I feel if I'm going to help the government, I

21  feel they should help me.

22  **Q.**   And helping the government, helping the government means

23  getting convictions on these defendants, right?

24     MR. GUERRERO:  Objection, Your Honor.

25     THE COURT:  Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1      THE WITNESS:  I don't --

2      THE COURT:  That means you don't answer.

3      THE WITNESS:  Oh, okay.

4  BY MR. TABACKMAN:

5  **Q.**   Helping the government means coming in here, is that

6  right?

7  **A.**   Right.

8  **Q.**   Helping the government means having to go to the U.S.

9  Attorney's Office and meet with them; isn't that right?

10  **A.**   Right.

11  **Q.**   How many times, by the way, have you met with

12  Mr. Guerrero in the last three weeks?

13  **A.**   Uh, I'd say maybe three, four times.  Maybe three times.

14  **Q.**   Maybe three or four?

15  **A.**   Maybe three times.

16  **Q.**   In the last three weeks?

17  **A.**   Yeah, you could say that.

18  **Q.**   Okay.  And let's go back and say the last two months, how

19  many times have you met with Mr. Guerrero?

20  **A.**   None.

21  **Q.**   So, how about in 2007, how many times have you met with

22  Mr. Guerrero?

23  **A.**   I wasn't talking to him.  I was talking to

24  Ms. Ann Petalas.

25  **Q.**   Okay.  When -- how many times in the last -- in 2007 have

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  you met with Ms. Petalas?

2  **A.**   I think I met with her one time, and that was last year.

3  **Q.**   Last year.  Okay.  So let's go -- but with Mr. Guerrero

4  in the last few weeks, you met with him three or four times?

5  **A.**   I met with him at least three times and that was not last

6  week, it was this week.

7  **Q.**   This week?

8  **A.**   Yeah.

9  **Q.**   So when did you first find out you were going to testify

10  in this trial?

11  **A.**   I found out last year sometime.

12  **Q.**   Last year?

13  **A.**   Yeah.  I been -- was asked about testifying on this case

14  maybe two years ago.

15  **Q.**   But you were given a choice as to whether you would

16  testify or not?

17  **A.**   It wasn't that I got a choice.  It was just by me -- the

18  same stuff that I testified here today on, I testified on my

19  case.  It's just that I wasn't talking about them on my case.

20  It was basically on what we done after the fact, what they done

21  to us.

22  **Q.**   Okay.  We're going to get into all that.

23  **A.**   So that's why it was -- when I talked about them, it was

24  more different from our case.

25  **Q.**   We're going to get to all of that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1      In any event, in the last -- earlier this week, you sent

2  Mr. Guerrero a letter; isn't that right?

3  **A.**   Right.

4  **Q.**   And you said someone helped you write it?

5  **A.**   Yes.

6  **Q.**   Was that somebody at the jail?

7  **A.**   Yes.

8  **Q.**   And was that another prisoner?

9  **A.**   Yes.

10  **Q.**   And that prisoner knew something about the law?

11  **A.**   Well, it's not that he knew about the law, he had -- he

12  had time, too, so -- he had time in the state, so when he

13  testified, he had got that, so he brought that to my attention,

14  not saying that I can get the same thing, he just brought it to

15  my attention and asked me -- see if I can get that.

16  **Q.**   And it seemed like a good idea for you to ask for more

17  time and more assistance from the government with your problem,

18  right?

19  **A.**   Yeah.

20  **Q.**   Because you were helping with their problem, correct?

21  **A.**   Right.

22  **Q.**   Now, by the way, your problem, your problem arises from

23  the fact that you put 16 bullets into the back of a police

24  officer, didn't you?

25  **A.**   No, I didn't.  I ain't put 16 bullets in no police

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  officer.

2  **Q.**   Let me read something to you, sir, from the presentence

3  report.  On June 7th, 1996, MPD.

4      MR. GUERRERO:  Objection, Your Honor.

5      THE COURT:  Sustained.

6  BY MR. TABACKMAN:

7  **Q.**   Is it your testimony, sir, that you didn't fire 16

8  bullets from a .9 millimeter gun into the back of an undercover

9  police officer?

10  **A.**   I fired 17 bullets, but I didn't put 17 bullets into a

11  police officer.  That's what you said.

12  **Q.**   I'm sorry, sir, I guess -- I was giving you too much

13  credit for being a good shot.  How many did go into the police

14  officer?

15  **A.**   I don't know, maybe two, maybe three.

16  **Q.**   But you wanted to be sure, so you fired all 17?

17  **A.**   Yes.

18  **Q.**   And that -- what kind of gun was that?  Was that one of

19  the guns with the long clip that you were describing, that you

20  used?

21  **A.**   No, it was a .9 millimeter.

22  **Q.**   What kind of .9 millimeter?

23  **A.**   An eyewitness.

24  **Q.**   It's called an eyewitness?

25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  Do you know who makes it?
2  **A.**  Huh?
3  **Q.**  Do you know who makes it?
4  **A.**  Naw.
5  **Q.**  Did you pick it up on the street?
6  **A.**  No.
7  **Q.**  Did you go to a store and buy it?
8  **A.**  My cousin was selling guns.
9  **Q.**  Your cousin.  Where does your cousin sell guns?
10  **A.**  He was selling them.
11  **Q.**  So you bought one?
12  **A.**  No, he gave me one.
13  **Q.**  Did you register it?
14  **A.**  No.
15  **Q.**  And you carried it around every day?
16  **A.**  Yes.
17  **Q.**  And when did you buy it?
18  **A.**  When did I buy it?
19  **Q.**  I'm sorry.  When did you receive it from your cousin?
20  **A.**  I don't remember what day.  I probably just got it maybe
21  a month or two before I fired it.  I ain't have it that long.
22  **Q.**  Well, the incident that led you to have to spend time in
23  jail was in June of 1996.  Do you remember that?
24  **A.**  Right.
25  **Q.**  Do you remember the exact date?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**  Uh, no, I don't remember the exact date.
2  **Q.**  You don't remember the date that you fired those 17 shots
3  at that police officer?
4  **A.**  Naw, I don't remember the date.
5  **Q.**  Is it not important enough?
6  **A.**  No, it's not important.
7  **Q.**  And you got sentenced to how much time for doing that?
8  **A.**  Eight years.
9  **Q.**  Eight years.  And you served how much of those eight
10  years?
11  **A.**  It is a whole eight years.
12  **Q.**  So how much have you served so far?
13  **A.**  Ten and a half.
14  **Q.**  You've got eight years for that offense and you served
15  ten and a half.
16  **A.**  Well, I have two sentences, so they ran concurrent.  So
17  all together, I've been locked up ten and a half.
18  **Q.**  Okay.  So how much more time do you have on the eight?
19  **A.**  Five -- no, ain't no more time.  That's it.
20  **Q.**  So you just got time.  You've done the time for that?
21  **A.**  I've done the time.
22  **Q.**  So you just want something off your federal time?
23  **A.**  No, off my state time.
24  **Q.**  What's your state time?
25  **A.**  Five to 15.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  What was that for?
2  **A.**  Everything -- everything is federal now, but '96, we were
3  getting two numbers in Superior Court.
4  **Q.**  And what is -- what are you doing that 5 to 15 for?
5  **A.**  Attempted murder.
6  **Q.**  And who was the attempted murder -- that attempted murder
7  on?
8  **A.**  Ira Clayton.
9  **Q.**  Ira Clayton.  Was that the same Ira Clayton that Black
10  and JJ shot up -- not Black, Squid and JJ shot up?
11  MR. GUERRERO:  Objection, Your Honor, assumes facts not in
12  evidence.
13  MR. TABACKMAN:  There was testimony on that the other day.
14  THE COURT:  From this witness?
15  MR. TABACKMAN:  From Mr. Faison, Your Honor, about how he
16  shot Mr. Clayton while Squid was shooting Mr. Willis.
17  THE COURT:  Sustained.
18  BY MR. TABACKMAN:
19  **Q.**  Where did you shoot Mr. Clayton?
20  **A.**  On his body?
21  **Q.**  Where were you when you shot Mr. Clayton?
22  **A.**  On Alabama Avenue.
23  **Q.**  And was anybody with you?
24  **A.**  Uh, my cousin, a guy named Funky, a tall dude named Troy.
25  **Q.**  Is that Troy Lewis?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**  Naw.  This Troy is from another neighborhood.  He's from
2  16th and W.
3  **Q.**  He's from 16th and W?
4  **A.**  Troy.
5  **Q.**  The one you're talking about?
6  **A.**  Yeah.
7  **Q.**  You know Troy, though?
8  MR. GUERRERO:  Objection, scope.
9  THE WITNESS:  I know Troy Lewis.
10  BY MR. TABACKMAN:
11  **Q.**  He mentioned Mr. Lewis, Your Honor, when he was talking
12  about people at the beginning.
13  MR. GUERRERO:  Objection, same objection.
14  THE COURT:  I'll allow it.
15  BY MR. TABACKMAN:
16  **Q.**  Do you know Troy Lewis?
17  **A.**  Yes.
18  **Q.**  You mentioned him when you listed people in the beginning
19  of your direct testimony today.  He was with one of the names
20  that you mentioned, of people that would be around; is that
21  right?
22  **Q.**  Troy?
23  **A.**  Yeah.
24  **A.**  Well, let me correct that.  Not that Troy.  I said
25  Troy Black.  The Troy that I'm talking about is Troy Black.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13854

1 Q.  So there's a Troy Black, so you weren't talking about
2 Black as one of the people that you were --
3      MR. GUERRERO:  Objection, Your Honor.
4      THE COURT:  What was the question?
5      MR. TABACKMAN:  I'll rephrase, Your Honor.
6 BY MR. TABACKMAN:
7 Q.  Anyway, you were talking about shooting Mr. Clayton?
8 A.  Yes.
9 Q.  On Alabama Avenue?
10 A.  Yes.
11 Q.  And when did that occur?
12 A.  That happened in '96.
13 Q.  That happened in '96, and that was before or after you
14 fired those 17 shots at Officer Johnson?
15 A.  It was after.
16 Q.  And you used the same gun for that?
17 A.  No.
18 Q.  Why not?
19 A.  Because the gun I shot the police with, I gave it back to
20 my cousin.
21 Q.  Did you tell him you had killed a police officer with it?
22      THE COURT:  Can you come back to the microphone so we can
23 hear you?
24      MR. TABACKMAN:  I apologize, Your Honor.
25 BY MR. TABACKMAN:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13855

1 Q.  Did you tell him you had killed a police officer with it?
2      MR. GUERRERO:  Misstates the evidence.
3      THE WITNESS:  I didn't kill a --
4      THE COURT:  Hold on a second.  Come on up.
5      (Following sidebar discussion had on the record:)
6      MR. GUERRERO:  Mr. Tabackman, this is the second occasion
7 where he used the term "murder," that this witness "murdered"
8 someone, and now he's saying he killed a police officer.  That's
9 not accurate on the record that we have before us, and I think
10 the witness was just about to say the same thing.
11      THE COURT:  I'm not even clear about who the "him" is,
12 "did you tell him?"  Who is the "him"?
13      MR. TABACKMAN:  His cousin.  He said that he gave back the
14 gun to his cousin.
15      THE COURT:  He did say -- answer his objection.
16      MR. TABACKMAN:  I understood from the presentence report
17 that we were given, that the police officer was killed.
18      MR. GUERRERO:  It's inaccurate, Your Honor.  It's
19 inaccurate.
20      THE COURT:  Show it to me.
21      MR. TABACKMAN:  It's that paragraph there.
22      THE COURT:  Where is it?
23      MR. TABACKMAN:  "Officer Johnson -- he fired all 16
24 bullets from his" -- I apologize.  I thought that it said that 16
25 bullets went into Officer Johnson.  He said that he fired all 16

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13856

1 of them in front of the officer down.  And it says "An
2 examination of the ballistics of the .9 millimeter gun matched
3 the shell casings found at the scene of Anthony Payton's murder.
4      THE COURT:  Who is Anthony Payton?
5      MR. TABACKMAN:  I thought that's who it was, Your Honor.
6 I received this just a short while ago and I read it too quickly.
7 I thought that was -- I thought this was referring to the murder
8 of the police officer.
9      THE COURT:  Who is the police officer?
10      MR. GUERRERO:  Officer Kevin Johnson and Officer Darin
11 Marcus.
12      MR. TABACKMAN:  It says here that "He fired all 16 bullets
13 from his .9 millimeter gun, semi-automatic pistol.  Law
14 enforcement officials immediately responded to a call of an
15 officer down.  Mulberry disposed of his .9 millimeter" -- that
16 was his co-defendant -- "his .9 millimeter gun and his
17 bulletproof vest on the side of the dumpster."  It says,
18 "Damien Green began shooting at the back window of the police car
19 numerous times and fired all 16 of bullets from his .9 millimeter
20 semi-automatic," and then it goes down -- and says, "An
21 examination of the ballistics of the .9 millimeter gun matched
22 the shell casings down on the scene of the Anthony Payton
23 murder."  Officer Darin Marcus was not shot.  That's one of the
24 two police officers.  And then it said he was shot in the back.
25 And I thought that I had read that -- I received this this

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13857

1 morning before the testimony.  I obviously read it too quickly.
2 I will clear it up.
3      (Sidebar discussion concluded.)
4 BY MR. TABACKMAN:
5 Q.  You didn't kill Officer Johnson; isn't that correct?
6 A.  No.
7 Q.  You did fire 17 shots at him; isn't that right?
8      MR. GUERRERO:  Objection, asked and answered.
9      THE COURT:  Sustained.
10 BY MR. TABACKMAN:
11 Q.  And you thought that the officers were members of the
12 Stanton Terrace crew; isn't that right?
13 A.  Correct.
14 Q.  And you were firing 17 shots at that car because you were
15 trying to kill whoever it was from the Stanton Terrace crew;
16 isn't that right?
17 A.  Correct.
18 Q.  And the gun that was used, that you were using that day,
19 the one you said you got from your cousin, was also used in a
20 murder, wasn't it?
21      MR. GUERRERO:  Objection, basis.
22      THE COURT:  Sustained.
23 BY MR. TABACKMAN:
24 Q.  Do you know, sir, whether or not that same gun was used
25 to kill someone else --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13858

1      MR. GUERRERO:  Objection, scope.
2  BY MR. TABACKMAN:
3  Q.    -- by you?
4      THE COURT:  There's an objection.
5      MR. TABACKMAN:  I'm sorry.  I was trying to modify the
6  rest of the question, to bring it into his conduct.
7      THE COURT:  Rephrase the question, then.
8      MR. TABACKMAN:  Okay.
9  BY MR. TABACKMAN:
10 Q.    Do you know a person by the name of Anthony Payton?
11 A.    Yes.
12 Q.    Who is Anthony Payton?
13 A.    I think his name is Juney, his nickname is Juney.
14 Q.    And how do you know him?
15 A.    Uhm, he's from up Stanton Terrace.
16 Q.    Is that somebody you were beefing with when you were with
17 Mr. Edelin's group?
18     MR. GUERRERO:  Objection, scope.  Beyond the scope.
19     THE COURT:  Sustained, but just get to the point.
20 BY MR. TABACKMAN:
21 Q.    Did you use that gun to kill Anthony Payton?
22 A.    No.
23 Q.    Did you lend that gun to someone else to kill Anthony
24 Payton?
25     MR. GUERRERO:  Same objection, beyond the scope.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

13859

1      THE COURT:  I'll allow it.
2      THE WITNESS:  No.
3  BY MR. TABACKMAN:
4  Q.    So you have the shooting of Officer Johnson and the
5  shooting of Ira Clayton.  Who else have you shot with that gun?
6  A.    The gun that I shot the police with, that was the only
7  gun that I ever did a crime with.  That was it.  Idaho, I shot
8  him with a different gun.
9  Q.    Okay.  And what gun was that?
10 A.    It was a .40 caliber.
11 Q.    Revolver or semi-automatic?
12 A.    It was a semi-automatic.
13 Q.    How many bullets did that carry?
14 A.    Uh, maybe 10 to 15.  I'm not for sure.
15 Q.    And did you empty the clip into Mr. Clayton when you saw
16 him?
17 A.    Naw, I think I shot maybe seven, seven or eight and then
18 I realized the gun wasn't emptied and I shot him some more.
19 Q.    You mean you stopped and reloaded?
20 A.    Naw, there was still bullets in the gun, so I finished
21 the rest of the bullets on him.
22 Q.    Okay.  You fired seven or eight?
23 A.    Right.
24 Q.    And you said you thought it was empty?
25 A.    Yeah.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

13860

1  Q.    But you discovered that it wasn't empty?
2  A.    Right.
3  Q.    So after discovering that it wasn't empty, you decided to
4  finish off the clip in Mr. Clayton?
5  A.    Yes.
6  Q.    And what had Mr. Clayton done to you to bring that about?
7  A.    He supposed to have been testifying on me about shooting
8  a police officer.
9  Q.    The testifying against shooting a police officer, is that
10 the Police Officer Johnson --
11 A.    Yes.
12 Q.    -- that we're talking about?
13     So, if I understand you correctly, you found out that
14 Mr. Clayton was going to testify against you?
15 A.    Yes.
16 Q.    Because -- had you been arrested on the charge against
17 Mr. Johnson -- for shooting Officer Johnson?
18 A.    Well, the police had ran in my house and searched my
19 house.  They took a lot of pictures.  They locked me up for a
20 gun that I had.  It was a .380 caliber gun that I had under my
21 bed.  I knew that they was coming there for that, because when
22 they was in my house, they was saying that I don't like
23 policemen, while they were taking my pictures off the wall and
24 stuff like that.  That's how I knew that they was in there for
25 that, but they didn't find the gun, so I got out the next day.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

13861

1  Q.    So, the police -- after you had shot Officer Johnson --
2  A.    Yes.
3  Q.    -- the police came to your house --
4  A.    Yes.
5  Q.    -- they had a search warrant, is that what you're saying?
6  A.    Yes.
7  Q.    And that search warrant, did that mean that they charged
8  you -- did it state that you had committed any specific crimes?
9  A.    Naw, I didn't see the search warrant, so -- they never
10 said I did any crimes or nothing, they just ran in my house,
11 searched my house.
12 Q.    And what did the search warrant say they were looking
13 for?
14     MR. GUERRERO:  Objection, Your Honor.
15     THE COURT:  Sustained.
16 BY MR. TABACKMAN:
17 Q.    Were you at home when they came?
18 A.    Yes.
19 Q.    And were there -- how many police were there?
20 A.    Maybe 15, 20.
21 Q.    And they started looking all over your house.  And they
22 were looking for a 380 gun?
23 A.    Well --
24     MR. GUERRERO:  Objection, Your Honor, speculation.
25     THE COURT:  Sustained.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  BY MR. TABACKMAN:
2  **Q.**  You had a .380 semi-automatic in your house; is that
3  right?
4  **A.**  Yes.
5  **Q.**  And you were hiding it?
6  **A.**  Yes.
7  **Q.**  And had you committed any crimes with that .380?
8  **A.**  No.
9  **Q.**  And they didn't find it?
10  **A.**  Yeah, they found it.
11  **Q.**  They found it that day?
12  **A.**  Yeah.
13  **Q.**  And they arrested you?
14  **A.**  Yeah.
15  **Q.**  And you went down to court?
16  **A.**  Yeah.
17  **Q.**  And you got let out the next day?
18  **A.**  Yes.
19  **Q.**  Okay. Now, I thought I heard you say they didn't find
20  the gun?
21  **A.**  No, they found it.
22  **Q.**  But you still got out the next day?
23  **A.**  Yes.
24  **Q.**  And then we were talking about how that linked up with
25  shooting Mr. Clayton.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**  Uh --
2  **Q.**  Let me ask you a question, then.
3      So you're back out and Mr. Clayton is aware that -- you
4  told Mr. Clayton that you had shot Officer Johnson?
5  **A.**  No, I didn't tell him. The night that I shot the police,
6  he was out there. He was -- he was out there. He was sitting,
7  I'd say, in the yard, Brad's yard. I think in the front. He
8  was out there. The same night that I shot the police, two other
9  guys supposed to have been killing somebody that night, but by
10  me shooting a policeman, it stopped them from what they was
11  doing and that's when Idaho seen me, you know, that night, but
12  everybody thought somebody else shot the police. They didn't
13  think I did it.
14  **Q.**  But Idaho knew --
15  **A.**  But Idaho knew, so once he told everybody, it got out
16  there, and then he was supposed to be telling anyway. He was
17  already out there, he was supposed to be telling anyway. So by
18  that time, he had already been shot up before -- stabbed, or
19  whatever. And so at that time, once I heard that he was
20  supposed to be telling on me --
21  **Q.**  There was nothing else to do?
22  **A.**  There was nothing else to do.
23  **Q.**  As you just said, like that, what else could you do at
24  that point, right?
25  **A.**  Right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  Now, I take it you have a different view today of a
2  cooperating witnesses?
3  **A.**  Do I have a different view?
4  **Q.**  Yeah. I mean, if Mr. Clayton you were afraid was going to
5  be a cooperator, right?
6  **A.**  Well --
7  **Q.**  Isn't it?
8  **A.**  I'm in the same shoes he was in.
9  **Q.**  Right. So you don't think much now the way you responded
10  to him, do you?
11  **A.**  I mean, if I wasn't in this position, yeah, I still think
12  the same way.
13  **Q.**  If you weren't in this position, you'd think the same
14  way?
15  **A.**  Yeah.
16  **Q.**  So your attitude towards the law hasn't changed, is that
17  what you're saying?
18  **A.**  No, my attitude changed a lot. I mean, I know that I
19  can't deal with the law, as far as going up against them or
20  doing crimes no more, because of my position, but if I would
21  have never been locked up, I would still be doing the same
22  thing.
23  **Q.**  And if you could get away with it, you'd do the same
24  thing when you get out, right?
25  **A.**  If I can get away with it now?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  Yeah.
2  **A.**  Oh, naw.
3  **Q.**  Naw?
4  **A.**  I'm done, I can't go back to that life. I can't go back
5  to that life no more. I violated that life.
6  **Q.**  I see. Now, so you have the shooting of Mr. Clayton, the
7  shooting of Officer Johnson, and those are the two assaults or
8  shootings that you've taken accountability for. Are there any
9  others that you have taken accountability for?
10  **A.**  The Mark Barnes and Keith. He was with Idaho when I shot
11  Idaho. He got shot that night, too.
12  **Q.**  He got shot. You mean you shot him?
13  **A.**  Right.
14  **Q.**  Right. You shot him with the same firearm?
15  **A.**  Yes.
16  **Q.**  Okay. And did you shoot him from behind?
17  **A.**  He was sitting next to him. The bullet wasn't meant for
18  him.
19  **Q.**  I'm sorry, you said -- how many shots did you say you
20  fired at Idaho?
21  **A.**  Maybe 10 or 15. I don't recall. I know it was -- maybe
22  12. It was in that range.
23  **Q.**  Firing that many increases the likelihood that you'll be
24  successful in hitting them, right?
25  **A.**  I guess.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13866

1 Q. Well, you know that. Isn't that why you fired that many?
2 A. I fired that many to try to kill him.
3 Q. Right. But you didn't; is that right?
4 A. Correct.
5 Q. That must have been disappointing.
6 A. Well, it can be disappointing sometimes, but you always
7 got another day, when you living that life style.
8 Q. And Mark Barnes, how many shots did he get? Is that his
9 name, Mark Barnes?
10 A. Yes.
11 Q. And had you had any dealings with him?
12 A. No.
13 Q. Hadn't done anything to cross you in any way?
14 A. No.
15 Q. Hadn't tried to tell the police about anything that you
16 had done?
17 A. No.
18 Q. Just an unlucky bystander?
19 A. Naw, he wasn't a bystander, he was -- he used to deal
20 with Tweety and them, too.
21 Q. Well, on that night, he was just sitting next to wherever
22 Idaho was, right?
23 A. No, Mark Barnes wasn't there, it was Keith.
24 Q. I'm sorry. It was Keith. Keith what?
25 A. I forgot his -- Keith something. I forgot his last name.

13867

1 Q. So he was sitting next to Idaho when you were firing down
2 on Idaho?
3 A. Yes.
4 Q. Now, when you fired down on somebody like Idaho or
5 Officer Johnson, do you pull the trigger and all of them come
6 out at once, pow, pow, pow, pow, pow, pow, pow, or is it like
7 you pull it and you stop and some come out, and -- how do you do
8 that?
9 A. You just keep pulling the trigger.
10 Q. Until you can't pull it anymore?
11 A. Until you can't pull it no more.
12 Q. So, in the accountability that you've taken, have you
13 written a letter to Officer Johnson?
14    MR. GUERRERO: Objection, relevance.
15    THE COURT: Overruled.
16 BY MR. TABACKMAN:
17 Q. Have you written a letter to Officer Johnson or
18 communicated to him?
19 A. No.
20 Q. Have you written a letter to Mr. Clayton or his family?
21 A. No.
22 Q. Have you written a letter to Keith?
23 A. No.
24 Q. How about Mr. Barnes?
25 A. No.

13868

1 Q. How did Mr. Barnes happen to get shot by you?
2 A. He was standing in the -- he was standing with a group of
3 guys, and we just shot at everybody who was standing over there
4 with him, and he the one who got shot.
5 Q. Okay. Where was he standing?
6 A. Stanton Terrace.
7 Q. Exactly where in Stanton Terrace?
8 A. It's the next street over from Stanton Road.
9 Q. And what was he doing -- did you just come up from behind
10 and shoot at these guys?
11 A. Yeah.
12 Q. How many guys was he with?
13 A. It was probably like about seven, six.
14 Q. Were you -- how many guys were you with?
15 A. About five, about five of us.
16 Q. You all were armed?
17 A. Yes.
18 Q. Shot at all -- did you all empty your clips, do you know?
19 A. Naw.
20 Q. You wanted to kill the guys that were there, though?
21 A. Yeah, I wanted to kill the guys, but I didn't fire that
22 night.
23 Q. Oh, I thought you hit Mark Barnes?
24 A. Naw, I was charged with it, but I didn't hit him.
25 Q. You didn't tell on anybody else?

13869

1 A. Did I tell on somebody?
2 Q. Yes.
3 A. Naw.
4 Q. Did you testify against them?
5 A. I testified against them on the conspiracy, yeah.
6 Q. That was part of Mr. Edelin's group?
7 A. Yes.
8 Q. Who was with you that night?
9 A. Uhm, I think it was Soup Bone, Rocky.
10 Q. Soup Bone have a real name, regular name?
11 A. Suiterman. I've forgot his last name.
12 Q. And who's Rocky?
13 A. Rocky, I forgot his last name, too. I can't remember
14 everybody who was there. I can't remember. I know it was about
15 four or five of us.
16 Q. Okay. So that's Mr. Clayton, Mr. Barnes, Keith,
17 Officer Johnson. Anybody else that you've assaulted know that
18 you hit and injured firing a gun?
19 A. That's it.
20 Q. That's it. Have you tried on other occasions?
21 A. Yeah.
22 Q. How many other occasions would you say you've tried to
23 kill somebody else using a firearm?
24 A. I don't know. I can't count, maybe 10, 15.
25 Q. And do you remember who some of those people were?

13870

1   **A.**   A few of them was Tweety, a few of them was a couple guys
2   from up at Stanton Terrace.  One time we went around Congress
3   Park and tried to get Cool Wop.  That was it.
4   **Q.**   And would you just come up with this idea on your own or
5   would you do this pursuant to direction from other people?
6   **A.**   Basically, it wasn't me, it was just mostly the guys that
7   I hung with, they was more -- whatever they was trying to do, I
8   was with them.
9   **Q.**   They didn't force you to bring these guns?
10  **A.**   Naw, they didn't force me.
11  **Q.**   I mean, you were with Tommy Edelin; isn't that right?
12  **A.**   Yes.
13  **Q.**   You were part of the One-Five mob; isn't that right?
14  **A.**   Yes.
15  **Q.**   And wasn't the One-Five mob for quite some time the
16  baddest mob out there?
17  **A.**   Well, you can say that.
18  **Q.**   Would you say that?  I'm asking you?
19  **A.**   At one point in time, yeah, but --
20  **Q.**   And at what point in time was that?
21  **A.**   From the '80s all the way up to the 90's.
22  **Q.**   And what made the One-Five mob the baddest mob out there?
23  **A.**   Before it became the One-Five mob, the name that we were
24  using back in the day was the Young Young Crew, that was the
25  name of the neighborhood group.  It was the Young Young Crew.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13871

1   **Q.**   And that was Mr. Edelin that started that, right?  And it
2   was a man by the name of Thaddeus Foster, who was part of that
3   group?
4   **A.**   Yes.
5   **Q.**   And you became part of the Young Young?
6   **A.**   Well, I was real young then.
7   **Q.**   You were young, Young, Young?
8   **A.**   I was young, Young, Young, yeah.
9   **Q.**   So --
10  **A.**   Back then, you know, even though they had the Young Young
11  Crew, they had a baby Young Young Crew, so, you know, growing
12  up, you growing up around it, so eventually you're going to be
13  part of it.
14  **Q.**   Would it be fair to say you didn't struggle too hard
15  against being part of it?
16  **A.**   Huh?
17  **Q.**   Would it be fair to say you didn't struggle too hard not
18  to be part it?
19  **A.**   Yeah.
20  **Q.**   You wanted to be part it?
21  **A.**   Yeah, I grew up around it.
22  **Q.**   And Mr. Edelin was clearly the person in charge; is that
23  right?
24  **A.**   Uh, yeah.
25  **Q.**   And he would get -- one of the things that the One-Five

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13872

1   mob did is they sold a lot of crack cocaine in the area of what,
2   Stanton -- not Stanton Terrace -- did you have a defined area?
3   MR. GUERRERO:  Objection, basis.
4   THE COURT:  Basis, you said?
5   MR. GUERRERO:  Yes.
6   THE COURT:  Come on up.
7   (Following sidebar discussion had on the record:)
8   THE COURT:  What do you mean?
9   MR. GUERRERO:  Basis of knowledge.  He's using the
10  One-Five mob in general terms, not naming anybody specific.  When
11  the government asked specifically who he was out there selling
12  crack cocaine with, we always elicited specific names.
13  What Mr. Tabackman is seeking is just a broad umbrella of
14  One-Five members who were out there selling crack cocaine.  We
15  don't know if this witness was there with them during those
16  times, or if he's going to be testifying about what he heard that
17  other people were selling.  If he can break it down a little bit.
18  THE COURT:  Well, the question ended up being compound,
19  but the last part of it was, "did you have a defined area"?
20  MR. GUERRERO:  I'm sorry.
21  THE COURT:  He ought to know if he had a defined area.
22  I'll sustain the objection as to the compound, but I'll let you
23  put a new question.
24  MR. TABACKMAN:  Thank you.
25  (Sidebar discussion concluded.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13873

1   BY MR. TABACKMAN:
2   **Q.**   The One-Five mob, did it have a specific area that it
3   felt it controlled or ought to control?
4   **A.**   Yes.
5   **Q.**   What was that?
6   **A.**   15th Place.
7   **Q.**   15th Place.  And is that an entire block of a street, two
8   blocks?
9   **A.**   It's one.
10  **Q.**   15th, between where and where?
11  **A.**   Just one block.
12  **Q.**   Just one block.  So 15th Place, between two other --
13  **A.**   Congress.
14  **Q.**   Between what?
15  **A.**   Congress and Bruce Place.
16  **Q.**   That was yours?
17  **A.**   Yes.
18  **Q.**   When I say One-Five mob?
19  **A.**   Right.
20  **Q.**   Now, the One-Five mob -- strike that.
21  The crack cocaine, would you be out there doing
22  hand-to-hands?
23  **A.**   Yes.
24  **Q.**   And there would be other members of the One-Five mob out
25  there doing hand-to-hands?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**    Yes.

2  **Q.**    And the weight that the One-Five mob would get, so that

3  it could do hand-to-hands, was Mr. Edelin in charge of that?

4  **A.**    Yes.

5  **Q.**    And it flowed down through Mr. Edelin?

6  **A.**    Yes.

7  **Q.**    And there weren't a whole bunch of people out there

8  grabbing some here, and grabbing some there, as far as you knew,

9  in the One-Five mob?

10  **A.**    Well, you had some that was in the neighborhood that --

11  like Doon, he was fronting people on his own.

12  **Q.**    When you say "he," meaning Mr. Edelin?

13  **A.**    No, Doon.

14  **Q.**    Who is Doon, do you know?

15  **A.**    Doon.  He was a guy who lived on 15th.  He was fronting

16  people on his own.  I mean, you had different people fronting

17  people in the neighborhood.  I might get some from Doon, I might

18  get some from Squid.  I might get some from my cousin, but it's

19  all the same -- it's all the --

20  **Q.**    It's all -- I'm sorry?

21  **A.**    It all boils down to the same.

22  **Q.**    From Tommy?

23  **A.**    Yeah.

24  **Q.**    And did -- to your knowledge, did the other members of

25  the One-Five mob, did you see them carrying guns, regularly?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**    Just the ones who had beefs.

2  **Q.**    Well, the ones that you would see -- did Mr. -- when you

3  would see -- did you see Eric Jones regularly?

4  **A.**    Yes.

5  **Q.**    Daily basis, almost?

6  **A.**    Yes.

7  **Q.**    When you would see Eric Jones, would he usually have a

8  firearm, so far as you knew?

9  **A.**    Yes.

10  **Q.**    Okay.  And Mr. Jones was one of Mr. Edelin's closest

11  associates; is that right?

12  **A.**    Yes.

13        MR. GUERRERO:  Objection, Your Honor, beyond the scope.

14        THE COURT:  Sustained.

15  BY MR. TABACKMAN:

16  **Q.**    And when Black -- Maurice Willis?

17  **A.**    Yes.

18  **Q.**    Would you see him on a daily basis?

19  **A.**    Yes.

20        MR. GUERRERO:  Same objection, beyond the scope.

21        THE COURT:  Overruled.

22  BY MR. TABACKMAN:

23  **Q.**    And based on your knowledge, what you know, would he have

24  a gun with him every day?

25  **A.**    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**    Okay.  And Bradley Carter, was he part of One-Five?

2  **A.**    Yes.

3  **Q.**    Okay.  And was he a good friend of yours?

4  **A.**    Yes.

5  **Q.**    And you would see him almost every day?

6  **A.**    Yes.

7  **Q.**    And to your knowledge, would he carry a gun with him

8  every day?

9  **A.**    Off and on.

10  **Q.**    Okay.  Not quite as regular?

11  **A.**    Right.

12  **Q.**    Was Mr. Edelin also the source of the guns that you would

13  get?

14        MR. GUERRERO:  Objection, scope.

15        THE COURT:  Sustained.

16  BY MR. TABACKMAN:

17  **Q.**    And back in 1990 -- you were born in 1977; isn't that

18  right?

19  **A.**    Correct.

20  **Q.**    January?

21  **A.**    Yes.

22  **Q.**    Okay.  So you're 30 now?

23  **A.**    Yes.

24  **Q.**    So in 1990, you were 13?

25  **A.**    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**    By January 10th, you had had your birthday, you turned

2  13, right?

3  **A.**    Yes.

4  **Q.**    And you said that 1990 is when you basically started

5  being out on the street doing -- selling drugs?

6  **A.**    Correct.

7  **Q.**    Okay.  And you'd be out there every day?

8  **A.**    Yes.

9  **Q.**    You'd load up in the morning?

10  **A.**    No, not really.  I mean.

11  **Q.**    Did you keep a stash?

12  **A.**    Yeah.

13  **Q.**    Okay.  So -- and you'd be out there on the street.  Did

14  you have a stash out on the street somewhere, in somebody's

15  house?

16  **A.**    No, in my house.

17  **Q.**    In your house, and where would you go to load up with

18  your drugs that you were going to sell?

19  **A.**    If I'm going to get more drugs?

20  **Q.**    Yeah.

21  **A.**    Well, I'd call my cousin.  I had homies that looked out

22  for me.

23  **Q.**    Well, when you were out there in the One-Five mob -- when

24  you were 13, you weren't part of One-Five, were you, you

25  **A.**    It wasn't that I was a part of One-Five -- you see, you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13878

```
 1   have to understand, One-Five, it's more of a throw off from 15th
 2   Place, so when you go back to the 80s, when they had the Young
 3   Young Crew, you have a lot of guys that still live around there.
 4   They're still from there, so by us not being a Young Young Crew
 5   anymore, so now they're naming the street.  So instead of saying
 6   15th Place, you say the One-Five, and where it turn off at, when
 7   you go to GoGo clubs, people, they name their streets, so that's
 8   where the One-Five came from, but it's always off from the
 9   Young Young Crew.  So, most of the guys that grew up around
10   there or was raised from Stanton Terrace, 15th Place, Congress
11   Park, Parkland, you had -- you got some guys that live in them
12   neighborhoods was in the Young Young Crew.
13   Q.    Right.
14   A.    So you can say -- you can say some of the guys around
15   Congress Park is part of One-Five, if you want, because if you
16   trying to say that's a throw off from the Young Young Crew, then
17   they are, because Antwuan was in the Young Young Crew, Jo-Jo was
18   in the Young Young Crew.
19         MR. GUERRERO:  Objection, Your Honor, the witness hasn't
20   finished his answer.
21         THE WITNESS:  So they all were part of the Young Young
22   Crew.
23         MR. TABACKMAN:  Your Honor, I asked him what I thought was
24   a narrower question and I was trying not to cut him off and not
25   be polite.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13879

```
 1         THE COURT:  You may.
 2         MR. TABACKMAN:  What's that?
 3         THE COURT:  You may.
 4         MR. TABACKMAN:  Well, thank you.
 5   BY MR. TABACKMAN:
 6   Q.    What I was asking you was when you get your drugs and
 7   when you would reload, would you get them from Mr. Edelin?
 8   A.    No.
 9   Q.    Okay.  Would you get them from one of Mr. Edelin's
10   associates?
11   A.    No, I would get it from his father.
12   Q.    From his father?
13   A.    Yes.
14   Q.    And that's Earl Edelin?
15   A.    Right.
16   Q.    Known as Tony Edelin, right?
17   A.    Right.
18   Q.    And when you would reload, you would have to go to him to
19   get them; is that right?
20         MR. GUERRERO:  Objection, Your Honor, scope.
21         THE COURT:  Sustained.
22   BY MR. TABACKMAN:
23   Q.    So you're out there.  From 1990 to 1996, you are out on
24   the street every day selling drugs?
25   A.    Correct.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13880

```
 1   Q.    Okay.  And that -- you would be with Mr. Carter
 2   sometimes?
 3   A.    Yes.
 4   Q.    Mr. Willis?
 5   A.    Yes.
 6   Q.    Squid?
 7   A.    Yes.
 8   Q.    And when y'all weren't out there on the street selling
 9   drugs, you were hanging together; isn't that right?
10   A.    No.
11   Q.    What would you be doing with them?  Would you be with
12   them regularly?
13   A.    Well --
14   Q.    I think --
15   A.    All of us hung on One-Five.  All of us claimed One-Five,
16   but the group of guys that I hung with was Squid, JJ, Mark,
17   Honky, Cooler, AD, Blue, Waluck and that was it.  Now, Eric and
18   all them, Brad, Black, Pooh, all them was part of One-Five.  We
19   would come around and holler at Eric and chill with them, but
20   they done they thing and we done our thing, but when it came
21   down to a beef, if it's with both of us, then we'd all come
22   together, and that's how we come together.
23   Q.    So -- but one night you are with Brad and Pooh and this
24   fellow from outside the area.  Would you say his name was Brick?
25   A.    Who?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13881

```
 1   Q.    There was a night when you were over at Monkey Mark's
 2   house, right?
 3   A.    Correct.
 4   Q.    Would you go to Monkey Mark's house lots of nights?
 5   A.    Basically, every night.
 6   Q.    That was the place to go?
 7   A.    Correct.
 8   Q.    And when you would go over there, you'd play video games?
 9   A.    Play video games, watch basketball, watch football, use
10   the phone, use the bathroom.
11   Q.    Smoke some weed?
12   A.    No, we ain't never smoke no weed in there.
13   Q.    Where would you go to do that?
14   A.    You'd go outside.
15   Q.    Okay.  Did you ever use any other drugs inside
16   Monkey Mark's?
17   A.    Naw.
18   Q.    All right.  And when you would go over to Monkey Mark's,
19   your friends would be there, the guys that you were talking
20   about, right?
21   A.    Correct.
22   Q.    All right.  So there's this night that Brad's over
23   there --
24   A.    No, Brad's not in there.  Brad lived next door.
25   Q.    Brad lived next door.  And Black is over there with you?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  A.   No.
2  Q.   Do you remember a night -- strike that.
3       When was the last time, prior to the last few weeks, you
4  talked about the incident where -- that you testified to today
5  about Mr. Carter and getting shot?
6  A.   I testified on the case about it, I think.  I think I
7  told Mr. Steve Phleger about it.
8  Q.   And when was that?
9  A.   This was '98.
10 Q.   When?
11 A.   '98.
12 Q.   '98.  So since the time you have talked about it, have
13 you talked about it much, prior to very recently?
14 A.   Naw, the last time I talked about it was 2001.
15 Q.   Okay.  That's when you testified in Mr. Edelin's trial?
16 A.   Yes.
17 Q.   So that's been six years ago?
18 A.   Yes.
19 Q.   Okay.  Now, when you -- how did it come up again most
20 recently, before this trial?
21 A.   Uhm --
22 Q.   Did you get a call -- let me ask you a direct question,
23 rather than a narrative.  Did you get a call from the
24 prosecutors?
25 A.   No.

1  Q.   Did you get a call from the FBI?
2  A.   What happened was, I called my agent.  I talked to my
3  agent, and we was talking.
4  Q.   Your agent, meaning your probation --
5  A.   No, when I say "agent," that means FBI.
6  Q.   You have an agent that's assigned to you?
7  A.   Yes.
8  Q.   Okay.  And what's that person's name?
9  A.   Gus.
10 Q.   All right.  Agent Gus, bald headed guy?
11 A.   Yes.
12 Q.   Okay.
13 A.   And he was talking to me because --
14 Q.   Don't tell me what he said.
15 A.   Well, yeah, I talked to him.
16 Q.   Well, let me ask you this:  You were asked to come
17 testify in this trial?
18 A.   Yes.
19 Q.   Was Gus the first person to raise the possibility of your
20 testifying in this trial?
21 A.   Yes.
22 Q.   Okay.  And did he mention anything in particular, just
23 answer this yes or no, anything in particular that they wanted
24 you to testify about, meaning subject area?
25 A.   Naw.  When I talked to him, he was like, we might need

1  you to testify.  And I was like, "all right," so he was like,
2  just tell what you know.
3  Q.   Just tell what you know?
4  A.   That's it.
5  Q.   And when did that -- when did you have that conversation
6  with Mr. -- with Gus?
7  A.   This was maybe last year -- it was last year sometime, it
8  was early last year sometime.
9  Q.   Okay.  Now, since that time when you had that
10 conversation with Gus, have you talked to any other agents about
11 that?
12 A.   No.
13 Q.   Okay.  And did you go to the office -- or meet with the
14 U.S. Attorney, Mr. Guerrero, or someone in his office, in the
15 last couple weeks to talk about the questions that would be
16 asked of you?
17 A.   I don't think it was a couple of weeks.  I think it was
18 probably a few months.  I think it was probably a month or two.
19 Might have been longer than that, but I know after I talked to
20 Gus, he told me he would come and see me and that was the last
21 time I talked to him, and then he came to see me.
22 Q.   And how long after his first contacting you from last
23 year passed before he came to see you?
24 A.   Say that again.
25 Q.   He contacted you, said early last year, and said "We may

1  need to you testify in a trial," right?
2  A.   Right.
3  Q.   And then he came and he called you and he came to see you
4  at some point, you just said?
5  A.   Correct.
6  Q.   How much time passed?  Was it months later?
7  A.   After he came to see me?
8  Q.   Between when he first contacted you and then came to see
9  you?
10 A.   Might have been -- maybe two months.
11 Q.   So that was still last year?
12 A.   Yeah.
13 Q.   Okay.  Now, this year -- I'm talking about in preparation
14 for this trial, you met with the lawyers; isn't that right?
15 A.   Correct.
16 Q.   Okay.  And I believe you met with Mr. Guerrero three or
17 four times; isn't that right?
18 A.   Correct.
19 Q.   And that was in the past week?
20 A.   I think I met him when I got here, when I came back to
21 D.C.
22 Q.   Okay.  And when was that?
23 A.   That was -- I left.
24 Q.   Don't say where you left from.
25 A.   Tuesday.  Tuesday.

1  Q.   Today is Thursday, so that was two days?
2  A.   I met him on the phone, and Tuesday.
3  Q.   Day before yesterday?
4  A.   Yeah.
5  Q.   Okay.
6  A.   I met him on the phone, and Tuesday I met him in person.
7  Q.   Okay.  And then -- so you met with him.  Where did you
8  meet with him on Tuesday?
9  A.   In a conference room.
10 Q.   Okay.  At CTF?
11 A.   Naw, here.
12 Q.   All right.  And you talked about the subjects that you
13 would be asked about, didn't you?
14 A.   Correct.
15 Q.   And one of them was the incident with Mr. Carter; isn't
16 that right?
17 A.   Correct.
18 Q.   And did he show you any exhibits -- you know, during
19 your -- strike that.
20      During your testimony, you've been shown exhibits, right?
21 A.   Correct.
22 Q.   Pictures, shown the map and all of that, right, during
23 your testimony here, you've been shown those things?
24 A.   Oh, yeah.  Correct.
25 Q.   Now, in preparation -- in these meetings that you had,

Scott L. Wallace, RDR, CRR
Official Court Reporter

1  did he do the same thing with you there?
2  A.   Well, he showed me maps.  He showed me maps.
3  Q.   He showed you the picture of Brad's car?
4  A.   Yes.
5  Q.   Right.  Had you remembered what kind of car he had?
6  A.   Yes.
7  Q.   You had?
8  A.   Yes.  The only thing I was off on was the color.  I knew
9  it was champagne or gold.  I just don't know what color exactly
10 it was.
11 Q.   Now, that night, did you talk about the date of that
12 event?
13 A.   I don't remember.
14 Q.   You don't remember?
15 A.   I don't remember what day it was.  I don't remember what
16 date.  I know it was wintertime, though.
17 Q.   And you know that because?
18 A.   Because it was cold.
19 Q.   Well, fine.  What else do you remember about that
20 evening, other than it was cold?
21 A.   That was it.
22 Q.   Do you remember what Mr. Carter was wearing?
23 A.   No.
24 Q.   Well, you had said when you saw him, he was sweating,
25 right?

Scott L. Wallace, RDR, CRR
Official Court Reporter

1  A.   Yes.
2  Q.   And was he in a heavy coat?
3  A.   I don't remember if he was in a heavy coat.  I know he
4  was running and he was sweating.  He was hyped.  He was tired.
5  Q.   Did you talk about the way Mr. Carter was with
6  Mr. Guerrero over the last several days, when you met with him?
7  A.   Yes.
8  Q.   He asked you to describe him?
9  A.   Yes.
10 Q.   Did anybody suggest words you might use to better
11 describe him?
12 A.   No.
13 Q.   Hyped is your word?
14 A.   Yes.
15 Q.   Any other words you would use to describe him?
16 A.   Yeah.  I mean his blood was flowing, that's the only
17 thing I could say.
18 Q.   What do you mean "his blood was flowing"?
19 A.   That means he's hyped, when your blood is flowing, that
20 means you're running, that means you've got your blood flowing
21 so when you're saying it's flowing, that's where it comes from.
22 Q.   Now, your understanding was -- what time of night did
23 they leave?
24 A.   It's -- it was at nighttime.  It was between probably
25 9 -- between 9 and 11, probably.

Scott L. Wallace, RDR, CRR
Official Court Reporter

1  Q.   Nine and 11.  You don't remember?
2  A.   I don't remember the exact time.  I know it was
3  nighttime.  It wasn't real past, it wasn't past 12.
4  Q.   Could it have been 8?
5  A.   Naw, it was at nighttime.  I know it was between 9 or 11.
6  It was in that range.
7  Q.   In that range.  And what were you guys doing before they
8  left the house?
9  A.   Well, what happened was, we was all outside.  They pulled
10 up.  Mark and them them going inside they house, so Brad came out
11 his house and he was going to the car.  So I was like, "Where
12 y'all going at?
13 Q.   Let's try not to do it all in a narrative, because it's
14 hard for Mr. Wallace and for everybody to follow.
15      You're over at -- where is your house in relation to
16 Monkey Mark's house?
17 A.   About two blocks over.
18 Q.   Okay.  So you come over to his house that night.  Do you
19 remember what you were doing before you went over there?
20 A.   I went over Mark's house so many times, the only thing to
21 do but to drink and smoke cigarettes and talk trash to each
22 other.
23 Q.   Hard to separate one of those nights from another, right?
24 A.   Yeah.
25 Q.   When you get over there, when you get there, it's hard to

Scott L. Wallace, RDR, CRR
Official Court Reporter

13890

1  remember who's there?
2  **A.**   What, at Mark's house?
3  **Q.**   When you get there that night, that particular night --
4  **A.**   Naw, it's never hard because it's based on the same
5  people there every day.
6  **Q.**   Well, but we're talking about a particular event that
7  happened on a particular night, so I'm asking you if you can
8  remember who was there on that night?
9  **A.**   I can remember.  The only reason I say that is because
10  Brad and Black and them don't come in Mark house.  So you might
11  as well put them out of there.  It's only me, Squid, JJ, Mark,
12  AD, Honky, Cooler.
13  **Q.**   And were those guys -- were those guys over at Mark's
14  house that night?
15  **A.**   Yes, that's it.
16  **Q.**   All of them were over at Mark's house?
17  **A.**   I don't think Squid was there.  I don't think Squid was
18  there, and I don't think AD was there.  I think it was just me,
19  JJ, Honky and Cooler.
20  **Q.**   So Brad and Black just showed up?
21  **A.**   They ain't showed up at Mark house.  Brad live next door.
22  **Q.**   So they came next door?
23  **A.**   No.  By all -- all of us was outside.  Black and them
24  pulled up in the car.  Brad came out his house.  So I was asking
25  Brad, where y'all going?  They said they're going to the liquor

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13891

1  store.
2  MR. MARTIN:  Objection.  Objection.
3  THE COURT:  Hold on when there's an objection.
4  MR. MARTIN:  Objection as to what they said.
5  THE COURT:  Sustained.
6  BY MR. TABACKMAN:
7  **Q.**   As far as you knew, they went off to the liquor store; is
8  that right?
9  **A.**   Yes, so I gave Brad some money to bring some beer back.
10  **Q.**   Right.  Now, Monkey Mark lives on what -- what's his
11  address?
12  **A.**   I don't know his address, but he live on Stanton Road.
13  **Q.**   Stanton and what?
14  **A.**   Stanton Road.
15  **Q.**   Well, Stanton Road is a fairly long street, isn't it?
16  **A.**   Stanton Road -- it's Stanton Road coming from Suitland
17  Parkway and Alabama Avenue.  As a matter of fact, it's right on
18  the top of Congress Place.
19  **Q.**   Stanton Road at the top of Congress.  Okay.  And what --
20  did you know, without saying what they told you, do you know
21  what liquor store they went to or were going to?
22  **A.**   No.  I think they were going to 51.
23  MR. MARTIN:  Objection.
24  THE COURT:  Sustained.
25  BY MR. TABACKMAN:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13892

1  **Q.**   And how far is 51 from -- walking or driving -- can you
2  walk there from where Monkey Mark lives?
3  **A.**   Yeah, you can walk to the 51.
4  **Q.**   How long would it take to walk?
5  **A.**   About 30 minutes.
6  **Q.**   Thirty minutes.  Okay.  And where is Greater Southeast
7  Hospital?  Do you know where that is?
8  **A.**   Yeah.
9  **Q.**   Where is that?
10  **A.**   It's about -- the same thing, about 30 minutes away.
11  **Q.**   And in the same direction as 51?
12  **A.**   You can go to 51 in the same direction as you're going to
13  Southeast Community, but 51 is left and Southeast Community is
14  right.
15  **Q.**   Okay.  And about half an hour walk to Greater Southeast
16  from where you are or longer?
17  **A.**   No, same thing.  Because both of them --
18  **Q.**   So about 30 minutes.  Okay.  And to run from Greater
19  Southeast back to Monkey Mark's, if you were going to do it,
20  back in those days, how long would it take you?
21  MR. GUERRERO:  Objection, speculation.
22  THE COURT:  I'll allow it.
23  MR. TABACKMAN:  I'm sorry?
24  THE COURT:  Sustained.  Rephrase.
25  BY MR. TABACKMAN:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13893

1  **Q.**   Do you know how long it would take you to run from
2  Greater Southeast to Monkey Mark's?
3  **A.**   Well, I wouldn't run, but if it take about 30 minutes to
4  walk, I guess it could take about 20 minutes, 15 minutes
5  running.
6  **Q.**   It's not a run that you would take?
7  **A.**   No.
8  **Q.**   Because it's a long run?
9  **A.**   I mean, it's long, but it's not that long.  You can ride
10  a bike and be there in no time.
11  **Q.**   And if you were -- if you were going to run it yourself,
12  you'd get sweaty, wouldn't you?
13  **A.**   Yeah, if I get shot and I ain't trying to go to jail,
14  because I'm on the run, yeah I'm going to run, too.
15  **Q.**   And as far as you knew, Brad was running to keep from
16  going to jail?
17  **A.**   Yes.
18  **Q.**   That's what he was concerned about?
19  **A.**   Yes.
20  **Q.**   And so he ran all the way home from Greater Southeast?
21  **A.**   Yes.
22  **Q.**   Did you know Brad to be a particularly good athlete?
23  **A.**   Well, Brad, he wasn't a good athlete, but he was a big
24  guy, he played basketball, he exercised.
25  **Q.**   Now, if you're over to 51 and you had to go over to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13894

1  Greater Southeast -- have you ever driven that way?
2  **A.**  Driven from 51 to Greater Southeast?
3  **Q.**  Greater Southeast.
4  **A.**  Yeah.
5  **Q.**  How long would that take?
6  **A.**  Ten minutes, not even ten minutes.  It's a straight shot
7  from the liquor store to Greater Southeast.  Ain't nothing but,
8  like -- not even ten minutes.  You might get there in five
9  minutes if the light don't stop you.
10  **Q.**  And then?
11  **A.**  That's it.
12  **Q.**  And then you run back?
13  **A.**  Run back where?
14  **Q.**  It's your understanding that Mr. Carter ran back from the
15  hospital?
16  **A.**  Oh, you said from the liquor store to Greater Southeast,
17  you didn't say from his house to Greater Southeast.
18  **Q.**  No.  I'm sorry, I didn't mean to confuse you.  I'm just
19  trying to get an idea of --
20      MR. TABACKMAN:  Your Honor, this would be a place to break
21  if we can.
22      THE COURT:  All right, ladies and gentlemen, we'll break
23  for the weekend.  Today's Thursday, so we don't sit tomorrow.
24  Please come back on Monday promptly at 9:00.  Remember to take
25  your notes back in the jury room where you can leave them and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13895

1  please don't talk about the case, but enjoy your break.  Have a
2  safe trip home.  We'll see you Monday at 9.
3      (Jury out at 4:59 p.m.)
4      THE COURT:  All right.  The defendants can be excused.
5  Counsel, do you have anything I need to take up?
6      MR. BALAREZO:  One very brief scheduling matter that I
7  think won't be a problem.  On Monday at 9, I have a matter with
8  Judge Walton, but I think Mr. Purpura will be here on Monday just
9  in case I'm late.
10      THE COURT:  Thank you.  All right.
11      MS. PETALAS:  Your Honor, I want to alert the Court.  I
12  did file a motion to reconsider, with some additional case cites
13  regarding the issue of the admissibility of the grand jury
14  transcripts.  It was filed during the course of the day, and I
15  gave Ms. Redmond a copy as well.  I can raise it now or if the
16  Court would like, I can do it Monday.  I don't think we're going
17  to have the transcript -- I've handed a copy to Mr. Balarezo, but
18  I can discuss it now or we can wait until Monday.  I don't think
19  we're going to introduce the grand jury transcripts -- well, I
20  just raised that with the Court.
21      THE COURT:  Anything else?
22      MS. WICKS:  Your Honor, what I was trying to put on the
23  record this afternoon was through the vast majority of the direct
24  this afternoon of the witness, my client could not see the
25  witness.  I asked Mr. Guerrero to adjust himself, but even after

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13896

1  that, Mr. Wilson could not see the witness, and that's what I was
2  trying to approach about.  I know that sometimes this gets moved
3  and apparently it had gotten moved to a point that -- normally my
4  client can see the witness, but my client could not see the
5  witness for the vast majority of this afternoon.  I'll try to
6  adjust it again on Monday, but when it gets moved in the middle
7  of the day, that's what I was trying to approach about.
8      MR. ZUCKER:  Just a reminder on the scheduling matter.
9  4:00 -- actually this Wednesday, you agreed that I could leave
10  early, and -- 3:45 or 4, something like that.
11      MR. GUERRERO:  Your Honor, I have an ex parte matter at
12  the end of the day.
13      THE COURT:  Before I take that up, anything else?
14      MR. BALAREZO:  Have a good weekend.
15      THE COURT:  Mr. Balarezo, that what you wanted to mention
16  before you got off?
17      MR. BALAREZO:  No, nothing related to this, just a comment
18  for another time.
19      THE COURT:  Okay.
20      MR. BALAREZO:  I'll save it for some other time.
21      THE COURT:  All right.
22      MR. GUERRERO:  Your Honor, I would ask that this matter be
23  under seal.
24      THE COURT:  All right, this bench conference will be
25  sealed.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13897

1      **(Following further proceedings sealed by order of the**
2  **Court.)**
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**(Previously designated sealed proceedings concluded.)**

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the
foregoing is a correct transcript from the record of proceedings
in the above-entitled matter.

------------------------------
**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

**I N D E X**

**EXAMINATIONS**                                    **Page**

CONTINUED DIRECT EXAMINATION OF DAMIEN GREEN 13774
BY MR. GUERRERO
CROSS-EXAMINATION OF DAMIEN GREEN           13843
BY MR. TABACKMAN


**EXHIBITS**

**DESCRIPTION**                                    **Page**

13900

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
          Plaintiff,               : Docket No. CR 05-100
     v.                            :
ANTWUAN BALL, DAVID WILSON,        : Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        : June 4, 2007
DOMINIC SAMUELS,                   : 9:30 a.m.
          Defendants.              :
                                   :
                                   :

VOLUME 60 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

13901

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

13902

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

13903

**MORNING SESSION, JUNE 4, 2007**

1    (9:31 a.m.)

2        THE COURT:  We're still, I think, missing three jurors,

3    but I thought we would keep hope alive and be ready as soon as

4    they get here.  Let me just ask, the witness for whom we had

5    issued the contempt citation is going to be the next witness?

6        MR. GUERRERO:  Yes, Your Honor.

7        THE COURT:  And it may be too much to ask if defense

8    counsel anticipates completing cross-examination of the current

9    witness today?

10       MR. MARTIN:  I think so.

11       MR. TABACKMAN:  I may have another -- I probably have a

12   half hour, 45 minutes.

13       MR. ZUCKER:  I anticipate nothing.

14       MR. BALAREZO:  And the same for us.

15       MR. BEANE:  Maybe three minutes.

16       MS. WICKS:  I have extensive cross, but I can't imagine it

17   would go all day.

18       MR. ZUCKER:  Can I have a minute with the prosecutors?

19       THE COURT:  Yes.  This will be off the record.

20       (Discussion had off the record.)

21       MR. ZUCKER:  I just consulted with Mr. Guerrero.

22       THE COURT:  Yeah.

23       MR. ZUCKER:  And it may become moot if in fact the next

24   witness is Mr. Ewing, and that's the person who's -- they're

Scott L. Wallace, RDR, CRR
Official Court Reporter

1 having trouble locating.  We just learned of Mr. Ewing being a

2 witness on either Thursday night -- and got his *Jencks* on Friday.

3 Frankly, I was going to object to it.  If they're going to

4 call him today, I'm going to object anyway.  We didn't get our

5 three days and there is some investigation that we've been

6 diligently pursuing over the weekend, but unable to complete.  So

7 I would ask -- if he was going to be the next witness, I would be

8 objecting anyway because we're not prepared to cross him and we

9 didn't get our three days and we just found out about him,

10 frankly, on Friday.  Might have been Thursday night.

11 I think I asked Mr. Leon if Ewing was even going to be

12 a witness in the trial.  And he did say, well, he anticipated he

13 likely would.

14 MR. TABACKMAN:  I have a completely different matter, Your

15 Honor, unless you want to hear from the government first.

16 THE COURT:  Okay.  Let me ask you to hold on one second.

17 (Discussion had off the record.)

18 THE COURT:  Yes.

19 MR. GUERRERO:  Good morning, Your Honor, if I could just

20 briefly respond.  John Ewing is our next expected witness after

21 Damien Green.  We released the name John Ewing last week and his

22 discovery, his *Jencks* package was also released last week, in

23 accordance --

24 THE COURT:  Meaning Friday?

25 MR. GUERRERO:  Yes, on Friday, in accordance with our

1 other *Jencks* disclosures, as we've been doing regularly

2 throughout this trial.  So we have complied with our obligations

3 of disclosure and *Jencks* disclosures as well.

4 This witness should come as no surprise to Mr. Zucker.

5 It's a 1997 shooting, which was filed before in Superior Court.

6 James Faison has testified about this event as well.  The

7 discovery has been released well in advance of Friday, which

8 includes the police reports and a 9-1-1 call by Mr. Ewing.

9 So we think that the defense has had ample opportunity to

10 be prepared for this witness and we see -- we would ask the Court

11 not to delay the Government's presentation of Mr. Ewing today, in

12 part also because Mr. Ewing is under a citation for contempt, so

13 we would like to get him on and off as soon as possible.

14 MR. ZUCKER:  The only brief addition I would make is we

15 were given a line-up of witnesses last week, of this is the order

16 we expect to go and Ewing was not on it.  There are several

17 witnesses that have not been called.  So frankly, when I got the

18 *Jencks* on Friday, I assumed they were going to stay in order and

19 that Ewing would be called at the end of that.

20 THE COURT:  All right.  Well, Mr. Tabackman, did you have

21 something else?

22 MR. TABACKMAN:  Yes, Your Honor.  It has to do with the

23 cross-examination, something I wanted to raise preliminarily.  I

24 though the Court might have been -- I didn't know if the Court

25 was ready to have me proceed.

1 Your Honor, there is --

2 THE COURT:  Actually, now that you ask, it may be well, if

3 the defendants are here, we can probably bring them on out in the

4 hope that we'll have all of our jurors soon.

5 Go ahead.

6 MR. TABACKMAN:  There is a very brief area of

7 cross-examination of this witness that is outside the scope of

8 direct examination, but clearly, I believe, evidence of bias.

9 And I wanted to, rather than have it come up and start asking the

10 questions and elicit an objection and then have it, you know,

11 dealt with at the bench that way, if I could raise it in advance.

12 And it has to do with this.  And I'm tempted to say

13 that -- well, I'm tempted to raise it ex parte, but I don't have

14 any problem with this, just raising it now because the government

15 will probably have to respond.

16 Mr. Green testified in the case of *United States versus*

17 *Tommy Edelin* and he testified to a number of things, including

18 his relationships and conversations he had with a number of the

19 defendants that were on trial there.  One of those defendants was

20 a -- last name of Marbury and had a nickname -- he was nicknamed

21 after a Korean grocery store, Wah Luck, W-A-H-L-U-C-K, and he was

22 the person -- probably the shooter who killed another person by

23 the name of Tweety, who's name has come up in this trial.  It's

24 Edgar Watson.

25 And there's his testimony in the Edelin case that this witness

1 is with Wah Luck driving down the street and they are, in effect,

2 flagged down by Tweety.  And Wah Luck goes over and has a

3 conversation with Tweety.  Green doesn't know the precise

4 substance of it.  The implication is -- and we're not going to

5 get into that.  The implication of it is that Tweety tells Wah

6 Luck something about something that had happened to Wah-Luck's

7 family members.  Wah Luck comes back to Mr. Green and says, "I'm

8 going to kill him."  That's Mr. Green's testimony.

9 And the prosecutor, Mr. Quander, asks this witness -- let

10 me get the precise page cite.

11 I don't know if Mr. Guerrero has the transcript from the

12 Edelin trial, but it's volume 64, page 13878, begins at line 22:

13 "Question:  When Wah Luck got back into that car on 15th

14 Street after talking to Tweety and he said that he was going to

15 kill him, did you have any doubt in your mind that that's exactly

16 what Wah Luck was going to do?"

17 There's an objection from Wah-Luck's counsel that is

18 sustained and the prosecutor then goes on:

19 "Question:  How well did you know Wah Luck?

20 "Answer:  I've known -- I knew him all my life.

21 "Question:  How much time did you spend with Wah Luck?

22 "Answer:  How much time did I spend with him?

23 "Question:  Yes.

24 "On an everyday basis.

25 "Question:  Have you ever known Wah Luck to make idle

1  threats or just make threats in random?
2      "Mr. Moore:  Same objection, Your Honor."
3      And on this occasion, it's overruled and it goes on.
4      "Mr. Quander:  Question:  Have you ever known Wah Luck
5  just to make random threats and didn't mean them?"
6      "Answer:  Only if he mad, if he mad at you about
7  something.  I mean --
8      "Question" -- and he cuts him off and says:  "Okay.
9  Listen to my question now.  Have you ever known" --
10      There's objections.  The witness is answering the
11  question.  The Court overruled and the question is then put:
12      "Have you ever known Wah Luck to make idle threat, to
13  say something about a threat and not mean it, is what I'm saying?
14      "Answer:  If he say it, he mean it."
15      And I suggest that that is a clear indication -- the
16  witness answered the first time and says he's just heard -- he
17  comes back and said, "I'm going to kill this guy" and he's angry.
18  And the witness's first answer starts to be, to the question,
19  "Does this guy ever make idle threats," "Only if he's mad, if he
20  mad at you about something.  I mean" -- he's clearly cut off and
21  the question is:  "Okay.  Listen to my question.  Have you ever
22  known" --
23      And then after we get through the objection:  "Answer:  If
24  he say it, he mean it."
25      And we think that that's a clear indication of the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  witness's willingness to modify his testimony to meet clear
2  prosecution goals.
3      I mean, there's -- maybe there's a weight question and I
4  wrestle with whether it's worth it, but I think the admissibility
5  for bias is clear.  And I wanted to raise it at this point rather
6  than, as I said, in the middle of the examination so that it
7  wouldn't -- the Court wouldn't be hit with it in the context of
8  it looks like they're getting off into the details of the Edelin
9  trial and with a prosecution objection, I just wanted to raise it
10  up front.
11      MR. GUERRERO:  Good morning, Your Honor.  The government
12  does object to that line of questioning.  And first, we'd start
13  with the relevance.  We're talking about a conversation that
14  Damien Green has with Wah Luck regarding Tweety, which is
15  separate and apart from the case before the Court and the case
16  before the jury.  It's an incident where Wah Luck is describing
17  to Damien Green some incident that happened to Wah-Luck's family
18  and that caused trouble between Wah Luck and Tweety.  How that is
19  relevant to this trial or the subject matter that the government
20  posed on direct -- we just don't see a close enough nexus.
21      I believe Mr. Tabackman is going the towards showing bias,
22  that perhaps because Damien Green says, "If Wah Luck says it,
23  then he mean it," that that somehow shows that Damien Green is
24  willing to curry favor with the government by making that
25  statement before a jury.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1      And again, we don't see the close enough nexus for him --
2  for Damien Green to somehow be trying to curry favor in answering
3  in that fashion.
4      If the Court is considering that testimony, even if there
5  is some small piece of relevance to this trial, we still would
6  ask the Court to deny that line of questioning because we're
7  going to talk about levels of hearsay that we don't see how that
8  would permit that line of questioning to come in without going
9  into the conversations that Wah Luck has with Tweety, the
10  conversation that Wah Luck has with Damien Green in order for the
11  defense to be able to elicit that line of testimony.
12      And then lastly, it would start what we're trying to avoid
13  here, which is different avenues of mini trials in order for the
14  defense to be able to elicit that.  Then the government is caught
15  on redirect trying to go into that same subject matter and we get
16  into a completely different issue, derailed from the facts of
17  this case, confusing to the jury and probably not the best use of
18  the witness's time before the jury.
19      And so we would ask the Court to deny that line of
20  questioning, based on those comments.
21      MR. TABACKMAN:  Again, as for the hearsay problem, we're
22  not at all interested in having this introduced for the truth of
23  the matter that Wah Luck did or did not intend to kill Tweety, so
24  that is beside the point.  It's not for that at all.  And nor are
25  we getting into an argument as to whether or not there was an

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  issue between Wah Luck and Tweety in the sense -- substantively
2      The context here is Mr. Green testifies that he's with
3  him.  Wah Luck goes and has a conversation with Tweety.  He comes
4  back and says he's going to kill him.  And the prosecutor says,
5  you know, does he -- is he the kind of guy who just says that
6  sort of thing without meaning it?  The witness starts to answer
7  and it would appear to be that when he's angry, he does tend to
8  say things.  The prosecution is cut -- the answer ends in the
9  middle.  The prosecution says:  "Listen to what I'm asking you."
10  There's an objection to him being cut off and then the witness
11  says something that I will argue is totally different, "And when
12  he says it, he means it."
13      And it does, I think, clearly indicate -- the jury can
14  infer from that, along with the other things that we're going to
15  get into, a willingness to curry favor with the prosecutor.  The
16  prosecutor clearly wanted that statement that when Wah Luck says
17  he's going to do something like that, he's going to do it.
18      So that is the basis.  I don't think it gets off into a
19  whole debate on this.  The issue with respect to the person --
20  the people that are involved, Edgar Watson or Tweety, the
21  evidence of his death notices were seized from Mr. Wilson's
22  house, Mr. Ball's house as part of the -- it goes to the whole
23  issue of this beef.
24      But we're not going to use it for that.  It simply has to
25  do with this witness and the jury's assessment of this witness's

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13912

1  credibility and his bias.
2      THE COURT:  All right.  I think I understand your
3  argument.
4      Although the probative value of where you're going to show
5  bias is not very high, it sounds as if the witness had already
6  said, "Well, except for when he's mad, when he says what he says,
7  he means what he says."  The inference to be drawn that he has
8  changed his testimony in the muddled context of that transcript
9  is not a strong one.
10     In any event, it seems to me that any probative value that
11 it may have to show bias is substantially outweighed by the risk
12 of confusion of issues to the jury and under 403, I'm going to
13 sustain the objection.
14     But thank you, Mr. Tabackman, for raising that in advance
15 and saving the jury from having to cool its heels with the
16 hushers on for a long time.  I appreciate it.
17     MR. TABACKMAN:  Thank you.
18     THE COURT:  Are you ready for the jury, Mr. Tabackman?
19     MR. TABACKMAN:  Yes, Your Honor.
20     THE COURT:  Let's let the witness come in first.  Do you
21 want the witness first?
22     Fine.
23     (Jury in at 9:50 a.m.)
24     THE COURT:  Good morning, ladies and gentlemen.
25     THE JURY PANEL:  Good morning.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13913

1      THE COURT:  Welcome back.  It's good to have you back.  I
2  hope you had a restful weekend.  We're ready to resume.
3      Mr. Tabackman.
4      CONTINUED CROSS-EXAMINATION OF DAMIEN GREEN
5  BY MR. TABACKMAN:
6  Q.   Good morning, Mr. Green.  How are you?
7  A.   Good morning.
8      MR. TABACKMAN:  Good morning, ladies and gentlemen.
9  BY MR. TABACKMAN:
10 Q.   You became -- I just wanted to make sure we have a
11 context here.  You became involved in drug activity when you
12 were about eight years old; is that right?
13 A.   About eight or nine.
14 Q.   Eight or nine.  And that was -- you were the lookout at
15 first for Mr. Cunningham selling drugs?
16 A.   Mr. Cunningham?
17 Q.   Nardy?
18 A.   Naw.  I was mostly hanging with him then.
19 Q.   Pardon me?
20 A.   I was mostly hanging with him.
21 Q.   Okay.  Did you -- wasn't there a time when you were --
22 when you first got started in drug activity where you used to go
23 up to the top of 15th Place where you would
24 take the lookout for the police, what direction they might be
25 coming from, because you could see down Suitland Parkway and

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13914

1  Stanton Road?
2  A.   Yes.
3  Q.   Okay.  And that's what I meant by being a lookout, in
4  effect, weren't you?
5  A.   But it wasn't for him.
6  Q.   Okay.  Who was that for?
7  A.   Jamie Freeman.
8  Q.   I stand corrected.  I apologize.  That's correct.  And
9  the purpose of that was to make sure that they could get rid of
10 the drugs or whatever else they might be holding before the
11 police actually got to where they were; isn't that right?
12     MR. GUERRERO:  Objection, speculation.
13     THE COURT:  Sustained.  You can rephrase.
14 BY MR. TABACKMAN:
15 Q.   Your understanding of your role was to ensure that -- to
16 let the Freemans know when the police were approaching; isn't
17 that right?
18 A.   Yes.
19 Q.   And it's your understanding that the reason to do that
20 was to enable people to get rid of whatever they were holding
21 before the jump-outs actually arrived on the scene; isn't that
22 right?
23 A.   Yes.
24 Q.   And the risk that the jump-outs would come is something
25 that was faced every day; isn't that right?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13915

1  A.   I'd say probably three times out of a week.
2  Q.   My point is that you wouldn't know what three days it
3  might be; is that right?
4  A.   Naw.
5  Q.   So you were out there as the warning signal, so to speak;
6  isn't that right?
7  A.   Yes.
8  Q.   But the risk that the jump-outs might arrive on a day
9  when, say, you weren't out there or weren't looking didn't stop
10 you from getting involved in drug selling yourself shortly
11 thereafter, did it?
12 A.   You could say that.
13 Q.   I could say that it didn't stop you?
14 A.   No, it didn't.
15 Q.   Right.  And by 13, you were engaged in that activity on a
16 regular basis; isn't that right?
17 A.   Yes.
18 Q.   And also around that time, you began using PCP on a
19 regular basis; isn't that right?
20 A.   Yeah.
21 Q.   About how old were you when you started smoking PCP on a
22 daily basis, would you say?
23 A.   I'd say I was about 16.
24 Q.   Okay.  So that was around 1993?
25 A.   Yeah.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  Q.  Okay.  And you would smoke on and off throughout the day?

2  A.  I'd smoke maybe a good ten every day.

3  Q.  I'm sorry.  Smoke what?

4  A.  Ten.

5  Q.  Ten what?

6  A.  Ten blunts.

7  Q.  Okay.  And would you start in the daytime or would that

8  also be at night?

9  A.  Sometimes in the day, mostly at night.

10  Q.  And particularly when it was warm out, it would be at

11  night; isn't that right?

12  A.  Yeah.

13  Q.  I believe you testified that when it was hot out and you

14  smoked PCP during the day, it had just a really powerful effect;

15  isn't that right?

16  A.  Right.

17  Q.  So that in the cooler weather, say around February in the

18  year, you wouldn't have that problem?

19  A.  Naw.

20  Q.  The problem of the heat?

21  A.  Naw.

22  Q.  Okay.  And could you describe the effect that PCP would

23  have on you?

24  A.  It had you -- your body numb.  It can have different

25  effects.  It can have you feeling hot, it can have you feeling

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  cold, it can have you doing things like you strong or sometimes

2  it make you can't see.  Sometimes it make you just want to have

3  fun, laugh.  It has different effects.

4  Q.  But on some occasions, it would have the effect that -- I

5  mean, you couldn't see anything and it would take several stages

6  for you to come down to a point where you could -- your

7  perception was regular again; isn't that right?

8  A.  Yeah, about three or four.

9  Q.  About three or four stages?

10  A.  Yeah.

11  Q.  And so in other words, if you would be getting real high

12  off PCP and then you'd stop and you'd reach one of those stages

13  where you really couldn't see -- know what was going on around

14  you, how long could it take you to get back to a point where you

15  did know?

16  A.  So you're saying -- what you're trying to say, if I smoke

17  PCP and I stop smoking PCP, that I still be messed up from it;

18  is that what you're saying?

19  Q.  No.  I'm asking you a question.  Say if you smoke PCP

20  throughout a day --

21  A.  Right.

22  Q.  -- and you got to a point -- you would sometimes get to a

23  point where you couldn't really even tell what was going on

24  around you; isn't that right?

25  A.  I mean you could tell.  It's just that you high.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  Right.

2  A.  You could tell what's going on around you.  It's just

3  that you're in a stage that nobody else is in the same stage as

4  you.

5  Q.  And what would that -- can you describe the physical

6  consequences of that feeling?

7  A.  Well, I can't really explain the whole -- I don't know.

8  I guess you have to smoke it and see.

9      MR. TABACKMAN:  One second, Your Honor.  Court's

10  indulgence.

11  BY MR. TABACKMAN:

12  Q.  Would it be accurate to say that sometimes it felt like

13  it put you in another world?

14  A.  Yeah, it put you in another world.

15  Q.  And was there something called Shermans that you used to

16  smoke?

17  A.  Yes.

18  Q.  Is that a form of smoking PCP?

19  A.  Yes.

20  Q.  What is a Sherman?

21  A.  A Sherman is you dip a cigarette in the PCP water.

22  Q.  Just a regular cigarette?

23  A.  Cigarette, right.

24  Q.  And you used to smoke PCP that way?

25  A.  Sometimes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  Okay.  And sometimes would you mix the PCP with crack?

2  A.  Naw.

3  Q.  Was that another way to smoke it, though?

4  A.  You got some people that smoke it that way.

5  Q.  Does that have a name also?

6  A.  Yeah.

7  Q.  What was that called?

8  A.  Woodies.

9  Q.  "Woody"?

10  A.  "Woodies."

11  Q.  But you didn't smoke those?

12  A.  No.

13  Q.  And you also would be drinking a lot when you were a

14  teenager; isn't that right?

15  A.  Yes.

16  Q.  And when did that begin?

17  A.  I started drinking beer probably in 1990.

18  Q.  And when you drink beer, would you drink beer every day

19  all day?

20  A.  Naw, not 1990.  Maybe from 1993 on up, I drink beer every

21  day.

22  Q.  Throughout the day?

23  A.  Throughout the day.

24  Q.  And in fact, you testified, do you recall, in the Edelin

25  trial that you said you loved the liquor store?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13920

1   **A.**   Yeah.

2   **Q.**   And so you -- and you would drink beer during the day,

3   you would drink liquor at night; isn't that correct?

4   **A.**   Correct.

5   **Q.**   You would drink Remy?

6   **A.**   Yes.

7   **Q.**   Or Hennessy?

8   **A.**   Yes.

9   **Q.**   What's Remol?

10   **A.**   Say that again.

11   **Q.**   Is there another drink you used to have, R-E-M-O-L?

12   **A.**   I don't know.

13   **Q.**   It could be a typing error there.

14        And when you referred to drinking, did you drink white

15   liquor?

16   **A.**   Naw, not too much.  I drunk it before.

17   **Q.**   When you refer to "white liquor," what are you talking

18   about?

19   **A.**   Vodka, gin.

20   **Q.**   And would you drink brown liquor?

21   **A.**   Yes.

22   **Q.**   And when you talk about that, what are you referring to?

23   **A.**   Remy, Hennessy, E & J.

24   **Q.**   And you would do that with your friends; isn't that

25   right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13921

1   **A.**   Yes.

2   **Q.**   And that would include Mr. Faison?

3   **A.**   Yes.

4   **Q.**   Mr. Carter?

5   **A.**   Yes.

6   **Q.**   Mr. Willis?

7   **A.**   Yes.

8   **Q.**   And again, that would be on a daily basis; is that right?

9   **A.**   Yeah, when we got money.

10   **Q.**   And you'd be out there selling most days; isn't that

11   right?

12   **A.**   Yes.

13   **Q.**   And one of you would always pretty much have the ability

14   to go to the liquor store and get something to drink at night;

15   isn't that right?

16   **A.**   Yes.

17   **Q.**   And in addition, you would smoke marijuana?

18   **A.**   I ain't smoke marijuana too much.

19   **Q.**   But that was also one of the things that was there when

20   you guys in the evenings were playing video games or watching

21   television or whatever you were doing?

22   **A.**   Well, some of the guys that hung around, they smoked

23   marijuana a lot, but I didn't smoke it all the time.

24   **Q.**   So it was mostly PCP and drinking in the evenings?

25   **A.**   Yeah.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13922

1   **Q.**   And it's fair to say that you would be pretty high at the

2   end of most evenings; isn't that right?

3   **A.**   Not all the time.  Sometimes the high go away.  Sometimes

4   when you drink -- when you drink and smoke PCP, it don't mix,

5   because you can smoke PCP and drink liquor and you ain't going

6   to feel the liquor until the PCP high is gone.  So once the PCP

7   high is gone, then you can feel the liquor.

8   **Q.**   So what you're saying, if I understand you correctly, is

9   that sometimes the high from the PCP was so powerful that the

10   liquor didn't have any -- you didn't feel the effect of the

11   liquor?

12   **A.**   Correct.

13   **Q.**   But when the PCP then would be wearing off, then the

14   liquor -- you could feel the liquor more?

15   **A.**   Yes.

16   **Q.**   Okay.  Now, from your observations, was this also the

17   sort of thing that Brad Carter would engage in with you?

18   **A.**   Yes.

19   **Q.**   On a daily basis?

20   **A.**   You know, when we together, yeah.

21   **Q.**   And you were together on the night of February 20th of

22   1994?

23   **A.**   I don't know what date that was.

24   **Q.**   Well, that's the night that he reported that he was shot

25   at.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13923

1   **A.**   With who?

2   **Q.**   In his car.

3   **A.**   With who?

4   **Q.**   Pardon me?

5   **A.**   With who?

6   **Q.**   No, I'm asking you, was Mr. Carter with you on that

7   night?  Do you recall testifying about that night?

8   **A.**   I'm trying to figure out who he was with.  You said he

9   was shot at, right?

10   **Q.**   Right.  But before he was shot at, when he was shot at

11   with Mr. Willis, Black --

12   **A.**   Oh, okay.

13   **Q.**   -- he had been with you that evening; is that right?

14   **A.**   He wasn't with me.

15   **Q.**   You had been together at Monkey Mark's house?

16   **A.**   No, he wasn't at Monkey Mark's house with me.  He wasn't

17   there with me.

18   **Q.**   Oh, he wasn't there before you left?

19   **A.**   No.

20   **Q.**   He lived next door to Monkey Mark?

21   **A.**   Yes.

22   **Q.**   Okay.  So the first time you saw him that evening was

23   when?

24   **A.**   He was going to Black in them car.  They was going to the

25   liquor store.  I gave them some money to bring me some beer

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13924

1    back. That was it.
2    **Q.**    Okay. But you had been in Monkey Mark's for a while that
3    evening?
4    **A.**    Probably, mostly the whole day.
5    **Q.**    Right. Hanging out?
6    **A.**    Outside, inside, outside, inside.
7    **Q.**    Smoking some PCP?
8    **A.**    Naw. I don't smoke PCP around his mother or around his
9    house.
10   **Q.**    You didn't smoke PCP around Monkey Mark's house?
11   **A.**    Not around his mother. If his mother -- naw, I'll go
12   somewhere else and smoke it.
13   **Q.**    Where did you go to smoke it that day?
14   **A.**    I didn't smoke it that day. I don't remember I was high
15   that day.
16   **Q.**    That day was different than other days?
17   **A.**    I mean, it was some days that I smoked it, some days I
18   didn't, but I don't remember me smoking it that night.
19   **Q.**    You testified both here and before that you smoked PCP
20   every day?
21   **A.**    Show me in the paper. Show me on there that I was high
22   that night when they -- I said I was high that night off PCP.
23   **Q.**    You never testified about this event before, have you?
24   **A.**    Okay. Well, I'm telling you, I wasn't high.
25   **Q.**    And what I'm asking you, sir, is do you specifically

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13925

1    recall that night was a night that you weren't high on PCP?
2    **A.**    Yeah.
3    **Q.**    And you hadn't been drinking that night either?
4    **A.**    I probably was drinking. I probably had some beer during
5    that day. I was still drinking beer. I didn't even get the
6    liquor yet, remember?
7    **Q.**    Now, when was the first time that you were asked about
8    February 20th, 1994 by any prosecutors or anybody else?
9    **A.**    I can't even remember.
10   **Q.**    Well, were you asked about it by Mr. Phleger when he was
11   preparing for the Edelin trial.
12   **A.**    I talked to Mr. Phleger about it, Michael Rokaw. I
13   talked to a lot of them about it.
14   **Q.**    You talked to Mr. Phleger and Mr. Rokaw about Bradley
15   Carter?
16   **A.**    Oh, Bradley Carter, about that incident, yeah.
17   **Q.**    And when do you recall speaking with him about that, sir?
18   **A.**    I can't give you no date.
19   **Q.**    And what is your recollection of them asking you about
20   that?
21          MR. GUERRERO: Objection, Your Honor. Calls for hearsay.
22          THE COURT: Overruled.
23   BY MR. TABACKMAN:
24   **Q.**    What is your recollection about them asking you about
25   that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13926

1    **A.**    Basically, I told them what happened.
2    **Q.**    You mean you just volunteered it?
3    **A.**    No, I didn't volunteer. I mean --
4    **Q.**    Let me ask you --
5    **A.**    -- when I came back from Ohio and I talked to Steve
6    Phleger and them, I was in Virginia --
7    **Q.**    I'm sorry?
8    **A.**    I was in Arlington, Virginia when they brought me back
9    from Ohio. My cousin got them to call me back. He got them --
10   he got them to come, you know, talk to me. After we got
11   comfortable talking to each other, they called me here and we
12   talked and that's when I told them everything that I know.
13   **Q.**    And when they were talking -- that was before you ever
14   testified in the Edelin trial; isn't that right?
15   **A.**    Yes.
16   **Q.**    And the prosecution in that case was about the One-Five
17   mob; isn't that right?
18   **A.**    Yes.
19   **Q.**    And it wasn't about the gentlemen that are here; isn't
20   that right?
21   **A.**    See, you have to understand, it was about the One-Five
22   mob, but at the same time, all that stuff happened because it
23   was either Stanton Terrace or them. That's why they are here
24   now. They are here because they didn't --
25   **Q.**    Excuse me. That is nonresponsive, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13927

1          MR. GUERRERO: Objection, Your Honor. The witness hadn't
2    finished his answer.
3          THE COURT: Overruled.
4    BY MR. TABACKMAN:
5    **Q.**    My question is: That trial focused on people other than
6    the people that are not -- that are not at this table; isn't
7    that right?
8    **A.**    You right.
9    **Q.**    And it's a fact that the only mention of Antwuan Ball,
10   for example, in your entire testimony came after four days when
11   somebody asked you if you knew the Ball family; isn't that
12   right?
13   **A.**    Say that again.
14   **Q.**    That the only reference to Antwuan Ball in your four days
15   of testimony came almost at the end when one of the lawyers
16   happened to ask you if you were aware of the Ball family?
17          MR. GUERRERO: Objection, form.
18          THE COURT: Form?
19          MR. GUERRERO: Compound, form.
20          THE COURT: Beg your pardon?
21          MR. GUERRERO: Yes. Compound, form.
22          THE COURT: Overruled.
23          THE WITNESS: I don't understand that.
24   BY MR. TABACKMAN:
25   **Q.**    You were not asked by the prosecution in the Edelin trial

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  to testify about the activities of the men that are at this
2  table; isn't that correct?
3  **A.**   Because he wasn't in trial then.
4  **Q.**   My question, sir, you did not testify about the
5  activities of any of these men --
6  **A.**   Right.
7  **Q.**   -- at that trial, correct?
8  **A.**   But I made a statement about every incident that happened
9  before the trial started in Edelin's case, so it's on paper.
10 **Q.**   So that if there is a reference to -- and you recall them
11 writing down the discussion with you about Bradley Carter
12 getting shot at?
13 **A.**   Yes. I know they was talking about it. If they wasn't
14 talking about it, they wouldn't keep asking the questions on it
15 every time I went and talked to them about it.
16 **Q.**   Every time that you talked to --
17 **A.**   Most of the time I talked to Steve Phleger, he talked to
18 me about that incident or he talked to me about other incidents.
19 **Q.**   I'm talking about that incident, sir.
20 **A.**   I'm just telling you about that one and other ones.
21 **Q.**   Well, I'm talking to you. You recall -- you have a
22 specific recollection of Mr. Phleger asking you about the
23 Bradley -- the incident where Bradley Carter allegedly was shot
24 while he was in a car with Pooh and Willis --
25 **A.**   Right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**   -- is that correct?
2  **A.**   Right.
3  **Q.**   Mr. Phleger did?
4  **A.**   Right.
5  **Q.**   And you admit -- you acknowledge that didn't come up in
6  the trial?
7       MR. GUERRERO:  Objection, asked and answered.
8       THE COURT:  Sustained.
9       THE WITNESS:  Naw, it didn't come up in the trial, but --
10      THE COURT:  That means you don't have to answer.
11      THE WITNESS:  Okay.
12 BY MR. TABACKMAN:
13 **Q.**   And you said also that Mr. Rokaw asked you about that?
14 **A.**   Naw, he didn't ask me about it, but it was -- it came a
15 time that we was sitting talking about the incident, but we
16 never really got all the way into it. It was in and out.
17 **Q.**   What does "in and out" mean?
18 **A.**   That means we talked about it for a second and then we
19 went to something else.
20 **Q.**   And was your conversation with Mr. Phleger that you
21 talked for a second and then went on to something else?
22 **A.**   Naw.
23 **Q.**   Mr. Phleger, you talked in detail?
24 **A.**   Yes.
25 **Q.**   And you told him about how you were at Monkey Mark's that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  evening?
2  **A.**   I told him about that incident. I told him about the
3  Reesey murder. I told him about all other murders.
4  **Q.**   What I'm asking you, sir, is did you tell him in detail
5  your recollection of the night of February 20th, 1994?
6  **A.**   Yes.
7  **Q.**   And you were asked -- and you told him about your
8  recollection of how Brad Carter was when he came back to Monkey
9  Mark's house?
10 **A.**   Yes, I told him -- I told him how Brad came to the window
11 and told us that Black got shot in the head. I told him all
12 that.
13 **Q.**   And did he ask you to describe in detail how Mr. Carter
14 seemed at that point?
15 **A.**   He probably did. I don't remember. I don't remember if
16 he asked me that, but I know we talked about that case.
17 **Q.**   I'm talking about the specific point in time when
18 Mr. Carter came back to Monkey Mark's house.
19 **A.**   Yes.
20 **Q.**   Isn't it a fact, sir, that the first time you were asked
21 about that and what Mr. Carter said is when you spoke to Mr.
22 Guerrero? Isn't that the first time you talked about that
23 particular aspect of it?
24 **A.**   Naw.
25 **Q.**   And isn't it a fact, sir, that it was only recently that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  you were asked to describe how Mr. Carter appeared to you at
2  that time? Not what he said, but how he appeared to you.
3  **A.**   I talked to Phleger about it. But even if I didn't talk
4  to Phleger about it, you asked me how he was and I told you how
5  he was.
6  **Q.**   I'm asking a question, sir. Mr. Guerrero asked you on
7  direct examination -- I'm asking you, wasn't your conversation
8  with Mr. Guerrero the first time that you were asked to describe
9  and to focus on how Mr. Carter appeared when he came back to
10 Monkey Mark's house that night?
11 **A.**   No, it wasn't the first time.
12 **Q.**   It wasn't?
13 **A.**   Steve Phleger asked me how he was. He asked me how he
14 was. The same thing he asked me, Steve Phleger asked me the
15 same thing. It wasn't no different.
16      MR. TABACKMAN:  Your Honor, may we approach?
17      THE COURT:  Yes.
18      (Following sidebar discussion had on the record:)
19      MR. TABACKMAN:  I would request that the government be
20 directed to produce any recordation of this witness's having told
21 Mr. Phleger details about how Brad Carter appeared on that
22 evening or anything else that he spoke to Mr. Phleger about. He
23 said Mr. Phleger wrote it down. We haven't been given anything
24 like that.
25      It is our good faith belief that the issue of excited

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13932

1  utterance came once -- it focused on when Mr. Carter spun them,
2  perhaps, arguably, in the government's view at least, on the
3  issue of his recollection.  And I think it's a significant point
4  because he said he spoke with Mr. Phleger about it; we don't
5  believe that he did, but if there's Jencks material about it, we
6  think we're entitled to it.
7        MR. GUERRERO:  Your Honor, I don't think the record shows
8  that there is any Jencks material for that particular event that
9  may or may not have happened as the witness testified.  When he
10 was asked several times -- Mr. Tabackman -- did you talk to Mr.
11 Phleger about the details of how Carter appeared when he appeared
12 at Monkey Mark's house, Damien Green said on the record, "I may
13 have, I may not have.  I'm not sure.  I probably did, I probably
14 didn't."  Those are my notes.
15       And even if he did or did not do that with Assistant U.S.
16 Attorney Steve Phleger, it wouldn't be Jencks as to this witness.
17 And we don't even know if there was a verbatim documentation of
18 that particular interview.  So I think the record is far from
19 establishing that there's some Jencks out there that the defense
20 is entitled to.
21       I think that this witness made it very clear in his
22 cross-examination that he had -- this is not something that's
23 new.  Maybe it wasn't flushed out as much as it was for this
24 trial, but we don't have any reason to believe that there's
25 Jencks out there that has not already been disclosed.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13933

1        THE COURT:  Well, the question is:  Is there Jencks?  And
2  did you all look for any on this issue?
3        MR. GUERRERO:  We have.
4        THE COURT:  Regardless of whatever the record may show,
5  I'm not going to direct you to produce something that doesn't
6  exist.  But I want you to make some representation about whether
7  any Jencks does exist with respect to this witness's comments
8  about Mr. Carter's condition or what Carter said, be it to Mr.
9  Phleger or anybody else.
10       MR. GUERRERO:  We have searched for that.  We haven't
11 found anything on point.  We'll continue to search and make those
12 inquiries so that we can comply with any Jencks disclosure that
13 we need to, but as of this point, we haven't come across any
14 material that Mr. Tabackman is inquiring about or perhaps
15 suggesting that it even exists.
16       THE COURT:  Well, I --
17       MR. TABACKMAN:  I'm sorry.
18       THE COURT:  I'll ask that you make sure that when you're
19 determining whether any Jencks exists, at minimum you contact Mr.
20 Phleger.  Has he left the office?
21       MR. GUERRERO:  He has transferred to a different office.
22       THE COURT:  Well, check whatever files remain of his and
23 see if you can contact him and any agents that might have been
24 present to see if they took any documents that might qualify as
25 Jencks in connection with this discussion and his direct

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13934

1  testimony.
2        MR. TABACKMAN:  And I would ask that Mr. Guerrero report
3  at least, if there are any notes, whether or not there are, in
4  his view, that the government qualifies as Jencks because we
5  believe, and there's case law that in some instances, the Court
6  ought to take a look at them to make its own determination as to
7  whether or not -- and we're not simply at the government's mercy
8  on these things as to whether it's verbatim and what's there.
9        I don't think that there's anything, but I've made that
10 point, and I would simply ask that if there are notes or any
11 recordation whatsoever on those, that we be notified of those so
12 we can make a request that this be examined by the Court.
13       THE COURT:  You said you don't think there's anything?
14       MR. TABACKMAN:  No.  I said -- I think that they have
15 not -- that the issue and the detail of this discussion did not
16 occur until recently.  That's our theory, that the other day, Mr.
17 Guerrero, you know, raised the issue of excited utterance.  I
18 think that came up --
19       THE COURT:  You don't think there's any Jencks?  If that's
20 your theory, you don't think there's any Jencks.
21       In any event, I've asked the government to exercise due
22 diligence in determining what, if any, Jencks materials exist
23 with respect to this witness's direct testimony concerning the
24 Carter incident and let us know.
25       MR. GUERRERO:  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13935

1        (Sidebar discussion concluded.)
2  BY MR. TABACKMAN:
3  Q.    When Mr. Carter came back to the house that night, he was
4  out of breath, right?
5  A.    Yes.
6  Q.    And he was sweating a little?
7  A.    Yes.
8  Q.    And he had been running from Greater Southeast Hospital,
9  as you understood it, back to Monkey Mark's house; is that
10 right?
11 A.    Yes.
12 Q.    And you know that's about -- maybe a little over a mile
13 and a half away; isn't that right?
14 A.    Yeah, you could say that.
15 Q.    So it wouldn't surprise you that he'd be out of breath
16 from that kind of a run?
17 A.    No.
18 Q.    Did he stutter at all when he spoke with you?
19 A.    I don't remember him stuttering.  I know he was tired, he
20 was sweating, he was shaking a little bit.  You know, you could
21 tell that he was into something.  His hand was shaking because a
22 bullet was in his hand.
23 Q.    Right.  A bullet was in his hand and his hand was
24 shaking.  But the question is, he wasn't like -- his eyes
25 weren't all wild, were they?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13936

1  **A.**  I mean, he was hyped.  He was --

2  **Q.**  He had been running a mile and a half?

3  **A.**  Basically, he was running, plus those gunshots woke him

4  up.

5  **Q.**  Right.  But you didn't have any trouble understanding

6  what he was saying to you; is that right?

7  **A.**  Naw.

8  **Q.**  And he wasn't like he couldn't complete a sentence, he

9  was so excited; is that right?

10  **A.**  I mean, once he came to the window and said that Black

11  got shot in the head and I ran outside and started talking to

12  him, once he told me everything that happened, I mean after

13  that, that was it.  He didn't have to explain nothing else.

14  **Q.**  And he seemed pretty calm by that point?

15  **A.**  Naw, he wasn't calm.  He was more scared and hyped

16  because, for one, he just got shot in the hand.  He don't want

17  to go to the hospital, for one, because he on the run.  He ain't

18  trying to go to jail.  So basically, his mind is just -- his

19  mind going in circles.  He don't know what to do.

20  **Q.**  Right.  Because -- and what was he on the run from?

21  **A.**  I don't know.  I don't remember.

22  **Q.**  But he was talking about that too, wasn't he?

23  **A.**  No.  I don't remember him saying nothing about he was on

24  the run.  I knew he was on the run.  He was on the run for a

25  while, but I don't know what it was for, though.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13937

1  **Q.**  Didn't you testify that he said, "I ain't going back to

2  jail"?

3  **A.**  I don't remember if I said that.

4  **Q.**  I'll move on to something different.

5  When -- you recall Mr. Guerrero asking you last week

6  about the issue of perjury in this trial?  Do you recall he was

7  asking you some questions about that?

8  **A.**  Yes.

9  **Q.**  And he asked you if you understood what that meant?

10  **A.**  Yes.

11  **Q.**  And you said that you understood that if you lied in this

12  case, you could subject yourself to perjury?

13  **A.**  Yes.

14  **Q.**  And --

15  MR. GUERRERO:  Objection, Your Honor.  May we approach?

16  May we approach?

17  THE COURT:  Yes.

18  (Following sidebar discussion had on the record:)

19  MR. GUERRERO:  Your Honor, I don't have a technical

20  objection to Mr. Tabackman, but I want to alert the Court that

21  it appears that one of the jurors, Juror Number 14, is struggling

22  with some type of physical ailment and I wasn't sure if I should

23  bring it to the Court's attention, but it does appear she's

24  struggling with something.

25  THE COURT:  All right.  Thank you.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13938

1  (Sidebar discussion concluded.)

2  THE COURT:  Would you like a break?

3  JUROR NO. 14:  Please.

4  THE COURT:  Ladies and gentlemen, why don't we go ahead

5  and take a recess for the moment.  We'll take 15 minutes.

6  Juror 14, will 15 minutes be good enough?

7  Let's excuse the witness and then we'll have the jurors

8  take a break.

9  Would you like to see the nurse?

10  JUROR NO. 14:  Yes.

11  THE COURT:  Okay.  Go ahead.

12  (Jury out at 10:24 a.m.)

13  THE COURT:  All right.  We'll be at ease.  Please don't go

14  far and we'll come back as soon as we're able to reassemble.

15  MR. ZUCKER:  Judge, are we in a 15-minute recess?

16  THE COURT:  We can call it that, but I want the juror to

17  have full access to the nurse, which might mean it might extend

18  beyond that.  But as soon as she's back, I want to get started.

19  MR. ZUCKER:  We can be held harmless for 15 minutes?

20  MR. BEANE:  Your Honor, I have one issue at the bench I

21  would like to discuss.  It will take one minute.

22  (Following sidebar discussion had on the record:)

23  MR. BEANE:  It does not have to be under seal.

24  Nobody at the table knows -- remembers what the order of

25  cross is and I need to change -- I need to go further down the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13939

1  list, if I could take it back.

2  THE COURT:  Bring it back.

3  (Discussion had off the record.)

4  MR. BEANE:  Thank you.  Sorry for the confusion.

5  (Thereupon, a break was had from 10:26 a.m. until 10:55

6  a.m.)

7  (Discussion had off the record.)

8  MR. BEANE:  Judge, do we want to bring the jurors in?

9  THE COURT:  No, we don't need them.  Actually, you know

10  what, I guess they should be here.  Yes, bring them in.

11  MR. ZUCKER:  Judge, I have a quick ex parte matter once

12  we're done.

13  THE COURT:  All right.

14  (Jury in at 11:04 a.m.)

15  THE COURT:  Good morning, ladies and gentlemen.

16  THE JURY PANEL:  Good morning.

17  THE COURT:  As you may know, we're going to let juror 14

18  go to the doctor and let the doctor check her out and make sure

19  everything is okay.  It's fairly clear that that will take

20  probably the rest of the day and that we will not be able to

21  proceed today.  What I want to do is release you now with two

22  instructions.  One, if you go back through your normal route to

23  the jury lounge, the jury lounge will give you a phone number.

24  That's a number you can call close to the end of the day to find

25  out whether you'll be coming back first thing in the morning or

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13957

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :

    Plaintiff,          : Docket No. CR 05-100

    v.          :

ANTWUAN BALL, DAVID WILSON,          : Washington, DC
GREGORY BELL, DESMOND          :
THURSTON, JOSEPH JONES, and          : June 5, 2007
DOMINIC SAMUELS,          : 9:20 a.m.
              :
    Defendants.          :
              :
              :

VOLUME 61 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
    Glenn S. Leon, Assistant United
    States Attorney
    Ann H. Petalas, Assistant United
    States Attorney
    Gilberto Guerrero, Assistant
    United States Attorney
    555 4th Street
    Washington, DC  20001
    202.305.0174

For Defendant    CARNEY & CARNEY
Antwuan Ball:    John James Carney, Esq.
    South Building
    601 Pennsylvania Avenue, N.W.
    Washington, DC  20004
    202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13958

APPEARANCES (Cont.)

For Defendant    TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:    TEASDALE, PLLC
    Steven Carl Tabackman, Esq.
    1747 pennsylvania Avenue, NW
    Suite 300
    Washington, DC  20036
    202.454.2811

For Defendant    LAW OFFICE OF JENIFER WICKS
David Wilson:    Jenifer Wicks, Esq.
    503 D Street NW, Suite 250A
    Washington, DC  20001
    202.326.7100

    GARY E TABACKMAN, LLC
    Gary E. Proctor, Esq.
    6065 Harford Road
    Baltimore, MD  21214
    410.444.1500

For Defendant    LAW OFFICE OF JAMES W. BEANE
Gregory Bell    James W. Beane, Jr., Esq.
    2715 M Street, N.W.
    Suite 200
    Washington, DC  20007
    202.333.5905

For Defendant    LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:    Jonathan Seth Zucker, Esq.
    514 10th Street, NW
    9th Floor
    Washington, DC  20004
    202.624.0784

For Defendant    LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:    Anthony Douglas Martin, Esq.
    7841 Belle Point Drive
    Greenbelt, MD  20770
    301.220.3700

    LAW OFFICE of ANTHONY ARNOLD
    Anthony Darnell Arnold, Esq.
    One Research Court
    Suite 450
    Rockville, MD  20852
    301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13959

APPEARANCES (Cont.)

For Defendant    LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:    A. Eduardo Balarezo, Esq.
    400 Fifth Street, NW
    Suite 300
    Washington, DC  20001
    202.639.0999
    and
    William B. Purpura, Esq.
    8 East Mulberry Street
    Baltimore, MD  21202
    410.576.9351

Court Reporter:    Scott L. Wallace, RDR, CRR
    Official Court Reporter
    Room 6814, U.S. Courthouse
    Washington, DC 20001
    202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13960

**MORNING SESSION, JUNE 5, 2007**

1

2    (9:20 a.m.)

3    THE COURT:  Counsel, we are still waiting apparently for

4    one juror.  I thought they were all here.  That's my mistake.

5    I understand that there has been a continuing problem with

6    delay in the delivery of clothing for the defendants.  The

7    marshals have reported that at least for the last several weeks

8    on a consistent basis the clothing has not been completely

9    delivered until beyond 8:30.  The arrangement has been to -- or

10    the directive has been to have the clothing here by 8:00.  Can

11    anyone tell me what the problem is?

12    MR. PROCTOR:  Your Honor, the person that deals with the

13    clothing issues works with Mr. Zucker and I'm sure Mr. Zucker

14    knows he's just in the lawyer's lounge.  Could you maybe address

15    this at the next break or when Mr. Zucker gets here?

16    THE COURT:  Could someone get him, please.  No one else

17    knows.

18    MR. BEANE:  This is the first I heard of this on behalf of

19    Mr. Bell.

20    MR. MARTIN:  The procedure, Your Honor, is that we go down

21    in the evening, we pick up the clothes that they've worn for the

22    day, we bring them upstairs to the war room, wherever that may

23    be.  And then in the morning, it's taken back downstairs.

24    If the intern -- if Shane is late, I'm usually the first

25    here or Mr. Carney and we will sometimes take it down there.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13961

1  When he was in school, he would sometimes be late on Tuesdays so
2  I would always try to get here early on Tuesdays, but he's not in
3  school now so I don't know -- I can't say what the problem is.  I
4  don't know.
5      MS. WICKS:  Your Honor, the person that deals with the
6  clothes is in the process of moving us from the old room to the
7  new room, but he indicated to me that he had actually never been
8  told 8:00.  So he's -- if it's 8:00, he can bring them by 8:00.
9  That's not a problem.  But he had not been told that they needed
10 to be down there by 8:00.
11      The other issue is if there are problems with the
12 clothing, he's not told until the defendants are up here, and so
13 his suggestion is he can wait downstairs and if there are
14 problems, if they let them know downstairs, there's more time if
15 there's any clothing issues to get it dealt with before 9:15.
16      THE COURT:  The complaint I heard about has not to do with
17 whether the defendants are dissatisfied with what they've
18 received.  It's that the marshals are have not been getting the
19 clothes by 8:00.  The marshals need the clothes by 8:00.
20      MS. WICKS:  Right.  And if that had ever been communicated
21 to him, they would have been here by 8:00.  I told him 8:00 and
22 they will be here by 8:00, but he was never told 8:00.
23      THE COURT:  Well, that is certainly not the marshals'
24 fault.  If it's anybody's faults, it's defense counsels' fault,
25 so let's not try to shift blame to anyone else.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13962

1      MS. WICKS:  I'm not trying to shift blame.  I'm saying if
2  anyone had been told about this prior to today, it would have
3  changed.  It will change now.
4      THE COURT:  "If anybody had been told about this prior to
5  today?"  What is the problem about being told the clothes are due
6  at 8:00 in the morning?  When we first started the trial, I made
7  it very plain that you must follow the marshals' directive to get
8  the clothes there on time.  The marshals have told me that 8:00
9  was the starting time from the beginning, so I'm not sure what
10 this issue is about "if anybody had ever told him about it."
11      MS. WICKS:  Your Honor, I was not part of the arrangement
12 for having him do the clothing.  My point is he -- if he had ever
13 been told by the marshals since February that the clothes needed
14 to be there 8:00, he would have had them there at 8:00.
15      THE COURT:  Fine.  It is not the marshals' responsibility
16 to have told him.  It was defense counsels' responsibility to
17 have told him, so it is defense counsels' problem.  I've told
18 defense counsel from the beginning, you must confer with the
19 marshals and follow their rule and their rule is to get the
20 clothes at 8:00 and have it there.
21      MS. WICKS:  And I'm letting the Court now that I have
22 communicated that to him and they will be there at 8:00.
23      THE COURT:  Anything else?
24      MR. ZUCKER:  I came in on the second half.  I will say I
25 was the person that helped coordinate it and I was never told

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13963

1  8:00.  And I can't recall if we were told 8:15 or 8:30
2  originally, but we were told different times.
3      THE COURT:  Did anybody go and ask the marshals what time?
4      MR. ZUCKER:  Yes.
5      THE COURT:  And you're telling me the marshals never did
6  get them here by 8:00?
7      MR. ZUCKER:  Yes, I'm telling you that.
8      THE COURT:  I find that very difficult to believe because
9  the marshals have made plain from the beginning that they have a
10 deadline by which the clothing must be delivered, that they rely
11 upon that deadline and I've communicated to counsel in the
12 beginning of this trial that that is what is to be followed.
13      MR. ZUCKER:  I'm not disagreeing with you except that the
14 time was different.
15      THE COURT:  What was the time you were told by the
16 marshal?
17      MR. ZUCKER:  I think I was told 8:15.  It might have been
18 8:30.
19      THE COURT:  The fact remains that the marshals have
20 reported that the clothing has consistently for the last few
21 weeks not been delivered even by 8:30.
22      MR. ZUCKER:  Well, we'll address it, but they never -- no
23 one ever said anything to me or any other defense counsel, as far
24 as I know.  And now that you've raised it, we'll address it.
25      THE COURT:  About?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13964

1      MR. ZUCKER:  About getting --
2      THE COURT:  Getting the clothing there by the deadline?
3      MR. ZUCKER:  That it had been a problem, that it was late.
4  And the deadline that I was told in the beginning, I can't recall
5  with a hundred percent certainty, but I think was an hour before
6  it had to be up here.
7      THE COURT:  The marshals have been kind about not
8  complaining about it, but let's not make it sound as if nobody
9  ever told the marshals -- nobody ever found out from the marshals
10 that there was a deadline and that the deadline had to be met.
11      MR. ZUCKER:  I'm not quarreling with you on that, Judge.
12 I'm just saying that the deadline we were operating under was
13 different.  And now that it's clarified they want them there at
14 8:00, we'll deal with it.
15      THE COURT:  Anything else?
16      MR. TABACKMAN:  There's a preliminary matter having to do
17 with this witness that I wanted to raise regarding some *Jencks*
18 material that we just received.  I was waiting for Your Honor to
19 finish reading.
20      And I was late this morning and I am sorry and I'll tell
21 the Court why if the Court wishes to know at the bench ex parte.
22 It's a personal reason, but I will be glad -- I apologize for
23 that.
24      I came in, I had this.  The Court was reading something
25 over the last few minutes and I didn't want to interrupt while

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  you were looking down at your piece of paper.

2      THE COURT:  Do you need to have this resolved before the

3  examination is continued?

4      MR. TABACKMAN:  Yes, Your Honor.

5      THE COURT:  Okay.  Approach.

6      (Following sidebar discussion had on the record:)

7      THE COURT:  If you could do it quickly and succinctly, I

8  would appreciate it because the jury is about to come in.

9      MR. TABACKMAN:  Okay.  This morning, pursuant to the

10  request that we made for *Jencks* material or any statement, we

11  received a portion of a 302 which the witness apparently had on

12  April the 6th of last year -- April 19th of last year, made a

13  statement regarding what Mr. Carter had told him on that evening.

14      THE COURT:  Can I invite you to have a seat there beside

15  the marshal.

16      MR. TABACKMAN:  It's different in several material

17  respects from the testimony that had been given.

18      THE COURT:  Okay.  Bottom line, what is your request?

19      MR. TABACKMAN:  I'm requesting, Your Honor, that we

20  receive the entire 302 of the interview where this has been

21  disclosed, in part because the portion that is relevant to the

22  issue of what Mr. Carter said is on the same page as another

23  piece of 302 that we got, although, while they both purport to be

24  page 3 of the same 302, this paragraph, the one in my left hand

25  that bears mark 10-6-95 has an FBI index number on it.  This

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  document, which also purports to be page 3 of the same 302 --

2  it's dated the same date -- doesn't have those markings.

3      I don't see how the government could have missed the

4  paragraph regarding Mr. Carter, having already given us this

5  other paragraph.  It's curious that these pages, which they're

6  both marked "3," have different markings on them.  And we think

7  we should be entitled to the entirety of Mr. Green's most recent

8  interview.

9      MR. GUERRERO:  Your Honor, we've released the portions

10  that are disclosable under Rule 16.  They're not entitled to the

11  entire 302.  We've gone back and double-checked, as the Court

12  instructed, for the specific area that Mr. Tabackman was looking

13  for, which was a statement by this witness, Damien Green, to law

14  enforcement about the conversation that Damien Green had with

15  Bradley Carter after the shooting by Antwuan Ball.

16      We found that.  We disagree.  We don't think it's

17  materially different in any respect.  And now they're equipped

18  with the information that they want to impeach if they so choose

19  on cross-examination, but there's nothing else that we could find

20  that was material to the inquiry that Mr. Tabackman wanted.

21      THE COURT:  Question one:  Are these two excerpts from the

22  same 302 or a different 302?

23      MR. GUERRERO:  They're from the same 302.

24      THE COURT:  Can you explain why it appears there's an

25  index number at the top on the one that was provided earlier and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  none such on the one provided yesterday, or the vice versa?

2      MR. GUERRERO:  Just a photocopying error.  I don't know

3  why when it was originally copped for disclosure, the first

4  disclosure of the 302, which went out last Friday of last week,

5  June 1st, it just happened that they didn't copy the actual FBI

6  serial report number on it.  But when I made the copy this

7  morning after double-checking everything, I made sure to include

8  it in there.  It's the same report, just different paragraphs.

9      MR. TABACKMAN:  I hear Mr. Guerrero's point.  Mr. Guerrero

10  also says that the first one which was released on June 1st and

11  at that point, Mr. Green had already testified regarding the

12  Carter -- his conversation with Mr. Carter.  If indeed this

13  paragraph now on the one with Mr. Carter is on the same piece of

14  paper as this one, why it was redacted is of great curiosity.

15  And we think it bears the Court's examination.

16      THE COURT:  Do you have it?

17      MR. GUERRERO:  I do have the original.

18      THE COURT:  Let me see it.  How many pages?

19      MR. GUERRERO:  Three pages.

20      THE COURT:  You can have a seat.

21      (Brief pause.)

22      THE COURT:  Counsel, come back up, please.

23      I know that the request yesterday had been to determine

24  whether there were any other statements that had been made and

25  recorded concerning the Bradley Carter comments concerning the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  shooting of Black.  However, I'm also seeing --

2      I'm sorry.  This is page --

3      MR. TABACKMAN:  Both of these purport to be page 3.  The

4  one with highlighting, Your Honor, had previously been given to

5  us.  It doesn't have anything -- the one with the highlighting

6  had previously been provided.

7      THE COURT:  Well, as I recall this witness's testimony

8  from, I think, last week --

9      MR. GUERRERO:  Thursday, May 31st, yes.

10      THE COURT:  -- the second and perhaps the third of the

11  series of incidents -- well, let's put it this way:  The second

12  in the series of events following the testimony about the

13  shooting of Black, as I recall it, involved a 19- --

14  apparently -- '96 incident where this witness was on Congress

15  with Squid and possibly JJ; they heard about -- or he heard about

16  20 shots and he eventually saw Tweety running from one cut to the

17  other cut with a gun.  And then he saw Cool Wop run up through an

18  alley with a gun.

19      Did I remember that correctly?

20      MR. GUERRERO:  Yes, sir.

21      MR. TABACKMAN:  Yes.

22      THE COURT:  Is there not something in the 302, Mr.

23  Guerrero, that you've handed me concerning that that is not a

24  part of the two excerpts that Mr. Tabackman has handed me?

25      MR. GUERRERO:  That's correct, Your Honor.  I don't see a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13969

1  in there. We can --
2      THE COURT: I think I see it in here and you need to
3  disclose it.
4      Let me finish reading because I stopped right at that one
5  and it looks as if that was not appearing in the excerpts that
6  Mr. Tabackman showed me, so I think that was overlooked.
7      But let me continue to see if, in response to Mr.
8  Tabackman's request, there's anything else in here concerning his
9  Bradley Carter incident.
10      MR. TABACKMAN: May I just point out one thing? With
11  respect to the Bradley Carter incident, this is the first time
12  there's been a mention of this man -- that there's been a mention
13  of the man Moe Brown as a possible person in the vehicle with
14  Mr. Ball. His name has never come up before and I just wanted
15  the Court to be aware of that.
16      (Brief pause.)
17      THE COURT: Counsel, come up, please.
18      Let me understand what the theory of disclosure was.
19      MR. GUERRERO: The theory of disclosure for this
20  particular -- is if there's nothing inconsistent, we don't
21  release it because they're not entitled to a 302. The only
22  disclosure is if there's something materially different in there,
23  so that's what we've been trying to parse out.
24      The sections that we did release are sections where there
25  might be something arguably inconsistent, but for the defense to

Scott L. Wallace, RDR, CRR
Official Court Reporter

13970

1  get our entire 302 on a statement that's written by another FBI
2  agent which is not *Jencks* for this witness -- that's why we don't
3  release them.
4      MR. TABACKMAN: Shall we stay here, Your Honor?
5      THE COURT: No. Take your seat.
6      (Brief pause.)
7      MR. TABACKMAN:
8      THE COURT: Counsel, come up.
9      Let me give Mr. -- let me give Mr. Tabackman back his
10  excerpts. I reviewed the unredacted 302 and I think the
11  disclosures that are contained in the redacted 302 concerning
12  Mr. Carter's comments are appropriately disclosed and there's
13  nothing else in the complete 302 that, under the Government's
14  theory of disclosure, needs to be disclosed.
15      I will confess when I first read this, I was operating
16  under what may now be an antiquated review practice that the
17  office, U.S. Attorney's Office doesn't follow anymore. But I'm
18  satisfied that the disclosure, appropriate disclosure has been
19  made and I'll hand Mr. Guerrero back his 302.
20      MR. TABACKMAN: Your Honor, perhaps this may simply be for
21  the record, although I hope not.
22      I think that the failure to disclose the inconsistency --
23  the 302 that bears the inconsistencies with respect to this
24  witness's testimony about Mr. Carter, what Mr. Carter told him,
25  and indeed the inconsistency between what he relates -- it's

Scott L. Wallace, RDR, CRR
Official Court Reporter

13971

1  inconsistent with the grand jury testimony of Mr. Carter that was
2  read into the record. They put a totally different person in
3  there. And with respect to Mr. Martin's client, Mr. Jones, it
4  moves from he was there to he might have been there.
5      This raises questions, Your Honor, about the Government's
6  ability to discern what is and what is not disclosable in the
7  302s. And while we -- number one, we disagree with respect to
8  their theory under the *Jencks* Act, but in any event, we think
9  that -- we don't know how many 302s bear the kind of
10  absolutely obvious disclosability -- information as in this 302.
11  It was on the same page.
12      The reason that they put Mr. Green into this, and the
13  Court knows this, is because Carter collapsed. Green had never
14  been -- well, I -- I accept Mr. Green's testimony that he
15  probably talked to Mr. Carter.
16      THE COURT: Can you conclude this?
17      MR. TABACKMAN: The point is -- so they knew what they
18  were doing and they knew why Green was on there and they knew
19  this was an important paragraph. And I think that -- we would
20  ask the Court to require them to produce 302s, any 302s with
21  respect to other witnesses so that the Court can conduct, I
22  understand, a very tedious kind of examination to see if there
23  have been other omissions in disclosure.
24      MR. MARTIN: Your Honor, before you respond to that, may I
25  say something?

Scott L. Wallace, RDR, CRR
Official Court Reporter

13972

1      THE COURT: Yes.
2      MR. MARTIN: Thank you, sir.
3      With respect to this statement regarding Maurice Andrews
4  perhaps being on the scene, before Mr. Green makes any statement
5  at all about my client, Mr. Joseph Jones, I would like the
6  government to lay a foundation as to the basis of his knowledge,
7  because, again if it's just hearsay, we need to know the source,
8  because Brad Carter, based on the testimony he's given so far,
9  did not mention to him that Jo-Jo was at the scene, so now if he
10  wants to put Mr. Jones at the scene, it must be from a different
11  source. And I would want to know -- I would want a foundation
12  laid first to determine whether or not there is some kind of
13  hearsay exception before that is blurted out in front of the
14  jury.
15      THE COURT: He's not on direct examination anymore.
16      MR. MARTIN: I'm sorry. That's true.
17      THE COURT: And if there's an appropriate objection, I'll
18  be happy to hear it.
19      MR. MARTIN: I'm sorry. You're right. But whatever --
20  okay. I guess on redirect, then, I would make the same argument
21  with respect to redirect.
22      MR. GUERRERO: Your Honor, may I just -- just -- I'll be
23  very brief.
24      We -- all of us over at government table are taking our
25  *Jencks* obligations seriously, our *Brady* obligations seriously.

Scott L. Wallace, RDR, CRR
Official Court Reporter

1 We worked diligently within 24 hours to scour through notes and
2 302s and produce the materials pursuant to the Court order and we
3 gave that to Mr. Tabackman first thing in the morning.  And we --
4 it's our opinion that we are complying legitimately with what our
5 disclosure obligations are and we just want to put that on the
6 record.
7         THE COURT:  All right.  The -- this incident does not
8 disclose any violation of my order the government review
9 diligently all of the materials for any of the *Brady* impeachment
10 and produced them promptly.  It may underscore the defense's
11 difficulty and perhaps the Court's difficulty with the United
12 States Attorney's Office's policy about what is and isn't *Jencks*
13 and what should or shouldn't be disclosed as *Jencks*.  But this
14 incident does not disclose a violation by the government of an
15 order that I entered.
16         I would continue to implore the government to review very
17 carefully all the materials after the witness has testified to
18 make sure hat any *Brady* impeachment is promptly disclosed to the
19 defense and that all *Jencks* obligations have been met.  I think
20 that's the best I can do at this point.
21         MR. GUERRERO:  If I can just put one last thing on the
22 record, the original 302 redacted that was disclosed was actually
23 disclosed May 25th.  I misspoke when I said June 1st, but it was
24 disclosed May 25th.
25         THE COURT:  Are you ready for the jury, Mr. Tabackman.

1         MR. TABACKMAN:  Yes, Your Honor.
2         (Jury in at 9:59 a.m.)
3         THE COURT:  You have the patience of saints.  Thank you
4 for your indulgence and good morning.
5         THE JURY PANEL:  Good morning.
6         THE COURT:  Welcome back.  Glad to have everybody back and
7 we're ready to resume.
8         MR. TABACKMAN:  Thank you, Your Honor.
9         <u>CONTINUED CROSS-EXAMINATION OF DAMIEN GREEN</u>
10 BY MR. TABACKMAN:
11 Q.   Good morning, Mr. Green.
12 A.   Good morning.
13 Q.   How are you?
14 A.   All right.
15 Q.   Hopefully, we can get this done today.
16      Just to go back for just a moment to, I think, where --
17 something that we were doing just before we had to break
18 yesterday morning, we were talking about your conversations with
19 prosecutors and police and FBI about the incident with
20 Mr. Carter --
21 A.   Yes.
22 Q.   -- and his getting shot, when -- do you recall when you
23 were told for certain that you would be a witness here in this
24 trial?
25 A.   Well, uhm, I'd say probably 2000 maybe, 2001, I might

1 be -- it was brought to our attention that they might use us.
2 Q.   And so you're saying seven years ago you were told you
3 might be a witness in this trial?
4 A.   Yeah.
5 Q.   And when were you told that you definitely would be
6 coming to Washington to testify?
7 A.   It was last year sometime, early last year.  That's when
8 I talked to my agent, Gus, that he asked me -- he wanted me to
9 testify on this case.  But before that, prosecutors, you know,
10 they talked to me about the Kevin Gray case and this case.
11 Q.   Right.  I understand that.  But what I'm trying to
12 understand is, you are incarcerated -- and I don't want to know
13 where -- but you're incarcerated somewhere other than in the
14 Washington, DC area, correct?
15 A.   Yes.
16 Q.   Okay.  And at some point someone said to you, we're
17 putting you on a -- I guess it's a bus or a plane or whatever
18 mode of transportation, not important, and said you're coming to
19 Washington, right?
20 A.   Naw.  Naw.  I was in the place where I was at and I
21 talked to my agent and the agent told me that he might need me
22 to testify.  So I was like, "All right."  So he said, "I'm going
23 to come and see you."
24      So they came can and see me, talked to me and then they
25 was like they'll get back with me.  And then I talked to them a

1 couple times on the phone and then that was it.
2      So I'd say after I got the letter for the parole board,
3 seven months done pass.  I done went to parole already, so I'm
4 thinking I ain't got to testify.  So I thought that was it, so I
5 ain't press the issue.  I ain't call nobody, ask them why they
6 ain't call me or none of that.  I was like, "Okay, if they don't
7 need me, they don't need me."  So it was a done deal.
8      But then it was like I got the call, it was like "Call
9 Washington."  So I called Washington, Washington transferred me
10 to the phone -- to the prosecutor and then I talked to him and
11 he said, "We're calling you up."  So that's it.
12 Q.   Okay.  I guess that's what I'm not -- it's that last
13 phone call.  When did that happen, the one where you called
14 Washington and talked to the prosecutor?
15 A.   I think --
16 Q.   Was that within the last few weeks?
17 A.   Maybe about two weeks ago.
18 Q.   About two weeks ago?
19 A.   Yeah.
20 Q.   So the time -- now, the time -- the last time that
21 anybody came to visit you where you were being incarcerated, I
22 believe, was -- correct me if I'm wrong -- April 19th of 2006,
23 when Ms. Petalas came with Giannakoulias?
24 A.   Yes.
25         MR. TABACKMAN:  Does Mr. Wallace need the spelling?

13977

1      THE COURT REPORTER:  No.
2      MR. TABACKMAN:  Good.  It's harder than Tabackman.
3  BY MR. TABACKMAN:
4  Q.    That was the last time you spoke to anyone in person
5  face-to-face before this recent phone call?
6  A.    Yes.
7  Q.    And your coming to Washington.
8        And then you said -- so that was in April.  And at
9  that point, you talked about everything you knew or heard with
10  Ms. Petalas, Detective Giannakoulias and whoever else was there
11  at that time, correct?
12  A.    Well, I talked about basically what I can remember at the
13  time.  At the time, I had to think about a lot of stuff.
14  There's probably a lot of stuff still in there.  At that time, I
15  told them what I knew right at that time, and then if I come up
16  with anything else, let them know.
17  Q.    Right.  And that was in April of 2006.  And that was
18  roughly 12 years or so after this event that you've -- one of
19  the events that you testified about regarding Mr. Carter and
20  getting shot, which was in February of '94?
21  A.    Yes.
22  Q.    So it's understandable that that kind of passage of time,
23  12 years, it's hard to remember everything?
24  A.    Well, it's not hard.  I mean, if you living that
25  lifestyle every day, it's not hard.  You ain't going to forget

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13978

1  it like that.  When I say you've got to think about it, it's
2  more so many events that happened, that some of them are
3  similar, so you have to, you know, space them out and remember
4  who was here or who was here.
5  Q.    Right.
6  A.    It's sometimes -- you know, I might say he was here on
7  one case and he was here on this case, but once I think about
8  it, then the truth come out.
9  Q.    Right.  And I'm not suggesting that it's not the truth.
10  But it is, as you point out, sometimes difficult to separate out
11  what may have happened in one event involving certain people --
12  A.    No, it's not difficult.  It's not difficult at all.  It's
13  just that I have to think about it.
14  Q.    Okay.  In any event, you spoke with them in April of 2006
15  and you said about seven months passed before you had any other
16  communication with Detective Giannakoulias?
17  A.    During that time, I called him a couple of times.
18  Q.    Okay.
19  A.    And that was it.
20  Q.    And that was brief telephone conversations.
21  A.    We stayed on the phone for probably 45 minutes, an hour
22  sometimes.
23  Q.    And were you talking about the events back in the day or
24  were you talking about how you were doing at the time?
25  A.    Basically, he's talking about events back in the day,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13979

1  my -- what I done done.  Same stuff we've been talking about in
2  here.
3  Q.    Okay.  And then after you went to the parole board
4  sometime in 2006 and you hadn't heard anything in a while, you
5  had assumed that you weren't going to be a witness, if I
6  understood what you said before?
7  A.    Yes.
8  Q.    Okay.
9  A.    Yes.
10  Q.    And then you got the call a couple weeks ago that you in
11  fact were going to be coming down to Washington?
12  A.    Yes.
13  Q.    Okay.  And when you came down to Washington, you met with
14  Mr. Guerrero; is that right?
15  A.    Yes.
16  Q.    And was Detective Giannakoulias there?
17  A.    Yes, sir.  Yeah, he was.
18  Q.    Okay.  But you had never met with Mr. Guerrero prior to
19  that?
20  A.    No.
21  Q.    He was a new face for you?
22  A.    Yes.
23  Q.    Okay.  And had you spoken with Mr. Guerrero on the phone
24  before meeting him?
25  A.    Yeah.  I spoke to him the week -- I'd say on a Friday.  I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

13980

1  think it was a Friday.  And then the next week, I met him.
2  Q.    Okay.  And -- so once again, you had to talk to him about
3  the things that had happened, as I'll refer to it, back in the
4  day --
5  A.    Yes, I talked to him.
6  Q.    -- before you were incarcerated, right?
7  A.    Yes, I talked to him.
8  Q.    Right.  And was there -- strike that.
9        You had spoken about the Carter incident previously --
10  you can just answer yes or no -- is that right?  To the other
11  people that you had spoken to over the years?
12  A.    Yes, I spoke to -- plenty of times.
13  Q.    Right.  Did Mr. Guerrero go over that with you in any
14  greater detail than, say, it had been gone over before,
15  specifics?
16  A.    Basically, naw, he just told me to tell him about it.  I
17  told him about it and that was it.
18  Q.    Okay.  Was there -- did he focus on what Mr. Carter said
19  to you when you saw him back on Stanton Road in front of his
20  house and Monkey Mark's house after the shooting?
21  A.    Say that again.
22  Q.    Was there, in your view, a greater emphases on the
23  details of what Mr. Carter had said to you about the incident
24  when he came back?
25  A.    I mean, he just -- he just told me about the whole thing,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    what happened.

2    Q.    Mr. Carter did?

3    A.    Yeah.

4    Q.    I'm asking you, was Mr. Guerrero more focused on that

5    piece of it -- let me withdraw that.

6    A.    I know what you're saying. I mean, yeah, he wanted to

7    know all the details. He wanted to know what all the details

8    were, what really went down. He wanted to know the details so I

9    gave him the details.

10   Q.    Okay. And I take it that, you know, you named the

11   people -- now, everything that you knew about who was in this --

12   the car where the shooters were was based on what Carter had

13   told you?

14   A.    Yes.

15   Q.    Had anybody else told you -- given you an account of what

16   had happened?

17   A.    Well, yeah. What happened was after Black got out of the

18   hospital, he was at home --

19   Q.    I don't want to know the substance, but just, you know,

20   did you talk to someone else?

21   A.    He told me about it.

22        MR. MARTIN:    Objection.

23        THE COURT:    "He," who?

24        THE WITNESS:    Black. Maurice Willis, the one that got

25   shot in the head.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1    BY MR. TABACKMAN:

2    Q.    So Maurice Willis gave you an accounting? You just have

3    to answer yes or no.

4    A.    Yes.

5    Q.    Okay. So you had Mr. Carter's version and you had

6    Black's version, correct?

7    A.    Yes.

8    Q.    Okay. Now, when you had spoken with -- now when you

9    testified earlier, rather, in this trial, you named the people

10   that Carter had told you were in the car where the shooter was,

11   correct?

12   A.    Correct.

13   Q.    And were you able to separate out in your mind what

14   Mr. Carter told you from what Mr. Willis told you? Black?

15   A.    I think Black told me --

16   Q.    Don't get into the substance. I just need an answer.

17   A.    Yeah. It's a little different, but it's based on the

18   same thing.

19   Q.    Right. But when you -- what I want to focus on, when you

20   spoke to Detective Giannakoulias and Ms. Petalas and, I believe,

21   Agent Lockhart, when they came to see you --

22   A.    Yes.

23   Q.    -- do you recall giving them some names of some people

24   that were definitely or might be in the car where the shooter

25   was?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1    A.    Yes.

2    Q.    Right. And do you recall mentioning that a Moe Brown or

3    Maurice Andrews might have been in the car?

4    A.    Yes.

5    Q.    Now, that's not a name that you mentioned in your

6    testimony?

7    A.    Yes.

8    Q.    And Moe Brown or Maurice Andrews is a guy who you knew on

9    the street who was associated with Kevin Gray, right?

10   A.    Yes.

11   Q.    Not Tommy Edelin?

12   A.    No.

13   Q.    So was your statement to Detective Giannakoulias and

14   Ms. Petalas that Mr. Brown may have been in the car --

15   Mr. Andrews was his formal name; Moe Brown is how he's known --

16   was that based on something Mr. Carter had told you?

17   A.    No.

18   Q.    That was based on something Black had said to you?

19   A.    Black had told me, and it was another time when we was

20   all locked up together when we talked about it.

21   Q.    So you and Mr. Carter and Black all talked about it

22   together?

23   A.    Yeah. We -- all the guys that testified on Tommy case

24   was in the same block together.

25   Q.    And that was over at CTF?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1    A.    Yes.

2    Q.    And so when -- and by "Tommy's case," you're talking

3    about Tommy Edelin's case?

4    A.    Yes.

5    Q.    And you all were locked up together at CTF for a fairly

6    long period of time, right? A couple months?

7    A.    About three years.

8    Q.    Three years. I had forgotten that.

9         And so you had opportunities to talk about it on more

10   than one occasion?

11   A.    Yeah. We had opportunity to talk about a lot of stuff.

12   Q.    Did you talk about this case, too?

13   A.    This case -- it wasn't really a case. It was just more

14   as we knew he was going to get locked up. It was more as like

15   we always say they coming in, too.

16   Q.    Right. But had you talked about incidents that had --

17   one or the other of you might have been involved in regarding

18   these gentlemen?

19   A.    Yes. Every -- I'd say everybody was on Tommy case that

20   had any problems with them, when we went to talk to Phleger or

21   Michael Rokaw about anything about our lifestyle, they was

22   involved with it.

23   Q.    Right. I'm talking about when you guys -- what I

24   understood you to say a few minutes ago was that you and Black

25   and Mr. Carter there at the CTF, just the three of you --

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13985

1    **A.**   No. It probably be them, my cousin, Tall Eric. We be
2   all in the room just talking about everything.
3    **Q.**   Talking about things that happened?
4    **A.**   Talking about everything that happened. We might be
5   talking about testifying. We might be talking about a whole lot
6   of stuff.
7    **Q.**   Right. And people would talk about what they remembered
8   about certain things; is that fair to say?
9    **A.**   It's like, see how we're talking about it? It's not
10   like -- we don't talk about it like that. We talk about it in a
11   different way.
12    **Q.**   I understand. We're in a courtroom and it's --
13    **A.**   Yeah.
14    **Q.**   -- more formal and I appreciate that. I guess what I'm
15   saying, though, is that people would be sitting around and
16   talking and remembering different things, right?
17    **A.**   Yes.
18    **Q.**   And you may remember one thing and somebody else may
19   remember something else about an incident and somebody else may
20   remember something else?
21    **A.**   That's what I said. Like when I got the -- from Brad and
22   then I got it from Black, it's based on the same thing. It's
23   just that Black remembered seeing Moe. So I mean, it's
24   different because Brad ain't never say he seen Moe.
25       So that's like Black say the only thing he remember is

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13986

1   when he turned around, he seen -- he said he didn't even see
2   Antwuan. He said he seen Moe. So the only thing he say he
3   remember was his head was numb. He say he was still woke,
4   talking. And he say the next thing you know, he's in the
5   hospital. So, I mean --
6    **Q.**   But when you -- I'm sorry. I didn't mean to cut you off.
7       The -- were you finished? And I apologize.
8    **A.**   Naw. Go ahead.
9    **Q.**   When you testified, though, you testified to Mr. -- what
10   Mr. Carter had said. I guess that's because you were asked what
11   Mr. Carter had said to you.
12    **A.**   Yes.
13    **Q.**   Right. Okay. So no need to say what Mr. Black had said
14   to you -- Mr. Willis -- because you're talking about Mr. Carter?
15    **A.**   Well, at the time it was more -- when I was explaining
16   the story, it was more as where I was at when this happened. So
17   it led to Mr. Carter. It didn't lead to Black. Black is really
18   after the fact. I talked to Black after he got shot. So it's
19   based on at the beginning of the whole incident.
20    **Q.**   Well, by the way, was Moe Brown locked up over at CTF,
21   too?
22    **A.**   Yeah, he was.
23    **Q.**   Did you talk about this with him?
24    **A.**   Naw.
25       MR. TABACKMAN: Court's indulgence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13987

1   BY MR. TABACKMAN:
2    **Q.**   I'll try to circle back to where I was trying to go.
3       The conversation with Mr. Guerrero just before -- in the
4   week or so before you were about to testify focused in greater
5   detail about, you know, what Mr. Carter said when he came back
6   to the house that night than you had before -- more precisely,
7   if that's fair to say?
8    **A.**   He asked me what Brad said to me about the whole
9   situation, but his whole focus was on how Brad react, how was
10   he? He wanted to know. So he wanted to know more details, so I
11   gave him more details. I gave him the details that I remember.
12    **Q.**   Okay. And you had never talked about how Brad appeared
13   to you -- I mean, in that level of detail before? Not the
14   substance of what he was saying, but how he looked when he was
15   saying it? You hadn't talked about that very much before that,
16   right?
17    **A.**   I think the only thing I probably mentioned was he was
18   shaking. He was shaky.
19    **Q.**   In this kind of -- I'm sorry. You're talking in the most
20   recent conversation?
21    **A.**   Yeah, recent conversation. I think I remember saying
22   something about the bullet in his hand. I know -- I think I
23   remember him saying that he was tired, too, but I don't remember
24   me saying that his general -- his blood was flowing. I don't
25   remember saying that, but that's the only thing I say that's different

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13988

1   from the conversation.
2       MR. TABACKMAN: Court's indulgence.
3   BY MR. TABACKMAN:
4    **Q.**   I guess one last question. Did anybody ever -- or did
5   you ever inquire or did anybody ever offer an explanation why
6   there was a new -- this greater emphasis on how Brad --
7   Mr. Carter appeared at the time?
8    **A.**   Say that again.
9    **Q.**   Did you ever ask or did anybody ever volun- -- well, let
10   me do it one way with two different questions.
11       Did you ever ask, "Why are you focusing more on
12   Mr. Carter's appearance, how he appeared to me," in these most
13   recent conversations? Was that something that you asked about?
14    **A.**   Naw.
15    **Q.**   Anybody ever say or give you an explanation why they
16   might need to do that?
17    **A.**   Well, naw, they never told me why, but I mean, I
18   understand you have to go through the details. I understand you
19   want to know what he said. I understand all that.
20       I look at it like this: Half of the details are
21   whatever -- how Brad was acting or whatever. At the end of the
22   conversation, it's still boil down to the end --
23    **Q.**   Okay.
24    **A.**   -- that he shot Black in the head. He shot at the car.
25       It always going to be something different. If you have

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   somebody else that Brad told might come up here and tell
2   something different in the whole thing, but at the end of that
3   conversation, it's going to be that he shot at the car.
4   Q.   Right.  Based on what Mr. Carter told you?
5   A.   Yeah.  I'm just saying, if he tells somebody else and you
6   put him up here, it's going to come out the same way.  It might
7   be something different.  He might say that he had on a belt, his
8   belt was loose.  It's always going to be something different in
9   the conversation.
10   Q.   Right.  And in this instance, the something different was
11   a different perception -- a different idea as to who was in the
12   car?
13   A.   I mean --
14   Q.   Isn't that correct, sir?
15   A.   You have to understand, just like I said, he might tell
16   you that -- he might didn't see that person in the back seat.
17   Q.   I understand.
18   A.   So he's just going to tell you who he seen and what
19   happened.  So then the next man can come and tell you who's in
20   the back seat, what type of rims was on the car and everything.
21   But you can't get the same story from everybody.
22   Q.   Right.  Right.  And as -- but you would agree that in
23   this instance, it's a difference as to who was in the car?
24   A.   I can --
25   Q.   Isn't that correct, sir?

1   A.   I can say it's a difference from them two telling the
2   story, but at the end of the story, both of them say he shot
3   through the car.
4   Q.   Right.  Now --
5   MR. TABACKMAN:  Court's indulgence.  I lost the train of
6   thought for a second.
7   BY MR. TABACKMAN:
8   Q.   Last week when you were talking, when Mr. Guerrero was
9   asking you questions -- let me strike that.  I'm sorry.
10   You testified at some length in the Edelin case; is that
11   right?
12   A.   Yes.
13   Q.   In fact, I think you testified on parts of five or six
14   days; isn't that right?
15   A.   Yes.
16   Q.   Right.  And you were examined by -- in addition to the
17   prosecutor, maybe five or six different defense lawyers; isn't
18   that right?
19   A.   Yes.
20   Q.   And the Edelin Group, and this is just a context, was
21   beefing with a number of different organizations; isn't that
22   right?
23   MR. GUERRERO:  Objection, relevance.
24   THE COURT:  Sustained.
25   BY MR. TABACKMAN:

1   Q.   In the course of the Edelin trial, did the prosecutor ask
2   you any questions at all about Antwuan Ball?
3   MR. GUERRERO:  Objection, relevance.
4   THE COURT:  Wasn't that asked already?
5   MR. TABACKMAN:  Well, I may have asked it yesterday, Your
6   Honor.  I'll move on.
7   BY MR. TABACKMAN:
8   Q.   Did the prosecutor -- do you recall testifying at all
9   about anything to do with Bradley Carter in the Edelin trial?
10   MR. GUERRERO:  Objection, asked and answered.
11   MR. TABACKMAN:  That has not been asked, Your Honor.
12   THE COURT:  I'll allow that one.
13   THE WITNESS:  I think so.  I think -- I don't remember.  I
14   think so.  I'm not for sure, but I think so.
15   BY MR. TABACKMAN:
16   Q.   If I -- I would represent to you that Mr. Carter's name
17   does not appear in a word search of the transcript of your
18   examination and I would ask you if you have a clear recollection
19   to the contrary.
20   MR. GUERRERO:  Objection, Your Honor.  Form.
21   THE COURT:  Sustained.
22   THE WITNESS:  I'm not for sure.
23   THE COURT:  That means you don't have to answer.
24   MR. TABACKMAN:  Your Honor, may we approach.
25   THE COURT:  Huh?

1   MR. TABACKMAN:  May we approach?
2   THE COURT:  Yes.
3   (Following sidebar discussion had on the record:)
4   MR. TABACKMAN:  I'm not going to go into detail.  The
5   other day when he was testifying and he wanted to answer and I
6   wound up finally intervening and trying to cut him off because I
7   think I had said -- I was trying to be polite, and he had talked
8   about -- or given the impression that this trial was simply the
9   flip side of the Edelin trial.  He's testified against these guys
10   the way -- he testified against one group in the beef in the
11   Edelin trial and now he's testifying against the other group.
12   The fact of the matter is that in his testimony, and I
13   stake my license on this, there is -- other than a one-word
14   mention of Reesey, there is no reference at all to anything with
15   Congress Park.  And the only time he's asked about Antwuan Ball
16   is when Jensen Barber, the last cross-examiner, takes a list of
17   every person that's involved with anything.
18   And I just want to ask one or two questions to try to
19   establish that, in fact, you know, this isn't -- this wasn't the
20   primary, you know, focus of these things, that the only thing he
21   knows about that, this beef, couldn't have been as great or as
22   significant, with respect to him at least, because he was never
23   even asked any questions about it, that focused on it.
24   And I want to question him and move on to establish that
25   context, that all he knows is this hearsay about Carter -- that

13993

1  Carter told him.
2        THE COURT:  What is your request?
3        MR. TABACKMAN:  That I be allowed to ask --
4        THE COURT:  Not that way, no.  You're testifying.  I won't
5  permit that.
6        MR. TABACKMAN:  I'm not sure how, given six days of
7  testimony, how one gets into the witness without asking him to
8  examine the entire transcript.
9        THE COURT:  I'm not going to tell you how to try your
10  case.  The objection is to form.  The form is you testifying.
11  I'm going to sustain the objection.
12        MR. TABACKMAN:  I didn't realize the objection was to
13  form.  I'll try to figure out another way to do it.
14        (Sidebar discussion concluded.)
15        MR. TABACKMAN:  Court's indulgence.
16  BY MR. TABACKMAN:
17  Q.   In the course of your examination, your testimony in the
18  Edelin trial, you testified about a large number of people;
19  isn't that right?
20  A.   Yes.
21  Q.   And you recall that the last person -- the last lawyer
22  before Mr. Quander -- he was the prosecutor, right?
23  Mr. Quander?
24  A.   Yes.
25  Q.   All right.  There was a lawyer who had some photographs

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13994

1  and he tried to take you through all the different names of
2  people that had come up during your testimony or that had been
3  involved in one way or another with Tommy Edelin?
4  A.   Yes.
5  Q.   All right.  And do you recall that in the course of that
6  last examination by that lawyer, he went through the various
7  areas of -- around Congress Heights and Stanton Terrace one by
8  one; isn't that right?
9  A.   Well, during the trial, he -- from my knowledge, he based
10  on --
11  Q.   Well --
12  A.   -- was talking about more the beef with Stanton Terrace
13  and -- with me anyway, but --
14  Q.   Right.  With you.
15  A.   As far as with me, it was more he talked about the beef
16  with Stanton Terrace.  Only on how Congress Park came in with my
17  conversation, because Cool Wop, he always used to be with Tweety
18  and them.
19  Q.   Right.
20  A.   Now, they never really got to talk to me about did
21  Congress Park beef that much.  The only thing I talk about the
22  Congress Park beef with was about how it started with Reesey and
23  how it ended with Antwuan and Squid beefing.
24        So really, it started off with Squid and just Antwuan
25  beefing, because Squid --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13995

1  Q.   I need to ask you to focus on the question, okay, and I
2  can't let you do a narrative.
3  A.   I just wanted you to understand -- I want you to
4  understand the whole picture.
5  Q.   Well, you need to answer the questions.  I'm not trying
6  to cut you off, Mr. Green, but it works better, you know, doing
7  it question and answer, okay.
8        The -- and I want to focus for a moment on that last
9  examination.
10  A.   Right.
11  Q.   And do you agree -- do you agree with my characterization
12  that you were asked about by that examiner -- he went through
13  the various areas one by one?
14        MR. GUERRERO:  Objection, asked and answered.
15        THE COURT:  I'll allow it.
16        THE WITNESS:  Uhm --
17  BY MR. TABACKMAN:
18  Q.   And if looking at your transcript would refresh your
19  recollection, I can do that.
20  A.   Yeah.  He asked me one by one about a lot of different
21  things.
22  Q.   Right.  And one of the -- and at one point, he got to
23  Congress Park; isn't that right?
24  A.   I'm not for sure.  You have to read it to me.
25  Q.   Okay.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13996

1        MR. TABACKMAN:  Court's indulgence.
2  BY MR. TABACKMAN:
3  Q.   Do you recall him -- Mr. Barber, that is -- you went
4  through the different people whose names came up in your
5  testimony; you would assign them and say that person is
6  associated with this group --
7  A.   Yes.
8  Q.   -- and this other person is associated with this other
9  group, correct?
10  A.   Yes.
11  Q.   And when he came to somebody like Squid, he'd say, "Well,
12  he's associated 50/50 with different groups," right?
13        MR. GUERRERO:  Objection, relevance.
14        THE COURT:  I'll give you some leeway.
15  BY MR. TABACKMAN:
16  Q.   Right.  And then he came to -- and then he asked you, if
17  you recall this -- it's not impeachment -- he said:  "Now, let's
18  talk about the wonderful Congress Park area, okay?  We have the
19  Ball family, Violet Ball, yes?"
20        MR. GUERRERO:  Objection, Your Honor.  Can we approach?
21        THE COURT:  Yes.
22        (Following sidebar discussion had on the record:)
23        MR. GUERRERO:  Mr. Tabackman is reading into the record a
24  piece of trial transcript from another case that's not in
25  evidence and he's reading it word for word to this witness

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

13997

1  without laying any foundation to either refresh the witness's
2  recollection or to impeach the witness. He's just reading other
3  testimony before the jury without it even being admitted.
4      MR. TABACKMAN: Your Honor, the witness has said to me,
5  you know, that I would have to read it to him. I would normally
6  ask that the witness read it to it himself. There is some
7  indication that the witness has reading problems and I think it's
8  important in the scope of what he said about Mr. Ball in the
9  course of that trial that it be clear to the jury, because the
10  picture that the government wants them to draw is that -- that he
11  is a man who knows these guys very well.
12      He doesn't even testify about Mr. Wilson, for example, and
13  his testimony about Mr. Ball is that he used to be in Congress
14  Park. I think that this is the only way I can get that out.
15      THE COURT: You're trying to get out testimony that
16  Mr. Ball used to be in Congress Park?
17      MR. TABACKMAN: I'm saying this witness says -- when he
18  describes Mr. Ball --
19      THE COURT: In his direct testimony here or --
20      MR. TABACKMAN: In the Edelin trial, all he says is he
21  used to be -- quote it as: "He used to be around there," when
22  he's asked who was Antwuan Ball. This is in 2001, when he's
23  still on the street.
24      So there's -- and there's no other mention of Mr. Ball in
25  this entire Edelin trial. So the only thing he's got is hearsay

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13998

1  about Bradley Carter. And I think for the jury, it undercuts to
2  a substantial degree his direct testimony in this trial.
3      THE COURT: I'll give you some leeway, but if you're going
4  to be reading verbatim from a transcript that extends far
5  beyond the ultimate question of weren't you asked about Antwuan
6  Ball and Congress Park and didn't you just say "He used to be
7  around there," I'm going to cut you short.
8      (Sidebar discussion concluded.)
9      MR. TABACKMAN: Your Honor, may I approach the witness?
10      THE COURT: Yes.
11  BY MR. TABACKMAN:
12  Q.    This is volume 69 of the Edelin trial. The day is July
13  24th, 2001 and page 14915 --
14      MR. TABACKMAN: May I inquire of the witness, would it be
15  easier if I read this?
16      THE WITNESS: Yes.
17      MR. TABACKMAN: Shall I read it out loud or just to the
18  witness, Your Honor? I'm doing it to refresh his recollection.
19      THE COURT: Have you established the proper predicate for
20  refreshing recollection?
21      MR. TABACKMAN: Well, my -- that's fine, Your Honor. We
22  can do it this way.
23      THE COURT: What way?
24      MR. TABACKMAN: Well, the way we discussed at the bench,
25  Your Honor.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

13999

1      THE COURT: We didn't discuss this at the bench just now.
2  Come on up.
3      (Following sidebar discussion had on the record:)
4      THE COURT: I heard you say you would help him refresh his
5  recollection, but maybe I misheard that. But if you're going to
6  do that, you have to establish a predicate for it.
7      MR. TABACKMAN: Your Honor, when Mr. Guerrero objected to
8  my reading from the transcript and the Court said, "I'll give you
9  some leeway to do it," it occurred to me that perhaps a better
10  way to do it was to read silently to the witness rather than --
11  the Court had told me that I could read out loud and I was trying
12  to be fairer to the government, perhaps, and do it silently and,
13  therefore, was trying to come up -- to suggest that's a reason to
14  do it.
15      THE COURT: You're either refreshing his recollection or
16  you're not. If you're refreshing his recollection, lay the
17  foundation for it. If you're not refreshing his recollection,
18  that's a different thing. So what are you doing?
19      MR. TABACKMAN: I'm just going to read this out loud. I
20  will read this to him, as the Court said I could, to see -- to
21  have him acknowledge that that was his testimony in the Edelin
22  trial.
23      He testified for six days. I can't have him say, you
24  know, "What did you testify to in the Edelin trial?"
25      THE COURT: What are you going to do next?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

14000

1      MR. TABACKMAN: I'm going to read out loud this portion of
2  the transcript.
3      THE COURT: What portion?
4      MR. TABACKMAN: The portion where he is asked these
5  questions about the Ball family in Congress Park, which I would
6  represent is the entirety of the examination of this witness in
7  the Edelin trial about Mr. Ball.
8      THE COURT: From what page and line to what page and line?
9      MR. TABACKMAN: Page 14915, beginning at line 4 and going
10  to line -- I guess I can stop at Ball, line 20. I can ask him if
11  he remembers first.
12      THE COURT: Anything else?
13      MR. GUERRERO: Your Honor, we still object because we
14  still don't have the predicate -- our initial objection was
15  Mr. Tabackman is reading this out loud in front of the jury
16  without first establishing whether it's going to be impeachment,
17  whether this witness, Damien Green, has said something before
18  this jury that's different in the Edelin trial. There's no
19  connection there.
20      And then second, whether Mr. Tabackman wants to refresh
21  the recollection of this witness by reading out loud, that's
22  improper. That's not the proper refreshing recollection. But
23  even if that's where he was going to go, there's still no
24  predicate foundation to establish that reading this testimony on
25  page 14915 of July 24th, 2001, would refresh Damien Green's

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

## 14001

1 memory about what he said in that trial.
2     THE COURT: Correct. So you can't refresh his
3 recollection. I take it you're now wanting to impeach him?
4     MR. TABACKMAN: I haven't tried. I haven't asked him what
5 his recollection is yet, so --
6     THE COURT: So you're going back to refreshing
7 recollection?
8     MR. TABACKMAN: I'll try that. I'll do that.
9     THE COURT: Try what?
10     MR. TABACKMAN: I will ask him what his recollection was
11 regarding his testimony about Mr. Ball's -- about Mr. Ball in the
12 Edelin trial.
13     (Sidebar discussion concluded.)
14 BY MR. TABACKMAN:
15   Q.  Mr. Green, do you recall today what your answers were --
16 what your testimony was to the questions that I described to you
17 before from the lawyer that -- Mr. Barber, who was asking you at
18 the end of your cross-examination?
19   A.  Do I understand the questions that he asked me?
20   Q.  Do you recall what your testimony was?
21   A.  Yes.
22   Q.  Okay. And what was your testimony with respect to your
23 description of Congress Park, Mr. Ball and Congress Park?
24     MR. GUERRERO: Objection, time frame, date.
25     THE COURT: I'll allow it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 14002

1     THE WITNESS: Uhm --
2 BY MR. TABACKMAN:
3   Q.  I'm asking you now to recall what your testimony was
4 then.
5   A.  It was based on telling how Antwuan and Squid started
6 beefing.
7   Q.  Okay. Do you recall being asked -- and is that your
8 recollection of your -- your testimony in response to
9 Mr. Barber's questions?
10   A.  Yes. It was based on how the beef started.
11   Q.  Okay. Do you recall being asked the following questions
12 and giving the following answers:
13   "Question: Now, let's talk about the wonderful Congress
14 Park area, okay? We have the Ball family, Violet Ball, yes?
15   "Answer: Who?
16   "Question: Violet. Do you know Ms. Vi, Violet Ball?
17   "Answer: Ms. Val?
18   "Question: Uh-huh.
19   "Answer: I don't know her. I just --
20   "Question: All right. Do you know if she lives in
21 Congress Park?
22   "Answer: No. I don't think so, no.
23   "Question: Okay. So you -- how about Kairi Ball?
24   "Answer: He used to be around there.
25   "Question: How about Antwuan Ball?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 14003

1   "Answer: He used to be around there.
2   "Question: How about Aman Ball?"
3     MR. GUERRERO: Objection.
4     THE COURT: Sustained.
5 BY MR. TABACKMAN:
6   Q.  Do you recall being asked those questions and giving
7 those answers?
8   A.  To be honest with you, that's -- to me, that's a lie,
9 because I don't know his mother, but I know his mother raised
10 them around Congress Park. I know his mother went to jail for
11 Tommy, so I think that's a lie. I don't remember me answering
12 them questions like that.
13   Q.  Okay. Are you saying that the transcript has it wrong?
14   A.  That's how I see it because I don't think that's true.
15   Q.  Okay. And other than the questions and answers that I
16 just read to you, can you recall -- not what you testified --
17 not just generally what you think you testified to: Can you
18 recall specific questions that you were asked about Antwuan
19 Ball --
20     MR. GUERRERO: Objection, asked and answered.
21 BY MR. TABACKMAN:
22   Q.  -- in the Edelin trial?
23     THE COURT: Sustained.
24 BY MR. TABACKMAN:
25   Q.  Now, you did testify about a lot of other subjects,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 14004

1 didn't you?
2   A.  Yes.
3   Q.  Over six days?
4   A.  Yes.
5   Q.  And they involved lots of other people, didn't they?
6   A.  Yes.
7     MR. GUERRERO: Objection, asked and answered.
8     THE COURT: Sustained.
9 BY MR. TABACKMAN:
10   Q.  You testified about Squid; is that right?
11     MR. GUERRERO: Same objection.
12     THE COURT: Sustained.
13 BY MR. TABACKMAN:
14   Q.  You testified about Mr. Edelin's -- the Edelin Group's
15 interaction with a variety of organizations, correct?
16     MR. GUERRERO: Objection, asked and answered.
17     THE COURT: Sustained.
18 BY MR. TABACKMAN:
19   Q.  You testified about his beef with Kevin Gray; is that
20 right?
21   A.  Yes.
22     MR. GUERRERO: Objection, relevance.
23     THE COURT: Sustained.
24 BY MR. TABACKMAN:
25   Q.  You testified --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1     MR. TABACKMAN:  On relevance grounds, Your Honor?

2     THE COURT:  Absolutely.

3     BY MR. TABACKMAN:

4     Q.    And you testified in this trial on Thursday to certain

5     interactions with Mr. Ball; is that right?

6     A.    Yes.

7     Q.    Now, one of those, you said, involved Mr. Faison?  Yes or

8     no?

9     A.    On which incident?

10    Q.    Well, you testified to an incident where Mr. Ball and

11    Mr. Wilson were supposedly together?

12    A.    Yes.

13    Q.    All right.  And that's not an incident that you testified

14    about in the Edelin trial, was it?

15    A.    I know that I told him about it, but --

16    Q.    I didn't ask you that, sir.

17    A.    He probably didn't ask me about it.  I'm not for sure.  I

18    don't remember him asking me about it in the Edelin trial.

19    Q.    Fair enough.  You have no recollection of being asked

20    about that incident in the Edelin trial?

21    A.    Naw.

22    Q.    Okay.  I believe you testified to an incident where --

23    that involved Tony Edelin and Mr. Ball.  Mr. Ball said

24    something, Mr. Edelin tried to say something to him and Mr. Ball

25    said something in response about you killed my man?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1     A.    Right.

2     MR. GUERRERO:  Objection, Your Honor.  Misstates the

3     evidence.

4     THE COURT:  Beg your pardon?

5     MR. TABACKMAN:  No, it does not misstate the evidence.

6     THE COURT:  I asked him to repeat what he said.

7     MR. GUERRERO:  Misstates the evidence, Your Honor.

8     MR. TABACKMAN:  It does not misstate the evidence, Your

9     Honor.  I can virtually quote it.

10    THE COURT:  I'll allow it.

11    BY MR. TABACKMAN:

12    Q.    Do you recall the question?

13    A.    Yes.

14    Q.    You testified to an incident, an incident such as the one

15    I just described?

16    A.    The two incidents you just said -- you got to understand,

17    them two incidents you just said, it wasn't -- in the trial,

18    they're asking questions about as far as what violence was going

19    on.  They didn't ask about --

20    Q.    Sir --

21    A.    -- what Cool Wop did when he got out the car or what JJ

22    do, because JJ not on trial, Cool Wop not on trial.  It was

23    Tommy on trial.

24    Q.    Sir, let me ask you a question.

25    A.    So --

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1     Q.    Sir, your answer is non-responsive.  You cannot --

2     What questions did they ask about violence involving any

3     of these men and the Edelin case -- in the Edelin case?

4     MR. GUERRERO:  Objection, Your Honor.  Relevance.

5     MR. MARTIN:  Your Honor, I object as well.

6     MR. TABACKMAN:  I'll rephrase the question, Your Honor.

7     BY MR. TABACKMAN:

8     Q.    The violence that was asked about, of you when you were

9     on the witness stand, had to do with Kevin Gray, didn't it?

10    MR. GUERRERO:  Objection, relevance.

11    MR. TABACKMAN:  The witness has made a statement, Your

12    Honor, that they asked about violence involving Congress Park.  I

13    will make a representation that --

14    THE COURT:  Don't represent in front of the jury.  I don't

15    want your testimony.

16    MR. TABACKMAN:  Well, Your Honor, then I need to be able

17    to cross-examine the witness on his statement.

18    THE COURT:  You can't testify in front of the jury.

19    MR. TABACKMAN:  I'm not going to testify.

20    THE COURT:  If you want to be able to approach, you can

21    ask to do that.

22    MR. TABACKMAN:  May I approach?

23    THE COURT:  All right.

24    (Following sidebar discussion had on the record:)

25    THE COURT:  Bring the transcript if you're --

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1     MR. TABACKMAN:  This is my transcript, four pages to a

2     page, of Mr. Green's entire testimony in the Edelin trial.

3     THE COURT:  Where is the transcript with his testimony

4     that you're saying your questioning is directed to?

5     MR. TABACKMAN:  Yes, Your Honor.  He --

6     THE COURT:  Involving his prior direct testimony in this

7     trial pertaining to some comment on his part about this --

8     MR. TABACKMAN:  But that's not what his latest comment

9     was, Your Honor.  He agreed that the questions -- what he said

10    was --

11    THE COURT:  In this trial?

12    MR. TABACKMAN:  May I --

13    THE COURT:  No, answer my question.

14    MR. TABACKMAN:  Yes, yes.

15    THE COURT:  In this trial?

16    MR. TABACKMAN:  In this trial, he described two incidents.

17    And I said to him, they weren't asked about in -- he wasn't asked

18    about any of that in the Edelin trial.  And he said because in

19    the Edelin trial, they were interested in asking about the

20    violence that was done.  And the fact of the matter is --

21    THE COURT:  That's what I want you to show me.  Where is

22    the transcript where you say he says that?  That's what I want to

23    see.

24    MR. TABACKMAN:  He said that just now.  He said that for

25    the first time just now.  He said -- he agreed that the

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1   that he talked about in this trial were not ones that were --
2   that he was asked about by the prosecution or anybody else in the
3   Edelin trial.  And he said, in a non-responsive comment, they
4   were only asking about -- because they weren't interested in all
5   of JJ and all of that.  They were interested in the violence.
6        Well, the fact of the matter is they never asked about any
7   violence on the part of these people.  That's my point.  And now
8   the statement's in the record that somehow or another, they asked
9   about other things involving Congress Park.  They did not ask him
10  about Congress Park, other than Jensen Barber's one question when
11  he was trying to go through and place all these people in the
12  various groups.
13       THE COURT:  When you were up here before, you said that
14  you were exploring this area because in his direct testimony, he
15  made some claim that he -- he had an expectation or belief that
16  he had testified about the Kevin Gray people or the Tommy Edelin
17  people; the time would come around, he's got to testify about the
18  Congress Park people.  Something to that effect.
19       MR. TABACKMAN:  I've implied that he said it again
20  yesterday.  I can get that for you.  It will take a couple
21  minutes.
22       THE COURT:  Are you exploring this area for some reason
23  other than to attack that comment?
24       MR. TABACKMAN:  No, no.
25       THE COURT:  Now, I gave you leeway.  I thought you had

1   based that request upon that previous direct testimony.
2        MR. TABACKMAN:  Right, but I mean -- that's exactly right.
3   And what I'm trying to show is that, you know, the testimony that
4   he is giving in this trial is -- -- how do I describe it? --  was
5   stuff that wasn't even of consequence apparently in the Edelin
6   trial.  Again, that -- I don't know how else to articulate it.
7        The government's theory is that part of the -- a lot of
8   the violence here is having to do with this beef and this witness
9   is on there and now he's come forth and made these global
10  statements about how that trial was about that half of the beef
11  and this trial is about this half of the beef.
12       And the fact of the matter is in that trial, they never
13  asked about any interactions between the people that are on trial
14  here as connected to the people who were on trial there, how
15  those people interacted here.  And I'm just trying to show that,
16  you know, these incidents that he's talking about are ones that
17  now, as the prosecution wants to bolster their case over here,
18  we're now hearing about, you know, incidents that are
19  inconsequential.  And they are very vague in his direct
20  testimony.
21       THE COURT:  Is there any reason why you can't dispatch
22  that idea in three questions?  This is taking an awfully long
23  period of time to get to for a very small point.
24       MR. TABACKMAN:  Well, I think that there are a few -- not
25  many more than that -- questions, Your Honor, but there have been

1   objections.  And I think they're not well founded.
2        MR. GUERRERO:  I disagree, Your Honor.  I think what
3   Mr. Tabackman is trying to do is juxtapose the two cases, the
4   Edelin case versus the Congress Park case, and that now Damien
5   Green in the Congress Park trial is saying incriminating
6   testimony against these defendants which Damien Green never
7   mentioned in the Edelin trial.
8        And there's a perfectly logical explanation for that,
9   which the witness explained.  That was the Edelin trial.
10  Congress Park was not on trial.  We weren't talking about
11  Congress Park.  Mr. Tabackman has made that point clear a couple
12  of times.  Now, granted, a couple of times he hasn't gotten the
13  response he wanted, but the witness has been trying to explain
14  that to him for the last about 35 or 40 minutes.  And we keep on
15  going in circles and now he's talking pulling out transcripts,
16  talking very vaguely about how he knew Antwuan Ball, and he still
17  hasn't tied it up to the impeachment.
18       MR. TABACKMAN:  That's about the most disingenuous
19  statement I think I've heard in the last decade.  The government
20  has put on a case and they said, you know, these two groups were
21  beefing and this witness supposedly knows something about it.
22  And I'm not allowed -- and then the witness they put on the stand
23  says, you know, I'm just flipping the other side.  I testified to
24  all of this beef between the two of them in that trial and now
25  I'm testifying to the same beef, but from the perspective of

1   these guys in this trial.
2        And the fact of the matter is -- is that that's not true.
3        THE COURT:  Is there any reason why you can't get that
4   point out in three questions?  "Mr. Carter [sic], isn't it true
5   that nobody asked you about X incident?  Mr. Carter, [sic] isn't
6   it true that you never testified about Y incident?  Mr. Carter
7   [sic], isn't it true that in the Edelin trial, nobody asked you
8   about Z incident?"  And then finish up?
9        MR. TABACKMAN:  Fine.  You know, I'd also like to show,
10  Your Honor, that they never asked about any incidents.  This
11  notion that somehow or another he's just flipping to the flip
12  side -- standing on this side of the street and testifies this
13  way and then stands on the other side on the street and testifies
14  for the other side -- isn't true.
15       THE COURT:  And the fourth question:  "Isn't it true that
16  they never asked you in the Edelin trial about any of the
17  incidents that you just testified about in direct examination?"
18  So that's four questions.
19       MR. TABACKMAN:  Other than trying to lay a context, Your
20  Honor, in a few questions, that's where I was going.
21       THE COURT:  I'll let you do that.  I'll let you ask those
22  limited number of questions.  This is just taking much too long
23  for too minor of a point.
24       (Sidebar discussion concluded.)
25  BY MR. TABACKMAN:

1  Q.   Yes or no, Mr. Green, the incident that you testified to
2  in this trial regarding where you and Mr. Faison supposedly had
3  an encounter with Mr. Ball and Mr. Wilson never came up in the
4  Edelin trial?  You weren't asked about that; isn't that right?
5  A.   Correct.
6  Q.   And the incident where Mr. Ball said something to, I
7  believe you testified, to Tony Edelin -- do you recall your
8  testimony here about that?
9  A.   Correct.
10  Q.   All right.  That didn't come up in the Edelin trial
11  either, did it?
12  A.   I don't remember.
13  Q.   And you also have no recollection of testifying in the
14  Edelin trial about the incident that you described regarding
15  Mr. Wilson and Tweety; isn't that right?  That didn't come up
16  either?
17  A.   Mr. Wilson?  Who's Mr. Wilson?
18  Q.   Cool Wop.
19  A.   Oh, okay.  Yeah, I had told Phleger about it.
20  Q.   Right.  I'm talking about --
21  A.   As a matter of fact, I did testify on that.
22  Q.   You did testify on that?
23  A.   I think I did.
24  Q.   And you believe that's in the transcript?
25  A.   I should be.  If it's in there, I think I did.

1  Q.   Okay.  And was it Mr. Quander who asked you about it?
2  A.   I don't remember who asked me about it, but I believe
3  it's probably in there.  Most likely it is in there.
4  Q.   Was it Mr. -- do you remember -- but you have no idea
5  whose lawyer asked you about it?
6  A.   Naw, it wasn't -- I don't think no lawyer asked me about
7  it.  I think -- I think I was telling one of the stories about
8  when Tweety came through.  I told a number of stories when
9  Tweety and them came through.  I think I told him that one and
10  the one when they came through the cuts.
11  Q.   But you're not sure about that, are you?
12  A.   I'm close to be there, but --
13  Q.   Right?
14  A.   -- I'm not all the way there.  But I think I did.
15  Q.   All right.  And other than the question that I read to
16  you before about Mr. Ball, there were no other questions about
17  his conduct asked of you by the prosecutor in the Edelin trial;
18  isn't that right?
19  A.   I think so.  I think it was more of me telling about him,
20  about the Squid situation as far as after Reesey got killed.  So
21  it was more -- his name was coming in and out because I had to
22  tell the story of how --
23  Q.   I'm sorry.  Go ahead.
24  A.   -- how they was beefing, how the beef started.
25  Q.   And how would you establish how many times Mr. Ball's

1  name got mentioned during your transcript?
2  A.   I can't even -- I don't know.
3  Q.   Do you know if it was more than one time?
4  A.   I don't know.  I know it was mentioned.
5  Q.   And you know it was mentioned on some occasion other than
6  the one question that I just asked you?
7  A.   I'm not for sure.
8  Q.   You're not sure about that?
9  A.   Naw.
10  Q.   Now, at the -- the testimony you've given here about the
11  incidents that you did testify to involving Mr. Ball, can you
12  tell -- the incident that Mr. Faison was supposedly a part of,
13  when did that occur?
14  A.   I think that happened like '95.
15  Q.   When in '95?
16  A.   During the summertime.  I think during the summertime.
17  Q.   And why do you say it was '95?
18  A.   Because I had my cousin Caprice.  He was locked up during
19  '95.
20  Q.   Okay.  And when in the summertime?
21  A.   I don't remember.  I think it was summer -- I think it
22  was just summer.  I don't know what month or none of that.  I
23  know he was locked up at that time.  I had his car.
24  Q.   Who was?
25  A.   My cousin.  So I had his car at that time, so I think it

1  was '95.  He was locked up in '95.  I think he came home at the
2  end of '95, I think.
3  Q.   But you can't say what day it was?
4  A.   Naw.
5  Q.   You can't say what month it was?
6  A.   Naw.
7  Q.   And exactly where was it?
8  A.   It was on Congress Place.
9  Q.   On Congress Place.  Congress Place near where?
10  A.   By Stanton Road.
11  Q.   And what time of day was it?
12  A.   It was -- school was just letting out.
13  Q.   And you were parked?
14  A.   Yes.
15  Q.   Mr. Ball came driving down the street?
16  A.   Well, I was facing going towards Stanton Road and he came
17  up Congress.
18  Q.   You were on Congress Place?
19  A.   Yes.
20  Q.   He was coming on Congress Place?
21  A.   Yes.
22  Q.   Had he turned off of Stanton Road?
23  A.   Well, that was after the fact.
24  Q.   Well, did you see where he came from?
25  A.   He came from Congress Park.

1   **Q.**   And how do you know that, sir?

2   **A.**   I mean that's the way he came from.

3   **Q.**   That was the direction he was coming when you saw him?

4   **A.**   Yes.

5   **Q.**   Was he on Stanton Road or Congress Place?

6   **A.**   He stopped on Congress Place.

7   **Q.**   What kind of car was he driving?

8   **A.**   I don't remember what kind of car.

9   **Q.**   Was it a big car or little car?

10   **A.**   I don't know.  I know it was a four-door car.

11   **Q.**   Was it a light colored car or a dark colored car?

12   **A.**   I don't remember.

13   **Q.**   Was it an American car or European car?

14   **A.**   I don't remember.

15   **Q.**   But you remember that he parked up next to you?

16   **A.**   He didn't park next to me.  I was parked and he rolled up

17  and he wasn't going fast and we caught eye.  We looked at each

18  other and then he pulled up and then he stopped.  By that time,

19  I had JJ daughter right here.  He was standing in the doorway of

20  the car.  And Cool Wop got out the car and started walking

21  towards -- to the court.  And that's when JJ was like, "Let me

22  holler at you."  And he was like, "Naw," with a grin on his

23  face.  And that's when Antwuan got out the car and was like,

24  "Naw, you can't holler at nobody."

25   **Q.**   So Antwuan -- Mr. Ball said to Mr. Faison that Mr. Faison

*Scott L. Wallace, RDR, CRR*

*Official Court Reporter*

1  couldn't talk to Mr. Wilson?

2   **A.**   Yes.

3   **Q.**   Mr. Wilson couldn't speak for himself?

4   **A.**   I mean he could have, but, you know, that's his son.  You

5  know, he basically raised him.

6   **Q.**   He basically raised -- oh, okay.  And where did he do

7  that?  He supported him, did he?

8   **A.**   I mean, he basically raised him.  Cool Wop always hung

9  under Antwuan.  He always was with him.  I mean, everybody know

10  that was like his son.

11   **Q.**   Everybody know -- well, when you were asked a question,

12  who is Antwuan Ball, in 2001, in a Congress Park, you said, "He

13  used to be there."  That was your testimony in the transcript?

14   **A.**   Just like I told you, I don't believe that's true there

15  because he is Congress Park.

16   **Q.**   So you -- so the transcript got it wrong?

17   **A.**   That's how I see it.

18   **Q.**   Have you looked at any of your other transcripts, sir?

19   **A.**   No, I never looked at it, but that's wrong, because it's

20  like I said.  He is Congress Park.

21   **Q.**   And how did the reporter get it wrong, sir?

22        MR. GUERRERO:  Objection, Your Honor, speculation.

23  BY MR. TABACKMAN:

24   **Q.**   Do you have an explanation in your mind --

25        MR. TABACKMAN:  I'm sorry, Your Honor.  I was rephrasing.

*Scott L. Wallace, RDR, CRR*

*Official Court Reporter*

1  BY MR. TABACKMAN:

2   **Q.**   Do you have an explanation in your mind as to how the

3  reporter at that trial in this courthouse got that testimony so

4  wrong?

5   **A.**   Maybe -- I don't know.  Maybe the question was different.

6  I don't know, but I know that him not being around Congress

7  Park -- that's wrong.

8        THE COURT:  What did you say?

9        THE WITNESS:  Him -- Antwuan not being in Congress Park,

10  that's wrong.  He always was in Congress Park.

11  BY MR. TABACKMAN:

12   **Q.**   So the testimony that -- at least the testimony that's

13  recorded on that page, according to you today, is wrong?

14   **A.**   That's how I see it.

15   **Q.**   And you're saying that you never said that?

16   **A.**   I'm not saying that --

17        MR. GUERRERO:  Objection, Your Honor.  Asked and answered.

18        MR. TABACKMAN:  I never asked that question, I don't

19  believe.

20        THE COURT:  Sustained for other reasons.

21  BY MR. TABACKMAN:

22   **Q.**   Are you saying, sir, that you didn't say the words that

23  appear on the transcript page?

24   **A.**   Yes.

25        THE COURT:  All right.  I can't allow that because he's

*Scott L. Wallace, RDR, CRR*

*Official Court Reporter*

1  testified to something that's completely different from what you

2  said the transcript says.  That's just an unfair approach.  He

3  has to give testimony that is not he is saying is on that

4  transcript page, so you have to clear that up if you want to

5  pursue it.

6        MR. TABACKMAN:  I'm asking him, on the transcript page --

7  BY MR. TABACKMAN:

8   **Q.**   I'm asking you, sir, what appears on the transcript

9  page -- are you saying that you never said those words?

10        THE COURT:  Sustained.

11        MR. GUERRERO:  Objection, Your Honor.

12        THE COURT:  You have to identify exactly what is on the

13  transcript page since that language is different from what he

14  just testified about believing is on the transcript page.

15  BY MR. TABACKMAN:

16   **Q.**   Do you recall being asked the following question -- well,

17  there are a series of questions, in order to give the context.

18  "Now, let's talk about the wonderful Congress Park area.

19  Okay.  We have the Ball family.  Violet Ball.  Yes?"

20        MR. GUERRERO:  Objection.

21        THE COURT:  Sustained.  Move to the line where the direct

22  question was and the direct answer.

23  BY MR. TABACKMAN:

24   **Q.**   "Question:  How about Antwuan Ball?

25        "Answer:  He used to be around there."

*Scott L. Wallace, RDR, CRR*

*Official Court Reporter*

14021

1      Do you recall being asked that question and giving that
2  answer?
3  **A.**   I don't remember.
4  **Q.**   Would looking at it refresh your recollection?
5  **A.**   No.
6  **Q.**   Is there anything that would refresh your recollection
7  with respect to your giving that testimony?
8  **A.**   No.
9  **Q.**   Are you saying that the transcript did not accurately
10  record your words?
11      MR. GUERRERO:  Objection, asked and answered.
12      THE COURT:  I'll allow him to clear it up.
13      THE WITNESS:  Right now, to me, in my eyes, it's wrong.
14  Right now, what I'm hearing is wrong.
15  BY MR. TABACKMAN:
16  **Q.**   What I'm asking you, sir:  Are you saying that the
17  transcript does not accurately record the words that you said
18  during the Edelin trial?
19  **A.**   I'm not saying that.  I'm just saying right now what I'm
20  getting from you, I don't trust that.  I don't believe that's
21  what I said.
22      MR. TABACKMAN:  May we approach the bench, Your Honor?
23      THE COURT:  Me?  You want to approach me or him?
24      MR. TABACKMAN:  You, Your Honor.
25      THE COURT:  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

14022

1      (Following sidebar discussion had on the record:)
2      MR. TABACKMAN:  I sure don't know how I deal with that at
3  this point, that I -- what is his exact words?  "I don't believe
4  that that's what it says."  I mean, he's saying I'm not reading
5  it?  I've changed what the transcript says?  I'm not sure exactly
6  what --
7      THE COURT:  I'll give you leeway to clear that up.
8      MR. TABACKMAN:  I want to --
9      THE COURT:  It isn't clear whether he's saying he doesn't
10  trust you or whether the transcript's inaccurate, but I'll let
11  you clear that up.  You're right, it's not clear now.  He
12  plainly -- I'll let you clear it up.  I don't know.
13      Do you have a question or a request?
14      MR. TABACKMAN:  Yeah, that I be allowed -- I just didn't
15  want to start getting into that area without clearing it with the
16  Court first.
17      THE COURT:  All right.
18      (Sidebar discussion concluded.)
19      MR. TABACKMAN:  May I approach the witness, Your Honor?
20      THE COURT:  Yes.
21  BY MR. TABACKMAN:
22  **Q.**   I would like you to take a look at page 14915 and if you
23  would read down the page to yourself silently.
24  **A.**   (Complied.)
25      THE COURT:  Does that have an exhibit number?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

14023

1      MR. TABACKMAN:  I'm sorry.  I will do that.
2      Your Honor, we're going to use Wilson's Exhibit 32 L,
3  which is already marked on her exhibit list.  I'll let Mr. Green
4  satisfy himself that these two documents have the same stuff here
5  on this location.  This is another copy.
6      So the exhibit number, Your Honor, again is Wilson 32 L.
7  BY MR. TABACKMAN:
8  **Q.**   Mr. Green, do you see on the page the words that I had
9  read to you?
10  **A.**   Yes.
11  **Q.**   The question and the answer?
12  **A.**   Yes.
13  **Q.**   Is it -- I'm just trying to clarify what your testimony
14  was before.  Are you saying that the person who typed those
15  words got it wrong, that you didn't say them?
16  **A.**   I'm just telling you -- I'm not saying that the person
17  who typed the words got it wrong.  I'm --
18  **Q.**   Okay.
19  **A.**   -- just telling you that from me growing up, this man
20  grew up around Congress Park and I -- and his mother grew up
21  around Congress Park.  All the guys that I hung with used to be
22  in his house, so it's like I said, he are Congress Park.
23  **Q.**   Are you saying, sir, that your testimony in the Edelin
24  case on this point was inaccurate?
25  **A.**   I probably -- I'm going to put it like this.  Just say I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

14024

1  did say that, right?
2  **Q.**   No, I --
3  **A.**   Just hear me out.  Let's say if I did say that --
4  **Q.**   Your Honor, I would ask --
5  **A.**   -- and he don't hang around there no more --
6      THE COURT:  Hold on one second.  You have to make sure you
7  answer only the questions put to you.
8      THE WITNESS:  All right.
9  BY MR. TABACKMAN:
10  **Q.**   Are you saying that your testimony in the Edelin trial
11  was inaccurate, was wrong?
12  **A.**   Yeah.  But see, that's what I'm trying to say again.
13  **Q.**   Thank you.
14  **A.**   I feel it's wrong now, because --
15      MR. MARTIN:  Objection, Your Honor.
16      THE COURT:  Let him put another question.
17      THE WITNESS:  All right.
18      THE COURT:  You have to answer only what he's asking at
19  this point.
20  BY MR. TABACKMAN:
21  **Q.**   You were trying to be truthful in the Edelin trial and
22  accurate; yes on no, sir?
23  **A.**   It's not that I was trying to be truthful.  What I'm
24  trying to tell you -- what I'm trying to say is, even though --
25      MR. TABACKMAN:  Your Honor, I would ask that the witness

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14025

1  be --
2      THE COURT:  Hold on.  Let him put another question.
3  BY MR. TABACKMAN:
4  Q.   Were you trying to be accurate in the Edelin trial?
5  A.   Naw.
6  Q.   You were not?
7  A.   Naw.
8  Q.   Okay.  You were under oath at the time; is that right?
9  A.   Yes.
10  Q.   Okay.  And you're under oath today?
11  A.   Yes.
12  Q.   Okay.  Now, you -- at the close -- excuse me.
13      MR. TABACKMAN:  Your Honor, it's 11:15.  I don't know if
14  the Court was going to take a break or not.
15      THE COURT:  No.
16      MR. TABACKMAN:  Okay, fine.
17  BY MR. TABACKMAN:
18  Q.   At the close of your direct examination by Mr. Guerrero
19  last Thursday, he asked you if -- do you recall him asking you
20  what -- if you knew what "perjury" means?
21  A.   Yes.
22  Q.   Do you recall that?
23  A.   Yes.
24  Q.   And he asked you what it meant to you?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14026

1  Q.   Okay.  And do you recall saying that if you were caught
2  lying under oath -- he asked you what would that expose you to
3  and do you recall that you said that you wouldn't -- you didn't
4  think your situation in front of the parole board would be a
5  real problem, correct?
6  A.   Naw.  It was more as -- it wasn't about the parole.  It
7  was more as that if I lie, it's more as I can get more time
8  added with my parole time.
9  Q.   I'm sorry.  That's right.  You said --
10      "And if you were caught lying under oath, what could that
11  expose you to?"
12      And you said:  "Some more time."
13      And Mr. Guerrero asked you:  "Some more time on top of
14  that?  Of what?"
15      And you said:  "My five years."
16      And you said you weren't willing to risk that; is that
17  right?
18  A.   Correct.
19  Q.   Okay.  And so you said to -- and then you told the jury
20  that you weren't lying; isn't that right?
21  A.   Right.
22  Q.   Now, at various times -- the risk of perjury is the risk
23  of getting caught in a lie; isn't that right?
24  A.   Right.
25  Q.   And the risk is if you get caught lying, you could get a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14027

1  perjury charge; is that right?
2  A.   Right.
3  Q.   And then you also would have problems with the parole
4  board in addition, right?
5  A.   Right.
6  Q.   You probably wouldn't get the reduction that you were
7  looking for?
8  A.   Right.
9  Q.   And basically, your testimony to this jury was, "I'm not
10  going to do that.  I'm not going to take that risk," right?
11  A.   Right.
12  Q.   But in fact, you haveb een faced with a similar situation
13  many times, haven't you, in your life?
14  A.   With what?
15  Q.   For example when you were incarcerated at Lorton, you
16  were awaiting your -- you were under a cooperation -- you were
17  under a cooperation agreement; isn't that right?
18      MR. GUERRERO:  Objection, relevance.
19      THE WITNESS:  In Lorton?
20      MR. TABACKMAN:  Your Honor, if the Court wants a proffer,
21  I can give it.
22      THE COURT:  It isn't about what I want.  It's about what
23  you can do.  Either you can give a nonspeaking answer to an
24  objection or you can't.  If you can, give a nonspeaking answer to
25  the objection; if you can't, ask permission to approach.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14028

1      MR. TABACKMAN:  I prefer to come up.
2      (Following sidebar discussion had on the record:)
3      MR. TABACKMAN:  The nonspeaking answer is on a number of
4  occasion, on a number of occasions, very specifically both with
5  respect to when he was at Lorton and he smoked marijuana at the
6  jail -- I mean at Lorton, where he smoked marijuana at CTF --
7  there are a number of circumstances where, faced with potential
8  bad consequences from breaking the law or not telling the truth
9  and losing an opportunity, he nonetheless did that, because
10  the --
11      THE COURT:  Did what?
12      MR. TABACKMAN:  He nonetheless engaged in the unlawful
13  behavior.  So the point being is that for him, it is not a
14  question of, you know, "Gee, I shouldn't lie because it's the
15  wrong thing to do," but that his calculation has always been,
16  will I get caught?
17      And I should be able to show that in this instance -- in
18  other words -- I'm not articulating it well.
19      My contention is that when the government asks the
20  question, "Well, I wouldn't lie because I'll get perjury; I'll
21  get a perjury charge."  You only get a perjury charge if you get
22  caught, and that there are a variety -- there are a number of
23  instances in this witness's history that show he is in fact,
24  faced with exactly the same choice -- lying, for whatever reason,
25  and you know -- or doing something else that would jeopardize

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    something good that he might get -- for the other witnesses, it
2    was a 5K; for him it's the parole letter he wants.  He'll run the
3    risk of getting an additional five years, that he's engaged in
4    the kind of behavior where he says "Oh, I would never do that
5    because here's my risk," when -- and then in fact time after
6    time, he has done that.  And we should be allowed to undercut
7    this bolstering testimony that the government was allowed to
8    elicit:  "The consequences of my lying are so terrible for me, I
9    would never do that."  And in fact, people do that all the time
10   and he's done that.
11        THE COURT:  The question was:  Did you have a cooperation
12   agreement while you were at Lorton?  That tie that up --
13        MR. TABACKMAN:  I will do that.
14        THE COURT:  -- to me.
15        MR. TABACKMAN:  While he was at Lorton -- and I have to go
16   back and look at my notes, because I have it laid out -- while he
17   was at Lorton, he was -- I think that that was the point where he was
18   pending his testimony in the Edelin trial and he gets caught
19   using marijuana and selling marijuana at Lorton.
20        And there are other instances -- this is all from the
21   Edelin -- these are all things he's admitted having done.  In
22   situation after situation -- I'm sorry -- my recollection is --
23   let me check my notes.
24        "When you were at CTF" -- this was a sexual relationship
25   with one of the people.  "While at CTF, have you ever smoked

1    marijuana?"  It was at CTF rather than at Lorton.  I was
2    confusing -- conflating two different instances.
3        "How often were you smoking marijuana?
4        "One time.  I wasn't smoking."
5        And then he talks about how he was selling marijuana.  And
6    I have extensive notes on the questions.  If the Court wants me
7    to get them, I'll lay them out.
8        THE COURT:  It sounds like there's a difference between
9    "Would you do something bad" versus "Would you lie?"  I'll let
10   you ask him about, you know, *Giglio* type behavior.  But what does
11   that have to do with whether he's under a cooperation agreement
12   with respect to whether he's lying?
13        MR. TABACKMAN:  What I'm trying to do is -- in the
14   situation where he stands to gain something and he's saying --
15   the testimony here is -- the thrust of the testimony on direct
16   is, "I have something to gain and, therefore, I wouldn't
17   jeopardize it by, you know, telling -- by telling a lie."
18        And in fact, you know, in many instances he does -- I'm
19   sorry, my mouth -- I take medication; my mouth is like a cotton
20   ball right now.
21        In many instances, this gentleman has engaged in behavior
22   that is precisely analogous to that, made exactly the kind of
23   choice, that he's telling this jury a lie, that he would never
24   make.  "You can trust what I'm saying" because that would be
25   self-destructive to himself or something.

1        MR. GUERRERO:  Your Honor, I still don't see the
2    connection.  What Mr. Tabackman wants to do is go into specific
3    instances of bad conduct to help make the point that this witness
4    should not be believed, that he's lying here under oath.  And we
5    just don't see the connection, that he's tying it up close
6    enough.
7        THE COURT:  Well, his argument is -- his argument is "I
8    wouldn't engage in behavior that would jeopardize the benefit I'm
9    hoping to get."  He testified here, "I wouldn't lie because it
10   would jeopardize my ability to get a letter to the judge or to
11   the parole board."
12        The argument is that shouldn't be believed because when he
13   had a benefit that he's looking for in the cooperation while he
14   was at Lorton, he engaged in behavior that would have jeopardized
15   that benefit, too.
16        MR. GUERRERO:  But I understand the Court's logic, and I
17   understand Mr. Tabackman's --
18        THE COURT:  It's not mine.  I'm just trying to repeat what
19   Mr. Tabackman said.
20        MR. GUERRERO:  I understand what Mr. Tabackman is saying,
21   but he's talking apples and orange.  It's prior bad conduct,
22   which he's trying to equate with lying under oath, which is a
23   situation that he has now before him -- under no cooperation
24   agreement where he -- he, Damien Green -- is only looking at four
25   and a half years of his own sentence; that he has no connection

1    to the government.  And lying at this point would compromise
2    serving not only his four-year sentence that he has remaining,
3    which is not tied to the government, but adding on top of that an
4    exposure of ten years.
5        It's a lot -- it's different from where Mr. Tabackman
6    wants to go.  I can see how he's comparing them, but there is a
7    distinct difference.
8        MR. TABACKMAN:  Your Honor, I'm --
9        THE COURT:  I'm going to allow the examination with
10   respect to this witness's credibility and asserting that he
11   wouldn't lie here because it would be inconsistent with his being
12   able to get the benefit that he says he's looking for.
13        (Sidebar discussion concluded.)
14   BY MR. TABACKMAN:
15   **Q.**    Mr. Green, do you recall smoking marijuana in the CTF
16   facility?
17   **A.**    Yes.
18   **Q.**    And did you distribute marijuana in the CTF facility?
19   **A.**    Sometimes.
20   **Q.**    And how many times did you do that?
21   **A.**    Over 50.
22   **Q.**    Pardon?
23   **A.**    Over 50.
24   **Q.**    Over 50 times you distributed marijuana in the Community
25   Treatment Facility?

14033

1   **A.**   Right.

2   **Q.**   And you understood that that was a jail, right?

3   **A.**   Right.

4   **Q.**   And marijuana wasn't supposed to be in the jail; isn't

5   that right?

6   **A.**   Right.

7   **Q.**   And you realize that you were breaking the law when you

8   distributed marijuana in the jail over 50 times, right?

9   **A.**   Right.

10  **Q.**   And at the time that you did that, were you serving a

11  sentence?

12  **A.**   I was serving the five to 15.

13  **Q.**   That was the sentence?  And that five to 15 was in

14  connection with what case?

15  **A.**   The Idaho case.

16  **Q.**   I'm sorry?

17  **A.**   The Idaho case.

18  **Q.**   That's the one with Mr. Clayton, where you shot him?

19  **A.**   Correct.

20  **Q.**   Right.  And were you also pending a sentence in another

21  case?

22  **A.**   Yes.

23  **Q.**   And that was -- was that the case that was in front of

24  Judge Lamberth in this courthouse?

25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14034

1   **Q.**   And that was the case where you pleaded guilty to RICO

2   conspiracy?

3   **A.**   Yes.

4   **Q.**   Okay.  And that was the case -- and that was for your

5   involvement in the Edelin -- the One-Five mob, correct?

6   **A.**   Yes.

7   **Q.**   And you were looking at that time for a -- at the time

8   that you were distributing the marijuana and smoking the

9   marijuana, you were looking for a 5K Letter from the government;

10  isn't that right?

11  **A.**   Yes.

12  **Q.**   And that was because you had been giving them cooperation

13  in connection with the Edelin case, correct?

14  **A.**   Correct.

15  **Q.**   And in connection with the Gray case, correct?

16  **A.**   Naw --

17  **Q.**   Fine.  But with respect to the Edelin case?

18  **A.**   Yes.

19  **Q.**   All right.  And you understood that getting caught for

20  marijuana in the jail could jeopardize that, right?

21  **A.**   Well, not really.

22  **Q.**   You didn't think that bringing marijuana into the CTF

23  might jeopardize your 5K Letter?

24  **A.**   No.

25  THE COURT:  We've reached the mid-morning break point, but

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14035

1   you can complete this line if you want.

2   BY MR. TABACKMAN:

3   **Q.**   Did you think the government wouldn't care about the fact

4   that you distributed marijuana into --

5   MR. GUERRERO:  Objection to what the government cares.

6   BY MR. TABACKMAN:

7   **Q.**   Did you think --

8   THE COURT:  Finish your point.

9   BY MR. TABACKMAN:

10  **Q.**   Did you think in your head that the government -- the

11  prosecutors wouldn't care about the fact that you distributed

12  marijuana over 50 times in the Community Treatment Facility?

13  **A.**   Naw.  I knew they would care.  I just didn't care.

14  **Q.**   So you were willing to jeopardize that 5K Letter in order

15  to do that?

16  **A.**   It wasn't going to jeopardize it because at the time

17  where I was at, you get caught with marijuana, the only thing

18  would happen to you, you go to the hole for a month and then you

19  come back.

20  **Q.**   And you didn't think it might jeopardize it with Judge

21  Lamberth, that he would care?

22  MR. GUERRERO:  Objection as to speculation on the

23  Judge's --

24  THE COURT:  Overruled.

25  BY MR. TABACKMAN:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14036

1   **Q.**   You can answer.

2   **A.**   I can't really talk for him.

3   **Q.**   I'm not asking you to.

4   **A.**   I can't say if he care or not.  I don't know how he would

5   react to that.

6   **Q.**   I'm asking what you thought.  Or didn't you think about

7   it one way or the other?

8   **A.**   Naw.

9   **Q.**   You didn't think about it?

10  **A.**   I never even thought about it with the judge.

11  **Q.**   But you thought about what the consequences of perjuring

12  yourself would be in this case?

13  **A.**   Yes.

14  MR. TABACKMAN:  It's a good break point, Your Honor.

15  THE COURT:  All right, ladies and gentlemen.  We'll take

16  our mid-morning break.  Please remember not to talk about the

17  case and leave your notes in the jury room and come back in 15

18  minutes.  Enjoy your break.

19  (Jury out at 11:31 a.m.)

20  THE COURT:  All right.  We'll be back in 15 minutes.

21  (Thereupon, a break was had from 11:32 a.m. until

22  11:50 a.m.)

23  THE COURT:  Are you ready for the jury, Mr. Tabackman?

24  MR. TABACKMAN:  Yes, Your Honor.  Thank you.

25  (Jury in at 11:51 a.m.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    THE COURT: Good morning, ladies and gentlemen.

2    THE JURY PANEL: Good morning.

3    THE COURT: Welcome back. We're ready to resume.

4    MR. TABACKMAN: Thank you, Your Honor.

5    THE COURT: Mr. Tabackman.

6    BY MR. TABACKMAN:

7    Q.    When you were at CTF and distributing the marijuana, were

8    there other witnesses, in connection with the cases that you

9    testified, in there at CTF with you?

10    A.    Yes.

11    Q.    And did you distribute the marijuana to any of those

12    people?

13    MR. GUERRERO: Objection relevance.

14    THE COURT: Sustained.

15    BY MR. TABACKMAN:

16    Q.    To whom did you distribute the marijuana?

17    MR. GUERRERO: Same objection.

18    MR. TABACKMAN: I think it's relevant, Your Honor, if

19    there were other witnesses in this case who smoked or received

20    marijuana in CTF. I can limit it to that.

21    THE COURT: That's been answered. Sustained.

22    MR. TABACKMAN: I don't know that it's been answered, with

23    respect to other witnesses in this case, Your Honor, I haven't

24    asked that. I thought the Court had sustained the objection,

25    because I asked for other cases, plural. I thought that's why

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    the Court perhaps sustained the objection.

2    THE COURT: Go ahead.

3    BY MR. TABACKMAN:

4    Q.    Did you distribute it to other witnesses in this case?

5    A.    Uhm.

6    Q.    Persons who have testified in this case, that you know

7    have testified in this case?

8    A.    In this case here?

9    Q.    Yes.

10    A.    Uhm, I probably gave some to Brad, Black, my cousin.

11    Q.    Who's your cousin?

12    A.    Mussy (sic).

13    Q.    What's his name?

14    A.    Thomas Simms.

15    Q.    How about to Bobby Capies or Munya?

16    A.    Who in.

17    Q.    Bobby Capies, Munya?

18    A.    Naw, they weren't there when I was there.

19    Q.    Was there anybody from Congress Park there that --

20    A.    Uhm, Drano, he was downstairs, but that was it. Oh,

21    yeah, it was -- it was a tall dude named Slim over there, some

22    tall dude. He used to hang with Cool Wop.

23    Q.    Larry Browne?

24    A.    I don't know if that's his real name. I know he's real

25    tall. They call him Slim.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    Q.    Do you recall that in connection with one of your

2    sentences, you were in a -- supposed to be in a drug program?

3    A.    Yes.

4    Q.    And you had to give urines on a regular basis?

5    A.    Yes.

6    Q.    And was that monitored by Bond-O-Bonds?

7    A.    Yes.

8    Q.    And Bond-O-Bonds is a third-party custodian?

9    A.    Yes.

10    Q.    And what kind of case was that, that you were on release

11    for?

12    A.    I don't remember. I don't know if -- I think either it

13    was for possession of cocaine, possession of PCP, or either the

14    gun charge. It was one of them. It was one of them.

15    Q.    Right. And you were supposed to go and give urines

16    several times a week?

17    A.    Sometimes twice a week.

18    Q.    Right. And you were supposed to be in a drug program?

19    A.    Yes.

20    Q.    And in order to do those -- doing those things were to

21    keep from you getting locked up, right?

22    A.    Yes.

23    Q.    Because you could get locked up if you didn't do what you

24    were supposed to do when you were released?

25    A.    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    Q.    And you didn't do what you were supposed to do, did you?

2    A.    No.

3    Q.    What did you do?

4    A.    I smoked.

5    Q.    What else did you do?

6    A.    I drink.

7    Q.    What else did you do?

8    A.    Sold drugs.

9    Q.    What else did you do?

10    A.    That's it.

11    Q.    Did you have Earl Edelin lie for you about having a job?

12    A.    Oh, yeah.

13    Q.    And you were jeopardizing something, your freedom,

14    weren't you?

15    A.    Well, he had a community center, so that's what a lot of

16    guys did when they got home. If they wanted to stay on the

17    street, you just go to him and he'd sign a slip saying you have

18    a job.

19    Q.    Which is a lie?

20    A.    Yeah.

21    Q.    And you were on drugs, so you ran the risk of it showing

22    up in your urine?

23    A.    Yes, sir.

24    Q.    Did you give them phony urine?

25    A.    Well, you know, they have a lot of tricks to try to clean

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   your urine, but sometimes it works, sometimes it don't.

2   **Q.**   So, again, you were placing your freedom in jeopardy --

3   and possibly losing a benefit; isn't that right?

4   **A.**   Yes.

5   **Q.**   In exactly the same way that lying here could cost you a

6   benefit if you got caught, right?

7   **A.**   Well, it's a little different.

8   **Q.**   It's a little different?

9   **A.**   I was younger then, plus I was on drugs, running the

10  streets.  I ain't doing that now.  I haven't been on drugs for

11  the last five years now, so --

12  **Q.**   So you haven't continued smoking drugs while you've been

13  incarcerated?

14  **A.**   Nope.

15  **Q.**   Was the last time just before the Ede*lin tr*ial?

16  **A.**   The last time I had marijuana was 2000 -- probably the

17  end of 2001.

18  **Q.**   Right.  So that was even after the Ede*lin* -- when you

19  testified in the *Edelin* trial?

20  **A.**   Right, I guess right when it was over -- right before I

21  got sentenced.  I got sentenced in 2002.

22  **Q.**   Right.  And you were counting on the fact that nobody

23  would hold that against you, that you had brought drugs into the

24  jail?

25  **A.**   Well, it came a time that we had got drugs in the jail

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   and somebody went downtown and told that we had drugs, and, you

2   know, the prosecutor, they said if we stopped -- if we don't

3   stop doing what we're doing, things going to happen, so we

4   stopped doing what we was doing.

5   **Q.**   So they just looked the other way?

6   MR. GUERRERO:  Objection, Your Honor.

7   THE COURT:  Sustained.

8   BY MR. TABACKMAN:

9   **Q.**   Did you use PCP in jail?

10  **A.**   I think one time.

11  **Q.**   Did you give PCP to other people in jail?

12  **A.**   Naw.

13  **Q.**   Did you use cocaine in jail?

14  **A.**   Naw.

15  **Q.**   Did you use heroin in jail?

16  **A.**   I think I used heroin one time.  And that was in Lorton.

17  **Q.**   Right.  How did you get it into Lorton?

18  **A.**   Well, somebody else had it.

19  **Q.**   Did you help distribute it to other people?

20  **A.**   No.

21  **Q.**   Did you distribute any of it at all?

22  **A.**   No.

23  **Q.**   Now, in the Ede*lin* -- strike that.

24       What is lacing?

25  **A.**   Lacing is you put cocaine on cigarettes, PCP, marijuana.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   That's how they smoke cocaine with --

2   **Q.**   Did you do that?

3   **A.**   -- they add it with something else like cigarettes,

4   marijuana.

5   **Q.**   Did you do that?

6   **A.**   Naw, I never done that.

7   **Q.**   You never done that.  Is that like a woody?

8   **A.**   Yes.

9   **Q.**   But you would mix your PCP with cigarettes; is that

10  right?  That's how you would smoke it?

11  MR. GUERRERO:  Objection, asked and answered.

12  THE COURT:  I'll allow it.

13  THE WITNESS:  Well, when you dip a cigarette into the

14  water, they call it Sherman.  It's just the chemicals that's

15  soaking into the cigarette.  Now, you have the boat, what they

16  call love boat, they take the water and soak it on the reefer so

17  it's a little different, but it's basically the same.

18  BY MR. TABACKMAN:

19  **Q.**   Do you do both of those things?

20  **A.**   I usually smoked boat, but sometimes I would smoke a

21  Sherman here and there.

22  **Q.**   Boat more powerful?

23  **A.**   Sherman more powerful.

24  **Q.**   And what's a straight rush?

25  **A.**   Straight rush, when you take a couple of pulls on

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   something and it automatically hit you right there.

2   **Q.**   And what's the effect on you when that happens?

3   **A.**   You can get a lot of different effects.  You can get one

4   that you can't see; one that you might get hot, want to take

5   your clothes off; one that you get angry; one that you get

6   funny, you want to be playful.  It's a lot.

7   **Q.**   Sometimes it make you paranoid?

8   **A.**   It can make you paranoid.

9   **Q.**   And you said you sometimes would see things that aren't

10  exactly accurate?

11  **A.**   Oh, naw.

12  **Q.**   You talked about --

13  **A.**   It -- it never made me paranoid, it just made your vision

14  blurry.

15  **Q.**   Give you a misperception of what's going on?

16  **A.**   Naw, it's just -- if a person is standing in front of

17  you, it would be like they far back, but they right here in

18  front of you.

19  MR. TABACKMAN:  Court's indulgence.

20  BY MR. TABACKMAN:

21  **Q.**   Which of your charges did you have the opportunity --

22  were you going for the Youth Act on?

23  **A.**   Say that again.

24  **Q.**   Which of the charges that you've had, did you have an

25  opportunity for the Federal Youth Act?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **A.**   Oh, the 5 to 15.

2   **Q.**   Which case was that, which shooting?

3   **A.**   Attempted murder on Ida Clayton.

4   **Q.**   And in that case, you didn't get charged -- you used a

5   gun to shoot him, right?

6   **A.**   Yes.

7   **Q.**   But you didn't get charged with while armed; isn't that

8   right, you got charged with assault with intent to murder,

9   right?

10   **A.**   Yes.

11   **Q.**   And that's 5 to 15?

12   **A.**   Yes.

13   **Q.**   And you knew that if you had gotten charged with an

14   assault with intent to commit murder while armed, you could face

15   a life sentence, right?

16   **A.**   No.  I took a plea 2 to 15, Youth Act.

17   **Q.**   Okay.  And then you went down for -- what is the Youth

18   Act, as you understood it?

19   MR. GUERRERO:  Objection, relevance.

20   THE COURT:  I'll allow it.

21   THE WITNESS:  The Youth Act is 2 to 15.  I go to Lorton

22   prison with all the other youths.  If I do 18 months clean, I can

23   go home.

24   BY MR. TABACKMAN:

25   **Q.**   And that was a benefit that you wanted; isn't that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **A.**   Yes.

2   **Q.**   And what did you do to try to get that benefit?

3   **A.**   They came and got me from Lorton.  They took me to CTF,

4   put me in the Youth Act block.  They tested me, did a lot of

5   tests on me.  Sometimes they asked me and I lied on it and

6   that's how it messed up my Youth Act study.

7   **Q.**   You lied because you thought that would improve your

8   situation to get the Youth Act?

9   **A.**   Yeah and no -- you can say, yeah -- it was a yeah and no

10   at that time.

11   **Q.**   I mean, you thought -- that's what you thought, that

12   lying would get you in a better position?

13   **A.**   Well, I thought I already had that position, for one, but

14   by me lying, it just messed it up for me, that's all.

15   **Q.**   But you were willing to lie to try to get less time in

16   jail, right?

17   **A.**   It's like I say, I thought I already had that time,

18   because I took a plea to it.  See, when you take a plea to a

19   certain time, you think you got that certain time.

20   **Q.**   But nevertheless, since you weren't sure, you tried to

21   lie to make it certain; isn't that right?

22   **A.**   Correct.

23   **Q.**   And the purpose of telling a lie was to see if you could

24   get less time?

25   **A.**   Correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   But you wouldn't do that anymore?

2   **A.**   I don't see no sense in it.

3   **Q.**   You're just willing to -- well, in the Ede*lin tri*al, you

4   didn't -- Mr. Ball wasn't the defendant, right?

5   **A.**   No.

6   **Q.**   And that's -- and isn't that why you didn't -- you

7   thought you could -- you weren't -- strike that.  But in this

8   case, you know Mr. Ball is on trial; isn't that right?

9   **A.**   Correct.

10   **Q.**   And you know that you've been brought in here within the

11   last couple weeks; isn't that right?

12   **A.**   Yes.

13   **Q.**   And you understand that the role is for you to help

14   convict Mr. Ball; isn't that right?

15   MR. GUERRERO:  Objection, form.

16   THE COURT:  Sustained.

17   BY MR. TABACKMAN:

18   **Q.**   In your mind, sir, isn't that why you have talked about

19   these circumstances?

20   MR. GUERRERO:  Same objection.

21   THE COURT:  Sustained.

22   BY MR. TABACKMAN:

23   **Q.**   Do you recall that in the Ede*lin tri*al, you talked a lot

24   about the effects of PCP; is that right?

25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   Do you remember that?  Do you remember the lawyers were

2   asking you questions about it?

3   **A.**   Yes.

4   **Q.**   And do you remember describing how sometimes if you get a

5   straight rush, you can't see maybe for 20 or 30 minutes?

6   **A.**   Yes.

7   **Q.**   Is that the truth?

8   **A.**   Yeah, that's true.

9   **Q.**   And sometimes you'll have to sit down and stay there

10   where your high can come down to a level, because once PCP gives

11   you a straight rush, it's like you got to come down --

12   MR. GUERRERO:  Objection, Your Honor, to form.

13   BY MR. TABACKMAN:

14   **Q.**   -- at least four or five levels?

15   THE COURT:  Hold on.

16   MR. GUERRERO:  Objection, form.

17   MR. TABACKMAN:  I'm asking -- I'm asking him if that's an

18   accurate description of what PCP does.

19   THE COURT:  Sustained.

20   BY MR. TABACKMAN:

21   **Q.**   Let me ask you -- let me read you -- does -- sometimes

22   you have to sit down when you smoke PCP because you can't stand

23   up and see what's around you?

24   **A.**   Well, when you get PCP, you don't know if it's good until

25   you smoke it, so I mean, you can stand up and smoke it and then

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    when you find out it's good, then you sit down.

2    **Q.**    All right.  And then sometimes when you smoke PCP, you

3    can get a rush and have the effect of PCP a day or two later

4    when you smoke a cigarette, can't you?

5    **A.**    Well, the PCP gets -- it gets into your tissues, so you

6    don't have to smoke PCP for seven months, and one day you can

7    smoke a cigarette or drink a beer and get high all over.

8    **Q.**    But you've had the circumstance where you've smoked good

9    PCP on one day and the next day smoked a cigarette and you're

10   high all over again; isn't that right?

11   **A.**    Well, me, myself, it don't -- it didn't ever affect me

12   that much, but it was guys that I knew that I hung around that

13   was high for days and they didn't smoke none of it for days.

14   **Q.**    Well, when you were describing -- talking about the

15   straight rush, that's something that happened to you, right?

16   **A.**    Well, when I say "straight rush," it's just more as I

17   smoke some good PCP, it got me real high and that was it.

18   **Q.**    And you can stay high for a while off of that; isn't that

19   right?

20        MR. GUERRERO:  Objection, relevance.

21        THE COURT:  Overruled.

22        THE WITNESS:  I'd say an hour.  You'd probably stay high

23   an hour, hour and a half.

24   BY MR. TABACKMAN:

25   **Q.**    And you'd smoke it throughout the day; isn't that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    **A.**    Yeah, throughout the day, I might smoke it no more than

2    five times.

3    **Q.**    Some days you would go as high as ten packs a day?

4    **A.**    Well, I was selling it, so by me selling it, I was

5    smoking it sometimes, too.

6    **Q.**    And that would keep you high all day long?

7    **A.**    Not all day.  You don't want to be high off PCP all day.

8    **Q.**    Most of the day?

9    **A.**    Not even most of the day, because you're vulnerable, you

10   put yourself in a position that you don't want to be in.  So,

11   you might smoke it at a good time, say, 6:00, 7:00, so in that

12   time frame.

13   **Q.**    In the morning or in the evening?

14   **A.**    In the evening.  So in that time frame, you're good for

15   that time frame.  After then, then you drink or whatever, but if

16   you're in the house, then you can smoke all you want.

17   **Q.**    So, you would sometimes smoke in the morning in the house

18   before you went out?

19   **A.**    No, I never smoked PCP in the morning.

20   **Q.**    Smoke it in the afternoon --

21   **A.**    Yes.

22   **Q.**    -- in order to get the feeling?

23   **A.**    Yes.

24   **Q.**    In order to get the -- and your perceptions would have

25   the effect that you talked about; isn't that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    **A.**    Yes.

2    **Q.**    And you've been involved in some -- in a lot of

3    circumstances where you were high on PCP; isn't that right,

4    violent circumstances?

5    **A.**    Uh, I got in a couple of violent situations.

6    **Q.**    That time that you -- I believe in your direct testimony,

7    do you recall saying that you saw 75 bullets?

8    **A.**    Say that again.

9    **Q.**    Do you remember -- did you testify on your direct

10   testimony that there was a day -- you were describing some guns

11   and you said you saw 75 bullets?

12   **A.**    I didn't saw them, but I heard them.

13   **Q.**    Were you on PCP that day?

14   **A.**    Naw, I don't think I was -- I might have -- me and

15   Teeny Man was probably together, so most likely we probably was

16   smoking.

17   **Q.**    The fact is, you can't say which days your perceptions

18   were altered and which days they weren't, can you?

19   **A.**    See, that's the thing, when I'm on PCP, it's not that

20   you're going to have me -- you're not going to have me walking

21   all around the neighborhood everywhere.  If I'm smoking PCP, I'm

22   somewhere situated.  I'm sitting somewhere where I feel

23   comfortable, or I'm sitting in a car with somebody or I'm in

24   somebody's house or on somebody's front porch.  I'm not smoking

25   it and just walking around.  See it before, walked around and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    smoked, but that wasn't an every day thing.  That wasn't

2    something that I do all the time.

3    **Q.**    A couple days a week?

4    **A.**    I can't even say a couple days a week, because it's --

5    **Q.**    And you can't say -- I'm sorry, you can't say that it's

6    not.

7    **A.**    The only way I say that because, every time I smoked PCP,

8    I always go somewhere and sit down.  I always get in a comfort

9    zone.  I never get in a place where I feel uncomfortable,

10   because I know what the high do.

11   **Q.**    And when you were with Mr. Faison, you were generally in

12   a comfortable place, weren't you?

13   **A.**    What, on Congress?

14   **Q.**    I'm talking about generally, with Mr. Faison was a

15   comfortable place for you to be?

16   **A.**    Yes.

17   **Q.**    And you could drive a car on PCP; isn't that right?

18   **A.**    No.

19   **Q.**    You wouldn't drive a car on PCP, never did?

20   **A.**    I did, and I crashed, that's why I don't do it.

21   **Q.**    You walk around the neighborhood high on PCP?

22   **A.**    Nope.

23        THE COURT:  Mr. Tabackman, let me ask you to wrap up,

24   please.

25        MR. TABACKMAN:  Pardon?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    THE COURT:  Let me ask you to wrap up, please.
2    MR. TABACKMAN:  I am, Your Honor.
3 BY MR. TABACKMAN:
4    Q.    And on the days -- the encounters you described with
5 Mr. Ball, you weren't high on PCP?
6    A.    What, with JJ?  No.
7    Q.    And when you saw Mr. Ball while you were at the rec
8 center, you weren't high on PCP?
9    A.    No.
10   Q.    Except you can't say the dates that you saw Mr. Ball;
11 isn't that right?
12   A.    The only way I say that is because I never smoke PCP
13 around the center or in the center, and JJ don't smoke, he on a
14 dialysis machine, so -- I wasn't never always smoking PCP by
15 myself.  I always had somebody with me.  So them incidents I was
16 with JJ, he didn't smoke it.  I'm not going to smoke PCP with
17 his daughter in the car.  So, two, at the center, I'm not going
18 to smoke because Tony don't allow that around the center.
19   Q.    Tony didn't allow drugs in the center?
20   A.    Well, he didn't allow smoking in the center or smoking
21 around the center.  As far as selling drugs, that was his thing.
22   Q.    So selling drugs in the center but didn't allow you and
23 Squid to smoke drugs in the center?
24   A.    The only thing you could smoke was cigarettes.
25       MR. TABACKMAN:  I have no further questions.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    THE COURT:  Mr. Martin.
2    MR. MARTIN:  Thank you, Your Honor.
3        CROSS-EXAMINATION OF DAMIEN GREEN
4 BY MR. MARTIN:
5    Q.    Well, good afternoon, sir.
6    A.    Good afternoon.
7    Q.    My name is Anthony Martin and I represent Joseph Jones.
8    A.    All right.
9    Q.    Now, I think when you started your testimony, you had
10 mentioned there was a dispute between the people that you used
11 to run with and some of the residents in Congress Park, right?
12   A.    Yes.
13   Q.    And you knew at that time that Mr. Jones lived in the
14 Congress Park area, right?
15   A.    Uh, yeah, he -- I think his baby's mother lived around
16 there, I think.
17   Q.    But you knew he frequented that area, correct?
18   A.    Yes.
19   Q.    So you identified him, in your mind, with Congress Park,
20 right?
21   A.    Yes.
22   Q.    And moving on to this incident that -- well, strike that.
23 Disregard that, I mean.
24       And you also testified, I think, that you and Brad were
25 friends, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    A.    Yes.
2    Q.    And you and Bradley Carter would hang out together from
3 time to time, right?
4    A.    Yes.
5    Q.    In fact, you would do that often, right?
6    A.    Yes.
7    Q.    And sometimes in hanging out, you guys would get high,
8 too, right?
9    A.    Yes.
10   Q.    And that would be alcohol or whatever, correct?
11   A.    Yes.
12   Q.    Now, where exactly would you and Brad hang out?
13   A.    Uhm, sometimes we be in his back yard, like that's where
14 everybody used to be, sitting on the wall.  His house was right
15 here (indicating), but there was a wall by his house, so
16 everybody used to be right there.
17   Q.    And where did he live?
18   A.    He lived on Stanton Road.
19   Q.    And how far is that from the Congress Park area?
20   A.    A few blocks.
21   Q.    But it's not in the Congress Park area -- it's not in
22 Congress Park, the neighborhood itself, right?
23   A.    No.
24   Q.    So you might know of people from Congress Park, you might
25 be acquainted with their appearance, but you really don't know

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 them; is that correct?
2    A.    Uhm, you had a lot of Congress Park guys that went to
3 school with me.  You had a few of them that come up to my
4 neighborhood and hang with -- you know, hang with certain guys
5 up there that was cool, and it's been like that for years.
6    Q.    Like -- go ahead, I'm sorry.  Finish.
7    A.    Like Cool Wop and them.  I went to school with them.
8 They used to come up to the center.  So it was like we knew each
9 other, we hung around each other sometimes.  It was like, we
10 grew up with these guys.  The guys that I testified on the
11 Tommy *Edelin* case, I grew up with them, okay?  I grew up around
12 them, the Congress Park guys.  When I say "I grew up around
13 them," that means we go to the same store, we run into each
14 other here and there, at the same liquor store or at the
15 basketball court, but I never actually hung with them like that.
16   Q.    I understand.  And the ones that you did know or the ones
17 that you went to school with, those were ones who were closer to
18 your age, correct?
19   A.    Yes.
20   Q.    And Mr. Jones wasn't close to your age, was he?
21   A.    No.
22   Q.    And you didn't go to school with him, right?
23   A.    No.
24   Q.    Now, Mr. Carter, is he closer to your age as well?
25   A.    Yeah.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.   All right.  And so that as far as you know, Mr. Carter
2  also didn't go to school with Mr. Jones, right?
3  A.   No.
4  Q.   Do you know when Mr. Carter first became aware or
5  acquainted with Mr. Jones?  If you know.  It's either yes or no.
6  A.   No.
7  Q.   Okay.  Do you know -- and I don't remember my question.
8       Did I ask you where or when last time?
9  A.   Uh.
10 Q.   Well, let me do it this way:  Do you remember or do you
11 know when he first became acquainted with Mr. Jones?
12 A.   The only first time I could say is the incident, the
13 incident, but other than that, I know he knew Jo-Jo.
14 Q.   Okay.  And you said you know he knew him, and when you
15 say he knew him, he didn't run with him, right?
16 A.   No.
17 Q.   All right.  And he knew him from the neighborhood, right?
18 A.   Yes.
19 Q.   He didn't hang out with him, right?
20 A.   No.
21 Q.   Okay.  Now, if I recall your testimony, on February 20th,
22 1994, specifically the night of the shooting, you guys were over
23 at Monkey Mark's house?
24 A.   Yes.
25 Q.   Okay.  And at Monkey Mark's house, if I recall correctly,

1  the following people were there:  Yourself?
2  A.   Yes.
3  Q.   Maurice Willis?
4  A.   No, he wasn't in there.
5  Q.   He wasn't in there.  Was Travis there?
6  A.   No.
7  Q.   Brian Edmonds, was he there?
8  A.   No.
9  Q.   Was Detective Oliver Garvey there?
10 A.   No.
11 Q.   Okay.  There came a time, though, when Travis, Brian,
12 Maurice Willis and Brad went into a car, right?
13 A.   Yes.
14 Q.   Okay.  How did you know that they went into the car?
15 A.   Well, we was all -- we was outside already.  Mark and
16 them had just went in the house, so Black and them pulled in the
17 alley.  I already knew it was Black and them, because they had
18 been driving the car for a few days or whatever, and Brad was
19 coming out the house and he was going to the car.  So I was
20 like, where y'all going, and he was like, we going to 51.  So I
21 gave them some money to bring me some beer back.
22 Q.   So you actually saw them go in the car, right?
23 A.   Yes.
24 Q.   And of the people I just mentioned, they all went in the
25 car, but you never saw Detective Oliver Garvey go in the car,

1  right?
2  A.   Naw.
3  Q.   Okay.  And as far as you know, Detective Oliver Garvey
4  wasn't waiting at 51 liquor for them, was he?
5       MR. GUERRERO:  Objection, Your Honor.
6       THE COURT:  Sustained.
7  BY MR. MARTIN:
8  Q.   Well, you said you spoke to Bradley shortly after the
9  shooting happened.  I think, as you described it, he ran back to
10 the house after the shooting, correct?
11 A.   After the shooting, they went to the hospital and then he
12 ran back.
13 Q.   Okay.  And then he ran back.
14      And if I recall your testimony correctly, he came back
15 and he mentioned to you that there was some shooting, but he
16 didn't mention that Jo-Jo did any shooting, correct?
17 A.   Naw.
18 Q.   And with respect to his mentioning the shooting, when he
19 came back, he didn't mention Detective Oliver Garvey's name, did
20 he?
21 A.   No.
22 Q.   And this was on the night of the shooting itself,
23 correct?
24 A.   Yes.
25 Q.   Okay.  Now, you also talked about an incident that

1  happened over at the rec center.  Do you remember that, sir?
2  A.   Yes.
3  Q.   And you said there was a shooting there as well.  As I
4  recall, you said a car pulled up near the rec center, correct?
5  A.   Correct.
6  Q.   Now, again, tell the ladies and gentlemen of the jury
7  again, please, what kind of car was that?
8  A.   It looked like a Pontiac.  I think it was a rental car.
9  Q.   You think it was a rental?  Was it a new car?
10 A.   It wasn't -- it wasn't brand-new, but it looked all
11 right.
12 Q.   Okay.  And what time of day did you see this car?
13 A.   What time of day?  It was daytime, but I don't know what
14 time it was.
15 Q.   Okay.  And as I understand your testimony, you said there
16 were five people in the car?
17 A.   Yes, there was five.
18 Q.   Okay.  And you said that at some point some shooting
19 started, but you didn't see Mr. Jones do any shooting, right?
20 A.   No.
21 Q.   And this was in the summer of 1996, right?
22 A.   Yes.
23 Q.   Let me return to the incident on the night of 20 February
24 1994, for just a second.
25      That evening, you said you saw them as they were getting

14061

1  in the car, just before they went to the liquor store, right?
2  **A.**  Yes.
3  **Q.**  Do you remember whether -- well, again, disregard that.
4      Maurice Willis, where was he seated?
5  **A.**  He was in the passenger side.
6  **Q.**  Front passenger?
7  **A.**  Yes.
8  **Q.**  And Brian Edmonds, he was driving?
9  **A.**  Yes.
10  **Q.**  Travis Honesty was in the back?
11  **A.**  Yes.
12  **Q.**  And Brad Carter was in the back as well, right?
13  **A.**  Yes.
14  **Q.**  And that was a February evening. I think you said it was
15  kind of chilly that night?
16  **A.**  Yeah.
17  **Q.**  Do you remember whether -- and with respect to
18  Mr. Edmonds, is his nickname Black?
19  **A.**  Yes.
20  **Q.**  Now, do you remember what Mr. Edmonds was wearing?
21  **A.**  Naw. At that time he was -- he used to wear a lot of
22  Polo stuff, at that time.
23  **Q.**  He used to wear a lot of what?
24  **A.**  Polo clothing.
25  **Q.**  Polo clothing?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

14062

1  **A.**  Yeah.
2  **Q.**  Do you recall whether or not Mr. Edmonds was wearing a
3  bulletproof vest that night?
4  **A.**  I don't know. He might have.
5  **Q.**  He might have? Why did you say he might have?
6  **A.**  He got shot so many times, I mean, he needed it.
7  **Q.**  Had you ever seen him with a bulletproof vest?
8  **A.**  No.
9  **Q.**  Do you know whether he had a Tec-9 on him that night?
10  **A.**  I think he did have a Tec-9 on him. I think he did.
11  **Q.**  What about Mr. Carter, Bradley Carter? Was he armed that
12  night?
13  **A.**  I don't think so.
14  **Q.**  You don't think so?
15  **A.**  Naw.
16  **Q.**  When he ran back to the house after coming back to the
17  hospital, do you know whether he had a weapon on him at that
18  time?
19  **A.**  Naw, I don't think he had no weapon.
20  **Q.**  You don't think so?
21      MR. MARTIN: Just a minute sir, just give me a second.
22  Court's indulgence.
23      (Discussion had off the record.)
24  BY MR. MARTIN:
25  **Q.**  I may have misspoke and I don't want to you think I was

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

14063

1  trying to play games with you. Maurice Willis is Black,
2  correct, and Brian Edmonds is Pooh, right?
3  **A.**  Correct.
4  **Q.**  So I misspoke and I asked you the question earlier. So,
5  let me go back and rephrase that.
6      Since Brian Edmonds is Pooh, let's go back and make sure
7  we understand the same person.
8      Do you know whether Black wore a bulletproof vest that
9  night?
10  **A.**  He might have.
11  **Q.**  He might have. And your answer -- would your answers
12  change if I called the person Black as opposed to Brian Edmonds,
13  the answers you gave earlier?
14  **A.**  Yes, because we're talking about Black.
15  **Q.**  Okay. Well, then, let's talk about Black, now that we're
16  squared away on that, because I think I mixed up the street name
17  and the real name. Did Black have a Tec-9 on him that night?
18  **A.**  He might have.
19  **Q.**  He might have. And you said earlier and I don't want to
20  repeat the point too much, that you didn't or couldn't see
21  whether or not he was wearing a bulletproof vest, right?
22  **A.**  Couldn't see.
23  **Q.**  Okay. Thank you for your patience, Mr. Green. I may be
24  finished. I may be.
25      MR. MARTIN: I have nothing further, Your Honor.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

14064

1      THE COURT: All right. Mr. Balarezo.
2      MR. BALAREZO: Yes, Your Honor. Thank you.
3      CROSS-EXAMINATION OF DAMIEN GREEN
4  BY MR. BALAREZO:
5  **Q.**  Sir, I may have slept through a little bit of this, but
6  what are you serving time for right now?
7  **A.**  Five to 15 for.
8  **Q.**  For what, I said.
9  **A.**  Attempted murder.
10  **Q.**  And that was the attempted murder of the person who
11  turned out to be a police officer, right?
12  **A.**  Naw.
13  **Q.**  Which attempted murder was this?
14  **A.**  You talking about Ira Clayton?
15  **Q.**  Is that the one you're serving time for now?
16  **A.**  Yes.
17  **Q.**  Okay. And that's -- a judge in Superior Court saw fit to
18  sentence you to 5 to 15 years, right?
19  **A.**  Yes.
20  **Q.**  Okay. And how much time do you have left on that?
21      MR. GUERRERO: Objection, Your Honor, repetitive.
22      THE COURT: I'll allow it.
23      THE WITNESS: Five years.
24  BY MR. BALAREZO:
25  **Q.**  You have five years left on that sentence?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

1  A.   Yes.

2  Q.   And you also pled guilty to a RICO conspiracy in this

3  courthouse, right?

4  A.   Yes.

5  Q.   And I believe you testified that you already served your

6  time in that case?

7  A.   Yes.

8  Q.   I'm sorry?

9  A.   Yes.

10  Q.   And in that case, that RICO conspiracy, you -- when you

11  pled guilty, you were facing up to life in prison; is that

12  correct?

13  A.   Correct.

14  Q.   But based on your cooperation with these people, the

15  government, and whatever else you did for him, you were

16  sentenced to something significantly less than life; is that

17  right?

18  A.   Correct.

19  Q.   In fact, you got eight years in that case?

20  A.   Correct.

21  Q.   And when you pled guilty, you did it because you were

22  accepting responsibility; is that right?

23  A.   Yes.

24  Q.   You wanted to make amends for what you had done, right?

25  A.   Yes.

1  Q.   All your drug dealing out there, right?

2  A.   Yes.

3  Q.   Your violence?

4  A.   Yes.

5  Q.   And the acceptance -- well, excuse me, the responsibility

6  that you accepted was for the RICO drug conspiracy, right?

7  A.   Yes.

8  Q.   Also for three assaults with intent to kill while armed?

9  A.   Yes.

10  Q.   Three attempted murders, in effect?

11  A.   Yes.

12  Q.   One of them involved those two cops that were in that car

13  in an alley, correct?

14       MR. GUERRERO:  Objection, Your Honor, repetitive.

15       THE COURT:  Mr. Balarezo.

16       MR. BALAREZO:  Your Honor, I'm just trying to lay my

17  foundation for the following questions.

18       THE COURT:  Sustained.

19  BY MR. BALAREZO:

20  Q.   One of the -- anyway, the assault with intent to kill,

21  the attempted murders that you pled to was for Ira Clayton,

22  right?

23       MR. GUERRERO:  Same objection.

24       THE COURT:  Sustained.

25  BY MR. BALAREZO:

1  Q.   And Ira Clayton, the reason you shot him was because you

2  thought he was going to tell on you for shooting a cop, right?

3       MR. GUERRERO:  Same objection.

4       THE COURT:  Sustained.

5  BY MR. BALAREZO:

6  Q.   Well, you shoot at two cops, Ira Clayton, Keith Archy,

7  and Mark Barnes and you end up with eight years, right?

8       MR. GUERRERO:  Objection.

9       THE COURT:  Sustained.

10  BY MR. BALAREZO:

11  Q.   And you are accepting responsibility today in front of

12  this jury by testifying against these gentlemen, right?

13       MR. GUERRERO:  Objection.

14       THE COURT:  Sustained.

15  BY MR. BALAREZO:

16  Q.   Is your testimony here today part of your accepting

17  responsibility?

18  A.   Yes.

19  Q.   And when you initially pled guilty to that RICO count,

20  you pled -- you agreed to testify against Tommy Edelin, right?

21  A.   Yes.

22  Q.   And he was one of your homeboys, right?

23  A.   I can't say he was one of my homeboys, but he was -- but

24  he was a homie.  He was older than me, so it wasn't like I grew

25  up with him.  I didn't hang with him.

1  Q.   Well, just a few minutes ago you said that the people

2  from the Edelin Group, you grew up with those people.

3  A.   I grew up --

4  Q.   Did you say that?

5  A.   See, I grew up --

6  Q.   Did you say that?

7  A.   Yes.

8  Q.   Okay.  Now you grew up with those people, they were your

9  friends, right?  Not all of them, but a lot of them were your

10  friends?

11  A.   Yes.

12  Q.   These were the people that were out there selling your

13  drugs and shooting people up with, right?

14  A.   Yes.

15  Q.   These were the people that you had some sort of loyalty

16  to, at some point, right?

17  A.   Yes.

18  Q.   And of course, you had no problems going into a courtroom

19  and pointing fingers at them, these people that you grew up

20  with, that you had a loyalty to, right?

21       MR. GUERRERO:  Objection, repetitive.

22       THE COURT:  I'll allow it.

23       THE WITNESS:  Of course I had a problem with it.

24  BY MR. BALAREZO:

25  Q.   But you did it, right?

1   **A.**   I had a problem with it, because some of the guys I
2   testified on, I grew up with them.
3   **Q.**   All right.  But that problem that you had did not keep
4   you from doing that; is that right?
5   **A.**   Yeah, because I didn't want to do life.
6   **Q.**   You didn't want to do life, so you would do anything that
7   you could to get out of that life sentence that you were facing?
8   **A.**   Yes.
9   **Q.**   Now these guys, the Congress Park people, I think you
10  said you grew up around them?
11  **A.**   Yes.
12  **Q.**   So these weren't your homies.  They weren't your
13  homeboys.  They weren't the people you hung out with every day,
14  right?
15  **A.**   No, it was just more, I respect them, they respect me.
16  **Q.**   They -- all right.  And these were also the guys that you
17  claimed were beefing with your group, right?
18  **A.**   Yes.
19  **Q.**   So, I think it's clear that you would have less loyalty
20  to these guys; is that correct, than you would to the Edelin
21  group?
22  **A.**   Even though --
23  **Q.**   Is that correct or not?
24  **A.**   Correct.
25  **Q.**   Okay.  So you have no problem sitting here testifying

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   against these guys today?
2   **A.**   It's still a problem.
3   **Q.**   But it's not keeping from you doing it, right?
4   **A.**   Naw, but it's still a problem.
5   **Q.**   All right.  Now, you've mentioned that you're here
6   testifying about the truth.
7   **A.**   Yes.
8   **Q.**   Everything that you say is the truth?
9   **A.**   Yes.
10  **Q.**   And that's because if you lie on the stand, of course,
11  you might get charged with perjury by these people here, right?
12  **A.**   Yes.
13  **Q.**   And you know -- you do know that they're the ones who
14  would prosecute you for perjury if you were found to be lying,
15  right?
16  **A.**   Yes.
17  **Q.**   And you also understand that the ones who would make a
18  determination about whether you're lying or not are these guys,
19  right?
20  **A.**   Yes.
21  **Q.**   And in your mind, do you believe that if you lied and it
22  helped their case, do you really think they're going to charge
23  you with perjury?
24  MR. GUERRERO:  Objection, form.
25  THE COURT:  Overruled.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   BY MR. BALAREZO:
2   **Q.**   That means you can answer.
3   **A.**   Say that again.
4   **Q.**   In your mind, if you lie and it helps them, do you really
5   think they're going to charge you with perjury?
6   MR. GUERRERO:  Same objection, Your Honor.
7   THE COURT:  Overruled.
8   THE WITNESS:  Yes, they're going to charge me with
9   perjury.
10  BY MR. BALAREZO:
11  **Q.**   Just like they charged you for all the drug dealing you
12  did inside the jail?  Wait, they didn't charge you for that, did
13  they?
14  **A.**   Naw.
15  **Q.**   All right.  Just like they charged you for -- well, they
16  didn't charge you, right?  That's my point, I'll leave it at
17  that.
18  MR. GUERRERO:  Objection, asked and answered.
19  THE COURT:  Sustained.
20  BY MR. BALAREZO:
21  **Q.**   Now, the reason -- another reason you're testifying here
22  is because you're also contrite about what you've done in the
23  past, right?
24  **A.**   Say that -- explain that.
25  **Q.**   Well, you feel bad about what you've done in the past,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   right?
2   **A.**   Yes.
3   **Q.**   And you want to make amends to society, right?
4   **A.**   Yes.
5   **Q.**   You want to make up for what you've done?
6   **A.**   Yes.
7   **Q.**   So you're kind of doing your civic duty, testifying here
8   today?
9   **A.**   Yes.
10  **Q.**   It has nothing to do with your desire to get rid of those
11  five years you have hanging over your head, right?
12  **A.**   Yes, that has something to do with it, too.
13  **Q.**   Some of it or all of it?
14  **A.**   Naw, it doesn't have to be all of it, it could be some of
15  it.
16  **Q.**   So that desire could taint what you say here in court,
17  right?
18  **A.**   Say that again.
19  **Q.**   That desire could taint the things that you say here in
20  court?
21  **A.**   I don't know what you mean by that.
22  **Q.**   By taint, you know, could cause you to shade the truth a
23  little bit or cause you to spin a story a certain way to help
24  them, because they're the ones that you want to help you get rid
25  of those five years, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14073

1  A.   I don't feel that I'm helping them, I'm helping me.
2  Q.   Well, you're helping you.  You already accepted
3  responsibility for you, for what you did.  Why are you here?
4  A.   I'm helping me.
5  Q.   Helping you.  You want to get rid of those five years?
6  A.   Yes.
7  Q.   And by helping you, you help them, right?
8  A.   I mean.
9  Q.   Excuse me, let me withdraw that.
10      By helping them, you help yourself?
11      MR. GUERRERO:  Objection, Your Honor, speculation.
12      THE COURT:  Sustained, but you can rephrase.
13  BY MR. BALAREZO:
14  Q.   Well, sir, did you not, on May 27th of this year, just
15  two weeks ago, write a letter to Mr. Guerrero, the gentleman
16  over there that keeps objecting to my questions, did you not
17  write a letter to him?
18  A.   Yes.
19  Q.   And in that letter, did you not mention that you had some
20  time and that you wanted something in exchange for your
21  testimony?
22  A.   Yes.
23  Q.   And, in fact, you told him a sentence modification -- you
24  know what a sentence modification is, right?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

14074

1  A.   A reduction in time.
2  A.   Yes.
3  Q.   That a sentence modification seems to be the only way?
4      MR. GUERRERO:  Objection, Your Honor, leading.
5      THE COURT:  Beg your pardon?
6      MR. GUERRERO:  Form, Your Honor.  May we approach?
7      THE COURT:  No.  Overruled.
8  BY MR. BALAREZO:
9  Q.   Did you not, in the letter you wrote Mr. Guerrero on the
10  27th of May, less than two weeks ago, indicate, quote:
11      "The sentence modification seems to be the only way I can
12  be properly compensated for my cooperation?"
13  A.   Correct.
14  Q.   Right?
15  A.   Right.
16  Q.   So you're testifying here because you want compensation
17  from them, right?
18  A.   Yes.
19  Q.   And that compensation would be for them -- them to
20  somehow get your sentence reduced, right?
21  A.   Yes.
22  Q.   And although you accepted responsibility, another five
23  years, you don't think that's time that you should be doing for
24  three attempted murders and a drug conspiracy, or is that too
25  much time for that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

14075

1  A.   I mean --
2  Q.   Is that too much time for that?
3  A.   No, it's not.
4  Q.   So why are you trying to get a sentence modification,
5  sir?
6  A.   Because if I have a chance for a door to be open for me,
7  I'm going to take it.
8  Q.   And the door is snitching on these guys, right?
9      MR. GUERRERO:  Objection.
10      THE COURT:  Sustained.
11  BY MR. BALAREZO:
12  Q.   That door is testifying against these guys, right?
13      MR. GUERRERO:  Objection, Your Honor.
14      THE COURT:  I'll allow it.
15      THE WITNESS:  Correct.
16  BY MR. BALAREZO:
17  Q.   Now -- and you -- the reason you wrote that letter on May
18  27th was because you know that they have the ability; they have
19  the authority; they have the power to ask a judge to reduce your
20  sentence; is that right?
21      MR. GUERRERO:  Objection, speculation.
22      THE COURT:  Sustained as to form.  You can rephrase.
23  BY MR. BALAREZO:
24  Q.   In your mind, you do know that they have the power, the
25  ability and the authority to ask a judge to reduce your

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

14076

1  sentence; is that right?
2      THE COURT:  Sustained.
3      MR. GUERRERO:  Same objection.
4  BY MR. BALAREZO:
5  Q.   Well, sir, in your mind, do you know whether or not they
6  have the ability to ask a judge to reduce your sentence?
7  A.   Yes.
8  Q.   And do they have the authority to do that also, right?
9  A.   No, I can't say that.
10  Q.   Well, when you went for sentencing before Judge Lamberth,
11  when you got those 8 years with the RICO conspiracy for the
12  three attempted murders, they filed a 5K Letter for you, right,
13  or 5K motion, correct?
14  A.   Correct.
15  Q.   And they told the judge about all the good things you'd
16  done, right?
17  A.   Correct.
18  Q.   Nowhere in that letter did they mention about the drug
19  dealing you did in that jail, correct?
20  A.   That came up.
21  Q.   Was it in the letter?  That's what I'm asking you.
22  A.   No, it's not in the letter.
23  Q.   But now you remember that came up somehow?
24  A.   That came up at trial.
25  Q.   I'm talking about at sentencing, sir, not at trial.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**  No, it didn't come up at sentencing.

2  **Q.**  And although you were facing that life sentence, you got

3  eight years, right?

4  **A.**  Yes.

5  **Q.**  So you know that if they write a little letter, that your

6  time can come way down, right, you're aware of that?

7  **A.**  It can.

8  MR. GUERRERO:  Objection to form.

9  THE COURT:  Sustained.

10  BY MR. BALAREZO:

11  **Q.**  Now you also mentioned some incident back -- I think it

12  was 1995, where you claim you saw some weapon that was being

13  used by Mr. Wilson.  Do you remember that?

14  **A.**  By Mr. Who?

15  **Q.**  Wilson, Wop.

16  **A.**  Yes.

17  **Q.**  And I think on direct examination, you were asked if you

18  saw a weapon and you said you had, right?

19  **A.**  Yeah.

20  **Q.**  But then you said you never actually saw it, but it

21  looked like a weapon.

22  **A.**  You talking about Congress Place, when he stuck his hands

23  in his pocket.

24  **Q.**  Right.  Right, you remember?

25  **A.**  Right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  You never saw a gun, did you?

2  **A.**  No, he never pulled it out.

3  **Q.**  And you said, because he stuck his hand in his pocket,

4  you could tell it was a gun, right?

5  **A.**  Correct.

6  **Q.**  And did you wear glasses back then?

7  **A.**  No.

8  **Q.**  And are those glasses or are they like attitude glasses?

9  **A.**  They're reading glasses.

10  **Q.**  Can you see me clearly?

11  **A.**  Yes.

12  **Q.**  What am I holding in my hand right now?

13  **A.**  I don't know what you're holding in your hand.

14  **Q.**  Let me stand closer.

15  **A.**  I don't know.

16  **Q.**  You can't tell, right?

17  MR. TABACKMAN:  I have nothing further.

18  THE COURT:  Mr. Zucker.

19      <u>CROSS-EXAMINATION OF DAMIEN GREEN</u>

20  BY MR. ZUCKER:

21  **Q.**  Good afternoon, sir.  I'll be very brief.  I want to

22  return to something that came up in your conversation with

23  Mr. Tabackman.

24  Do you recall talking about a time that you took a plea

25  and thought you had a Youth Act?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**  Yes.

2  **Q.**  And what do you mean by you thought you had a Youth Act,

3  you thought it was guaranteed that you would get it?

4  **A.**  Because my lawyer came to me and said he got a plea

5  bargain for me.

6  **Q.**  Okay.

7  **A.**  He said 2 to 15, Youth Act.

8  **Q.**  Okay.  Just explain to the jury what that means.

9  **A.**  A 2 to 15 Youth Act means the judge give you the 2 to 15

10  Youth Act, but I didn't know you had to go for a Youth Act

11  study.

12  **Q.**  Let me make sure, break it down slightly.  The 2 to 15

13  means you have to do a mandatory 2, but no more than 15, right?

14  **A.**  Eighteen months you can go home, clean conduct.

15  **Q.**  If you get the Youth Act?

16  **A.**  Yes.

17  **Q.**  Okay.  And the Youth Act is a way to get away from the

18  two years, right?

19  MR. GUERRERO:  Objection, Your Honor, repetitive.

20  THE WITNESS:  No, the Youth Act.

21  THE COURT:  Hold on.  When there's an objection, I have to

22  rule on it.

23  Sustained.

24  You can go ahead.

25  BY MR. ZUCKER:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  I guess the focus I want to get to is this.  You didn't

2  get the Youth Act, did you?

3  **A.**  No.

4  **Q.**  Now, when you went for the plea, you were asked a series

5  of questions from the judge, as with every plea you've ever

6  taken, right?

7  **A.**  Yes.

8  **Q.**  And one of the questions the judge asked you was, you

9  understand -- and I'm going to paraphrase -- you understand that

10  the sentence is going to be imposed by me, the judge?  Have any

11  promises been made to you about what sentence I'm going to

12  impose, right?  Or questions along those lines?

13  **A.**  I don't remember.

14  **Q.**  All right.  You don't remember telling the judge, as part

15  of the plea colloquy -- plea colloquy is just a conversation

16  when your plea goes in -- that nothing has been represented to

17  you about what sentence the judge was going to impose.

18  Do you remember him or her asking those questions?

19  **A.**  Naw.

20  **Q.**  All right.  But you did have an expectation, based on

21  conversations between your lawyer and the prosecutor, you were

22  going to get a favorable sentence, i.e., Youth Act, right?

23  **A.**  Yes.

24  **Q.**  Even though that wasn't anything said by the judge, nor

25  said in front of the judge, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   A.   Right.

2   Q.   Actually, was that with Judge Burgess in Superior Court?

3   A.   Yes.

4   Q.   And that was on November 13th, 1996?

5   A.   Yes.

6   Q.   Okay.  Court's indulgence.  You do not recall

7   conversations about the judge asking you about whether or not

8   any promises have been made to you about what sentence --

9        MR. GUERRERO:  Objection, Your Honor.

10  BY MR. ZUCKER:

11  Q.   -- he would impose?

12       THE COURT:  Sustained.

13       MR. ZUCKER:  I'm sorry, Judge, may we approach, then?

14       THE COURT:  Approach about what?

15       MR. ZUCKER:  I -- I don't want to argue in front of the

16  jury.  I'm unsure of the ruling.

17       THE COURT:  I sustained the objection.  You can put

18  another question.

19  BY MR. ZUCKER:

20  Q.   On November 13th -- you recall it was November 13th, 1996

21  when you pled in front of Judge Burgess?

22  A.   Yes.

23  Q.   Okay.  And do you recall whether or not the judge had --

24  in the colloquy you had with the judge, him asking you whether

25  or not any promises had been made about the granting of the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   youth study?

2   A.   No, I don't remember.

3   Q.   Would it refresh your recollection to look at a copy of

4   that transcript of what was said to you by the judge and what

5   you answered that day?

6   A.   I still don't remember.

7   Q.   I'm asking you, if you saw a copy of the transcript --

8   A.   Even if I see it, I still won't remember.  If that

9   happened, I won't remember.

10  Q.   So you're saying, even if you saw a copy of what he said

11  to you and what you said on that day, you still wouldn't recall

12  what he said?

13  A.   The only way I say that is because my lawyer handled all

14  that when I went to court.

15  Q.   I understand that.

16  A.   I don't remember what the judge said to me.

17  Q.   And even if you looked at a copy of what a court reporter

18  wrote down that the judge said, and a copy of what your answers

19  are, you're telling us you still wouldn't recall, having looked

20  at it?

21       THE WITNESS:  Naw.

22       MR. GUERRERO:  Objection, asked and answered.

23       THE COURT:  I'll allow it.  Go ahead.

24  BY MR. ZUCKER:

25  Q.   Is that what your sworn testimony was in front of the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   jury?

2   A.   I just don't remember, I mean --

3   Q.   I know you said you don't remember now.  What I'm asking

4   now is a different question.  What I'm asking now is:  If you

5   looked at a copy of a court reporter's transcript --

6   A.   Right.

7   Q.   -- of what the judge said and what you answered, would it

8   refresh your recollection?  And you're telling me, no, that

9   still wouldn't -- you know anything about refreshing

10  recollection?

11  A.   Even if --

12       MR. GUERRERO:  Objection, Your Honor.

13  BY MR. ZUCKER:

14  Q.   That still would not refresh your recollection?

15       THE COURT:  He answered the question.  Move on.

16  BY MR. ZUCKER:

17  Q.   You're not trying to avoid answering questions here, are

18  you?

19  A.   Naw.

20  Q.   You just don't trust that the court reporter would have

21  accurately taken it down?

22  A.   Naw, it's just that even if I read it, I'm still saying

23  that I don't remember.  If I don't remember, I can't tell you I

24  would remember.  You want me to say it just to say I remember,

25  when I don't.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   Q.   What I asked you -- well, I don't want to argue with you,

2   but what I want to ask you is:  If you looked at what a court

3   reporter had written down that day, both what you said and what

4   the judge said, you're saying you still wouldn't remember it?

5        MR. GUERRERO:  Objection, Your Honor.

6        THE COURT:  Sustained.

7        MR. ZUCKER:  No other questions of this witness.  Thank

8   you.

9        THE COURT:  Ms. Wicks.

10       MS. WICKS:  Thank you, Your Honor.

11  May we approach, Your Honor?

12       THE COURT:  Yes.

13       (Following sidebar discussion had on the record:)

14       MS. WICKS:  Your Honor, I thought I was going last.  I can

15  start now, but --

16       THE COURT:  You know, blame Mr. Beane, because he switched

17  positions.

18       MS. WICKS:  Okay, that's fine.  I can start.

19       (Juror stepped out of the courtroom.)

20       (Sidebar discussion concluded.)

21       MS. WICKS:  Court's indulgence.

22       CROSS-EXAMINATION OF DAMIEN GREEN

23  BY MS. WICKS:

24  Q.   Good afternoon, Mr. Green.

25       THE COURT:  Hold on.  Hold on.  Hold on.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14085

| | |
|---|---|
| 1 | MS. WICKS: Sorry. |
| 2 | (Juror returned to the courtroom.) |
| 3 | MS. WICKS: Thank you, Your Honor. Good afternoon, |
| 4 | Mr. Green. |
| 5 | THE WITNESS: Good afternoon. |
| 6 | BY MS. WICKS: |
| 7 | Q. Now cooperation, which is something -- you started |
| 8 | cooperating in what year, '98? |
| 9 | A. Yes. |
| 10 | Q. And cooperation with the government is something where |
| 11 | the government promises you something, right? |
| 12 | A. No, they can't promise you nothing. |
| 13 | Q. Well, when you testified last week, you testified under |
| 14 | oath that cooperation is something that the government promises |
| 15 | you, correct? |
| 16 | A. Naw. |
| 17 | Q. That's not what you testified to last week? Is that what |
| 18 | you testified to last week? |
| 19 | A. Naw, I know they can't promise you nothing. |
| 20 | Q. Last week you were asked the following question by the |
| 21 | government and you gave the following answer: |
| 22 | "Question: Do you know what a cooperation agreement is?" |
| 23 | "Answer: It's something that you promise me." |
| 24 | That's what you said last week, right? |
| 25 | A. I might have did say that, but I know they can't promise |

Scott L. Wallace, RDR, CRR
Official Court Reporter

14086

| | |
|---|---|
| 1 | you nothing. |
| 2 | Q. So was that the truth or was that a lie what you said |
| 3 | last week? |
| 4 | A. I don't know. I don't know if it's true or a lie. I |
| 5 | know they can't promise you nothing. I know that's the truth. |
| 6 | Q. Well, under oath last week, you said a cooperation |
| 7 | agreement is what you -- meaning the government, who is asking |
| 8 | you the question, promises me, meaning Damien Green, right? |
| 9 | A. I can't give you no response on that one. |
| 10 | Q. Well, that's -- well, do you recall that question last |
| 11 | week? |
| 12 | A. Naw. |
| 13 | Q. So you don't recall being questioned by the government, |
| 14 | that very question, just four or five days ago, correct? |
| 15 | A. No, that's what I said, I said they promised me |
| 16 | something? |
| 17 | Q. Yeah, that's what it said in the transcript. |
| 18 | A. That was wrong. |
| 19 | Q. The court reporter got it wrong or your answer was wrong? |
| 20 | A. Either both. |
| 21 | Q. And today you'd give a different answer to that very |
| 22 | question, right? |
| 23 | A. Yes. |
| 24 | Q. Okay. So I'm going to ask you the same question today: |
| 25 | Do you know what a cooperation agreement is? |

Scott L. Wallace, RDR, CRR
Official Court Reporter

14087

| | |
|---|---|
| 1 | A. Uh, yes. |
| 2 | Q. Okay. What's a cooperation agreement? |
| 3 | A. Uhm, you agree to testify for the prosecutor, and if you |
| 4 | testify, they're going to help you some type of way in your plea |
| 5 | agreement. |
| 6 | Q. And that's not what you said last week, right? |
| 7 | A. Nope. |
| 8 | Q. And sitting here today, in your mind -- well, you've been |
| 9 | in jail since you were locked up in September '96, right? |
| 10 | A. Yes. |
| 11 | Q. And because of everything that you've done for the |
| 12 | government, you think you've been in jail too long, right? |
| 13 | A. No, I don't think I've been in jail too long. |
| 14 | Q. You're willing to do more to get out, right? |
| 15 | A. Even if I have to do this five years, it don't make a |
| 16 | difference. I still done a lot of time. It don't really make |
| 17 | a -- I still feel that I served my time. |
| 18 | Q. Well, the reason why you called Detective Gus and |
| 19 | initiated contact with him is because you wanted to get out of |
| 20 | jail, right? |
| 21 | A. Nope. |
| 22 | MS. WICKS: Court's indulgence. |
| 23 | BY MS. WICKS: |
| 24 | Q. Well, you testified last week that you called your agent, |
| 25 | right? |

Scott L. Wallace, RDR, CRR
Official Court Reporter

14088

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And the reason that you called your agent is because you |
| 3 | had gotten a hit from the parole board, right? |
| 4 | A. No. I called my agent for something else. It was |
| 5 | something that was going on with me. I ain't talked to my agent |
| 6 | in years, so I called him for something that was going on with |
| 7 | me. I didn't even know these brothers got locked up. |
| 8 | Q. And it just happened, as a result of you calling your |
| 9 | agent, that now you're testifying for the government, right? |
| 10 | A. Yes. |
| 11 | MS. WICKS: Court's indulgence. |
| 12 | BY MS. WICKS: |
| 13 | Q. Now, last week when Mr. Tabackman started asking you |
| 14 | questions, you indicated that you've taken -- you've taken |
| 15 | accountability for the murders you've done, right? |
| 16 | A. Attempted murders. |
| 17 | MR. GUERRERO: Objection, Your Honor, misstates the |
| 18 | evidence. |
| 19 | THE COURT: Sustained. |
| 20 | MS. WICKS: May we approach, Your Honor? |
| 21 | THE COURT: Yes. |
| 22 | (Following sidebar discussion had on the record:) |
| 23 | MS. WICKS: Your Honor, that's actually exactly what he |
| 24 | was asked and what he answered yes to. |
| 25 | MR. GUERRERO: Where? |

Scott L. Wallace, RDR, CRR
Official Court Reporter

1      MS. WICKS:  First on page 13844, the question is:

2  "Right.  Because that's part of the accountability that

3  you've had for the murders you've done."

4      There's an objection.  The Court said overruled, and the

5  witness said:  "That's not like this."

6      And he goes on to say, "It's not like that?"

7  "Answer:  Naw."

8      Question -- Mr. Guerrero said:  "You've taken

9  accountability and then you said yes for the murder you've done?"

10  "Answer:  Right."

11      THE COURT:  Your first line you read to me had the word

12  "that" in it with no context.  I don't know what the context is.

13      MS. WICKS:  I'm sorry.  Right before that, he's talking

14  about...

15      MR. GUERRERO:  Your Honor, if I can just interject here, I

16  can speed this up.  I know exactly what the transcript says.  And

17  I objected then, when Mr. Tabackman asked it, and I'm still

18  objecting now.  When Mr. Tabackman asked that, we approached the

19  bench and we went into a colloquy over what the PSI report had

20  about whether or not Mr. Tabackman was misstating attempted

21  murders for murders and we went into that interchange.  And there

22  wasn't any murders at all that this person was pleading guilty to

23  as part of the RICO.  They are AWIKs or assault with intent to

24  kill or murder.

25      MS. WICKS:  Your Honor, that's absolutely not what's in

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  the transcript.  In the transcript he goes on to continue

2  questioning him, and at that point there's no approach about

3  what's in the PSI.  The Court allowed him to answer the question,

4  I'm merely following up on what murders is he talking about,

5  because he pled guilty to attempted murders.

6      MR. GUERRERO:  Right, Your Honor, and there is a colloquy.

7  If Ms. Wicks keeps on flipping those pages, there is a colloquy,

8  that I remember, where we came up here to the bench to address

9  this very same issue, and Mr. Tabackman was informing the Court

10  that they had just gotten this PSI report, and Your Honor was

11  asking Mr. Tabackman to search through the PSI report to see

12  exactly where it was that he had pled guilty to murders, versus

13  attempted murders, and there was nothing in there.

14      MS. WICKS:  And that's a completely different part of the

15  cross-examination.  That's a completely different part of the

16  cross-examination.  No one approached after this question and

17  that's what the witness indicated, he had taken accountability.

18      MR. CARNEY:  Your Honor, I'm looking at Page 13845 of this

19  trial transcript, where I specifically say on line 9:

20  "Objection, Your Honor, misstates the record."

21      THE COURT:  And the Court said:  "I'll allow it."

22      MR. GUERRERO:  Right.

23      MS. WICKS:  And he answered the questions.

24      THE COURT:  One at a time.

25      MR. GUERRERO:  And we repeatedly came back on this same

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  issue to address whether or not Mr. Tabackman was misreading the

2  information that he had.

3      MS. WICKS:  That's another portion.

4      THE COURT:  Wait a minute.

5      MR. GUERRERO:  The fact is, under this particular plea

6  that he pled guilty to in his RICO conspiracy case, he did not

7  plead guilty to any murders.  He pled guilty to three assault

8  with intent to murders, and Mr. Tabackman was under the

9  impression that in one of those cases, the officer was shot and

10  killed, and I specifically remember coming up here and talking

11  with Mr. Tabackman to the Court so that we could clarify that.

12  And we did clarify that in the record, that there wasn't any

13  murders and that's what I was objecting to then, that

14  Mr. Tabackman was using the word "murders" instead of attempted

15  murders.

16      THE COURT:  Did somebody die?

17      MS. WICKS:  No, but the witness answered under oath that

18  he's taking accountability for the murders he's done.

19      THE COURT:  That's not his language.  He answered right to

20  a question that was phrased, perhaps --

21      MS. WICKS:  He's actually --

22      THE COURT:  Excuse me.  The question added the word murder

23  in there.  I know it says "Right," but my question is:  What --

24  did somebody die?  Was there a murder?

25      MS. WICKS:  No, that's what I'm asking about.  I know

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  that's not what he pled guilty to, but this is what he was

2  testifying to under oath last week.

3      THE COURT:  So your question is:  "Are you here

4  testifying, taking accountability for the murders you committed?"

5      MS. WICKS:  I'm asking -- I'm trying to clarify his

6  testimony from last week.  If in his mind he thinks there are

7  murders that he's taken responsibility for, that's what I'm

8  trying to clarify.  I don't know why he answered that way.

9      THE COURT:  I'll allow you to ask him, "Did you commit any

10  murders," to clarify them.  If he says no, then you're going to

11  have to move on.

12      MS. WICKS:  Okay.

13      (Sidebar discussion concluded.)

14  BY MS. WICKS:

15  **Q.**  Mr. Green, did you commit any murders?  Have you ever

16  committed any murders?

17  **A.**  No.

18  **Q.**  So, when Mr. Tabackman was asking you about -- during the

19  first part of your cross-examination by Mr. Tabackman last week,

20  when you were asked about the accountability you had for the

21  murders, you were thinking the attempted murders, correct?

22  **A.**  Correct.

23  **Q.**  And there were three separate instances where you tried

24  to kill people that you pled guilty to in the *Edelin* matter,

25  right?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  **A.**    Yes.

2  **Q.**    But there are approximately 10 to 15 times where you shot

3  people trying to kill them, right?

4  **A.**    Naw.  No.

5  **Q.**    How many times did you try to shoot people to kill them?

6  **A.**    Well, shooting at a person and they shooting at you, it's

7  a little different, but I never shot nobody and get charged for

8  it.

9  **Q.**    So the only times you initiated shooting somebody are the

10  times you were charged for in the *Edelin* matter?

11  **A.**    Well, I shot at other people before, but they never got

12  hit.  You said got hit.

13  **Q.**    As far as you know, they weren't hit, correct?

14  **A.**    Yes.

15  **Q.**    You didn't stick around to find out, did you?

16  **A.**    We would have known.

17  **Q.**    Well, you would have known?  You thought that Ira Clayton

18  was dead, right?

19  **A.**    Yeah, but I knew he was shot, too.

20  **Q.**    Right.  You knew he was shot and you thought he was dead,

21  right?

22  **A.**    Yeah.

23  **Q.**    And when you saw him and he was alive, then you found out

24  he wasn't dead, right?

25  **A.**    Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  **Q.**    And were there people that you shot at that you never saw

2  again, right?

3  **A.**    Yes.

4  **Q.**    So you don't know whether they're dead or alive, correct?

5  **A.**    No, it's not like I'm just coming to your neighborhoods

6  and just shooting at you.  It's -- if I'm beefing with somebody,

7  I'm going to see them again.  If I shot him, I'm going to know

8  that I shot him.  It's going to be known that he got a bullet.

9  **Q.**    Okay.  I thought a couple questions ago, you just

10  indicated that there were people that you shot that you never

11  saw again, correct?

12  **A.**    Yeah, and that was Idaho, the one I'm being charged for.

13  I didn't see him no more.

14  **Q.**    You didn't see him again after you shot him?

15  **A.**    I saw him after -- like a couple days after I shot him.

16  I'm talking about as far as the years now, I haven't seen him no

17  more.

18  **Q.**    About two weeks after you shot him, trying to kill him,

19  you were locked up, right?

20  **A.**    I got locked up in -- I think that same month after I

21  shot him.

22  **Q.**    Well, you got locked up September 5th, 1996, correct?

23  **A.**    Correct.

24  **Q.**    And you shot him in August, '96, correct?

25  **A.**    Okay.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1      MS. WICKS:  Court's indulgence.  Well, I don't think

2  you've answered my question.

3  BY MS. WICKS:

4  **Q.**    My question is:  How many people did you shoot to kill?

5  **A.**    I shot at a lot of people, but the people that I shot at,

6  they never got hit.

7  **Q.**    They never got hit?

8  **A.**    Naw.

9  **Q.**    The police officers were hit, right?

10  **A.**    Yes.

11  **Q.**    Ira Clayton was hit, right?

12  **A.**    The ones that I was charged with.

13  **Q.**    Mark Barnes wasn't hit?

14  **A.**    I wasn't charged by that.

15  **Q.**    He wasn't hit by you, to your knowledge, correct --

16  **A.**    I still was charged with that, because --

17  **Q.**    I understand.  My question is:  Do you know if you hit

18  him?

19  **A.**    I never shot my gun.

20  **Q.**    How many people were you all shooting at that night?

21  **A.**    About six.

22  **Q.**    Well, last week when you testified maybe 10 or 15 people

23  that you tried to kill using a firearm; is that a fair

24  assessment or could it be more than that?

25  **A.**    Uh, when I say that it's more, it's say five or six of us

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  going to another neighborhood that we're beefing with --

2  **Q.**    Mr. Green --

3  **A.**    When I say 10 to 15, I'm trying to just give you what I'm

4  saying, because I see that when I say something, you are taking

5  it and putting it over here.  I'm trying to tell you that when I

6  go to shoot somebody, it's the guys that we're beefing with.  So

7  if it's five of them sitting in the car, we're going to shoot at

8  them in the car.  We're not shooting at nobody else but them.

9      So you can count that five.  And then when we come back

10  and shoot again, two of them who was in that five might be with

11  these now, so now you can count that five, even though

12  we're counting the two left from this five over here.

13  **Q.**    Okay.  Let's do it this way.  How many different times

14  did you, yourself, go with a gun to try to kill somebody?

15  **A.**    Maybe ten times.

16  **Q.**    And of those ten times, there are three times that you

17  were charged in the *Edelin* case, right?

18  **A.**    Yes.

19  **Q.**    And there are seven times -- approximately seven times

20  that you weren't charged with in that case, right?

21  **A.**    Yes.

22  **Q.**    And you talked to the police about those seven times,

23  right?

24  **A.**    Yes.

25  **Q.**    And in those seven times, how many total people do you

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

14097

1   recall being out there that you were trying to kill?

2   **A.**   Awe, man, no more than ten, maybe six, seven.

3   **Q.**   And last week, I believe your testimony was:  There was

4   one time when you went looking for my client, Wop, also known as

5   Mr. Wilson, to try to get him, right?

6   **A.**   Correct.

7   **Q.**   That was your testimony last week, correct?

8   **A.**   Correct.

9   **Q.**   When you testified -- and that was the incident when you

10  were in the taxicab, right?

11  **A.**   Yes.

12  **Q.**   And when you testified in the Ed*elin case*, you didn't

13  talk about Cool Wop related to that incident, correct?

14  **A.**   Naw, I think it was just more that we just rode around

15  there in a cab.

16  **Q.**   Okay.  And your testimony in the Ed*elin case* was that you

17  rode around there looking for Tweety, right?

18  **A.**   Yeah.

19  **Q.**   And in -- that was in relationship to questioning about

20  the beef with Stanton Terrace, right?

21  **A.**   Yes.

22  **Q.**   And the beef -- I think you testified even earlier this

23  morning, that central to your testimony in the *Edelin* case was

24  your testimony about having problems with people that lived on

25  Stanton Terrace, right?

*Scott L. Wallace, RDR, CRR*

*Official Court Reporter*

---

14098

1   **A.**   Yes.

2   **Q.**   Okay.

3       MS. WICKS:  Court's indulgence.  Your Honor, I'm asking

4   the government to bring up 103.1.

5       (Juror stepped out of the courtroom.)

6       MS. WICKS:  Okay.  And --

7       THE COURT:  You need to wait a moment.

8       (Juror returned to the courtroom.)

9       THE COURT:  Ms. Wicks, we're only about ten minutes away

10  from the lunch break, did you want to break now?

11      MS. WICKS:  That's fine, Your Honor.

12      THE COURT:  Why don't we go ahead and take our lunch break

13  now.  Please come back at 2:20.  Enjoy your lunch break.  Leave

14  your notebooks back in the jury room, and we'll see you back in

15  an hour and 15 minutes.

16      (Jury out at 1:04 p.m.)

17      THE COURT:  All right.  We'll see you back at 2:20.

18      MR. ZUCKER:  Your Honor, there is an issue Mr. Guerrero

19  and I both want to address with the Court before Mr. Ewing

20  testifies, or at least before the cross-examination of Mr. Ewing,

21  who is the next witness, and we'll raise it whenever it's

22  convenient for you.

23      (Thereupon, a luncheon recess was had beginning at

24  1:05 p.m.)

25

*Scott L. Wallace, RDR, CRR*

*Official Court Reporter*

---

14099

## CERTIFICATE

2       I, Scott L. Wallace, RDR-CRR, certify that the
foregoing is a correct transcript from the record of proceedings

3   in the above-entitled matter.

4       ----------------------------
    **Scott L. Wallace, RDR, CRR**

5       **Official Court Reporter**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Scott L. Wallace, RDR, CRR*

*Official Court Reporter*

---

14100

## INDEX

**EXAMINATIONS**                                         **Page**

CONTINUED CROSS-EXAMINATION OF DAMIEN GREEN   13974
BY MR. TABACKMAN

CROSS-EXAMINATION OF DAMIEN GREEN             14054
BY MR. MARTIN

CROSS-EXAMINATION OF DAMIEN GREEN             14064
BY MR. BALAREZO

CROSS-EXAMINATION OF DAMIEN GREEN             14078
BY MR. ZUCKER

CROSS-EXAMINATION OF DAMIEN GREEN             14084
BY MS. WICKS


EXHIBITS

NO.      DESCRIPTION                              Page

Page 14101

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :        Docket No. CR 05-100
                                   :
                Plaintiff          :
                                   :
v.                                 :        Washington, DC
                                   :
ANTWUAN BALL,                      :
DAVID WILSON,                      :
GREGORY BELL,                      :        June 5, 2007
DESMOND THURSTON,                  :
JOSEPH JONES,                      :
DOMINIC SAMUELS,                   :
                                   :
          Defendants               :        2:20 p.m.
. . . . . . . . . . . . . . . . . :        . . . . . . . . . . . . .

VOLUME 61 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530
For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                              TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006
                          (202) 454-2811

Page 14102

APPEARANCES CONTINUED

For the Defendant   JENIFER WICKS, ESQUIRE
David Wilson:   LAW OFFICES OF JENIFER WICKS
   The Webster Building
   503 D Street, NW
   Suite 250A
   Washington, DC  20001-2728
   (202) 326-7100
   GARY E. PROCTOR, ESQUIRE
   8 East Mulberry Street
   Baltimore, MD  21202
   (410) 444-1500

For the Defendant   JAMES W. BEANE, JR., ESQUIRE
Gregory Bell:   2715 M Street, NW
   Suite 200
   Washington, DC  20007
   (202) 333-5905

For the Defendant   JONATHAN SETH ZUCKER, ESQUIRE
Desmond Thurston:   514 10th Street, NW
   9th Floor
   Washington, DC  20004
   (202) 624-0784

For the Defendant   ANTHONY DOUGLAS MARTIN, ESQUIRE
Joseph Jones:   7841 Belle Point Drive
   Greenbelt, MD  20770
   (301) 220-3700

For the Defendant   A. EDUARDO BALAREZO, ESQUIRE
Dominic Samuels:   LAW OFFICES OF A. EDUARDO BALAREZO
   400 Fifth Street, NW
   Suite 300
   Washington, DC  20001-2719
   (202) 639-0999

---

Page 14103

APPEARANCES CONTINUED

For Defendant Samuels:  WILLIAM B. PURPURA, ESQUIRE

   8 East Mulberry Street

   Baltimore, MD  21202

   (410) 727-8550


Court Reporter:   REBECCA STONESTREET, RPR, CRR

   Official Court Reporter

   Room 6415, U.S. Courthouse

   Washington, D.C. 20001

   (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

Page 14104

CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAMIEN GREEN | | | | |
| By Mr. Guerrero | -- | -- | 14176 | -- |
| By Ms. Wicks | -- | 14108 | -- | -- |
| By Mr. Beane | -- | 14166 | -- | -- |
| JOHN EWING | | | | |
| By Mr. Guerrero | 14214 | -- | -- | -- |

EXHIBITS

| NUMBER | ADMITTED |
|---|---|

(NO EXHIBITS MOVED INTO EVIDENCE.)

---

Page 14105

```
1                   PROCEEDINGS
2        MR. ZUCKER:  I guess -- I can, and I'm even not sure
3    what we're asking of the Court, in all candor.
4        This is the situation:  I understand that Mr. Ewing has
5    made representations that he has been threatened, and suspects
6    that -- threatened, and that his mother's car was shot up,
7    suspects that it might be connected with this case.
8        I asked Mr. Guerrero for -- whether there was any
9    confirmation that any of those events occurred, and I guess what
10   I was forming it as, is a Brady request, because I anticipated
11   that they had not.
12       He advises me that in fact I am wrong, as is frequently
13   the case, that they have reason to believe that the mother's car
14   was shot up, but there's no independent corroboration of the
15   threats.
16       And I guess the question is -- I'm not even sure what
17   the question is, in all candor, you know, because I don't want
18   to step afoul...
19       I don't want to open up any land mines, but if there is
20   anything there that I could use to my client's advantage,
21   because there were misrepresentations made and the government is
22   aware of it, then I want the disclosure of that.  I guess that's
23   the best way to frame it.
24       THE COURT:  Give me that again.
25       MR. ZUCKER:  Sure.  My suspicion is that it was an
```

2 (Pages 14102 to 14105)

Page 14106

1   excuse used to -- when confronted with his failure to appear,
2   and so I guess I'm looking for confirmation of that.  And
3   Mr. Guerrero has advised me that he doesn't think that is the
4   case.
5        THE COURT:  He doesn't think what is the case?
6        MR. ZUCKER:  That these were fabrications used to
7   explain the failure to comply with the subpoena.  So I guess we
8   just wanted to frame the issue, raise it with the Court.
9        I've asked him to -- he's advised me he is continuing
10  to look into it, and will make disclosures.  Is that a fair
11  assessment?
12       MR. GUERRERO:  Your Honor, we have --
13       THE COURT:  Can I call you Mr. Balarezo again?
14       MR. GUERRERO:  That's fine, Your Honor.
15       THE COURT:  Sorry, go ahead.  This is Mr. Guerrero,
16  just for the record.
17       MR. GUERRERO:  There are two incidents that we talked
18  about with respect to Mr. Ewing.  One is a threat, the other is
19  a shooting.  We raised those issues under seal.  We're not going
20  to go into the details of those shootings, of those two
21  incidents.  We're still looking into them.
22       We do have a good faith basis to believe that the
23  shooting of the car, the van, did happen.  There's no reason for
24  us to disbelieve that that didn't happen, based on our research
25  thus far.

Page 14107

1        We're still working on confirming or getting
2   independent corroboration about this other threat.  We're not
3   there yet, but we're working on it.
4        So at this point we have no reason to disbelieve John
5   Ewing, and there's nothing to disclose, because in his mind he
6   thinks that they're connected to this case.
7        Now, I've instructed him that until we confirm that,
8   that he's not to talk about that in his direct testimony.  I'm
9   not going to go there.  And I alerted Mr. Zucker, and I guess I
10  placed the rest of defense counsel on notice, that if they go
11  there, to be careful for what the answer might be.  Because,
12  although I've instructed him I'm not going to go there and not
13  to go there as well, you can never tell what might happen during
14  cross-examination in a heated exchange.  So...
15       THE COURT:  Anything else?
16       MR. ZUCKER:  I don't think there's really anything
17  else.
18       THE COURT:  I guess you've made a record.  There's
19  nothing for me to do at the moment about it.  But we'll see what
20  happens.
21       MR. BALAREZO:  Your Honor, just so we're clear,
22  Mr. Guerrero has hair and I'm the good-looking one.
23       MS. WICKS:  Objection.
24       THE COURT:  I'm glad I'm not on the stand, though.  I
25  could have been cross-examined pretty effectively.

Page 14108

1        Are you ready for the jury?
2        MS. WICKS:  I'm ready, Your Honor.  But I need a
3   witness.
4        (Jury in at 2:24 p.m.)
5        THE COURT:  Good afternoon, ladies and gentlemen.
6        THE JURY:  Good afternoon.  (Singing).
7        THE COURT:  That's music to my ears.
8        Welcome back, and we're ready to resume.
9        Ms. Wicks?
10       MS. WICKS:  Thank you, Your Honor.
11            CONTINUED CROSS-EXAMINATION
12  BY MS. WICKS:
13  Q.  Mr. Green, I'm having you look at Government's 103.1 that is
14  in evidence, that shows Stanton Terrace.  And if you could
15  just -- that's in the upper right-hand corner of the photograph
16  that's displayed to you right now.  Do you see that?
17  A.  Yes.
18  Q.  And that's the Stanton Terrace.  That's the area that you
19  testified about in the Edelin case.  Right?
20  A.  Yes.
21  Q.  And then in that area that's marked Stanton Terrace on this
22  photograph, that's the area that you went to kill Mark Barnes.
23  Right?
24  A.  Yes.
25  Q.  And to shoot other people.  Right?

Page 14109

1   A.  Yes.
2   Q.  And specifically back in '96, on several occasions you were
3   involved in incidents going to Stanton Terrace and trying to
4   kill people.  Right?
5   A.  Yes.
6   Q.  And that was -- the bulk of your testimony in the Edelin
7   case was about those instances.  Right?
8   A.  Yes.
9   Q.  And when you testified last week about --
10       MS. WICKS:  Court's indulgence.
11  BY MS. WICKS:
12  Q.  Well, actually, were you involved -- you were involved in an
13  incident where Tweety's brother Spook was killed?
14  A.  No, I wasn't involved with it, but...
15  Q.  Well, your involvement with that incident was, you knew a
16  person named Murph had gotten shot when Spook was killed.
17  Right?
18  A.  Yes.
19       MR. GUERRERO:  Objection.  Beyond the scope.
20       MS. WICKS:  I have a reason.  I can approach.  May we
21  approach, Your Honor?
22       THE COURT:  Yes.
23       (BENCH CONFERENCE ON THE RECORD.)
24       MS. WICKS:  The reason I'm going into it is because
25  Murph was a witness to that shooting, and his involvement in

3 (Pages 14106 to 14109)

Page 14110

1  that incident is, he specifically approached Murph to get him
2  not to talk to the police, in an effort to get him not to talk
3  to the police. And that's why I'm going into it.
4       I think it's a prior bad act that I should be entitled
5  to go into.
6       MR. GUERRERO: I think it's still beyond the scope,
7  Your Honor. I didn't go into that. I know the incident she's
8  talking about, but I think that's well beyond the scope of
9  direct examination.
10      THE COURT: Why isn't it legitimate bad act inquiry? I
11 mean, the guy is trying to suborn perjury, I guess is what
12 you're saying.
13      MS. WICKS: I think it's more along the lines of --
14      THE COURT: Obstructing justice?
15      MS. WICKS: -- to obstruct justice, yes.
16      MR. GUERRERO: I defer to the Court.
17      THE COURT: I'll allow it.
18      (END BENCH CONFERENCE.)
19 BY MS. WICKS:
20 Q. Mr. Green, you approached -- let me just step back.
21      Spook was the individual that was killed in May of '96.
22 Right?
23 A. Yes.
24 Q. And that's Tweety's brother. Correct?
25 A. Yes.

Page 14111

1  Q. And Murph was a person that got shot when Spook got killed.
2  Right?
3  A. Yes.
4  Q. And you approached Murph to talk to him so that he wouldn't
5  talk to the police. Right?
6  A. Yes.
7  Q. And if you thought that he was going to tell, you would have
8  killed him. Right?
9  A. No, I wouldn't have killed him.
10      MS. WICKS: Court's indulgence.
11 BY MS. WICKS:
12 Q. Well, you thought Idaho was going to tell. Right?
13 A. Yes.
14 Q. And that's why you tried to kill him. Right?
15 A. Yes.
16 Q. When you talked to Murph, he told you that when the police
17 talked to him, he told them he couldn't see the shooters.
18 Right?
19      MR. GUERRERO: Objection. Calls for hearsay.
20      MS. WICKS: It goes to his state of mind, Your Honor.
21      THE COURT: I'll allow it. I'm sorry.
22 A. Yes.
23      THE COURT: Sustained.
24 BY MS. WICKS:
25 Q. When --

Page 14112

1       MS. WICKS: Court's indulgence.
2  BY MS. WICKS:
3  Q. And the incident where -- well, you shot at a car thinking
4  that it was individuals from Stanton Terrace. Right? In June
5  of '96?
6  A. Yes.
7  Q. And it turned out that those were the police officers that
8  you shot at. Right?
9  A. Yes.
10 Q. After that, June 19th, '96 is the incident where Mark Barnes
11 gets shot at. Right?
12 A. Yes.
13 Q. And it's after that incident that -- and essentially, all of
14 those incidences that I just asked you questions about that
15 occurred in '96 were stemming from the problems that you were
16 having with dudes from Stanton Terrace. Right?
17 A. Yes.
18 Q. And Stanton Terrace, as indicated on the map, is on the
19 other side of Stanton Road from 15th Place and Congress Place
20 where you used to hang out. Right?
21 A. Yes.
22 Q. So it's essentially one block away, on the other side of
23 Turner School. Right?
24 A. Yes.
25 Q. And back in '96 -- you were arrested on June 20th, '96 for a

Page 14113

1  gun that the police found in your grandmother's house. Right?
2  A. Yes.
3  Q. And the drugs that they found in the house. Right?
4  A. Yes.
5  Q. And --
6       MS. WICKS: Court's indulgence.
7  BY MS. WICKS:
8  Q. And actually, when you -- the 5 to 15 that you got from
9  Judge Burgess is run concurrent with the time that you got for
10 the gun -- you pled guilty to the gun found in your
11 grandmother's house. Right?
12 A. Yes.
13 Q. And you got a year for that. Right?
14 A. Naw, I think it was just 100 days.
15 Q. I'm sorry. You got 100 days to run concurrent with your
16 other sentence. Right?
17 A. Yes.
18 Q. And that was the incident that arose when you were arrested
19 on June 20th of '96 in your grandmother's house. Right?
20 A. Yes.
21 Q. So you were released -- prior to being arrested in that
22 case, you had been arrested in the PCP and marijuana case in
23 February of '96. Right?
24 A. Yes.
25 Q. And when you were released in that case, you promised not to

4 (Pages 14110 to 14113)

Page 14114

1  break the law.  Correct?
2  A. I promised?  Who I promise to?
3  Q. The judge.
4  A. I don't remember promising the judge that.
5  Q. You don't remember promising the judge?
6      MS. WICKS:  Court's indulgence.
7      May I approach the witness, Your Honor?
8      THE COURT:  Yes.
9      MS. WICKS:  I'm showing him 32-E.
10 BY MS. WICKS:
11 Q. Mr. Green, I'm showing you 32-E, which is the United States
12 versus Damien A. Green.  Right?
13 A. Yes.
14 Q. Okay.  And specifically looking at this court order from the
15 Superior Court, it's dated February 14th, '96.  Do you see that
16 here at the bottom of the page?
17 A. Yes.
18 Q. And there's a signature here.  That's your signature, Damien
19 Green?
20 A. Yes.
21 Q. And this is a release order where you're released on
22 conditions.  Do you see that at the top of the page?
23 A. Yes.
24 Q. And specifically, "You are to refrain from committing any
25 criminal offenses, the penalties of which are explained on the

Page 14115

1  reverse side of this order."
2      That's what it says on the order.  Right?
3  A. Yes.
4  Q. And that's actually checked off.  Right?
5  A. Right.
6  Q. And you signed here, saying that you "understood the
7  penalties which may be imposed on me for willful failure to
8  appear or for violation of any condition of release."
9      That's what it says there.  Right?
10 A. Right.  So that lets you know somebody helped me, because at
11 that time I couldn't read.
12 Q. Okay.  Well, you signed the order.  Right?
13 A. Right.
14 Q. And it's your testimony that someone helped you to
15 understand what the order said.  Right?
16 A. Right.
17 Q. And when you were released, you kept on selling drugs.
18 Right?
19 A. Right.
20 Q. And you were involved in these shooting instances in 1996.
21 Right?
22 A. Right.
23 Q. And then you were arrested again in June of '96, and you
24 made that same promise again.  Right?
25 A. Right.

Page 14116

1  Q. And you kept doing what you were doing back then.  Right?
2  A. Right.
3  Q. The incident that you talked about last week -- and I
4  believe your testimony was, you observed a shooting at
5  15th Place -- I'm sorry, at where Congress Place intersects with
6  Stanton Road.  Right?
7  A. Yes.
8  Q. And that incident, you said Marcia was out there?
9  A. Yes.
10 Q. And Marcia was Chanté's sister.  Right?
11 A. Yes.
12 Q. And they're both Marcia and Chanté Morris.  Right?
13 A. Yes.
14 Q. And when you saw Wop coming up to that neighborhood in the
15 years prior to you being arrested, he came to see Chanté.
16 Right?
17 A. Sometimes he would come and see Chanté.  Sometimes he would
18 come up there for Truck's sisters, Martha and Michelle.  They
19 live in the same court.
20 Q. Okay.  Well, your testimony last week was, you saw them
21 coming up there to holler at the dudes.  Right?
22 A. I mean, if he come up there to holler at the dudes --
23 Q. Mr. Green, I'm asking you about your testimony last week.
24 Your testimony last week --
25 A. Yes.  Yes.

Page 14117

1  Q. Okay.  You also saw him, he would come and visit Chanté.
2  Right?
3  A. Yes.
4  Q. You also saw him, and he would come up there and visit the
5  Brooks family.  Right?
6  A. Who is the Brooks family?
7  Q. Martha and Michelle Brooks.
8  A. All right.  Yeah.
9  Q. And can you show the ladies and gentlemen --
10     MS. WICKS:  May I approach the witness and give him a
11 pen, Your Honor?
12     THE COURT:  Yes.
13 BY MS. WICKS:
14 Q. If you could mark on 103.1 where the Morris family residence
15 was.
16 A. (Witness complies.)
17 Q. And is that arrow right at the building that is the Morris?
18 A. It's right here (indicating.)
19 Q. Can you just clear and try to put the mark right where the
20 building is?
21 A. (Witness complies.)
22 Q. And is the arrow pointing at the building?
23 A. Yes.  Yes.
24 Q. And if you could also mark where the Brooks family residence
25 was.

5 (Pages 14114 to 14117)

1  A. (Witness complies.)
2  Q. Are you meaning to point at the same building or a different
3  building?
4  A. Naw, it's like a U. The Brooks' house is on the side.
5  Chanté and them houses is facing the court. It's like this
6  (indicating).
7  Q. Okay.
8  A. They live in the same court. It's like a U.
9  Q. I understand. I'm just trying to look where -- okay.
10 Essentially, on Congress Place, between 15th Place and
11 Stanton Road, are both of the buildings that the Morris family
12 lived in and the Brooks family. Right?
13 A. Yes.
14 Q. And they're right in that block where in 1996 you said you
15 observed JJ, Squid, and Sabrina getting into a vehicle. Right?
16 A. Yes.
17 Q. And Marcia Morris was one of the people that was out there
18 that night?
19 A. Yes.
20 Q. And she was out there with you. I mean, in the area where
21 you were. Right?
22 A. She was sitting like on her porch. Wah-Luck was sitting out
23 there with her boyfriend.
24 Q. That was her boyfriend at the time? Or you're saying there
25 was another individual that was her boyfriend?

1  A. Naw. Marcia and Wah-Luck was going together then.
2  Q. Okay. And are they on a porch where you are?
3  A. No, they sitting on Marcia porch.
4  Q. Okay. And is Marcia's porch back from the street or up at
5  the street?
6  A. It's back from the street.
7  Q. Okay. From Marcia's porch, can you see the intersection of
8  Stanton Road and Congress Place?
9  A. No.
10 Q. Where were you standing when you observed JJ's car making
11 that left turn?
12 A. I was standing like --
13 Q. If you could mark on the map. Why don't you do that?
14 A. (Witness complies.) Right in front of the court.
15 Q. Okay. So almost on the sidewalk?
16 A. Naw -- well, you could say that. Because it's the sidewalk,
17 and then you got the stairs, and then you got like a little wall
18 with like a tree that you could sit on the wall.
19     So if you sit on the wall, it's like you in front of
20 the court. So you got the stairs and then the sidewalk. You
21 can either sit on the stairs, or you can sit on the --
22 Q. My question is, where were you sitting?
23 A. I was standing like in front of, like, where the stairs at.
24 Q. And this incident that you're testifying about, did this --
25 this occurred after the police ran up in your house and got that

1  gun. Right?
2  A. Yeah, this is about that time they took my gun, I think.
3  Q. I'm not asking if it's about the time. I'm asking, did it
4  occur --
5  A. I'm trying to think --
6  Q. Let me finish my question. Did it occur before or after the
7  police took your gun that day?
8  A. This was after. This was after.
9  Q. Okay. And --
10     MS. WICKS: Court's indulgence.
11 BY MS. WICKS:
12 Q. The two individuals that you observed, if you could show on
13 the map now which cut it is that you're saying they were
14 standing in front of when you observed them.
15 A. Okay. This where the cut -- okay. Hold on, let me see.
16 Tweety was in this cut. Hold up. Tweety was in this cut, and
17 Spook was in this cut, okay, and Cool Wop was in this cut right
18 here (indicating) and...
19 Q. And that's where they were when they were shooting at the
20 car at the corner of Congress Place and Stanton Road?
21 A. Oh. Naw, I'm talking about something else.
22 Q. That's what I'm asking about, Mr. Green. What you testified
23 last week --
24     MS. WICKS: Court's indulgence.
25 A. They was in this cut right here --

1      THE COURT: Hold on a second. Let her put her
2  question.
3  BY MS. WICKS:
4  Q. The incident that you talked about last week, where you
5  observed two people standing in front of a cut, can you point
6  out to the ladies and gentlemen which cut?
7  A. (Witness complies.)
8  Q. And are you pointing to the area essentially in the
9  photograph above the end of Turner School?
10 A. Yes.
11 Q. And just to the right of the arrow -- right now there's an
12 arrow partially covering the C -- I'm sorry, the S in "Stanton
13 Road"?
14 A. Right. Right at the tip of the arrow, there's a cut right
15 there.
16 Q. Let me ask the question. The two buildings that are just to
17 the right of that arrow as you look at the photograph, that
18 whole set of buildings there is Turner Elementary School.
19 Right?
20 A. Yes.
21 Q. And you're saying that the cut that they came out of was
22 essentially the area just past the school on the top -- in the
23 photograph, on the top of Turner School. Right?
24 A. Yes, it's -- yeah, it's...
25 Q. And there's an area in the photograph that almost looks like

Page 14122

1  there's a shadow?
2  A. Yes.
3  Q. So if you could just point to that shadow area.
4  A. (Witness complies.)
5  Q. Okay. So you're saying on essentially that far side of the
6  school is where you saw the two people standing in the cut?
7  A. Yes.
8  Q. And I think your testimony last week was, during this
9  incident, the first thing that you heard or saw was actually
10  hearing gunshots. Right?
11  A. Right.
12  Q. And when you looked up you saw the two individuals standing
13  in front of the cut. Right?
14  A. Well, when I heard the shots and I looked up there by -- the
15  car was making a left at the same time, so you could see two
16  people, but you can't see their whole body because the car is
17  still blocking them. But you could see two people.
18  Q. You could see the heads?
19  A. Yeah, you could see the heads. You could see the fire from
20  the gun.
21  Q. So when you first see them, they're not in the cut. They're
22  almost on the sidewalk of the street there. Right?
23  A. Yeah.
24     MS. WICKS: Court's indulgence.
25  BY MS. WICKS:

Page 14123

1  Q. But before you see them, you hear gunshots. Right?
2  A. Yes.
3  Q. And --
4     MS. WICKS: Court's indulgence.
5  BY MS. WICKS:
6  Q. Do you recall how many shots you heard that night?
7  A. Let me see. I don't know. It was a lot, maybe 10, 15. It
8  was up there.
9  Q. And as you're standing there observing that -- well, even
10  after -- the car that you're watching leaves and goes down
11  Stanton Road. Right?
12  A. Yes.
13  Q. And at that point you don't know if anyone is hit. Right?
14  A. Yes.
15  Q. You didn't call the police. Right?
16  A. Right.
17  Q. You called your cousin to get your gun. Right?
18  A. To get me a gun.
19  Q. To get you a gun, I'm sorry. Because the police had
20  actually just taken your gun. Right?
21  A. Yes.
22  Q. And was that the .38 that they took out of your house, that
23  was your gun?
24  A. No, they took a 380 out my house. I think it was the 38 --
25  it was a .38 or a .32 they took from out of Man car, the gun

Page 14124

1  that I lost before that.
2  Q. And that was back in February. Right?
3  A. I don't know when I got caught with it.
4  Q. The 380 that they took out of your grandmother's house, that
5  was not the gun that you used to shoot the police. Right?
6  A. No.
7  Q. That was a different gun?
8  A. Yes.
9  Q. And what kind of gun was that?
10  A. That was a 380 that I had -- the gun that I shot the police
11  with was a nine-millimeter.
12  Q. And when you said you called your cousin, do you mean the
13  same cousin that you were talking about this morning that was
14  also look locked up with you over at CTF?
15  A. Yes.
16  Q. And his name again?
17  A. Thomas Sims.
18  Q. And his nickname?
19  A. Mussy.
20  Q. And prior to hearing the gunshots -- I'm sorry, withdraw
21  that.
22     During the time that you're watching the two
23  individuals, they're both standing. Right?
24  A. Yes.
25  Q. And you knew -- you had just seen JJ get in that car?

Page 14125

1  A. Yes.
2  Q. And so he would be in a position to either hear the gunshots
3  or to see what happened. Right?
4     MR. GUERRERO: Objection. Speculation.
5     THE COURT: Sustained.
6  BY MS. WICKS:
7  Q. Now going back, you testified last week about an incident.
8  I think you testified you think it was in '93, in 1993, when you
9  were playing basketball in the summer months?
10  A. Yes.
11  Q. Okay. When was the first time that you told the police
12  about this incident that you say happened in 1993?
13  A. I told Steve Pfleger that, the prosecutor.
14  Q. So way back in 1998 and '99 and 2000 and 2001, when you're
15  dealing with Mr. Pfleger, you told them about this incident
16  involving Wop from 1993?
17  A. Yes.
18  Q. And it's -- well, you don't recall -- sitting here last
19  week, your testimony was, you couldn't recall who was playing
20  basketball. Right?
21  A. Yes.
22  Q. But you do recall that Wop was on a bicycle?
23  A. Yes.
24  Q. Do you recall what the bicycle looked like?
25  A. No.

1  Q. And you recall that he had a 380 that he showed you?
2  A. Naw, I can't say it was a 380.
3  Q. I'm sorry, a .38?
4  A. It looked like a .38.
5  Q. It looked like a .38 to you. Can you describe the .38?
6  A. Yes. It looked like a revolver.
7  Q. I'm sorry?
8  A. A revolver.
9  Q. Now, you're saying it was summertime, and you were wearing a
10 sweatshirt before you played basketball in the summertime here
11 in Washington, D.C. Right?
12 A. Yes.
13 Q. And you recall that was a Polo sweatshirt. Right?
14 A. Yes.
15 Q. This is not an incident -- prior to this trial, this is not
16 an incident that you ever testified about. Correct?
17 A. Naw.
18 Q. No, you did, or --
19 A. I never testified.
20 Q. Last week was the first time that you testified under oath
21 about this incident. Correct?
22 A. Correct.
23 Q. You were never asked about this in the grand jury after you
24 talked Mr. Pfleger about it. Right?
25 A. No.

1  Q. And actually, back when you were dealing with Mr. Pfleger
2  and in the Edelin case, you testified in the grand jury prior to
3  testifying in that trial. Right?
4  A. Yes.
5  Q. And in that grand jury, you didn't testify about any of the
6  instances that you're testifying about in this case. Correct?
7  A. Because he never asked me -- answered the question -- he
8  never asked me nothing about it in the grand jury.
9  Q. I understand. I'm just clarifying. In that grand jury --
10 and that was the first time that you were under oath,
11 testifying. Right?
12 A. Yes.
13 Q. And that's prior to -- you also testified for the government
14 against Lawrence Hunter. Right?
15 A. Yes.
16 Q. But you testified in the grand jury regarding the Edelin
17 case prior to testifying in that trial. Right?
18 A. Yes.
19 Q. And after testifying against Mr. Hunter, then you testified
20 against Mr. Edelin and the other co-defendants in that case.
21 Right?
22 A. Yes.
23 Q. After the incident in 1993 -- well, do you know it was 1993,
24 or sitting here today you think, you know, it was more or less
25 14 years ago?

1  A. Well, the Polo shirt that I had had just came out, so --
2  Q. So your recollection --
3  A. -- at the particular time it had 1993 right here
4  (indicating).
5  Q. Okay. But you can't recall who was playing basketball.
6  Right?
7  A. I don't remember who was playing basketball.
8  Q. After that incident, Mr. Wilson, and I'm --
9       MS. WICKS: Mr. Wilson, could you stand up?
10 BY MS. WICKS:
11 Q. This is the person that you identified as Wop. Right?
12 A. Yes.
13 Q. I'm going to call him Mr. Wilson.
14      Mr. Wilson still came around that neighborhood after
15 1993. Right?
16 A. Yes.
17 Q. And you-all were still cool after that. Right?
18 A. No.
19 Q. Well, the times that you testified about last week, these
20 shootings and these other times that you testified about --
21 well, the shootings that you testified about last week all
22 occurred in '96. Right?
23 A. Yes.
24 Q. So after the '93, there's no shootings until '96, involving
25 Mr. Wilson, that you observed. Right?

1  A. It was some shootings, but it wasn't like at me. It was
2  more at Black, JJ, Squid. It wasn't actually at me.
3  Q. Right. Was the time --
4  A. But there was still some shootings going on between --
5  Q. Hold on a second.
6       The times that you talked about shootings just last
7  week, that you came in here and testified about, he wasn't
8  shooting at you. Right?
9  A. No, he wasn't shooting at me.
10 Q. I understand. What you observed was him shooting at other
11 people. That was your testimony. Right?
12 A. Yes.
13 Q. In fact, he's never shot at you. Right?
14 A. No.
15 Q. And you've never shot at him. Right?
16 A. No.
17 Q. Your testimony in the Edelin case was that you went
18 around -- well, in the Edelin -- I'll withdraw that.
19      In 1996, after shooting Idaho, you're part of a group
20 of people that ends up with a stolen cab. Right?
21 A. Correct.
22 Q. And in that stolen cab you go around Congress Park. Right?
23 A. Yes.
24 Q. And this is one of the last things -- prior to getting
25 arrested in September '96, this is essentially the last incident

Page 14130

1  that you even testified about in the Edelin case.  Right?
2  A.  Yes.
3  Q.  In chronological order, it was the last incident that you
4  were involved in before you got arrested.  Right?
5  A.  Yes.
6  Q.  And in the Edelin case, it was your testimony that you got
7  that cab to go around Congress Park to get Tweety.  Right?
8  A.  Yes.
9  Q.  And you were under oath when you testified against
10  Mr. Edelin.  Right?
11  A.  Yes.
12       MS. WICKS:  Court's indulgence.
13  BY MS. WICKS:
14  Q.  When you testified last week, you talked about, one of the
15  places that you saw Mr. Wilson was at the community center on
16  15th Place.  Right?
17  A.  Yes.
18  Q.  After this incident that you say happened in 1993, you
19  continued to see Mr. Wilson at the community center.  Right?
20  A.  Yes.
21  Q.  And there weren't any problems at the community center.
22  Right?
23  A.  No.
24  Q.  When --
25       MS. WICKS:  Court's indulgence.

Page 14131

1  BY MS. WICKS:
2  Q.  Now, when you were having these problems with people from
3  Stanton Terrace, there was a guy that you knew from Stanton
4  Terrace named Dale.  Right?
5  A.  Yes.
6  Q.  And do you know Dale's full name?
7  A.  No.
8  Q.  Dale was short?
9  A.  Yes.
10  Q.  At least back then.  Right?
11  A.  Yes.
12  Q.  You haven't seen him since you got locked up, have you?
13  A.  Yes.
14  Q.  Yes, you have?
15  A.  No, I ain't seen him since he got locked up -- since I got
16  locked up.
17  Q.  And back then, prior to you getting arrested, he was about
18  the same height as Mr. Wilson.  Right?
19       MR. GUERRERO:  Objection, Your Honor.  Scope.
20       MS. WICKS:  May we approach, Your Honor?
21       THE COURT:  Yes.
22       (BENCH CONFERENCE ON THE RECORD.)
23       MS. WICKS:  Your Honor, my defense, at least in part,
24  to some of these shootings is misidentification.  And I believe
25  that the person that he may have thought was Mr. Wilson was not

Page 14132

1  Mr. Wilson.  It was another person from Stanton Terrace that
2  Tweety was close with, and I have a good faith basis to believe
3  did a number of things with Tweety.
4       MR. GUERRERO:  Your Honor, I didn't go into any
5  incidents about this other person.  If Ms. Wicks believes
6  that it is a misidentification, she can just go right to it and ask,
7  "Isn't it true that" -- well, I'm not going to make any
8  suggestion.  But she can just go straight to that
9  misidentification, if that's what she believes, without filling
10  in that testimony through this witness about height, weight, and
11  all this other conduct about this other person, which I didn't
12  go into.
13       THE COURT:  I thought I heard Ms. Wicks say that she
14  was asking this witness about the incident this witness did
15  testify about on direct examination, and was attempting to get a
16  description of someone else on the theory that it was the
17  misidentification about this incident he talked about on direct,
18  not some other one.
19       MS. WICKS:  Yes.
20       THE COURT:  Unless I misheard that.
21       MS. WICKS:  No, that's exactly where I was going, Your
22  Honor.
23       MR. GUERRERO:  But the name of that person that she's
24  trying get all the identification about was never incorporated
25  in the direct.  This witness never said that person was out

Page 14133

1  there.
2       THE COURT:  All right.  I think it's a fair area of
3  inquiry.  I'll allow it.
4       (END BENCH CONFERENCE.)
5       MS. WICKS:  I'm sorry.  Could I have the last question?
6       (The record is read.)
7  BY MS. WICKS:
8  Q.  Correct?
9  A.  Probably about the same height.
10  Q.  Same complexion.  Right?
11  A.  Yes.
12  Q.  Same build?
13  A.  I don't know about the build.
14  Q.  Well, it looked like he weighed about the same.  Right?
15  A.  Yeah.
16  Q.  They were both skinny back then.  Right?
17  A.  I think Dale had a little weight on him.
18  Q.  And he was a person that you associated with Stanton Terrace
19  that is just essentially a block or a little less than a block
20  away from that school, Turner Elementary.  Right?
21  A.  Correct.
22       MS. WICKS:  Court's indulgence.
23  BY MS. WICKS:
24  Q.  Now you indicated this morning, I think in response to
25  Mr. Tabackman's questions, that to your knowledge -- well, it's

Page 14134

1  to your knowledge that Antwuan raised Mr. Wilson?
2  A. Yes.
3  Q. Okay. But back in the '90s, you were spending your time up
4  on 15th Place and Congress Place. Right?
5  A. Yes.
6  Q. According -- well, you weren't hanging down in
7  Congress Park. Right?
8  A. No.
9  Q. You weren't hanging out with Mr. Wilson. Right?
10 A. No.
11 Q. You weren't hanging out with Antwuan Ball. Right?
12 A. No.
13 Q. Okay. And the bulk -- well, your testimony in the Edelin
14 case was about your association and what you did with the
15 people, specifically, mainly Squid and JJ. Right?
16 A. Yes.
17 Q. And so you weren't -- the vast majority of your time, from
18 when you first started selling drugs and essentially being
19 involved in drugs at the eight age of eight or nine until you
20 got locked up in '96, was not with Mr. Wilson. Right?
21 A. Naw.
22 Q. Was not with Mr. Ball. Right?
23 A. Naw.
24 Q. So when you say that, it's based on rumors. Right? Not
25 what you observed.

Page 14135

1  A. Based on rumors?
2  Q. Yeah. It's not based on what you observed. Right?
3  A. I mean, we wasn't hanging together.
4  Q. That's what I'm pointing out.
5  A. But we knew each other. It was like, they can come around
6  our way and chill.
7  Q. Okay. Well, when you --
8  A. When it was cool --
9  Q. Hold on a second.
10 A. When it was cool, they can do that.
11 Q. Okay.
12 A. But once the beef start, they couldn't do it no more.
13 Q. And you testified about one incident one time when you say
14 Mr. Ball was driving and Mr. Wilson was in the car with him.
15 Right?
16 A. Yes.
17 Q. But when the government asked you about seeing Mr. Wilson,
18 you testified he would come up there and see the people around
19 15th Place. Right?
20 A. Yes.
21 Q. And he would come to the community center. Right?
22 A. Yes.
23 Q. And then today I asked you about the Brooks family and the
24 Morris family. Right?
25 A. Yes.

Page 14136

1  Q. When the government found out that you had been using
2  marijuana and distributing marijuana at CTF, you still had a
3  plea agreement. Right?
4     MR. GUERRERO: Objection, Your Honor. Asked and
5  answered.
6     THE COURT: I'll allow it.
7  BY MS. WICKS:
8  Q. You still had a plea agreement. Right?
9  A. Yes.
10 Q. That plea agreement was never ripped up. Right?
11 A. No.
12 Q. You went to sentencing with that plea agreement. Right?
13 A. Yes.
14 Q. And you got eight years for that plea agreement. Right?
15 A. Yes.
16 Q. And essentially, the 50 times distributing marijuana at CTF,
17 and all the times that you possessed marijuana and used it
18 yourself, didn't matter a wit, did it?
19    MR. GUERRERO: Objection. Repetitive.
20    THE COURT: Sustained.
21    MS. WICKS: Court's indulgence.
22 BY MS. WICKS:
23 Q. Now, Mr. Tabackman was asking you questions this morning
24 about your testimony in the Edelin trial. And I believe you
25 offered the fact that one of the times -- one of the incidents

Page 14137

1  that you testified about in this case, you also testified about
2  in the Edelin case. Right?
3  A. Yes.
4  Q. Okay. And specifically, when you testified about hearing
5  gunshots and then seeing Tweety and then seeing Wop -- and I'm
6  talking about the incident where Squid fired. Right?
7  A. Yes.
8  Q. That's the incident that you testified about in the Edelin
9  case. Right?
10 A. Yes.
11 Q. And when you testified in the Edelin case you said Spook was
12 also there. Right?
13 A. Yes.
14 Q. And when you testified in the Edelin case -- well, when you
15 testified last week, you indicated it was you, Squid, and JJ.
16 Right?
17 A. Yes.
18 Q. When you testified in the Edelin case, you were testifying
19 against Wah-Luck. Right?
20 A. Yes.
21 Q. And you testified then that Wah-Luck was also out there.
22 Right?
23 A. Yes.
24 Q. And you also testified that your cousin Thomas Sims was
25 there. Right?

Page 14138

1  A. I don't remember if he was there or not.
2  Q. Well, specifically -- oh, so your testimony now is, you
3  don't recall if he was there or not?
4  A. I don't recall if he was there, but everybody else I can say
5  they was there.
6  Q. So now you're saying Wah-Luck was there?
7  A. Yes.
8  Q. And when you testified in the Edelin case -- well, when you
9  testified in the Edelin case, it was six years ago. Right?
10  July of 2001?
11  A. Yes.
12  Q. And was your memory better then or better now?
13  A. It's better.
14      MS. WICKS: Court's indulgence.
15  BY MS. WICKS:
16  Q. Well, when you testified here last week, you testified that
17  Tweety was shooting. Right?
18  A. Yes.
19  Q. Okay. And you said you saw a gun in Wop's hand. Right?
20  A. Yes.
21  Q. But you didn't know what kind of gun it was. Right?
22  A. No, I couldn't really tell what kind it was.
23  Q. And you said he wasn't shooting. Right?
24  A. Well, at the time that the gunfire was going on --
25  Q. I'm asking about what you yourself observed. I'm not asking

Page 14139

1  you to assume. You heard gunshots. Right?
2  A. Yes.
3  Q. Then you saw Tweety?
4  A. Yes.
5  Q. And Tweety shot. Right?
6  A. I couldn't really -- only thing I could see, you could just
7  hear gunfire. You can't see them shooting the gun, you could
8  just hear gunfire. After the gunfire, you could see Tweety run
9  across the street, Squid shot at him one time.
10      Then after that you see Cool Wop run from out the cut
11  and run through the alley.
12  Q. So you never saw Mr. Wilson shooting. Right?
13  A. No.
14  Q. And you never saw Tweety shooting. Right?
15  A. No.
16  Q. And you never saw Spook shooting. Right?
17  A. Naw.
18  Q. But you testified in the Edelin case that all of them were
19  shooting. Right?
20  A. Yes.
21  Q. But you didn't see that. Right?
22  A. Yes.
23  Q. Yes, you did not see it. Right?
24  A. Yes.
25  Q. And this time when you're testifying, you're saying Wop

Page 14140

1  wasn't shooting. Right? You didn't see it. Right?
2  A. I didn't see him shoot.
3  Q. You didn't see Tweety shooting?
4  A. I didn't see Tweety shoot, Spook, or him shoot. But them
5  three was in the cut, all they bullets was going to one court.
6  So if they had somebody else in the cut with them that went
7  back, that was shooting, then we'll never know. But them the
8  ones that came out the cut, so them the ones get the blame for
9  it.
10  Q. If people were in that cut and ran the other way, you didn't
11  see those people, did you?
12  A. That's what I just said. I just said, if they was in the
13  cut with them, and they ran back the other way --
14  Q. Okay.
15  A. -- then they got away with it. But them two came out, so
16  they get the blame for it.
17  Q. But when you testified under oath, all three individuals
18  were shooting in Blue's court on Congress Place --
19  A. Yes.
20  Q. -- you did not see that, did you?
21      MR. GUERRERO: Objection. Asked and answered.
22  A. I'm right across the street.
23      THE COURT: Hold on. When there's an objection, I need
24  to hear it. Sustained.
25  BY MS. WICKS:

Page 14141

1  Q. You heard gunshots, and you saw my client. Right?
2  A. Yes.
3  Q. That's your testimony?
4  A. Yes.
5      MS. WICKS: Court's indulgence.
6  BY MS. WICKS:
7  Q. And that's the same incident where you weren't sure -- well,
8  you did have a gun that day, or didn't you?
9  A. At that time I didn't remember, I wasn't sure. I wasn't
10  sure. But I did have a gun that night.
11  Q. And that incident took place after the first incident that
12  you testified about. Right?
13  A. I think it did take -- it went after that.
14  Q. Well, when the government is asking you -- last week, when
15  they're asking you about these different incidents, you first
16  talked about '93. Right?
17  A. Yes.
18  Q. Then you talked about the incident at Congress Place and
19  Stanton Road. Right?
20  A. Yes.
21  Q. Then you talked about this incident, which occurred
22  essentially more at 15th Place and Congress Place. Right?
23  A. Right.
24  Q. And in your mind, chronologically, that's how they occurred.
25  Right?

Page 14142

1  A. Right.
2  Q. And the reason why you changed your testimony between the
3  Edelin trial and this trial is because your cousin told you that
4  Wop wasn't even there, didn't he?
5  A. My cousin told me that?
6  Q. Yes. Muncy (sic).
7  A. When?
8  Q. Is that why you changed your testimony?
9  A. Naw. Why my cousin going tell me that --
10  Q. (Inaudible) --
11  A. -- why my cousin going to tell me that?
12      THE REPORTER: I didn't hear the question.
13  BY MS. WICKS:
14  Q. I'm sorry. Did your cousin ever tell you that Wop wasn't
15  even there?
16  A. Naw, my cousin ain't tell me that.
17  Q. But you're saying he was there. Right?
18  A. I don't know if my cousin was there. I can't tell you if he
19  was there.
20  Q. Well --
21  A. That isn't me remember him being there.
22  Q. You don't remember him being there. When you testified in
23  the Edelin case, you're saying he was there and you told him to
24  get off his bicycle. Right?
25  A. No, see, that's a different incident. The incident that you

Page 14143

1  talking about, it was Tweety, Joonie, and Cool Wop, they was
2  walking up the alley. This is an incident that we ain't even
3  talking about now.
4  Q. Okay.
5      MS. WICKS: May I approach the witness, Your Honor?
6      THE COURT: Yes.
7  BY MS. WICKS:
8  Q. I'm going to show you 32-G, and specifically page 13911.
9  This is the United States versus Tommy Edelin.
10  A. Right.
11  Q. This is your testimony. Right?
12  A. Yes.
13  Q. And here is a section where you're talking about Tweety
14  coming through the cut, Spook coming through the cut, and
15  Cool Wop coming through the cut. Right?
16  A. Right.
17  Q. And just prior to that, when the government started to ask
18  you about this incident, they indicate, "Does there come a time
19  when your cousin Muncy (sic) was involved in a shooting with
20  Tweety while he was on a bicycle?" Right?
21  A. Right.
22  Q. This is the only incident --
23  A. See, it don't go no farther than that?
24  Q. I'm saying that's the introduction to this portion of your
25  testimony. Do you see that question there?

Page 14144

1  A. Right. Only why I say that because --
2  Q. Hold on a second. That's on page 13909. Right?
3  A. Right.
4  Q. Just after that, on 13911, is when you're talking about
5  seeing Tweety come through the cut, Spook come through the cut,
6  and Cool Wop come through the cut. Right?
7  A. Right. Well, to be honest with you, it's wrong because --
8  Q. Mr. Green, I'm asking you the questions here.
9  A. I know you are, but I'm just saying that's wrong.
10  Q. And my last question was, when you testified about that,
11  it's on page 13911 --
12  A. Somebody did it wrong. I'm being honest with you. Somebody
13  did it wrong.
14  Q. Hold on a second. You'll have it -- if the government wants
15  you to explain it, you can explain it further.
16      And I can show you -- 32-G and 32-L I have here is all
17  of your testimony in the Edelin case. Okay?
18  A. Right.
19  Q. There's no other incident in that case where you talk about
20  Cool Wop coming through a cut. Correct?
21  A. That isn't the only incidents that I talked about.
22  Q. That one incident. Right?
23  A. The one with him and Tweety coming through Turner, and the
24  one that Spook, Tweety, and Cool Wop was in the cut. And then I
25  ain't talk about the one with him, Joonie, and Tweety.

Page 14145

1  Q. Hold on a second. So you're saying, against Mr. Edelin you
2  talked about the incident where him and Tweety came through the
3  cut by Turner?
4  A. No, not by Turner. The one on Congress, the three cuts.
5  Q. Right.
6  A. That's the one I talked about.
7  Q. I just showed you that. That's on page 13911.
8  A. That was the only one I talked about.
9  Q. That's the only one you talked about. Correct?
10      And I believe your answer to Mr. Tabackman this morning
11  was that incident you were also talking about here, right, that
12  same incident you testified against Mr. Edelin about. Right?
13  A. In the three cuts?
14  Q. Yes.
15  A. Yes.
16  Q. And that's the same as this incident that you talked about
17  on direct last week. Right?
18  A. Yes.
19      MS. WICKS: Court's indulgence.
20  BY MS. WICKS:
21  Q. When you testified in the Edelin case, you testified that
22  they were shooting in the cut. And then you saw Tweety run
23  through a cut, Spook run through a cut, and Wop run -- I'm
24  sorry, run through a cut. Right?
25  A. Only two ran through the cut, out the cut. The other one

1   ran back.
2   Q.  Well, when you said in the Edelin case that you saw the
3   shooting, that wasn't true.  Correct?
4   A.  What wasn't true?
5   Q.  You didn't see a shooting that day.  Correct?
6   A.  Correct.
7   Q.  Well, you saw a shooting because you saw Squid shooting.
8   Right?
9   A.  Yeah, he shot at Tweety when he ran out the cut.
10  Q.  The incident -- now, the incident where you and JJ are in
11  JJ's car, when you see Mr. Ball and Mr. Wilson?
12  A.  No, it's in my cousin car.
13  Q.  I'm sorry, it's in your cousin's car.  Okay.
14        And you said JJ tried to talk to Wop?
15  A.  Yes.
16  Q.  Okay.  And Wop went into the house.  Right?
17  A.  Well, it was more that he was still -- it wasn't like he was
18  rushing to go in the house, he was just --
19  Q.  Well, he didn't stop and shoot you.  Right?
20  A.  No, he didn't.
21  Q.  He didn't shoot at JJ.  Right?
22  A.  Naw.
23  Q.  He went into Marsha Brooks' house.  Right?
24  A.  Yes.
25  Q.  And that's the house that you had seen him going to several

1   other times.  Right?
2   A.  Yes.
3   Q.  And at no point did you-all try to something to him there.
4   Right?
5   A.  Yes.
6   Q.  Yes, you did not.  Correct?
7   A.  Correct.
8        MS. WICKS:  Court's indulgence.
9   BY MS. WICKS:
10  Q.  Do you recall what he was wearing that day?
11  A.  Naw.
12  Q.  Do you recall how his hair was done?
13  A.  I don't know.  He might have had plats in his hair.
14  Q.  And this is in '96 after these other incidences.  Right?
15  A.  No, this was in '95, when he went in Marsha and them house.
16  Q.  So that's before all of these shootings that you're involved
17  with in Stanton Terrace.  Right?
18  A.  In '98, '96, yeah.
19  Q.  So you're saying 1995 is the point where you see Mr. Wilson
20  in the car with Mr. Ball?
21  A.  Yes.
22  Q.  Do you recall when it was in '95?
23  A.  No.  It was during the summertime, though.
24  Q.  So summer '95?
25  A.  Yes.

1   Q.  And I think your testimony was, JJ had picked his daughter
2   up from school?
3   A.  Yes.
4   Q.  And so it was probably June '95?
5   A.  I know it was hot.
6   Q.  Okay.  So any point that it's hot in '95 when school is not
7   let out.  Right?  I mean, if he picked her up from school, she
8   went to school that day.  Right?
9   A.  Yes.
10  Q.  And obviously he was there and saw all of this.  Right?
11        MR. GUERRERO:  Objection.  Speculation.
12        THE COURT:  Sustained.
13  BY MS. WICKS:
14  Q.  He was standing there right next to the car.  Right?
15  A.  Who is you talking about?
16  Q.  JJ.  I'm sorry.
17  A.  And he saw all of what?
18  Q.  No, the government objected to that question.
19        My question was, JJ is standing right next to the car
20  that you're in on that day.  Right?
21  A.  In the doorway.
22  Q.  In the doorway.
23        Now, if you could clear the screen again.
24  A.  (Witness complies.)
25  Q.  The car that you were in, where was it?  And I'm asking you

1   to point out on 103.1.
2   A.  (Witness complies.)
3   Q.  You're marking to an area that looks -- okay.  You're
4   clearing the screen.
5   A.  It's where the car is right there.
6   Q.  There's a car right there in the photograph where your car
7   was?
8   A.  Yeah.
9   Q.  I'm sorry, where your cousin's car was.  And the other car
10  that you testified about, how did it pull into the block?  From
11  which direction?
12  A.  From Congress, it came up through --
13  Q.  From 15th Place or from Stanton Road?
14  A.  It came up 15th and made a right on Congress.
15  Q.  And your car is facing towards Stanton Road.  Right?
16  A.  Yes.
17  Q.  And you're driving the car.  Right?  I mean, you're in the
18  driver's seat.  Right?
19  A.  Yes.
20  Q.  And Mr. Ball's car is facing Stanton Road.  Right?
21  A.  Yes.
22  Q.  And he pulls up next to you?
23  A.  Yes.
24  Q.  And Mr. Wilson is in the passenger side of the car?
25  A.  Yes.

13 (Pages 14146 to 14149)

Page 14150

1    Q. And he gets out to go, and you see him eventually get into
2    Mrs. Brooks' family's residence. Right?
3    A. Yes.
4    Q. And JJ is standing in the doorway on the passenger side?
5    A. Yes.
6    Q. Now, there was a point in April of -- I'm sorry, April of
7    last year, April of 2006, where in a facility, and I'm not
8    asking what facility, but in the prison facility that you're in,
9    you were interviewed by Ms. Petalas, Detective Gus, who you had
10   known a long time. Right?
11   A. Yes.
12   Q. And there was also Special Agent Lockhart there. Right?
13   A. Yes.
14   Q. And was that the first time that you had met with Lockhart?
15   A. I think I seen him before. I think he was around once -- a
16   couple of times, I think.
17   Q. But Detective Gus was the person, I think you referred to
18   him as your agent. Right?
19   A. Yes.
20   Q. And that's who you had dealt with back in '98, '99, 2000,
21   and 2001 when you were also dealing with Mr. Pfleger. Right?
22   A. Yes.
23   Q. And when you met with them back in April of '06, last year,
24   you talked to them about a number of the things that you're
25   testifying about here in this case. Right?

Page 14151

1    A. Yes.
2    Q. And when you talked to them about the incident where you're
3    walking with Teeny Man, you told them you had heard a number of
4    shots. Right?
5    A. Yeah.
6    Q. Okay. And you told them you heard later that the weapon
7    being shot that day was a Calico. Right?
8    A. Yes.
9    Q. You told them that day you had observed Wop, Tweety, Drano,
10   and Fat Tony in the car. Right?
11   A. Yes.
12   Q. And Wop and Tweety were in the front seats. Right?
13   A. Yes.
14   Q. And Fat Tony and Drano were in the back seat. Right?
15   A. Yes.
16   Q. And this incident, similar to your testimony last Thursday,
17   took place after the other incidents in '96. Right?
18   A. Say that again.
19   Q. Well, this incident where you are with Teeny Man took place
20   in '96. Right?
21   A. Yes.
22   Q. And it took place after the other situations that we've
23   already talked about today. Right?
24   A. Yeah. Jojo was in the car too, though.
25   Q. I know. Now you're saying Jojo was in the car. But back

Page 14152

1    when you talked the FBI in April of 2006, you told them that Wop
2    and Tweety were in the front seat. Right?
3    A. Yes.
4    Q. And Drano and Fat Tony were in the back seat. Right?
5    A. Yes.
6    Q. And --
7         MS. WICKS: Court's indulgence.
8    BY MS. WICKS:
9    Q. And you never told them that Wop had a gun. Right?
10   A. Yes, he had a gun.
11   Q. I understand that you're saying now that he had a gun. But
12   when you talked to them in April of 2006, you didn't tell the
13   FBI that Wop had a gun, did you?
14   A. I might have did. I don't know.
15   Q. You forgot about that?
16   A. It's not that I forgot. It's just, sometimes like knowing
17   that I ain't talk to the agent and them in a while, they came to
18   me and was talking to me. So it was like everything was coming
19   back to me that day. Because I wasn't thinking about none of
20   that stuff or talking about none of that stuff.
21        So now it's like opening up a book again, so now I'm
22   starting to remember everything. So as I go, I was remembering
23   everything.
24        So basically, what I was saying out my mouth, they
25   probably was just writing it down.

Page 14153

1    Q. Well, do you remember them writing things down that day?
2    A. I remember them writing something down.
3    Q. Who was writing things down that day? And I'm talking about
4    the interview in April of 2006.
5    A. Ms. Ann Petalas.
6    Q. And who else? Was anybody else writing anything down?
7    A. Not that I remember. Probably was.
8         MS. WICKS: Court's indulgence.
9    BY MS. WICKS:
10   Q. When you discussed this incident last week, you indicated
11   that La-La was out there?
12   A. Yeah.
13   Q. And that there were females with La-La?
14   A. Yeah.
15   Q. Do you recall what females were out there with La-La?
16   A. They was a girlfriend.
17   Q. I'm sorry?
18   A. They was his girlfriend.
19   Q. Whose girlfriend?
20   A. La-La's girlfriend.
21   Q. Do you know her name?
22   A. Charise. I think her name was Charise. There was another
23   girl named Sharmaine. I can't think of the other girl name.
24   She used to live around there. I can't think of her name.
25        Then there was like Sharmaine's brother and somebody

14 (Pages 14150 to 14153)

Page 14154

1  else, they was all on the wall, smoking and drinking.
2  Q. And they were right there by Sharmaine's house. Right?
3  A. Yeah, Sharmaine house is on the left and they was sitting on
4  the right.
5  Q. And there were other guys out there other than La-La and
6  Sharmaine's brother. Right?
7  A. It was, I think another guy named Black. That's Charise
8  brother.
9      MS. WICKS: Court's indulgence.
10 BY MS. WICKS:
11 Q. And I think this incident, just like the other incidents,
12 took place after the police ran up in your grandmother's house.
13 Right?
14 A. I think so.
15 Q. And was this before or after shooting Idaho?
16 A. I think this was before I shot Idaho, I think. I think this
17 happened before I shot Idaho. Yeah, I think this happened
18 before I shot Idaho.
19     MS. WICKS: Court's indulgence.
20 BY MS. WICKS:
21 Q. Now, I think the government asked you some questions about
22 people that you hung with and people that you sold drugs with in
23 that neighborhood, 15th Place. Right?
24 A. Yes.
25 Q. Actually, living just almost next door to you on Alabama

Page 14155

1  Avenue, I think there was someone that you knew named Derek?
2      MR. GUERRERO: Objection. Scope.
3      MS. WICKS: May we approach, Your Honor?
4      THE COURT: Yes.
5      (BENCH CONFERENCE ON THE RECORD.)
6      MS. WICKS: I don't understand how -- I don't think
7  it's beyond the scope for me to ask about other people in that
8  neighborhood when the government brought out who he was hanging
9  with and who he was selling drugs with in that neighborhood, on
10 direct.
11     And I believe this is another individual that he was
12 hanging with in that neighborhood.
13     MR. GUERRERO: I mean, the name Derek was never
14 mentioned on direct examination. There's a purpose why
15 cross-examination is limited to direct. Just because we talk
16 about a topic and he never mentions this person Derek doesn't
17 give the defense a free-for-all to include everybody else that
18 he did not mention.
19     THE COURT: Well, is it accurate that on direct
20 examination he testified, or you asked about who he was hanging
21 out with and selling drugs with in that neighborhood?
22     MR. GUERRERO: Yes. And he never mentioned this person
23 Derek. And now the defense wants to inject this person Derek
24 into the group of people he was talking about, when we never
25 raised that.

Page 14156

1      THE COURT: Do you have a good faith belief that this
2  is somebody with whom he was selling drugs?
3      MS. WICKS: Yes.
4      THE COURT: I'll allow it.
5      (END BENCH CONFERENCE.)
6      THE COURT: But you have to wait.
7  BY MS. WICKS:
8  Q. Hanging in that neighborhood, and also selling drugs during
9  the same time period that you were hanging in that neighborhood
10 and selling drugs, was an individual named Derek. Right?
11 A. Yes.
12 Q. Do you know Derek's last name?
13 A. Huh-uh.
14 Q. Do you know where Derek lived?
15 A. He lived in the back of my house, across from me.
16 Q. Would that have been 1512 Alabama?
17 A. Yes.
18 Q. And Derek was friends with Idaho. Right?
19 A. Yes.
20 Q. And you also saw Derek hanging with a guy named Oonie.
21 Right?
22 A. Yes.
23 Q. And they were hanging -- I'm sorry?
24 A. I think that's his cousin.
25 Q. And they were hanging up in that neighborhood. Right?

Page 14157

1  A. In our neighborhood?
2  Q. Yeah.
3  A. Yeah, Oonie used to come up there all the time.
4      MS. WICKS: Court's indulgence.
5  BY MS. WICKS:
6  Q. During the three years that you were at CTF, that was prior
7  to testifying against Mr. Edelin. Right?
8  A. Yes.
9  Q. And JJ was there?
10 A. He came later.
11 Q. And your cousin Mussy. Is that his name?
12 A. Yes.
13 Q. He was there with you. Right?
14 A. Yes.
15 Q. Now, the person -- I think when Mr. Tabackman was asking you
16 questions, you also indicated there was another guy there that
17 you called Slim?
18 A. Yes.
19 Q. You don't know his name, though. Right?
20 A. No, we just called him Big Slim.
21     MS. WICKS: And actually, can I approach with
22 Mr. Guerrero, Your Honor, the court?
23     MR. GUERRERO: Court's indulgence.
24     (BENCH CONFERENCE ON THE RECORD.)
25     MS. WICKS: I'm going to get into issues of where he

15 (Pages 14154 to 14157)

1  is, but I don't want to presume that he's held at CTF, and I
2  don't think he's held at CTF during this testimony.  But I just
3  wanted -- if he was, I wanted to go into it, but I didn't want
4  to inquire in front of the jury.
5       MR. GUERRERO:  Quite frankly, Your Honor, I don't even
6  know where he is right now.  The U.S. Marshals even keep that a
7  secret from us.
8       He's in Witness Security right now, Mr. Damien Green
9  is.  And we go through main Department of Justice to get him
10  here, so it would be up to the U.S. Marshal to find out the
11  answer to that.  I don't know.  I don't believe he's at CTF, but
12  I really don't know.
13      MS. WICKS:  If I can just wait on that issue until we
14  have a break, and that will be my next area.  But I can wait
15  until a break to get a chance for them to consult, and if it's
16  not something that -- if there's no --
17      THE COURT:  For whom to consult?
18      MS. WICKS:  I don't think we need to do it right now --
19  I think it's something that I'm entitled to go into if he's
20  being held at CTF.  I don't know if he is or not, if he's being
21  held at CTF during his testimony here in this case or prior to
22  it.  And obviously, Mr. Guerrero doesn't know.
23      If that is something they can tell me about, I would
24  like to know that.
25      MR. GUERRERO:  I'm just getting a note from my

1  colleagues that we believe he is not at CTF.
2       MS. WICKS:  Okay.  Then I'm not going to go into it.
3       THE COURT:  I was going to wait until 3:45 to take a
4  break, but I think I'll just take it now unless you need to
5  continue with a few more questions.
6       MS. WICKS:  No, that would be good.  Because there's
7  areas that I'm not going to go into, obviously, because other
8  counsel has, so I can get through that during the break, and
9  then be a little expeditious in front of the jury when we get
10  back.
11      (END BENCH CONFERENCE.)
12      THE COURT:  Ladies and gentlemen, it's roughly 3:30.
13  We'll go ahead and take our mid-afternoon break at this point.
14  Please remember not to talk about the case, and to take your
15  notes with you back into the jury room.  I would ask that you be
16  back at 3:45.  Enjoy your break.
17      (Jury out at 3:29 p.m.)
18      THE COURT:  We'll see you back in 15 minutes.
19      (Recess taken at 3:30 p.m.)
20      THE COURT:  Are you ready for the jury, Ms. Wicks?
21      MS. WICKS:  Yes, Your Honor.
22      (Jury in at 3:49 p.m.)
23      THE COURT:  Good afternoon, ladies and gentlemen.
24  Welcome back.  We're ready to resume.
25      MS. WICKS:  Thank you, Your Honor.

1  BY MS. WICKS:
2  Q.  Mr. Green, also when you spoke to the FBI in April of '06,
3  you told them that Mo Brown may have been in the car when Black
4  got shot.  Right?
5  A.  Yes.
6  Q.  And that was based on what Black told you.  Right?
7  A.  Yes.
8  Q.  And when you spoke -- now, when you pled guilty to shooting
9  Idaho, you were interviewed for a PSI.  Right?  A presentence
10  report investigation for the court.  Right?
11  A.  Yes.
12  Q.  And you were also interviewed over at CTF for a Youth Act
13  study.  Right?
14  A.  Yes.
15  Q.  And you lied to the PSI writer when you told the PSI writer
16  that Idaho was reaching for his gun.  Right?
17  A.  Yes.
18  Q.  And you lied to -- you similarly lied to the Youth Act study
19  people also trying to justify the shooting, saying that Idaho
20  had a gun.  Right?
21  A.  Yes.
22  Q.  And when you said you observed Idaho reaching for his gun,
23  that was a lie to the Youth Act study people as well.  Right?
24  A.  Yes.
25  Q.  You also lied to the Youth Act study people about -- you

1  over -- well, you embellished on your use of drugs and alcohol.
2  Right?
3  A.  Yes.
4  Q.  You told them that you smoked PCP every day, drank 10 beers
5  a day, and a fifth of Hennessy.  Right?
6  A.  Yes.
7  Q.  And that was not true.  Right?
8  A.  Yes, that's true.
9  Q.  That is true?
10  A.  I drunk beer every day and I drunk Hennessy most every
11  night.
12  Q.  Well, did you drink that much on a daily basis?
13  A.  Yeah, I drank about 10 22-ounce St. Ives every day.
14  Q.  Every day?
15  A.  Every day.
16  Q.  Okay.  And a fifth of Hennessy every day?
17  A.  If I had the money for the Hennessy.  But if I ain't got the
18  money, I buy E&J.
19  Q.  A fifth of E&J?
20  A.  Yeah.
21  Q.  If you don't get a fifth of Hennessy, you get a fifth of
22  E&J.  Right?
23  A.  Yes.  But I'm drinking with it other people, too.
24  Q.  And the other people that you're drinking with are Squid and
25  JJ.  Right?

1  A. Sometimes. Sometimes it be Wah-Luck, Mark, Honky, or
2  Cooler. It depends on who goes to the liquor store with me or
3  who put in with me.
4  Q. And your drinking of this amount every day started in '93 or
5  '94. Right?
6  A. Yeah.
7  Q. And every day up until when you got locked up in 1996.
8  Right?
9  A. Yes.
10  Q. And you also told, I believe it's the presentence report
11  writer, you also told the presentence report writer that you
12  used cocaine and heroin. Right?
13  A. That's a lie.
14  Q. That was a lie, but that's what you told them. Right?
15  A. I ain't tell them that, because I ain't never used no
16  cocaine.
17  Q. I understand that. But you admit that you lied to both the
18  Youth Act people and the PSI writer back in 1996. Right?
19  A. But see, that's the thing: I'm telling you that I lied to
20  them, but if I said that I used cocaine, I would say -- tell you
21  I used it. But I didn't, and I ain't lie to them about that.
22  Q. So that's the one thing you didn't lie about in terms of
23  your drug use and your alcohol use?
24  A. I guess they put that in theyself.
25  Q. And I think your testimony was prior to going -- well, you

1  went to Lorton after you were arrested for shooting Idaho.
2  Right?
3  A. I stayed over at the jail for a minute, and then I went to
4  Lorton.
5  Q. And did you go to Lorton before or after you were sentenced?
6  A. I went to Lorton before I got sentenced.
7  Q. And your use of heroin at Lorton was before or after you
8  were sentenced?
9  A. I think I tried heroin 1997, 1997, before I went to Ohio.
10  So 1997, I was locked down, and they came in the hole and took
11  us up to Ohio, Youngstown.
12     So I used it one time in the hole.
13  Q. And my question to you is, is that before or after you were
14  sentenced by Judge Burgess?
15  A. I think I was sentenced already. I think I already got
16  sentenced.
17  Q. So when you told the PSI writer that you had used heroin,
18  that was also a lie. Right?
19  A. No, I can't say that was a lie.
20  Q. You think you may have used heroin before you got sentenced?
21  A. No, because I think -- let me see. I went to Lorton before
22  I got sentenced, and then I went to CTF for my Youth Act study.
23  Then once I got my Youth Act study, I came back, yeah, and I
24  lied to them about that.
25  Q. The incident where you were locked down at Lorton, did that

1  occur before or after you were sentenced?
2  A. What incident?
3  Q. There was an incident, a stabbing incident that you were
4  locked down for at Lorton. Right?
5  A. Yeah.
6  Q. And was that before or after you were sentenced?
7  A. That was after.
8  Q. And when you were locked down for that stabbing incident is
9  when you were in the hole and you used heroin. Right?
10  A. Yes.
11  Q. That's the truth about the one time you used heroin. Right?
12  A. Yes.
13  Q. And --
14     MS. WICKS: Court's indulgence.
15  BY MS. WICKS:
16  Q. When you -- back when you had a cooperation agreement with
17  the government in writing, that was in '98. Right?
18  A. I think it was in '97. If I'm not mistaken, I think --
19     MS. WICKS: May I approach the witness, Your Honor?
20     THE COURT: Yes.
21  A. I think it was in '97.
22  BY MS. WICKS:
23  Q. I'm going to show you Defense Wilson 32-B. And this is a
24  letter dated February 19th, '98. Do you see that here?
25  A. Yes.

1  Q. And it's regarding the United States versus Damien Green.
2  Right?
3  A. Yes.
4  Q. Does this look like your plea agreement?
5  A. Yes.
6  Q. And in your plea agreement, it includes a provision here on
7  page three that you will not commit any criminal violations --
8     MR. GUERRERO: Objection. Hearsay.
9     MS. WICKS: I'll just ask --
10     THE COURT: Sustained, but you can rephrase.
11  BY MS. WICKS:
12  Q. Part of your plea agreement was that you not commit any
13  criminal violations during the period of your cooperation.
14  Right?
15  A. Yes.
16  Q. And you violated that. Right?
17  A. How?
18  Q. I think your testimony this morning was there were 50 times
19  when you distributed marijuana at CTF. Right?
20  A. Right.
21  Q. And how many times did you have in your possession and use
22  marijuana at CTF?
23     MR. GUERRERO: Objection. Repetitive.
24     MS. WICKS: Just how many times. I don't think he's
25  been asked that question.

17 (Pages 14162 to 14165)

Page 14166

1      THE COURT:  Go ahead.
2  BY MS. WICKS:
3  Q.  How many times?
4  A.  I've been there three or four years?  Out three or
5  four years, I smoke marijuana maybe over 100 times.
6  Q.  And you still had your plea agreement when you went to
7  sentencing.  Right?
8  A.  Yes.
9      MS. WICKS:  I have no further questions, Your Honor.
10     THE COURT:  All right.  Mr. Beane?
11     MR. BEANE:  Thank you, Your Honor.
12         CROSS-EXAMINATION
13  BY MR. BEANE:
14  Q.  Good afternoon.
15  A.  All right.
16  Q.  Do you remember last week when you were testifying in your
17  direct testimony?  Do you remember that?
18  A.  Naw.
19  Q.  Okay.  Mr. Guerrero I believe was asking you questions.  Do
20  you remember that?
21  A.  Yes.
22  Q.  And about halfway through your questions by Mr. Guerrero,
23  Mr. Guerrero asked you a question about Gregory Bell.  Do you
24  remember that?
25  A.  What's his nickname?

Page 14167

1  Q.  Boy-Boy.
2  A.  Yes.
3  Q.  And Mr. Guerrero said, "Now, what about Boy-Boy?"  Do you
4  remember that question?
5  A.  Yes.
6  Q.  And he asked you how you knew Boy-Boy.  Right?
7  A.  Yes.
8  Q.  And then he asked you whether or not you ever sold drugs to
9  Boy-Boy.  Right?
10  A.  I sold drugs to Boy-Boy.
11  Q.  Mr. Guerrero asked you whether you ever sold drugs to
12  Boy-Boy -- I'm sorry, bought drugs from Boy-Boy.
13  A.  Oh, yeah.
14  Q.  And your answer was, yes, a couple of eight-balls?
15  A.  Yeah.
16  Q.  Okay.  And according to you, this happened between 1993 and
17  1996.  Right?
18  A.  Yeah.
19  Q.  Now, prior to your testimony here last week about
20  Gregory Bell, when was the first time you testified about
21  Boy-Boy selling you drugs?
22  A.  This is the first time.
23  Q.  So you've never testified to that before.  Right?
24  A.  Well, I talked to Pfleger about it.
25  Q.  When did you talk to Pfleger about it?

Page 14168

1  A.  I talked to Pfleger about all the people I bought drugs
2  from, all the people that fronted me drugs.
3  Q.  When did you do that?
4  A.  This was before the Tommy Edelin case started.
5  Q.  So before the Tommy Edelin case started, you talked to
6  Pfleger about Boy-Boy selling you drugs.  Right?
7  A.  Yes.
8  Q.  Okay.  And then after you talked to Pfleger about all the
9  drug dealing in the Edelin case, you went into the grand jury.
10  Right?
11  A.  Yes.
12  Q.  And when you went into the grand jury after talking to
13  Pfleger, you never mentioned the words Boy-Boy, did you?
14  A.  Because he never asked me.
15  Q.  He never said, "Hey, don't tell us about Boy-Boy, just tell
16  us about this."  He never said that.  Right?
17  A.  The grand jury was based on the prosecutor asking the
18  questions, and I just answered and that's it.  He never
19  mentioned Boy-Boy, so I never said nothing.
20  Q.  Just like right then I asked you a simple question, and you
21  came back with more than I was asking you.  You had that same
22  opportunity in the grand jury, didn't you?
23  A.  Yeah.
24  Q.  And when you were in there and you were asked questions
25  about Tommy Edelin and what was going on, you never did that;

Page 14169

1  you never said Boy-Boy also sold me drugs?
2  A.  I told Mr. Pfleger that I got drugs from Boy-Boy, but it
3  ain't go in the grand jury statement.
4  Q.  Okay.  That's fine.
5      Now, before you got here today, I believe you indicated
6  you were contacted about two weeks ago by somebody from the
7  government.  Right?
8  A.  Yes.
9  Q.  And that was Gus.  Correct?
10  A.  Yes.
11  Q.  And who else?
12  A.  Ms. Ann Petalas and another detective.
13  Q.  So Ms. Petalas contacted you as well?
14  A.  Yes.
15  Q.  Did she come meet with you or did she give you a phone call?
16  How did Ms. Petalas contact you?
17  A.  I talked to them a couple of times first, and then they came
18  to see me.
19  Q.  So you talked to Ms. Petalas a couple of times before they
20  went to see you?
21  A.  Yes.
22  Q.  And in those conversations -- well, before you talked to --
23  before you met with Ms. Petalas, did you talk to her about
24  Boy-Boy?
25  A.  I think I did.  I think I did.

18 (Pages 14166 to 14169)

Page 14170

1   Q. You talked to her on the phone about it?
2   A. Yeah, I think -- yeah.
3   Q. How long was this phone call you had with Ms. Petalas?
4   A. No longer than 45 minutes, 30 minutes.  It wasn't that long.
5   Q. And during this conversation, did you talk to her about your
6   testimony here today?
7   A. Yes, I did.
8   Q. And you talked to her about all the things you've already
9   said on direct testimony.  Right?
10  A. Yes.
11  Q. And at some point you yourself bring up Boy-Boy.  Is that
12  correct?
13  A. Yes.
14  Q. So Ms. Petalas or somebody from the government doesn't say,
15  "Hey, what about Boy-Boy?  Do you know Boy-Boy?"
16  A. Yeah, they asked me did I know him.
17  Q. So they brought it up first?
18  A. Yeah.
19  Q. And when they brought it up, you said to them, "Yeah, I know
20  Boy-Boy, he sold me a couple of eight-balls."  Right?
21  A. Right.
22  Q. And then you told them the date on which he sold you the
23  eight-balls.  Right?
24  A. No, I don't remember the date.
25  Q. Well, you told us that he sold you eight-balls.  You let us

Page 14171

1   know what date that was.
2   A. I don't know what date it was, but it was between 1993 and
3   between 1996.  During the summer 1996, I had ran into him and
4   got some from him, but during the long period of time, I ain't
5   get that much from him.  I bought probably no more than six
6   eight-balls from him.  I used to buy wholesales from him.  He
7   used to give me wholesales.
8   Q. This is between 1993 and 1996.  Yes?
9   A. Yes.
10  Q. When was it that Reecy was killed?
11  A. Reecy was killed in '93.
12  Q. And then Reecy's killing was when the beefing started.
13  Right?
14  A. Yes.
15  Q. And who was beefing?
16  A. It was us against Congress Park.
17  Q. So the 1-5 Mob against Congress Park?
18  A. Yes.
19  Q. And Tommy Edelin was in charge of 1-5 Mob, wasn't he?
20  A. Yeah.
21  Q. Okay.  And you told us that Tommy Edelin was your main
22  supplier of crack.  Right?
23  A. Well, he was the main supplier.  You had other main
24  suppliers, too.
25  Q. So if he's your main supplier and his crew is beefing with

Page 14172

1   Congress Park, and you're saying that Mr. Bell is a member of
2   Congress Park, why in the world would you go buy drugs from your
3   competitor?
4   A. Because you got to understand, it's like this:
5   Congress Park was getting drugs from Tommy, too.
6   Q. So Congress Park and Tommy Edelin were not beefing?
7   A. It wasn't that Tommy was beefing with them with a gun.  What
8   I'm trying to say is the beef come from Reecy robbing one of
9   Tommy's guys, so they put a hit out on Reecy.  So once Reecy got
10  killed, that's when Antwuan and them got mad and they ain't like
11  when Squid killed Reecy.
12       So it was more focused on Squid at first, then as it
13  got bigger --
14  Q. Wait a minute.  My question to you was about your going to
15  buy drugs from Tommy Edelin's competitor.  Okay?
16  A. He's not a competitor to Tommy.  He ain't on Tommy level.
17  Q. Okay.  Well, wait a minute.  But you're buying drugs from
18  Tommy.  Tommy is your supplier.  Right?
19  A. I never bought drugs from Tommy.
20  Q. Tommy was not supplying you with drugs?
21  A. No.  I used to get drugs from his father.  I never went and
22  got drugs from Tommy.  I never even seen a dime in Tommy hand.
23  Q. What about Eric?  You testified last week that Eric supplied
24  you with drugs as well.
25  A. I went to him and bought wholesales from him too before.

Page 14173

1   Q. Okay.  But Eric got his drugs from Tommy's father, didn't
2   he?
3   A. Naw, he get it from Tommy --
4   Q. He got his drugs from Tommy --
5   A. -- he ain't get it from his father.
6        THE REPORTER:  I'm sorry, I can't hear your question
7   when he's still talking.
8   BY MR. BEANE:
9   Q. So he got, meaning Eric, also got his drugs from Tommy.
10  Right?
11  A. Yeah.
12  Q. Now, you know that out on the street, selling drugs is a
13  competition, isn't it?
14  A. Yeah, you could say it's a competition.  But, I mean, it
15  ain't a competition when you ain't got drugs like this man here.
16  Q. Well, wait a minute.  So Mr. Edelin is out there selling
17  drugs, but he doesn't care about his competitors?
18  A. You got to understand, Tommy, he was the type of guy, you
19  never see him with a drug in his hand.  You never see him --
20  Q. That's not my question.
21  A. -- so he had other people running it for him.
22  Q. But that's not my question.  Mr. Edelin was in fact selling
23  or supplying drugs to other people.  Right?
24  A. Yeah.
25  Q. And according to you, Mr. Bell was also supplying drugs to

19 (Pages 14170 to 14173)

Page 14174

1  other people.  Right?
2  A. Yeah.
3  Q. And we can at least agree that when two people are selling
4  the same things in the same area, they are in competition with
5  each other.  Right?
6  A. Well, not really.  Because just like in 1-5, you had a guy
7  named Dune (ph) was selling a lot of coke.  He was getting coke
8  from other places.  That don't mean you got to be mad at him
9  because he got coke.
10  Q. Okay.  All right.  If you say so.
11      At some point last week you said you knew Gregory Bell
12  through his brother Santuce.  Is that right?
13  A. Right.
14  Q. Who introduced you to Mr. Bell?
15  A. Naw, it just you grow up -- you grew up around him.  It's
16  like I went to Johnson, I went to Malcolm X, so I ran into
17  Boy-Boy all my life, at the store.  Boy-Boy a cool dude.  He was
18  a cool dude on the street.  I ain't never had no beef with
19  Boy-Boy; Boy-Boy ain't never had no beef with me.  He never
20  showed me no gun, I never showed him no gun.  I never
21  disrespected him or nothing.
22  Q. All right.  That's fair.  Let me ask you this:  You say that
23  at some point you come down and you actually speak to the
24  government in person.  Right?
25  A. Yes.

Page 14175

1  Q. Yes?  When was that?
2  A. Last Friday.
3  Q. Last Friday?
4  A. No, I came down last Tuesday.
5  Q. And who did you talk to in that meeting?
6  A. On a Wednesday, I talked to Mr. Guerrero.
7  Q. Anybody else in there?
8  A. The marshals and the agent.
9  Q. How about Ms. Petalas?  Was she there?
10  A. She came in there for a minute.
11  Q. And when Ms. Petalas was in there, did she ask you about
12  Mr. Bell again?
13  A. Not that I know of, no.
14  Q. Did anybody ever ask you on what day you sold cocaine or
15  crack to Mr. Bell?
16  A. No, we ain't never talk about what day, but I talked about
17  buying the coke from him.
18  Q. But you never really gave them a date or time frame.  Right?
19  A. Naw.
20      MR. BEANE:  Court's indulgence.
21  BY MR. BEANE:
22  Q. Just a couple more questions.
23      Do you actually know where Mr. Bell lives?
24  A. I know he lived around Congress Park.  I don't know what
25  exactly door, but I know -- I think it was across the street

Page 14176

1  from the rental office.
2  Q. Across the street from the rental office?
3  A. I think so.
4  Q. That's where he lived with his family?
5  A. Yeah, with his mother.  Last time I know, it was his mother
6  and his brothers and sisters.
7  Q. Always lived there?
8  A. They always lived there.
9  Q. Never moved?
10  A. Not that I know of.
11  Q. Thank you.
12      MR. BEANE:  Nothing further.
13      THE COURT:  All right.  Anything further?
14      REDIRECT EXAMINATION
15  BY MR. GUERRERO:
16  Q. Good afternoon, Mr. Green.
17  A. All right.
18  Q. Mr. Green, I would like to go back to last week when
19  Mr. Tabackman was asking you some questions about you shooting
20  at police officers.  Do you remember that?
21  A. Yes.
22  Q. And during that cross-examination, the word "murders" were
23  used.  Was it your understanding that anyone was killed as a
24  result of you shooting at that car?
25  A. No.

Page 14177

1  Q. And in fact, did you plead guilty to that as part of your
2  RICO conspiracy case?
3  A. Yes.
4  Q. Mr. Tabackman was asking you about your life-style back
5  then, and you said in response to that that you violated that
6  life-style and you can't go back.  What do you mean by that?
7  Explain.
8  A. That mean that I testified on my friends, I hurt a lot of
9  people in my family and they family.  It's a lot of stuff that I
10  done that I can't go back to.  I have to change my life.
11  Q. Have you told the government everything that you had done
12  back out in 1993 or 1996?
13  A. Yes.
14  Q. You mentioned in that cross-examination that at one point
15  Antwuan and Jojo were part of Young Young Crew.  Do you remember
16  that?
17  A. Yes.
18  Q. Explain that.
19  A. They grew up around Tommy.  They grew up around --
20      MR. MARTIN:  Objection.  Basis of knowledge, 602, Your
21  Honor.
22      MR. TABACKMAN:  Objection.
23      THE COURT:  Let's establish the foundation.
24  BY MR. GUERRERO:
25  Q. Tell us, if you know, did you ever see them as part of

20  (Pages 14174 to 14177)

United States District Court    kingreporter2@verizon.net    Rebecca Stonestreet, RPR, CRR
For the District of Columbia 202-354-3249        Official Court Reporter

1  Young Young Crew?
2  A. Yes.
3  Q. And what did you see them do?
4  A. They used to hang with Tommy, they used to gang up and go
5  places and fight other places. Tommy was the leader. I was
6  young then, but, you know, it was in my neighborhood, so I
7  always was seeing it. So...
8  Q. Did there come a point when Reecy was killed that that
9  changed?
10  A. Yes.
11  Q. And what did you see change?
12  A. It was more as once Reecy got killed, Tommy and them was
13  still talking to Antwuan and all them; it was more as Antwuan
14  was messed up at Tommy and them, but --
15      MR. TABACKMAN: Objection. 602.
16      MR. MARTIN: Objection also, Your Honor. If we could
17  have a time frame, please.
18      THE COURT: Establish foundation and time frame.
19      MR. TABACKMAN: And an ability to see, an opportunity
20  to observe what he's testifying to.
21  BY MR. GUERRERO:
22  Q. Tell us what you saw, Mr. Green.
23  A. It's like I said, once Reecy got killed and -- it was more
24  like Antwuan was messed up at Squid.  He was --
25      MR. ZUCKER: Objection. Foundation.

1  BY MR. GUERRERO:
2  Q. Did you see that with your own eyes?
3  A. Yes.
4      MR. ZUCKER: Objection to -- could we approach for a
5  second?
6      THE COURT: No. Put another question to make clear
7  what that means.
8  BY MR. GUERRERO:
9  Q. Only tell us what you saw with your own eyes that made you
10  conclude that.
11  A. I already knew Squid had killed Reecy, but I never talked to
12  Squid about it after the fact.
13      But me and Squid was standing in front of the center,
14  and Antwuan rolled down the street.  Tony pulled him over, and
15  we went to go talk to him.
16  Q. When you say Squid, is that Tony Edelin?
17  A. No, Squid is I think Ronnie Middleton, I think.
18  Q. So go ahead.  You're telling us about the rec center.
19  A. Tony stopped Antwuan, and Antwuan pulled over.  He was
20  driving a brown van.  And like the center was right here
21  (indicating), he pulled a little further up.
22      So Squid was like, "Let me holler at you," and Antwuan
23  was like, "Fuck naw, you killed my man." So Squid was like,
24  "Well, fuck you, then." Excuse my language.
25      So that was that.  So Squid ain't say nothing, but --

1  Squid was mad, but it was a done deal.
2  Q. And after that, is that when all the shootings that you
3  testified to in the last week or so occurred, between '93 and
4  '96, after Reecy was killed?
5  A. Yes.  Even though him and Antwuan didn't get along, we
6  already knew that Squid was a target.  But it ain't like --
7      MR. MARTIN: Objection as to speculation.
8      MS. WICKS: Objection.
9      THE COURT: Sustained.
10     MR. TABACKMAN: Hearsay.
11     THE COURT: I sustained the objection.
12     MR. TABACKMAN: I didn't hear, Your Honor.
13  BY MR. GUERRERO:
14  Q. Let me move on to a different topic.  You said in
15  cross-examination with Mr. Tabackman that it wouldn't be
16  uncommon when you go to a go-go club and they yell out your
17  street --
18     MR. ZUCKER: Objection.
19     THE COURT: Let him finish the question.
20  BY MR. GUERRERO:
21  Q. Do you remember that?
22  A. Say that again.
23  Q. You said in cross-examination to Mr. Tabackman that it
24  wouldn't be uncommon that you go to a go-go club and you would
25  yell out your street name?

1  A. Right.
2      THE COURT: Objection is overruled.
3  BY MR. GUERRERO:
4  Q. Did you ever hear the name Congress Park yelled out?
5      MS. WICKS: Objection. Hearsay.
6      THE COURT: Overruled.
7  A. Once in the blue.
8  BY MR. GUERRERO:
9  Q. Let's talk about your drug abuse.  Okay?  PCP, remember
10  that?
11  A. Right.
12  Q. You said that you actually used Woodies or Shermans before?
13  A. Naw.  I smoked Shermans, but I never smoked Woodies.
14  Q. And the instances that we talked about with Antwuan Ball
15  being at the rec center, were you under the influence of PCP
16  then?
17  A. No.
18  Q. How about when Cool Wop, and the incident that we talked
19  about with Squid and Sabrina off Stanton Road, were you on PCP
20  then?
21  A. Naw, but I had something to drink, though.
22  Q. Was there any doubt in your mind that you saw Antwuan over
23  at the rec center?
24     MR. TABACKMAN: Objection. Leading.
25     THE COURT: Overruled.

Page 14182

1   BY MR. GUERRERO:
2   Q. You can answer.
3   A. I saw him.
4   Q. And was there any doubt in your mind that you saw Wop around
5   the area where Squid and Sabrina on Stanton Road incident?
6   A. Yes.
7   Q. Is there any doubt or no doubt?
8   A. No, there's no doubt.
9           MS. WICKS: Objection. Leading.
10          THE COURT: Overruled.
11          MR. GUERRERO: Court's indulgence.
12  BY MR. GUERRERO:
13  Q. How about the incident that happened over on -- there was
14  three cuts that you were talking about with Wop and Tweety. Do
15  you remember that?
16  A. Yes.
17  Q. Was there any doubt in your mind then that Wop and Tweety
18  were there?
19  A. No, there wasn't no doubt. They was there.
20  Q. Were you under the influence of PCP?
21  A. I probably had something to drink. I don't remember having
22  no PCP.
23  Q. Now, that's the incident that Ms. Wicks was talking about
24  with Spook being involved in that, too. Right?
25  A. Yes.

Page 14183

1   Q. I believe that's the incident that she talked about that you
2   testified in the Edelin case whether or not you saw Wop and
3   Tweety shooting. Do you remember that?
4   A. Right. But she turned it around to a different case.
5           MR. MARTIN: Objection.
6   BY MR. GUERRERO:
7   Q. And you were trying to explain that --
8           MR. ZUCKER: Objection.
9           MS. WICKS: Objection.
10          THE COURT: Sustained.
11  BY MR. GUERRERO:
12  Q. You were explaining in response to that incident that there
13  was a different incident --
14          MR. ZUCKER: Objection.
15          MS. WICKS: Objection.
16  BY MR. GUERRERO:
17  Q. -- involving Joonie --
18          MR. ZUCKER: Same objection.
19  BY MR. GUERRERO:
20  Q. -- do you remember that?
21          THE COURT: Let him finish the question.
22  A. Yes.
23          THE COURT: Hold on. Let him finish the question.
24          MR. GUERRERO: That was my question, Your Honor.
25          THE COURT: What is the question?

Page 14184

1   BY MR. GUERRERO:
2   Q. In response to that topic, you were explaining that there
3   was a different incident that she was talking about that
4   involved Joonie. Do you remember that?
5   A. Yes.
6           MS. WICKS: Objection.
7           THE COURT: Overruled.
8           MS. WICKS: May we approach?
9           THE COURT: No. Overruled.
10  BY MR. GUERRERO:
11  Q. And what was the misunderstanding? Are there two different
12  incidents?
13  A. Yes.
14  Q. And tell us about this other incident that you were talking
15  about.
16          MS. WICKS: Objection.
17          THE COURT: Basis?
18          MS. WICKS: May we approach, Your Honor?
19          THE COURT: All right.
20          (BENCH CONFERENCE ON THE RECORD.)
21          MS. WICKS: Your Honor, my cross-examination was based
22  on his answer to Mr. Tabackman, which was there was one incident
23  that he testified about in Edelin that was the same as one of
24  the incidents that he testified about here. That's where my
25  cross-examination was. In response to one of my questions, he

Page 14185

1   brought up another shooting. I didn't go into that. So I think
2   it's beyond the -- first of all, I think it's beyond the scope.
3           Second of all, I mean, this is their witness that's now
4   coming up with something else that they didn't bring out on
5   direct, that I didn't bring out on cross. Specifically after --
6   twice, because he answered it to Mr. Tabackman and he answered
7   it to me that there was one incident at the Edelin trial that he
8   talked about that was the same as one of the incidents here.
9           Now, because he came up with yet another incident, it
10  came out of his mouth. It's not something I went into. So I
11  don't see how this isn't beyond the scope, not to mention it's
12  completely prejudicial, because I have to go on what he's
13  saying, that it's the same incident that he had testified about
14  at Edelin that he testified about here. This is a completely
15  different incident.
16          MR. GUERRERO: That was the whole purpose of clearing
17  it up, Your Honor. And on cross-examination, when he tried to
18  explain this, Ms. Wicks even said, "Hold up, don't answer
19  anything. If the government wants to do a redirect and clear
20  this up, you'll have a chance to do it."
21          We have a right to clear this up and rehabilitate the
22  witness about whether or not he was being misled that the two
23  incidences were one and the same, or whether they're separate
24  and distinct.
25          THE COURT: Did you want to add something else?

22 (Pages 14182 to 14185)

Page 14186

1       MS. WICKS:  I cut him off because it was nonresponsive
2   to my question at that point and I chose not to go into it.  So
3   I don't think the government can now.
4       THE COURT:  I'm going to allow it.  Overruled.
5       (END BENCH CONFERENCE.)
6   BY MR. GUERRERO:
7   Q.  My question was, was there a different incident that you
8   were trying to explain that involved June Bug?  Is it June Bug?
9   A.  It's Joonie.
10  Q.  And tell us about that.
11  A.  Well, it was one night, it was me, my cousin Anthony, and
12  Brad, and we was in the alley on Stanton Road.  A blue car kept
13  riding around, so Honky and Cooler was telling us that it was
14  Tweety and them riding around in the car.
15      So I had called my cousin on the phone and told him to
16  come around the way, Mussy.  So it was me, Mussy, my cousin
17  Anthony, and Brad, we was standing in the cut by Monkey Mark
18  house.
19      And so three guys was walking towards us, and we was
20  looking.  At first we was saying who it was, because --
21      MS. WICKS:  Objection as to "we" and narrative.
22  BY MR. GUERRERO:
23  Q.  Could you see who it was?
24      MR. GUERRRERO:  I'll rephrase.
25      THE COURT:  Sustained.

Page 14187

1   A.  At first I couldn't see who it was.
2   BY MR. GUERRERO:
3   Q.  Did you eventually see who it was?
4   A.  Yeah, eventually.  Because when they was coming through the
5   cut, you know, it was dark.  The trees and stuff, we couldn't
6   see them.
7       Once they crossed to the alley --
8   Q.  What did you see?
9   A.  The light, it was Joonie, Tweety, and Cool Wop.  And by that
10  time, my cousin already had asked who it was like twice.
11      So they didn't answer who it was, so my cousin Anthony
12  said, "If you-all don't say who it is" --
13      MS. WICKS:  Objection.
14      THE COURT:  Sustained.
15  BY MR. GUERRERO:
16  Q.  Without telling us what Anthony said, what happened next?
17  A.  My cousin start shooting at them.
18  Q.  Shooting at whom?
19  A.  Shooting at Tweety, Cool Wop and them.
20  Q.  And did you see Wop with a gun at that point?
21      MR. ZUCKER:  Objection.  Leading.
22      THE COURT:  Sustained.
23  BY MR. GUERRERO:
24  Q.  Did you see anything in Cool Wop's hand?
25  A.  Yeah.

Page 14188

1   Q.  What did you see?
2   A.  I seen a gun, but I can't tell what type of gun it was or
3   nothing like that.
4   Q.  How about any of the other guys?  Did you see anything in
5   their hands?
6   A.  Naw, I just seen the gun in Joonie hand and Cool Wop hand.
7   Tweety, I couldn't really see what he had in his hand.
8   Q.  Now, that's a different incident than what Ms. Wicks was
9   asking you about --
10      MR. ZUCKER:  Objection.  Leading.
11      THE COURT:  Sustained.
12  A.  Yeah, it was --
13      MS. WICKS:  Objection.
14      MR. ZUCKER:  Objection.
15      THE COURT:  Let him put a question.
16  BY MR. GUERRERO:
17  Q.  Let me ask a better question.  Was that the same incident or
18  a different incident than what Ms. Wicks was asking you about?
19  A.  It was different.
20  Q.  Now let's talk about Mr. Carter's incident, Bradley Carter.
21  Do you remember that?  Mr. Tabackman was asking you about the
22  number of times you talked to the government about that
23  incident?
24  A.  Yes.
25  Q.  When was the first time you actually met with me?

Page 14189

1   A.  I think I talked to you on the phone first.  Right?  That
2   was last week, I think, last Friday.  No -- yeah, last Friday.
3   Q.  Was it in the month of May?
4   A.  Yes.
5   Q.  And before the month of May of 2007, had we ever talked at
6   all?
7   A.  Naw.
8   Q.  And when you actually came here from -- are you in prison
9   right now?
10  A.  Yes.
11  Q.  And when you came here, did you and I meet?
12  A.  Yes.
13  Q.  And in that meeting, did we talk about the Bradley Carter
14  incident?
15  A.  Yes.
16  Q.  Were you ever told to say something --
17      MR. TABACKMAN:  Objection (inaudible).
18  BY MR. GUERRERO:
19  Q.  -- that you thought was untrue about the Bradley Carter
20  incident?
21      THE COURT:  Overruled.
22      THE REPORTER:  I didn't hear the objection anyway.  I
23  didn't hear what you said.
24      MR. TABACKMAN:  Leading.
25  BY MR. GUERRERO:

23 (Pages 14186 to 14189)

United States District Court   kingreporter2@verizon.net   Rebecca Stonestreet, RPR, CRR
For the District of Columbia 202-354-3249   Official Court Reporter

Page 14190

1  Q. You may answer.
2  A. Yes, we was talking about -- we talked about it.
3  Q. Were you ever told what to say?
4  A. No.
5  Q. Were you ever -- were you ever told what words to testify
6  about?
7  A. Naw.
8  Q. Had you gone into as much detail about the Bradley Carter
9  incident before when you talked to Mr. Pfleger?
10  A. Well, I told some details, not all. I just told some. I
11  basically told him what he wanted. I gave him what he wanted,
12  what he asked for.
13  Q. And was he ever really asking about the Bradley Carter
14  incident in as much detail, or was he focusing on other things?
15  A. He asked about it, but his focus was mostly on Tommy and
16  them.
17  Q. Now, Mr. Tabackman was asking you along the same topic about
18  whether or not you were trying to be accurate in the Edelin
19  case. Do you remember that?
20  A. Yes.
21  Q. And I think at one point in response to that you said,
22  quote, "Naw, I wasn't." Do you remember that?
23  A. I think I do remember that.
24  Q. Were you telling the truth when you testified in
25  Tommy Edelin's case?

Page 14191

1  A. Yes.
2  Q. Did they focus in that case on Congress Park?
3  A. They talked about Congress Park a lot, because that's what
4  started the whole conspiracy --
5      MR. TABACKMAN: Objection, Your Honor. May we
6  approach?
7      THE COURT: No. Rephrase your question.
8  BY MR. GUERRERO:
9  Q. Were you asked to give specific details about the same
10  incidents that we've been talking to you about?
11  A. Yes. Yes.
12  Q. And do you recall if all that specific detail came out, or
13  was it more specific here?
14  A. No, all of it didn't come out. Some came out --
15      MR. TABACKMAN: Objection, Your Honor.
16  A. -- here that didn't come out there, and, I mean, there's
17  probably still some that didn't come out.
18  BY MR. GUERRERO:
19  Q. Did you just say some came out here that did not come out
20  there?
21      MR. ZUCKER: Objection.
22  A. Yeah.
23      THE COURT: Overruled.
24  BY MR. GUERRERO:
25  Q. Was Antwuan Ball standing trial in that case?

Page 14192

1      MR. TABACKMAN: Objection. Irrelevant.
2      THE COURT: Overruled.
3  A. No.
4  BY MR. GUERRERO:
5  Q. Was David Wilson, or Cool Wop, one of the defendants in that
6  case?
7  A. No.
8  Q. Was Joseph Jones, or Jojo, one of the defendants in that
9  case?
10  A. No.
11  Q. Was Gregory Bell, or Boy-Boy, one of the defendants in that
12  case?
13  A. No.
14  Q. Let's talk about your five to 15 years that you're serving
15  time for, a sentence issued by Judge Burgess. Do you remember
16  that?
17  A. Right.
18  Q. How much time do you have left remaining?
19  A. Five.
20  Q. And you were asked whether or not you wrote me a letter. Do
21  you remember that?
22  A. Right.
23  Q. And in that letter you are asking for what?
24  A. A sentence modification.
25  Q. A sentence modification?

Page 14193

1  A. Yes.
2  Q. What do you mean? Explain that.
3  A. Well, I didn't know what it mean at first. It was based on
4  talking to a couple of inmates about the way it was said, and I
5  let them know that I might have to testify.
6      So knowing that I was going to testify anyway, but my
7  whole thing is, what can I get out of it if I'm going to
8  testify? Because I feel as that I shouldn't testify for
9  nothing.
10  Q. And so you're seeking a letter from us --
11      MR. ZUCKER: Objection. Leading.
12  Q. -- to the judge?
13      THE COURT: Sustained.
14  BY MR. GUERRERO:
15  Q. What is it that you want in the letter from the government?
16  A. Well, I want a letter for the -- to go to the judge to see
17  if I can get a sentence modification.
18  Q. Have you asked for that type of letter before from the
19  government?
20  A. No.
21  Q. Have you ever asked from the government a letter to your
22  parole board?
23  A. Yes.
24  Q. How many have you gotten from the government?
25      MR. BALAREZO: Your Honor, objection. This has been

24 (Pages 14190 to 14193)

Page 14194

1    asked and answered in direct.
2            THE COURT: I'll allow it.
3    A. Two.
4    BY MR. GUERRERO:
5    Q. And let's talk about the first one. When you got the letter
6    from the government the first time, did it help you or did your
7    sentence remain the same?
8            MR. BALAREZO: Objection. Asked and answered.
9            MR. TABACKMAN: Asked and answered.
10           THE COURT: Sustained.
11           MR. GUERRERO: Opened up on cross-examination,
12   Your Honor.
13           THE COURT: It's covered. Go ahead.
14   BY MR. GUERRERO:
15   Q. The second letter that you got, was that from Mr. Pfleger or
16   from Ms. Petalas?
17   A. Ms. Petalas.
18           MR. TABACKMAN: Objection. Asked and answered.
19           THE COURT: I'll allow it.
20   BY MR. GUERRERO:
21   Q. Now, that letter that you asked for when you got it from
22   Ms. Petalas, had you talked about the Congress Park case to the
23   government?
24   A. No. As a matter of fact, I ain't really -- I talked about
25   it a little bit with Gus on the phone, but I'm trying to

Page 14195

1    think -- I think I did talk to her. Yeah, I think yeah.
2    Q. And did you get the letter?
3    A. I got the letter --
4            MR. TABACKMAN: Objection. Asked and answered.
5            MR. BALAREZO: Objection.
6    A. Yeah, I'm trying to think -- I got the letter --
7            MR. BALAREZO: Objection.
8    A. -- she faxed a letter to me.
9            THE COURT: I'll allow it. Go ahead.
10   BY MR. GUERRERO:
11   Q. And after you got the letter -- well, before we even go
12   there, did you get any promises from the government with respect
13   to that letter as to what the parole board would do with it?
14   A. Naw.
15   Q. And did you get any promises -- now you're seeking another
16   letter. Right?
17   A. Yes.
18   Q. To Judge Burgess. And have you gotten any promises at all
19   from the government as to what Judge Burgess --
20           MR. TABACKMAN: Objection. Argumentative.
21   BY MR. GUERRERO:
22   Q. -- is going to do?
23           THE COURT: Let him finish the question. Finish the
24   question.
25   BY MR. GUERRERO:

Page 14196

1    Q. Have you gotten any promises from the government with
2    respect to that letter as to what Judge Burgess is going to do
3    with it or not?
4            THE COURT: The objection is overruled.
5    A. No, I don't get no promise.
6    BY MR. GUERRERO:
7    Q. And in fact, you've testified for the government on more
8    than just this case, haven't you?
9    A. Yes.
10   Q. And all this time, where have you been?
11   A. In jail.
12   Q. In prison?
13   A. Yes.
14   Q. You said that in your experience in knowing Antwuan Ball,
15   Antwuan Ball and Cool Wop, you characterized them as Cool Wop
16   always hung under Antwuan. Do you remember that?
17   A. Correct.
18   Q. Take a look at Government's Exhibit 108.43, marked and
19   admitted.
20           MS. WICKS: Objection, Your Honor. May we approach?
21           THE COURT: Yes.
22           (BENCH CONFERENCE ON THE RECORD.)
23           MS. WICKS: Your Honor, I believe it's a photograph
24   that -- it's in evidence, I believe, but it's a photograph
25   that's taken in Congress Park, and I believe his testimony was

Page 14197

1    that he didn't hang out in Congress Park. So showing him a
2    photograph of defendants taken in Congress Park, I don't
3    understand what the point of that is, since he testified that he
4    wasn't there.
5            THE COURT: I don't even know what's in the photograph.
6            MS. WICKS: I believe it's a photograph of Antwuan and
7    Mr. Wilson -- I'm sorry, Mr. Ball and Mr. Wilson.
8            MR. GUERRERO: That's exactly correct, Your Honor.
9    It's a photograph that corroborates the relationship between the
10   two. It's already marked and admitted into evidence.
11           MR. TABACKMAN: Your Honor, it is argumentative.
12   That's really what its purpose is, is a form of argument.
13           THE COURT: Overruled. I'll allow it.
14           MS. WICKS: Your Honor, actually, one more thing. I
15   think this photograph was seized in 2004, which would be eight
16   years after this individual was locked up. So I think I would
17   ask for a recross on that.
18           THE COURT: No. Overruled.
19           (END BENCH CONFERENCE.)
20   BY MR. GUERRERO:
21   Q. Can you clear the screen there, Mr. Green, if you touch the
22   lower right-hand corner? If we can pull up 108.43.
23           Do you see Government's Exhibit 108.43 in front of you?
24   A. Yes.
25   Q. Who do you see there?

1    A.  I see Cool Wop and Antwuan.
2    Q.  What is Cool Wop wearing?
3    A.  He wearing a yellow shirt.
4    Q.  Speak up nice and loud.  I can't hear you.
5    A.  He wearing a yellow shirt with -- I can't see what that say
6    on there.  He got cornrows in his hair.
7    Q.  And who is standing next to Cool Wop?
8    A.  Antwuan.
9    Q.  And is Antwuan the taller of the two?
10   A.  Yes.
11   Q.  What is Antwuan wearing?
12   A.  An orange shirt, orange T-shirt.
13   Q.  Where is Antwuan's arm?
14   A.  Wrapped around Cool Wop.
15       MR. GUERRERO:  Thank you, Mr. Mazzitelli.
16   BY MR. GUERRERO:
17   Q.  Let me talk to you about your time at CTF at some point.  Do
18   you remember that?
19   A.  Yes.
20   Q.  You mentioned that while you were at CTF, there were other
21   people that were cooperating that you recognized.  Do you
22   remember that?
23   A.  Yes.
24   Q.  Were you ever told what to say by anyone else about
25   Congress Park?

1    A.  Naw.
2        MR. TABACKMAN:  Objection.  Argumentative and leading.
3        THE COURT:  Overruled.
4    BY MR. GUERRERO:
5    Q.  I want to go back to this incident that Ms. Wicks was asking
6    you about with Wop and Tweety and Spook.  Do you remember that?
7    A.  Yes.
8    Q.  I think she was --
9        MS. WICKS:  Objection.  Misstates the record.
10   BY MR. GUERRERO:
11   Q.  Do you remember --
12       THE COURT:  Overruled.
13   BY MR. GUERRERO:
14   Q.  Do you remember talking about an incident where you saw
15   those three guys coming out of the cuts?
16   A.  Well, I only seen two.  I ain't seen Spook.
17   Q.  I think she was asking you whether or not you actually saw
18   them shooting.  Do you remember that?
19   A.  Yes.
20   Q.  And you said that -- what was your answer whether or not you
21   saw them shooting?
22   A.  I actually didn't see them shooting, but all you heard is a
23   lot of gun fire.  As soon as the gun fire stopped...
24   Q.  Once the gun fire stopped, who did you see?
25   A.  I seen Tweety first.

1    Q.  And did you see anything in Tweety's hands?
2    A.  Yes.
3    Q.  What did you see?
4    A.  A gun.
5    Q.  Who did you see next?
6    A.  Then I seen Cool Wop run out the alley.
7    Q.  Did you see anything in Cool Wop's hands?
8    A.  Yes.
9    Q.  What did you see?
10   A.  A gun.
11   Q.  How much time had passed --
12       MS. WICKS:  Objection.
13   BY MR. GUERRERO:
14   Q.  -- between the time you heard the shots and the time you saw
15   Tweety with the gun?
16       THE COURT:  Basis?
17       MS. WICKS:  I think it's argumentative and asked and
18   answered numerous times.
19       THE COURT:  Overruled.
20   BY MR. GUERRERO:
21   Q.  My question was, how much time had passed between the time
22   you heard the shots and the time you saw Tweety with a gun in
23   his hand?
24   A.  All that happened in 15, 20 seconds.
25   Q.  How much time had passed between the time you heard the

1    shots and the time you saw Cool Wop with a gun in his hand?
2    A.  Probably a minute.  Probably a minute, 30 seconds.
3    Q.  When you saw Tweety with the gun in his hand, was he staying
4    in that area or going somewhere else?
5    A.  He was running from --
6        MS. WICKS:  Objection.  Asked and answered.
7        THE COURT:  Overruled.
8    BY MR. GUERRERO:
9    Q.  You may answer.
10   A.  He was running from one cut to the next cut.
11   Q.  How about Cool Wop?  Was he staying there or was he running
12   somewhere else?
13   A.  Well, I ain't even know he was there.  I just thought it was
14   just Tweety.  But once Tweety ran through the cut --
15       MS. WICKS:  Objection.  Nonresponsive.
16       THE COURT:  Put your question.
17   BY MR. GUERRERO:
18   Q.  When you saw Cool Wop, what did it appear he was doing,
19   staying there or going somewhere else?
20       MR. ZUCKER:  Objection.  Leading.
21       THE COURT:  Sustained.  Rephrase.
22   BY MR. GUERRERO:
23   Q.  When you saw Cool Wop with the gun in his hand, what did you
24   see him do?
25   A.  Well, ain't see him -- I just seen him running.  I just seen

26 (Pages 14198 to 14201)

Page 14202

1  him running from one cut to the alley.
2  Q. Was anything affecting your perception that day?
3  A. No.
4  Q. Could you see clearly?
5  A. Yes.
6  Q. Was there anything blocking your view?
7  A. No.
8      MR. TABACKMAN: Objection. Asked and answered.
9      MS. WICKS: Objection. Beyond the scope and asked and
10 answered.
11     THE COURT: Overruled.
12 BY MR. GUERRERO:
13 Q. What was your answer?
14 A. No, wasn't nothing blocking my view.
15 Q. Was there any drug that you were on that impaired your
16 perception?
17     MR. ZUCKER: Objection. Opinion.
18     THE COURT: Overruled.
19 A. No.
20 BY MR. GUERRERO:
21 Q. Let's talk about the incident that Mr. Jones' attorney,
22 Mr. Martin, was asking you about where -- an incident with Teeny
23 Man. Do you remember that?
24 A. Yes.
25 Q. And I think Ms. Wicks was also asking you that now you're

Page 14203

1  saying that you remember Jojo being in the car. Do you remember
2  that?
3  A. Yes.
4  Q. And why is it that you remember now that Jojo was in the
5  car?
6  A. It's not that I remember, it's I ain't never forget. It's
7  just at that point in time when he was talking about it,
8  probably I just ain't mention it.
9      MR. GUERRERO: Court's indulgence.
10 BY MR. GUERRERO:
11 Q. Let's talk about Mr. Balarezo's cross-examination. He was
12 asking you whether or not you had any loyalty to the guys in the
13 Edelin case in which you testified. Do you remember him asking
14 you that topic?
15 A. Yes.
16 Q. And you said it was a problem for you when you testified
17 there. Do you remember that?
18 A. Yes.
19 Q. Explain.
20 A. It was a problem because I grew up with them guys. Not --
21 you could just put Tommy and his father to the side, and Brian
22 Bostick, you can put them to the side. The rest of the guys
23 that was on the case, Wah-Luck, Funky, Blue, all of them, I
24 basically grew up around them, you know. So it's like we come
25 up together.

Page 14204

1  Q. And then Mr. Balarezo asked you about your loyalty to
2  Congress Park. Do you remember that?
3  A. Correct.
4  Q. And you --
5      MR. BALAREZO: Objection, Your Honor. The question was
6  that he did not have any loyalties to Congress Park.
7      THE COURT: Rephrase.
8  BY MR. GUERRERO:
9  Q. Let me rephrase exactly. The question was by Mr. Balarezo
10 that you did not have any loyalty to Congress Park.
11 A. Well, growing up with Cool Wop and them --
12     MR. BALAREZO: Objection. Nonresponsive.
13     MS. WICKS: Objection. Nonresponsive.
14     THE COURT: Overruled.
15 A. Being around them, growing up and going to school and
16 hanging in the center on 15th Place, it used to be Cool Wop,
17 Truck, Taneal, Drano, sometimes Big Head Dave, all them --
18 Q. Is this association that you saw with your own eyes?
19     MS. WICKS: Objection. Leading.
20     MR. ZUCKER: Characterization.
21     MR. BALAREZO: It's a narrative at this point.
22     MS. WICKS: And it's not responsive to the previous
23 question.
24     THE COURT: Put your question.
25 BY MR. GUERRERO:

Page 14205

1  Q. Who did you see hanging around Congress Park that you recall
2  seeing with your own eyes?
3      MS. WICKS: Objection.
4      THE COURT: Overruled.
5  A. I used to see -- well, the main ones I always used to see
6  together --
7      MR. BALAREZO: Objection.
8      THE COURT: Basis?
9      MR. BALAREZO: It's vague, nonresponsive. It's an
10 opinion.
11     THE COURT: Overruled.
12 BY MR. GUERRERO:
13 Q. You may answer.
14 A. I always used to see Jojo and Antwuan together. Cool Wop,
15 Drano, Truck, Taneal, and all them used to be together.
16 Q. Now, you testified that now, as you're testifying against
17 some people in Congress Park, it's still a problem. Do you
18 remember testifying to that?
19 A. Yes.
20 Q. And why is it still a problem for you?
21 A. Because -- I mean, you got some people from Congress Park
22 that I don't have a beef with. I mean, for real, I never had a
23 beef with them. It's just that, by me hanging with Squid and
24 Antwuan beefing with Squid. So the younger group that hang with
25 Antwuan is beefing with the younger group with Squid.

27 (Pages 14202 to 14205)

1    MR. TABACKMAN: Objection. Nonresponsive.
2    THE COURT: Narrative. Go ahead. Put your question.
3  BY MR. GUERRERO:
4  Q. Let me just ask you to focus on you, Mr. Green. Why is it
5  still a problem for you to testify?
6    MR. TABACKMAN: Objection. Relevance.
7    THE COURT: Overruled.
8  A. It's a problem for me because, for one, I still have family.
9    MR. ZUCKER: Objection.
10   MR. TABACKMAN: Objection.
11   THE COURT: Come on up.
12   (BENCH CONFERENCE ON THE RECORD.)
13   MR. TABACKMAN: This is just purely inflammatory at
14 this point. There's no basis whatsoever for a claim that his
15 family has been in any way threatened by these people, or --
16 they didn't even know he was coming on the stand.
17   THE COURT: Mr. Guerrero, do you know what the answer
18 is going to be in connection with that comment?
19   MR. GUERRERO: I wasn't trying to elicit -- I don't
20 think there's any testimony that's going to be that he's been
21 threatened at all. I think he's just trying to say that he
22 still has friends in Congress Park, like he testified earlier
23 about Boy-Boy, that he had no beef with. That's all he was
24 trying to get out, and then they objected to it.
25   THE COURT: Well, I don't know what he's going to say.

1  He said, "I still have family," when you asked him, "What's the
2  problem with testifying against these people?"
3    So we potentially are running into the same problem we
4  had with an earlier witness.
5    MR. GUERRERO: I can move on, Your Honor. I'm not
6  going to try to make a big deal about this. It was opened up on
7  cross-examination, and I can move on. I don't think he's, any
8  response that he's made right now has crossed any line to being
9  prejudicial. All he said was, he finds it difficult because of
10 family, period.
11   THE COURT: Well, the problem is, the inference can be
12 drawn that his family is vulnerable to something. So that's
13 what I want to avoid having come out, if it is not based upon
14 any evidence of behavior by these defendants or anybody acting
15 at their behest.
16   So I'm not shutting you down from inquiring about the
17 issue that was raised on cross, about problems he may have now
18 about testifying. But unless you can tell me that there's a
19 basis for his -- any testimony about his family being in danger
20 because of these defendants or their associates, I may have to
21 give an instruction if I let you have him continue his answer.
22   MR. GUERRERO: And I'm not going to ask to continue the
23 answer, because I'm not really going down that road. I can just
24 move on.
25   MR. TABACKMAN: We would ask for an instruction in any

1  event, Your Honor, and that the last comment be stricken. It's
2  out there: "My family. I have a problem because of my family."
3  Or, "I have family." And this jury hears that, and everybody
4  understands, given that we're talking about violence and
5  behavior.
6    THE COURT: If you're not going to proceed down that
7  road, then I'll instruct the jury to disregard the last question
8  and answer.
9    MS. WICKS: If I can also just put on the record, in
10 front of the jury when we came to the bench, Mr. Green started
11 smiling and almost like shaking his shoulders like he's dancing
12 in his seat right after the answer.
13   I want to put that on the record. I don't know if it
14 was in response to something that was occurring, because I was
15 up here at the bench looking across at him. So I don't know
16 what was happening out there, but I'm just concerned.
17   (END BENCH CONFERENCE.)
18   THE COURT: Ladies and gentlemen, I'm going to strike
19 the last question and answer, so I'll direct you to disregard
20 the last question and answer that was just put.
21 BY MR. GUERRERO:
22 Q. Let's talk about, along the same cross-examination by
23 Mr. Balarezo about your trying to get a lesser sentence, and
24 that's why you're testifying now. Do you remember that?
25 A. Yes.

1  Q. And Mr. Balarezo was asking you, if you get caught in a lie
2  then that exposes you to perjury. Do you recall that?
3  A. Yes.
4  Q. And what is perjury to you?
5    MR. ZUCKER: Objection. Asked and answered.
6    MR. TABACKMAN: Objection. Asked and answered.
7    THE COURT: Overruled.
8    MR. TABACKMAN: He went into it on direct examination,
9  Your Honor.
10   THE COURT: I've overruled the objection.
11 BY MR. GUERRERO:
12 Q. What is perjury to you?
13 A. Perjury is when a person lie to the court of law.
14 Q. And if you lie to the court of law, would that give you an
15 exposure to more prison time than what you already have hanging
16 over your head?
17 A. It can, yeah.
18 Q. Is that something that you're willing to do?
19 A. Naw.
20 Q. Ms. Wicks started off with your understanding of a
21 cooperation agreement. Do you recall that?
22 A. Yes.
23 Q. As you sit here today, do you have a cooperation agreement
24 with the government?
25 A. No.

1    MR. GUERRERO:  Court's indulgence.
2  BY MR. GUERRERO:
3    Q.  Let's talk about Mr. Beane's cross-examination.  He was
4  asking you why it was that you would buy crack cocaine from
5  Boy-Boy between 1993 and '96.  Do you recall that?
6    A.  Yes.
7    Q.  Why did you buy crack cocaine from Boy-Boy?
8    A.  It's no reason why, because it's like --
9      MR. BEANE:  Objection, Your Honor.  He said there's no
10  reason why.  That answers the question.
11      THE COURT:  Overruled.
12  BY MR. GUERRERO:
13    Q.  Go ahead, please answer.
14    A.  Like my cousin, I used to get coke from my cousin.  I used
15  to get coke --
16      MR. TABACKMAN:  Objection.  Nonresponsive.
17      THE COURT:  Overruled.
18    A.  The answer, what I'm trying to get to is, if I see Boy-Boy
19  at the store, I speak to him, say, "What's up?"  I might have
20  $100 in my pocket, $50.  I can tell him, "Give me a wholesale,"
21  and he give me a wholesale.  Basically, he double my money.
22      So it's not like I go to him on a regular basis.  It's
23  that when I do run into him, I always get a wholesale from him.
24  It ain't like I beeps him, I call him or none of that, naw.
25    Q.  And now I would like to switch focuses on this person named

1  Dale.  Ms. Wicks was asking you about this person named Dale.
2  Do you recall that?
3    A.  Yes.
4    Q.  And she was asking you about height and weight and physical
5  characteristics of Dale.  Do you remember that?
6    A.  Yes.
7    Q.  If you saw Dale and Wop side by side, would you be confused
8  as to who is who?
9    A.  Naw.
10    Q.  Was Dale involved in the shooting where Squid and Sabrina
11  over on Stanton Road, or was it Wop?
12    A.  It was Cool Wop.
13    Q.  Any doubt in your mind?
14    A.  No.
15    Q.  How about the cut where the three guys, with Spook and
16  Tweety and Wop, where you didn't see them shooting but you saw
17  guns in their hands?
18    A.  Right, right.
19    Q.  Was that Wop or Dale?
20    A.  It was Cool Wop.
21    Q.  Is there any doubt in your mind that it was Cool Wop versus
22  Dale?
23    A.  No.
24    Q.  Was Dale even out there?
25    A.  I think Dale got locked up.  I know Dale came through a

1  couple of times shooting, but it wasn't at us.  See, the thing
2  was, Dale was with Tweety and them.  But the thing was, Dale was
3  more beefing with some of the other guys was on 15th, Rocky and
4  them.  He wasn't actually shooting at us.  He was shooting at
5  Rocky, Suda (ph), Dada (ph), and them.  He wasn't shooting at
6  us.  He never shot at us, not that I know of.
7    Q.  How about the incident where Antwuan and Wop are in a car,
8  and you and JJ are in a car?  Do you remember that?
9    A.  Yes.
10    Q.  Was that Wop, or was that Dale?
11    A.  That was Cool Wop.
12    Q.  And Mr. Balarezo was asking you whether or not you could see
13  what is was that Wop had in his hand.  Do you remember that?
14    A.  Yes.
15    Q.  And he actually demonstrated for the jury by putting his
16  hand in his pocket.  Do you recall that?
17    A.  Yes.
18    Q.  When you saw Wop put his hand in his pocket, describe what
19  you saw in that pocket, or from the outside.
20    A.  Well, I mean, you could tell when somebody got a gun on
21  them --
22      MS. WICKS:  Objection.  Nonresponsive.
23      THE COURT:  Overruled.
24    A.  You can tell when somebody got a gun on them.  When they
25  stick their hand in they pocket, and they aggressive, that's

1  letting you know that they got something.  Then plus, when you
2  look at they pocket, you can see the print of the gun.
3  BY MR. GUERRERO:
4    Q.  Let me pause you right there.  You just said when you look
5  at the pocket, you can see the print of the gun?
6    A.  Yes.
7    Q.  Is that what you saw that day?
8    A.  Yes.
9      MR. ZUCKER:  Objection.
10      THE COURT:  Overruled.
11  BY MR. GUERRERO:
12    Q.  Describe the print of the gun that you saw.
13    A.  It was a big gun.  Because his pants, it was like you could
14  see the point from the bottom of the pocket.  It was like
15  sticking out.  So it was more as like, he sticking his hand in
16  his pocket to either get a good grip on the gun or straighten
17  the gun up.
18      MR. BALAREZO:  Objection.  Speculation at this point,
19  if it matters.
20      THE COURT:  Put your next question.
21      MR. GUERRERO:  Thank you, Your Honor.  I don't have
22  anything further.
23      MS. WICKS:  May we approach, Your Honor?
24      THE COURT:  Beg your pardon?
25      MR. GUERRERO:  Nothing further, Your Honor.

Page 14214

1    MS. WICKS:  May we approach, Your Honor?
2    THE COURT:  Yes.
3    (BENCH CONFERENCE ON THE RECORD.)
4    MS. WICKS:  Your Honor, the incident that he brought up
5    during my cross, and that Mr. Guerrero went into, when he
6    testified in the Edelin matter, he said it was Tweety, Joonie,
7    and Pete.  So I would ask for recross on that distinct issue.
8    THE COURT:  Denied.
9    (END BENCH CONFERENCE.)
10   THE COURT:  The witness may be excused.
11   Announce your next witness.
12   MR. GUERRERO:  Your Honor, the government calls John
13   Ewing.
14       (Oath administered by Courtroom Deputy.)
15   (JOHN EWING, GOVERNMENT witness, having been duly sworn
16       testified as follows:)
17       DIRECT EXAMINATION
18   BY MR. GUERRERO:
19   Q.  Good afternoon, sir.
20   A.  Hello.
21   THE COURT:  Hold on one second.
22   Counsel, approach.
23   Can I ask you to have a seat on that chair over there?
24   Counsel, approach.
25   (BENCH CONFERENCE ON THE RECORD.)

Page 14215

1    THE COURT:  The juror has mentioned that she knows the
2    witness.  I just want to ask, how do you know him and how well?
3    JUROR:  My grandson's uncle and, I mean, we're not
4    tight, tight, tight, but --
5    THE COURT:  What we can probably do is just take a
6    break so we can have you sit.  You don't have to stand and tell
7    us what you know.  Okay?  Why don't you just go back to your
8    seat, and we'll excuse the jurors.
9    JUROR:  Okay.
10   THE COURT:  Hold on one second.
11   (END BENCH CONFERENCE.)
12   THE COURT:  Ladies and gentlemen, this is probably a
13   propitious time to break for the day, so we'll go ahead and
14   break.  Let me ask you to come back tomorrow promptly at
15   9:00 o'clock.  Take your notes and leave them in the jury room,
16   and don't talk about the case.
17   Have a safe trip home.  We'll see you tomorrow morning
18   at 9:00.  Thank you.
19   (Jury out at 4:52 p.m.)
20   THE COURT:  Let me excuse you for the evening, but ask
21   that you come back tomorrow morning at 9:00 a.m.
22   All right.  You-all may be seated.  Thank you,
23   Juror 14, temporarily Juror 1.  Why don't you just repeat for us
24   if you can how you know the witness and how close, if at all,
25   you are to him.

Page 14216

1    JUROR:  He's my grandson's uncle.  I'm not really close
2    to him.  I've met him over the last five -- my grandson will be
3    five this year.  The last past years.  I don't see him very
4    often.  I don't talk to him at all.  So...
5    I heard the name last week, but I had to put a face
6    with a name before I say something.  And he walked in, and I
7    know, that's Johnny.
8    THE COURT:  How frequently do you see him?
9    JUROR:  I haven't seen Johnny, I know, in the last
10   two years.  He's not one that frequents my daughter's house,
11   because my daughter and his brother no longer together, but they
12   do have a baby together.
13   THE COURT:  Now, who has the baby together?
14   JUROR:  My daughter and his brother.
15   THE COURT:  I see.  All right.  Do you know how
16   frequently the witness sees your daughter?
17   JUROR:  Not very often.  Not often, not at all, believe
18   it or not.  When my grandson goes, they come pick him up and he
19   goes to the father's house.  He doesn't come over there.
20   THE COURT:  All right.  Have you spoken about him to
21   your daughter or her baby's father?
22   JUROR:  No.
23   THE COURT:  Recently?
24   JUROR:  No.  I don't even talk to the baby's father,
25   unless he calls and I happen to answer the phone.  Other than

Page 14217

1    that, I have no conversations with him.
2    THE COURT:  All right.  If Mr. Ewing testifies as a
3    witness, would you have difficulty listening to his testimony
4    with an open mind?
5    JUROR:  No, I would not.
6    THE COURT:  If he were to testify as a witness, would
7    you be able to listen to the questions and answers elicited by
8    the government, as well as by all the defense lawyers?
9    JUROR:  Yes, I would.
10   THE COURT:  In other words, if there's any effort by
11   any lawyer to elicit information from him, is there anything
12   about your relationship to him that would cause you
13   automatically to not believe what he says?
14   JUROR:  No.
15   THE COURT:  Is there anything about your relationship
16   to him that would cause you to automatically credit or believe
17   anything he says?
18   JUROR:  No.
19   THE COURT:  If the lawyers attempted, for example on
20   cross-examination, to question him in such a way as to challenge
21   the believability of what he is saying, would you be able to
22   listen with an open mind to both the questions and the answers
23   put to Mr. Ewing?
24   JUROR:  Yes, I would.
25   THE COURT:  Even though he has this distant

United States District Court    kingreporter2@verizon.net    Rebecca Stonestreet, RPR, CRR
For the District of Columbia 202-354-3249    Official Court Reporter

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 05-CR-100-2 (rwr)** |
| **v.** | : | |
| | : | |
| **DAVID WILSON** | : | |
| | : | |

## SUPPLEMENT TO MOTION FOR A MISTRIAL

David Wilson, by and through undersigned counsel, respectfully moves this Honorable Court for a mistrial for the presentation of perjured testimony in the presentation of re-direct testimony of Damien Green.  In support of this motion, counsel states the following:

By mail sent June 11, 2007 from Tommy Edelin's current (appellate) counsel, counsel received a copy of Damien Green's prior grand jury[1] on September 29, 1998.  Therein, Mr. Green does testify about one of the incidents he testified about on direct and additionally, yet again, similar to his trial testimony in the Edelin matter, testified about the Tweety and Junie incident, without mentioning Mr. Wilson's name or nicknames.  See Exhibit 3 at 66-68.  He also referred to "Cootie" as the person with Spook and Tweety when running through the cuts, See Exhibit 3 at 30-33; in the incident at our trial he indicated that it was Coolwop and describes the incident quite differently.  In fact, to counsel's recollection, he never referred to Mr. Wilson as Cootie in the trial before this Court.

In addition, the nondisclosed Grand Jury indicates several other shootings Mr. Green was involved with, other than those he plead guilty, in addition to another gun recovered from his grandmother's house on September 5, 1996 when he was arrested for trying to kill Ira Clayton.  See

---

[1] Prior to his testimony, the government disclosed no grand jury in the Edelin matter.  Counsel has been given a copy of Mr. Green's grand jury in the Edelin matter for two prior dates but Mr. Edelin's current counsel could not locate the third date in the boxes he had received from Mr.

Exhibit 5 at 80.

WHEREFORE for these grounds, grounds raised at any hearing on the defendant's motion, and any other grounds deemed meritorious by the Court, counsel and Mr. Wilson request a mistrial in this matter.

Respectfully Submitted

_____/s/_____
JENIFER WICKS
The Law Offices of Jenifer Wicks
The Webster Building
503 D Street, N.W., Suite 250A
Washington, DC 20001
(202) 326-7100


_____/s/_____
GARY PROCTOR
8 E. Mulberry Street
Baltimore, MD 21202
(410) 444-1500

Counsel for David Wilson

Edelin's trial counsel.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - x
                          :
IN RE:                    :
                          :
POSSIBLE VIOLATIONS OF    :
21 U.S.C. 846,            :
18 U.S.C. 1962 (RICO)     :
                          :
- - - - - - - - - - - - - x
```

Grand Jury Room No. 2
United States District Court
    for the District of Columbia
3rd and Constitution, N.W.
Washington, D. C.   20001

Tuesday, September 29, 1998

The testimony of DAMIEN GREEN was taken in the

presence of a full quorum of the Grand Jury 97-5, impaneled on

December 5, 1997, commencing at 10:15 a.m., before:

MICHAEL VOLKOV
STEPHEN PFLEGER
Assistant United States Attorneys

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C.  20005
(202) 296-2929

```
 1                      P R O C E E D I N G S

 2     Whereupon,

 3                          DAMIEN GREEN

 4     was called as a witness and, having been first duly sworn by

 5     the Foreperson of the Grand Jury, was examined and testified

 6     as follows:

 7                          EXAMINATION

 8               BY MR. PFLEGER:

 9         Q    Good morning, Mr. Green.

10         A    Good morning.

11         Q    Mr. Green, the last time you were here, we were

12     talking about a beef or a war between the Stanton Terrace crew

13     and the people who are from your neighborhood, the 1-5 mob or

14     the 15th Place crew.  Do you recall that?

15         A    Yes.

16         Q    Okay.  We had talked a little bit the last time

17     about who the members of the rival Stanton Terrace crew were.

18     And we were about to start into some of the violence that had

19     started in March of 1996 between the two crews.

20               And so we're just going to go through all of those

21     events today.  Okay?

22         A    Yeah.

23         Q    All right.  Now, again, I need you to speak up

24     loudly, so that the lady all the way in the back can hear you.

25     Okay.  And all of your answers need to be oral.  All right.
```

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1        A     Okay.

2        Q     All right.  Now, do you know a person by the name of

3     -- well, let me just ask you this way.  What kicked off the

4     beef between Stanton Terrace and the members of the 1-5 mob in

5     1996?  What event happened that kicked off that beef?

6        A     A dude named Tweety and his brother, Spook, and

7     their friend, Willie, had robbed a friend of mine's cousin.

8     That's what kicked it off.  They had robbed a dude named Lala

9     and shot at -- and Pop.

10       Q     Now, let's just back up here for a second.  This

11    person -- or the people you talked about, Willie, Spook and

12    Tweety, which crew were they associated with?

13       A     Stanton Terrace crew.

14       Q     The Stanton Terrace crew?

15       A     Mm-hmm.

16       Q     All right.  And the people, Pop and Lala, which crew

17    are they associated with in terms of the people that they're

18    with?

19       A     The 1-5.

20       Q     One-five.  Okay.  Now, you said there was a robbery

21    of Pop and Lala?

22       A     Yeah, there was a robbery.

23       Q     And the people who were supposed to be responsible

24    for that were Willie, Spook and Tweety?

25       A     Right.

4

1          Q     Okay.   Now, where were you, if you know, when this

2     actual robbery took place or when the robbery of Pop and Lala

3     happened?

4          A     I wasn't around there, but me and Wah-Luck, we had

5     pulled on 15th Place.   Tweety flagged us down, told Wah-Luck

6     that he know what happened to his nephew.   So, I pulled off.

7               And Wah-Luck told me to take him back.

8          Q     Hang on one second now.   Let's go back.   So, you

9     weren't actually present when the robbery happened, correct?

10         A     Uh-uh.

11         Q     All right.   You said -- was this on the same night

12    of the robbery and the shooting, that you actually see Tweety?

13         A     On the same night.

14         Q     Okay.   Had you heard -- prior to meeting up with

15    Tweety, had you heard anything about this robbery or shooting?

16         A     I ain't hear nothing about it.   When we came back,

17    that's -- Tweety flagged us down and was telling us about it.

18         Q     So, Tweety was the first person to actually say

19    anything to you then about this robbery and shooting?

20         A     Right.

21         Q     Okay.   Now, so tell us what happened.   You and Wah-

22    Luck are in a car together?

23         A     We was in a car together.

24         Q     Whose car?

25         A     Wah-Luck's car.

5

```
 1          Q     Which car was this?

 2          A     It was an LTD.

 3          Q     What color?

 4          A     Gray.

 5          Q     Was anybody else in the car with you, besides Wah-

 6     Luck and yourself?

 7          A     Just us two.

 8          Q     Were either of you armed as far as you know?

 9          A     No.

10          Q     Okay.  Now, do you remember where you were coming

11     from?

12          A     I don't remember exactly.  Probably from the liquor

13     store.  I don't remember exactly where we was coming from.

14          Q     Okay.  But, as you're driving what street does

15     Tweety --

16          A     Fifteenth Place.

17          Q     Okay.  So, when you're coming down 15th Place,

18     Tweety waves you over?

19          A     Yeah.

20          Q     Okay.  And what happens?  Does Tweety get in the car

21     or does Tweety get -- how does that happen?

22          A     He came on my side.  And Wah-Luck was on the

23     passenger side.  He told Wah-Luck that he wanted to holler at

24     him because he know who did that to his nephew -- I mean, his

25     cousin.
```

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1          So, I pulled off.  And Wah-Luck told me take -- take

2     him back.  So, I took him back.

3          Wah-Luck got out of the car and talked to him.  Then

4     he got back in the car.  I pulled off.  And Wah-Luck said he

5     going to kill him.

6          Then we pulled on Congress, got out of the car.

7     Q    Okay.  Let's slow up for a second here.  When Tweety

8     first comes up to the car, he's talking to the Wah-Luck

9     through the driver's window across you; is that right?

10    A    Right.

11    Q    All right.  And he's basically telling Wah-Luck, I

12    know what happened to your cousin?

13    A    Yeah.  He was telling him that he know who -- you

14    know, was with it, just shot him, so.

15    Q    Was it your impression that Wah-Luck already knew

16    what had happened --

17    A    No.

18    Q    -- or that he didn't know?

19    A    Wah-Luck didn't know.  None -- me or Wah-Luck ain't

20    know.  He just came to the car and told us.  So, he was like,

21    he know who was with it and all that.  So, Wah-Luck -- and we

22    pulled off.

23    Q    Did Wah-Luck ask him, what are you talking about?

24    Or, what's going on?  Or, did Tweety just walk away?  Or, what

25    happened?

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

 1      A    No.   He told us -- he told us that Wah-Luck's cousin

 2   got shot.

 3      Q    Okay.

 4      A    But, he telling -- he told -- he told Wah-Luck that

 5   he know who was with it.  So, he say, I'm going to holler at

 6   you.  So, when we pulled off, Wah-Luck said, take me back.

 7      Q    Okay.  Now, when he told you that -- or when Tweety

 8   says to Wah-Luck about his cousin being shot, did he identify

 9   which cousin?  Did he say, Pop or Lala?

10      A    He said, Lala.

11      Q    And is Lala, in fact, Wah-Luck's cousin, to your

12   knowledge?

13      A    He's his cousin, yeah.

14      Q    All right.  Now, when he pulls off, why does he ask

15   you to take him back to see Tweety, do you know?

16      A    Because Tweety told him he going to -- Tweety told

17   him that he know who was with it.  He ain't tell us who was

18   with it right there when he came to the car.  He just said, he

19   going to holler at him.  So, when we pulled off, Wah-Luck

20   said, take me back.

21      Q    So, Wah-Luck wanted to find out right away who was

22   with it.

23      A    Who was with it.

24      Q    So, then when you pulled back, is Tweety in the same

25   area?

8

1        A    No.  He was -- he was in -- on the same street, but

2    he was in a cut there.  He was in the cut.

3        So, when I went back, Wah-Luck went in the cut and

4    came back out of the cut, jumped back in the car.  I pulled

5    off.  He said that he going to kill him.

6        Q    Why did he say he was going to kill Tweety at that

7    point?

8        A    I guess Tweety was lying or something.

9        Q    What did Wah-Luck say to you when he got back in the

10   car, besides, I'm going to kill him?

11       A    I'm going to kill him.  Then we pulled on Congress,

12   got out, went in his cousin's grandmother's house.  His uncles

13   and aunts and everybody was in there saying he was in the

14   hospital.

15       Q    Saying who was in the hospital?

16       A    Lala, that -- they was saying that Tweety and Spook

17   and Willie did it.  Then they was saying -- I forgot who

18   exactly the people was, but the people -- some young person

19   sitting in my car and they seen Tweety, Spook and Willie walk

20   past my car and went through the cut.  And --

21       Q    Now, you're talking about this person is talking

22   about what happened at the time of the actual robbery?

23       A    Yeah, but they ain't see the robbery.  They just

24   know that before they heard the shot, they came past my car

25   and went through the cut.  And then they heard the shots.  And

1    that's when they was like, Wah-Luck -- that's when they -- I

2    mean, that's when they was like, Pop and Lala got shot.  They

3    figured it was them, because them the only ones that went

4    through the cut.

5              And Tweety's brother, if you see him anywhere down

6    by our way, he either coming to see his brother or he coming

7    to rob somebody or he up to something, so.

8         Q    You're talking about Spook.

9         A    Spook.

10        Q    Spook was known in your neighborhood as somebody who

11   would rob people?

12        A    Yeah.

13        Q    Okay.  All right.  So, basically, the people from

14   the 1-5 mob concluded that Tweety, Willie and Spook were

15   responsible for the shooting of Pop and Lala because they had

16   seen them walk into the neighborhood shortly before the

17   shooting.

18        A    Right.

19        Q    Now, did you have any idea how badly shot either Pop

20   or Lala was at that point?

21        A    I think Pop got shot probably in his back.  Lala got

22   shot in the shoulder, I think.

23        Q    Did either of them stay in the hospital for any

24   length of time?

25        A    Pop stayed in the hospital for a long time.  He was

1    messed up.  Lala, I think he came out like the next day or two

2    days.  Pop stayed in for at least probably over six months.

3        Q    Did you have a conversation with either Pop or Lala?

4        A    One time I was in the hospital and I was talking to

5    Pop.  And he had his name on a John Doe.  And he was just

6    like, they was in the car smoking.  And they came over to the

7    car and told him to give up the money.  But they told him to

8    get out of the car and lay down.

9            They took the money and I think they took some

10   marijuana.  And they just shot at them and then took off

11   running while they was on the ground.

12       Q    So, they took money and drugs from them?

13       A    Mm-hmm.

14       Q    And did Pop indicate whether or not he knew who it

15   was that had actually done it?

16       A    He was saying that it was Spook and Willie.  I

17   didn't hear him mention Tweety.

18       Q    Did he indicate whether or not they had covered

19   their faces at the time of the robbery?

20       A    I don't remember him telling me that, cover up their

21   faces.  I don't think they covered up their faces.

22       Q    Would -- would Pop know who Tweety, Spook and Willie

23   are?

24       A    Yeah, because Pop used to be up there with them.

25       Q    All right.  Do you know Pop's real name, by the way?

1      A      I don't know his real name.  No, I don't know his

2   real name.

3      Q      Do you know Lala's real name?

4      A      I just know his real name, LaSalle.

5      Q      LaSalle?

6      A      LaSalle.

7      Q      Okay.  Now, did you ever have a conversation with

8   Lala about what happened at the time of the robbery?

9      A      He came out of the hospital.  And he told me about

10  the exact same thing Pop told me, that they came up on the car

11  and they was in there smoking.  He said, when he turned

12  around, he just seen somebody at the door telling him to get

13  out of the car.  That was it.

14     Q      Now, going back for a second, when you -- after Wah-

15  Luck gets back in the car and says, I'm going to kill Tweety,

16  and you go over to Congress, okay.  While you're there, what's

17  everybody talking about?  Is everybody talking about the

18  robbery?

19     A      We went into Lala's grandmother's house.  We wasn't

20  -- we wasn't exactly on Congress.  We just pulled on Congress

21  and parked and went inside the cut into Lala's grandmother's

22  house.  And we was in there with his grandmother and aunts and

23  uncles and stuff.

24         So, we was in the kitchen, me, Wah-Luck, his uncles.

25  And they were just like -- they were saying that Tweety and

12

1    them did it.  So, Wah-Luck was like, he going to kill them.
2    And that was that.
3         Q    Was anybody else from your crew or from the 1-5
4    there besides you and Wah-Luck?
5         A    It was just me, Wah-Luck, Lala's Uncle Mark, Honky
6    and Cooler.  And that was it.
7         Q    Now, after that, where do you go after that -- after
8    you were meeting there at that house; do you remember?
9         A    I'm not familiar right now.
10        Q    Okay.  You can't remember where you went after that?
11        A    I can't remember right now.
12        Q    When is the first shooting that happens after the
13   robbery of Pop and Lala?  Not so much when, but what was it
14   that happened?  What was the first shooting?  Can you tell us
15   about that?
16        A    We was at a party.  And --
17        Q    Now, whose party is this?
18        A    A girl named Chante.
19        Q    And where is the party taking place?
20        A    Stanton Road.
21        Q    All right.  Is this in your neighborhood of Stanton
22   Dwellings?
23        A    Mm-hmm.
24        Q    Okay.  And who all is invited to this party?
25        A    Everybody.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1      Q     Everybody from the neighborhood?

2      A     Everybody, yeah, from the neighborhood, from other

3   neighborhoods, just come to the party.

4      Q     And are you at this party yourself?

5      A     Right.

6      Q     Is that a yes?

7      A     Yeah.

8      Q     All right.  So, tell us what happens while you're at

9   the party.

10      A     I was inside the party, but I came outside.  And I

11   seen Tweety outside or I fixed me a cup of liquor.  I went

12   back in the house.  And I was in the house with Tweety's

13   brother.

14      Q     What's his name?

15      A     Spook.  He was cooking Oodles o' Noodles.

16      Q     Spook was cooking Oodles o' Noodles?

17      A     Yeah, on the stove.  And -- so, that's when I know

18   Wah-Luck -- at that time, while I was coming back in the

19   house, Wah-Luck was walking up the alley.

20           And Tweety didn't know who it was.  So, Tweety asked

21   a friend of mine's named Mark, who was that?

22           Mark was telling him it was a dude named K.C. that

23   fix on cars.

24           So, Tweety was like, nah, that ain't him.

25           So, at the time, Wah-Luck must have seen Tweety was

1    looking at him.  So, Wah-Luck pulled a shotgun out.

2         Q    Where did he -- where did he get the shotgun from?

3         A    I think he got it from Blue.  He started shooting at

4    Tweety.  Tweety started shooting back.  And then Tweety ran

5    through the cut.  Then he came back and started shooting.

6    That's when J.J. was shooting with Wah-Luck at Tweety.

7         Q    Okay.  Let's -- let's stop for a second and try to

8    break this down.  Okay.  You got a lot of people shooting at a

9    lot of people.  All right.  You're outside, right?

10        A    Right.

11        Q    Now, is this all taking place before you go back in

12   and see Spook cooking Oodles o' Noodles?

13        A    This -- it took place like -- I'd say soon as I get

14   in the living room.  Like -- like soon as I get in the living

15   room.  So, at that time --

16        Q    Okay.  Wait a second.  Are you able to actually see

17   all of what you're telling me or are you telling --

18        A    I could -- I can see -- when I came back out the

19   front door, I could see J.J. shoot -- and Wah-Luck shoot.

20   But, at first, I ain't see Wah-Luck shoot.  I heard the shots.

21   At that time, it was just Wah-Luck's gun going off.

22        Q    Okay.  Wait a second.  What kind of gun does Wah-

23   Luck have when you see him shoot?

24        A    It was a pump shotgun.

25        Q    A pump shotgun?

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1           A      Mm-hmm.

2           Q      Do you know what a pump shotgun sounds like?

3           A      Yeah, like a cannon.

4           Q      Have you fired a pump shotgun yourself?

5           A      I fired a 410 shotgun, a sawed-off.  But it wasn't

6    like a shotgun that you cock back.  It was just a sawed-off.

7    You put the shells in and just shoot.

8           Q      Okay.  But you're familiar with what -- a pump

9    -- the pump shotgun that you're talking about sounds like,

10   right?

11          A      Yeah.

12          Q      All right.  So you're inside when the -- when you

13   hear the first shot, right?

14          A      Yeah.

15          Q      What is the first shot?  Is it from a pump shotgun,

16   a pistol, what?

17          A      From a pump shotgun.

18          Q      All right.  So, the first thing you hear is a shot

19   from a pump shotgun, right?

20          A      Yeah.

21          Q      All right.  Now, do you run back to the door after

22   hearing the first shot?

23          A      I ain't -- when I heard the first shot, I was

24   already in the living room.  Then everybody started running

25   out the party.  I went to the front door and was looking down

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1   the cut.  I seen J.J. and Wah-Luck shoot like up the alley.

2              So, I went back into the house.  That's when

3   Tweety's brother was leaving out the house.  So, I started

4   coming out of the house.  I went this way.  He went that way.

5   Then Wah-Luck told all of us to go ahead -- go ahead in the

6   house.  So, we went on in the house.

7        Q    What did Wah-Luck do with the shotgun?

8        A    When he was shooting, he put it in -- he put it in

9   the car.  And Tweety came back out the cut shooting.  And he

10  pulled the shotgun back out and started shooting again.

11             And then that's when we had -- that's when we

12  started going back in the cut going towards our houses.  And

13  that was it.

14       Q    All right.  Let me just make sure we got this

15  straight.  When you're at the party, you go outside at first

16  and you see Tweety just standing out there, right?

17       A    Mm-hmm.

18       Q    And then there is some kind of conversation about

19  somebody coming up the street, correct?

20       A    Mm-hmm.

21       Q    All right.  And then you go back inside, right?

22       A    Mm-hmm.

23            COURT REPORTER:  Yes or no?

24            THE WITNESS:  Yes.

25            BY MR. PFLEGER:

1        Q    When you go back inside, that's when you hear the

2   shotgun blast, right?

3        A    Yeah.

4        Q    All right.   And then you come back to the front

5   door, correct?

6        A    Yes.

7        Q    And when you're back at the front door, you see who

8   is shooting?

9        A    I see Wah-Luck and J.J. shoot.

10       Q    And what is Wah-Luck shooting with?

11       A    A pump shotgun.

12       Q    And what is J.J. shooting with?

13       A    I think a 357.

14       Q    Is it a pistol, a rifle?

15       A    Pistol.

16       Q    A pistol.   All right.   And you're saying, you think

17  it's a 357?

18       A    Mm-hmm.

19       Q    Is it a revolver or a semi-automatic, do you know?

20       A    Revolver.

21       Q    All right.   Did you know J.J. to have a 357 revolver

22  before these events?

23       A    No.

24       Q    What makes you think it was a 357?

25       A    Well, when I -- when I was walking down the cut, I

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1     looked at the gun.  I knew it was a revolver.  It could have

2     been a 38, but I think it was a 357, because when -- when he

3     -- the next day, they wanted to go get some bullets.  And he

4     left the gun with me.  And I ain't actually -- you know, hold

5     the gun or really pay attention to the gun.  He just gave it

6     to me and told me to hold it.  I took it and put it in the

7     car.

8          Q    So, later on, J.J. actually gives you the gun that

9     he used that night before; is that right?

10          A    Yeah.

11          Q    All right.  Now, can you see who it is that they're

12     shooting at when you come out to the front porch and you're

13     hearing this shooting?

14          A    That's all I know Tweety was down that way.  So --

15          Q    But when you first get to the door, you don't see

16     Tweety?

17          A    I don't see Tweety.  I don't see Tweety, but I know

18     -- I know when I came out there, they was shooting up like up

19     the alley.  So, when I got -- by the time I got down that way,

20     Tweety came from out of the cut shooting.  He was running like

21     across the alley, from this cut to that cut, run across the

22     alley.  I seen him like he ain't -- he wouldn't have the gun

23     like this.  He had the gun like pointing backwards while he

24     was running, shooting.  So, they was shooting.

25          Then after it stopped --

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

19

1        Q      Okay.  Let's back up for a second.  After you see

2     Wah-Luck and J.J. shooting up an alley in, you believe, the

3     direction of Tweety, but you don't see him; is that correct?

4        A      I don't see him at the time, no.

5        Q      Then you come out of the house, right?

6        A      Mm-hmm.

7        Q      And that's when you see Tweety actually run

8     across --

9        A      Run across from this cut to this cut across the

10    alley.

11       Q      And at that point, J.J. and Wah-Luck start shooting

12    again?

13       A      They start shooting again.

14       Q      And Tweety is shooting back at them?

15       A      Shooting back.

16       Q      All right.  And what happens -- does Tweety just run

17    away from the area?

18       A      He just ran like to another cut.  He could have

19    -- he still in the area, but he just ran out of sight,

20    probably around from -- around that part of the house.  He

21    like on another street now.

22       Q      All right.  And what does Wah-Luck do with the pump

23    shotgun at that point; do you know?

24       A      I don't know exactly what he did right then and

25    there, but I know we had -- he told everybody to go in the

1    house, so we started walking towards on Congress.  So, at that

2    time, Wah-Luck and them on Congress inside the court.  And so

3    I'm walking through the cut like coming on Congress.

4            And Tweety and some more other guys coming up the

5    street in the car.  So, they started shooting like towards in

6    the court and the cuts and stuff.

7            So, I turned around and started running.  So, I

8    guess Wah-Luck and them was shooting at them from in the

9    court.  But, at the time, I was in the cut.  The court right

10   here.  So, I can't see Wah-Luck and them in the court, because

11   the court is like a U.  And they inside the U.

12       Q   Just so we're clear, the court is actually the area

13   in front of this u-shaped building, correct?

14       A   Yeah.  It's -- it's -- the house is made like a U.

15   He inside the U.

16       Q   Right.  And you're outside the U.

17       A   And I'm out -- I'm on the side of the U on the

18   outside.

19       Q   So, you can't actually see them in the court?

20       A   Yeah, I can't see them, because houses blocking me

21   from seeing him.  So, the car come up the street and started

22   shooting.  They shooting inside the court and at the cut that

23   we in.  So, at the time --

24       Q   Who is with you in the cut?

25       A   It was Brad.  Brad.  Brad was in the cut with me.

1       Q     Brad who?

2       A     Brad Carter.  He was in the cut with me.

3       Q     And who is in the court the last time that you knew

4    who was there?

5       A     Wah-Luck, J.J.  I think Honky -- Honky was in the

6    court.  I don't know exactly who was in the court, too.  I

7    mean, I just know they was in the court.  And there was more

8    people in the court, too, some more people in the court.

9       Q     This -- this court, this is one of the places where

10   you guys would routinely gather and sell drugs from and hang

11   out there, correct?

12      A     Correct.

13      Q     All right.  Now, do you actually see Tweety when the

14   car goes by?

15      A     Yeah, because he was hanging out of the car while

16   they was coming up.  And he was shooting towards on our side.

17      Q     Could you tell who else was in the car?

18      A     No, I couldn't tell who else was in the car.

19      Q     And this is all happening on the same night?

20      A     Same night.

21      Q     Now, did you have a gun with you at that point?

22      A     No.

23      Q     So, is that the end of it for that night or does

24   anything else happen that night?

25      A     The next day, that's when J.J. gave me the gun, him,

1    my cousin, Munsey, they was -- and Wah-Luck and he wanted to

2    go get some bullets.

3         Q    Where were they going to get bullets?

4         A    Out in Maryland, I think.  But he left the gun.  So,

5    I put the gun in the car.  So, I was like in the same cut that

6    they shot at us that night before.  So, Tweety's brother,

7    Spook, pulled up in the car.  Him and some other dude.

8    And --

9         Q    Did you know who the other guy was in the car with

10   Spook?

11        A    No.  And he was telling me to come here.  I didn't

12   know who it was at first.  He got out, but he wouldn't come

13   from around the car.  So, a dude that I knew named Randy was

14   coming towards me from over that way where he was at, the

15   dude, Spook.

16             So, Randy was telling me not to go to the car

17   because he got a gun on him.

18             So, I was like, yeah.

19             So, at the time, it was a gun, the same shotgun Wah-

20   Luck had was like by me, by the house.  So, I was telling

21   Honky, go get it.

22             At the time, Spook jumped back in the car and pulled

23   off.

24        Q    Just so we're clear, you're out there after they've

25   taken off to go get bullets, right, Wah-Luck and Munsey and

1        -- who else was with him?

2            A    It was Wah-Luck, Munsey, and J.J.

3            Q    And J.J.  So, they go off and get some bullets.

4    You're left out there with some of the other guys in that same

5    cut where you've been shot at the night before, right?

6            A    Yeah.

7            Q    And you see Spook pull up in a car with somebody

8    else, right?

9            A    Yeah.

10           Q    Who is the other person; do you know?

11           A    I don't know the other person who was in the car.

12           Q    You couldn't see them all?

13           A    I could see him, but I just ain't know who he was.

14           Q    All right.  And Spook is telling you to come on

15   over, right?

16           A    Yeah.  He telling me to come here.  He waving his

17   hand like, come here.

18           Q    And at the time this is going on, this guy, Randy,

19   who is also one of you guys, right, part of the 1-5?

20           A    Mm-hmm.

21           Q    Is that yes?

22           A    Yes.

23           Q    Okay.  He walks past the area where he can see

24   Spook, correct?

25           A    He walked right past Spook.

24

1    Q    And walks up actually to you; is that right?

2    A    Towards me.  He was going towards his house.  He was

3    coming from the store.  And he was walking -- he walked past

4    -- he walked out the cut where Spook was at and walked in the

5    cut where I was at and he was telling me, don't walk over

6    there, because he had a gun on him.

7    Q    All right.  So, apparently, Randy had seen that he

8    had a gun?

9    A    Yeah.

10    Q    Now, were any shots fired actually at that point in

11    time?

12    A    No.

13    Q    Going back for just one second, when Tweety -- when

14    the whole party shooting happened, when Spook -- excuse me

15    -- when Wah-Luck and J.J. were shooting at Tweety, do you know

16    whether or not Tweety actually got hit or not?

17    A    He got hit by the pump.

18    Q    He got hit by the pump?

19    A    Mm-hmm.

20    Q    How do you know that?

21    A    Because he had a lot of -- like beebees out the

22    shotgun.  They hit him in his back and he had a whole lot of

23    them.  So, that night, he went down Congress Park and he got

24    one of his friends to take the beebees out of his back.

25    Q    Now, how do you know that?

1      A      Because when I got locked up, Tweety got locked up
2    with me and he told me.

3      Q      So, Tweety himself told you about this?

4      A      Yeah, he told me.

5      Q      Did he show you anything to prove that, in fact,
6    he --

7      A      He showed me a couple of black spots where he got up
8    at the top, but he ain't showed me none down here. He just
9    showed me the ones at the top.

10      Q      But he said there were a whole bunch more?

11      A      Yeah, he said there was a whole lot of them.

12      Q      All right. Now -- all right. Now, after there was
13    that attempt or potential attempt when Spook looked like he
14    was going to try to shoot you, when is the next time there was
15    some shooting going on? Was there anything else later that
16    day?

17      A      No, there wasn't no -- there was no more. Wasn't no
18    more shooting. Oh, yeah, after that -- that day -- that day
19    we had -- we had went up there, but we didn't see nobody.

20      Q      Wait a second. Wait a second. You said, you had
21    gone up there. Who are you talking about?

22      A      Me -- me -- me, my cousin, but that was like -- it
23    was like night time, though. It was me, my cousin -- hold on.
24    No, it wasn't even -- as a matter of fact, my cousin wasn't
25    even with me. It was me, Wah-Luck, Rocky, I think Randy. We

1    went up there. And that's when Wah-Luck, he had two guns on
2    him. And Pooh was like bending over in the car. And that's
3    when Wah-Luck ran out there and started shooting.

4              And then that's when I know we started running back
5    across the field. That's when Pooh and them was shooting at
6    us.

7              And Randy -- Randy started shooting his gun back at
8    him and that's when we ran through the cut back on Stanton
9    Road.

10        Q    All right. Let's -- let's try to take it from the
11   top. Okay. You said there was a group of you who went up to
12   where, Stanton Terrace?

13        A    Yeah.

14        Q    All right. What was your intent? I mean, why did
15   you guys get together and decide to go up there?

16        A    Well, for one, the dude, Spook, tried to get me.
17   So, that's why we went up there that time, because he was
18   trying to get me.

19        Q    Basically, at this point, 'the beef was on?

20        A    The beef was on. That's when I -- that's when I
21   really knew that the beef was on. I ain't take it seriously
22   that night when Wah-Luck and them was shooting, but the next
23   day, I took it seriously because when I seen that the dude was
24   trying to get me. So, I took it seriously.

25        Q    Now, where did you guys meet up? You said, it was

1    you, Wah-Luck, Randy and who else?

2         A    Rocky.

3         Q    And Rocky.  Now, Rocky is dead, right?

4         A    Rocky dead.

5         Q    He was later killed by one of the Stanton Terrace

6    guys on 15th Place, right -- around --

7         A    Yes.

8         Q    Now, where did you guys get together before you went

9    actually up to Stanton Terrace?

10        A    In the alley.

11        Q    Which alley are you talking about?  Is that the

12   alley that runs between Congress and Bruce Place?

13        A    Yeah.

14        Q    All right.  Where in the alley, up by the basketball

15   court or down by the trash cans or where?

16        A    It's like the basketball court right here.  It's

17   like in the middle of the trash can and the basketball court.

18        Q    Now, so you guys are going to go over to Stanton

19   Terrace to do what?

20        A    To go -- just go shooting.

21        Q    So, basically, anybody from Stanton Terrace who was

22   over there you were going to go shoot?

23        A    That was with Tweety and them, yeah.

24        Q    So that would essentially mean most of the guys that

25   we talked about the other day, right?

1      A     Yes.

2      Q     All right.  So, trace the path.  How do you go from

3   the alley to Stanton Terrace?

4      A     We went through the alley, through the cut on

5   Stanton Road.  Then we went through Turner Field.

6      Q     Turner Elementary School?

7      A     Yeah.

8      Q     Okay.  This is the ball field and stuff they have

9   out there?

10     A     Yes.

11     Q     All right.

12     A     Then we went through the fence.  And then we went

13   through one of their cuts.  And then we on E Street.  But we

14   stayed in -- we stayed like in the cut.  Wah-Luck, the one

15   that went out in the street.

16     Q     Did you guys have a plan about what was supposed to

17   actually happen?

18     A     No.  It wasn't -- it wasn't really no plan.  It was

19   just that time we got up there, one of the dudes just out

20   there talking to some girls in the car.  And at the time, Wah-

21   Luck just ran out there and just started shooting.  Then he

22   came back.  We ran -- we was running back across the field.

23   That's when they started shooting at us.

24     Q     Could you tell who it was that was actually shooting

25   at you?

1          A       I couldn't tell exactly, but I got an idea that it

2     was Pooh and Junie.   But I can't tell you exactly who it was.

3          Q       You couldn't actually see the faces of the people

4     shooting?

5          A       I couldn't see their faces because it was dark at

6     the time.

7          Q       All right.   But there's gunfire coming at you, so

8     you're running.

9          A       Yeah, I'm just running.

10         Q       Who else from your group is shooting -- well, who,

11    if anybody, is shooting back at these guys?

12         A       Rocky and -- no, it was just Randy shooting back.  I

13    think Rocky shot back twice, a couple of times.

14         Q       Rocky shot back twice?

15         A       Yeah, I think he shot back a couple of times.

16         Q       And you said Randy was shooting?

17         A       Randy was shooting, but Randy shot back more

18    -- Randy shot back more than Rocky.

19         Q       What did Randy have?   What kind of gun?

20         A       I think Randy had a Tech 22 -- Tech 22.

21         Q       Okay.   That's essentially a hand machine gun that

22    shoots 22 caliber bullets?

23         A       Yeah.

24         Q       All right.   Now, when you guys got back over into

25    Stanton Dwellings, to your home territory, what happened when

1    you got back there?

2         A    We went back in the alley.  Then I went on Congress.

3    Me and Wah-Luck went on Congress.  Rocky and them went on 15th

4    Place.  Then that was it.

5         Q    That was it for that night?

6         A    That was it for that night.

7         Q    Okay.  Now, what's the next time -- let me ask you

8    something about this.  Was there a shooting that happened

9    before this where Munsey was riding -- that your cousin was

10   riding around on a bike or something?  Is that before or after

11   this shooting that you just described where you went up there?

12        A    I think -- I think this was before the shooting,

13   that we went up there.  I think this is before.

14        Q    Okay.

15        A    I think this -- I think that was before.  And the

16   one that Munsey was on the bike, I think that was after.

17        Q    So, you think Munsey riding around on the bike, that

18   -- the shooting --

19        A    Yeah.

20        Q    -- that happened with that, that happened after?

21        A    Yeah, that happened after.

22        Q    Okay.  And can you tell us about that?  When this

23   thing that we're referring to as Munsey riding around on his

24   bike --

25        A    We was just in the court, me -- me, Squid and Wah-

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1    Luck, J.J.  Munsey came around there.  He was just riding a

2    bike up and down the street.  So, I told -- I told him to get

3    off the bike.  So, he was like all right.  So, he rode up to

4    the top of Stanton Road.

5         Q    Why did you tell him to get off the bike?

6         A    Because they was like -- you know, the dude might

7    come around there.  So, he was like -- he was like, all right.

8         Q    What's the problem with being on a bike if the dudes

9    come around?

10         A    Because if you on a bike, you can't really react

11   from -- you know, if somebody try to run -- run at you with a

12   gun, you can't really react from it.

13         So, I told him to get off the bike.  He was like,

14   all right.  So, he rode up to the top of the corner.

15         Q    Which corner are we talking about?

16         A    Stanton Road.  And at the time he did that, he

17   already on Stanton Road.  And while he up there, we across

18   -- we across the street in one court.  And Lala and all them

19   like across the street in another court.

20         So, Tweety, his brother, Spook, and the dude named

21   Cootie, it's like three cuts on the street.  It's one at this

22   -- end of this cut.  It's one in the middle.  And it's one in

23   the other end.

24         Q    Just so we're clear, a cut is just a space between

25   two buildings, right?

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

32

1      A      It's just a space between -- yeah, two buildings.

2    He was in the cut.  It's three cuts on the street.  And they

3    are just -- they're apart from each other, like separate, you

4    know.  So, they -- all of them was shooting across the street

5    in the cut where Lala and them at.

6      Q      Which street are they shooting across?

7      A      They shooting across Congress Street.

8      Q      Okay.

9      A      So, we in -- we in the cut across the street from

10   Lala and them.

11     Q      Who is we?

12     A      Me, J.J., Wah-Luck and Squid.  So, they can't see us

13   in the court.  But, the cut right here, so we can hear the

14   guns like here and here.  But I didn't know that Tweety was at

15   the end.  Tweety ran from the cut all the way across the

16   street to another cut.

17            So, Squid shot at him one time.  So, he went through

18   the cut.  At the time when he ran through the cut, my cousin

19   was on the bike, he was at the other cut on Stanton Road,

20   coming down.  And he seen Tweety come across the cut.

21            So, my cousin started shooting at Tweety.  And that

22   was it.

23     Q      Okay.  Then they ran -- they ran back?

24     A      Tweety ran another way.  Tweety's brother and the

25   dude, Cootie, they went back the way they came.

1     Q     Did anybody get shot that time?

2     A     No, nobody didn't get shot that time.

3     Q     Now, on May 8, 1996, Spook gets murdered.  Are you

4  around when he actually was murdered?

5     A     No.

6     Q     Do you remember where you were on the day that he

7  got killed?

8     A     I was uptown, Northwest.

9     Q     Okay.  Did you come around to the neighborhood after

10  the murder actually happened?

11     A     I came -- I came around the neighborhood when a

12  helicopter was picking him up.

13     Q     And when you got back in the neighborhood when the

14  helicopter was there, what happened?  Just tell us what you

15  saw and what you heard.

16     A     I just seen a helicopter picking him up.  And I was

17  asking people who it was.  And they was like, it's Spook.  So,

18  I was like, yeah.

19          So, I came back on Congress.  Wah-Luck was standing

20  in the court.

21     Q     Wait, wait.  Before we get that far, where were you

22  actually at when you see the helicopter landing?

23     A     I pulled on Stanton Road.  Then I pulled on

24  Congress, went to the end of Congress and turned around.

25  Parked on Congress.  Got out.  Went across the street.

34

1        Q    To where?

2        A    To Turner.  At that time, the helicopter was already

3    landing.  So, at that time, they was putting him in the

4    helicopter and they took off.  So, when the helicopter took

5    off, I just left.

6        Q    Did you see where Spook was actually shot at?

7        A    I seen where he got shot at.  He got shot like by

8    the library.  But, at the time, I didn't know he got shot down

9    there by the library, because at the time, they had everything

10    blocked off.  So, we was like at the other end of the school,

11    so we couldn't tell where he got shot at until when they

12    picked them up.  And they -- you know how they have the shells

13    and all that.  So, that's how we knew he got shot down there.

14        Q    So, you stayed around long enough to see where the

15    police were picking up evidence from?

16        A    Uh-huh.

17        Q    Okay.  And who was with you while you were out there

18    looking at all this, do you remember?

19        A    Rocky and Mush.

20        Q    And were they saying anything about what had

21    happened at that point?

22        A    No, but they was with me.  They was just like

23    -- they was just like trying to find out like I'm trying to

24    find out.  We was like, who was that?  And to -- there was a

25    lot of people out there, so they was like, that's -- that was

1     Spook.  And they was like --

2          Q    Did anybody else get shot, besides Spook?

3          A    Yeah, Murphy.

4          Q    A guy named Murf?

5          A    Yeah.

6          Q    Do you know his real name?

7          A    His last name is Murphy.  I keep forgetting his

8     first name.  But his name Man.

9          Q    They call him Man on the street?

10         A    Yeah, his name Man.  He my -- on my brother's -- on

11    my father's side, he my brother's cousin.  But I forgot his

12    -- you know, his real first name.  I forgot his first name.

13         Q    All right.  So, now you go back over from Turner

14    Elementary School where you're watching all this, back onto

15    Congress, right?

16         A    Right.

17         Q    So, what happens when you get back to Congress?

18         A    So we getting back in the car.  I see Wah-Luck

19    standing in the court.  So, I was like, somebody got us Slim,

20    like that.  He was like -- he just looked at me and smiled

21    like -- he just gave me a smile like he did it.

22              So, I jumped in the car and we just left around the

23    neighborhood.  We just pulled off and left from around there.

24         Q    So, in your mind, you understood this exchange that

25    you had with Wah-Luck that he had been the one -- or one of

1      the ones responsible for the killing of Spook?

2           A     Yeah.   Then they was like in the neighborhood, that

3      he did it anyway.

4           Q     All right.   Did you ever have an actual sit-down

5      conversation with Wah-Luck where he kind of laid it all out?

6           A     He -- it wasn't like he really laid it out on that

7      -- that one.   But it was -- it was one that he did tell me

8      about.   But he ain't exactly told me about that one.   He was

9      just like that when they supposed to shot him, he didn't know

10     that -- all right.   He was walking through the cut.   I think

11     he was eating or something.

12          Q     Who are you talking about?

13          A     Spook.

14          Q     Spook was walking through the cut eating?

15          A     Through the cut eating.   And when he turned around,

16     he couldn't get his gun in time.   At that time, they shot him

17     -- shot him when he turned around.   They was shooting him up.

18          Q     Are you saying this is what Wah-Luck told you or is

19     this what you put together from other people talking about it?

20          A     Well, other people was talking about it, too.   He

21     ain't -- he ain't tell me exactly that.   He was just saying

22     that when he turned around, he didn't know what was coming.

23          Q     Okay.

24          A     So, I just put -- put the other stuff together.

25     When he turned around, he just got -- you know, shot up from

1      everybody talking about it all the time.

2            Q    So, what Wah-Luck actually said to you is --

3            A    When he turned around, he didn't know what was

4      coming.

5            Q    All right.  So, when Spook turned around, he didn't

6      know he was about to get killed?

7            A    He didn't know it was coming.

8            Q    It was a surprise?

9            A    It was a surprise.

10           Q    Okay.  And that conversation that you had with Wah-

11     Luck about that murder, was that at the time when you first

12     went up to him and you said to him, I heard that Slim got

13     killed and he gives you the look that tells you he did it?

14           A    I didn't -- I didn't go up to him.  I was getting in

15     the car.  And the court like this.  And this the street.  So,

16     I'm getting -- I'm getting back in the car.  I'm driving.  So,

17     I'm getting back in the car.

18                So, I look at him.  I was like, Slim -- I did like

19     that, Slim got -- somebody got -- got us Slim, like that.  He

20     was like -- he just started smiling.  So, the smile that he

21     gave me was like he did it, so.

22           Q    Now, let me make sure I understand this.  When

23     -- this is right after Spook gets murdered, right?

24           A    Mm-hmm.  Matter of fact, the helicopter just took

25     off like probably five minutes.  And I'm ready to get back in

38

1       the car and just get away from the neighborhood.

2           Q     And does Wah-Luck get in the car with you?

3           A     No, he just standing in the court.

4           Q     So, you're talking to him from the window.

5           A     I'm getting -- like I'm opening up the door.  And I

6       say, somebody getting us -- I'm facing him.  He in the

7       court -- I'm like, somebody -- somebody got us Slim, huh?  And

8       he just gave me like a smile, like he did it.  So, I just jump

9       in the car and start it up.

10          Q     Now, you made a motion earlier that you said -- when

11      you said, somebody got us Slim, you nodded your head, like you

12      were nodding over to a certain area.

13          A     I did -- I did like this.  Somebody got us Slim,

14      huh?  Because the school like at this corner.  The car faces

15      the school.  The court is on my right.  So, I'm getting in the

16      driver's side.  I'm facing Wah-Luck while I'm getting in the

17      driver's side.

18                But when I -- when I get in the car, I'm facing the

19      school now.  So, all I got to do is nod my head this way, c

20      I'm facing Wah-Luck at the same time.

21          Q     So, your gesture to the school was a reference to

22      somebody getting killed?

23          A     Somebody got us Slim, like that.  So, he was -- he

24      just gave me a smile and I just got back in the car and pulled

25      away.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE N W  SUITE 1250
WASHINGTON, D C  20005
(202) 296-2929

1   Q    And when was it that he made this comment to you

2   about, he didn't see it coming?  Where were you at at that

3   point in time?  Were you on the street or were you in jail or

4   what?

5   A    I think -- I think he was telling Squid -- I think

6   he was telling Squid about it.  I'm not -- I think he was

7   telling Squid about it one night when we was in the court.

8   And I was just sitting there listening.  And that was -- that

9   was it.

10   Q    .Okay.  So, it was one of the nights before you got

11   locked up after Spook's murder, he was sitting there telling

12   Spook about -- excuse me.  He was telling Squid about the

13   murders?

14   A    He was telling Squid.

15   Q    Telling Squid about the murder of Spook?

16   A    Mm-hmm.  And I think -- I'm not for sure, but the

17   rumor -- it wasn't no big rumor like Wah-Luck, like the rumor

18   of Wah-Luck.  But, certain people was like, Blue was with it.

19   They was saying that Blue was with it.  But that was just a

20   rumor with him.  They were saying two people had did it.

21   Q    Did Wah-Luck ever confirm to you that Blue, in fact,

22   was with him?

23   A    No, he didn't tell me that Blue did it.

24   Q    Did Blue ever tell you?

25   A    I heard somebody say that Blue did it, but I don't

1    remember who -- who it was.  Blue ain't never tell me he did

2    it.  I never got a chance to really -- really talk to Blue.

3    Blue was just -- Blue that type, when he out there, he like to

4    brag about things.  So, he probably did tell a couple of

5    people if he was with him, so.

6        Q    But, to the best of your memory, the conversation

7    where you overhear Wah-Luck saying something about -- Spook

8    didn't expect it coming, that was in a conversation that

9    happened in the court between Wah-Luck and Squid, right?

10       A    Right.

11       Q    Okay.  Now, after the murder of Spook, there were a

12   whole series of shootings.  The pace of the shootings picked

13   up, isn't that correct?

14       A    Correct.

15       Q    I mean, basically, there were shootings going back

16   and forth and back and forth on a relatively routine basis,

17   correct?

18       A    Correct.

19       Q    And you participated in at least some of those

20   shootings, right?

21       A    Correct.

22       Q    Now, do you recall a time when you and a group of

23   guys got into a pick-up truck?

24       A    Yes.

25       Q    All right.  Where were you before you got into the

1    pick-up truck, do you remember?

2         A    I was on Congress.

3         Q    You were on Congress?

4         A    Yeah.

5         Q    Tell us what happened leading up to this attempt?

6         A    Me and Wah-Luck had walked up to -- me, Wah-Luck and

7    Blue had walked up the alley just to see what was going on

8    with -- you know, a couple of them dudes up there.

9         Q    Now, is this the same alley you were referring to

10   before, the one that runs between Congress and Bruce?

11        A    Yeah.

12        Q    All right.  Go ahead.

13        A    But we was just walking up there to see what was

14   going on up there.  And Funky and ODB had a pick-up truck.

15   And --

16        Q    Where had they gotten the pick-up truck, do you

17   know?

18        A    They rented it from some -- some dude.  So, they

19   were just riding around, spinning the truck around and all

20   that.  So -- so, at the time we walked up there, Rocky

21   -- there was just a whole lot -- a whole lot of people up

22   there.  So, at the time they was like, well, either use the

23   truck to go up -- up Stanton Terrace.  So, everybody started

24   going to get their guns and stuff.

25             So, Blue went and got his gun.

42

1      Q    What kind of gun did Blue have?

2      A    Blue had an AK.

3      Q    Is this a rifle?

4      A    Uh-huh.  So, everybody went up there.  Everybody get

5   in the truck.  And it was me, Blue, Funky, ODB, Rocky, Randy,

6   J.J.  I think that was it.

7      Q    Was Wah-Luck in there?

8      A    Yeah, Wah-Luck.  He was in there.

9      Q    And was Munsey in there?

10     A    I can't remember.  I don't -- I can't recall that he

11  was in there.  I think he was.

12     Q    You're not sure?

13     A    I'm not -- I'm not sure right now, but I think he

14  was.

15     Q    Did anybody else have an AK besides Blue?

16     A    Funky had an AK.

17     Q    Do you remember what Randy had?

18     A    Randy had a Tec 22.

19     Q    And how about Rocky?

20     A    Rocky -- I think he had a 9, I think, a 9, I think.

21     Q    And how about Wah-Luck, what did he have?

22     A    Wah-Luck had a 40.  Wah-Luck had a 40.  And I think

23  he had a 357, too.  And J.J. had a 9.  And I had a 40.

24     Q    You had a 40, as well?

25     A    Uh-huh.

1        Q      Where did you get your 40 from?

2        A      From my cousin.

3        Q      Your cousin, again, being Munsey?

4        A      Yeah.

5        Q      All right.  So, after you guys all hop in the truck

6    -- I mean, everybody knows you're going up there to try to

7    shoot at some of the Stanton Terrace guys, right?

8        A      Yes.

9        Q      So, you go from the alley.  Trace the path of the

10   truck.  What happens?

11       A      We rode -- we rides up Stanton Terrace.  There

12   wasn't nobody out there.  We come back down.  There wasn't

13   nobody out there, so we just came back in the alley.  And then

14   everybody got out.  And that was it.

15       Q      So, you rolled through a couple of times?

16       A      Mm-hmm.

17       Q      And nobody was out there?

18       A      Nobody was out there.

19       Q      Did you come to learn at any point in time that

20   people were looking out for you guys coming and calling ahead

21   to them?

22       A      At the time, I didn't know, but I found out.

23   But --

24       Q      What did you find out?

25       A      At the bottom of Stanton Terrace, the dudes down

1    there had walkie-talkies, letting them dudes know that people

2    -- whoever going to come through that they was beefing with,

3    they was letting them know.

4         Q    And when you say, the bottom, you're talking about

5    the area near Turner Elementary School, right?

6         A    Yeah.

7         Q    Was there somebody particular from the bottom that

8    was doing this?

9         A    I think a dude named Mike, Mike Tinch, I think.

10        Q    Mike Tinch?

11        A    Uh-huh.

12        Q    Now, on June 7, 1996, you shot a police officer,

13   correct?

14        A    Yeah.

15        Q    All right.  Now, let's start from the beginning on

16   that.  Before you actually shot the police officer, where were

17   you?

18        A    I was at the liquor store.

19        Q    Who was with you?

20        A    Cooler.

21        Q    Cooler?

22        A    Yeah.

23        Q    And what happened after you went to the liquor

24   store; where did you go?

25        A    I'm coming back towards Congress.

1      Q      Had you been on Congress before you went to the

2    liquor store?

3      A      Yeah.

4      Q      And who is out there at the time that you were out

5    there before you went to the liquor store, to the best of your

6    memory?

7      A      Me, Wah-Luck, Cooler, Honky, dude named Block.   A

8    lot of girls was out there.   Lala.   A lot of young dudes his

9    age was out there, like 14 and 15.   They was out there.

10      Q      Okay.   Now, when you come back from the liquor

11    store, what happens?

12      A      I was getting out of the car.

13      Q      Which street are you on?

14      A      On Congress.   I was getting out of the car.   I had a

15    bag in my hand.   I had a gun under the bag, so at the time I

16    was getting out of the car, an old car was coming down the

17    street with the lights out.   And there was like four people in

18    there.

19          So, I really didn't pay attention to the car, but I

20    knew the lights was off.   So, when I looked at the car, they

21    rode past.   They pulled in the alley.

22          So, at the time, they pulled in the alley, a couple

23    -- a couple of dudes over there by Wah-Luck and them was like

24    -- they was like, that was -- that was them.

25      Q      That was who?

1           A      That was -- you know, they was saying, that was them

2      niggers, like that, so.

3           Q      Who were they referring to?

4           A      They were saying that was Stanton Terrace and them.

5      So, at the time, I put the bag down and went through the cut.

6      So, a dude named Poochie had come through the cut with me.

7                  At the time, Wah-Luck --

8           Q      Was Poochie with you guys?  Was he part of 1-5?

9           A      No, he wasn't part of it.  He would just come

10     around.  He one of the old-timers used to be around there when

11     I was young.  He just grew up around there.  So, he don't live

12     around there no more.  He just come around sometimes.  But, at

13     the time, he was out there that night.

14          Q      Now, were you armed at this point?

15          A      Yeah, I was armed.

16          Q      So, you had a gun with you this whole time, from the

17     time you came back from the liquor store?

18          A      Yeah.

19          Q      What kind of gun was it that you had?

20          A      I had a 9 -- a 9.

21          Q      A 9 millimeter?

22          A      Uh-huh.

23          Q      And where did you get that gun?

24          A      From my cousin.

25          Q      Now, do you know whether Poochie was armed?

1          A     Yeah, he was armed.

2          Q     What did he have?

3          A     He had a 380.

4          Q     All right. So, you decided to follow this car into

5     the alley?

6          A     He -- the car went in the alley. I went through the

7     cut. Wah-Luck went -- ran down to the alley and was like

8     -- well, the car went at the entrance of the alley. That's

9     where Wah-Luck went through.

10          So, I went to like the end of the cut and was just

11     standing right there. The car pulled beside another car. And

12     they was just sitting beside each other.

13          At the time, Poochie was like, that was them. He

14     was telling me, that was them and all that. So, if I would

15     have -- if I would have waited just about two or three

16     minutes, Wah-Luck would have ran down on the car.

17          But, at the time, I had started shooting at the car.

18     And then after I started shooting, I just got up and we walked

19     back towards Congress. So, I put the gun in the bushes.

20          Q     Hang on a second. Let's back up a minute. When you

21     go through this cut toward the alley, right?

22          A     Correct.

23          Q     And you said, Wah-Luck goes in a different

24     direction, is that correct?

25          A     Yeah.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE  N.W. SUITE 1250
WASHINGTON, D.C.  20005
(202) 296-2929

1        Q    All right.  The only thing you know at this point is

2    that this car has pulled into the alley, right?

3        A    Pulled into the alley.

4        Q    And you're thinking at that point in time that this

5    is the people from Stanton Terrace?

6        A    Yeah.

7        Q    All right.  And so when you get into the alley and

8    you can see this car, it's actually pulled next to another

9    car, correct?

10       A    Yeah.

11       Q    And can you actually see the faces of the people

12   inside these cars?

13       A    No, because it's dark.  The alley dark.  You can't

14   -- the only thing you can see is the lights on the car, the

15   back lights.

16       Q    All right.  So, you get to where before you start to

17   fire?  Where is it that you're actually firing from?

18       A    Well, I got by like the end of the cut like where I

19   said that Tweety's brother called me from.  I was like right

20   there at the end of the cut.

21       Q    Now, when you -- you start firing.  Can you tell us

22   how many shots do you fire?

23       A    Seventeen times.

24       Q    Is that everything the gun will hold?

25       A    Yeah.

1       Q     And you fire at this car?

2       A     Yeah.

3       Q     Can you tell whether or not any of your bullets are

4    hitting the car?

5       A     I couldn't tell.  I just know that bullets was

6    hitting the fence like where the car was at.  There's a big

7    fence in front of the car.  So, bullets was hitting the fence.

8    But I ain't know that the car was getting hit or none of that.

9             I just knew that -- because it was a long range.  It

10   was like I'm in the cut.  The car was like way over there in

11   the alley.  So, I'm shooting from a long -- you know, a long

12   range, so.

13      Q     Now, does Poochie shoot?

14      A     No, Poochie didn't shoot.

15      Q     Did you expect Poochie to shoot?

16      A     Yeah, I expected him to shoot.

17      Q     Why didn't he shoot?

18      A     I guess I started shooting before he did.  I guess

19   he ain't -- I guess he ain't had to shoot.  And sometimes,

20   like if I shoot, shoot all my bullets, and he got a gun, he

21   just hold his bullets just in case somebody else get to

22   shooting at us.

23      Q     Kind of back-up.

24      A     Yeah.

25      Q     All right.  Now, you shot them before Wah-Luck could

1    get in position, is that right, to shoot, as well?

2        A   He -- he could have been in position. He just ain't

3    go out and do it, yet. But, from my knowledge, he wasn't in

4    position right then. So --

5        Q   Well, let me ask you this. After you do all the

6    shooting at that point, where do you go at that point?

7        A   I walk back across the street on Congress, put the

8    gun in the bushes. Then, at the time --

9        Q   Did anybody else come up at that point?

10       A   At that time, Wah-Luck, he was walking up the

11   street. At that time, the police had already jumped out and

12   laid us down on the ground and was checking us. So, he was

13   --

14      Q   This is before or after you put the gun up in the

15   bushes?

16      A   This -- this was -- I already put the gun down. And

17   then the police came and laid us down. Then --

18      Q   So, the police got there almost immediately then?

19      A   Yeah, they -- they was right -- as soon -- as soon

20   as it happened, police was everywhere. So, they laid us down

21   on the ground and was checking us and stuff.

22      So, we was like, what happened?

23      They was like, the police just got shot.

24      So, they had the whole street blocked off. So, they

25   were just checking us. And they let us go.

1      Q     Did they find anything on you?

2      A     They didn't find nothing.

3      Q     Who else was laid down?

4      A     I think it was Poochie, J.J.  It was a whole lot of

5  us laid down.  It was like about five of us laid down.

6      Q     Now, did you stay out there while the police are

7  processing the scene or going up there?

8      A     They was like in the alley, so that's all we could

9  see is people moving because it's dark.  We across the street

10  on Congress, so we stayed in -- in the court.  But we could

11  look through the cut, but we can't see what they exactly

12  doing.

13          We know -- I knew that where -- where I was at and

14  where I shot the gun, they was right there picking up all the

15  shells and stuff.

16      Q     Now, when the policeman told you that it was a

17  police officer who had been shot, what were you thinking?

18      A     I was -- well, I was thinking a whole lot of things.

19  I can't remember what I was thinking.  I was thinking a whole

20  lot of things.  At the time, I was drinking, so I was just

21  -- I was in another world at that time, so I couldn't remember

22  what I was thinking.

23          But all I remember -- all I remember, I was just

24  like -- I was shocked that -- when he told -- when he told me

25  -- the police told me the police got shot, I ain't really

1    believe it at the time.  I ain't believe it.

2            And then when I seen all the police around, I was

3    like, it can be.

4            When I went in the house at 6:00 that morning, I

5    seen on the news, that's when I believed it.

6            And my cousin was like, don't -- don't even worry

7    about it, you know.  He was just like, you know -- at first,

8    he was like, the lord forgive -- you know, for your sins and

9    all that.  But, at the time, I ain't -- I'm saying I knew that

10   the lord, you know, but I didn't believe in all that at one

11   time.

12           So, at the time, I was like, yeah, okay.  You know

13   what I'm saying?  I'm just going on what he saying.  You know

14   what I'm saying?

15           But, at the time, it was just -- it was just wild.

16   Q    I mean, were you messed up that you --

17   A    I was messed up, yeah, because when I came in the

18   house and I seen it on the news, I woke up my uncle's friend

19   and I was telling him about it.  And he was like, you know,

20   you fucked up and all that.  Excuse my language, but he was

21   like, you know, you know, you messed up.

22           So, I was like -- I was just -- you know, I was

23   down.  I was like, you know, I'm gone.

24           The only thing I was thinking of was life, you know

25   what I'm saying.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C.  20005
(202) 296-2929

1          Q     Meaning you were going to go to jail for life?

2          A     Yeah.  So, after a couple of days passed, I was just

3     like, I guess I'm going to get away with it.  I didn't think

4     that they was going to come for me or nothing like that.

5                Then when they ran in my house, they ran in my house

6     and was like, the police locked me for I had a gun in my

7     house.  So, they was locking me up for the gun.

8                So, the police was taking pictures off my wall.  He

9     was like, you don't like police.

10               So, then I started thinking, they here for -- they

11    got me for this now, for the police.  All along, they was just

12    running in my house for the guns to see if they could catch me

13    with the gun.  But they did not catch me with the gun.  They

14    caught me with another gun.

15         Q     What happened to the gun that you used in the

16    shooting of the police officer?

17         A     I gave it back to my cousin.

18         Q     And do you what he did with it?

19         A     Sold it.

20         Q     Now, you said that Wah-Luck had run around a

21    different way in order to try to get a different angle at the

22    car, right?

23         A     Correct.

24         Q     All right.  Did you have a conversation with Wah-

25    Luck that night after the shooting?

1      A      He had walked up there and was like, I should have
2      waited until he did something first.  I should have waited,
3      because at the time I shot, he couldn't get out of the alley
4      just in time, because the police was everywhere.  So, he put
5      his gun -- he took his vest off and put a gun down by the
6      trash can.
7             So, the police found the vest and the gun.
8      Q      Was he upset about that?
9      A      Yeah, he was upset, because that was the only gun
10     that he had.  And then from my understanding, I think that was
11     a gun that supposed to kill Spook.  So, he was really messed
12     up, because his fingerprints was on the gun and stuff like
13     that.
14            But, now after a couple days passed, he wasn't even
15     worrying about -- worrying about it no more.  So, that was
16     that.
17     Q      So, he was worried because that was the gun he had
18     used in Spook's murder?
19     A      Yeah.
20     Q      And you said you put down a vest?
21     A      He had a vest.
22     Q      Are you talking about a clothing vest or what kind
23     of vest?
24     A      A bullet-proof vest.
25     Q      A bullet-proof vest.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1        A     Yeah.

2              A JUROR:  Are you planning on taking a break?

3              MR. PFLEGER:  I was just going to say, if you want

4     to, we can.

5              (Brief recess.)

6              BY MR. PFLEGER:

7        Q     Mr. Green, at the time that we left off just a

8     minute ago here, we were talking about the time when you shot

9     a police officer.  Did you become aware, in fact, that a

10    police officer had actually been shot by you?

11       A     Yeah.

12       Q     Was that on the news when you heard it that, in

13    fact, a police officer had been shot?

14       A     Yeah.

15       Q     Now, do you know or did you come to learn why the

16    police were in that area in the first place?

17       A     Well, the girl, Chante, her -- her and her brother

18    got shot one time.  Her brother died.  And she was testifying

19    against the dude.  And the dude's brother and the dude, Funky,

20    was just out there plotting on her.  She was -- they was out

21    there trying to, you know, get her.

22       Q     They were trying to kill a witness?

23       A     Yeah.  So, she was just out there.  So, the dude,

24    Idaho, he seen them, but he didn't know what they was doing.

25    So, he was like, who is that?  Because he couldn't see them.

1    It was dark.

2            So, at that time, she went on in the house and
3    called the detective.  So, that's when the police must have
4    came around there.  All along, the police probably was coming
5    to get the two dudes out of the alley, because they was in the
6    alley where the police got shot at.

7        Q    So, as far as you knew, the police were there for
8    something unrelated to you and your -- and your friend, as far
9    as you knew?

10       A    Yeah.

11       Q    Although, Funky, of course, was one of the guys that
12   was with you in all this, right?

13       A    Yeah.

14       Q    All right.  Now, do you know whether or not this
15   person, Idaho, actually -- do you know Idaho's real name, by
16   the way?

17       A    It's Ira something.

18       Q    Ira something?

19       A    Mm-hmm.

20       Q    Okay.  Do you know whether or not he actually saw
21   you shoot at the police officers?

22       A    He -- he was standing on the front porch like on my
23   right.  So, he was -- he was out there.  He was like on my
24   right.

25       Q    Okay.  We're going to come back to him a little

1    later.  Okay.  Now, after your shooting of the police officers

2    and you learned that basically they -- you weren't going to

3    get picked up, at least not immediately with regard to that

4    shooting, did you and Shelton Marbury go on another occasion

5    up to the Stanton Terrace area to try to shoot some of the

6    Stanton Terrace guys?

7         A    Just me and him.

8         Q    Just you and him?

9         A    Yeah.

10        Q    Where were you guys before you went up there?  I

11   mean, what street?

12        A    Just on Congress.

13        Q    So, you were just hanging out as normal?

14        A    Yeah.

15        Q    So, tell us what happened.

16        A    We just walked up there and we seen -- we seen a

17   whole lot of people out there.  They were at a block party.

18   So, we were just walking up there.

19        Q    What street is the block party on?

20        A    On Frederick.

21        Q    So, go ahead.

22        A    So, we was just walking up there.  And we seen

23   everybody out there, but there was too many kids out there.

24   So, we just turned around and went back.  It was -- it was hot

25   outside.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1        Q     So, this was during the day time or the night time?

2        A     Day time.

3        Q     All right.  And did you guys go masked up or did you

4    go --

5        A     Just regular clothes.  No mask, nothing.

6        Q     Okay.  So, you just walk up there in day time right

7    into their territory?

8        A     Yeah.

9        Q     What were you carrying?

10       A     A 9.

11       Q     A 9 millimeter?

12       A     Yeah.

13       Q     And what was Wah-Luck carrying?

14       A     A Tec 9.

15       Q     A Tec 9?

16       A     Yeah.

17       Q     And did either one of you actually fire any shots?

18       A     No.

19       Q     And you say when you got up there, you saw some of

20   the people that you were -- some of the Stanton Terrace guys?

21       A     Yeah.

22       Q     But there was a lot of other people around, too?

23       A     Yeah.

24       Q     Including a bunch of children?

25       A     Yeah.

1          Q     And who made the decision, well, let's not do it

2     because there's too many kids?

3          A     Wah-Luck.

4          Q     So, Wah-Luck said, too many kids, let's go?

5          A     Yeah

6          Q     So, what did you guys do?

7          A     Just turned around and walked back.

8          Q     Now, shortly after that, there was an individual by

9     the name of Mark Barnes, who was shot.  Do you know a person

10    by the name of Mark Barnes?

11         A     Yeah.

12         Q     And, in fact, for a while, you were actually locked

13    up in the same area as Mark Barnes over at the Correctional

14    Treatment Facility near the D.C. jail, correct?

15         A     Yeah.

16         Q     All right.  Now, before Mark Barnes got shot, where

17    were you and some of the guys that you were with?

18         A     Me, Rocky, Wah-Luck, Soupbone and Randy, we was all

19    in the alley.  So, they decided to just walk up there.  So,

20    instead of us just walking exactly up there, we started from

21    the bottom, started walking.

22               By the time we got to the bottom --

23         Q     Hang on a second.  Trace for us by landmarks how

24    you're going.  You go from the alley, right?

25         A     Go from the alley through the cut by Turner School.

1        Q     Do you cross over Turner School?

2        A     We cross over there, but we still -- Turner School

3   still right here by us.  We like by -- by the door.  We by the

4   tunnel, so.

5        Q     Okay.

6        A     At the time, we by a house, too.  We by Tommy's

7   mother's old house.  We by her house.

8        Q     Tommy Edelin's mother's old house?

9        A     Yeah.  We by her house. And it was real dark right

10  there, so.

11       Q     What's your intent for the four of you guys going up

12  there or the group of you to do?

13       A     We was going up Stanton Terrace to see if we see

14  anybody out there.

15       Q     Okay.  And the people who go with you is Wah-Luck,

16  Rocky, Randy and Sooliman, right?

17       A     Mm-hmm.

18       Q     And Sooliman's nickname is what?

19       A     Soupbone.

20       Q     Okay.  Now -- I'm sorry.  When you get up to Tommy

21  Edelin's old house, what happens?

22       A     We seen some dudes like across the street, but we

23  couldn't tell who they was.  So, Rocky and Randy was talking.

24  And I heard -- I heard Wah-Luck say, you want to get at them,

25  like that.

1          So, as soon as he said that, a light just flashed

2     on.  Like it was a light, like so if your body get under that

3     light, it just come on.

4          Q     You mean, there's a sensor there?

5          A     Yeah, sensor.  So, the light just came on.  As soon

6     as the light came on, they just started shooting.

7          Q     Who was actually shooting?

8          A     Well, I seen Wah-Luck and Soupbone shooting.  I

9     ain't really pay attention to Randy.  But, as soon as they

10    started shooting, they started taking off.  I started taking

11    off, but I went the opposite way.  I went like under the

12    tunnel where the school at.  I went under the tunnel and came

13    out on the street.

14          They went towards the field and went through the cut

15    and then came on the street.

16          So, we went two opposite ways, but we end up at the

17    same place.

18          Q     And what happened when you got back to the same

19    place?  Where was that, first of all?

20          A     That was like in the alley of 15th.

21          Q     Okay.  So, back to the same home spot you started

22    from?

23          A     Yeah.

24          Q     And what -- what happens when you get back there?

25          A     Really, ain't nothing happened.  We was just in the

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1    alley.

2         Q    Did anybody know if somebody got hit or not?

3         A    We ain't know nobody got hit until like probably the

4    next day or something.  Somebody was -- the dude, Donnie

5    -- the dude named Donnie, he was like -- he said, Wah-Luck did

6    it.  And they was like, how can you say -- people was saying,

7    how can you say Wah-Luck did it?

8              Something -- Wah-Luck went up there and was talking

9    to them or something.  That was that.

10        Q    When did you find out who it was that actually got

11   shot?

12        A    The next day, my brother told me, because my brother

13   be up there with them, with the dudes.

14        Q    Now, when you say, up there with them, you're

15   talking about the guys from the bottom half of Stanton

16   Terrace, right?

17        A    Yeah.

18        Q    All right.  And they're a slightly different group

19   than the guys from the top half that you're actually beefing

20   with, right?

21        A    Yeah.

22        Q    But, some of the guys from the bottom were actually

23   helping out the guys from the top, right?

24        A    Correct.

25        Q    All right.  And was that why Wah-Luck and -- I think

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE. N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1    you said it was Rocky were talking about, should we just get

2    at them anyway?

3        A    I can't say that was the reason, but they just shot

4    at them.

5        Q    I mean, is there any other reason why Wah-Luck or

6    Rocky would want to shoot at these guys, other than their

7    involvement with these --

8        A    As far as I can say about Rocky, I mean, he -- he

9    can use a reason because back in '93, they was beefing with

10   the bottom.  So, that could be a reason with Rocky, back in

11   '93.

12       Q    So, at one point back in '93, there was also a beef

13   with the guys from the bottom, as well?

14       A    Yeah.

15       Q    All right.

16       A    And at the top, but it wasn't -- the top -- it was

17   just some of the dudes at the top with the bottom.

18       Q    And, in fact, there had been even before all of this

19   started in the robbery of Pop and Lala, there had been some

20   -- I guess for lack of a better word, there's even been a beef

21   before that between the 1-5 mob and Stanton Terrace guys

22   before, right?

23       A    Yeah.  At that time, it was me -- Wah-Luck was

24   locked up at that time.  At that time, me and J.J. and all of

25   us, we ain't had nothing to do with it.  At that time, they

1    was just beefing with the dudes that just be on 15th.  And, at

2    that time, we just see Stanton Terrace walk past us and they

3    go shooting and then run back up there.  They go up there,

4    come back.

5            At that time, it wasn't -- you know, we ain't had

6    nothing to do with that.

7        Q    You guys were trying to stay out of it at that time.

8        A    At that time -- well, we ain't -- at that time, we

9    didn't even have to try.  They knew we ain't had nothing to do

10   with it.  They were just -- they'll see us and just say,

11   what's up.  And then they'll go on 15th and shoot.

12       Q    So, that was more of a limited beef in terms of not

13   as many people were involved.

14       A    Yeah.

15       Q    All right.  Getting back to -- I'm sorry.  Getting

16   back to when Mark Barnes got shot, so you find out the next

17   day that he got shot?

18       A    The next day.

19       Q    All right.  Did you know Mark Barnes?

20       A    I knew him, but on the street, it was just -- it was

21   like we ain't -- it was like, we ain't get along.  It was

22   like, if I see him ride past my neighborhood, I be like, what

23   did he ride past it for?

24           If I ride past his neighborhood, he be like, what am

25   I riding past there for?

1          So, it be -- it be seeming like one of us up to

2     something.  So, it wasn't like, but since we got locked up, we

3     been all right.

4          Q    Okay.  So, you've actually seen him since you been

5     locked up?

6          A    I been seeing him for -- I been seeing him for the

7     last 18, 19 months.

8          Q    You're locked up in the same place?

9          A    CTF, out in Virginia, just running into him.

10          Q    And have you guys had any problems since then?

11          A    Never had any problems.

12          Q    Now, do you know whether or not Barnes was actually

13     with the beef in terms of, was he one of the guys that was

14     helping the Stanton Terrace guys from the top?

15          A    He could have been.  I can't say.

16          Q    You don't know one way or the other?

17          A    I don't know.  He could have been.

18          Q    Do you know whether or not anybody actually intended

19     to shoot Mark Barnes in particular as opposed to anybody that

20     was out there?

21          A    No, because at the time, you couldn't see who it was

22     that they was shooting at.  They was just -- it was just

23     -- you could just see some dudes standing over there by the

24     car with Eddie Bauer coats on.  You couldn't see who it was.

25     So, all you see is dudes walking back and forth, walking back

66

1      and forth.

2             It was so dark, you couldn't tell who it was.  You

3      couldn't tell who it was.

4         Q    So, they could have shot anybody up.

5         A    They could have shot anybody.

6         Q    Now, you've mentioned this person by the name of

7      Cooler on a couple of different occasions.  Was there a time

8      when he got shot?

9         A    Yeah, there was a time when he got shot.

10        Q    Can you tell us about the time when he got shot?

11        A    He was standing in the court on Congress.  At time,

12     me and Wah-Luck was on Stanton Road at the top.  And we had

13     -- we had got a call saying that the dude's around there.  So,

14     me and Wah-Luck walked up to the top.

15        Q    Wait a minute.  When you said you had gotten a call,

16     a call from who?

17        A    Somebody -- somebody had called somebody around the

18     neighborhood.  And the message got back to Wah-Luck.

19        Q    Saying what?

20        A    Saying that some dudes was going to come around

21     there.

22        Q    Some of the Stanton Terrace guys?

23        A    It could be some Congress Park dudes, because they

24     be down -- some dudes be in Congress Park, too.  So, they was

25     just saying -- you could say the Stanton Terrace guys, because

1    that's who it is.  But, the --

2        Q    Some of the guys who --

3        A    Yeah.

4        Q    -- were going to be beefing with you.  It could be

5    Congress or it could be Stanton Terrace.

6        A    It could be Congress Park, too.

7        Q    Okay.  Go ahead.

8        A    So, they was saying the dudes going to come around

9    there.  So, me and Wah-Luck had walked up to the top of

10   Stanton Road.  And, at the time, I had called my cousin and

11   told him to come around.  He was coming around there.  So, he

12   parked his car at my grandmother's house and walked through

13   the cut.

14           At the time he was walking through the cut, he ran

15   into three dudes.  I think it was Tweety, Junie and somebody

16   else.  So, at the time he ran into him, but he ain't run into

17   them like face up like.  They was like across the alley and he

18   was in the cut.

19           And he was asking -- he was hollering, telling them,

20   say their names, who they is.  They wouldn't say their name.

21   So, he pulled his gun out.  They pulled their gun out and they

22   started shooting at each other.

23           Then -- so, at the time, we run down the street, ran

24   into my cousin.  By the time, they was gone.

25           So, we walked back up the street.  So, we just up

1      the street over at Mush's house, just standing on the front

2      porch.

3              So, at that time, that's when -- when they ran back

4      where they came from, they went and jumped in the car and rode

5      past Congress, did a drive-by on Coolie -- Cooler and them,

6      shot Cooler in the leg.

7              And then they made the left towards us coming up

8      Stanton Road.  But they ain't know we was up there.  So, they

9      was coming up.  So, when they rode past, we started shooting

10     at them.  And they kept going down Suitland Parkway.

11         Q    And who was it who was shooting at them?

12         A    Me, Munsey and Wah-Luck.

13         Q    And Cooler got shot where, do you know?

14         A    He ain't actually get shot.  He got like grazed in

15     the leg.

16         Q    Grazed in his leg?

17         A    Yeah.

18         Q    Now, was there another time when somebody tried to

19     get at you when you had a bunch of children in the car?

20         A    Yeah.

21         Q    Can you tell us about that?

22         A    I had two girls in the car and like about four kids.

23     And I was coming from the Star Carry-out.  And I was making a

24     right at a stop sign.  And they was coming down.  So, when I

25     was making the right, I was looking at them and they looked at

1    me.  So, they tried to bust a U real fast.

2         So, I hurried up, pulled in the alley, threw the car

3    in park, grabbed one of the kids.  And, at the time, the

4    little kids, they knew what was going on.  So, they started

5    running towards the house.  So, I ran -- ran in the house.

6    Then I got the kids in the house.

7         Then I got -- I called Mush and Funky.  So, they

8    came outside.  So, I came outside.

9         So, they told me to go ahead and get back in the

10   car.  I got in the car and went on home.

11        Q    So, Mush and Funky -- excuse me -- Mush and Funky

12   came out to watch your back?

13        A    Yeah.

14        Q    And then you left and went home?

15        A    I left and went home.

16        Q    On July 27, 1996, there were some people that were

17   shot up on Stanton Terrace at the recreation center.  Are you

18   aware of that?

19        A    Yeah.

20        Q    Were you actually in the neighborhood at the time

21   that that shooting happened?

22        A    No.  I could say I was probably on my way around

23   there or I just -- must have just got around there on time or

24   something, because I didn't hear the shooting.  I just know

25   that when I came in the alley --

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1        Q    Now, which alley is this?  Same alley you're talking

2    about?

3        A    Same alley.  They was teasing -- they was teasing

4    Nardy, the way he was driving the truck.  He must have -- he

5    was driving the truck slow after they must have did the

6    shooting and stuff.

7        Q    Who's doing the talking here?

8        A    ODB.

9        Q    So, ODB.  Are there other guys around, too, or is it

10    just ODB?

11        A    Just -- it was other guys around, laughing and all

12    that.  But it was ODB was teasing Nardy, saying that he was

13    driving, you know, messed up.

14        Q    Well, when you first come around and you join in the

15    conversation, what is -- does ODB talk about what actually

16    happened?

17        A    Well, when I walked up, they was already talking,

18    laughing and all that stuff.  By that time, I went up there

19    and they was talking about it.  So, I was like, yeah, he was

20    driving like that, you know.

21        So, he was like, yeah, he was driving slow.

22        So, Nardy was like, nah, I wasn't driving.  He was

23    driving, you know, normal.  He ain't want to drive fast where

24    the police can get on him or something.  He said he wanted to

25    drive normal and all that, so.

1        Q     Did you know about the shooting at that point when
2    you --

3        A     Yeah, because they was talking about the shooting.
4    They was like, they rolled past, seen the dudes out there and
5    started shooting.

6        Q     So, this is Nardy and ODB talking about what they
7    did?

8        A     Well, it was just really ODB.  Nardy wasn't talking
9    about the shooting.  He was just talking about, driving.  ODB
10   was just -- was just saying that they rode past and started
11   shooting and a whole lot of people was out there.  I think it
12   was a band or something up there.

13       Q     Did they indicate what kind of vehicle they were in?
14       A     They was in some kind of pick-up.  They wasn't in a
15   pick-up.  They was like in a jeep.  Like a -- I can't think
16   what kind of jeep it was.  It was like a -- Suzuki Sidekick,
17   something.  It was something like that.

18       Q     Like a sport utility vehicle.

19       A     Trooper or something, yeah.  That's the kind it was.

20

21       Q     All right.  Had you seen the actual vehicle before?
22       A     I seen it before, but the dudes that was supposed to
23   did the crime, they wasn't driving it.  There was two girls
24   driving it before.  I think it was a pipehead van or
25   something, but it was two girls driving it when I first seen

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1      it before.  That was like probably a couple of days before

2      that.

3              Q      All right.  Now, did you ever find out what kind of

4      weapons were used in that shooting at the recreation center?

5              A      As far as I know, it was an AK --

6              Q      Whose AK?

7              A      -- a 40.  I think it was Mush's AK.

8              Q      Okay.  Who had the AK, if you know?

9              A      Funky.

10             Q      Did you ever have a conversation with Funky while

11     you were at the jail about this?

12             A      Most likely I told -- I asked him about it.  He was

13     like -- I was -- no, what it was, I was like I heard about

14     Nardy was driving.  He was like, yeah, man.  Nardy could have

15     got us caught up and all this and that.

16             We rode past.  He was telling that he rode past and

17     shot.  He said he seen -- seen Pooh and some other dudes out

18     there.  They just started -- they just started shooting and

19     stuff.

20             Then they rode -- they rode off.  I think they took

21     the long way back or something, something like that.  They

22     took the long way back towards -- to where -- to around our

23     way.

24             Q      And were you -- you were at the jail at the time

25     when this conversation happened?

1       A       Yeah, I was at the jail.

2       Q       Did Funky ever say anything to you about the AK?

3       A       He didn't say nothing to me about probably like as

4    far as they shot it.  I mean, he said he shot it.  I mean, he

5    had the AK.  He said he had the AK.

6       Q       And --

7       A       He didn't tell me that he hit somebody with it, but

8    it was already stares around the area, way around it that some

9    people got hit, so.

10      Q       At a later point in time, did he tell you anything

11   about what happened to the AK?

12      A       We was over at CTF and the police had ran into his

13   house.  And they found the AK in -- in a -- they came to the

14   jail and searched the jail, searched his room and stuff, found

15   pictures and stuff.  But they ain't charge nobody for the AK.

16      Q       So, he told you, though, that the police had gotten

17   the AK?

18      A       Yeah.

19      Q       Now, this person by the name of Idaho that we've

20   talked about once before, there was a point on August 13, 1996

21   when you shot him; is that correct?

22      A       Yeah.

23      Q       All right.  And you shot him because you were afraid

24   that he was going to potentially tell the police that you had

25   done that shooting of the police officer, right?

1      A      Yeah.

2      Q      Had he been talking it up in the neighborhood that

3   he was going to give it up?  Or why did you believe that he

4   might tell the police?

5      A      Because before -- before I even shot him, he got

6   shot 17 times once before.  And then he turned around, got

7   stabbed eight times in his sleep.  Then he turned around, got

8   shot again.  Then he turned around and got stabbed again.

9   Then I -- that's when I shot him, so.

10     Q      He's a man with nine lives.

11     A      Yeah.

12     Q      But, what I'm trying to figure out is why -- why was

13  it that you decided that you would shoot him?  I mean, he was

14  -- was he talking it up in the neighborhood?

15     A      For one -- for one, we wasn't friends no more

16  because we got into it a couple of times.  You know, there was

17  one time he was trying -- you know, me and him was getting

18  -- it wasn't nothing important, but we got into it.  So, I

19  ain't like him.  He ain't like me.  But, we see each other, we

20  might say, what's up, something like that.

21             But, at the time, the dude I was hanging with

22  couldn't stand him because he supposedly had told on Tommy and

23  them once before or something.

24     Q      He had told on Tommy Edelin?

25     A      Yeah, once before or something.  So, that's why the

1    reason he supposed to had got shot up 17 times that time.

2    But, he had told two girls that he was going to tell on me.

3    He was going to get some money or something.  So, they was

4    telling me about it.  So, I was like, yeah.

5         So, every time I come around him, he just leave.  He

6    don't never, you know -- he just leave.  He don't -- you know,

7    he usually stay around, but he just leave, so.

8         This one particular he just left.  So, he went on

9    Alabama Avenue in the court.  That's when I went around there

10   and just shot him.

11       Q    Now, you've actually -- you plead guilty to that

12   shooting, correct?

13       A    Correct.

14       Q    We talked about that when you first came into the

15   grand jury, right?

16       A    Correct.

17       Q    All right.  So, we won't go into any more details on

18   that.  Now, do you remember a time when there was a shooting

19   near Hunter Pines, a neighborhood that's close to you?  I'm

20   sorry.  Before we get to that.  You know a person by the name

21   of Egg and Cheese, correct?

22       A    Yeah.

23       Q    And he's dead now, right?

24       A    Yeah.

25       Q    And do you know what his real name is?

1        A       Anthony Howard.

2        Q       Were you actually out there at the time that Egg and

3    Cheese was killed?

4        A       No.

5        Q       How did you find out about him getting killed?

6        A       Next day we was going to King's Dominion and --

7        Q       King's Dominion?

8        A       Yeah.   And --

9        Q       The day after he was murdered?

10       A       Yeah.   So, everybody was like feeling sad on the

11   bus, but I ain't -- you know, I ain't know.   So, somebody told

12   me on the bus.   And then that's when everybody -- it was like

13   everybody went to King's Dominion, but ain't nobody had no

14   fun.   So, it was like, everybody at King's Dominion was sad

15   faces walking around, sad faces.

16       Q       Because he was one of your boys?

17       A       That was my cousin, so it was like, everybody had

18   sad faces.   So, after we came back, that was that.

19               Then rumor that -- they was saying that Junie

20   supposed to did it.   So, I'd say about that Monday -- that

21   Monday -- no, that Tuesday, I was coming from the liquor

22   store.   And I made the right at Suitland Parkway light.

23               The dude that supposed to kill him was at the light

24   talking on the phone.

25               And I made the right.   And I looked at him and he

1    looked at me.  So, I slowed down like I was making the left

2    into an alley -- the alley from off Bruce Place.

3              So, he got to shooting at me.  So, I --

4         Q    Who is this?

5         A    Junie.  So, when he was shooting at me, I stopped

6    the car.  I was looking like in the mirror -- my mirror.  So,

7    he stopped shooting.  He was still sitting at the light.

8              So, I backed the car up real slow and was like

9    -- when I backed it up and then the front of the car like

10   facing him, so he jumped out the car.  I could see him put

11   another clip in the gun.  So, he started shooting again.  So,

12   I just pulled off and went down the alley.

13             So, I stopped in the alley.  I blew the horn.  Funky

14   got in the car, him and ODB.  The dude, Melvin, was in the car

15   with me.  He got out.  Funky and ODB got in the car.  So, I

16   pulled off.

17             So, we went up there.  We ain't see him up there.

18   So, we went down like Hunter Pines.  So, I was coming up.

19             So, one of the dudes from up there was walking down.

20        Q    One of the dudes from up where?

21        A    From up Stanton Terrace.  So, ODB jumped out the car

22   and ran into the cut where the dude was going to.

23             So, I turned around and went down the hill.  Now, I

24   went on the next street.

25             Now, I'm coming up the hill on the next street.  So,

1    I'm thinking that ODB is going to come out of the cut.

2           So, at the time I'm coming up the hill, I hear a

3    rack of gunfire.  So, by the time I'm coming up the hill, I'm

4    thinking ODB is going to come out of the cut.  But the dude

5    come out of the cut and started shooting at the car.

6           So, I go up and make the right.  And ODB was on the

7    right.  So, he jumped in the car.  And I took him in the

8    alley, dropped him off and I went on in the house.

9       Q    What did ODB say when he got back in the car?

10      A    He said that when he ran in the cut, he said that

11   the dude stopped.  And he said the dude pulled out his gun, so

12   he just started shooting and the dude started shooting back.

13   So, that was it.  Then the dude took off running.

14      Q    And the intention was for ODB to run out there and

15   shoot him, right?

16      A    Yeah.

17      Q    So, you get ODB back in the car and then you guys go

18   back up.

19      A    Go back up the hill.

20      Q    To the home territory at Stanton Dwellings?

21      A    Mm-hmm.

22      Q    And just kind of to summarize that one, basically

23   there's a shooting that happens where Junie tries to shoot at

24   you while you're up in the Stanton Dwellings area, right?

25      A    Yeah.

1       Q      And then you picked up Funky and ODB and you're

2    riding around looking for Junie to try to shoot him, right?

3       A      Yeah.

4       Q      And then you end up down in Hunter Pines where you

5    see another Stanton Terrace crew member down there, right?

6       A      Yeah.

7       Q      And that's when ODB jumps out and tries to shoot

8    him.

9       A      Yes.

10      Q      But that guy ends up shooting back at him, as well.

11      A      Started shooting back.

12      Q      All right.  And then you end up back in Stanton

13   Dwellings.

14      A      Back in Stanton Dwellings.

15      Q      And does anybody actually get shot in that one?

16      A      No.

17      Q      Not that you're aware?

18      A      Ain't nobody get shot.

19      Q      Okay.  Now, I'll tell you what.  Why don't we break

20   here?

21             MR. PFLEGER:  I think we're going to take a break

22   right here.

23             (Whereupon, at 11:55 a.m., the lunch recess was

24   taken.)

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1          A F T E R N O O N   S E S S I O N

2               BY MR. PFLEGER:

3          Q    Now, Mr. Green, when we left off, we were talking

4     about a whole series of shootings that had happened between

5     the Stanton Terrace crew guys from the 1800 block and the 1-5

6     mob.  Do you recall that?

7          A    Yes.

8          Q    All right.  And we just have a few more things we

9     have to take care of and then you should be done with the

10    grand jury for now, at any rate.

11              Mr. Green, you previously testified that back on

12    September 5, 1996, you were arrested at your house during the

13    course of the search warrant, if I remember correctly?

14         A    Yes.

15         Q    And at that point in time, they actually recovered a

16    gun from your house?

17         A    Yes.

18         Q    All right.  And you were also arrested on the

19    shooting that you had done with regard to Ira Clayton or

20    Idaho, correct?

21         A    Yes.

22         Q    All right.  Now, that arrest and that search warrant

23    actually took place during the morning of September 5th,

24    correct?

25         A    Yes.

1        Q    All right.  Later on that day, did somebody get

2   killed, do you know, on September 5, 1996?  Well, who is the

3   next person that got killed after you were arrested, do you

4   know?

5        A    Junie.

6        Q    Okay.  And Junie was a member of the Stanton Terrace

7   crew?

8        A    Yeah.

9        Q    All right.  Now, Junie was somebody who was a target

10  throughout most of this beef.  He was the target of the guys

11  from the 1-5 mob, wasn't he?

12       A    Yeah.

13       Q    Now, you -- obviously, since you were in jail, you

14  were not actually out at the time that Junie was killed; is

15  that correct?

16       A    Correct.

17       Q    And how did you first learn about Junie being

18  killed?

19       A    I had a visit when I was locked up.  And Wah-Luck,

20  my mother and my girlfriend came over there to see me.

21       Q    Came to see you where?

22       A    Over at D.C. jail.  My mother had got up to talk to

23  me, so she like moved to the side, so Wah-Luck was talking to

24  me.  So, I asked -- I told him I heard Junie got killed.  And

25  he was like -- he just nodded his head, yeah.  So, he gave me

1    that same eye like, you know, that he did it.  So, I just left
2    that alone because I ain't want to talk about it in front of
3    my mother.

4         Q    Was this the same kind of look that he had given you
5    when he also acknowledged that he had done Spook's murder?

6         A    It was -- it was just like -- it was like the same
7    kind of look, but -- but he said, yeah, this time.  He was
8    like, yeah, he got killed.  But he was like that.  He gave me
9    the eye with it, too.  So, I left that alone.

10        Q    But your understanding from the way he had
11   communicated to you was that he was saying that he had done
12   it?

13        A    Yeah.  He ain't tell me he done it.  I just -- you
14   know, went by the expression on his face.

15        Q    Did there come a point in time later on when you had
16   an opportunity to actually have a conversation with him about
17   the murder of Junie?

18        A    Yeah.

19        Q    And where were you when you had that conversation?

20        A    In my cell over at the jail in my room.

21        Q    And where was he?

22        A    He was in there with me.

23        Q    So, he -- he eventually himself was arrested and he
24   actually came and visited you?

25        A    He came in the block with me.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1       Q   Okay.  Now, you were at the jail until sometime

2   after -- after Thanksgiving of 1996, but before Christmas of

3   1996, correct?

4       A   Correct.

5       Q   So, this happened sometime after his arrest and

6   before you got shipped out from the jail, correct?

7       A   Correct.

8       Q   All right.  And can you tel us, had you guys seen

9   each other before this or was this the first time you had seen

10  each other since you had gotten to jail -- well, since both of

11  you were in jail?

12      A   I mean, I seen him when he came in.  I seen him

13  -- all right.  When he first came in the jail, I seen him but

14  he wasn't in the block with me.  We didn't get a chance to

15  talk, though.

16          Then he moved in the block with me.  And --

17      Q   Which block is this that you're talking about, do

18  you remember?

19      A   Northwest 2.

20      Q   Northwest 2?

21      A   Yeah.

22      Q   Do you have a memory of what your cell number was?

23      A   Twenty-nine.

24      Q   Twenty-nine.  And he was in the same block with you

25  in Northwest 2?

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

84

1           A     Yeah, he was in 36.

2           Q     So, what happened?  He comes over and you're just

3     talking?

4           A     We just -- I was in my room.  His room like across

5     from mine.  So, he came from over his room to over my room.

6     And we were just in there talking, smoking cigarettes and

7     stuff.  He don't smoke, but I was in there smoking cigarettes.

8                 And one of the dudes from up Stanton Terrace at the

9     bottom was in there with us, too.

10          Q     Who was that?

11          A     Jerkbone.  We was in there talking.  So, we was just

12    talking and stuff that Wah-Luck was telling the man, Jerk, how

13    he did it and stuff.

14          Q     Now, in as much detail as you can remember, can you

15    explain to the ladies and gentlemen of the grand jury what it

16    was that Wah-Luck told you happened, from the beginning?

17          A     They was riding, him, Rocky and ODB in the cab.

18          Q     And what cab are you talking about?

19          A     It was -- they had a stolen cab.

20          Q     Is this a taxicab you're referring to?

21          A     Taxicab.

22          Q     Okay.

23          A     They riding around.  Well, they riding up the

24    Stanton Terrace neighborhood.

25          Q     Why were they doing that?

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1        A     Because they was looking for somebody.

2        Q     Looking for who?

3        A     Whoever was with Stanton Terrace or with the beef.

4        Q     So, they were looking for any of the Stanton Terrace

5    crew guys?

6        A     Yeah.  So, they see Junie walking down the street.

7    So, they pulled -- pulled -- I guess pulled beside him.  He

8    started shooting.  Rocky started shooting at him.

9        Q     Who started shooting first?

10       A     I think Rocky started shooting first.  They started

11   shooting at each.

12       Q     So, Wah-Luck tells you that Rocky started shooting

13   first?

14       A     Yeah, he tell me that.  Really -- really, Wah-Luck

15   ain't tell me exactly that Rocky started shooting first.  He

16   just said, they started shooting.  But, ODB told me Rocky

17   started shooting first.

18       Q     Okay.  We'll get to ODB later.  Let's stick with

19   what Wah-Luck told you.

20       A     And Rocky started shooting.  So, they shooting at

21   each other.  I guess Rocky ran out of bullets.  And Wah-Luck

22   jumped out of the car and shot him in his back.  Then Junie

23   fell.  Then Wah-Luck say he walked up on -- walked up on

24   Junie.  And I think Junie still alive, but he couldn't move, I

25   think.  I think he was still alive, but he couldn't move.

1          But, however it was, he had -- he was laying down on

2     his stomach, I think, with the gun he had in his hand.  I

3     think it was -- it was jammed or something, because he tried

4     to shoot -- shoot Wah-Luck while Wah-Luck was over the top of

5     him.

6          But, Wah-Luck said he didn't know that the gun was

7     in his hand.  He forgot all about that the gun was in his

8     hand.  He said, his mind was somewhere else.  He said he took

9     the gun from him and hit him with the gun and then shot him

10    and ran back to the car.

11        Q    So, he -- so, Wah-Luck says that he ends up taking

12    Junie's gun?

13        A    Taking his gun.

14        Q    And does he shoot Junie with the gun that he --

15        A    His own gun.

16        Q    With his own gun.

17        A    His own gun, because I don't -- he ain't had no more

18    bullets in his gun.

19        Q    So, he had fired all of his bullets?

20        A    Yeah, he shot all of his bullets out of his gun.

21        Q    Did he tell you what kind of gun that he had before

22    he picked up Junie?

23        A    As far as I know, it was a 40, a 40.

24        Q    Is that what he told you or is that just what you

25    know from being out on the street?

1       A       That's what I know when I just had left, because,

2    see, when I left it, the cab was out there.  I left -- I was

3    out there when the cab was out there.  When I left -- I came

4    to jail, the cab -- they still had the cab.  But I ain't know

5    they still had the cab.

6       Q       And so that when you left, when you say you left,

7    when you got arrested on September 5th, the last gun that you

8    knew that Wah-Luck had was a 40 caliber?

9       A       Forty.

10      Q       And do you know where that gun came from?

11      A       It might have came from my cousin.

12      Q       But you're not sure?

13      A       I'm not sure.

14      Q       All right.  And then did Wah-Luck indicate to you

15   what he did with the 9 millimeter -- or with the pistol after

16   he took it from Junie?

17      A       No, he ain't tell me.  I know he told me that he

18   -- he hit him with -- I think he hit him with his gun and then

19   took -- took the gun from Junie.  Yeah, because -- yeah, he

20   was hitting Junie.  And he heard something click.  That's when

21   he seen the gun in Junie hand.  He took the gun out Junie

22   hand.  And I think he hit him again and then he shot him.  And

23   then he just ran back to the car.

24           They -- while he was doing that, Rocky and ODB was

25   calling his name.  So, when he got back in the car, he told me

1    that he said something to ODB, calling his name out loud,

2    something like that.

3        Q    He was upset with ODB for calling his name out?

4        A    Yeah, calling his name out, but he let it go.  Then

5    ODB had shot hisself in the leg.

6        Q    Did Wah-Luck tell you this?

7        A    At the time when it was going off.  At the time.

8        Q    Listen to my question.  Did Wah-Luck tell you this?

9        A    Wah-Luck tell me what?

10       Q    About ODB shooting himself in the leg?

11       A    Yeah, he told me that, too.

12       Q    He did tell you that?

13       A    Yeah, he told me that, too.  He said -- he said, ODB

14   -- he said, ODB stupid.  He said, ODB stupid ass shot hisself

15   in the leg, like that.

16            So, I was like, yeah.

17            So, when I went to court -- I was going to court and

18   I seen ODB down at R&D.  And they was putting these --

19       Q    What is R&D?

20       A    -- chains on us.  They get you ready to go to court.

21   So, they was putting these chains on us.  So, I seen him in

22   his cell.  He was in juvenile part.

23            So, I was talking to him through the bars.  So, he

24   was telling me the same thing, but it was like -- he told me

25   that they just rolled up and seen Junie and Rocky started

1      shooting.   Junie started shooting back.   Then Wah-Luck jumped

2      out.

3               He said he shot hisself in the leg.

4               So, I asked him, let me see the bullet wound.   So,

5      he showed me the bullet wound.   The bullet wound was healed

6      up.

7               So, I was like -- I was like, why you go to the

8      hospital?   He was like -- I said, what they -- what the

9      hospital do?

10              He said, they just poured peroxide in there and

11     cleaned it and that was it.

12              I said -- I told him that he could have did that

13     hisself, you know what I'm saying?

14              So, he was like, yeah.   But, he was like -- he was

15     like, I ain't tripping, though, because I put it on the dude

16     named Dawan, this other dude from Barry Farms.   So, I was

17     like, all right.

18              So, when I got back to the jail -- when I went -- I

19     left and came back, I told Wah-Luck what he was saying.   He

20     was going to put it on two other dudes.   So, that was that.

21              And I wasn't in -- I wasn't in their business no

22     more.   That was their case.

23         Q    Well, let's back up for a second.   When you said he

24     was going to put it on two dudes, one Dawan and another guy.

25         A    Some other dude.

1           Q    Did he give the name of the other dude?

2           A    He gave the name.  I just can't remember the name.

3    It was some dude down in Barry Farms that he grew up with.  He

4    used to live down in Barry Farms.  So, he said he just gave

5    the name up.  I just know the dude that he's talking about was

6    living in Barry Farms.

7                The other dude he talking about live around our way

8    is a young dude.  And he don't do nothing, probably just steal

9    cars and stuff, something like that.

10          Q    Now, this guy, Dawan, who is he telling this?  Who

11   is he -- who is he telling that he put it on Dawan or

12   something like that?

13          A    Who is he telling it to?

14          Q    Right.

15          A    He was telling it to me.

16          Q    Okay.  No.  But, I mean, when he's telling you, I

17   put it on Dawan, okay, who is he saying that he had done that

18   to?  Do you understand my question?

19          A    No.

20          Q    Okay.  Was ODB indicating to you that he spoke to

21   somebody else about Dawan?

22          A    No.  I'm saying, he was telling like he talked to

23   the police.  So, I think when he got shot, he went -- he was

24   at the hospital.  The doctor wouldn't see him.  So -- until

25   the police get there.  So, the police had to question him.

1              Then, while the police question him, then the doctor
2     -- you know, treat his leg.

3              But, at the time, the police wasn't there, the
4     dude's family was trying to fight him.

5         Q    What dude's family?

6         A    The dude, Junie, family trying to fight him or
7     something.

8         Q    This is what he's telling you?

9         A    Yeah, this is what he was telling me.  And -- and
10    they was trying to fight him.  Then they was asking him
11    questions.  The police came and they was asking him questions
12    or something.

13             He told the police that it was Dawan and some other
14    dude from Barry Farms.

15        Q    So, he indicated to them that he knew something
16    about the murder and that the people that were responsible
17    --

18        A    Yeah, he knew some -- he knew some other murder.
19    They ran -- I think they ran in his house and got him.  I
20    think they ran in his house and got him, I think.  I think
21    that's what he told me.  I think they ran in his house and got
22    him.  I can't -- I can't remember right now, but.

23        Q    But you're clear that he was trying to -- he was
24    trying to say that he had told the police that it was a guy
25    named Dawan and some other guy?

1       A    No, I'm sure about that.  I'm sure that -- I'm sure

2    about that.  He told me that he told the police it was two

3    other dudes that did it.

4       Q    Did he ever indicate to you what kind of weapon he

5    used?

6       A    As far as -- as far as I know, it was a 38.  It was

7    a 38 that he had, because he said -- that's all he had was a

8    38 when I was out there.  And when I was locked up, he had a

9    38.  Because when he shot hisself, it was clicked back.  And

10   he said he didn't mean to do it.

11          He said, he just had it like this, like towards his

12   -- towards his -- you know, his knee, but it was down, he

13   said.  It was a trigger.  He had accidently hit the trigger.

14   And the trigger easily go off when you -- you don't even have

15   to have it in your hand most of the time.  You can just hit

16   your leg and it go off.  So, it went off.

17          That's when Wah-Luck came back to the car and they

18   pulled off.

19      Q    Did you know a person by the name of Sherman

20   Johnson?

21      A    Yeah.

22      Q    Or just known as Sherman?  Was he -- I think

23   actually I may have asked you this before.  He was actually

24   connected in terms of he grew up in the neighborhood of

25   Stanton Terrace, right?

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C.  20005
(202) 296-2929

1          A     Yeah.

2          Q     Now, he died in -- on September 15, 1996.  You're

3     aware that he died, correct?

4          A     Yeah.

5          Q     All right.  Did you have a conversation with

6     somebody in the jail about his murder?

7          A     Yeah.

8          Q     Who did you speak with about his murder?

9          A     Funky.

10         Q     Now, when Funky first came in the jail, how did you

11    get -- how did you get in touch with him or how did the two of

12    you guys end up talking?

13         A     Me, Wah-Luck and all of us in the block.  Funky came

14    in there on another charge.

15         Q     When you say on another charge, what do you mean?

16         A     He came in on a violation or a gunshot.  He came in

17    on something.  He was -- he had a charge.  So, he came in.

18    Came in. Came to jail.  And he was telling us -- he was

19    telling me how -- when he was at a party one night or

20    something, Sherman with some Stanton Terrace dudes.  And they

21    was outside.  He was scared to come outside.  Something

22    Sherman was doing a rack of faking or something, he was

23    saying.

24         Q     What does that mean, he was doing a rack of faking?

25         A     That mean he probably grinning or maybe pull out a

1    gun, something he did, you know what I'm saying, that scared

2    Funky.  So, Funky said he seen him one day.  He rode past.

3    And then he came back.  Said Sherman was standing outside on

4    the porch or something.  He said he ran towards Sherman with a

5    gun.  The dude that was with Sherman ran.  Sherman stood there

6    and was like, I ain't got nothing to do with it.

7            Next thing I know, Sherman got killed right there on

8    the spot.

9        Q    Did he say that he was the one who shot Sherman?

10       A    Yeah.

11       Q    Did he indicate what kind of gun he used in the

12   shooting?

13       A    No.

14       Q    No.  Now, was anybody else present for this

15   conversation besides yourself and Funky?

16       A    I don't remember -- like when I was over at the

17   jail, Funky was over there with me.  And then I moved over to

18   CTF.  He was over -- over at CTF with me.  So, I can't

19   remember exactly where did he tell me that.  I can't remember

20   that he told me over at the jail, because he was over at the

21   jail with me for some months.  Then he -- and I moved over to

22   CTF.  He moved over there with me.

23           I can't remember if it was over CTF.  I just can't

24   remember which part of the jail he told me.  I don't remember

25   right now.

1          Q     But you were in the jail or the CTF, one or the

2     other?

3          A     I remember I was in jail. I wasn't down -- I wasn't

4     down in Lorton then. But I remember when he told me, I was

5     either one of them. I can't remember which one I was over.

6          Q     The CTF is kind of a part of the jail in the sense

7     that it's connected or in the same area as the jail?

8          A     Well, CTF, it was like part of the jail. It was

9     like -- CTF was like an Act unit, drug program and place -- it

10    was like a place that they send you at and then you go over

11    the hill. Over the hill is down in Lorton. It's different,

12    you know what I'm saying, different levels. It depends on how

13    much time you got. But they changed it now, so CTF ain't CTF

14    no more. It's CTA. It's the same -- same people own that,

15    same people own Ohio.

16          Q     You mean, the --

17          A     It's different. Now, the jail don't got nothing to

18    do with it no more.

19          Q     When you say the same people who own Ohio, you're

20    talking about lock-up facility in Ohio?

21          A     CTA.

22          Q     And that's -- that's also where you had served some

23    of your time, as well, right?

24          A     Yeah.

25          Q     So, you've been to Ohio, you've been to CTF, you've

1     been to the jail, you've been down at Lorton, you've been to

2     all these places, right?

3          A    Yeah.

4          MR. PFLEGER:  I need to review a few notes.  But if

5     anybody wants to ask a question, this would be a good time if

6     you have any that you want to follow-up on.

7          (Pause.)

8          BY MR. PFLEGER:

9          Q    Have you seen either Wah-Luck or ODB since the time

10    when you had the conversations with them at the jail?

11         A    I seen Wah-Luck when I left from over the jail, went

12    down to Lorton.  I came back and went to CTF.  And I went back

13    over to jail.  I went to Northwest 2.  I was in Southwest 2.

14    I went to Northwest 2 and was just talking to him, gave him a

15    pair of tennis shoes.  And I was talking to him through the

16    side port.  Then that's when I just left.

17         Q    Did you guys talk about anything that was going on

18    out on the street or anything like that?

19         A    No, because we couldn't talk about it, because Kevin

20    Gray and a whole lot of dudes in the side port talking, Funky.

21    Everybody was in the side port talking, so we couldn't talk

22    about nothing that was going on on the street.

23         Q    Now, Tweety, what ultimately happened with him?

24         A    All I know, I found out he got killed when I was out

25    in Virginia.

1       Q      When you were out at Lorton?

2       A      Virginia.

3       Q      Out in Virginia.

4       A      No.   No, he got killed when I was down in Lorton,

5   because -- he got killed when I was down in Lorton, but I just

6   had left and went to Ohio.   And then that's when I came back

7   and I went out in Virginia, because his uncle was out in

8   Virginia with me, so that's why I thought he got killed when I

9   was out in Virginia.

10      Q      Who's his uncle?

11      A      His name -- his last name Watson, but I forgot his

12  first name.   He been in a lot -- a lot of years.   I forgot his

13  first name, though.

14      Q      Did you -- how did you find out about Tweety being

15  killed?

16      A      Well --

17      Q      Who told you that?

18      A      Well, when I was down Occaquan, me and the dude from

19  Stanton Terrace was hanging together.   We was down there.

20      Q      Who's the dude from Stanton Terrace; do you remember

21  his name?

22      A      Donk.

23      Q      Donk?

24      A      Yeah.   And we was down there.   And he messed with

25  Tweety, so after Tweety got killed, somebody sent him the prom

1    picture that night he got killed, sent the prom picture.

2         Q    What do you mean, sent the prom picture?  Whose

3    prom?

4         A    He went to a prom that night, the night he got

5    killed.  And the prom picture that he took, he sent it to

6    -- somebody sent it to Donk.  So, Donk was showing me the

7    picture and was telling me that Tweety got killed.  So, that

8    was that.

9              Then when I got out in Virginia, I ran into Tweety's

10   uncle.  And he was telling me, yeah, my nephew hang around

11   there where you live at.  So, he was like -- he was like, yeah

12   -- I asked him, what's his nephew's name.  He told me.  I was

13   like, yeah.

14             And then we got to talking about his nephew, this

15   and that.

16        Q    His nephew being Tweety?

17        A    Yeah.  So, he told me that dudes around there killed

18   his nephew.  So, I was asking, who the dudes that killed his

19   nephew.  And he was like, Wah-Luck and Blue.  So, I was like,

20   yeah.

21        Q    Wah-Luck and Blue?

22        A    Yeah.

23        Q    Was Wah-Luck --

24        A    I mean, Squid and Blue.  I mean, Squid and Blue.  I

25   apologize.  I mean, Squid and Blue, because Wah-Luck was

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1    locked up.  I meant to say Squid.

2            But, he was telling me that he was -- he was riding

3    -- riding from the prom or something.  His girl was driving or

4    something.  And a car pulled in front of him and they ran up

5    on the car.  And Tweety -- Tweety covered the girl up for she

6    wouldn't get shot.  They shot up -- shot him all in his back

7    and stuff.  I think that's how it was.

8        Q    Now, did you ever talk to either Squid or to Blue

9    about that shooting?

10       A    No, because Blue came -- Blue came to jail for

11   something he did with his baby's mother's friend or something.

12   Squid was still out there.  I ain't never talk with Squid.

13       Q    Did you get a chance to talk to Blue when he came to

14   the jail?

15       A    I never -- I never ran into Blue over there.  Blue

16   was like on the third floor of the jail.  I was on the second.

17   Everybody else was on the second floor.  Everybody else was on

18   the second floor for like armed robbery, attempted murder,

19   murder.  Just -- you know, a lot of -- just a lot of vicious

20   stuff.

21           Blue was just up on the third floor for like coke

22   charges, you know, stuff that is in federal court like

23   sometime they put you in a unit with a lot of people that got

24   federal charges.  So, I think he was in that unit.

25       Q    But, the bottom line is you never got a chance to

1    talk to Blue?

2         A    I never got a chance to talk to him.

3         Q    All right.  And since you've been out in Ohio or

4    actually since you've been back here in Virginia, have you run

5    into any of those guys at the jail?  I'm sorry.  In Virginia?

6         A    No.  I just ran into a couple of dudes from up town,

7    Northeast.  A couple of dudes from Southeast, but they're not

8    from around my neighborhood.  I ran into one dude from around

9    my neighborhood, but he -- he older than us.  And that was it.

10   The only person I ran into was Mark from up Stanton Terrace.

11        Q    That was Mark Barnes, the guy who got shot?

12        A    Yeah.

13        Q    And since you've basically been locked up and plead

14   guilty in relation to this case that you're currently

15   testifying about, the 1-5 mob, you've seen your cousin on two

16   occasions, is that right?

17        A    Correct.

18        Q    And both of those occasions were controlled or

19   monitored by detectives and agents from the FBI, correct?

20        A    Correct.

21        Q    And both of those occasions were relatively short;

22   the first occasion was probably, what, five or six minutes

23   long?

24        A    Correct.

25        Q    And the second occasion was also a relatively short

1    period of time, as well, correct?

2         A    Correct.

3         Q    All right.  And you were not allowed to talk about

4    substantive things in terms of your testimony; is that right?

5         A    I can't talk about nothing.

6              MR. PFLEGER:  All right.  I'll just double check my

7    notes and then I'll be finished.

8              (Pause.)

9              BY MR. PFLEGER:

10        Q    There was one other thing I did want to ask you.  At

11   one point in time going back in time when you were dealing

12   drugs out there as a young kid, there were some Jamaicans who

13   came into the area and were taking over part of the area;

14   isn't that right?

15        A    Correct.

16        Q    What happened to those Jamaicans after they came

17   into the area and tried to take over part of it?

18        A    They all died.

19        Q    They all died?

20        A    Mm-hmm.

21        Q    Okay.  Did any of the guys from the 1-5 mob help

22   that process, kill any of those Jamaicans, as far as you're

23   aware, or from the Young-Young Crew, any of them?

24        A    (Nodding.)

25        Q    Is that a yes or no?

1        A    Yes.  I can't -- I know the dudes with it, a lot of

2    dudes was with it.  I can't say who exactly, but it really

3    kicked off as far as one of the Jamaicans was supposed to

4    smack one of the dudes, Roosevelt's mother around the way.  He

5    just snapped and started killing all of them.

6        And they had some around Robinson Place.  And

7    Squid's brother and Doom, they supposed to went around there

8    or something and got into it with the Jamaicans.  So, they was

9    beefing with the Jamaicans, Mush, all them.

10        Then that's when I noticed it died down.  There

11    weren't no more Jamaicans around there.

12        Q    Did you actually ever witness any of them, when

13    anybody actually shot one of the Jamaicans?

14        A    I ain't witness it.  It was like it happened and I

15    was right down the street.

16        Q    What are you talking about?

17        A    Like one happened right there like close to Stanton

18    Road.  A dude -- a Jamaican named Stretch got shot, shot up.

19        Q    Who shot hi?

20        A    They was saying, somebody on Stanton Terrace shot

21    him.  But, at the time, Stanton Terrace and 15th Place, you

22    could go up Stanton Terrace and hang up there.  You can go

23    -- Stanton Terrace can come down there and hang.  It was like

24    together.  It was like everybody can go in each other's

25    neighborhood then, you know what I'm saying.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1       Q       This was back before the beef.

2       A       This was back way before the beef.

3       Q       This is even back before Reesie got killed, right?

4       A       Yeah.  This is way back before that.

5       Q       Did Doom kill one of the Jamaicans?

6       A       He killed one of the Jamaicans around where I was.

7       Q       Were you out there when that happened?

8       A       Yeah.  I was right across the street.

9       Q       What happened in that one, can you tell us?  What

10      did you see?

11      A       We was coming from the skating ring.

12      Q       Who's we?

13      A       Me, J.J., my cousin.  No, it was just me and J.J.

14      Two other dudes.  I just can't remember, it's been so long.

15      But, we was ready to go in the party.  I was taking off my

16      skates outside.  And Doom was coming out.  And he went across

17      the street.

18              I just -- I looked across the street.  I seen him

19      talking to somebody, but I didn't know who he was talking to.

20      That's when I know I heard a rack of shots.

21              Doom running.  He shooting at the police.  The

22      police shooting at him.

23              The dude's dead.  They caught Doom.  Doom did five

24      years, came home.

25      Q       He was a juvenile at the time?

1        A    Yeah.

2        Q    And you said, the police were actually involved in a

3   gun battle with Doom?

4        A    They were shooting at him.  He was shooting at them.

5        Q    So, all of those Jamaicans who were selling drugs in

6   your area ended up getting killed basically?

7        A    Basically.

8        Q    All right.

9             MR. PFLEGER:  Does anybody have any other questions

10  that you'd like to ask at this point?

11            A JUROR:  I have a question about the gun.  You

12  mentioned probably half a dozen or a dozen different kinds of

13  guns that people used at different times.  Is there any reason

14  why -- why were so many different kinds used?  Is there any

15  -- any preference that people have for a certain kind of gun

16  if they're going to do a certain kind of thing?  Or is it just

17  a matter of whatever you happen to have, you just grab what's

18  handy?

19            THE WITNESS:  It can go both ways.  Say -- say, it's

20  me and you and there's ten of them.

21            A JUROR:  We're on the same side, right?

22            THE WITNESS:  Yeah.  And we need to -- it just me

23  and you, we ain't got no help.  So, say we need the AK-47.

24  AK-47 shoot 50 rounds.  So, 50 rounds would take -- take ten

25  people.  So, you'll try your hand with that one.

1          Then you got some dudes that you'll have a six-

2    shooter, I have a six-shooter.  So, that's 12 bullets.  Me and

3    you just go and use the 12 bullets on the same ten people.  It

4    could work that way, too.

5          But, usually, a lot of dudes will try to get the

6    biggest gun they can to use on a lot of dudes.

7          Like if you do a drive-by or you coming through a

8    cut or something like that, you'll like to have a bigger

9    -- big gun, because you moving fast.  You ain't just sitting

10   there aiming.  You moving.

11         A JUROR:  So, you want to put in as much lead out

12   there as possible.

13         THE WITNESS:  Yeah, put all you can all the way out

14   there.

15         A JUROR:  Excuse me.  I have a question.  Did the

16   Jamaicans live in that area or they would just come into the

17   area?  Were they close by or what?

18         THE WITNESS:  No.  The Jamaicans, they was close by.

19   They was -- they'll come around the neighborhood.  They might

20   hook up with a couple of dudes that be around there and sell

21   drugs.  Start fronting them.

22         Then they might find a couple of pipehead girls

23   smoke cocaine and move into their house, take over their whole

24   house.

25         A JUROR:  Within the neighborhood.

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1           THE WITNESS:   In the neighborhood, pay their phone

2     bill, pay the rent, keep the house up, keep supplying the lady

3     that own the house.   Really, it their house once they do that.

4     So, everything going to go by their rules.   If nothing go by

5     their rules, then they ain't going to be there.

6           And it got to a point that the Jamaicans -- one

7     time, the Jamaicans started killing each other.

8           But this was the women, because the women were

9     Jamaican.   They started killing each other over something, but

10    I forgot what it was.   That's how it is.

11          BY MR. PFLEGER:

12    Q     So, at one point in time, the Jamaicans were

13    actually running a couple of crack houses where they were

14    selling crack out of?

15    A     They was running a lot of them.   It wasn't just a

16    couple.   It was a lot.   It was a lot.   I give you ten -- I

17    give you ten houses.   It wasn't just ten houses down there on

18    15th.   It was probably four or five houses up Stanton Terrace.

19    They just had houses everywhere.   And it's just that they just

20    had everything out there.

21          And a lot of dudes liked the Jamaicans because the

22    Jamaicans was supplying them, you know, giving them money, no

23    problem.   Like when I was -- when I was younger and the

24    Jamaicans used to ask to use the phone, I let them use my

25    phone.   And he'll pay me -- pay me a lot of money just to use

1     the phone, $25, $30, just to use the phone for ten minutes.

2          So, it was -- it was like everybody loves the

3     Jamaicans around there at one time.

4     Q     What happened?

5     A     Guess the guys around the way got tired of them.

6     Q     They were taking too much business?

7     A     You could say that, yeah.

8     Q     Was it -- were they, in fact, getting a lot of

9     business?

10    A     It wasn't that they would take too much.  They

11    started -- started to think they can do everything to

12    everybody and get away with it and it wouldn't work that way.

13    It wouldn't work that way.

14         They can say -- they can say -- say, I live right

15    here and they be in front of my house.  And my mother gots to

16    come through that cut.  And they say slick shit -- you know,

17    say slick stuff to my mother.  And my mother telling me, she

18    getting tired of them being out there.  And one day I might

19    come home and they cussing my mother out.  You know, I ain't

20    going to like that.  And I go out there and tell him, man, you

21    can't disrespect my mother and they tell me, F me, you know.

22         So, you got issues you got to deal with.  You got

23    -- you got to straighten it.  Be a man and straighten it.  If

24    not, they going to keep on trying to carry it.

25    Q     What happens if they -- what happens if they keep on

1    doing it?

2        A    I mean, if you don't be a man and straighten it

3    there, they going to keep on doing it.  The next thing --

4        Q    What do you mean by --

5        A    Next they going to try to come in your house and

6    rule your house.

7        Q    What do you mean by, you'd straighten it; what does

8    that mean?

9        A    You go to them, talk to them like a man.  If he

10   don't -- he don't take it like that, I mean, Jamaicans don't

11   know how to fight, so they don't -- they going -- they going

12   to pull out a gun fast or a knife.  They going to pull a knife

13   or a gun out fast, so.  They ain't going to fight you, so

14   they'll just pull a gun or knife out.  So, you know what you

15   got to do.

16            If you -- if you pull out a gun on a Jamaican and

17   don't kill him, he going to kill you.  You can't -- you can't

18   pull a gun out on nobody and don't kill him.  That's just like

19   you just shooting at you.

20       Q    Did this actually ever happen with you or you just

21   know this from watching this?

22       A    No, this never happened to me.  I just seen it a

23   couple of times.  And I just been around a lot of stuff like

24   that.  It's been Jamaicans around that way that got a lot of

25   money and walk around with no shoes all day long.  Walk around

1      with no shoes on all day long on the streets, stepping on

2      glass, everything.   And just -- they got a pocket full of

3      money.   They just thought they was still at home, I guess.

4                    MR. PFLEGER:   Any other questions?

5                    A JUROR:   I have one.

6                    MR. PFLEGER:   Yes, sir.

7                    A JUROR:   With all the stuff you had with the

8      Jamaicans, when he hit the kid's -- the guy's mother?

9                    THE WITNESS:   Huh?

10                   A JUROR:   The final straw you all had with the

11     Jamaicans or that your friend had with the Jamaicans was when

12     he hit the guy's mother?

13                   THE WITNESS:   Yeah, when he hit the guy's mother,

14     see, she was -- she used to wear a lot of muslim clothes, you

15     know.   She was -- she was a nice lady.   She was just on drugs,

16     you know.   She had two sons.   One was older.

17                   So, she used to have a house full of Jamaicans.   The

18     Jamaicans used to take care -- I think she used to mess with

19     one.   And the Jamaican probably used to beat on her all the

20     time, but this particular day he probably -- her son probably

21     just got tired of it and just started -- every time he see a

22     Jamaican somewhere, he just shoot him up, kill him.

23                   He killed one by the church.   And he used to kill a

24     lot of Jamaicans.

25                   He went to jail for like ten years for it.   He home

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929

1    now, as a matter of fact.  He went to jail for like --

2                   A JUROR:  Was he a juvenile when he did it?

3                   THE WITNESS:  I think he was.  I think he was older

4    than 18, but he went to jail and came home.  And like now,

5    it's like two Jamaicans around my way now from back then.

6                   And when Roosevelt was doing all that, they used

7    -- the police used to tell the one Jamaican, do you know

8    Roosevelt?  He going to get you.  You better skip town and all

9    this and that.

10                   The Jamaican used to talk trash, but he skipped

11    town, though.  He used to talk trash and everything, but now

12    he's back now, though.  He back around there, back around the

13    neighborhood.

14                   MR. PFLEGER:  You've seen a lot, huh?

15                   THE WITNESS:  I been through a lot.

16                   MR. PFLEGER:  Anybody have a question that they'd

17    like to ask?  Mr. Green is available if something else comes

18    up.  And there may be some additional things that we'll have

19    to ask him to come back for.  But, for right now, I think

20    we're finished.

21                   (The witness was excused.)

22                   (Whereupon, at 3:08 p.m., the taking of the

23    testimony in the presence of a full quorum of the grand jury

24    was concluded.)

25                                   *  *  *  *  *

Diversified Reporting Services, Inc.
1025 VERMONT AVENUE, N.W. SUITE 1250
WASHINGTON, D.C. 20005
(202) 296-2929