## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**THE UNITED STATES OF AMERICA**     :

               v.                                    :          **Cr. No. 05-100-17 (RWR)**

**GREGORY BELL,**                           :
  **also known as Boy-Boy,**
                          **Defendant.**          :

### GOVERNMENT'S MEMORANDUM IN AID
### OF SENTENCING FOR GREGORY BELL

The United States of America, by and through its attorney, the United States Attorney for the

District of Columbia, herewith files this memorandum in aid of sentencing for defendant Gregory Bell.

In support of this memorandum, the government relies on the following points and authorities and any

other points and authorities that may be cited at the sentencing hearing.

### Procedural and Factual Background

Since March of 2005, a total of eighteen individuals have been indicted in connection with the

instant case.  Fifteen of these defendants were indicted on March 22, 2005, and charged with, among

other things, participation in a narcotics conspiracy, as well as individual acts of drug-dealing and

weapons possession, in violation of 21 U.S.C. §§ 841, 846, and 18 U.S.C. §§ 922(g)(1), 924(c)(1), and

other statutes.  Subsequently, on November 29, 2005, the grand jury returned a superseding indictment

against fifteen defendants – twelve who remained from the initial March 2005 group, plus an

additional three defendants.  This superseding indictment charged these fifteen defendants with the

same counts contained in the March 2005 indictment as well as participation in a RICO conspiracy, as

well as individual acts of violence, including four murders, in violation of, among other things, 18

1

U.S.C. §§ 1962, 1963 and 1959.

Prior to the instant trial in this case, twelve of the eighteen defendants either pled guilty or were found guilty after trial.  Notably, the following seven defendants each pled guilty to RICO Conspiracy (count two of the superseding indictment), admitted participation in the charged narcotics conspiracy (count one as well as racketeering act one), and further represented to this Court that after reviewing the superseding indictment in this case, the allegations set forth in that document were either true or they had no information to dispute or disprove the allegations: Raymond Bell, aka Santuce; Marcus Smith, aka Mick; Gerald Bailey, aka Chow-Wow; Luscious Fowler; Philip Wallace; Jasmine Bell, aka Jazz; Daniel Collins, aka DC.  In addition, each of these defendants admitted that he was accountable for distributing or possessing with intent to distribute more than 1.5 kilograms of crack.

In addition, co-defendant Newett Ford went to trial before this Court in June of 2006.  After a four-day trial, Mr. Ford was convicted (after just 3 hours of jury deliberation), of the narcotics conspiracy which was charged in count one of the superseding indictment.[1]  Mr. Ford was subsequently sentenced by this Court to 263 months of incarceration.

As the Court is aware, Mr. Bell, along with five other defendants, went to trial in this case.[2] The jury acquitted the six defendants of counts one and two, and returned guilty verdicts on a number of other charges, including a guilty verdict for the first-degree double-homicide of Ronnie Middleton

---

[1]    Prior to Mr. Ford's trial, the government had dismissed the RICO Conspiracy (count two) charge against him.

[2]    The six defendants who went to trial before this Court from February though November of 2007 – Antwuan Ball, aka Twuan, Big Ant; David Wilson, aka Cool Wop; Desmond Thurston, aka Dazz; Joseph Jones, aka JoJo; Gregory Bell, aka Boy-Boy; and Dominic Samuels, aka Don, Dom  –  represent the final six of the total of eighteen defendants indicted in this case.

and Sabrina Bradley.  There was evidence presented at trial that this double-homicide was committed as part of an ongoing turf war between the Congress Park Crew charged in the superseding indictment and its rival, the 1-5 Mob.  The jury deadlocked on only two counts – each relating to co-defendant Dominic Samuels's August 27, 2002 murder of Jamel Sills, aka Black (counts 37 and 50).  On January 24, 2008, Mr. Samuels pled guilty in front of this Court to manslaughter while armed, admitting that he had, in fact, shot and killed Jamel Sills in Congress Park, on August 27, 2002, just as was alleged in the indictment in this case, and just as several trial witnesses had attested.

Defendant Bell was convicted by the jury of three counts of Distribution of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1) (Counts 5, 9, and 12).  Accordingly, Mr. Thurston faces a sentence of up to 20 years incarceration with respect to each of these offenses.  *See* 21 U.S.C. § 841(b)(1)(B).

The United States Probation Office prepared a Pre-Sentence Investigation Report ("PSI") for Mr. Bell and computed that pursuant to the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), Mr. Bell has a total offense level of 40, a criminal history category of I, and a recommended Guidelines range for imprisonment of 292 to 365 months.

## Legal Standards

The Supreme Court opinion in *United States v. Booker*, 543 U.S. 220 (2005) held, *inter alia*, that the Guidelines are no longer mandatory and therefore "effectively advisory."  *Id*. at 245, 259.  *See also Gall v. United States*, No. 06-7949, 552 U.S. at ----, 128 S. Ct. 586, 594-596 (2007); *Kimbrough v. United States,* No. 06-6330, 552 U.S. at ----, 128 S.Ct. 558, 570-571 (2007).  Accordingly, the Sixth Amendment's bar against judicial fact-finding does not apply to Guidelines sentencing.  Although judges are still required "to take account of the Guidelines together with other sentencing goals," without the provision that makes "the relevant sentencing rules . . . mandatory . . . ," the statute falls outside [the constitutional] requirement."  *Booker,* at 259; *id*. at 252. (citations omitted).

