**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**THE UNITED STATES OF AMERICA** :

     v.                           :          Cr. No. 05-100-3 (RWR)

**GREGORY BELL,**              :
  also known as Boy-Boy,
           **Defendant.**      :

**GOVERNMENT'S REPLY MEMORANDUM IN AID**
**OF SENTENCING FOR GREGORY BELL**

      The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, herewith files this reply memorandum in aid of sentencing for defendant Gregory Bell. The government relies on the following points and authorities in this reply memorandum and any other points and authorities that may be cited at the sentencing hearing.

      1.      In his sentencing memorandum, Mr. Bell makes reference to an August 2, 1996 search warrant executed at 2309 Irving Street, Southeast, Washington, D.C., which was a home that Mr. Bell lived at with his father, Raymond Bell, Sr. *See* Bell Sentencing Mem. at 2. Bell asserts that Mr. Bell, Sr. testified that the gun recovered from their home belonged to him (Bell, Sr.) and not his son. *Id.* This is not an accurate representation of Mr. Bell, Sr.'s testimony. In fact, all that Mr. Bell, Sr. testified to was that the night before the police executed the search warrant in question (August 1, 1996), there was a party at the home that he shared with his son, and that he found a gun while cleaning up after a party that they had that night. Bell, Sr. then claimed that instead of calling the police or attempting to determine who owned the weapon, he instead took the gun, and put it in a

1

cabinet in the kitchen. *Id.* at 20454-62.[1] However, shortly after putting it in the kitchen cabinet, Bell, Sr. testified that he then took the gun and moved it into a closet in the back bedroom which was where his son, Gregory Bell, lived. *Id.* at 20460-62. Mr. Bell, Sr. went on to say that the back bedroom where this gun (Government Exhibit 700.13), an additional 78 grams of crack (Government Exhibit 700.6), scales (Government Exhibit 700.10), a plate and razor with residue (Government Exhibit 700.11), and $1210 of cash (Government Exhibit 700.14) was not his room, but rather his son's room (*i.e.* Gregory Bell's). Mr. Bell, Sr., further testified that his son, Gregory Bell, had his own private entrance to this bedroom, along with his own key. *Id.* at 20463-69. Mr. Bell, Sr. went on to emphatically assert that none of the crack cocaine, the drug paraphernalia, or the $1210 in cash was his. *Id.* Finally, Mr. Bell, Sr. testified that a single bullet, which was also recovered from his son's bedroom closet (separate and apart from the loaded pistol found in the bedroom) was also not his. *Id.* at 20469.

  2. Despite the obvious bias that Mr. Bell, Sr. has to testify favorably for his son, his testimony establishes the following: (i) the gun recovered from his home did not belong to him (Bell, Sr.); (ii) this pistol was, in fact, recovered from his son's bedroom closet during the execution of the search warrant the next morning; (iii) the large amounts of crack cocaine, cash and drug paraphernalia were not his, and were in his son's private room, for which his son had a separate entrance and key; and (iv) he knew nothing about a separate bullet also recovered from his son's bedroom closet. Indeed, if anything, this testimony further establishes the primary assertions contained in the government's sentencing memorandum: namely, that throughout the length of the conspiracy (in this

---

[1] Copies of relevant portions of Mr. Raymond Bell, Sr.'s trial testimony are attached hereto as **Exhibit A.**

case during 1996) Gregory Bell possessed with intent to distribute large amounts of crack cocaine and also possessed dangerous weapons.

      3.      Mr. Bell also argues that he made money through various "legitimate jobs" in order to help "revitalize the Congress Park neighborhood." *See* Bell Sentencing Mem. at 4.  This argument is contrary to the evidence established throughout this case.  Indeed, there is overwhelming evidence on this record of Mr. Bell's unusually prolific crack cocaine dealing in Congress Park throughout the entire length of the charged conspiracy in this case; Mr. Bell's vital role in sustaining this crack cocaine market helped make Congress Park the dangerous neighborhood that it was for as long as it was.[2]  Moreover, this assertion is belied by other evidence in this case.  One of the counts that Mr. Bell was convicted of was the July 27, 2000 controlled purchase he made to cooperating witness Sandra White (count 9, *see* Government's Sentencing Memorandum at 10-11).  During this controlled purchase, Mr. Bell can be heard rushing Ms. White to complete the sale quickly so that he can get back to his construction job in Congress Park ("OK. Let's hurry up. I'm a lose my job. [mumbling] I'm a lose my job.").  In other words, while Mr. Bell was purportedly "revitaliz[ing]" Congress Park, he was also tearing it down with his continued crack cocaine dealing.  The audiotape of this controlled purchase was introduced into evidence as Government Exhibits 306 (unredacted) and 306.1 (redacted).

      4.      Finally, the government takes issue with Mr. Bell's repeated use of the term "acquitted conduct" throughout its sentencing memo.  Indeed, while the law certainly allows the Court to consider acquitted conduct in determining the appropriate sentence in this case, *see, e.g. United States v. Dorcely,* 454 F.3d 366 (D.C. Cir.), *cert. denied*, 127 S. Ct. 691 (2006), much of the conduct which

---

    [2]    In his sentencing memorandum, Mr. Bell makes reference to Ms. Linda Sweet, who was a lady that he called to testify during his defense case.  The Court might recall Ms. Sweet's testimony on cross-examination that she never ventured out of her home in Congress Park at night because it was too dangerous.

the Presentence Report writer used in determining Mr. Bell's total offense level to be a level 40, was not acquitted conduct. The two-point enhancement that Mr. Bell received for obstruction of justice, pursuant to U.S.S.G. §3C1.1, is a good example of this. Charlotte O'Brien's testimony regarding Mr. Bell's actions towards her during the early morning of April 4, 2004 (the morning after Trevon Shaw was killed) and Donna Brown's testimony regarding Mr. Bell's threats towards her in her capacity as a security officer at Congress Park were never voted on, or rejected by, the jury in this case.[3] Indeed, it is entirely appropriate for this Court to consider the credibility of these witnesses in determining whether or not Mr. Bell attempted to threaten, intimidate, or otherwise influence a witness, directly or indirectly. *See* U.S.S.G. §3C1.1, Comment 4(a).

WHEREFORE, the United States respectfully requests that the Court sentence defendant Bell consistent with the recommendation of the Presentence Investigation Report

> Respectfully submitted,
>
> JEFFREY A. TAYLOR
> United States Attorney
> D.C. Bar No. 498-610
>
> _____
> GLENN S. LEON
> Assistant United States Attorney
> New York Bar
> 555 4th Street, N.W., Room 4112
> Washington, DC  20530
> (202) 305-0174

---

[3] In fact, Mr. Bell essentially concedes that the factual assertions contained in the government's sentencing memorandum and the Presentence Investigation Report on these issues are true. For example, Bell admits that he did, in fact, approach Ms. O'Brien during the early morning of April 4, but claims rather that he did not have any intent to threaten anyone. *See* Bell Sentencing Mem. at 1-2 and Presentence Investigation Report at p. 26.