# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

          **Plaintiff,**           :  Docket No. CR 05-100

          V.

**ANTWUAN BALL, DAVID WILSON,**  :  Washington, DC
**GREGORY BELL, DESMOND**       :
**THURSTON, JOSEPH JONES, and**   :  September 12, 2007
**DOMINIC SAMUELS,**           9:17 a.m.

          **Defendants.**


**VOLUME 90 - MORNING SESSION**
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*


APPEARANCES:

For the United States:      UNITED STATES ATTORNEY'S OFFICE
                        Glenn S. Leon, Assistant United
                        States Attorney
                        Ann H. Petalas, Assistant United
                        States Attorney,
                        Gilberto Guerrero, Assistant
                        United States Attorney
                        555 4th Street
                        Washington, DC 20001
                        202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
                        South Building
                        601 Pennsylvania Avenue, N.W.
                        Washington, DC 20004
                        202.434.8234

And you said the party lasted until about 10 or 11 p.m.?

Yes, ma'am.

And what time did it begin?

Ma'am?

What time did the party begin?

Uhm, it was the weekend. It started about 12, I guess.

Q    Okay.  And you said you found the gun. What time was it
that you found the gun then?

This was about -- well, this was about 10. We started
cleaning up the back yard about 10, 10:30 maybe.

About 10 or 10:30?

Q    Yes, ma'am.

And where was the gun in the back yard?

It was on the other side of the house. It's a
subbasement, but no entrance to that basement, but it's on the
side of the wall before you enter the basement.

Q.   It was on the side of the wall before -- so it wasn't in
the basement?

No, not in the basement. The basement's flooded and you
can't even go into the basement.

And so it was just -- was it in a bag? Was it just
sitting there?

No, it was just sitting there on the side of the wall, no
bag, no nothing.

And what color was the gun?

1          Black, if I remember.

2          And what kind of gun?

3          I have no idea.

           Was it a revolver or automatic?

5          It was an automatic gun.

6          And was it loaded?

7          I don't know.

8          Did you check to see whether or not it was loaded?

9          No, ma'am, I did not.

10         So when you saw this gun, you picked this gun up?

11         Yes, Ma'am, I did.

12         And brought it into the house?

13         Yes, ma'am.

14         You didn't call the police?

15         No, I did not.

16         And why did you pick the gun up?

17         Why did I pick    up?

18         Right.

19         Well,    was in the back yard, so I just took it in the

20    house for the time. I had company and so I just brought it in

21    and put it in the kitchen, to begin with.

22         There was nobody in the kitchen -- I'm sorry, what?

23         Well, I sat it in the kitchen when I first took it into

24    the house.

25         Right.  But you pick up the gun and you bring it into

1    your house, correct?

2    A.    Yes, ma'am.

3    Q.    Okay.  And when you found it, was there anybody else

4    around?

5    A.    Ma'am?

6    Q-    Was there anybody there when you found the gun?

7    A.    No, ma'am -- well, yeah, I still had guests.

8    Q.    How many guests?

9    A.    Three band members were still left with me after the

10   party ended.

11   Q.    So, was it just the three band members that were left or

12   other people from the party?

13   A.    Three band members.

14   Q.    Did you ask any of them was it their gun?

15   A.    Ma'am?

16   Q.    Did you ask any of them whether or not it was their gun?

17   A.    No, ma'am, I didn't.

18   Q.    So, at that point when you pick up the gun next to your

19   house, you have no idea whose gun that is?

20   A.    No, ma'am, I do not.

21   Q.    And so when you picked up the gun, were you going to call

22   the police?

23   A.    Well, I hadn't had time to think about it.

24   Q.    You hadn't had time to think about it?

25   A.    No, not really.

1   Q.     And so when you saw the gun and decided to pick it up,

2   you didn't have time to think about it, whether or not to call

3   the police?

4   A.     It didn't enter my mind at the time to call anybody. I

5   had just found it, just that quickly, you know.

6   Q.     You found it that quickly?

7   A.     Well, by the time I picked it up and put it to the side

8   or out of the way, and I still had guests, and I didn't -- it

9   didn't enter my mind to call the police about the gun or

10  anything.

11  Q.     Okay.  So you pick up the gun and you go around    Now,

12  is there a back entrance to the house?

13  A.     It's a side entrance.

14  Q.     Okay.  And what are we looking at here, the front

15  entrance or the side entrance?

16  A.     That's the front entrance.  That's the entrance to the

17  front porch.

18  Q.     Okay.  So you pick up the gun and you don't check to see

19  whether or not it's loaded?

20  A.     No, ma'am, I do not.

21  Q.     Do you know whether or not there's a safety on it?

22  A.     I don't.

23         And so you take the gun into the house and you put it in

24  the kitchen at first, correct?

