**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                          )
UNITED STATES OF AMERICA,  )
                          )
        v.                 )   Criminal Action No. 05-100-2 (RWR)
                          )
DAVID WILSON,              )
                          )
        Defendant.         )
_____)


<u>**MEMORANDUM OPINION AND ORDER**</u>

After being found guilty of narcotics offenses, unlawful use
of a communications facility, and aiding and abetting first
degree murder while armed, David Wilson filed a motion for
judgment of acquittal, and a motion for a new trial alleging that
the government failed to disclose exculpatory <u>Brady</u> material and
that the government sponsored false testimony.  Because the
evidence when viewed in the light most favorable to the verdict
permitted a reasonable jury to find the essential elements of all
the offenses of which Wilson was convicted except for Count 11,
his motion for judgment of acquittal will be granted in part and
denied in part.  Further, because the testimony was not
demonstrably false and neither that nor the undisclosed
information could reasonably have affected the outcome or the
fairness of the trial, Wilson's motion for a new trial will be
denied.

- 2 -

BACKGROUND

Wilson was tried along with five other defendants on a 58-count indictment alleging a narcotics conspiracy among members of the Congress Park Crew and related violations.  The jury found Wilson guilty as to some of the charges of unlawful distribution of crack cocaine (Counts 4, 6, 11, 16, 18, 19, 20, and 21), unlawful use of a communication facility (Count 55), and aiding and abetting the first-degree murders of Sabrina Bradley and Ronnie Middleton (Counts 31 and 33).  During a ten and one-half-month trial, the government introduced testimony from FBI agents, experts, witnesses who had pled guilty under cooperation agreements with the government, and other witnesses; tape and video recordings; and physical evidence.  Viewed in the light most favorable to the verdict, the government's evidence established the following facts.

Wilson sold crack cocaine in the Congress Park neighborhood of Southeast Washington, D.C.  On at least seven occasions, he sold crack cocaine to witnesses cooperating with the Federal Bureau of Investigation.  One of those cooperating witnesses, Sandra White, was a crack addict who lived in the Congress Park neighborhood for a number of years.  In March or May of 2000, she purchased three ten-dollar quantities ("dimes") of crack from Wilson for $25.  (Trial Tr., Mar. 12, 2007 p.m. at 2516, 2519; Mar. 13, 2007 p.m. at 2713-17.)  On June 28, 2000, White

- 3 -

purchased twenty dimes of crack from Wilson for $200.  (Id. at
2527-28.)  On October 17, 2000, though, she entered Wilson's
apartment in Congress Park, where Wilson's co-defendant Desmond
Thurston weighed crack on a scale, and she bought the crack from
Thurston.  (Id. at 2536-37; see infra n.2.)

Season Wood grew up with Wilson and later sold drugs in
Congress Park as well.  (Trial Tr., Feb. 28, 2007 a.m. at 859-
61.)  In September 2000, Wood was arrested and began cooperating
with the FBI.  (Id. at 883-85.)  On January 24, 2001, Wilson sold
10.9 grams of crack to Wood for $600.  (Id. at 885-892; Feb. 28,
2007 p.m. at 904-05; May 2, 2007 a.m. at 9549.)  On February 14,
2001, Wood arranged with Wilson to purchase an ounce of crack
from him.  (Trial Tr., Feb. 28, 2007 p.m. at 920-22.)  However,
Wilson did not have enough crack to satisfy Wood's request.
Wilson telephoned an associate, Larry Browne, asking Browne to
obtain more powder cocaine so that Wilson could satisfy Wood's
order (id. at 926-28; Trial Tr., Mar. 5, 2007 a.m. at 1416), and
to purchase baking soda.  Wood furnished both, and an
unidentified person used the baking soda to cook the powder
cocaine into crack.  (Trial Tr., Feb. 28, 2007 p.m. at 926-933;
Mar. 5, 2007 a.m. at 1431.)  Wood gave Wilson $1,200 for 19.4
grams of the newly cooked crack cocaine.  (Trial Tr., Feb. 28,
2007 p.m. at 920-22, 933; Mar. 22, 2007 p.m. at 3972.)

- 4 -

Gail Parsons moved to Congress Park in 1991, and became
addicted to crack.  (Trial Tr., Mar. 6, 2007 p.m. at 1809-10.)
After she was arrested and charged with narcotics offenses,
Parsons began cooperating with the FBI.  (Id. at 1818-19.)  On
March 20, 2001, Parsons purchased a .52 gram piece of crack from
Wilson for $80.  (Trial Tr., Mar. 7, 2007 a.m. at 1933-34;
Mar. 12, 2007 p.m. at 2362; Mar. 22, 2007 p.m. at 4008-09.)  On
April 5, 2001, Parsons purchased 1.9 grams of crack from Wilson
for $200.  (Trial Tr., Mar. 7, 2007 p.m. at 1953-54; Mar. 12,
2007 a.m. at 2364-65; Mar. 22, 2007 p.m. at 4008-09.)
Additionally, on April 26, 2001, Darlene Irving, another
cooperating witness, purchased 2.8 grams of crack from Wilson for
$100.  (Trial Tr., Mar. 28, 2007 a.m. at 4679, 4685-86; July 10,
2007 p.m. at 17107.)

Wilson was particularly close with one of his associates,
Maurice Doleman, whose mother helped to care for Wilson when he
was growing up.  (Trial Tr., Mar. 29, 2007 p.m. at 5089.)
Doleman robbed the girlfriend of a member of the 1-5 Mob, a rival
gang operating in an area next to Congress Park, and robbed the
girlfriend's uncle.  (Id. at 5088.)  In 1993, as retaliation, the
gang member paid Ronnie Middleton, another member of the 1-5 Mob,
to kill Doleman.  (Id. at 5081.)  That same year, Doleman was
shot and killed, and members of the Congress Park group,
including Wilson, believed that Middleton was the person who shot

- 5 -

Doleman.  (Id. at 5075-81.)  After the murder, Wilson committed
himself to killing Middleton to avenge his friend.  (Id. at
5095.)

     In the early morning of August 17, 1998, Wilson and two
other members of the Congress Park group, Antonio Roberson and
Antoine Draine, spotted Middleton sitting in his car, a Ford
Bronco.  (Trial Tr., Apr. 2, 2007 a.m. at 5138, 5145.)  Also
sitting in Middleton's car were his girlfriend, Sabrina Bradley,
and a third individual nicknamed Teeny Man.  (Trial Tr., June 7,
2007 a.m. at 14572-73.)  After seeing Middleton in his car,
Wilson drove to Roberson's house to obtain a .9mm Glock handgun.
(Trial Tr., Apr. 2, 2007 a.m. at 5138-40.)  Wilson, Roberson, and
Draine returned to where Middleton had parked the car, and
Roberson opened fire with the gun on the Bronco.  (Trial Tr.,
Mar. 29, 2007 p.m. at 5112-15.)  Teeny Man escaped from the car
by jumping out a window, but both Middleton and Bradley were
wounded.  (Id.)  Middleton sped off in the car with Bradley to
the Metropolitan Police Department 7th District building, where
Detective Thomas Webb spoke briefly with Middleton about the
shooting.  (Trial Tr., June 7, 2007 p.m. at 14635-38.)  Rescue
workers took Middleton and Bradley to D.C. General Hospital,
where they both died as a result of the gunshot wounds they
sustained.  (Id. at 14663-64.)

- 6 -

During the trial, Wilson moved for a mistrial, or in the alternative, to dismiss Counts 31-34 of the superseding indictment, arguing that the government late disclosed evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).  In a separate motion, Wilson again moved for a mistrial, contending that the government failed to correct the false testimony of witness Damien Green in violation of Napue v. Illinois, 360 U.S. 264 (1959).  After the government rested, Wilson moved for a judgment of acquittal on all counts.  The motion was granted with respect to a crack sale alleged in Count 7,  to all other counts. Post-trial, Wilson now renews his motion for a judgment of acquittal with respect to all counts on which he was convicted, and his motion to dismiss Counts 31 and 33.[1]  Wilson also moves for a new trial on Counts 31 and 33 as an alternative remedy for the alleged Brady and Napue violations, and he has supplemented that motion citing additional evidence that the government failed to disclose as additional Brady violations.