In *United States v. Dorcely*, 454 F.3d 366 (D.C. Cir.), *cert. denied*, 127 S. Ct.691 (2006), the District of Columbia Court of Appeals, interpreting *Booker*, held that a sentencing court may base a sentence on unconvicted conduct without offending a defendant's Sixth Amendment right to trial by jury. *Id.* at 371. Indeed, as the Court of Appeals pointed out, every circuit that has reviewed the issue, post-*Booker*, has held that a district court may still consider acquitted conduct while applying the guidelines in an advisory manner. *Id.* (citing cases). The Court of Appeals found two aspects of the *Booker* holding to be instructive. First, the Court in *Dorcely* pointed out that the Supreme Court noted in *Booker* that "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant," and that a sentencing court has "broad discretion in imposing a sentence within a statutory range." *Id.* at 372 (citing *Booker*, 543 U.S. at 233). Second, the Court noted that the *Booker* remedial opinion concluded that 18 U.S.C. § 3661, which provides that no limitation shall be placed on the information concerning the background, character, and conduct of the convicted person that a sentencing court may receive and consider, posed no Sixth Amendment problem and permits a sentencing court to consider acquitted conduct. *Id.* (citing *Booker*, 543 U.S. at 251); *see also United States v. Watts*, 519 U.S. 148, 151 (1997).

Thus, the *Dorcely* court concluded, "[u]nder *Booker*, consideration of acquitted conduct violates the Sixth Amendment only if the judge imposes a sentence that exceeds what the jury verdict authorizes." *Id.* at 371. Here, defendant Thurston's conviction on the two counts of distribution of crack authorizes a sentence of "not more than 20 years" with respect to each count. Hence, any sentence which is 20 years or less for each count "plainly falls within the authorized sentence." *Dorcely*, 454 F.3d at 372; *see also Booker*, 543 U.S. at 244 ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established

by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a

reasonable doubt."); *see also* U.S.S.G. Section 5G1.2.

In *Dorcely*, the Court of Appeals also held that a sentencing court may base a sentence on

acquitted conduct without offending a defendant's due process rights under the Fifth Amendment. 454

F.3d at 372.  The Court noted that the Supreme Court has ruled that "possession of the fullest

information possible concerning the defendant's life and characteristics" is "[h]ighly relevant - if not

essential - to [the judge's] selection of an appropriate sentence." *Id.* (quoting *Williams v. New York*,

337 U.S. 241, 247 (1949)). Thus, the Supreme Court has ruled that a sentencing judge may consider

past criminal behavior of a defendant that did not result in a conviction without violating due process.

*Dorcely*, 454 F.3d at 372 (citing cases).  In this regard, in making its sentencing determination, a court

may consider acquitted and untried conduct, as well as conduct for which a jury deadlocked.  *See*

*United States v. Lawson*, 494 F.3d 1046, 1056-58 (D.C. Cir. 2007); *United States v. Bras*, 483 F.3d

103, 107-108 (D.C. Cir. 2007).

When determining relevant conduct, the sentencing court is to make its findings by a

preponderance of the evidence.  *See United States v. Dorcely*, 454 F.3d 366, 372-373 (D.C. Cir. 2006)

("[W]e reject Dorcely's claim that a sentencing court's use of acquitted conduct must be based not on a

preponderance of the evidence but instead beyond a reasonable doubt."); *see also Watts*, 519 U.S. at

157; *Bras,* 483 F.3d at 107; *see generally* U.S.S.G. Section 6A1.3.[3]

The District of Columbia Court of Appeals has held that "a sentence within a properly

calculated Guidelines range is entitled to a rebuttable presumption of reasonableness."  *Dorcely*, 454

F.3d 376 (citations omitted); *see also Gall*, 128 S. Ct. at 597 ("If the sentence is within the

_____

[3]    The sentencing judge need not consider only evidence which has been subject to
cross-examination.  In addition, the rules of hearsay as well as other provisions of the Federal
Rules of Evidence are not applicable.  *Bras*, 483 F.3d at 108 (citing cases).

Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness."). As the Supreme Court recently clarified in *Gall,* "the Guidelines should be the starting point and the initial benchmark" in determining a sentence. *Gall,* 128 S.Ct. at 596 ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"). District courts must therefore "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough,* 128 S.Ct. at 570 (quoting *Booker,* 543 U.S. at 245-46).

Indeed, sentencing does not end with consideration of the Guidelines. A sentencing court must also consider the non-guideline sentencing factors enumerated under 18 U.S.C. Section 3553(a), *Lawson,* 494 F.3d 1057-1058; *see also United States v. Price,* 409 .3d 436, 442 (D.C.Cir. 2005); *Booker* 543 U.S. at 261, 125 S.Ct. 738 ("Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.").[4]

Section 3553(a) lists, *inter alia,* the following factors relevant to a defendant's sentence: "the nature and circumstances of the offense and the history and characteristics of the defendant. . . the need for the sentence imposed to reflect the seriousness of the offense, and to promote respect for the law, and to provide just punishment . . . to afford adequate deterrence . . . to protect the public from further

---

[4]       Section 3553(a) requires the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a)(2). Although that provision is "often cited by defendants as if it were an admonition to be lenient," *United States v. Navedo-Concepcin*, 450 F.3d 54, 58 (1st Cir. 2006), it merely directs the district court to impose a sentence that is consistent with the factors in Section 3553(a)(2), most of which "hardly connote less punishment." *Id.* Moreover, the "not greater than necessary" language does not require that the sentencing court, "having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate." *Id.*; *see United States v. Maciel-Vasquez*, 458 F.3d 994, 995 (9th Cir. 2006) ("neither *Booker* nor our circuit precedent impose any requirement that the court state why it chose a particular sentence rather than other potential sentences").

crimes of the defendant . . . to provide the defendant with needed training and medical care . . . [and] to avoid unwarranted sentence disparities" among similarly situated defendants. *Id*. A district court is not required to refer specifically to *each* factor listed in Section 3553(a)," nor is it required "'to explain *sua sponte* why it did not find [a particular] factor relevant to its discretionary decision" if "a defendant has not asserted the import of [that] factor.'" *Bras*, 483 F.3d at 113 (*quoting Simpson* 430 F.3d at 1186-87 (emphasis in original). As the Supreme Court noted in *Gall*, "[t]he sentencing judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Gall*, 128 S.Ct. at 597.