25  A.     Yes, ma'am.

1      And where in the kitchen do you put it at that point?

2   A.    Under the kitchen cabinet under the sink cabinet.

3   Q.    Okay.  And so at that time you had no time to think about

4   whether or not to call the police, correct?

5          MR. ZUCKER:  Objection, asked and answered several times.

           THE COURT:  Overruled.

           THE WITNESS:  Well, like I say, it never entered my mind

8   to call the police about a gun.

9   BY MS. PETALAS:

10  Q.    Okay.  And then you went back to that kitchen cabinet?

11  A.    Yes, ma'am.

12  Q.    Back into the kitchen and decided to move that gun from

13  the kitchen into the bedroom?

14         Yes, ma'am, I did.

15  Qa    Now, was that your house?

16  A.    Yes, ma'am, it was.

17  Q.    Okay.  And so you said you moved it from the kitchen

18  cabinet into the closet?

19  A.    Yes, ma'am.

20  Q.    Okay.  And why did you move it from the cabinet to the

21  closet?

22  A.    Because I didn't feel comfortable with it being in my

23  kitchen.  I had people moving around the house, so I took it in

24  the back room, which nobody was going to be in that back room.

25  Q.    Okay.  So, you had time to think about whether or not you

1   wanted the gun there in the cabinet, correct?

2   A.    Somewhat.

3   Q.    But you didn't have time to think about whether or not to

4   call the police about that gun?

5   A.    It never entered my mind to call the police about the

6   gun.  So, you know -- at that time, anyway. I didn't know where

7   the gun came from or what I was going to do with it or any of

8   that.

9   Q.    Okay.  So, you put the gun, then, in the closet. Again,

10  you said you didn't feel comfortable having it, but you didn't

11  check to see whether it had any bullets in it, correct?

12  A.    No, I did not.

13        And you didn't try to take any bullets out of the gun in

14  case it was loaded?

15  A.    No, ma'am, I did not.

16  Q.    And you didn't check the safety?

17  A.    No, ma'am, I didn't.

18  Q.    And so that gun, to your knowledge, could have been a

19  loaded gun?

20        MR. ZUCKER:  Objection, Your Honor.

21        THE WITNESS:  Could have been.

22        MR. ZUCKER:  Argumentative.

23        THE COURT:  Sustained.

24  BY MS. PETALAS:

25        And you said you put it now in the closet?

1    A.    Yes, ma'am.

2    Q.    And where in the closet?

3    A.    On the floor behind the speaker at the bottom of the

4    closet, a speaker.

5    Q.    On the floor behind the speaker?

6    A.    Yes, ma'am.

7    Q.    Now, there's a TV in that back room?

     A.    Yes, ma'am, there is.

9    Q.    And that TV is not in the closet, correct?

10   A.    Not in the closet.

11   Q.    Okay.  The TV is in another part of the bedroom?

12   A.    This was ten years ago. Somewhere in that bedroom.

13         Okay.  But i wasn't in the closet?

14   A.    No, ma'am.

15   Q.    Now, you said you were in the front room when you heard

16   the knock at the door, correct?

17   A.    Yes, ma'am.

18   Q.    And the other band members were all in the front room

19   when you heard the knock on the door?

20   A.    Yes, ma'am.

21   Q.    Okay.  So what time -- did you spend the night in the

22   front room?

23   A.    Yes, ma'am, we did.

24   Q.    So, approximately what time did you move the gun from the

25   kitchen into the bedroom?

1   A.     Well, that was the earlier evening, maybe about 7, 8:00

2   that evening.

3   Q.     You moved the gun from the kitchen into the bedroom

4   around 7 or 8:00 at night?

5   A.     Approximately.  Somewhere in the evening.

6   Q.     But I thought you -- didn't you just testify that you

7   didn't find that gun until after the party which ended at 10 or

8   11:00 at night?

9   A.     No.   I said it was found in the back yard during the

10  party after the clean up.

11  Q.     It was found in the back yard during the party after the

12  clean up?

13  A.     Yes, ma'am.

14  Q.         the party had ended?

15  A.     It ended.

16  Q.     And I thought you testified earlier that the party ended

17  around 10 or 11:00 at night?

18  A.     Well, that was a rough estimate of the time. I can't say

19  exactly when it ended, but it ended early.

20  Q.     Okay.  And so now you're testifying that you moved the

21  gun -- after you found it, you moved it into the kitchen and

22  then moved it from the kitchen into the bedroom around 7 or 8:00

23  at night?

24  A.     Well, that's a rough estimate of the time. I can't say

25  exactly what time it was.

1      Okay.  And you don't spend the night in the back bedroom,

2  correct?

3      No, ma'am, I do not.

4      You spend the night up in that front room, correct?

5      Yes, ma'am.

6  Q.   And you spend it with those three other members of your

7  band, correct?