DISCUSSION

I.   MOTION FOR JUDGMENT OF ACQUITTAL

In reviewing a post-verdict motion for judgment of acquittal, a court must look at the entire record, United States

---

[1] Wilson also renews his motion for a mistrial.  Because a verdict has already been rendered and accepted, and the jury has been dismissed, a new trial -- not a mistrial -- would be the proper remedy for the alleged violations.

v. Byfield, 928 F.2d 1163, 1166 (D.C. Cir. 1991), and "must view the evidence in the light most favorable to the verdict," United States v. Campbell, 702 F.2d 262, 264 (D.C. Cir. 1983), according the verdict "the benefit of all legitimate inferences[.]" United States v. Singleton, 702 F.2d 1159, 1163 (D.C. Cir. 1983). "The evidence in question 'need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.'" United States v. Morrow, Criminal Action No. 04-355 (CKK), 2005 WL 1389256, at *4 (D.D.C. June 13, 2005) (quoting United States v. Maxwell, 920 F.2d 1028, 1035 (D.C. Cir. 1990)). "No distinction is made between direct and circumstantial evidence in evaluating the sufficiency of evidence supporting a guilty verdict." Maxwell, 920 F.2d at 1035. The trial court must give "'full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" United States v. Treadwell, 760 F.2d 327, 333 (D.C. Cir. 1985) (quoting United States v. Davis, 562 F.2d 681, 683 (D.C. Cir. 1977)). The jury's determination will stand unless no reasonable trier of fact could have found all the essential elements of the offense beyond a reasonable doubt when considering the evidence in the light most favorable to the verdict. See United States v. Alexander, 331 F.3d 116, 127 (D.C. Cir. 2003); Morrow, 2005 WL 1389256, at *3.

-8-

A.   <u>Narcotics convictions</u>

The jury convicted Wilson of unlawful distribution of crack cocaine in Counts 4, 6, 11, 19, 20, and 21, and unlawful distribution of five grams or more of crack cocaine in Counts 16 and 18.  To prove unlawful distribution, the government had to prove that Wilson knowingly and intentionally distributed a mixture or substance containing a detectable amount of cocaine base, known as crack cocaine.  <u>See</u> 21 U.S.C. § 841(a)(1); <u>Criminal Jury Instructions for the District of Columbia</u> § 6.202 (5th ed. revised 2009).  For Counts 16 and 18, the government also had to prove that the amount was five grams or more of crack cocaine.  Wilson argues that the government did not prove that the substances were crack.  (Def.'s Mot. for Consideration of Still Pending Mots. for a New Trial & for J. of Acquittal ("Def.'s Mot.") at 4.)

The D.C. Circuit has concluded that the government "may prove that cocaine base is crack cocaine in a variety of ways." <u>United States v. Pettiford</u>, 517 F.3d 584, 593 (D.C. Cir. 2008). Evidence of smokability is not required to prove that the substance is smokable crack.  <u>Id.</u> at 594.  For example,

> testimony that the seized substance was rock-like and off-white or yellowish in color; testimony by a chemist that it was 83% cocaine base; testimony by the seizing officer, experienced in crack cases, that the substance was crack; and testimony by an expert in the packaging and distribution of controlled substances that a photograph of the seized material showed crack and not powder cocaine

is sufficient evidence to enable a jury to conclude that a substance is crack.  Pettiford, 517 F.3d at 593 (internal quotation marks omitted) (citing United States v. Powell, 503 F.3d 147, 148 (D.C. Cir. 2007)).  United States v. Baugham, 449 F.3d 167, 183 (D.C. Cir. 2006), affirmed a conviction supported by evidence that crack was a slang term for cocaine base, that the officer could distinguish between crack and powder cocaine, that the substance recovered in numerous ziploc bags had a white rock appearance, and that the defendant had a reputation as a crack dealer.

Here, the government presented testimony from cooperators who described their transactions with Wilson, FBI agents who discussed the substances retrieved from cooperators after controlled purchases, and chemists who stated the type, purity level, weight, and appearance of the substances.  For Counts 16 and 18, Season Wood testified that on January 24, 2001, he purchased four 3.5-gram quantities ("eight-balls") of crack cocaine from Wilson for $600 (Trial Tr., Feb. 28, 2007 a.m. at 874, 885-92; Feb. 28, 2007 p.m. at 904-05), and that on February 14, 2001, he purchased crack cocaine from Wilson for $1,200.  (Trial Tr., Feb. 28, 2007 p.m. at 920, 933.)  Wood also testified that on February 14, 2001, he purchased for Wilson baking soda, which can be used to make crack, and that the crack he purchased from Wilson was wet and appeared as if it recently

-10-

had been cooked.  (Id. at 927-32.)  Larry Browne also testified
that on February 14, 2001, he gave cocaine powder to Wilson,
watched people cook the cocaine powder into crack, and saw Wilson
sell twenty-three grams of crack for $1,200 to a person he later
came to know as Season Wood.  (Trial Tr., Mar. 5, 2007 a.m. at
1431-42.)  Agent Robert Lockhart identified the white rock
substances that were recovered from Wood after the controlled
purchases on January 24, 2001 and February 14, 2001 as crack
cocaine.  (Trial Tr., Mar. 21, 2007 p.m. at 3656-58, 3666-68.)
Lockhart also testified that he had law enforcement experience
with controlled purchases involving crack.  (Trial Tr., Feb. 22,
2007 p.m. at 259.)  For Count 16, chemist Gwynn Reel testified
that the substance weighed 10.9 grams and contained cocaine base
with a purity of 73%.  (Trial Tr., May 2, 2007 a.m. at 9548-49.)
For Count 18, chemist Minh Dang testified that the substance
weighed 19.4 grams and contained cocaine base with a purity level
of 52%.  (Trial Tr., Mar. 22, 2007 p.m. at 3972.)  Dang also
testified that crack cocaine was the "street" term for cocaine
base and that the cocaine base he analyzed in this case had a
rock-like form.  (Trial Tr., Mar. 22, 2007 p.m. at 3962, 3964.)

For Counts 19 and 20, Gail Parson testified that she
purchased a piece of crack cocaine from Wilson for $80 (Trial
Tr., Mar. 7, 2007 a.m. at 1933-34) and that she purchased dimes
of crack cocaine from Wilson for $200.  (Trial Tr., Mar. 7, 2007

-11-

p.m. at 1953-54.)  Agent Kyle Fulmer testified that he recognized
Wilson's voice on audio recordings of those controlled purchases
and retrieved white rock substances from Parson after the
purchases on March 20, 2001 and April 5, 2001.  (Trial Tr.,
Mar. 12, 2007 a.m. at 2362-65.)  For Count 19, Dang testified
that the substance weighed .52 grams and contained cocaine base
with a purity of 53%.  (Trial Tr., Mar. 22, 2007 p.m. at 4008-
09.)  For Count 20, Dang also testified that the substance
weighed 1.9 grams, contained cocaine base with a purity of 75%,
and was packaged in thirty-two ziploc bags.  (Id.)

For Count 4, Sandra White testified that she purchased three
dimes of crack cocaine from Wilson for $25.  (Trial Tr., Mar. 12,
2007 p.m. at 2519.)  When asked by the government whether this
transaction occurred on "March 25, 2000," White responded "yes."
(Trial Tr., Mar. 12, 2007 p.m. at 2516).  Agent Fulmer later
testified that, based on police records, the transaction in Count
4 occurred on "May 25, 2000."  (Trial Tr., Mar. 13, 2007 p.m. at
2713-17.)  While the government introduced conflicting evidence
of the transaction date, it is the "right of the jury to
determine credibility, weigh the evidence and draw justifiable
inferences of fact."  Treadwell, 760 F.2d at 333 (internal
quotation marks omitted).  A reasonable jury could have found
that White was testifying about the transaction alleged in Count
4.

-12-

To support the conviction on Count 6, White testified that
on June 28, 2000 she purchased twenty dimes of crack cocaine,
packaged in twenty ziploc bags, from Wilson for $200. (Trial
Tr., Mar. 12, 2007 p.m. at 2527-28.)