## Argument

Mr. Bell stands before this Court as someone who spent the better part of the past 15 years routinely dealing crack cocaine in the Congress Park neighborhood. Indeed, virtually to a person, every witness who was asked about crack cocaine dealing in Congress Park identified Gregory Bell not only as a fixture in the area, but also someone whom other drug dealers knew they could go to when they needed a reliable source of supply for themselves. Mr. Bell was nicknamed the "wholesale king" by one of his fellow drug dealers (Jacques "JT" Powell) for a good reason. This nickname, however, underscores the true danger and key role that Mr. Bell played in the crack cocaine market in Congress Park: He served as an anchor for the market and provided stability and consistency when supply ran low. His unique role helped sustain the Congress Park crack cocaine market during the many years of its existence, and helped make it the true danger and harm to the community that it was.

Indeed, Mr. Ball's three convictions in this case for the crack cocaine distributions represent merely a snapshot of how he used his time in Congress Park year after year. For these reasons, the government respectfully submits that a sentence towards the low-end of the Guidelines range of 292- 365 months of incarceration is the reasonable and appropriate sentence to impose on Mr. Bell. A

sentence towards the low end of this recommended range would still be less than half of the 60 years that Mr. Bell faces by statute.[5]

Despite the frequent use of the term "acquitted conduct" in case law and elsewhere, virtually none of the conduct considered by the PSI writer and/or contained in the instant government memorandum is acquitted conduct. Rather, it is either uncharged conduct, or conduct upon which the jury never voted. Indeed, the jury acquitted on the conspiracy counts because they did not unanimously agree, beyond a reasonable doubt, with the government's theory of the partnership among the charged defendants. The jury never voted, one way or another, if Gregory Bell dealt or possessed with intent to distribute over 1.5 kilograms of crack cocaine in Congress Park. They were never asked this question.

What remains, therefore, is an ample record before this Court to apply its discretion – with guidance from the U.S.S.G. and Section 3553(a) – in imposing the appropriate sentence to a person who spent the better part of 15 years distributing and supplying poison within the Congress Park community.

---

[5]     Indeed, *each* of the counts that Mr. Bell was convicted of carries a statutory maximum sentence of 20 years incarceration. That means that when it passed the Uniform Controlled Substances Act, Congress determined that there would exist some defendants who warranted a 20-year sentence for committing the crime for which Mr. Bell has been twice convicted. Indeed, the Sentencing Guidelines explicitly provide for such instances where the appropriate sentence would require the imposition of consecutive sentences. *See* U.S.S.G. Section 5G1.2; *see also United States v. Moore*, 564 F.2d 482, 485 (D.C. Cir. 1997) ("It is well established that a district court in a narcotics case may in its sound discretion make some sentences consecutive to others.") (citing cases).

I.     **The United States Probation Office correctly
       calculated that under the U.S.S.G., Mr. Bell faces a
       benchmark sentence of 292 to 365 months of incarceration.**

Mr. Bell's PSI recommends a sentence of between 292 to 365 months of incarceration.  This

calculation is based largely on Mr. Bell's serial drug-dealing for the better part of the past 15 years as

well as his criminal history.

A.     **Mr. Bell is directly accountable for the distribution or
       possession with intent to distribute more than 1.5 kilograms of crack**

The record in this case is replete with sworn testimony establishing that Mr. Bell distributed

and/or possessed with the intent to distribute well more than 1.5 kilograms of crack during the many

years that he dealt drugs in the Congress Park neighborhood.  It is important to note that this 1.5

kilogram figure is reached based on the direct, personal acts of Mr. Bell himself – not based on any

agency and/or co-conspirator theories.[6]

---

[6]     There is ample evidence before this Court to make a finding that Mr. Bell, in fact,
was a member of a conspiracy (and is therefore also responsible for all of the reasonably
foreseeable acts committed by his co-conspirators, *see generally* U.S.S.G. Section 1B1.3(a)).
Numerous defendants have already admitted to factual proffers which formed the basis for this
Court to accept their pleas to RICO Conspiracy.  Similarly, another jury has already convicted a
charged co-defendant (Newett Ford) of being a member of the same conspiracy brought against
Mr. Bell.  Moreover, the jury in the instant case convicted co-defendant David Wilson of having
participated in the August 1998 double-homicide of Ronnie "Squid" Middleton and Sabrina
Bradley.  The motive for this murder was retaliation against the rival 1-5 Mob for the 1993
murder of Congress Park member Maurice Doleman, aka Reecey.  In addition, co-defendant
Dominic Samuels recently pled guilty before this Court and admitted that he, in fact, killed Jamel
Sills, aka Black, as was alleged in the superseding indictment in this case (and, more importantly,
just as witnesses such as Jacques "JT" Powell, Kairi Kelliebrew, and Robert Pough had attested.)
These previous admissions and convictions certainly corroborate the evidence presented at trial
that Mr. Bell, in fact, was a member of a conspiracy in Congress Park.