8      Yes, ma'am.

9      And your son, Gregory Bell, Boy-Boy, he spends the night

10  in that back bedroom, correct?

11      That's his room.

12      Him and Keysha, correct?

13      Yes, ma'am.

14  Q    And they're the ones that spend the night in that

15  bedroom?

16      Yes, ma'am.

17  Q    And they're the ones that are in that bedroom when the

18  police come in the next day, right?

19      Yes, ma'am.

20      And you testified you didn't see the police recover the

21  gun, correct?

22      Not from the bedroom.

23      Okay.  So you don't know where the police recovered that

24  gun from from the bedroom, correct?

25      I do not.

1    Q.    And what time, do you recall, did Gregory Bell come over

2    that night? Did he come to the party at all -- I'm sorry, that

3    was a compound question.

4          Did Gregory Bell come to that party that you had?

5    A.    He was at the party earlier.

6    Q.    Okay.  What time was he at the party?

7    A.    Well, during -- it started at 12, and they were there

8    during the cookout and so forth.

9    Q.    Okay.  And then did he stay there through the night or

10   did he leave and come back?

11   A.    No, they left and -- like I say, they had their own

12   entrance.  When the police entered, I didn't even know that they

13   were in the house.

14   Q.    Okay.  So when the police came in, you didn't know that

15   Boy-Boy and Keysha were in the back?

16   A.    No, ma'am, I did not.

17   Q.    Does Boy-Boy have a key to the house?

18   A.    Yes, to the private entrance.

19   Q.    Oh.   There's a private entrance?

20   A.    They had their own entrance on the side of the house.

21         Was that his own private entrance?

22   A.    That's the side entrance that leads to that room. You

23   can come through the kitchen to get to that room.

24   Q.    And how often would Boy-Boy come to your house?

25   A.    Well, every couple of days, maybe.

1    Q.    Okay.   And -- but you were sleeping in the front room,

2    correct?

3    A.    Yes, ma'am.

4    Q.    Okay.  So, why were you sleeping in the front room if you

5    didn't know Boy-Boy was coming over?

6    A.    Well, I allow them to have that back room, him and

7    Keysha, and I had other kids who come and they use the back room

8    to play games, and I had my own entrance in the front.

9    Q.    So, you would sleep every night on the couch in the front

10   room in case your kids wanted to use the room?

11   A.    No.  Well, I just let them have that room period. I just

12   had the front room for myself and the front porch.

13   Q    You had the front room and the front porch?

14   A.    Yes, ma'am.

15   Q.    So, you wouldn't sleep in that back bedroom?

16   A.    No, ma'am.

17   Q.    That was just for your sons?

18   A.    Well, it ended up that way. I started in that room, but,

19   you know, they came through and I would just let them have that

20   room period.

21   Q    And so you -- I just want to be clear. You then let them

22   have that back bedroom?

23   A.    Yes, ma'am.

24   Q.    And that was -- that back bedroom, that is same bedroom

25   where you had put that gun, correct?

1          Yes, ma'am.

2    Q    And you talked about how you talked to the police that

3    night, correct?

4          Yes, ma'am.

5          And you told them that you found a gun in the basement?

          In the back yard.

7          All right.   But you -- Court's indulgence.

8          It's your testimony that you did not tell them that you

9    found the gun in the basement?

10         No, ma'am, I did not.

11   Q.   And you told them that the gun was found with some other

12   stuff, and you took it upstairs and put it in the closet where

13      was found.   Do you recall that?

14         Well, I told them that the gun was found in the back

15   yard.

16         MS. PETALAS:   Court's indulgence.   May I approach, Your

17   Honor?

18         THE COURT:   Yes.

19   BY MS. PETALAS:

20         Showing you what's marked as 700.16, do you see that?

21         I don't have my glasses.

22   Q    Okay.   It's Government's Exhibit 700.16.   Is that your

23   name up at the top?

24         That's my name.

25         Is that your date of birth?

1    A.    It is.

2    Q.    And do you recognize this?

3    A.    No, ma'am, I don't.

4    Q.    Do you recognize this question and answer?

5    A.    No, ma'am, I don't.

6    Q.    Is that dated 8-2 -- August 2nd, 1996?

7    A.    I see the date, but I don't know what it relates to.

8    Q.    Well, that August, 1996, isn't that when the police came

9    into your house?

10   A.    Okay.

11   Q.    Is it?  You don't recall?

12   A.    I don't recall. It was ten years ago.

13   Q.    So, you don't -- your testimony is that you never told

14   the police that you found the gun with some other stuff, brought

15   it upstairs and put it in the closet?

16   A.    I told them that I found the gun in the back yard and

17   brought it in the house, and I'm the one who put     in the

18   closet, but I never said it was found in the basement. I made a

19   statement    was found in the back yard. The basement is

20   flooded.   There's no -- the basement -- it's a subbasement.