Agent Fulmer supported White's testimony by testifying that
law enforcement collected white rock substances from White after
she was sent to make controlled purchases on May 25, 2000 and
June 28, 2000. (Trial Tr., Mar. 13, 2007 p.m. at 2713-17, 2723-
24.) For Counts 4 and 6 respectively, Dang testified that the
substances from White's transactions were .21 grams containing
cocaine base with a purity level of 86% and packaged in three
ziploc bags, and 1.4 grams containing cocaine base with a 91%
purity level and packaged in twenty ziploc bags. (Trial Tr.,
Mar. 22, 2007 p.m. at 3995, 3998.)

For Count 21, Darlene Irving testified that on April 26,
2001 she purchased "coke" from Wilson and had discussed with
Wilson whether to take the substance in "one big rock" or in
dimes. (Trial Tr., Mar. 28, 2007 a.m. at 4685-86.) Dang
testified that the substance from the April 26, 2001 purchase was
2.8 grams containing cocaine base at 81% purity level. (Trial
Tr., July 10, 2007 p.m. at 17107.) Lockhart identified a
photograph of drugs recovered from Irving's April 26, 2001
purchase and testified that the photograph depicted crack cocaine
packaged in multiple ziploc bags. (Trial Tr., July 12, 2007 a.m.

-13-

at 17440-41.)  Viewing all of this evidence in the light most
favorable to the government, a reasonable jury could have
concluded that Wilson knowingly and intentionally distributed
crack cocaine as alleged in Counts 4, 6, 16, and 18 through 21.

For Count 11, White testified that she gave money to Desmond
Thurston in exchange for cocaine[2] on October 17, 2000.  (Id. at
2536-37.)  Although it was not Wilson who actually sold White the
drugs, Count 11 charged Wilson with violating 18 U.S.C. § 2,
aiding or abetting in the distribution of crack.  Under an aiding
and abetting theory, the government must show "'(1) the specific
intent to facilitate the commission of a crime by another; (2)
guilty knowledge on the part of the accused; (3) that an offense
was being committed by someone; and (4) that the accused assisted
or participated in the commission of the offense.'"  United
States v. Washington, 12 F.3d 1128, 1136 (D.C. Cir. 1994)
(quoting United States v. Harris, 959 F.2d 246, 262 (D.C. Cir.
1992), abrogated on other grounds by United States v. Stewart,
246 F.3d 728, 732 (D.C. Cir. 2001)).  The government must "'show
some affirmative participation which at least encourages the
principal offender to commit the offense[.]'"  United States v.

---

[2] White did not describe the cocaine further as powder or
crack cocaine.  However, Agent Fulmer testified that he collected
a white rock substance from White after the October 17, 2000
controlled purchase (Trial Tr., Mar. 13, 2007 p.m. at 2734), and
Dang testified that the substance collected from that transaction
weighed 1.5 grams and contained cocaine base at a 77% purity
level.  (Trial Tr., Mar. 22, 2007 p.m. at 4004.)

-14-

<u>Kelly</u>, 552 F.3d 824, 831 (D.C. Cir. 2009) (quoting <u>United States v. Monroe</u>, 990 F.2d 1370, 1374 (D.C. Cir. 1993)).  White testified that the drug transaction occurred in Wilson's apartment, that Thurston measured the cocaine on a scale in the apartment, and that Wilson was with Thurston in the apartment's bedroom just prior to Thurston completing the drug sale.  (Trial Tr., Mar. 12, 2007 p.m. at 2536-37.)  This evidence, viewed in the light most favorable to the verdict, merely shows Wilson's presence at the scene but does not support any affirmative participation by Wilson in the offense or prove that his mere presence was intended to help in the commission of the offense.[3]  The government has not cited any additional evidence that establishes that Wilson encouraged Thurston to conduct the sale, and Wilson's motion for judgment of acquittal will be granted with respect to Count 11.

B.   <u>Unlawful use of a communication facility conviction</u>

The jury also convicted Wilson of unlawful use of a communication facility in Count 55.  Wilson does not make any specific arguments in support of a judgment of acquittal.  To prove unlawful use of a communication facility, the government had to prove that Wilson intentionally and knowingly used a

---

[3] The government's theory was that White had purchased from Wilson and Thurston before then.  (<u>See</u> Superseding Indictment, Count One, Overt Act 35, and Count 3.)  Thus, Wilson's mere presence would not have served to vouch for a seller unknown to White, nor do the government's briefs argue such a theory.

-15-

telephone with the intent to commit, facilitate, or cause the commission of a conspiracy to distribute or possess with the intent to distribute crack cocaine.  See 3-56 Modern Federal Jury Instructions § 56.03 (2008); see also 21 U.S.C. § 843(b).  "[T]he government must prove actual commission (by the defendant or another person) of the alleged underlying offense."  United States v. Iennaco, 893 F.2d 394, 396 (D.C. Cir. 1990).

The jury acquitted Wilson and his co-defendants of conspiracy to distribute or possess with the intent to distribute crack cocaine, but the acquittal does not bar a conviction on this count.  In United States v. Powell, 469 U.S. 57, 69 (1984), the Supreme Court noted that while the defendant's conviction of unlawful use of a communication facility was inconsistent with her acquittal on the conspiracy to possess cocaine and the possession of cocaine charges, "there is no reason to vacate [defendant's] conviction merely because the verdicts cannot rationally be reconciled."  Powell discussed the dangers of speculating about the jury's reasoning, noting that the jury could have reached a conclusion of guilty on the communication facility offense, and then "through mistake, compromise, or lenity, arrived at an inconsistent conclusion" on the conspiracy offense.  Id. at 65.  Thus, even though Wilson was acquitted of conspiracy, a conviction for the unlawful use of a communication facility was not foreclosed.

Evidence introduced at trial sufficed for a rational jury to
find beyond a reasonable doubt the essential elements of this
offense.  The evidence when viewed most favorably to the jury's
guilty verdict certainly demonstrated that Wilson knowingly used
a telephone with the intent to facilitate the commission of a
drug offense.  According to Wood, Wilson contacted "L" by
telephone and asked "L" to come cook his powder cocaine into
crack cocaine on February 14, 2001.  (Trial Tr., Feb. 28, 2007
p.m. at 926-28.)  Browne was the person known as "L", and he
testified that Wilson called and stated that he needed more
cocaine.  (Trial Tr., Mar. 5, 2007 a.m. at 1416.)  Browne later
picked up money from Wilson, purchased ninety-three grams of
cocaine powder, and delivered this cocaine to Wilson.  (Id. at
1429-34.)  Browne watched an unidentified person cook the cocaine
into crack, saw Wilson sell Wood twenty-three grams of crack for
$1,200, and received $200 from the sale of the crack to Wood.
(Id.)  Browne also testified that on other occasions he had
obtained powder cocaine for Wilson.  (Id. at 1385-94, 1429-30.)

Despite the acquittal, there was also sufficient evidence
for a jury to conclude that a conspiracy to distribute or possess
with intent to distribute cocaine and crack cocaine existed.  The
government "must show an agreement or mutual understanding
between at least two people to violate narcotics laws, and
knowing and intentional participation in the conspiracy."  United

-17-

States v. Davis, 402 F. Supp. 2d 252, 258 (D.D.C. 2005).  United
States v. Simmons, 431 F. Supp. 2d 38, 49-50 (D.D.C. 2006), found
that because sufficient evidence existed to support the jury's
guilty verdict on a charge of narcotics conspiracy, there was
necessarily sufficient evidence to establish that narcotics
conspiracy as the underlying offense for an unlawful use of a
communications facility conviction.  Here, numerous witnesses,
including Browne, Wood, White, Irving, and Parson, testified that
Wilson sold crack cocaine in Congress Park during the relevant
period.  Keith Barnett, Kairi Kelliebrew, and Bobby Capies
testified that Wilson cooperated with other conspirators to sell
crack in Congress Park by participating in a method of sharing in
the proceeds from sales of crack cocaine they called "doors" or
"uno, dos, tres."  (See Trial Tr., Apr. 18, 2007 a.m. at 7555-56;
Apr. 2, 2007 p.m. at 5336-37; May 7, 2007 a.m. at 10164.)  Thus,
there was sufficient evidence for a jury to conclude that Wilson
knowingly used a telephone to facilitate the commission of the
offense of conspiracy to distribute or possess with intent to
distribute cocaine and crack cocaine.