Indeed, there was ample evidence put forth during this trial which demonstrated that Mr.
Bell, along with his fellow co-defendants, knowingly and actively chose to participate in the
conspiracies charged in the superseding indictment in this case.  For example, at various times,
members of the conspiracy, including Mr. Bell: (i) used the unique code word "doors" in order to
share sales and customers; (ii) chased away unknown and/or unwanted other drug-dealers from
Congress Park; (iii) acted violently towards other, rival, neighborhoods; (iv) warned each other

As set forth below, the Court has heard sworn testimony regarding Mr. Bell's serial crack cocaine dealing from a variety of sources:   fellow drug dealers of Mr. Bell's; suppliers of Mr. Bell's; and customers of Mr. Bell's.  All of this testimony demonstrates that Mr. Bell personally dealt well in excess of 1.5 kilograms of crack cocaine in Congress Park during the better part of the 1990s through and including Mr. Bell's arrest in this case in March of 2005.

### 1.    Controlled Purchases Presented During Trial.

The government presented evidence of seven separate controlled purchases in this case in which Mr. Bell sold crack cocaine to witnesses cooperating with the FBI.  The jury convicted Mr. Bell of three of these controlled purchases (counts 5, 9 and 12) and acquitted on the remaining four.  These seven controlled purchases range in time for virtually the entire time that the FBI was conducting controlled purchases in Congress Park and corroborate the testimony from various witnesses that Bell was a prolific and industrious crack cocaine dealer in the neighborhood.  The following chart

─────────────────────────

of the presence of law enforcement; (v) shared stashes; (vi) had common suppliers; and (vii) fronted each other crack cocaine.

There was also additional evidence introduced to this Court  –  but not shown to the jury during trial  – which further established the charged conspiracy in this case.  Such examples include: (i) a one-page handwritten roster of names underneath the title "Congress Park Crew" that was found in the bedroom of admitted co-conspirator, Raymond Bell, aka Santuce, and which included the names of each of the six defendants in this case; and (ii) the four complete grand jury transcripts of Antwuan Ball, Joseph Jones, Steve Sutton, aka Geeka, and Aman Ball, aka Bird, relating to the Superior Court investigation of the murder of Jamel Sills, aka Black. Each of these four grand jury transcripts: (a) falsely exculpated fellow co-conspirator Dominic Samuels (Samuels since admitted committing the murder); (b) used exactly the same language (". . . short, stocky guy . . . ") in doing so; and (c) falsely discredited the government's sole eyewitness to the murder, Kairi Kelliebrew, who at the time was known to have cooperating with the government.  The "Congress Park Crew" list was contained within **Government Exhibit 711.6** (Item 9), but was removed and therefore not part of the evidence that went back to the jury. The four Superior Court grand jury transcripts were marked (but not admitted) as Exhibits 1200 (Ball GJ), 1201 (Sutton GJ), 1202 (Aman Ball GJ) and 1203 (Jones GJ).  The Court will recall that only redacted portions of Mr. Ball's and Mr. Jones's grand jury transcripts were admitted into evidence at this trial (**Government Exhibit 1300**).  A copy of the "Congress Park Crew" list is attached hereto as **Exhibit A.**

10

summarizes the evidence of controlled purchases that were introduced at trial relating to Mr. Bell:

| Date | Cooperating Witness | Grams | Price | NT# | Count | Government Exhibit Series |
|------|---------------------|-------|-------|-----|-------|--------------------------|
| 6/5/00 | Sandra White | 2.50 | $200 | NT-23 | 5 | 302 Series |
| 7/27/00 | Sandra White | 1.00 | $200 | NT-31 | 9 | 306 |
| 11/16/00 | Sandra White | 1.50 | $200 | NT-55 | 12 | 309 |
| 1/9/01 | Gail Parson | 1.10 | $150 | NT-66 | 13 | 310 |
| 1/18/01 | Gail Parson | 0.85 | $150 | NT-68 | 15 | 311 |
| 8/30/04 | Earl Campbell | 8.00 | $575 | NT-176/T-113 | 25 | 323 |
| 10/4/04 | Horace Smith | 1.80 | $200 | NT-186 | 28 | 324 |
| 3/2/05 | Horace Smith | | | T-116 | | 326 |

**2.     Witnesses who testified regarding Bell's
           prolific drug dealing in Congress Park**

Virtually to a person, almost every witness who testified at trial regarding crack cocaine dealing in Congress Park had dealings with Gregory Bell.  The highlights of this trial testimony is discussed below.

**a.     Fellow Drug Dealer Bobby Capies**[7]

Bobby Capies testifed that in the mid-1990s several people would congregate inside of "Mom's" house on 13th Place.  Capies further testified that "[e]veryone around there would sell coke" in Congress Park.  3/29/07 Tr. at 4899-00.  When pressed as to who "everyone" included, Capies identified the following individuals: "Wop, Twan, Jo-Jo, Don, Dazz, Jazz, Santu, Boy-Boy."  *Id.* at 4900.

Mr. Capies testified that from approximately 1992/1993 through his arrest in 2001, Capies

---

[7]      Copies of the relevant transcript pages of Mr. Capies' trial testimony regarding crack cocaine sales are attached hereto as **Exhibit B.**

purchased wholesale quantities of crack cocaine from Gregory Bell "on and off" throughout the entire time period.  4/2/07 Tr. at 5205.  Specifically, Capies explained that David Wilson, aka Wop was Capies' primary wholesale supplier, but when Wilson was short of crack cocaine, he would next approach Gregory Bell.  Capies explained that a typical wholesale purchase from Bell would be 40 dimes of crack for $200.  *Id.* at 5206-07.