21   Q.    I understand, but my question is: It's your testimony

22   that you never told the police back on August 2nd, 1996 -- do

23   you remember an officer Harry Allen?

24   A.    No, ma'am, I don't.

25   Q.    So, your testimony is you never told an officer Harry

1    Allen that you found the gun in the basement with some other

2    stuff and then brought it upstairs?

3    A.    No, ma'am.

4    Q.    Now, you were asked also about drugs that were recovered

     from that house, correct?

6    A.    I was asked about it?

7    Q.    The police officer recovered over 70 grams of crack

8    cocaine from that house during that search warrant, correct?

9         MR. BEANE:  Objection, Your Honor.

10        THE WITNESS:  Well, I never saw it.

11        MR. BEANE:  Withdrawn.

12   BY MS. PETALAS:

13   Q.    Well, you said you -- Just to clarify, you never saw it.

14   You never saw that the police recovered it?

15   A.    No, ma'am.

16   Q.    Okay.  And you had never seen 70 grams of crack cocaine

17   in the house?

18   A.    Never saw it.

19   Q.    And if there were 70 grams of crack cocaine in the house,

20   it wasn't yours, correct?

21   A.    No, ma'am.

22   Q.    And you didn't know anything about 70 grams of crack

23   cocaine?

24        MR. BEANE:  Objection, asked and answered.

25        MR. ZUCKER:  Objection.

1          THE COURT:   Overruled.

2     BY MS. PETALAS:

3          I'm sorry, you can answer.

4     A.     No, ma'am, I didn't.

5     Q.     Now, the police also recovered a plate with numerous

6     little Ziploc bags?

7          MR. BEANE:   Objection, Your Honor.   Is that a question or

8     a statement?

9          THE COURT:   It's cross-examination.

10          MR. BEANE:   It's still --

11          THE COURT:   Beg your pardon?

12          MR. BEANE:   Nothing.

13    BY MS. PETALAS:

14    Q.     The police also recovered a plate with numerous Ziploc

15    bags from that house during that search warrant, correct?

16    A.     I never saw it.

17    Q.     And they recovered about $1,210 in cash during that

18    search warrant, correct?

19    A.     I don't know. They took 700 from me.

20    Q.     They took 700 from you?

21    A.     Yes, ma'am.

22    Q.     Okay.   What about -- did you see them recover $1,210 from

23    a speaker in the bedroom?

24    A.     No, ma'am, I did not.

25    Q.     Did you have $1,210 in a speaker in a bedroom?

1   A.     No, ma'am, I did not.

2   Q.     And they also recovered -- wel=1, you. testified previously,

3   you didn't take any bullets out of that gun, correct?

4   A.     That's true.

5   Q.     Okay.  So, if there was a bullet recovered from the

6   bedroom shelf, you wouldn't have put it there, correct?

7   A.     Ma'am?

8   Q.     If there was a bullet recovered from the bedroom shelf

9   back there, you wouldn't have put it there, separate and apart

10  from the gun?

11  A.     No, ma'am, I don't think so.

12  Q.     They also recovered two Ziploc bags of green weed and

13  numerous other Ziploc bags, correct?

14  A.     I never saw it.

15  Q.     Did you have any green weed in the back bedroom?

16  A.     Ma'am?

17  Q.     Did you have any weed that you were keeping in that back

18  bedroom?

19  A.     No, ma'am, I did not.

20  Q.     There were also several photographs recovered from that

21  back bedroom.

22         MS. PETALAS:  May I approach, Your Honor?

23         THE COURT:  Yes.

24  BY MS. PETALAS:

25  Q.     I'm going to show you what's been marked as Government's

1   Exhibit 705 E [sic]. Do you see that?

2       THE COURT:  Is that 700.5?

3       MS. PETALAS:  Point 5 E. I apologize. Do you see that?

4       THE WITNESS:  Partially.

5   BY MS. PETALAS:

    Q.   Well, the photographs that were in the back room, those

7   were your son's photographs, correct?

8   A.   Ma'am?

9   Q.   The photographs that were in the back room, those were

10  your son's photographs, correct?

11  A.   The one you just showed me?

12  Q.   Yes.

13  A.   Well, I couldn't really see that photograph too clearly,

14  but we had photographs in that room.

15  Q.   You said "we had photographs" in there?

16  A.   Yeah.

17  Q.   You testified that the porch and the front was pretty

18  much your part of the house, correct?

19  A.   Mostly.

20  Q.   And that back bedroom was your son's part of the house,

21  correct?

22  A.   Yes, basically.

23  Q.   You were also present in 2001 when another search warrant

24  was conducted, correct?

25      MR. BEANE:  Objection, Your Honor, beyond the scope.