 C. Aiding and abetting armed first degree murder
   conviction

  The jury also convicted Wilson of Counts 31 and 33 under the
D.C. Code for aiding and abetting in the armed first degree
murders of Ronnie Middleton and Sabrina Bradley on or about
August 17, 1998.  Proof of aiding and abetting under D.C. Code

-18-

§ 22-1805 "requires the Government to demonstrate that (1) an offense was committed by someone; (2) the accused assisted or participated in its commission; and (3) the participation was with guilty knowledge." Simmons, 431 F. Supp. 2d at 48.  Armed first degree murder requires that the government prove that a person caused the death of the decedent, that he did so with the specific intent to kill the decedent, that he did so after premeditation and deliberation, and that at the time of the offense, the person was armed with a firearm. Criminal Jury Instructions for the District of Columbia §§ 4.201, 8.101 (5th ed. revised 2009); see also D.C. Code §§ 22-2101, 4502.

There was sufficient evidence for a jury to find that Wilson aided and abetted in the armed first degree murder of Bradley and Middleton.  Bobby Capies testified that he and others in Congress Park believed that Middleton, a member of the 1-5 Mob and an associate of a man named Tommy Edelin, killed Doleman (Trial Tr., Mar. 29, 2007 p.m. at 5081, 5084), and that Wilson had expressed a desire to retaliate against Middleton for Doleman's death. (Id. at 5095.)  Capies also testified about a conversation he had with Wilson regarding Wilson's involvement in the Middleton and Bradley murders.  According to Capies, Wilson said that on the night of the murders, he was driving a car with Roberson and Draine as passengers when they saw Middleton sitting in his Ford Bronco.  (Trial Tr., Apr. 2, 2007 a.m. at 5138, 5145.)  Wilson

-19-

then drove to Roberson's house to get a .9mm Glock and then
returned to where Middleton had parked.  (Id. at 5138-40.)
Roberson got out of the car and shot at Middleton's Bronco.
During the shooting, Teeny Man jumped out of one of the Bronco's
windows and ran.  Wilson claimed that he was unaware that Bradley
was in Middleton's vehicle before Roberson started shooting and
that Bradley was not supposed to be with Middleton.  (Trial Tr.,
Mar. 29, 2007 p.m. 5112-17.)

Kairi Kelliebrew testified that Antwaun Ball and Joseph
Jones were associates of Wilson's, that they were angry at Tommy
Edelin because "Tommy had [Doleman] killed," and that Wilson was
close friends with Doleman's brother, Truck.  (Trial Tr., May 8,
2007 p.m. at 10457-58.)  Kelliebrew also testified about a
conversation he had with Wilson about the Middleton and Bradley
murders.  (Id. at 10459-61.)  According to Kelliebrew, Wilson
received a telephone call informing him of Middleton's location.
Wilson drove Roberson and Draine to where Middleton was located.
Roberson and Draine "jumped out" of the car, "wore them out,
[and] jumped back in" the car.  (Id.)  Kelliebrew also testified
that Wilson said he did not know at the time of the shooting that
Bradley was in the vehicle with Middleton.  (Id.)

Torran Scott also testified about Wilson's involvement in
the Bradley and Middleton murders.  Scott testified that Bradley
was in a relationship with Middleton, and that he, Scott, had

-20-

seen Bradley in Middleton's Bronco on previous occasions. (Trial
Tr., June 12, 2007 p.m. at 15102-03.)  Soon after the murders,
Wilson and Roberson went to Scott's home and Wilson appeared to
be surprised upon learning that Bradley had been in Middleton's
Ford Bronco.  (Trial Tr., June 13, 2007 p.m. at 15354-55.)
Wilson and Roberson later visited Scott again at his home and
both stated that they did not know that Bradley had been in
Middleton's Bronco.  (Trial Tr., June 12, 2007 p.m. at 15121;
June 13, 2007 a.m. at 15161.)  A few days after the murders,
Wilson told Scott that the police had questioned him about the
murders.  Wilson needed Scott's help because Wilson had told the
police that he was with Scott at the time of the shooting.
(Trial Tr., June 13, 2007 a.m. at 15169.)

     Moreover, Renne Cottingham's gripping testimony bore on
Wilson's conviction on Counts 31 and 33.  Wilson dated
Cottingham's daughter from the time her daughter was fourteen
until she was seventeen.  (Trial Tr., June 13, 2007 p.m. at
15367-68.)  Cottingham described Wilson as "like a son to me[,]"
and that he would sometimes address her as "Mom."  (Id. at
15369.)  After Wilson and her daughter stopped dating, Cottingham
maintained a relationship with him, cooking for him, caring for
his dog, and even grooming his hair.  (Id. at 15370.)  She
testified that the day after the murder of Bradley and Middleton,
Wilson appeared upset and stated to her that "she shouldn't have

-21-

been there.  I killed her." (Trial Tr., June 13, 2007 p.m. at
15378.)  Cottingham testified that Wilson described what had
happened on the night of the murders, stating that he was with
other people when the shooting occurred and that the female
victim was with two men at the time of the shooting, one of whom
died and one of whom "jumped out the window and ran." (Id. at
15379, 15382-83.)

Finally, Patrice Johnson testified that on the night of the
murders, she saw Teeny Man running away from her home, and that a
few minutes later Teeny Man knocked on her door in a nervous
state, asked Johnson if she had talked to Bradley, and told
Johnson to call Bradley's home. (Trial Tr., June 7, 2007 a.m. at
14554-60, 14579-80.)  After Johnson was unable to reach Bradley
by telephone, Teeny Man told Johnson that he was in a vehicle
with Middleton and Bradley, that two masked men started shooting
at the vehicle, and that he had jumped out. (Id. at 14580-83.)

While Wilson challenged the credibility of these witnesses
and presented a different theory for the Bradley and Middleton
murders, the evidence presented allowed a reasonable jury to
conclude that Roberson killed Middleton and Bradley, and that
Wilson knowingly assisted and participated in the armed first
degree murders by knowingly driving Roberson to retrieve a murder
weapon and driving him back to the victims to carry out the

-22-

murder.  Wilson's motion for judgment of acquittal will be denied
as to all counts on which the jury convicted him except Count 11.

II.  MOTION FOR A NEW TRIAL ON COUNTS 31 AND 33

Wilson also moves for a new trial on Counts 31 and 33.[4]
Under Federal Rule of Criminal Procedure 33, a court may "'vacate
any judgment and grant a new trial if the interest of justice so
requires.'"  United States v. Howard, 267 F. Supp. 2d 1, 3
(D.D.C. 2003) (quoting Fed. R. Crim. P. 33(a)).  A "[c]ourt
evaluates a Rule 33 motion from a different vantage point than
[the one from which] it evaluates a Rule 29 Motion for Judgment
of Acquittal."  United States v. Edmonds, 765 F. Supp. 1112, 1118
(D.D.C. 1991).  "In [assessing] a Rule 33 motion for a new trial
. . . [a] [c]ourt need not accept the evidence in the light most
favorable to the government, and the [c]ourt may weigh the
testimony and may consider the credibility of the witnesses."
Id.  "Even where errors occur, a new trial should be granted only
if the moving party has shown that the error was substantial, not
harmless, and that the error affected the defendant's substantial

---

[4] Wilson argues in the alternative that he is entitled to
dismissal of Counts 31 and 33.  However, a dismissal is not the
proper remedy for a Brady violation.  United States v. Evans, 888
F.2d 891, 897 n.5 (D.C. Cir. 1989).  Similarly, while a court's
supervisory powers might allow it to dismiss an indictment as a
sanction for the government's misbehavior with respect to a Napue
violation, the more appropriate remedy for such a violation is a
new trial.  United States v. Darui, 614 F. Supp. 2d 25, 37-38
(D.D.C. 2009).  Thus, the alleged Brady and Napue violations will
be analyzed under only the Rule 33 standard for a new trial.

-23-

rights." United States v. Walker, 899 F. Supp. 14, 15 (D.D.C.

1995) (internal quotation marks omitted).

    A.  Brady violations

    Under Brady, the government is required to disclose all

evidence in its possession that is favorable to a defendant and

"material either to guilt or to punishment."  373 U.S. at 87.