Mr. Capies testified that "on and off" during the 1992-1996 time period, he and Dominic Samuels would be supplied wholesale quantities of crack cocaine from Gregory Bell in Congress Park.  3/29/07 Tr. at 4969-71.  When asked how much he would purchase, Capies testified "[j]ust wholesale, like $200, 40 dimes or something like that." *Id.* at 4970.  When asked who the main people were whom he bought his wholesales from during this time period, Capies testified: "Boy-Boy, Kairi, and Antwuan." *Id.*

At another point of his testimony, Bobby Capies testified that during 1992-1996, he saw the following individuals "hustling" crack cocaine in the Circle of Congress Park: "Doo-Doo . . . Jo[J]o, Antwuan, Kairi, Boy-Boy, Fat Tony."  3/29/07 Tr. at 4973-74; 4978-80.  Capies further testified that in approximately 1997, many of the same individuals were still selling crack cocaine in Congress Park; specifically: "Me [Capies], Wop, Dazz, LT, Terrance . . . Ju-Ju, Jo-Jo, Sant, Jazz, Boy-Boy." 4/2/07 Tr. at 5192-93.

Mr. Capies further testified that in approximately 1999-2001, he along with other individuals purchased wholesale quantities of crack cocaine from Joe Langley.  4/2/07 Tr. at 5202.  Capies further testified that among the people who he personally saw purchase wholesales of crack cocaine from Langley during this time period were  Joseph Jones, Gregory Bell and Desmond Thurston.  *Id.* at 5202.

Mr. Capies further testified that during the 1996 to 2001 time period he had "a lot" of crack cocaine dealings with Gregory Bell.  4/2/07 Tr. at 5204.

12

Mr. Capies further testified that during the 1996-2001 time period, when he was purchasing wholesale quantities of crack cocaine from Gregory Bell, he personally saw Bell sell wholesales to the following additional people in Congress Park: "JT, Baby Kai, me, Jazz, Santu, Phil, Terrance, LT, Drano, Doo-Doo, Fat Tony, Dazz, Wop." 4/2/07 Tr. at 5207.

Mr. Capies testified that he saw Desmond Thurston being supplied wholesale amounts of crack cocaine from Gregory Bell during 1996-2001 "numerous times." 4/2/07 Tr. at 5208-5209.

Mr. Capies testified that "numerous times" he saw Boy-Boy supply wholesale quantities of crack cocaine to David Wilson. Capies stated that these amounts would be both "[w]holesale and sometimes large amounts." 4/2/07 Tr. at 5209. When asked what he meant by "larger amounts" Capies explained that on one occasion, he saw Wilson get an ounce of crack from Bell. Wilson then told Capies that he was going to break the ounce down into eight-ball quantities of crack. *Id.* at 5209-5210.

A conservative estimate of Mr. Capies' trial testimony attributes over 3000 grams of crack cocaine to Bell. Assuming that Bell bought or sold only approximately two "eight-balls" per week, and assuming Bell dealt in Congress Park for only 10 years, rather than the 13 years that the record suggests leads to a calculation of approximately 3000 grams of crack cocaine. (3.0 grams ("8-ball") x 2 (times per week) x 50 (weeks per year) x 10 years = 3000 grams).

### b.   Fellow Drug Dealer Keith Barnett[8]

Witness Keith Barnett testified that he would see Gregory Bell, aka Boy-Boy selling crack cocaine at various locations in Congress Park – "The Lincoln, the circle, the alley, 14th Place[]" – "all day" for "years." 4/18/07 Tr. at 7542-44. When asked what he meant by "years" Barnett clarified that

---

[8]      Copies of the relevant transcript pages of Mr. Barnett's trial testimony regarding crack cocaine sales are attached hereto as **Exhibit C.**

he meant for as long as he (Barnett) was himself hanging out and selling crack cocaine in Congress

Park, which was from the early 1990's through and until 2003. *Id.* Later, during cross-examination,

Barnett confirmed that Bell would sell "all over" Congress Park both outside at various locations, as

well as inside certain homes. *Id.* at 7760-61.

Barnett provides additional corroboration that Bell routinely sold crack cocaine in Congress

Park for over a decade. Barnett can account for the additional years of 2001-2003 (Capies could

account only through 2001, which is the year he was incarcerated).

### c.   Fellow Drug Dealer Kairi Kelliebrew[9]

Witness Kairi Kelliebrew testified that in addition to knowing his older cousin, Antwuan Ball,

most of his life, he also knew Gregory Bell "since I was a youngin, since I was probably . . . 12 to my

memory." 5/7/07 Tr. at 10088. Kelliebrew further testified that back around 1994 or so, he saw

Antwuan Ball selling and cutting up crack cocaine in the family's house on 14th Place, SE. In addition,

he testified that "they always had guns" in the house. *Id.*

Kairi Kelliebrew further testified that he began selling crack cocaine in Congress Park when he

was around 13 or 14 years old. 5/7/07 Tr. at 10112. One of the first people who he bought crack

cocaine from at that time was Gregory Bell. In addition to Boy-Boy, he also purchased crack cocaine

from "everybody" at the time, which included Antwuan Ball, and Joseph Jones. *Id.* at 10113.

Kelliebrew stated that at that time, he would get crack from Boy-Boy, "might be every day, every other

day. If I had some money or if he wanted to give me something, he'd throw me some dimes. . . . " *Id.*

at 10118.

Mr. Kelliebrew's trial testimony corroborates Mr. Capies' testimony that Bell routinely sold

---

[9]      Copies of the relevant transcript pages of Mr. Kelliebrew's trial testimony
regarding crack cocaine sales are attached hereto as **Exhibit D.**

crack cocaine in Congress Park for over a decade.  Kelliebrew's testimony is particularly corroborative of the earlier portion of this time period.