There are three components of a true Brady violation: "[t]he

evidence at issue must be favorable to the accused, either

because it is exculpatory, or because it is impeaching; that

evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued."  Strickler v.

Greene, 527 U.S. 263, 281-82 (1999).

    "A defendant asserting a *Brady* violation as grounds for a

new trial under Rule 33 must establish the materiality of the

evidence to show that its suppression was prejudicial."  United

States v. Cook, 526 F. Supp. 2d 10, 14 (D.D.C. 2007) (internal

quotation marks omitted).  Not all evidence helpful to a

defendant is material.  Kyles v. Whitley, 514 U.S. 419, 436-37

(1995).  "[E]vidence is material only if there is a reasonable

probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different.  A

'reasonable probability' is a probability sufficient to undermine

-24-

confidence in the outcome."[5]  United States v. Morrow, 412 F.

Supp. 2d 146, 158 (D.D.C. 2006) (quoting United States v. Bagley,

473 U.S. 667, 682 (1985)).  In order to be material under Brady,

the evidence must have been admissible at trial.  United States

v. Derr, 990 F.2d 1330, 1335-36 (D.C. Cir. 1993).

    1.    Police reports from the Doleman murder
          investigation

    Wilson asserts that the government failed to disclose police

reports from the investigation into Maurice Doleman's death.  The

four reports at issue summarize police interviews with different

witnesses who named Asay, Middleton, Cooler, and Shawn as various

individuals who might have killed Doleman.  (Def.'s Mot., Ex. 3

at 002928-32.)  At trial, the government argued that Wilson

believed that the members of the 1-5 Mob were responsible for the

death of Doleman, that there was a feud between the 1-5 Mob and

the Congress Park group, and that Wilson sought revenge by

killing Middleton.  Wilson contends that the undisclosed evidence

provides "multiple alternative theories for the death of Maurice

Doleman" and that these "factual scenarios rebut[] the motive

_____

        [5] An inquiry based on materiality is different from one
based on sufficiency of the evidence.  See United States v.
Smith, 77 F.3d 511, 512-13 (D.C. Cir. 1996) (noting that
materiality is not "gauged by a sufficiency-of-the-evidence
test").  The "'focus is on the potential impact that the
undisclosed evidence might have had on the fairness of the
proceedings rather than on the overall strength of the
government's case.'"  United States v. Oruche, 484 F.3d 590, 597
(D.C. Cir. 2007) (quoting United States v. Cuffie, 80 F.3d 514,
517 (D.C. Cir. 1996)).

evidence for the shooting of Ronnie Middleton aka Squid (and his girlfriend Sabrina Bradley) [which was premised on the theory] that David Wilson was looking for and trying to kill Ronnie Middleton for years because [Middleton] had killed Maurice [Doleman], Mr. Wilson's alleged play brother." (Def.'s Mot. at 2-3.)

While the government asserts that these reports cannot be Brady information because they refer to "nothing more than street rumor" (Gov't Opp'n to Def.'s Mot. for a New Trial & J. of Acquittal at 4), police reports identifying other possible leads or suspects could constitute Brady material.  See United States v. Andrews, 532 F.3d 900, 906 (D.C. Cir. 2008) (stating that the notes underlying an interview report might be Brady material because the notes could provide a defendant with information and leads).  Withheld information that weakens the government's motive theory is potentially exculpatory under Brady.  See Mendez v. Artuz, 303 F.3d 411, 414 (2d Cir. 2002).  Evidence that another individual had a motive to commit the crime at issue may weaken the inference that the defendant was involved in the offense.  United States v. Zuno-Acre, 44 F.3d 1420, 1426 (9th Cir. 1995).  In Zuno-Acre, the defendant argued that evidence showing that another drug cartel member had a motive to kill a federal agent because the agent was romantically involved with that cartel member's girlfriend and that the death was unrelated

-26-

to the agent's investigation of the cartel's narcotics operations
would weaken the inference that the defendant was involved in the
murder even though he was a cartel member.  Id.  However, the
court concluded that the alternative evidence of motive did not
create a reasonable probability that the jury would have reached
a different result because there was substantial evidence showing
that the victim was tortured over a two-day period only to
uncover his knowledge of the cartel's drug operations.  Id. at
1430.  In Mendez, the government withheld evidence documenting
that another suspect had been questioned by the police and had
admitted to taking out a contract on the victim's life because
the suspect believed that the victim had stolen money from him.
303 F.3d at 412-13.  Mendez found that this evidence was material
under Brady and was wrongfully withheld, noting that it
"supplie[d] a possible alternative perpetrator *and* motive" while
the government's theory of motive was "weak and unlikely."  Id.
at 413.

Here, three of the police reports raise theories that
someone other than Middleton killed Doleman, while one report
directly supports the government's theory that Middleton murdered
Doleman.  (See Def.'s Mot., Ex. 3 at 002928-32.)  Wilson could
have sought admission of evidence that someone other than
Middleton murdered Doleman in an attempt to argue that Wilson
could not have had a motive to murder Middleton.  Thus, these

-27-

police reports could constitute favorable <u>Brady</u> evidence,
although their character as exculpatory is not obvious.  Wilson
was not charged with or convicted of Doleman's death in this
case.  The police reports do not directly exonerate Wilson or
lessen the force of the corroborated and credible testimony
regarding admissions Wilson made about his involvement in these
murders to others like Kelliebrew, Scott, and Cottingham.[6]
Unlike in <u>Zuno-Acre</u> or <u>Mendez</u>, which involved withheld evidence
of others' motives to commit the crimes in question, the police
reports at issue in this case are directly connected to Doleman's
death, not the Bradley and Middleton murders.  Evidence of other
suspects who might have killed Doleman is collateral to whether
Wilson believed that Middleton killed Doleman, had his own motive
to kill Middleton, or participated in the homicides.  Because the
evidence does not make it less likely that Wilson participated in
the murders, there is no reasonable probability that the result
of the proceeding would have been different had that evidence
been disclosed to the defense.  See <u>United States v. Fields</u>,
Criminal Action No. 98-0071 (TFH), 2006 WL 148739, at *3 (D.D.C.
Jan. 18, 2006) (rejecting <u>Brady</u> claim in part because the
evidence, which implicated a third person in the conspiracy only

---

[6] Testimony from Cottingham was particularly compelling
given her relationship with Wilson and the fact that she, unlike
the other three witnesses, was not testifying under any deal she
had cut with the government.  (Trial Tr., June 13, 2007 p.m. at
15385-87.)

-28-

and did not "exonerate or minimize" the defendant's role, was not

exculpatory).[7]

Wilson also contends that the police reports pertaining to

the Doleman homicide could have been used to "impeach[] what the

government witnesses testified to as historical facts in this

case[.]" (Def.'s Reply to Gov't Opp'n to Mot. for a New Trial at

3.)  Evidence that impeaches a government witness is often

favorable to a defendant, as "making the government's case less

credible . . . enhances the defendant's chances of acquittal."

In re Sealed Case No. 99-3096, 185 F.3d 887, 893 (D.C. Cir.

1999).  For example, in United States v. Smith, 77 F.3d 511, 516

(D.C. Cir. 1996), the court found the government's failure to

disclose an agreement to dismiss charges against a cooperator as

part of a plea agreement to be a Brady violation that warranted a

new trial.  Smith concluded that the confidence in the jury's

verdict was undermined because "[a]rmed with full disclosure,

defense counsel could have pursued devastating cross-examination,

challenging [the witness'] assertion that he was testifying only

to 'get a fresh start' and suggesting that the witness might have

deliberately concealed the other favors from the Government that

were not in the written plea agreement."  Id.  Likewise, United

---

[7] Wilson cites additional evidence that the government
failed to disclose that named additional suspects in the Doleman
murder other than Middleton.  (See Def.'s Suppl. to Mot. for
Consideration of Still Pending Mots., for a New Trial and for J.
of Acquittal at 3; Ex. 10.)  This evidence similarly is not
plainly exculpatory.

States v. Cuffie, 80 F.3d 514, 518 (D.C. Cir. 1996), found that

evidence that a witness had lied under oath in a previous court

proceeding involving the same drug conspiracy was material

because such evidence was "almost unique in its detrimental

effect on a witness' credibility."