### d.      Fellow Drug Dealer Jacques "JT" Powell[10]

Witness Jacques "JT" Powell testified that between 1995 and 1997 he partnered up with Jasmine Bell and Dominic Samuels in buying and selling crack cocaine in Congress Park.  During this time period, he got his supply of crack cocaine from Gregory Bell.  Powell estimated that, "I [Powell] was getting like wholesales, eight-balls . . . from him [Bell]." 5/21/07 Tr. at 12195-96.  Powell testified that Bell was such a consistent and good supplier of crack cocaine, he called him "Wholesale King." *Id*. at 12196.  Powell explained that, "He [Bell] had wholesale whenever you need it."  *Id*. at 12196-97.  Powell also testified that in addition to eight-balls, he would also get quarter and half ounces of crack cocaine from Boy-Boy.  *Id*. at 12201.[11]

Powell was asked at trial who else he would see selling in the Circle when he sold there in the late 1990s, and identified the following people: "[w]ell, Don used to hustle in the circle, Wop hustled in the circle, Boy-Boy, Twuan hustled in the circle at a point in time, Dazz hustled in the circle, Santu hustled in the circle, Baby Kairi hustled in the circle, Munya, Phil, hustled in the circle, Terrence hustled in the circle, LT hustled in the circle.  That's about – I'm just giving you some of the names of people that I can recall that hustled in the circle."  5/21/07 Tr. at 12202.  Later, when testifying about selling crack cocaine in the 2000 to 2001 time period near the Lincoln and the Circle, he identified the

---

[10]      Copies of the relevant transcript pages of Mr. Powell's trial testimony regarding crack cocaine sales are attached hereto as **Exhibit E.**

[11]      A conservative estimate of Powell's interaction alone with Bell during just this 3-year period (1995-1997) leads to an attribution of approximately 500 grams to Bell.  (*e.g.,* 7 grams (quarter ounce) x 25 (every other week) x 3 (years) = 465 grams).  Not only is this just a 3-year window of time, but it also does not factor in any of Bell's other dealings with any other people during any other time period.

following people as sharing crack cocaine sales by playing the *uno, dos* "game": "me [Powell], Kairi,

Don, Wop, Dazz, Phil, Terrance, Jazz, Santu, Kay-Bay, everybody." *Id.* at 12215.

Mr. Powell's trial testimony not only corroborates that Bell was a fixture selling crack cocaine

throughout the 1990s up until his arrest in 2005, but also that Bell helped maintain the crack cocaine

market in Congress Park because he always had a steady source of supply.

### e.    **Customer Gail Parson**[12]

Witness Gail Parson testified that among the individuals that she purchased crack cocaine from

in Congress Park were "Boy Boy" and "Don." 3/7/07 Tr. at 1854-57. Ms. Parson indicated that she

would frequently page Boy-Boy in order to order her crack. Often she would page him for

"[a]nywhere from 15 to 20 Zips, 20 dime bags." 3/7/07 Tr. at 1854.

Ms. Parson testified that she purchased crack cocaine from Boy-Boy "over a hundred times,"

and that the range of drugs that she would purchase from him would be anywhere from $20 all the way

up to $300-$400 worth of crack. 3/7/07 Tr. at 1906-08.

A conservative estimate of Ms. Parson's trial testimony attributes at least 100 grams of crack

cocaine to Mr. Bell. Assuming Ms. Parson purchased an average of 10 ziplocks per purchase, and

made 100 purchases from Mr. Bell during the many years she bought and used drugs in Congress Park

leads to 1000 ziplocks. Ten ziplocks constitutes approximately one gram of crack cocaine. It is worth

noting that this represents just one customer of Bell's for a three year period of time.

### f.    **Customer Marylin Proctor**[13]

Witness Marilyn Proctor testified that she was a crack cocaine addict in Congress Park. She

---

[12]    Copies of the relevant transcript pages of Ms. Parson's trial testimony regarding crack cocaine sales are attached hereto as **Exhibit F.**

[13]    Copies of the relevant transcript pages of Ms. Proctor's trial testimony regarding crack cocaine sales are attached hereto as **Exhibit G.**

further testified that she got to know "Boy-Boy" in approximately 2003.  At first, she tried to purchase

crack cocaine from Boy-Boy, but he refused, because he indicated that he did not know who she was.

However, Ms. Proctor testified that she "kept bugging him" at his white van for a few days, and then

he agreed to sell her crack cocaine.  3/21/07 Tr. at 3564-70.  At that point, she became a regular

customer of Boy-Boy's, and purchased crack cocaine from him "[m]aybe about twice a week" When

she did this, she would purchase anywhere from a dime bag up to $50 worth of crack cocaine.  *Id*. At

3570-74  Ms. Proctor purchased this quantity of crack cocaine regularly from Boy-Boy from 2003

through approximately early 2005.  *Id*. at 3588-95.

A conservative estimate of Ms. Proctor's trial testimony leads to another 60 grams of crack

cocaine being attributed to Mr. Bell.  Assuming she purchased two ziplocks of crack from Bell twice a

week for three years leads to 600 ziplocks of crack (2 (ziplocks) x 2 (times per week) x 50 (weeks per

year) x 3 (years)).  It is worth noting that this is only one customer of Bell's for a three year period of

time.

## g.   Crack Cocaine Supplier Cedric Conner[14]

Witness Cedric Conner testified that he sold and supplied crack cocaine to various crack

cocaine dealers in Congress Park.  Specifically, Conner testified about how, in the mid to late 1990s,

he supplied Gregory Bell with "[l]ike half ounces [of crack] at the time."  4/23/07 Tr. at 8162-63.