However, unlike in Smith and Cuffie, here it is unclear whom

Wilson would have sought to impeach with the undisclosed

evidence.  Under the Federal Rules of Evidence, a party may

attempt to impeach a witness through evidence of character or

conduct, of conviction of a crime, or of prior inconsistent

statements.  See Fed. R. Evid. 608, 609, 613.  "[W]itnesses are

not impeached by prior inconsistent statements of *other*

witnesses, but by their *own* prior inconsistent statements."

United States v. Tarantino, 846 F.2d 1384, 1416 (D.C. Cir. 1988).

Several witnesses testified about the Doleman murder and the feud

between the 1-5 Mob and the Congress Park group including James

Faison, Kelliebrew, Capies, and Damien Green.  With the

undisclosed reports, Wilson may have been able to cross-examine

these witnesses about feud details the reports revealed that

varied from those offered by the witnesses.  However, Wilson

could not have impeached the witnesses since the suppressed

reports do not contain prior statements of these witnesses.  They

contain only summaries of interviews of other witnesses by police

investigators.

-30-

### 2. Giannakoulias' report from the Middleton and Bradley murders

Wilson argues that the government's failure to turn over Detective Konstantinos Giannakoulias' report until after the trial began violated <u>Brady</u>.  (Def.'s Mot. for a Mistrial or Dismissal of Counts 31, 32, 33, 34 at 3-4.)  Giannakoulias' report summarized a conversation with Bradley Carter.  According to Carter, Michael Smith stated that Aman Ball and Joseph Jones killed Middleton and Bradley.  (<u>Id.</u>, Ex. 1 at 1.)  Evidence that Ball and Jones were the actual shooters contradicts the government's theory that Roberson shot Middleton and Bradley.  The report should have been disclosed before trial.  The report, though, does not necessarily exculpate Wilson.  The government's theory was not that Wilson was a shooter, but that Wilson aided and abetted the shooter by driving the shooter to and from the murder scene.[8]  Giannakoulias' report may directly discredit the government's theory as to who shot Middleton and Bradley, but it less directly undercuts the government's theory that Wilson participated in the shootings.

---

[8] Wilson also argues that the government should have disclosed Detective Mike Will's June 14, 1999 running resume reflecting his interview of a confidential source regarding a recorded conversation the source had with one of the perpetrators of the Middleton and Bradley murders.  (Def.'s Suppl. at 2-3.)  The report summarizes a conversation the informant had with Roberson, in which Roberson admitted to being the trigger-man in the murder.  (Gov't Suppl. Opp'n, Ex. B.)  This evidence is not exculpatory in any respect, as it is entirely consistent with the government's theory that Wilson was the driver and Roberson fired the gun.

-31-

When the government makes a disclosure that is late but is still during trial, "'the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result' and not just that the evidence was material." Andrews, 532 F.3d at 907 (quoting United States v. Dean, 55 F.3d 640, 663 (D.C. Cir. 1995)). "'[A] new trial is rarely warranted based on a Brady claim where the defendant[] obtained the information in time to make use of it.'" Id. (second alteration in original) (quoting United States v. Wilson, 160 F.3d 732, 742 (D.C. Cir. 1998)). To determine whether a defendant received a late disclosure in time to make use of it at trial, the court can consider the volume of the undisclosed evidence, whether counsel had the opportunity to request a continuance, and whether there were opportunities for a defendant to use this evidence effectively later at trial. Andrews, 532 F.3d at 907-08. In Andrews, the court rejected the defendant's argument that he did not have "enough time to use the material properly, to build a responsive defense theory, or effectively impeach" a witness where the new evidence was "hardly voluminous" at six pages long, defense counsel had two opportunities to request a continuance, and defense counsel received the evidence before the defense case began. Id. at 907. Likewise, in Wilson, the court denied the defendant's motion for a new trial to remedy late disclosed statements of a witness because the defendant used the statements effectively on cross-examination instead of requesting additional

-32-

time "to determine whether there was a viable alternative defense" based on the new evidence.  160 F.3d at 742.  The court concluded that the defendant had "fail[ed] to show, beyond vague generalities, how the trial would have been different with earlier knowledge of [the witness'] statements."  Id.

Wilson asserts that he did not have time to investigate the facts contained in the FBI report once trial started, that witnesses had already testified who would have been confronted with the police report, and that he was unprepared to cross-examine witnesses about Jones' and Aman Ball's involvement in the shooting.  (Def.'s Mot. for a Mistrial or Dismissal of Counts 31, 32, 33, and 34 at 6-7.)  Wilson also asserts that he was unable to "weave Mr. Carter's statement into his theory of the defense for presentation to the jury during opening statements and during the cross-examination[s] of . . . Mr. Capies[] and Mr. Kelliebrew."  (Def.'s May 28, 2007 Reply in Supp. of Mot. for a Mistrial at 2.)

The government, although untimely, disclosed Giannakoulias' report approximately two months before the close of the government's case-in-chief, and Wilson had opportunities to use the evidence and call witnesses.  Giannakoulias' report was two pages long and the trial continued for several more months after disclosure.  Wilson's counsel met with Carter to discuss Giannakoulias' report, cross-examined Carter at trial about whether he had previously provided information to the police

-33-

about Middleton's death, attempted to refresh Carter's
recollection with Giannakoulias' report, and reserved the right
to recall Carter later in the trial.  (Trial Tr., May 31, 2007
a.m. at 13640-44.)  Wilson sought also to cross-examine Carter on
the contents of Giannakoulias' report, but the government's
objection that such testimony was outside the scope of the direct
examination was sustained.[9]  (Id. at 13640-41.)  Wilson asserts
that he would have used the report during Kelliebrew's and
Capies' cross-examinations.  While Wilson could have incorporated
information from Giannakoulias' report into his cross-examination
of Kelliebrew and Capies, Wilson did not seek to recall
Kelliebrew or Capies to testify, and the report summarizing
statements by Carter could not impeach testimony by Kelliebrew or
Capies.  Detective Giannakoulias also testified at trial as a
witness for Antwuan Ball, but Wilson did not question

---

[9] Wilson also argues that the government failed to disclose
evidence that would have corroborated Carter's statements to
Giannakoulias, namely an investigative supplemental police report
that memorialized Patrice Johnson as having identified Teeny
Man's presence at the murder scene.  (Def.'s Suppl. to Mot. for
Consideration of Still Pending Mots. for a New Trial and for a J.
of Acquittal at 1.)  It is unclear how this evidence would have
corroborated what Wilson has identified as the crucial disclosure
in the Giannakoulias report -- that Carter believed that Aman
Ball and Jones killed Middleton.  Even if evidence corroborating
one part of Carter's account could also be considered to
corroborate separate and independent parts of his account,
however, the evidence likewise would have been inadmissible as
outside the scope of the direct examination.  The government's
failure to disclose the investigative supplemental police report
does not warrant a new trial for Wilson as a remedy, since
evidence must have been admissible to be material under Brady.
See Derr, 990 F.2d at 1335-36.

-34-

Giannakoulias.  (Trial Tr., Aug. 22, 2007 p.m. at 19209.)

Despite the government's late disclosure of Giannakoulias'

report, Wilson did use it to investigate facts and question

witnesses, and had a sufficient opportunity to seek to recall

other witnesses for further questioning.  Wilson has not shown

that this late disclosure undermined confidence in the fairness

of the trial, or that an earlier disclosure would have changed

the trial's result with respect to Counts 31 and 33.

          3.   Bobby Capies impeachment evidence

     Wilson also contends that the government failed to disclose

material that he could have used to impeach witness Bobby Capies

at trial.  Capies testified that in 1998, he had a conversation

with Wilson in which Wilson admitted involvement in the Middleton

and Bradley murders.  (Trial Tr., Mar. 29, 2007 p.m. at 5112-17.)