Mr. Conner was asked to list his "regular clients" during the 1999/2000 time period he testified

that, "I distributed my drugs regularly to Boy-Boy, Santu, Dazz, on a few occasions, Dom.  Let's see,

Bootsy, Harry, Deon, quite a few other people as well."  4/23/07 Tr. at 8221-22.  When asked to clarify

amounts, Conner testified that when he sold to Gregory Bell, he often sold him "in the range of a 31 to

---

[14]      Copies of the relevant transcript pages of Mr. Conner's trial testimony regarding
crack cocaine sales are attached hereto as **Exhibit H.**

a 62" of crack cocaine approximately "[t]wo or three times a month" during 1999/2000. *Id.* at 8222-23.

Mr. Conner's testimony not only corroborates the other witnesses' testimony that Mr. Bell was a consistent crack cocaine dealer in Congress Park, but a conservative estimate of his testimony accounts for nearly 1.5 kilograms alone during just a 2 year period of time. Assuming that he supplied Bell only for the two-year period (1999-2000), and during that two-year period he sold to Bell only a "31" two times per month, leads to a finding of 1440 grams of crack cocaine (2 (years) x 12 (months per year) x 2 (sales per month) x 30 (grams per sale) = 1440 grams). This conservative estimate is telling: It not only corroborates other witnesses' testimony, but also shows how quickly this crack cocaine adds up. It is also worth noting that Mr. Conner was only one supplier of Gregory Bell's; it is not known who, if anyone else, Bell was getting his crack cocaine from during this time.

In short, conservative estimates from the trial testimony of several witnesses account for well in excess of 1.5 kilograms of crack cocaine being attributed to Bell, just as the PSI writer found.

      **B.**    **Under the Sentencing Guidelines, Mr. Bell should
receive a two-point enhancement for possession of a
dangerous weapon pursuant to U.S.S.G. Section 2D1.1(b)(1).**

The PSI writer was correct to give Bell a two-point Guidelines enhancement for possession of a dangerous weapon. This is for several reasons.[15]

As an initial matter, witness Robert Pough testified that in the early 1990's – around 1991/1992 – Gregory Bell, David Wilson and "Fat Tony" robbed Pough's sister's boyfriend in his presence near 12th Street and Congress Place, SE. Pough testified that he saw "a few handguns" during this robbery, including one in Gregory Bell's hands. 5/17/07 Tr. at 11667-70 and 5/21/07 Tr. at 11971-72. Thus,

---

[15]    Copies of the relevant transcript pages relating to the two-point weapons possession are attached hereto as **Exhibit I.**

there was testimony on this record that Bell possessed a gun in Congress Park. Although an argument can be made that this incident happened a couple of years before the charged conspiracy even began, Bell was already 20-21 years old at this time, and Congress Park was already an established neighborhood to buy and sell crack cocaine. Armed robberies by drug dealers in Congress Park helped establish the credentials of those dealers, and the neighborhood.

In addition, Bell's integral role in the Congress Park crack cocaine market, and his partnership and profiteering with many of the individuals who carried weapons and used violence to solidify and strengthen the market, leads to a further reason why the weapons enhancement is appropriate for Bell. Indeed, Bell's shoulder-to-shoulder association with these other Congress Park drug dealers, and the benefits he received from this knowing association, means that the actions of these other members (such as weapons possession, other armed robberies, and acts of violence) was within the scope of Bell's conspiratorial agreement with these other members of the conspiracy. *See United States v. Tabron*, 437 F.3d 63 at 76-77. (D.C. Cir. 2006).

As set forth above, Bell was not only a fellow drug-dealer in Congress Park, but he also served a unique and vital role in the market by serving as a constant source of crack cocaine for other established members of the market who needed crack. For example, Powell called Bell the "wholesale king" because he knew he could always get crack from him when he was in short supply. 5/21/07 Tr. at 12196. Powell also testified that Bell often fronted crack cocaine to him. 5/21/07 Tr. at 12213-14. In addition members such as Kairi Kelliebrew and Bobby Capies testified regarding how when violence erupted with the rival 10th Place neighborhood, many drug dealers in Congress Park began congregating near "the Lincoln" and the Circle for safety. *E.g.* 5/7/07 Tr. at 10168-69. In addition, drug dealers in Congress Park not only participated in the *"uno dos tres* system" of sharing drug sales for safety reasons as a result of increased violence with 10th Place. *See e.g.* 4/2/07 Tr. at

5337, but also carried and stashed weapons throughout the late 1990s and years that followed in

Congress Park as well.  4/4/07 Tr. at 5681-82.  Bell certainly participated in the "*uno, doors*" system of

sharing sales, *e.g.* 5/7/07 Tr. at 10162-65.  And while Capies did not testify that Bell personally carried

the weapons that Capies and other drug dealers would stash during this time, it would be difficult for

Bell to argue that such weapons possession was not within the scope of his agreement with these

fellow drug dealers, since Bell unquestionably benefitted and profited from this enhanced protection,

and they unquestionably benefitted and profited from Bell's vital role as a constant source of supply.

Similarly, Bobby Capies testified regarding how he and some of his fellow co-conspirators would alert

each other of when one of them saw "jumpout" police officers in the area. 4/4/07 Tr. at 5692.