Capies also testified that although he was cooperating with

Detective Mike Will of the Metropolitan Police Department

beginning in 1999, Capies did not trust Will and ultimately cut

off communication with him.  (Trial Tr., Apr. 3, 2007 a.m. at

5429-30, 5444-46.)  Wilson argues that the government should have

disclosed a summary of a 1999 police interview with Capies which

makes no mention of Capies speaking directly to Wilson when

discussing the murders of Middleton and Bradley, police notes

that Wilson claims were written during an interview of Capies

that make no mention of Capies discussing the murders with

Wilson, and sealed Superior Court records purportedly about

-35-

Capies' cooperation with law enforcement in regard to felony

charges in Superior Court.  (Def.'s Suppl. to Mot. for

Consideration of Still Pending Mots. for a New Trial and for a J.

of Acquittal ("Def.'s Suppl.") at 2.)

    The interview summary is favorable to Wilson and is <u>Brady</u>

material.  The summary makes no mention of Wilson's involvement

in the Middleton and Bradley murders.  However, Capies testified

that he learned of Wilson's involvement in 1998, before he went

to the police to tell what he knew about the murders.  Since the

summary suggests that Capies did not mention in the interview the

1998 conversation with Wilson, Wilson could have impeached Capies

with this omission.  Even if Capies had been successfully

impeached, the admissions Wilson made about his involvement in

these murders to Kelliebrew, Scott, and Cottingham -- virtually

identical in material respects to what Capies revealed -- defeat

any reasonable probability that the result of the proceeding

would have changed.

    Nor does the other evidence Wilson cites warrant the relief

he seeks.  The interview notes that Wilson speculates reflected a

police interview of Capies (<u>see</u> Def.'s Suppl. at 2 (citing notes

from interviews "which at least <u>appear</u> to be notes of interviews

of Bobby Capies") (emphasis added)) in fact relate to an

interview of another witness who did not testify in the trial.

(Gov't Suppl. Opp'n at 4-5.)  Moreover, the sealed Superior Court

records Wilson claims the government blocked access to were

-36-

Capies' juvenile records.  Wilson moved in the Superior Court to

obtain access to them, and the Superior Court denied the motion.

(Trial Tr., Apr. 4, 2007 a.m. at 5763-64.)  The government,

therefore, did not suppress this information.

      4.   Thomas Webb impeachment evidence

     Wilson argues that the government failed to disclose two

statements by Metropolitan Police Department officers that he

could have used to impeach the testimony of Detective Thomas Webb

at trial.  (Def.'s Suppl. at 3.)  Webb testified that he spoke

with a wounded Middleton the night of his murder after Middleton

drove to Webb's precinct to escape his attackers, where Middleton

stated that the shooting took place at 1527 Congress Place.

(Trial Tr., June 7, 2007 p.m. at 14649, 14681.)  Wilson contends

that the government should have disclosed the statements of

Officers James Craig and L. West.  Craig's states that Craig ran

out to the Bronco where the driver was fading in and out of

consciousness, Craig ran back inside to retrieve a flashlight,

and he returned by the time the Fire Department had arrived.  It

also contained the following question and answer: "Q: Was the

driver of this vehicle able to say anything to you at all, or did

you see or hear him saying anything to anyone else?  A: No."

West's says Webb questioned the driver who stated that the attack

took place at 1523 Congress Street.  (Def.'s Suppl., Ex. 8; Ex.

9.)

The information in the two statements was in theory favorable to Wilson.  Wilson might have been able to elicit testimony from Craig that he did not observe Middleton speaking to any officer on the scene, potentially impeaching Webb's testimony that he spoke with Middleton.  That is no certainty since the question Craig answered was compound, and it is unclear to which of the three parts of the question his answer was directed.  Nor is it clear that his statement necessarily would be impeaching since Craig admitted being absent from the driver for some period of time.  Wilson also could have called West to testify that he heard Middleton tell Webb that the attack took place at 1523 Congress Street, not 1527 Congress Place as Webb testified.  Eliciting this minor discrepancy in an insignificant detail would be a dubious tactic since it would also eviscerate any impeachment of Webb's testimony that he interviewed Middleton.  In any event, these non-disclosures do not require the remedy of a new trial that Wilson seeks.  Because Webb testified that Middleton stated that he did not know "who did this" (Trial Tr., June 7, 2007 p.m. at 14662), his testimony did not connect Wilson to the shooting.  The jury would not have concluded on the basis of Webb's testimony that Wilson aided and abetted the murders.  Wilson's inability to undermine Webb's credibility by impeaching him with information gleaned from the two undisclosed reports would not have had any effect on the verdict with respect to Counts 31 and 33 or undermined confidence

-38-

in the fairness of the trial.  Accordingly, Wilson has not shown
that he suffered prejudice from this non-disclosure.

     5.   Cumulative effect of alleged <u>Brady</u> violations

    When there are multiple <u>Brady</u> violations alleged, a court
should examine "the cumulative effect of all such evidence
suppressed by the government" and not make "independent
materiality evaluations" only.  <u>Kyles</u>, 514 U.S. at 421, 441; <u>see
also</u> <u>United States v. Lloyd</u>, 71 F.3d 408, 412 (D.C. Cir. 1995).
Materiality of the suppressed evidence is to be considered in
light of the entire trial record.  <u>United States v. Bowie</u>, 198
F.3d 905, 912 (D.C. Cir. 1999).

    Even considering the cumulative effect of the alleged <u>Brady</u>
violations, there is no reasonable probability that the result
would have been different.  The police reports from the Doleman
investigation -- and any other evidence that there were suspects
other than Middleton for the Doleman murder -- while helpful, do
not directly contradict the evidence about whom Wilson held
responsible for Doleman's death.  Nor does Wilson show that
suppression of the police reports "substantially affected the
efforts of defense counsel to impeach" the witnesses who
testified that Wilson was involved in Bradley and Middleton's
murders, "thereby calling into question the fairness of the
ultimate verdict."  <u>United States v. Emor</u>, 573 F.3d 778, 782
(D.C. Cir. 2009) (quoting <u>Cuffie</u>, 80 F.3d at 517).

-39-

Giannakoulias' report was disclosed approximately two months before the close of the government's case-in-chief, and Wilson had ample opportunity to use this evidence at trial.  The evidence that might have corroborated Carter's account as described in Giannakoulias' report would not have been admissible even if it had been disclosed.  Impeaching Capies based on his omission of Wilson in his police interview could have lessened the impact of Capies' testimony but not the three other credible witness accounts of Wilson admitting his involvement in the murders.  Although Wilson might have been able to impeach Webb based on the undisclosed police reports, he would have been able to impeach him only as to minor collateral details of his testimony, testimony that could not have provided a basis for the jury's verdict on Wilson's aiding and abetting first degree murder counts in any event.

In Oruche, the court found no material violation in part because the suppressed evidence had a negligible effect and there was "very strong" evidence implicating the defendant.  484 F.3d at 599-600.  As in Oruche, there was compelling evidence here showing that Wilson had a motive to kill Middleton, and that he drove the actual shooter who killed Middleton and Bradley to and from the scene.  There is not a reasonable probability that, in totality, the suppression of the favorable evidence cited by Wilson would have affected the outcome of the trial in light of the substantial evidence that he played a role in the shootings.

Wilson's motion for a new trial based on <u>Brady</u> violations therefore will be denied.

    B. <u>False testimony</u>

    Wilson also moves for a new trial on the ground that the government sponsored and failed to correct Damien Green's false testimony.  The government may not knowingly use false testimony to obtain a conviction.  <u>Napue</u>, 360 U.S. at 269.  "'[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  <u>United States v. Gale</u>, 314 F.3d 1, 3 (D.C. Cir. 2003) (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976)); <u>see also</u> <u>United States v. Quinn</u>, 537 F. Supp. 2d 99, 120 (D.D.C. 2008) ("Because the integrity of our justice system relies on the presentation of truthful evidence for a jury to evaluate, 'the prosecution's knowing use of false testimony entails a veritable hair trigger for setting aside the conviction.'" (quoting <u>Gale</u>, 314 F.3d at 4)).  To demonstrate that the court should set aside a conviction on these grounds, a "defendant must show that (1) the evidence was actually false; (2) the prosecution knew or should have known that the testimony was false; and (3) the false testimony was material." <u>Fields</u>, 2006 WL 148739, at *2.  In determining materiality, a court must assess whether "'the false testimony could in any reasonable likelihood have affected the judgment of the jury.'"  <u>United</u>

-41-

States v. Burch, 156 F.3d 1315, 1329 (D.C. Cir. 1998) (quoting
Giglio v. United States, 405 U.S. 150, 154 (1972)).  While one
court has required the allegedly false statement to be the result
of a "willful intent to provide false testimony, rather than as a
result of confusion, mistake or faulty memory," United States v.
Edmonds, 870 F. Supp. 1140, 1146 (D.D.C. 1994), other courts have
required only that the evidence be false, regardless of whether
such evidence resulted from confusion or mistake.  See, e.g.,
Drake v. Portuondo, 553 F.3d 230, 242 n.7 (2d Cir. 2009); United
States v. Cargill, 17 F. App'x 214, 224 (4th Cir. 2001).