One final example of how Bell's knowing and intentional conduct in Congress Park

demonstrates how weapons possession is properly attributed to him is his hostile conduct towards the

legitimate security force which attempted to protect the Congress Park community from drug dealers

such as himself.  Donna Brown testified on July 16, 2007, regarding the difficulties she faced as a

private security officer working in Congress Park during the 2000 to 2002 time period.  In addition to

general resistance she and her Eagle Security colleagues faced working in the neighborhood, she

testified that she was threatened by several members of the charged conspiracy, including Desmond

Thurston, Gregory Bell and Joseph Jones.  Brown testified that on more than one occasion, Thurston

told her that he would kill her.  Gregory Bell made hand gestures in her direction, representing a pistol.

For all of these reasons, the PSI writer correctly gave Bell a two-point enhancement pursuant to

U.S.S.G. Section 2D1.1(b)(1).

**C.     Under the Sentencing Guidelines, Mr. Bell should
receive a two-point enhancement for obstruction
of justice pursuant to U.S.S.G. Section 3C1.1.[16]**

As this Court is aware, the April 3, 2004 murder of Trevon Shaw was charged in the indictment

in this case.  While it was alleged that Antwuan Ball and David Wilson personally committed the

murder, it was also alleged that this murder was committed in furtherance of the conspiracy charged in

this case against all defendants, including Bell.  Two of the main government witnesses regarding this

murder were Brittany O'Brien, and her mother Charlotte O'Brien.  Brittany O'Brien was the sole

eyewitness to the murder, having been outside at the time the murder was committed.  Charlotte

O'Brien was a partial ear-witness to the murder, and also saw David Wilson outside at the murder

scene, just seconds after the third and final shot was fired into Trevon Shaw.

At trial, Charlotte O'Brien testified regarding how on the early morning after the murder of

Trevon Shaw  – *i.e.* just several hours after the murder itself  – Gregory Bell came to her home and

knocked on the door of her home. When Ms. O'Brien came to her window, Mr. Bell, "asked me, was

Brittany in there."  6/20/07 Tr. at 16320-21.  Another unknown male was standing beside Mr. Bell.

This unknown man was wearing a hoodie that was covering his face.  *Id.* at 16322.  Ms. O'Brien

testified that in all of her years living in Congress Park, Mr. Bell had never knocked on the door to her

home before.  *Id.* at 16323.  After telling Mr. Bell that her daughter, Brittany, was not home, Ms.

O'Brien went back inside here home, told her husband what had happened, and then, "[p]acked me

and my kids' clothes and left [because] I feared for my life."  *Id.* at 16324.  This incident was

corroborated by Mr. Bell himself.  The government introduced at trial **Government Exhibit 904,**

which was a tape of a recording of a call that Mr. Bell made to his girlfriend while incarcerated at D.C.

---

[16]     Copies of the relevant transcript pages relating to acts of obstruction of justice are
attached hereto as **Exhibit J.**

Jail.  This call was made one day after the government returned the superseding indictment in this case, which was the first time the government had alleged this act in any publically-filed document in this case.  On this call, Mr. Bell can be heard admitting that he knocked on the O'Brien's door and claimed that it was his First Amendment right to do so.  He further stated that he "checked with Fay [Detective James Faison] on this all the way."

This conduct qualifies as an effort to "threaten[], intimidat[e], or otherwise influenc[e] a . . . witness . . . directly or indirectly."  U.S.S.G. Section 3C1.1, Commentary, Application Note 4(a).

II.     **Application of the factors enumerated pursuant to
        Section 3553(a) does not compel a different result.**

As set forth both in the PSI and above, the correct Guidelines analysis leads to an initial starting point and benchmark of a sentence of between 292 to 365 months of incarceration for Mr. Bell. *Gall,* 128 S.Ct. at 596.  After reviewing the entire trial record, as well as the PSI, through the additional lens of Section 3553(a), leads the government to conclude that there is no compelling reason for this Court to impose a sentence either above or below this benchmark range.  It is true that Mr. Bell personally committed less acts of violence and weapons possession than some of his fellow co-conspirators; on the other hand, Bell served a vital and unique role in sustaining and maintaining the marketplace for crack cocaine in Congress Park.  For these reasons, the government believes that a sentence towards the low-end of the recommended range of 292 to 365 months incarceration would reflect the seriousness of Mr. Bell's criminal behavior, the need to promote respect for the law, the need to provide just punishment for such reckless and repeated criminal conduct, to deter future similar activities, and to protect the public.

**<u>Conclusion</u>**

Mr. Bell stands before this Court as a man who chose to spend the better part of the past 15 years spreading multiple kilograms of poison throughout the community, and actively associating with a crew of individuals who committed many additional violent crimes throughout the Congress Park neighborhood (as well as neighboring communities).  The government respectfully submits that a significant sentence, towards the low-end of the recommended Guidelines range, is not only well within this Court's discretion to impose, but would also provide just punishment, reflect the nature and seriousness of Mr. Bell's reckless criminal behavior, promote respect for the law, provide adequate deterrence, and protect the public from further, similar, criminal behavior.

WHEREFORE, the United States respectfully requests that the Court sentence defendant Gregory Bell to a period of incarceration of at least 292 months, to be followed by a period of three years' supervised release.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498-610


_____
GLENN S. LEON
Assistant United States Attorney
New York Bar
555 4th Street, N.W., Room 4112
Washington, DC  20530
(202) 305-0174


_____
ANN PETALAS
Assistant United States Attorney
TX Bar No. 24012852
555 4th Street, N.W., Room 4211
Washington, DC  20530
(202) 307-0476


_____
GILBERTO GUERRERO, JR.
Assistant United States Attorney
Bar No.  KS-19271
555 4th Street, N.W., Room 4811
Washington, DC  20530
(202) 514-7298