     Wilson argues that Green's testimony at trial was
inconsistent with his prior testimony about two events.  First,
Green testified here that he was with Mussy, his cousin Anthony,
and Brad by Monkey Mark's house when Anthony started shooting at
Tweety, Wilson, and Joonie.  (Trial Tr. June 5, 2007 p.m. at
14186-87.)  By comparison, in a trial captioned United States v.
Edelin, Green testified that Anthony and Muncee told him about a
time when Anthony shot at Pete, Tweety, and Joonie.  (Def.'s Mot.
for a Mistrial, Ex. 1 at 13974-76.)  Wilson asserts that Green
changed his testimony in this case by substituting Wilson for
Pete and stating that he personally witnessed the incident.
(Def.'s Mot. for a Mistrial at 2.)

     Next, Green testified at trial about seeing Middleton shoot
at Tweety and seeing Wilson run away while holding a gun.  (Trial
Tr., May 31, 2007 p.m. at 13820).  On December 5, 1997, Green

-42-

testified before a grand jury about an incident where he saw Middleton shoot at Tweety and saw Cootie running away. (Def.'s Suppl. to Mot. for a Mistrial, Ex. 3 at 32.) Wilson argues that Green is referring to the same incident on both occasions, but described the event differently each time. In particular, Green mentioned the involvement of Cootie and Spook before the grand jury, while in this case he mentioned Wilson. (Def.'s Suppl. to Mot. for a Mistrial at 1.) Wilson was not allowed to re-cross Green, and Wilson now contends that the government failed to correct Green's erroneous testimony and that the "the jury [was] left thinking that Mr. Green testified consistently at the Edelin trial[,] while the truth is that he did not." (Def.'s Mot. for a Mistrial at 2.)

Wilson has not established conclusively that Green testified falsely. He has not shown that the incident Green testified about in Edelin involving Pete, Tweety, and Joonie is the same incident described at trial involving Wilson, Tweety, and Joonie. Although there are factual similarities between the incidents, Wilson offers no basis for adopting an assumption that Green was describing the same event, and factual differences suggest these may have been different events. For example, Green testified at trial that he witnessed Middleton shooting at Wilson while "standing in the cut by Monkey Mark['s] house." (Trial Tr., June 5, 2007 p.m. at 14186.) By comparison, Green testified in Edelin that he was at Mush's house when he heard Anthony shooting

-43-

at Pete and ran down the block toward Anthony. (Def.'s Mot., Ex.
1 at 13976.) When asked at this trial whether he had testified
in Edelin about the Wilson, Tweety, and Joonie incident, Green
initially answered yes (Trial Tr., June 5, 2007 p.m. at 14142-
43), but later asserted twice that he had not discussed the
Wilson, Tweety, and Joonie shooting in Edelin. (Id. at 14144,
14188.)

Furthermore, Green may have described the event where
Middleton fired at Tweety differently at trial than he did before
the grand jury, but Wilson does not assert exactly which
statements were false. Contrary to Wilson's argument that Green
"never referred to Mr. Wilson as Cootie" in this trial (Def.'s
Suppl. to Mot. for a Mistrial at 1), Green stated at trial that
he knew of a person named "Wop," who had a nickname of "Cootie,"
and identified Wilson as Cootie. (Trial Tr., May 31, 2007 p.m.
at 13782-83.)

For the second prong, Wilson contends that the government
knew or should have known that Green's testimony was false.
While the government may have possessed Green's testimony before
the grand jury and from Edelin, Wilson does not offer evidence
that the government knowingly sponsored false testimony. At
best, he has established that the testimony may have been
inconsistent. Mere inconsistency is insufficient to warrant the
relief he seeks. See United States v. Harrison, 103 F.3d 986,
989 (D.C. Cir. 1997) (rejecting the defendant's argument that the

-44-

government relied on perjured testimony because "even if the
testimony is inconsistent, an inconsistency between the grand
jury and trial statements of a witness does not by itself support
an inference that the Government knowingly sponsored false
testimony"); United States v. Martin, 59 F.3d 767, 770 (8th Cir.
1995) (noting that "[a] challenge to evidence through . . . prior
inconsistent statements [is] insufficient to establish
prosecutorial use of false testimony" (internal quotation marks
omitted) (second alteration in original)); Simental v.
Matrisciano, 363 F.3d 607, 615 (7th Cir. 2004) ("[M]ere
inconsistencies in testimony by government witnesses do not
establish the government's knowing use of false testimony."
(internal quotation marks omitted)).

    Even if Green testified falsely, and the government knew
about the false statements, there must also be a reasonable
probability that the false statements could have affected the
judgment of the jury to warrant a new trial.  United States v.
Diggs, 161 F. App'x 7, 8 (D.C. Cir. 2005).  When there is
inconsistent testimony, a court considers the importance of the
testimony to the convictions, United States v. Anderson, 509 F.2d
312, 328 (D.C. Cir. 1974), and the other evidence presented at
trial.  For example, in Burch, 156 F.3d at 1328, the defendant,
who was convicted of crack possession, argued that the government
had a duty to alert the court about a discrepancy between his
accomplice's trial testimony for the government elicited under a

-45-

cooperation agreement and the investigator's debriefing notes
concerning whether the witness received sixty-two grams of crack
from a certain supplier.  <u>Burch</u> concluded that "[e]ven if the
jury had been made aware that [the witness] told the DEA agent
that she had received 62 grams from [a supplier] at some
point[,]" the jury's final verdict was unlikely to have been
influenced because the defendant had already admitted ownership
of this crack, the witness' credibility had already been
"thoroughly compromised by her own admissions of prior drug use
and dealing[,]" and "solid evidence establish[ed] [the
defendant's] guilt."  <u>Id.</u> at 1329.  Likewise, in <u>United States v.
Price</u>, 357 F. Supp. 2d 63, 69 (D.D.C. 2004), the court concluded
that a witness' false testimony about his credentials did not
affect "the judgment of the jury, in light of the other evidence
introduced in the case against the defendant."  Wilson
extensively cross-examined Green about his prior testimony in
<u>Edelin</u> and raised several issues affecting his credibility,
including his cooperation with the government and the benefits he
received, his prior drug use, and his prior involvement in acts
of violence and drug distribution.  (Trial Tr., June 5, 2007 a.m.
at 14092-97; June 5, 2007 p.m. at 14108-16, 14160-66.)  Even if
Wilson had shown that Green testified falsely, these
inconsistencies would not reasonably have affected the jury's
verdict, especially given the substantial evidence that Wilson
had a motive to harm Middleton and was involved in his death.

-46-

Wilson's motion for a new trial based on Green's allegedly false testimony will be denied.

CONCLUSION AND ORDER

The evidence, when viewed in the light most favorable to the verdict, permitted a reasonable jury to find beyond a reasonable doubt the essential elements of all the offenses of which Wilson was convicted except Count 11. No new trial is warranted by the government's failure to disclose potentially favorable evidence since its disclosure would not likely have affected the outcome or fairness of the trial, or by Green's testimony since the testimony was not demonstrably false or material. Accordingly, it is hereby

ORDERED that the defendant's motion [1233] for consideration of still pending motions, for a new trial, and for a judgment of acquittal be, and hereby is, GRANTED with respect to a judgment of acquittal on Count 11, and DENIED in all other respects. The jury's verdict of guilty on Count 11 as to David Wilson is hereby SET ASIDE, and a verdict of not guilty on Count 11 hereby is ENTERED.

SIGNED this 3rd day of July, 2010.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge